## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

MISH INTERNATIONAL MONETARY INC.,
on behalf of itself and
all others similarly situated,

        *Plaintiff*,

    v.

VEGA CAPITAL LONDON, LTD., and JOHN
DOES 1-100,

        *Defendants.*

Case No. 1:20-cv-04577

Hon. Gary S. Feinerman

Magistrate Judge Jeffrey T. Gilbert

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT VEGA CAPITAL LONDON LIMITED'S
## MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT

Michael P. Kelly
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 393-6222
michael.kelly@akerman.com

Joel S. Forman
Meghan K. Boland
AKERMAN LLP
520 Madison Avenue, 20th Floor
New York, NY 10022
(212) 880-3800
joel.forman@akerman.com
meghan.boland@akerman.com

Amy Graham Doehring
AKERMAN LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
amy.doehring@akerman.com

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

BACKGROUND .......................................................................................................................4

    A.    Background for the Events of April 20 ............................................................. 4

    B.    Mish Filed a Conclusory Complaint Seeking to Blame Vega for Any Trading Losses that the Market Suffered on April 20 ...........................................................7

STANDARD OF REVIEW .......................................................................................................8

DISCUSSION ...........................................................................................................................9

I.    Mish's Market Manipulation Allegations Do Not State a Claim .........................................9

    A.    Mish's Section 9(a) Claim Fails to Allege Fraud with Particularity .....................10

    B.    Mish's Section 9(a) Claim Fails to State a Claim Under Rule 8(a) .....................13

        1.    Mish Fails to Allege Facts That Vega or the Traders "Possessed the Ability to Influence Prices" ...............................................15

        2.    Mish Fails to Allege Facts That an "Artificial Price Existed" or That the Traders "Caused an Artificial Price" ......................................16

        3.    Mish Fails to Allege Facts that Vega or the Traders Specifically Intended to Cause an Artificial Price ...................................18

II.    Mish's Section 6(c)(1) Market Manipulation Claim Fails to State a Claim ......................20

    A.    Mish's Section 6(c)(1) and Regulation 180.1 Claims Fail to Allege Fraud with Particularity ..........................................................21

    B.    Mish's Section 6(c)(1) and Regulation 180.1 Claims Fail to Allege Specific Facts Needed to Allege a Plausible Right to Relief ...............22

III.    Mish's Principal-Agent Theory Fails to State a Claim ...................................................23

IV.    Mish's Aiding-and-Abetting Theory Fails to State a Claim ............................................23

V.    Mish Fails to State a Claim Under the Sherman Act .......................................................24

CONCLUSION .......................................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ackerman v. Northwestern Mut. Life Ins. Co.*,
172 F.3d 467 (7th Cir. 1999) ...............................................................................11

*Adams v. City of Indianapolis*,
742 F.3d 720 (7th Cir. 2014) ................................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................... passim

*ATSI Communications v. Shaar Fund, Ltd.*,
493 F.3d 87, 101 (2d Cir. 2007) .........................................................................22

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 554 (2007)................................................................................... passim

*Borsellino v. Goldman Sachs Grp., Inc.*
477 F.3d 502 (7th Cir. 2007) ................................................................................9

*Braman v. The CME Grp., Inc.*,
149 F. Supp. 3d 874 (N.D. Ill. 2015) ..................................................................16

*Brown v. Azar*,
No. 1:20-CV-03702-JPB, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020) ..................5

*Damato v. Hermanson*,
153 F.3d 464 (7th Cir. 1998) ............................................................................. 23

*DH2, Inc. v. Athanassiades*,
404 F. Supp. 2d 1083 (N.D. Ill. 2005) ................................................................21

*Henson v. CSC Credit Servs.*,
29 F.3d 280 (7th Cir 1994) ..................................................................................4

*In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*,
328 F. Supp. 3d 217 (S.D.N.Y. 2018)..................................................................10

*In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*,
560 F. App'x 84 (2d Cir. 2014) .................................................................. passim

*In re Crude Oil Commodity Litig.*,
  No. 06 CIV. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007)..............10, 11,12, 16

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*,
  801 F.3d 758 (7th Cir. 2015) ............................................................................10, 24

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
  213 F. Supp. 3d 530 (S.D.N.Y. 2016)...................................................................10

*In re Rough Rice Commodity Litig.*,
  No. 11 C 618, 2012 WL 473091 (N.D. Ill. Feb. 9, 2012)......................................18

*Ploss v. Kraft Foods Grp.*,
  197 F. Supp. 3d 1037 (N.D. Ill. 2016) ..................................................................21

*Premium Plus Partners, L.P. v. Davis*,
  No. 04 C 1851, 2005 WL 711591 (N.D. Ill. Mar. 28, 2005) ..................................10

*Pugh v. Tribune Co.*,
  521 F.3d 686 (7th Cir. 2008) ..................................................................................5

*Siegel v. Shell Oil Co.*,
  480 F. Supp. 2d 1034 (N.D. Ill. 2007) ..................................................................11

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*,
  366 F. Supp. 3d 516 (S.D.N.Y. 2018).....................................................................23

*U.S. CFTC v. Kraft Foods Grp., Inc.*,
  153 F. Supp. 3d 996 (N.D. Ill. 2016) ................................................10, 13, 20, 21

*United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*,
  772 F.3d 1102 (7th Cir. 2014) ...............................................................................13

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
  836 F.3d 770 (7th Cir. 2016) .................................................................................13

*United States v. Petway*,
  No. 2:17CR00534 (KM), 2020 WL 2394095 (D.N.J. May 11, 2020)......................4

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
  20 F.3d 771 (7th Cir. 1994) .....................................................................................9

## STATUTES AND REGULATIONS

7 U.S.C. § 1, *et seq.* ...................................................................................2

7 U.S.C. § 2(a)(1)(B) .............................................................................8, 23

7 U.S.C. § 9(1) .................................................................................. passim

7 U.S.C. § 13 ..................................................................................... passim

7 U.S.C. § 22 ........................................................................................9, 20

7 U.S.C. § 25 .....................................................................................7, 9, 20,21

15 U.S.C. § 1 .........................................................................2, 8, 24, 26, 27

17 C.F.R. § 180.1 ......................................................................................21

## INTRODUCTION

April 20, 2020 was a historic day for crude oil futures contracts in the United States.  The world was in the midst of the COVID-19 pandemic.  Because of the pandemic's effects on economies around the world, demand for oil was at a historic low.  At the same time, Saudi Arabia, Russia, and other countries were flooding the global market with oil, leading to a vast over-supply.  Physical storage space for oil in the key hub of Cushing, Oklahoma was diminishing rapidly.  And NYMEX WTI crude oil futures contracts for the month of May were set to expire on April 21, requiring anyone owning those contracts on that day to take physical possession of large amounts of oil with few places to store it.  Observing the signs in the days leading up to April 20, CME Group, Inc. ("CME") (which owns the NYMEX exchange) publicly and repeatedly warned that the price of crude oil futures contracts could drop into negative prices.  CME's prediction turned out to be correct.  On April 20, in the equivalent of a once-in-a-century storm, all of these factors joined together and drove crude oil futures contracts into negative prices for the first time.

Plaintiff Mish International Monetary Inc. ("Mish") has filed a complaint ignoring all of those events and seeking to blame Vega Capital London Limited ("Vega") for Mish's trading losses on April 20.  In seven short paragraphs of its complaint, Mish makes a series of conclusory allegations about Vega, none of which allows a plausible inference that it is entitled to relief.  Mish alleges that "at least a dozen traders" associated with Vega "worked together" to "aggressively sell" May 2020 WTI futures contracts "for the purpose of depressing the price (including the settlement price) of the May 2020 WTI futures contract."  Mish speculates that these traders were trying to sell their futures contracts at an "uneconomically" low price so as to

1

influence the closing settlement price and that these efforts caused damages to anyone who bought or sold oil futures contracts through CME on April 20 or 21.

But Rule 8(a) and Rule 9(b) require much more than these types of conclusory allegations to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007). For instance, for one of its Commodity Exchange Act claims, Mish's complaint must allege specific facts that allow a plausible inference that Vega or the traders possessed the ability to influence prices for the crude oil futures market, that an artificial price existed, that Vega or the traders caused the artificial price, and that they intended to cause the artificial price. Similarly, for its Sherman Act claim, Mish's complaint must allege specific facts that there was an agreement to fix prices, that the agreement unreasonably restrained trade, and that Mish was injured. Mish's complaint does not allege any specific facts that would lead to a plausible inference that Mish is entitled to relief under any of those claims.

The Second Circuit has already rejected the same type of formulaic conclusory allegations, which were asserted by Mish's counsel in another case. *In re Commodity Exch., Inc. Silver Futures & Options Trading Litig.*, 560 F. App'x 84 (2d Cir. 2014). In that case, the court concluded that similar allegations about "uneconomic" sales practices and strong market position failed to state a claim under the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.*, or the Sherman Act, 15 U.S.C. § 1, *et seq.* The court emphasized that Rule 8(a) requires allegations of specific facts, not conclusory descriptions, in order to allow for a plausible claim to relief. Mish's complaint relies on the same type of conclusory allegations about "uneconomic" sales practices and strong market position that the Second Circuit specifically rejected. Mish's complaint should fail for the same reasons.

Rule 9(b) also requires much more than what Mish has alleged.  It requires Mish to allege, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the commodities at issue.  Mish's complaint contains none of those allegations.  For instance, it does not contain specific allegations of any particular trade, the times of the trades, the full volume of the trades that were supposedly manipulative, the details of the higher offers that were supposedly available and declined, the identity of the traders who declined the higher offers, the basis to infer that any of the traders were "working together," the basis to infer there was any scheme by Vega or the traders, and how the supposedly improper trades affected CME's calculation of the settlement price.

Finally, and most remarkably, Mish alleged that the price volatility on April 20 was "highly unusual" and that there are "no fundamental supply or demand factors" to explain the unusual price movements it describes.  In doing so, Mish ignored the obvious explanation for the price volatility:  the existence of the global pandemic, its effects on the demand for oil, the over-supply of oil, the lack of storage space in Cushing, Oklahoma, the stay-at-home orders mandated by governments around the world, the loss of jobs suffered as a result of the pandemic, and the grave uncertainty that the world faced as it was in the midst of grappling with COVID-19, among many other factors.  Rule 8(a) and 9(b) do not allow a party to assert a plausible claim for relief based on allegations of price movements in commodity markets while ignoring major world disasters directly affecting those very same markets.  That conclusion necessarily follows from the reasoning of the Supreme Court's decisions in *Twombly*, 550 U.S 554 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  Mish's complaint should be dismissed under Rule 12(b)(6) for failure to state a claim.

**BACKGROUND**

**A.      Background for the Events of April 20**

Before turning to the allegations of Mish's complaint, there are some facts of which the

Court should take judicial notice.[1]  As we are all painfully aware, the world is suffering through

a pandemic and was experiencing widespread effects of the pandemic in April 2020.  *See, e.g.*,

U.S. District Court for the Northern District of Illinois, General Order No. 20-0012 (March 12,

2020) (ordering various restrictions on court operations "in order to protect public health, and in

order to reduce the size of public gatherings and reduce unnecessary travel").  Economies around

the world have suffered because of the pandemic.  *See, e.g.*, Exhibit 1 to Decl. of Michael Kelly,

Proclamation of Governor J.B. Pritzker (April 2, 2020) (observing, among other things, that "the

outbreak of COVID-19 has resulted in significant negative economic impact . . . that threatens to

undermine housing security and stability and overall financial stability and security for

individuals and businesses throughout Illinois").  "As a result of the pandemic, Federal, State,

and local governments have also taken unprecedented or exceedingly rare actions, including

border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction

---

[1]      Federal Rule of Evidence 201(b) provides: "A judicially noticed fact must be one not
subject to reasonable dispute in that it is either (1) generally known within the territorial
jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to
sources whose accuracy cannot reasonably be questioned." A court may take judicial notice of
matters of public record outside the pleadings without converting a Rule 12(b)(6) motion into a
motion for summary judgment. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir
1994).  The existence of the pandemic, the negative effect of the pandemic on the world's
economies, decrease in demand for oil, the stay-at-home orders mandated by governments
around the world, and the loss of jobs as a result of the pandemic are all subject to judicial notice
for both reasons.  *See, e.g.*, *United States v. Petway*, No. 2:17CR00534 (KM), 2020 WL
2394095, at *2 (D.N.J. May 11, 2020) (taking judicial notice of the pandemic).

4

moratoria." *Brown v. Azar*, No. 1:20-CV-03702-JPB, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020).

The Court can also take judicial notice of a CME report that the storage capacity in Cushing, Oklahoma was rapidly diminishing in April 2020.[2]  Exhibit 2 to Kelly Decl.; *see also* Docket Entry No. 1, Complaint ("Compl.") ¶¶ 37, 43 (describing Cushing as the "most significant marketing and trading hub for crude oil in North America").   That report stated:

> The U.S. crude oil stocks recorded a massive monthly build of 48 million barrels in April 2020, according to the Energy Information Administration (EIA).  In Cushing, inventories rose 23 million barrels during the month of April 2020, peaking at 65 million barrels in storage, which was 83% of working capacity, according to EIA data.

Exh. 2 at 1.  The report further noted that "[i]n response to the global demand and supply shocks from the COVID-19 pandemic and the recent OPEC+ meetings, the demand destruction and supply glut led to rising inventory levels in March and April 2020." *Id.*  Finally, "[t]he unprecedented global market fundamentals have applied intense stress on the oil industry in the first half of 2020, as companies responded to the volatile arbitrage price signals and hedge the associated price risk." *Id.*[3]

---

[2]     *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008) ("We may take judicial notice of documents in the public record, including publicly reported stock prices, without converting a motion to dismiss into a motion for summary judgment.").

[3]     CME's report was similar to news accounts available to market participants at the time. For instance, on April 20, 2020, the New York Times reported that "[d]emand for oil is collapsing, and despite a deal by Saudi Arabia, Russia and other nations to cut production, the world is running out of places to put all the oil the industry keeps pumping out — about 100 million barrels a day" and "[f]utures contracts that require buyers to take possession of oil in May are expiring on Tuesday, and nobody wanted the oil because there was no place to store it." Exhibit 3.

Finally, the Court can also take judicial notice of public notices issued by CME, the owner of the New York Mercantile Exchange, in the days leading up to April 20.[4] On April 8, 2020, CME publicly announced that "[t]he purpose of this advisory is to assure CME clearing firms and end clients that *if major energy prices continue to fall towards zero in the coming months*, CME Clearing has a tested plan to support the possibility of a negative options underlying and enable markets to continue to function normally." Exhibit 4 to Kelly Decl. (emphasis added). In an accompanying description of its plans, CME explained that it "want[ed] to give all of our clearing firms, customers, and partners a view into what the CME Clearing plan is so that each of our partners can do their own respective planning for this potential situation." *Id.* at 3.

Similarly, CME made another public announcement on April 15, 2020 – five days before the events alleged in Mish's complaint. Exhibit 5 to Kelly Decl. at 1. In that notice sent to clearing firms, the CME warned that "[r]ecent market events have raised the possibility that *certain NYMEX energy futures contracts could trade at negative or zero trade prices or be settled at negative or zero values*, and that options on these futures contracts could be listed with negative or zero strike prices." *Id.* (emphasis added). The purpose of CME's notice was again to reassure that "[w]ere this to occur, all of CME's trading and clearing systems would continue to function normally" and "[s]upport for zero or negative futures and/or strike prices is standard throughout CME systems." *Id.* CME also gave advice to clearing firms wishing to test their own systems: "Effective immediately, firms wishing to test such negative futures and/or strike prices in their systems may utilize CME's 'New Release' testing environments, for products CL (crude

---

[4]     The contents of CME's releases are subject to judicial notice under Rule 201 because they are not subject to reasonable dispute and can be found on the website of CME, a self-regulatory organization.

oil futures) and LO (options on those futures.)"  *Id.*  In an accompanying chart, NYMEX WTI Crude Oil futures (traded under the code "CL") was prominently listed by CME as among the future contracts with this kind of risk.  *Id.* at 3.

**B.**    **Mish Filed a Conclusory Complaint Seeking to Blame Vega**
         **for Any Trading Losses that the Market Suffered on April 20**

The substance of Mish's allegations against Vega and the traders can be found in seven short paragraphs of its Class Action Complaint entitled "Substantive Allegations."  Compl. ¶¶ 45-51.  The Complaint essentially alleges the following:

- "On April 20, 2020, at least a dozen traders associated with Defendant Vega Capital worked together to aggressively sell May 2020 WTI futures contracts and other related instruments for the purpose of depressing the price (including the settlement price) of the May 2020 WTI futures contract," and that this trading allegedly "put downward pressure" on the price of the market.  *Id*. ¶ 45

- Prior to selling the futures contracts, "numerous" traders "purchased a large volume of Trading at Settlement ('TAS') contracts," *id.* ¶ 46, and "had a large financial incentive" for the May 2020 contract to settle "at the lowest possible price" on April 20, *id.* ¶ 47.

- The traders supposedly sold their futures contracts "at the lowest possible price so as to register the lowest possible settlement price for the May 2020 contract."  *Id.* ¶ 48.

- "The financial press has reported that Defendant Vega Capital's trading on April 20, 2020 profited by as much as $500 million."  *Id.* ¶ 49.

- The "price action" of oil futures contracts for the May 2020 contract on April 20, 2020 was "highly unusual."  *Id.* ¶ 50.  Among other things, the closing price of crude oil futures contracts closed at $10.01 on April 21, 2020, an increase of $47 from the closing price on April 20.

- Ignoring the existence of a pandemic or any other related factors, Mish alleged that "[t]here are no fundamental supply or demand factors that can explain the foregoing highly unusual price movements."  *Id.* ¶ 51.

Mish uses these conclusory allegations to bring a putative class action alleging five causes of action: (1) market manipulation under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 13,

25(a); (2) a second claim of market manipulation under the CEA, 7 U.S.C. §§ 9, 25; (3) a claim of principal-agent liability under the CEA, 7 U.S.C. § 2(a)(1)(B); (4) a claim of aiding and abetting the traders' alleged market manipulation, 7 U.S.C. § 13; and (5) a claim under the Sherman Act, 15 U.S.C. § 1.

Besides failing to mention the global pandemic, the lack of demand for oil, the over-supply of oil, the lack of storage space, and all of the other factors affecting trading on the global markets that day, Mish's Complaint does not provide any allegations of facts in support of its conclusory allegations.  For instance, it does not allege: (i) the identity of the traders allegedly involved; (ii) the volumes that were traded; (iii) the times during the day that the trades were made; (iv) the basis for Mish's conclusory allegation that the traders were "working together" and not trading independently; (v) the details of *any* specific trade where any of the traders allegedly sold for a lower price when a higher price was available (let alone the details of the full universe of trades where that allegedly happened); (vi) the basis for Mish's conclusory allegation that such a small group of traders possessed the ability to influence the price of crude oil futures contracts; (vii) the basis for the conclusion that any specific trades by the traders affected the market in any material way; or (viii) any basis to believe that any of the traders (or Vega for that matter) had any intent to manipulate the market for futures contracts.

## STANDARD OF REVIEW

Under Rule 8(a) of the Federal Rules of Civil Procedure, a complaint must "state a claim to relief that is plausible on its face." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. While well-pleaded factual allegations are presumed true for purposes of a motion to dismiss

under Rule 12(b)(6), conclusory allegations that merely restate the elements are not. *Id.* If a claim does not state a claim to relief that is plausible on its face, it should be dismissed for failure to state a claim under Rule 12(b)(6).

In addition, "[i]n all averments of fraud," the circumstances constituting fraud "shall be stated with particularity." FED. R. CIV. P. 9(b). The "circumstances constituting fraud" include "the identity of the person, who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 777 (7th Cir. 1994) (internal quotation omitted). The heightened pleading standard of Rule 9(b) applies to all "'averments of fraud' regardless of whether those averments pertain to a 'cause of action' for fraud." *Borsellino v. Goldman Sachs Grp., Inc.* 477 F.3d 502, 507 (7th Cir. 2007).

## DISCUSSION

There are two reasons why Mish's complaint fails to state a claim. First, Mish's market manipulation claims fail to comply with Rule 9(b)'s requirement to plead fraud with particularity. Second, all of Mish's claims fails Rule 8(a)'s requirements that they allege specific facts that plausibly give rise to relief.

## I.    Mish's Market Manipulation Allegations Do Not State a Claim

Mish's conclusory allegations fail to state market manipulation claims under Section 9(a)(2) and 22(a) of the Commodity Exchange Act.[5] Compl. ¶¶ 64-68. Under Section 9(a)(2), a

---

[5]    7 U.S.C. §§ 13(a)(2) and 25(a) are the statutory citations for Sections 9(a)(2) and 22(a) of the CEA, respectfully. Cases discussing the CEA typically cite to the original sections in the CEA, so Vega is following that convention here. It should be noted that Mish's complaint refers generally to Section 9 and 22 of the CEA (7 U.S.C. §§ 13 and 25), which contain multiple subsections, but does not attempt to allege a claim under any of those other subsections.

claim of market manipulation requires allegations of four elements: "(1) the defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764-65 (7th Cir. 2015); *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1018 (N.D. Ill 2016). Mish's Section 9(a) claim fails to state a claim under Rule 9(b) and Rule 8(a).

### A.  Mish's Section 9(a) Claim Fails to Allege Fraud with Particularity

Mish's market manipulation claim makes a series of conclusory allegations, but none of the particulars required by Rule 9(b). To meet the requirements of Rule 9(b) in the context of a Section 9(a) market manipulation claim, the plaintiff must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *In re Crude Oil Commodity Litig.*, No. 06 CIV. 6677 (NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007).

Courts have typically employed "a case-by-case approach" when deciding whether Rule 9(b) applies to market manipulation claims. *See, e.g.*, *In re London Silver Fixing, Ltd., Antitrust Litig.*, 213 F. Supp. 3d 530, 565 (S.D.N.Y. 2016); *see also In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 231 (S.D.N.Y. 2018) ("Market manipulation claims sounding in fraud must be pleaded with particularity in accordance with Rule 9(b) of the Federal Rules of Civil Procedure."); *Premium Plus Partners, L.P. v. Davis*, No. 04 C 1851, 2005 WL 711591, at *15 (N.D. Ill. Mar. 28, 2005) (not applying Rule 9(b) to a market manipulation claim but also declining to "endorse a rule that Rule 9(b) pleading requirements *never* could apply to a CEA manipulation claim. . . .").

In this case, Rule 9(b) should apply to Mish's Section 9(a) claim of market manipulation, because the gravamen of the complaint is based on a conclusory allegation of a fraudulent concealment by the traders: *i.e.*, that Vega's traders allegedly misled CME and the market into believing that the traders were selling future contracts for fair market value when they were allegedly selling those contracts for below-market prices to "suppress" the settlement price at the closing. *See, e.g.*, Compl. ¶ 11; *id.* ¶ 48. Mish's theory appears to be that this concealment deceived CME into setting a lower settlement price, and that this concealment damaged Mish when it sold its futures contracts at a lower price at settlement close. Mish is careful not to use the word "fraud" in its Section 9(a) claim, but "this is not dispositive in a determination of the essence of the factual premises of their claim, nor whether Rule 9(b) applies." *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *5. In that case, a federal district court concluded that Rule 9(b) was appropriate in evaluating a Section 9(a) claim because "[i]t is beyond question that the crux of plaintiffs' allegations is that defendants misled the market with regard to supply and demand at Cushing by concealing its capacity and its actions, resulting in artificial prices." *Id.* The same reasoning should apply here. *Cf. Squires-Cannon v. Forest Pres. Dist. of Cook Cty.*, 897 F.3d 797, 805 (7th Cir. 2018) (concluding that "Rule 9(b)'s particular requirement also applies to fraudulent concealment claims" brought under Illinois state law).

Finally, the underlying purposes of Rule 9(b) favor its application to Mish's allegations. "[F]raud is frequently charged irresponsibly by people who have suffered a loss and want to find someone to blame for it." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). The purpose of Rule 9(b) is to "to protect a defendant's reputation from unnecessary harm" from these kinds of allegations. *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1041 (N.D.

Ill. 2007).  That is why Rule 9(b) requires "the plaintiff to do more than the usual investigation before filing his complaint. . . ."  *Ackerman*, 172 F.3d at 469.

Mish's complaint does not allege fraud with particularity.  While it makes a conclusory allegation that the traders were selling "at the lowest possible price," it does not allege the prices or any higher prices that were supposedly offered and known to the traders.  Nor does the Complaint allege any specific facts about "what manipulative acts were performed."  Mish's complaint does not make any allegations about: (i) any particular trade by the traders; (ii) the higher prices that were supposedly rejected by the traders; (iii) whether the higher prices were supposedly being offered in any kind of significant volume; and (iv) the prices that the traders actually achieved in the trades.  The Complaint does not allege "which defendants performed them," including which traders were supposedly making "uneconomical[]" trades.  The Complaint does not allege "when the manipulative acts were performed," including the times of these allegedly "uneconomical[]" trades during the course of April 20.  Finally, aside from reiterating conclusory language, the Complaint does not allege any particulars about "what effect the scheme had on the market for the commodities at issue," particularly during the midst of a global pandemic with problems caused by low demand, high supply, lack of storage, and a myriad of other issues.

In similar cases, courts have dismissed market manipulation claims when they rely on conclusory allegations like the *Mish* complaint.  For instance, in *In re Crude Oil Commodity Litig.*, No. 06 CIV. 6677 (NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007), the court concluded that a market manipulation claim failed to satisfy Rule 9(b) because "[t]he actions allegedly taken by defendants that caused the artificial prices in the crude oil market are described in a wholly speculative and conclusory manner in the complaint" and "[n]one of

plaintiffs' allegations specify which of the defendants perpetrated the acts in question." The court faulted the conclusory nature of the plaintiffs' complaint because they could not "point to one specific instance in which defendants or their agents made misleading statements 'talking up' their 'non-existent commercial needs,' or 'bidding up' or 'trashing' spot market prices for crude oil deliverable at Cushing." *Id.*

Mish emphasizes that "[t]he financial press has reported that Defendant Vega Capital's trading on April 20, 2020 profited by as much as $500 million." Compl. ¶ 49. But this allegation illustrates the danger here. "A public accusation of fraud can do great damage to a firm before the firm is (if the accusation [is] prove[d] baseless) exonerated in litigation. . . ." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1105 (7th Cir. 2014). The Seventh Circuit has recognized that:

> If discovery is allowed to proceed, a defendant well may face a long period of time where it stands accused of fraud, placing what may be undue pressure on the defendant to settle the case in order to lift the cloud on its reputation. The requirement that fraud be pleaded with particularity compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless.

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). During a difficult time for everyone, it may seem inviting for a party to bring a class action fraud lawsuit against a small U.K. company or to imply that profits of its traders must mean there was market manipulation, but Rule 9(b) should be applied here to prevent this kind of conclusory complaint from unfairly casting a cloud over Vega's reputation and its business. Because Mish's Section 9(a) claim fails to comply with Rule 9(b), it should be dismissed.

**B.**      **Mish's Section 9(a) Claim Fails to State a Claim Under Rule 8(a)**

Even setting Rule 9(b) aside, Mish fails to satisfy the pleading standards of Rule 8(a), because its complaint fails to allege any specific facts that would raise a plausible claim to relief.

In order to allege a claim under Section 9(a), Mish "must allege that: (1) the defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendants caused the artificial price; and (4) the defendants specifically intended to cause the artificial price." *U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1018 (N.D. Ill. 2015).

The principles set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) illustrate how Mish's complaint fails to comply with Rule 8(a). In those cases, the Supreme Court highlighted the following principles:

- "Factual allegations must be enough to raise a right to relief above the speculative level. . . ." *Twombly*, 550 U.S. at 555.

- "The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to relief.'" *Twombly*, 550 U.S. at 557.

- "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

- "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Twombly*, 550 U.S. at 557.

- "[A] district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558.

In *Twombly*, it was not enough for a plaintiff to allege that there was an "agreement" to restrain trade, because that was simply a conclusory label without the "heft" needed to show plausibility and not simply possibility. 550 U.S. at 564-70. In *Iqbal*, it was not enough for a party to allege that the Attorney General and the FBI director intended to discriminate against him, because conclusory allegations, without more, are not treated as true in deciding a motion to dismiss.

*Iqbal*, 556 U.S. at 680-84.  Mish cannot meet the standards in *Twombly* and *Iqbal* on any of the elements of a market manipulation claim.

> ## 1.  Mish Fails to Allege Facts That Vega or the Traders "Possessed the Ability to Influence Prices"

Mish does not allege any facts that would allow for a plausible inference that Vega or the traders "possessed the ability to influence prices" for WTI crude oil futures contracts on April 20.  Mish's complaint fails to allege any facts concerning the volume of trades made by traders associated with Vega, relying instead on conclusory terms.  *See, e.g.*, Compl. ¶ 46 (alleging traders owned a "large" amount of TAS contracts).  Mish fails to allege what higher sales prices *were* supposedly available and not accepted by the traders, relying again on conclusory terms.  *Id.* at  ¶¶11, 48 (traders were seeking to sell "at the lowest possible price" and "uneconomically").  There is no allegation as to how many of these higher offers supposedly existed for the number of contracts that the traders were trading.  Mish does not allege how these traders were working together or provide any basis for its allegations that they were working together at all.  Except in the most generic way, Mish's complaint fails to allege how – or which – of these trades would have affected the calculation by CME of the settlement price.  Those kinds of conclusory allegations do not "possess enough heft to show that the pleader is entitled to relief."  *Twombly*, 550 U.S. at 557.

The absence of specific allegations is further compounded by the Complaint's failure to address the world-changing forces that were in motion on April 20.  The Complaint cannot plausibly allege that a dozen traders had the ability to influence crude oil futures prices during a global pandemic with all of the accompanying complications for the crude oil market.  Any one of the difficulties described through this motion is a far more plausible explanation for the market volatility than the conclusory allegations in Mish's complaint.  For instance, even in

normal times, it is a basic principle in crude oil futures contracts that "supply and demand factors at the Cushing hub have a potential impact not only upon the price levels of crude oil at Cushing and its surrounding areas, but also throughout the entirety of the crude oil market." *In re Crude Oil Commodity Litig.*, 2007 WL 1946553, at *2.

### 2. Mish Fails to Allege Facts That an "Artificial Price Existed" or That the Traders "Caused an Artificial Price"

For many of the same reasons discussed above, Mish cannot allege facts that allow for a plausible inference that (i) "an artificial price existed" for WTI futures contracts on April 20 or (ii) Vega or the traders "caused the artificial price."  "To determine whether an artificial price existed, courts look to whether the price is affected by a factor that is not a legitimate part of the economic pricing of the commodity." *Braman v. The CME Grp., Inc.*, 149 F. Supp. 3d 874, 888 (N.D. Ill. 2015) (internal quotations omitted).

Mish's complaint alleges that NYMEX WTI crude oil futures contract is "the world's largest-volume physically delivered futures contract" Compl. ¶ 4—but does not make any non-general allegations as to how "a dozen" traders from the United Kingdom could cause an artificial price for a contract with that kind of volume.  Mish alleges that "[t]he price action of the May 2020 contract on April 20, 2020 was highly unusual," Compl. ¶ 50, but that allegation does not add any plausibility to Mish's claim, given the existence of everything else that was happening on April 20 (including the global pandemic, the effect that the pandemic had on the world economy and demand for oil, stay-at-home orders, the effect of over-supply of oil in the global market, the lack of storage facilities, and so on).  This case is a perfect example of why a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Twombly*, 550 U.S. at 558.

Mish makes a series of general allegations about the volatility of the market on April 20 and 21. *See* Compl. ¶¶ 50-51. From there, Mish's complaint leaps to a conclusion that "[t]here are no fundamental supply or demand factors that can explain the foregoing highly unusual price movements." *Id.* ¶ 51. But that kind of generalized conclusory allegation does not give Mish a plausible claim to relief, especially when compared to the far more plausible explanations provided by the global pandemic and its devastating effects on the economy and trading of crude oil. Conclusory allegations do not provide a plaintiff with unfettered immunity to ignore the elephant in the room.

*Iqbal* shows how courts should reject allegations that do not suggest a plausible claim to relief. In that case, a pretrial detainee accused the Attorney General and FBI Director of adopting "an unconstitutional policy that subjected [him] to harsh conditions of confinement on account of his race, religion, or national origin." 556 U.S. at 666. After the Supreme Court disregarded the numerous conclusory allegations in the complaint, "the only factual allegation against [the defendants] accuses them of adopting a policy approving 'restrictive conditions of confinement' for post–September–11 detainees until they were 'cleared' by the FBI.'" *Id.* at 683. But the Supreme Court found that this factual allegation did not allow the plaintiff to assert a plausible claim to relief for discrimination, reasoning that "[a]ll it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity." *Id.*

In the same way, Mish's allegations of volatility in the market do not plausibly suggest that there was an "artificial price" in the market or that it was caused by traders associated with Vega. The only plausible suggestion of Mish's allegations of market volatility is that the world

was experiencing a pandemic, the demand for oil had dropped sharply, the supply of oil had increased, there were limited storage facilities for the oil, and there was substantial uncertainty in the world generally and particularly with respect to the trading of crude oil futures contracts that were about to close. Those were the reasons why CME warned the market repeatedly about the possibility of negative prices, including on April 15 that "[r]ecent market events have raised the possibility that *certain NYMEX energy futures contracts could trade at negative or zero trade prices or be settled at negative or zero values. . . .* " Exhibit 5. There are no specific facts alleged in the Complaint that allow for a plausible inference that there was an artificial price or that Vega or the traders caused it.

### 3. Mish Fails to Allege Facts that Vega or the Traders Specifically Intended to Cause an Artificial Price

Finally, for many of the same reasons identified above, Mish fails to allege facts that Vega or the traders specifically intended to cause "an artificial price." "[A] manipulation claim requires a showing of specific intent, that is, a showing that 'the accused acted (or failed to act) with the purpose or conscious object' of influencing prices." *In re Rough Rice Commodity Litig.*, No. 11 C 618, 2012 WL 473091, at *7 (N.D. Ill. Feb. 9, 2012).

Mish relies on two allegations for its claim of intent: (1) "Defendant Vega had a large financial incentive for the May 2020 contract to settle at the lowest possible price on April 20, 2020," Compl. ¶ 47; and (2) "Defendants repeatedly engaged in a highly unusual violation of this standard practice by seeking to uneconomically sell May 2020 WTI crude oil futures contracts at the lowest possible price so as to register the lowest possible settlement price for the May 2020 contract," *id.* ¶ 48. These conclusory allegations do not warrant a presumption of truthfulness.

The Second Circuit rejected the same types of formulaic allegations in another case brought by Mish's lead lawyer. *In re Commodity Exch., Inc. Silver Futures & Options Trading*

*Litig.*, 560 F. App'x 84 (2d Cir. 2014) ("*In re Silver Futures*").  In that case, plaintiffs alleged that JPMorgan had "a large short position" on certain silver futures and options contracts and that JPMorgan's trading behavior was "inconsistent with trying to obtain the best sales price execution, but consistent with trying to move prices down by aggressively selling in a compressed period to receive less on the sales transactions."  *Id.* at 86-87.

The Second Circuit held that "plaintiffs' assertions relating to JPMorgan's market power and 'uneconomic conduct' were insufficient to plausibly allege intent or causation" under the CEA.  *Id.* at 86.  The court explained that "market power by itself is not enough to establish a CEA violation" and rejected the plaintiffs' argument that "JPMorgan's large short position in silver futures incentivized JPMorgan to depress prices."  *Id.*  The Second Circuit reasoned that "this 'incentive' could just as easily be imputed to any company with a large market presence in any commodity market."  *Id.*

The Second Circuit also held that plaintiffs' "vague allegations of purportedly 'uneconomic conduct' likewise failed to state a CEA claim."  *Id.*  The court found that "[a]bsent specific factual allegations, however, this argument does not support an inference of intent."  *Id.* at 87.  It described the kinds of cases that allow for that kind of inference, but observed that those cases relied on far more specific factual allegations than conclusory allegations of "uneconomic conduct" and a strong market position.  *Id.*  The Second Circuit emphasized the need for "specific factual allegations" to "support an inference of intent."  *Id.*

Mish's allegations cannot be distinguished from the allegations that were insufficient in the *In re Silver Futures* case.

| Allegations in the *In re Silver Futures* Complaint | Allegations in the Mish Complaint |
|---|---|
| "JPMorgan's large short position in silver futures incentivized JPMorgan to depress prices. . . ."  560 F. App'x at 86. | "Vega had a large financial incentive for the May 2020 contract to settle at the lowest possible price. . . ."  Compl. ¶ 47. |
| "JPMorgan's trading behavior was 'inconsistent with trying to obtain the best sales price execution, but consistent with trying to move prices down by aggressively selling in a compressed period to receive less on the sales transactions.'"  560 F. App'x at 86-87. <br><br> JPMorgan engaged in "uneconomic conduct." *Id.* at 86. | "Standard and rational practice among market participants is to seek to sell for the highest price available. However, pursuant to their manipulative scheme, Defendants repeatedly engaged in a highly unusual violation of this standard practice by seeking to uneconomically sell May 2020 WTI crude oil futures contracts at the lowest possible price so as to register the lowest possible settlement price for the May 2020 contract." Compl. ¶ 48. |

Just as the allegations are substantively the same, the result should be the same.  Mish's Section 9(a) claim should be dismissed for failure to state a claim.

## II.     Mish's Section 6(c)(1) Market Manipulation Claim Fails to State a Claim

Mish's claim of market manipulation under Section 6(c)(1) fares no better.[6]  Compl. ¶¶ 69-73.  To allege a claim under Section 6(c)(1), Mish must allege that Vega or its traders used or employed a "manipulative or deceptive device" in connection with a contract of sale of futures

---

[6]     7 U.S.C. §§ 9(1) and 25 are the current statutory citations for Sections 6(c)(1) and 22 of the CEA, respectively.  The current Section 6(c)(1) of CEA was added as part of the Dodd-Frank Act in 2010.  *CFTC v. Kraft*, 153 F. Supp. 3d 996, 1006-07 (N.D. Ill. 2015).  Although there appears to be substantial overlap between the market manipulation prohibitions in Section 6(c)(1) and Section 9(a)(2), Judge Blakey has found that "[t]here is no indication, in case law or elsewhere, that these new manipulation provisions—Section 6(c)(1) and Regulation 180.1—are governed by the same four part test that applies in cases under . . . Section 9(a)(2)." *Id.* at 1008-09.

contracts in contravention of rules established by the CFTC, 7 U.S.C. § 9(1), and that Mish suffered an injury as a result, 7 U.S.C. § 25. In its complaint, Mish tries to allege a claim under 17 C.F.R. § 180.1(c)(1) and (c)(3). Compl. ¶ 71. To allege a claim under those subsections, Mish has to allege that Vega or the traders:

(i)     "intentionally or recklessly"

(ii)    used or employed "any manipulative device, scheme, or artifice to defraud" or engaged in any act "which operates or would operate as a fraud or deceit upon any person"

(iii)   in connection with any futures contract subject to the rules of a registered entity.

17 C.F.R. § 180.1(c)(1) and (c)(3).

### A.     Mish's Section 6(c)(1) and Regulation 180.1 Claims Fail to Allege Fraud with Particularity

Mish's Section 6(c)(1) and Regulation 180.1 claims must be pled with particularity because they allege claims sounding in fraud. *CFTC v. Kraft*, 153 F. Supp. 3d 996, 1008-09 (N.D. Ill. 2015) (holding that Section 6(c)(1) and Regulation 180.1 "provide a cause of action that sounds in fraud"); *see also Ploss v. Kraft Foods Grp.*, 197 F. Supp. 3d 1037, 1057 (N.D. Ill. 2016). In particular, Mish's complaint alleges that Vega and the traders "intentionally or recklessly used or employed *a manipulative device or artifice to defraud* and engaged in any act, practice or course of business which operated or would operate as a *fraud or deceit* upon any person. . . ." Compl. ¶ 71 (emphasis added).

"To plead manipulative conduct, the Plaintiff here must plead what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the commodities at issue." *U.S. C.F.T.C. v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1012 (N.D. Ill. 2015); *see also DH2, Inc. v.*

*Athanassiades*, 404 F. Supp. 2d 1083, 1092 (N.D. Ill. 2005). "[T]he term manipulation connotes 'intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *Kraft Foods Grp.*, 153 F. Supp. 3d at 1013 (quoting *Hochfelder*, 425 U.S. at 199).

For the reasons described above in the Section 9(a) arguments, Mish's complaint fails to allege, with particularity, any specific facts concerning "any manipulative device, scheme, or artifice to defraud" or any act "which operates or would operate as a fraud or deceit upon any person." There are not specific allegations about what manipulative acts were performed, who performed them, when the acts were performed, and what effect the alleged scheme had on the market.

Likewise, for the same reasons stated above, Mish fails to plead any specific facts that would plausibly suggest that Vega or the traders acted with the intentional or reckless intent to defraud necessary to violate Section 6(c)(1) and Regulation 180.1. *Cf. ATSI Communications v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007) ("To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how market participants value a security" and "[s]imilarly, purchasing a floorless convertible security is not, by itself or when coupled with short selling, inherently manipulative.").

**B.** **Mish's Section 6(c)(1) and Regulation 180.1 Claims**
**Fail to Allege Specific Facts Needed to Allege a Plausible Right to Relief**

Even under Rule 8(a), Mish's Section 6(c)(1) and Regulation 180.1 claims fail to allege specific facts that allow a plausible inference that: (i) Vega or the traders employed a "manipulative device or artifice to defraud" or engaged in any act which operated "as a fraud or deceit upon any person;" or (ii) Vega or the traders acted with intentional or reckless intent. Just as with the *In re Silver Futures* decision described above, conclusory allegations about market

position and "uneconomic conduct" are not enough to allege under Rule 8(a) that Vega or the traders were acting with knowing or reckless intent to commit a fraud.

### III.    <u>Mish's Principal-Agent Theory Fails to State a Claim</u>

Mish fails to state a claim for principal-agent liability under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B). Compl. ¶¶ 74-77. A principal-agent liability claim is only "viable only where an underlying primary violation of the CEA can survive a motion to dismiss." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018). Because Mish's CEA market manipulation theories failed to state a claim, its principal-agent liability claim fails too.

### IV.    <u>Mish's Aiding-and-Abetting Theory Fails to State a Claim</u>

For two reasons, Mish fails to state a claim for aiding-and-abetting liability under Section 13c(a) of the CEA, 7 U.S.C. §13. Compl. ¶¶ 78-81. First, to allege an aiding-and-abetting claim, a plaintiff must first allege specific facts plausibly suggesting that a primary actor committed a commodities violation, which Mish has not done. *Damato v. Hermanson*, 153 F.3d 464, 470-71 (7th Cir. 1998); *In re Silver Futures*, 560 F. App'x at 87. Second, an aiding-and-abetting claim must allege specific facts plausibly suggesting that (i) the defendant knew of the scheme; (ii) the defendant intended to help others perpetrate such a scheme; and (iii) the defendant committed some act in furtherance of the scheme. *Damato*, 153 F.3d at 473. In this case, Mish has not alleged any specific facts to suggest that Vega (i) had any knowledge of any intent by anyone to engage in market manipulation; (ii) had any intent to further any violation of anyone else; or (iii) committed any act in furtherance of the scheme. In fact, Mish has not alleged that Vega (as opposed to the traders) did anything at all. Mish's aiding-and-abetting claim should be dismissed under Rule 12(b)(6).

## V.    Mish Fails to State a Claim Under the Sherman Act

Finally, Mish fails to state a Sherman Act claim.  Compl. ¶¶ 82-86.  To allege a claim under Section 1 of the Sherman Act, Mish must allege specific facts plausibly suggesting that "(1) defendants had a contract, combination, or conspiracy ('an agreement'); (2) as a result, trade in the relevant market was unreasonably restrained; and (3) they were injured." *In re Dairy Farmers of America, Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 762 (7th Cir. 2016); *see also In re Silver Futures.*, 560 F. App'x at 87.  For a "claimed conspiracy to survive the motion-to-dismiss stage, *Twombly* requires that it be pleaded plausible through allegations of fact" and "[s]uch allegations usually take one of two forms: (1) direct allegations of an agreement, like an admission by a defendant that the parties conspired; or (2) more often, circumstantial allegations of an agreement, which are claimed facts that collectively give rise to a plausible inference that an agreement existed." *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019).

The Supreme Court's decision in *Twombly* and the Second Circuit's decision in *In re Silver Futures* show why Mish's complaint is insufficient.  In *Twombly*, the Supreme Court explained that:

> [S]tating a claim [under § 1 of the Sherman Act] requires a complaint with enough factual matter to suggest an agreement.  Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  "[A]n allegation of parallel conduct and a bare assertion of conspiracy" should be dismissed for failure to state a claim.  *Id.*  The Supreme Court reasoned that that "without more," parallel business behavior could be "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.*

at 554. There must be enough specific facts alleged to push a claim past the "line between possibility and plausibility of entitlement to relief." *Id.* at 557. Otherwise, without this plausibility requirement, "a plaintiff with a largely groundless claim" would "be allowed to take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Id.* at 558 (internal quotations omitted).

The allegations of conspiracy in *Twombly* fell short of the plausibility standard. The plaintiffs asserted an agreement among local telephone companies not to compete with each other. The allegations were "in form a few stray statements [that] speak directly of agreement" but "on fair reading these are merely legal conclusions resting on the prior allegations." *Id.* at 564. The stray statements also included a statement by the CEO of one local telephone company "that competing in the territory of another [local telephone company] might be a good way to turn a quick dollar but that doesn't make it right. . . ." *Id.* at 551. The plaintiffs argued that the failure of local telephone companies to compete with each other, given the "especially attractive business opportunities" in neighboring territories, was "strongly suggestive of conspiracy." *Id.* at 568.

But the Supreme Court found that none of these assertions plausibly suggested the existence of an agreement when there was "an obvious alternative explanation." *Id.* The Supreme Court explained that "a natural explanation for the noncompetition alleged is that the former Government sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing." *Id.* Because of the obvious alternative explanation and other similar considerations, the Supreme Court concluded that "plaintiffs here have not nudged their claims across the line from conceivable to plausible." *Id.*

The Second Circuit's *In re Silver Futures* decision reached the same conclusion and affirmed the dismissal of a Sherman Act case making very similar allegations to Mish's complaint. 560 F. App'x 84 (2d Cir. 2014). As described above, the plaintiffs in that case argued "that its allegations of large volume uneconomic trades in a compressed period and price signaling plausibly alleged concerted action by JPMorgan and unidentified floor brokers." 560 F. App'x at 87. The Second Circuit rejected that argument because "these conclusory allegations did not identify any concerted action among the defendants." *Id.*

In its Complaint, Mish does not allege any facts in support of its conclusory allegations that the traders "worked together to aggressively sell May 2020 WTI futures contracts" and were "making a concerted selling effort." Compl. ¶¶ 8, 45. Even assuming that the Complaint alleged "parallel" conduct—and it has not—such conduct is equally consistent with legitimate and independently rational trading strategies and similar views of the market forces affecting the CME on April 20, all of which were foreshadowed by the CME on April 8 and 15. Mish's allegations are no different from the plaintiffs in *Twombly* alleging that there were "agreements" by local telephone companies "to refrain from competing against one another. . . ." 550 U.S. at 551, which was squarely rejected as insufficient in *Twombly*. Nor are they any different from the plaintiffs in the *Silver Futures* case erroneously arguing "large volume uneconomic trades in a compressed period and price signaling plausibly alleged concerted action. . . ." 560 F. App'x at 87. Because Mish has not alleged specific facts suggesting Vega entered into an unlawful agreement, its Sherman Act claim should be dismissed

In the same way, Mish fails to allege specific facts that there was an unreasonable restraint of trade or that Mish was injured by any actions of Vega. *In re Silver Futures*, 560 F. App'x at 87 (concluding that similar allegations "were insufficient to plead a claim that

defendants unreasonably acted to restrain trade").  Mish's allegations regarding market volatility do not plausibly suggest that Vega restrained trade or that Mish was injured by Vega.  As described above, Mish's market volatility allegations only plausibly suggest that the global pandemic, the lack of demand of oil, the over-supply for oil, the lack of storage space, and the world's uncertainty caused by COVID-19 (among many other factors) led to unprecedented market volatility.  Mish's allegations do not plausibly suggest that Vega's trading led to an "artificial price" in the crude oil markets or that the losses in Mish's transactions on the afternoon of April 20 were caused by any agreement involving Vega.  Because Mish fails to allege any specific facts plausibly suggesting an unreasonable restraint on trade or a causal connection to an injury to Mish, those are additional reasons why Mish's Sherman Act claim should be dismissed.

## **CONCLUSION**

For the reasons stated above, Vega Capital London Limited respectfully requests that the Court enter an Order dismissing Plaintiff Mish International Monetary Inc.'s Class Action Complaint for failure to state a claim upon which relief can be granted.

Dated: November 27, 2020                     Respectfully submitted,

VEGA CAPITAL LONDON, LTD.


By:     /s/  Michael Kelly
        Michael P. Kelly
        AKERMAN LLP
        750 Ninth Street, N.W., Suite 750
        Washington, DC 20001
        (202) 393-6222
        michael.kelly@akerman.com

Amy Graham Doehring
AKERMAN LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
amy.doehring@akerman.com

Joel S. Forman
Meghan K. Boland
AKERMAN LLP
520 Madison Avenue, 20th Floor
New York, NY 10022
(212) 880-3800
joel.forman@akerman.com
meghan.boland@akerman.com

*Attorneys for Vega Capital London Limited*