## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

MISH INT'L MONETARY INC.,
on behalf of itself and
All others similarly situated,

      v.

VEGA CAPITAL LONDON, LTD., *et al*.

Case No. 20-cv-04577

Judge Gary S. Feinerman

Magistrate Judge Jeffrey T. Gilbert

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTIONS
## TO DISMISS THE AMENDED COMPLAINT

## CORRECTED COPY

## Highly Confidential

**ERRATA**

| Page | Change |
|---|---|
| *Passim* | Corrected Table of Contents and Table of Authorities |
| *Passim* | Corrected citations |
| 9 | Delete "of" before "in excess of" |
| 10 | Add "short May" before "positions at the end of trading" |
| 11 | Add "aggressor/" before "manipulative quality" |
| 12 | Add "that" before "Defendants' assertedly low" |
| 29 | Delete "and Trader 10" before "also made sales of May Contracts" |
| 31 | Replaced "there" with "their" |
| 32 | Delete "of" before "in excess of" |
| 63 | Add "including through "ammo" transactions" after "their foregoing price depressing parallel conduct," |

# TABLE OF CONTENTS

I.    Introduction……………………………………………………………………1

    A.    Defendants' Conspiratorial Abuse Of The TAS Mechanism To Place Extraordinarily Large Cumulative Net Selling Pressure On May Contract Prices ………………………………………………………..……….……..2

    B.    Defendants' resulting extraordinarily large financial motivation to depress May Contract prices and their "ammo" and uneconomic trading which did greatly depress May Contract prices through 1:30 p.m. on April 20th…………...5

    C.    Defendants' arguments violate the controlling standards on this motion, as well as common sense…………………………………………………..12

II.    Plaintiff plausibly alleges a claim for manipulation in violation of § 9(a)(2) of The CEA……………………………………………………………………...…15

    A.    Rule 8(a) governs the pleading of market power and trade manipulations…..…16

    B.    Plaintiff plausibly alleges Defendants had the ability to influence May Contract prices…………………………………………………………..…..16

        1.    Cumulative Net Sales In A Futures Contract make the price of the futures contract lower than it otherwise would be……………...……17

            a.    Defendants Had The Ability On April 20 to Influence May Contract Prices By Making 15,854 Cumulative Net Sales Of May Contracts…………………………...………………….17

        2.    Net Aggressor Sales In A Futures Contract Tend To Depress The Prices Of The Futures Contract……………………………………...18

            a.    The VTDs Made Extraordinarily Large Amounts Of Net Aggressor Sales Of May Contracts………………………….19

        3.    Defendants' Ammo Trades Had An Especially High Ability To Influence May Contract Prices Between 1:00 And 1:30 p.m…..…………20

            a.    Through Their "Ammo" Transactions, Defendants Greatly Increased Their Already Significant Ability To Influence May Contract Prices…………………….………………….20

        4.    Defendants' structure, training and background prior to April 20 made them ideally suited to use cumulative net sales, net aggressor sales, and "ammo" trading to influence prices………….……21

i

a. The VTDs' Conspiratorial Manipulative Enhancing
Structure…………………………………………….…………..……21

5. Defendants' fail their burden to demonstrate that they did
Not have the ability to influence prices…………………………………23

6. Defendants Trader 7, Trader 11, Trader 10, and Trader 8 have failed
their burden to demonstrate that they did not have the ability to
influence prices……………………………………………………………24

C. Plaintiff Plausibly Alleges Manipulative Intent……………..………………..26

1. The VTDs "ammo" selling supports an inference of
Manipulative intent……………………………………………….……….26

2. The extremely highly correlated trading of VTDs Trader 1,
Trader 5, Trader 9, Trader 4, Trader 3, Trader 12, and Trader 6
establishes manipulative intent as to these defendants, and
also supports an inference of manipulative intent as to the
remaining defendants………………………………………………………30

3. Defendants' financial interdependence and common motive to
depress prices further enhances the inference of manipulative
Intent…………………………………………………..………..………..31

4. The conspiracy on April 20th and trading together prior to
April 20th to depress oil prices further supports an inference
of manipulative intent……………………………..………………………33

5. ▮▮▮▮ Have Failed Movant's Burden To Establish That
Plaintiff Has Not Plausibly Alleged Manipulative Intent……..…………35

6. Vega Has Failed Its Movant's Burden To Establish That
Plaintiff Has Not Plausibly Alleged Manipulative Intent……………..…36

7. Individual A Has Failed Its Movant's Burden To Establish That
Plaintiff Has Not Plausibly Alleged Manipulative Intent……………..…37

D. Plaintiff Has Plausibly Alleged Defendants Caused An Artificial Price……..…37

E. Defendants Fail Their Burden To Demonstrate That Plaintiffs'
Allegations Do Not Plausibly Indicate That May Contract Prices Were
Artificial…………………………………………………………..…….…..……42

III. Plaintiff Plausibly alleges market abuse manipulation in violation of § 6(c)(1) ..………46

IV.     Plaintiff Plausibly Alleges Section 2(a)(1)(B) Claims Against Defendants…………….50

V.      Plaintiff Plausibly Alleges Aiding and Abetting Claims Against Defendants……....…54

VI.     Plaintiff Has Plausibly Pled Actual Injury and Actual Damages………………………..57

VII.    Plaintiff Plausibly Alleges A *Per Se* Violation Of Section 1 Of The Sherman Act……..59

        A.      Legal Standard…………………………………………………….………..59

        B.      Defendants Engaged In Extensive Parallel Price Moving Behavior
                And Even Participated In One Another's Price Moving Behavior……………..62

        C.      The "Plus Factors" Relating To Defendants Conduct Here Go Far
                Beyond Those Present In Cases In Which The Agreement Was Upheld………..64

        D.      Defendants' Justifications Have, At Most, A Limited Role At The
                Pleading Stage……………………………………………………….....…67

VIII.   Plaintiff Has Plausibly Alleged a Claim for Unjust Enrichment…………...…………76

IX.     Conclusion……………………………………………………………………………76

## Table of Authorities

**Cases**                                                                                                           **Page(s)**

*Al Haj v. Pfizer Inc.*,
   338 F.Supp.3d 741 (April 13, 2018)...........................................................................................12

*Alarm Detection Sys., Inc. v. Village of Schaumburg*,
   930 F.3d 812 (7th Cir. 2019)............................................................................................60, 66

*Always Towing & Recovery, Inc. v. City of Milwaukee*,
   2 F.4th 695 (7th Cir. 2021)....................................................................................................60

*Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*,
   456 U.S. 556 (1982).............................................................................................................61

*Assoc. Gen. Contractors of Calif., Inc. v. Calif. St. Council of Carpenters*,
   459 U.S. 519 (1983).............................................................................................................69

*Bell A. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................................60

*Blasberg v. City of Chicago*, No. 18 C,
   2018 WL 3046867 (N.D. Ill. June 20, 2018)........................................................................12

*Cargill*, *Inc. v. Hardin*,
   452 F.2d 1154 (8th Cir. 1971)........................................................................................Passim

*CFTC v. Optiver US, LLC*,
   2012 WL 1632613 (S.D.N.Y. Apr. 19, 2012)……………………………………………….50

*CFTC v. Parnon Energy Inc.*,
   875 F.Supp.2d 233 (S.D.N.Y. 2012)....................................................................................38

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011).................................................................................................76

*Diplacido v. Commodity Futures Trading Com'n*
    364 Fed. Appx. 657 (2d. Cir. 2009).............................................................................. 23, 38, 41

*Dubensky v. City of Chicago,*
    2017 WL 3034651 (N.D. Ill. July 18, 2017).................................................................10, 45, 68

*Figueroa v. Kronos Incorporated,*
    2020 WL 1848206 (N.D. Ill. ED, April 13, 2020).......................................................12

*Frey v. Commodity Futures Trading Comm'n,*
    931 F.2d 1171 (7th Cir. 1991)...................................................................................15, 43

*Geinosky v. City of Chicago,*
    675 F.3d 743 (7th Cir. 2012)......................................................................................12

*Gelboim v. Bank of Am. Corp.,*
    823 F.3d 759 (2d Cir. 2016).......................................................................................73

*Golbert v. Aurora Chicago Lakeshore Hospital, LLC*
    2021 WL 952560 (N.D. Ill. Mar. 11, 2021).............................................................61

*Gomez v. Illinois State Bd. Of Educ.*
    811 F.2d 1030 (7th Cir. 1987)....................................................................................70

*Gomez v. Randle,*
    680 F.3d 859 (7th Cir.2012).......................................................................................12

*Guaranteed Rate, Inc. v. Conn,*
    264 F. Supp. 3d 909 (N.D. Ill. 2017)........................................................................61

*Guttman v. Commodity Futures Trading Comm'n,*
    197 F.3d 33 (2d Cir. 1999).......................................................................................50, 51

*Harry v. Total Gas & Power N. Amer., Inc.,*
    889 F. 3d 104 (2d Cir. 2018).....................................................................................59

*Hunter v. F.E.R.C*
    403 Fed. Appx. 525 (U.S. App. D.C., 22, 2010)..................................................Passim

*In re Amaranth Nat. Gas Commod. Litig.*,
    587 F.Supp.2d 513 (S.D.N.Y. 2008)................................................................Passim

*In re Amaranth Nat. Gas Commodities Litig.*,
    730 F.3d 170 (2d Cir. 2013)..............................................................................16

*In re Broiler Chicken Grower Antitrust Litig.*,
    290 F. Supp. 3d 803 (N.D. Ill. 2017)..........................................................63, 64, 68

***In re CBOE Volatility Index Manipulation Antitrust Litig.*,**
    435 F. Supp. 3d 845 (N.D. Ill. 2020)…………………………………………………..59

*In re Commodity Exch., Inc.*,
    213 F. Supp. 3d 631 (S.D.N.Y. 2016).................................................................66

*In re Copper Antitrust Litig.*,
    98 F. Supp. 2d 1039 (W.D. Wis. 2000)..............................................................71

*In re Crude Oil Commodity Futures Litig.*,
    913 F. Supp. 2d 41 (S.D.N.Y. Dec. 12, 2012).....................................................57

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    767 F. Supp. 2d 880 (N.D. Ill. ED, Feb. 4, 2011)............................................66, 67

*In re Dealer Mgt. Sys. Antitrust Litig.*,
    313 F. Supp. 3d 931 (N.D. Ill. 2018)..................................................................67

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016).....................................................51

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)..............................................................67

*In re Henner*,
   30 A.D. 1151 (1971) ...................................................................................................4, 34

*In re Initial Public Offering Securities Litigation*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003)....................................................................................48

**In re Ins. Brokerage Antitrust Litig.**,
   **2017 WL 3642003 (D.N.J. Aug. 23, 2017)……………………...…………………………34**

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013)....................................................................................59

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
   213 F. Supp. 3d 530 (S.D.N.Y. 2016)....................................................................................43

*In re Natural Gas Commodity Litig.*,
   337 F. Supp. 2d 498 (S.D.N.Y. 2004)..............................................................................53, 57

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011).......................................................................64, 66, 68

*In re Platinum & Palladium Antitrust Litig.*,
   2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017)...................................................................... 58

*In re Platinum & Palladium Commodities Litig.*,
   828 F. Supp. 2d 588 (S.D.N.Y. 2011)..............................................................................4,51

*In re Sumitomo Copper Litig.*,
   182 F.R.D. 85 (S.D.N.Y Sept. 18, 1998)..........................................................................41, 43

*In re Term Commodities Cotton Futures Litig.*,
   2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020).......................................................................11

*In re Term Commodities Cotton Futures Litig.*, No. 12 CIV. 5126,
   2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013)...................................................................11, 16

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010)....................................................................................................61

*In re Treas. Securities Auction Antitrust Litig.*,
    15-MD-2673 2021 WL 1226670 (S.D.N.Y. Mar. 31, 2021)......................................................67

*In the Matter of Anthony J. DiPlacido*
    2008 WL 4831204 (C.F.T.C. Nov. 5, 2008)....................................................................Passim

*In the Matter of Anthony J. DiPlacido*
    CFTC No. 01-23, 2004 WL 2036910 (C.F.T.C. Sept. 14, 2004)……………..…………….4

*In the Matter of Daniel Shak and SHK Management LLC, Respondents*,
    2013 WL 7085760 (CFTC Nov. 23, 2013)................................................................6, 11

*In the Matter of Gary Glass and Zoltan (Lou) Guttman, Respondents*,
    1996 WL 518121 (C.F.T.C. Sept. 11, 1996)..............................................................50

*In the Matter of Hohenberg Bros. Co., and J. J. Hohenberg*,
    CFTC No. 75-4, 1977 WL 13562 (C.F.T.C. Feb. 18, 1977)……………….…………………24

*In the Matter of Indiana Farm Bureau Coop. Ass'n, Inc., and Johnson*
    1982 WL 30249 (C.F.T.C. Dec. 17, 1982)................................................................26

*Johnson v. U.S.*
    2015 WL 7169589 (S.D.N.Y. Nov. 12, 2015)..........................................................65

*Kleen Products, LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011)................................................................63, 64

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
    244 F.R.D. 469 (N.D. Ill. 2007)...................................................................Passim

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)......................................................................................72

*Loeb Industries v. Sumitomo Corp.*,
306 F.3d 469 (7th Cir. 2002)......................................................................................Passim

*Martinez v. Wexford Health Services, Inc.*
2021 WL 1546429 (N.D. Ill. Apr. 20, 2021)...............................................................69

*Mervyn v. Nelson Westerberg, Inc.*,
2012 WL 6568338 (N.D. Ill. Dec. 17, 2012).........................................................12, 20

*Minpeco, S.A. v. ContiCommodity Svcs.*, Inc.,
673 F.Supp. 684 (S.D.N.Y. 1987)........................................................................42, 64

*Muir v. Playtex Products, LLC*,
983 F.Supp.2d 980 (Nov. 6, 2013)..............................................................................12

*Munson v. Gaetz*,
673 F.3d 630 (7th Cir.2012).........................................................................................12

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
2016 WL 3098842 (S.D.N.Y. June 1, 2016)................................................................38

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016).........................................................................15

*Premium Plus Partners, L.P. v. Davis*,
2005 WL 711591 (N.D. Ill. Mar. 28, 2005)...........................................................16, 75

*Rankow v. First Chicago Corp.*,
870 F.2d 356 (7th Cir. 1989)........................................................................................52

*Reger Dev., LLC v. Nat'l City Bank*,
592 F.3d 759 (7th Cir.2010).........................................................................................12

*Rosenthal and Co. v. CFTC*,
802 F.2d 963 (7th Cir.1986)...................................................................................51, 53

*Rueda v. Midland Credit Management, Inc.*,
2019 WL 3943681 (August 21, 2019) ........................................................................12

*Sanner v. Board of Trade of City of Chicago*
62 F.3d 918 (7th Cir.1995) .................................................................................Passim

*Schutz v. Arrow Fin. Servs., LLC*,
465 F. Supp. 2d 872 (N.D. Ill. 2006) .........................................................................52

*Slep-Tone Ent. Corp. v. Coyne*,
41 F. Supp. 3d 707 (N.D. Ill. 2014) ...........................................................................61

*Strobl v. New York Mercantile Exch.*,
582 F. Supp. 770 (S.D.N.Y. 1984) ........................................................33, 63, 65, 66

*Strobl v. New York Mercantile Exch.*,
768 F.2d 22 (2d Cir. 1985) ...................................................................33, 63, 65, 66

*Tichy v. Hyatt Hotels Corp.*,
376 F. Supp. 3d 821 (N.D. Ill. 2019) .........................................................................61

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*,
554 F. Supp. 2d 523 (S.D.N.Y. 2008) ..........................................................................4

*U.S. v. Andreas*
1999 WL 515484 (N.D. Ill. July 15, 1999) ...............................................................65

*U.S. v. Baker*,
40 F.3d 154 (7th Cir. 1994) .......................................................................................33

*U.S. v. Calderon*,
559 Fed. Appx. 554 (7th Cir. 2014) ...........................................................................33

*U.S. v. Fuller*,
532 F.3d 656 (7th Cir. 2008) .....................................................................................64

*U.S. v. Harris*,
  567 F.3d 846 (7th Cir. 2009)................................................................................33

*U.S. v. Haywood*,
  324 F.3d 514 (7th Cir. 2003)................................................................................33

*U.S. v. Hopper*,
  934 F.3d 740 (7th Cir. 2019)................................................................................33

*U.S. v. Jordan*,
  374 Fed. Appx. 3 (11th Cir. 2010).......................................................................65

*United States ex rel. Chepurko v. e-Biofuels, LLC*,
  2019 WL 162607 (S.D. Ind. Jan. 10, 2019).........................................................13

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940).............................................................................................59

**United States v. Topco Associates, Inc.**,
  **405 U.S. 596 (1972)**……………………………………………..……………………60

*Viacom, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020)................................................................................69

*Weifang Tengyi Jewelry Trading Co. Ltd. v. Intuii LLC*
  2019 WL 3889626 (N.D. Ill. Aug. 19, 2019).................................................12, 20

**Statutes**

7 U.S.C. §2(a)(1)(B)..............................................................................50, 51, 52, 54

7 U.S.C. §13c(a)..................................................................................................54

7 U.S.C. §25(a)....................................................................................................57

7 U.S.C § 13(a)(2)................................................................................................15

15 U.S.C. § 7.....................................................................................................................................61

**Rules**

Fed. R. Civ. P. 8(a).....................................................................................................................16, 46

**Regulations**

76 FR……....................................................................................................................................46

75 FR 67657……………………................................................................................................39

**Other Authorities**

Jerry W. Markham, *Manipulation of Commodity Futures Prices -- The Unprosecutable Crime*, 8 Yale J. On Reg. (1991)...............................................................................................................4

Jerry W. Markham, *Fiduciary Duties Under the Commodity Exchange Act*, 68 Notre Dame L. Rev. 199 (1992)………………………………………..…………………….60

Wright & A. Miller, Federal Practice and Procedure, 3d ed (2010)..............................................13

I.    **Introduction**. Plaintiff respectfully submits this memorandum and the accompanying declaration[1] in order to demonstrate that Defendants' motions (ECF 71, 73, 77) should be denied in all respects. Plaintiff plausibly alleges as follows. "Ammo" selling is a well-recognized manipulative device. ¶¶2b, 103-106, n.5.[2] Trade at Settlement ("TAS") contracts may be abused to exert manipulative pressure on futures contracts. ¶¶2a, n.3, 87-92, 109, 110. Defendants conspiratorially abused the TAS mechanism and the manipulative device of "ammo" selling on April 20, 2020 in order to artificially depress May Contract[3] prices. ¶¶2, 6, 7, 16, 42, 44, 46, 48, 50, 52, 53, 55-59, 129-145, 156, 166-68, 175, 180, 201. Defendants' conspiratorial price depressive pressure reached its greatest levels between 1:00 and 1:30 p.m. just before and during the time when the "vast majority" (¶136) of the May Contract's all-time record price decline occurred.

With regard to such price decline, a credible well-respected financial media firm, ***Bloomberg***, has reported:

> U.S. authorities and investigators ... were **shocked** to discover that the firm that appeared to have had the **biggest impact** on prices **that afternoon** [of April 20th] wasn't a Wall Street bank or a big oil company, but a tiny outfit called **Vega Capital London Ltd**.

---

[1] Declaration of Christopher McGrath, Esq., ("McGrath Decl.")
[2] Amended Complaint [ECF 40], paragraph ("¶").
[3] May 2020 West Texas Intermediate ("WTI") Light Sweet Crude Oil futures contract ("May Contract") (sometimes referred to by the VTDs as "Ti" or "front ti").
    Under the terms of the May ICE West Texas Intermediate (WTI) Light Sweet Crude Oil Futures Contract, its settlement price on April 20th was contractually required to be the same as that of the NYMEX May Contract. ¶ 199. Accordingly, Defendants' conspiratorial depression of the May Contract price also manipulatively depressed the ICE May Contract price which greatly profited the substantial short positions of which Defendants also held in ICE May Contracts.

McGrath Decl. Ex. 1 [Emphasis added].[4] 

¶¶181-195.

¶¶9, 27, 30, 68, 179-182.

(¶¶26, 141, 207-08, ECF 86, ¶2 (

)). Reportedly, the Commodity Futures Trading Commission ("CFTC") and U.S. Attorney are also investigating. ¶¶n.3, 92.

**A.** **Defendants' Conspiratorial Abuse Of The TAS Mechanism To Place Extraordinarily Large Cumulative Net Selling Pressure On May Contract Prices**. Plaintiff plausibly alleges as follows: Defendants had long common prior experience trading and training together to move and "blitz" prices. ¶¶5, 114-117, 126, 128. Defendants operated pursuant to a conspiracy facilitating structure in which VTDs guaranteed Vega against the losses in one another's accounts with Vega. ¶¶4, 122. Cumulative net selling pressure causes the prices of a futures contract to be lower than it otherwise would be. *See* "Ability to Influence". A person's cumulative net sales of the May Contract consisted of the amount of their sales of May Contracts minus the amount of their purchases of May Contracts.

If, like Plaintiff Mish International Monetary Inc. ("Plaintiff") (¶29) and most other market participants, Defendants had both sold and purchased their positions in the market for

---

[4] ***Bloomberg***, December 12, 2020, "The Essex Boys: How Nine Traders Hit a Gusher With Negative Oil".
[5] The Vega Trading Defendants ("VTDs") are Defendants Trader 1, Trader 2, Trader 5, Trader 9, Trader 4, Trader 3, Trader 10, Trader 11, Trader 12, Trader 6, Trader 7, Trader 8 .
The remaining Vega Defendants are Vega Capital London, Ltd., Individual A .

May Contracts, then Defendants' cumulative net sales on April 20th would have been zero. However, pursuant to their agreement to depress May Contract prices, each VTD made his sales of May Contracts in the market for May Contracts but overwhelmingly diverted his purchases of May Contracts into the TAS contract. ¶¶ 2, 6, 42(b), 44, 46(b), 48(b), 50(b), 52(b), 53(b), 55(b), 56-59, 128-129, 133, 138-139, 144, 156, 173-175, 201, 203.

| Trader | NYMEX May Contract Sales | NYMEX May TAS Purchases |
|---|---|---|
|  | ¶139 | ¶139 |
| Trader 6 | ████ | ████ |
| Trader 4 | ████ | ████ |
| Trader 5 | ████ | ████ |
| Trader 9 | ████ | ████ |
| Trader 3 | ████ | ████ |
| Trader 7 | ████ | █████ |
| Trader 12 | ████ | █████ |
| Trader 1 | ███ | ███ |
| Trader 2 | ███ | ██ |
| Trader 11 | ██ | ██ |
| Trader 10 | ██ | ██ |
| ███████ | ██ | ██ |
| Trader 8 | █ | █ |
|  |  |  |
| **Total** | █████ | █████ |

The net result of Defendants selling ████ May Contracts and diverting almost all their buying pressure into the TAS market was that they made cumulative net sales of approximately ████ May Contracts. ¶¶139-140.

The TAS contract provides that the holder will be entitled to purchase (in the instance of Defendants) May Contracts based upon the volume weighted average price (VWAP) of May Contracts traded between 1:28 and 1:30 pm. Purchases in the TAS market had very little or no offsetting price impact on Defendants' sales in the May Contract. *Id.,* ¶¶107-113. Because Defendants each made their sales of May Contracts in the market for May Contracts, and overwhelmingly diverted their offsetting purchasing pressure into the TAS market, Defendants

succeeded in placing increasing cumulative selling pressure on May Contract prices while avoiding placing countervailing buying pressure on May Contract prices. *See* "II" *infra* "Ability to Influence" (explaining the multiple ways in which Defendants' cumulative net sales depressed May Contract prices).

Defendants' cumulative net sales of ███ May Contracts is **many times more** than even the gross number of sales or purchases made by the defendant in numerous prior claims of one day trade manipulations which were upheld at the pleading or evidentiary stage.[6] But many of the Defendants enhanced the depressive impact on May Contract prices of their sell, sell, sell and don't buy behavior, through the "crafty"[7] ways in which they made their sales. **First**, seven Defendants made their cumulative net sales in an extremely highly coordinated manner which is contrary to independent decision making and was explicitly enhanced by real time communications in which they discussed their orders, sales, positions, and planned their next moves. *E.g.,* ¶¶2, 6-8, 141(graphing their positions), 142-143, 165-195. **Second**, all Defendants

---

[6] *Compare e.g., In re Henner*, 30 A.D. 1151 (1971) (after a full hearing on the merits, finding manipulation involving only six egg futures contracts, representing just 1/2700[th] (or 0.03%-) of defendants' selling volume); *In re Diplacido*, CFTC Docket No. 01-23, 2004 WL 2036910 (C.F.T.C. Sept. 14 2005) *aff'd in part, rev'd in part*, *In re Diplacido*, CFTC Docket No. 01-23, 2008 WL 4831204 (C.F.T.C. Nov. 5, 2008), *aff'd In re Diplacido*, 364 Fed. Appx. 657 (2d. Cir. 2009) (after a full hearing on the merits, finding manipulation involving between 65 and 289 electricity futures contracts on each of four days, with such daily trading volumes representing between 0.4% and 1.12% of Defendants' selling volume in this case), *U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.,* 554 F. Supp. 2d 523 (S.D.N.Y. 2008) (entering consent orders against defendants that included substantial civil monetary penalties, after denial of defendants' motions to dismiss and motions for summary judgment, in connection with alleged manipulation involving just 3,000 natural gas futures contracts (representing just 18.5% of defendants' trading volume) during a mere 30 minute settlement period on each of two days); *and In re Platinum and Palladium Commodities Litig.,* 10-cv-3617 (WHP) (S.D.N.Y.) (defendant Moore Capital not even contesting plaintiffs' CEA manipulation claims, despite such claims involving (on various days over a seven month period ) daily trading volumes of just 1-100 palladium futures contracts and/or 1-100 platinum futures contracts (Defendants' trading volume is between **16,205 and 162 times as large**)).

[7] *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971); J. Markham, *Manipulation of Commodity Futures Prices -- The Unprosecutable Crime*, 8 YALE J. REG. 281, 461 n. 526 (1991) (quoting a CFTC memorandum rejecting efforts to catalog manipulative practices because this would merely enable "crafty" traders to then "evade prohibitions").

participated in one another's sales of May Contracts on April 20th in two important additional ways:

- Although each Defendant was identified in their contract with Vega as an "independent contractor" and made his own trading decisions (¶37), each Defendant agreed that the capital in his account with Vega would be pooled and mutually guarantee Vega against losses of any other VTD. ¶¶4, 37, 122-125, 187. Through this backup participation in one another's May Contract trades on April 20th, each and every VTD further aligned their common financial interest to depress May Contract prices. ¶¶89, 109-110, 125, 128, 134. Moreover, because the cumulative assets of all stood behind the trades of each, such pooling greatly increased the **amount** of the net sales which the VTDs had the ability to make. ¶¶109, 125, 128, 134, 196-203.

- Prior to April 20th, Defendants had trained with one another for years to improve their ability to sell, sell, sell, and "blitz" or "bombard" markets with sales in order to depress oil prices.[8] ¶¶119,170, 179; *see* ¶¶7, 114-130. Exploiting on April 20th all their years of training in how to move prices, Defendants successfully ramped up the quantity and aggressiveness of their selling at specific times which greatly further increased their depressive impact on May Contract prices. *Id.*; *see also* "B" next.

B. **Defendants' resulting extraordinarily large financial motivation to depress May Contract prices and their "ammo" and uneconomic trading which did greatly depress May Contract prices through 1:30 p.m. on April 20th.** In commodity futures, each trader's financial results are established by the difference between their sell price and buy price on a given transaction. ¶¶70-79. Here, by diverting almost all of their purchases into the TAS market, Defendants' financial results of their ███ May Contract sales were all dependent upon the TAS price. ¶¶87-92, 107-115, 128, 138-140, 203. Again, this price was determined by the

---

[8] *Compare*, *e.g.*, ¶¶5, 41, 114-119, 126, 190 ("██████ ███Trader 1███ ██████
████████████) *with* McGrath Decl. Ex. 2 (**Bloomberg**, August 4, 2020, "London Traders Hit $500 Million Jackpot When Oil Went Negative") ("**Defendants' aggressive selling of oil on April 20th is a tactic Vega's traders used regularly, according to another person familiar with the firm's strategy.**")

volume weighted average price of May Contract transactions between 1:28 and 1:30pm on April 20th. ¶¶82, 91. Thus, as effective as Defendants' sell sell sell and don't buy strategy was in placing selling pressure on the May Contract, it also created a mutual time of financial reckoning for all Defendants during the "afternoon" (Chicago Time) of April 20th. As a result, Defendants then had an increasingly large shared financial motive to cause May Contract prices to go into a strong downward trend from which such prices could not recover by the 1:28-1:30pm fixing window for the TAS. ¶¶82, 89, 91, 109-110, 128, 134-137.

Consistent with their shared, extraordinarily large and growing financial motivation to depress prices, Defendants began by 1:00 p.m. at the latest to accelerate the rate and increase the "aggressiveness" of their sales of May Contracts. ¶¶2, 145-154, 157, 161-164, 206-209. "Aggressive" orders are orders which immediately match the bid in the market, execute immediately, and remove buy side liquidity from the order book. *Compare* ¶¶147-154 *with In The Matter of Brian Hunter*, Docket No. IN07-26-004, 130 FERC ¶ 63,004, 2010 WL 232835 (FERC Jan. 22, 2010) ("*Hunter*") (finding manipulation under the Natural Gas Act where the manipulator's sales were made to "hit bids" and thereby "almost guarantees a lower price").

Again, Plaintiff plausibly alleges but Defendants do not mention much less dispute, that regulators recognize "ammo" trading as a manipulative device. *Compare* ¶¶2, 16, 103-106 *with* ECF 71, 73, 77 *passim*. In "ammo" trading, the market participant fires its trades at prices in order to move prices in the desired direction. The "very essence" of futures contract trading is that market participants seek to sell at high (or buy at low) prices.[9] But in order to use their sales

---

[9] *See, e.g,*, *In re DiPlacido*, No. 01-23, 2008 CFTC LEXIS 101, *91-92 (Nov. 5, 2008) (explaining, "the very essence of a normal price on a futures market is a price arrived at by the free forces of supply and demand . . . acting rationally, *i.e.*, the buyers trying to buy as cheaply as they can and the sellers trying to sell as high as they can."), *aff'd by summary order*, 2009 U.S. App. LEXIS 22692 (2d Cir. Oct. 16, 2009); *In the Matter of: Daniel Shak and SHK Management LLC,* 2013 WL 7085760 at *3 (CFTC Nov. 23, 2013) ("Typically, traders want to buy at low prices and sell at higher ones.").

as ammo to move prices, market participants may, and Defendants here purposely did, seek to make sales at lower prices in order to cause those prices to be lower. ¶¶2.b, 111-112, 129, 134-136, 180.

Causation of artificial prices requires only that the accused be a contributing factor or one cause, not the sole cause, of artificial price movements. *See* fn. 28 and accompanying text. As a direct result of Defendants' extraordinarily large cumulative net selling pressure and the increasing rate and aggressiveness of Defendants' "ammo" selling of May Contracts after 1:00 p.m., Defendants successfully caused May Contract prices to fall below zero by 1:08:23 Chicago time. *See* ¶¶136, 145.e (the price of the May Contract went below zero, to approximately negative $0.01 per barrel, at 1:08:23 CST and then decreased by approximately $37.62 per barrel by 1:30 p.m. CST (to negative $37.63 per barrel)).

Sensing that their cumulative net sales had eaten away at the market's buy orders (¶205) and that their accelerated rates and increased amounts of "ammo" selling were causing the total sales in the market to begin to overwhelm the buy orders, Defendants then began after 1:08:23pm again to increase substantially both the rate and the aggressiveness of their "ammo" and other sales of May Contracts. *E.g.*:

| Time Period | May Contracts Sold (¶145) | **Rate Per Minute** (¶145) | Net Aggressor Sales (¶163) | **Net Aggressor Sales per minute** |
|---|---|---|---|---|
| 9:00 - 11:00 | ▇ May Contracts | ▇ May Contracts per minute | ▇ net aggressor sales | ▇ |
| 11:00 - 12:00 | ▇ May Contracts | ▇ May Contracts per minute | ▇ net aggressor sales | ▇ |
| 12:00 - 1:00[10] | ▇ May Contracts | ▇ May Contracts per minute | ▇ net aggressor sales | ▇ |

---

[10] The numbers in this fourth row were determined as follows. The total number of sales from 12 to 1:30 is ▇ May Contracts. The total number of sales from 1:00 to 1:30 is ▇ May Contracts. Subtracting ▇ from ▇ equals ▇. Dividing ▇ contracts by 60 minutes equals the rate of contracts per minute. The total number of net aggressor sales from 12 to 1:30 is ▇ May Contracts. The total number of net aggressor sales from 1:00 to 1:30 is ▇ May Contracts. Subtracting ▇ from ▇ equals ▇. Dividing ▇ contracts by 60 minutes equals the rate of net aggressor sales per minute.

| 1:00 - 1:08:23[11] | █ May Contracts | █ May Contracts per minute | █ net aggressor sales | █ |
| 1:08:23 - 1:30 | █ May Contracts | █ May Contracts per minute | █ net aggressor sales | █ |

Defendants' increased aggressive selling after 1:08:23 caused the total amount of sales of May Contracts sold to exceed the order to buy May Contracts. Further, Defendants' rapid aggressor selling also tended to send a signal to market participants that, in this first time ever in which a NYMEX crude oil futures contract had traded at negative prices, such prices could and would continue to fall. *E.g.,* ¶¶136-137, 252. This, notwithstanding the irrationality of selling and the favorability of buying at a negative price. ¶136.

Regarding irrationality, Defendants sold █ May Contracts after 1:08:23 virtually all of which were made at negative prices. ¶145; see chart above. Defendants did not receive any money for any of these negative sales. On the contrary, Defendants had to pay money for these sales (including, discovery will show, as much as negative $█ per barrel). Intrinsically, it was contrary to the essence of futures trading purposely to seek to sell at lower prices in **any** price environment. See cases collected in fn. 9. But it was especially irrational to continue purposely to sell for less when one **had to pay** in order to make such sales (rather than be paid, as was always the case in the history of crude oil futures trading prior to 1:08:23 on April 20[th]). It is a reasonable inference from Plaintiff's allegations that Defendants' purposeful selling designed to achieve progressively lower prices between 1:00 and 1:30 was uneconomic selling, though Defendants correctly point out that, in addition to specifically alleging that such selling

---

[11] The numbers in this fifth row were determined as follows. The total number of sales from 1 to 1:30 is █ May Contracts. The total number of sales from 1:08:23 to 1:30 is █ May Contracts. Subtracting █ from █ equals █. The total number of net aggressor sales from 1 to 1:30 is █ May Contracts. The total number of net aggressor sales from 1:08:23 to 1:30 is █ May Contracts. Subtracting █ from █ equals █. Dividing █ contracts by 60 minutes equals the rate of net aggressor sales per minute.

constituted unlawful "ammo" selling, Plaintiff did not explicitly characterize such selling as "uneconomic".

As Defendants' rapid "ammo" and uneconomic aggressor and other sales of May Contracts continued, Defendants helped cause May Contract prices to decline by more than 15% and also to decline rapidly at various times between 1:09 and 1:30pm. Compare ¶145 *with* ECF 71 at p. 28. Accordingly, CME market control mechanism imposed a series of halts of trading of the May Contract or the May Contract – June Contract spread (or both) prior to 1:30 p.m. *Compare* ¶145 *with* ECF No. 71, Exhibit F at pp. 35-36. With full knowledge of the CME's foregoing multiple efforts to restore an orderly market, Defendants purposely continued to seek to make rapid aggressor and other sales of May Contracts at progressively lower prices. ¶¶2.c, 128, 130, 133-137, 164, 168. Thereby, Defendants succeeded in overcoming the CME's market control mechanisms and causing a substantial downtrend in May Contract prices from which they did not recover through the 1:30 p.m. time by which the TAS price had been calculated. *Id.*

Through Defendants' "ammo" and uneconomic sales, Defendants were a proximate cause of the final TAS settlement price of minus $37.50 per barrel. ¶¶16, 129-137. Although Defendants frenzy of purposeful orders to seek to sell for progressively lower prices was uneconomic and contrary to the essence of futures trading, Defendants thereby proximately caused a uniform common buyback price for all of their net sales of ▮▮▮▮ May Contracts of minus $37.50 per barrel. Thus, Defendants' conspiratorial abuse of cumulative net sales and their frenzy of unlawful ammo and uneconomic sales, enabled Defendants to depress prices to the point at which they experienced a profit on their May Contract trading in excess of ▮▮▮▮▮▮. ¶¶ 138-139.

9

Although Defendants long training and working together to move prices made express discussions unnecessary, multiple Defendants did explicitly discuss ammo selling or adding to their short May positions at the end of trading. ¶¶2.b, 7, 165-195. Plaintiff plausibly alleges as follows. ██████████ ███ Trader 9, Trader 12, and Trader 4 ██████████. ¶¶2.b, 167-171. █████████████████ Trader 4, Trader 6, and Trader 9 ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ Trader 4, Trader 6, and Trader 9 ██████████████.

Defendants fail to argue that neither these Vega Defendants nor any other Vega Defendants would refuse to engage in ammo trading because it was a manipulative device. *Compare* ¶¶2(b), 16, 103-106, 111 *with* ECF 71, 73, 77 *passim*.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████. *Compare* ¶¶2.b, 167 *with* ECF 71, pp.32-33.

████████████████████████████ ██████████████████

██████████████████████████████████████

██████████████████ ECF 71, pp.32-33.

██████████████████████████████████

████████████████████████████████████

████████████████ Trader 12 and Trader 9 ████████████████

---

[12] *Dubensky v. City of Chicago*, 2017 WL 3034651, at *2 (N.D. Ill. July 18, 2017) (Feinerman, J) ("The parties' **punches and counter-punches** concern the weight of the evidence [the plaintiff] might offer to prove his claim, but evidence is not required at the pleading stage. Instead, on a motion to dismiss, the court must accept the well-pleaded facts as true and then determine, on that factual predicate, whether the plaintiff has a plausible claim to relief.").

███████████████████████████████████████████████████

███████████████████████████████ ¶¶46 (██Trader 6██), 50 (██Trader 4██); 53 (██Trader 9██),

55 (██Trader 12██), 145; *see* p. 29 (demonstrating that Plaintiffs' allegations are plausible).

Finally, Defendants knew that the May Contract market was somewhat "thin" or

congested. *Compare, e.g.,* ¶¶129, 193 *with* ¶190. To the extent that the VTDs observed that the

May Contract market was thin or congested between 1:00 and 1:30, then Defendants

extraordinary acceleration of their rates and aggressor sell orders (to a rate 10 times greater than

their rate between 9-11a.m.) constitutes an egregious and additional form of manipulation known

as exacerbation.[13] In any event, Defendants' rates of selling speak for themselves. In a tiny time

period of 1:00-1:30, Defendants sold ████ May Contracts. ¶145(d). This was a multiple of what

they had sold between 9am and 11am, and comparable to what they had sold in each of the

following hours. Such vast increase in Defendants' rate, quantity, and "aggressor"/manipulative quality of

selling May Contracts occurred just before and during the time when the "vast majority" (¶136)

of the all-time record decline in May Contracts occurred.

Selling in order to exacerbate a thin market also raises a reasonable inference of

uneconomic conduct. Where a trader reaches to sell more than he thinks the market can handle in

order to cause himself to get a lower price, it is uneconomic conduct that manipulates prices. See

*Hunter,* 2010 WL 232835 at *5-6, *15, *53; *In the Matter of: Daniel Shak and SHK*

*Management LLC, Respondents*, 2013 WL 7085760, at *3, *6 (CFTC Nov. 23, 2013)

("*Shak*"). And that applies equally where there is a thin market. *See In re DiPlacido*, 364 Fed.

---

[13] *Compare In re Term Commodities Cotton Futures Litig.*, No. 12 CIV. 5126 ALC KNF, 2013 WL
9815198, at *14 (S.D.N.Y. Dec. 20, 2013), *on reconsideration in part,* No. 12 CIV. 5126, 2014 WL
5014235 (S.D.N.Y. Sept. 30, 2014) (knowingly adding to positions in the face of a congestion
"exacerbates" the situation and constitutes manipulation) *with In re Term Commodities Cotton Futures
Litig.*, 2020 WL 5849142, n.20 (S.D.N.Y. Sept. 30, 2020).

Appx. 657, 660-61 (2d Cir. 2009) (finding large trades made during close in an illiquid market supported finding that defendant manipulated futures prices).

**C. Defendants' arguments violate the controlling standards on this motion, as well as common sense.**

Defendants argue that supply, demand, and other factors supposedly caused all of, and that Defendants' assertedly low percentage of the sales volume in the May Contract did not constitute even one cause of any of the May Contract's April 20th price decline. ECF 71, p. 18. First, Defendants' arguments violate this Court's controlling standards on this motion. As this Court has held:

> On a Rule 12(b)(6) motion, the court assumes the truth of the complaint's well-pleaded factual allegations but not its legal conclusions. *See Munson v. Gaetz,* 673 F.3d 630, 632 (7th Cir.2012); *Reger Dev., LLC v. Nat'l City Bank,* 592 F.3d 759, 763 (7th Cir.2010). The court must construe those facts in the light most favorable to Mervyn, the party opposing dismissal. *See Gomez v. Randle,* 680 F.3d 859, 864 (7th Cir.2012). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Mervyn's brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (7th Cir.2012). The following facts are set forth as favorably to Mervyn as permitted by the complaint and the other materials that must be considered on a Rule 12(b)(6) motion.

*Mervyn v. Nelson Westerberg, Inc.*, No. 11 C 6594, 2012 WL 6568338, at *1 (N.D. Ill. Dec. 17, 2012) (Feinerman, J) ("*Mervyn*").[14] Further, all "reasonable inferences" are to be drawn in favor of the non-movant (Plaintiff) here. *E.g., Weifang Tengyi Jewelry Trading Co. Ltd. v. Intuii LLC*, 2019 WL 3889626, *1 (N.D.Ill. Aug. 19, 2019)(Feinerman, J) ("*Weifang*"). In seeking to carry

---

[14] *Figueroa v. Kronos Incorporated,* 2020 WL 1848206 (N.D. Ill. April 13, 2020) (Feinerman, J); *Rueda v. Midland Credit Management, Inc*., 2019 WL 3943681 (N.D. Ill. August 21, 2019) (Feinerman, J); *Al Haj v. Pfizer Inc*., 338 F.Supp.3d 741 (N.D. Ill. April 13, 2018) (Feinerman, J); *Muir v. Playtex Products, LLC*, 983 F.Supp.2d 980 (N.D. Ill. Nov. 6, 2013) (Feinerman, J); *accord, Blasberg v. City of Chicago*, No. 18 C 1386, 2018 WL 3046867, at *1 (N.D. Ill. June 20, 2018) (Feinerman, J) ("*Blasberg*").

their movants' "heavy burden"[15] to show that any of Plaintiff's claims should be dismissed, Defendants woefully fail to follow the foregoing governing standards.

Plaintiff plausibly alleges as follows. The supply and demand for crude oil was relatively constant during the three trading days of April 17, 20, and 21, and that the May Contract closing price on April 17th was similar to that on April 21st. ¶¶12-15, 131, 236, 253. The vast majority of the all-time price decline on April 20th occurred between 1:00 and 1:30pm when Defendants' depressive manipulative pressure and uneconomic and unlawful selling were at their highest levels. See "B" above. There was an all-time record bounce back in May Contract prices on April 21st, as those fairly constant forces of supply and demand reasserted themselves and the manipulative impact of Defendants' price depressive conduct on April 20th gradually wore off. ¶¶14, 236-237.

Conspicuously Defendants fail to explain any changes in supply and demand for crude oil which could have caused such extreme yo-yo price movements of an all-time record decline on April 20th, a lopsided acceleration in the decline in which fully 78% of it occurred within 30 minutes, and an all-time record increase in prices which occurred on April 21st. ECF 71, 73, 77 *passim*.

When properly considered, the factors raised by Defendants will, at most, be seen to be reasons why Defendants thought the May Contract was vulnerable to manipulation and the Defendants could profit by conspiratorially depressing May Contract prices that day. To any extent that supply, demand, or the other dust which Defendants kick into the motion to dismiss,

---

[15] Wright and Miller § 1357 Motions to Dismiss—Practice Under Rule 12(b)(6), 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed.) ("All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists."); *United States ex rel. Chepurko v. e-Biofuels, LLC*, No. 114CV00377TWPMJD, 2019 WL 162607, at *7 (S.D. Ind. Jan. 10, 2019) (movant has "heavy burden of showing that dismissal is warranted under Rule 12(b)(6)").

did have some impact on May Contract prices, those factors did not remotely begin to change the fact that Defendants were one proximate cause of the all-time record price decline on April 20th, including the almost 4/5ths of that decline which occurred as Defendants engaged in their unlawful "ammo" and uneconomic frenzy of selling between 1:00 and 1:30pm.

Instead, Defendants repeatedly substitute their own facts. Similarly denying the Complaint, Defendants assert that their sales supposedly constituted only 6.5% of the total May Contract sales on April 20th. ECF 71, pp. 24, 27-28. However, Plaintiff alleges in detail that Defendants' sales of May Contracts between 9am and 1:30pm on April 20 constituted specified percentages of the market sales during successive time windows: 9am-11: 6.7%, 11am – 12: 16.4%, 12-1:30: 23.6%, 1-1:30: 29.2%. ¶¶138-145. Defendants do not specifically challenge any of these allegations. ECF 71, 73, 77 *passim*. Summing up such unchallenged allegations, Plaintiff clearly alleges that Defendants' percentage of the total sales in the May Contract between 9am and 1:30pm was approximately 16.76%. Though this percentage well exceeds that found sufficient to uphold claims of trade manipulation at the pleading or proof stage,[16] such percentage greatly understates Defendants' impact on May Contract prices for multiple reasons.

- It fails to consider Plaintiff's specific allegations of the amounts of Defendants' aggressor selling, accelerated rates of selling, and "ammo" uneconomic sales between 1:00-1:30pm. Because Defendants' cumulative net sales were at their highest level and Defendants then greatly accelerated their aggressive selling between 1 and 1:30, they overwhelmed the May Contract market during this time and caused substantial price declines. *E.g., ¶¶*146-164.
- It fails to consider Defendants' extremely highly coordinated selling. *E.g., ¶¶*138-145.

---

[16] *Hunter*, 2010 WL 232835 (finding, based on the same facts as *Amaranth Advisors* and *In re Amaranth Nat. Gas Commod. Litig*., 587 F.Supp.2d 513 (S.D.N.Y. 2008), manipulation under the Natural Gas Act where the alleged manipulator's trades constituted between 14.4% and 19.4% of the trading volume during the closing period for three natural gas futures contacts).

- Inaptly, Defendants misleadingly use as the denominator all the gross sales by the entire market. But the informative number, which can only be obtained after discovery, is the total amount of cumulative net sales by those market participants who had cumulative net sales. Using this number as the denominator will exclude the sales by market participants who made both sales and purchases and thereby tended to offset the selling and buying pressure they put into the market.

**ARGUMENT**

**II.      Plaintiff plausibly alleges a claim for manipulation in violation of § 9(a)(2) Of The CEA.**

Plaintiff alleges that Defendants made large trades to depress prices of the May Contract in violation of the manipulation provisions of Section 9(a)(2), 7 U.S.C § 13(a)(2). ¶¶222-230. Because the means of manipulation are limited only by the ingenuity of humans, Courts and regulators have consistently refused to define manipulation in a restrictive manner. *Ploss v. Kraft Foods Grp., Inc.,* 197 F. Supp. 3d 1037, 1061 (N.D. Ill. 2016) ("[t]he methods and techniques of manipulation are limited only by the ingenuity of man.") quoting *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir.1971).

Instead, the CFTC and courts have consistently looked to four elements in order to determine whether the accused manipulated prices in violation of the CEA. *See Frey v. CFTC*, 931 F.2d 1171, 1177–78 (7th Cir. 1991); *Kohen v. PIMCO*, 244 F.R.D. 469, 481 (N.D. Ill. 2007) (same), *aff'd,* 571 F.3d 672 (7th Cir. 2009); *Ploss*, 197 F. Supp. 3d 1037 at 1060 (same). Those elements are: (1) the accused had an ability to influence prices, (2) artificial prices existed, (3) the accused was a contributing factor or one of the causes of such artificial prices, and (4) specifically intended to cause such prices. *Id.* Plaintiff plausibly alleges all four elements of this

15

violation (*see* "A"-"D" below), and that Plaintiff was injured and suffered actual damages by such conduct. *See* "E" below.

### A. Rule 8(a) governs the pleading of market power and trade manipulations.

Courts have repeatedly found that the short and plain statement of Rule 8(a) of the Federal Rules of Civil Procedure governs the claims for market power and trade manipulation. *Premium Plus Partners, L.P. v. Davis*, 2005 WL 711591, at \*15 (N.D. Ill. Mar. 28, 2005) (explaining that "[a]lthough the Court does not purport to endorse a rule that Rule 9(b) pleading requirements *never* could apply to a CEA manipulation claim," Rule 8(a) applied to the instant claim, which did not "sound in fraud" and involved no allegedly false statements (emphasis in original)); *see also In re Term*, 2013 WL 9815198, at \*10, *on reconsideration in part*, 2014 U.S. Dist. LEXIS 145955, 2014 WL 5014235 (S.D.N.Y. Sept. 30, 2014) ("[T]he case specific approach" instructs courts to apply Rule 8(a) "[w]here a plaintiff has alleged a manipulative trading strategy[.]" (citing cases)); *Amaranth Advisors,* 554 F. Supp. 2d at 531 (same)*; In re Amaranth*, 730 F.3d at 180-81, ("fraud is not a necessary element of a market manipulation claim.")."As many courts recognize, manipulation is not specifically defined in the CEA." *Ploss*, 197 F. Supp. 3d at 1061.

### B. Plaintiff plausibly alleges Defendants had the ability to influence May Contract prices.

Plaintiff plausibly alleges as follows. Cumulative net selling pressure, net aggressor sales, and ammo selling each cause prices to be lower than they otherwise would be. *See* "1-3" below. By virtue of their training, structure, and prior practice in working together to move prices, Defendants were ideally suited to use the foregoing trade mechanics to depress May Contract prices on April 20th. See "4" below. Further, Plaintiff plausibly alleges that, at just the times when the Defendants placed the greatest selling pressure on prices, May Contract prices declined

by the greatest amounts. The forgoing allegations, as well as the "test" that, when Defendants' greatest alleged selling pressure was placed on prices, prices fall the most (*see* I.B-C above), present a strong showing that Defendants possessed the ability to influence prices.

1. **Cumulative Net Sales In A Futures Contract make the price of the futures contract lower than it otherwise would be.**

Plaintiff alleges that the net direction, quantity, and aggressive quality of futures contract transactions have impacts on prices. Sales "of futures contracts exert downward pressure on prices and the larger the number of sales, the greater the downward pressure on prices." ¶93. The more transactions a market participant makes in the direction of a sale of a futures contract, and the less transactions in the direction of a purchase, the more "**cumulative net sales** they will make and downward pressure on prices that they exert". ¶94 [Emphasis added]. Because only a miniscule fraction of 1% of NYMEX crude oil futures transactions result in deliveries, 99.9++% of the transactions in crude oil futures are typically satisfied by a market participant's making an opening purchase (or sale) and then later making an opposite transaction to offset and close such position. ¶¶75-78. For example, a person who makes an opening purchase typically makes a sale to offset and close their position. *Id*. And a person who makes an opening sale, makes a closing purchase. *Id*. In the foregoing manner, market participants typically open and close futures contract positions (*id*.); and, again, Plaintiff Mish purchased and sold 10 May Contracts in this manner on April 20th.

a. **Defendants Had The Ability On April 20 To Influence May Contract Prices By Making ▮▮▮▮▮ Cumulative Net Sales Of May Contracts.**

Plaintiff plausibly alleges that each VTD sold May Contracts and overwhelmingly diverted their offsetting buying pressure from the May Contract market into the TAS market. The amount of Defendants' ▮▮▮▮▮ cumulative net sales of May Contracts is **larger** than even the

total (non-netted) amount of purchases or sales of futures contracts made by any other accused in prior trade manipulation cases in which the claim was sustained at the pleading or evidentiary stage. *See* fn. 6. Plaintiff has plausibly alleged that, by means of Defendants' cumulative net sales alone, Defendants had the ability to influence, and did influence, May Contract prices on April 20th. But Plaintiff alleges that Defendants also had even larger additional abilities to influence prices on April 20th.

## 2. Net Aggressor Sales In A Futures Contract Tend To Depress The Prices Of The Futures Contract.

Plaintiff plausibly alleges that net aggressor sales in a futures contract tend to depress that contract's prices. ¶154. The CME defines an "aggressor" order as a customer order that triggers a trade immediately on entering the [order] book. ¶147 (quoting CME rule). The order book is the CME's list of open offers (orders to sell) and open bids (orders to purchase). Those offers which are sufficiently low to match the higher bids execute completed transactions. Accordingly, the futures market trading is sometimes referred to as a "dual auction" market. *See generally* ¶¶93-102. Because an "aggressor" sale immediately matches with one or more buy orders in the order book, it not only triggers an immediate transaction, but "pulls liquidity out of the order book" in the amount of the quantity and at the price levels of the buy orders which the "aggressor" sale order (at least) matches. ¶148 (referring to CME rules). The CME describes "multiple situations" in which it does not assign an "aggressor" tag to a transaction, even if the transaction fits the definition of an "aggressor order." ¶¶149-151. Accordingly, even transactions by Defendants that the CME does not characterize as an aggressor transaction may functionally have constituted an "aggressor" transaction. ¶152. This is a matter for discovery.

By definition, an aggressive sale "hits the bid," that is, matches or is less than the bid and removes the bid from the order book. *E.g.*, ¶¶147-157; *Hunter*, 2010 WL 232835, at *19 (finding manipulation under the Natural Gas Act where the manipulator's sales were made to "hit bids" and thereby were ["almost certain"] to reduce prices).[17] Thus:

> If a market participant's aggressive sales exceed that participant's aggressive buys over a given period, then that participant **will exert downward pressure on prices during that period. The greater the difference between the participant's aggressive purchases and sales, the more selling pressure and the greater the decline in prices that participant will cause over that period, all else equal**. The greater the percentage that a market participant's net aggressive sales represent of the entire market's net aggressive sales over a given period, the larger the proportion of the price decline during that period the market participant may cause.

¶154 [Emphasis added].

### a. The VTDs Made Extraordinarily Large Amounts Of Net Aggressor Sales Of May Contracts.

Defendants' aggressor purchases of May Contracts did not remotely begin to offset the price decreasing effects of their aggressor sales of May Contracts. CME records reflect that on April 20th there were approximately 47,077 aggressor sales of May Contracts, and approximately 20,769 aggressor purchases of May Contracts, resulting in net aggressive sales of May Contracts on April 20 of approximately 26,306 from 9 a.m. forward. ¶155. Plaintiff plausibly alleges in detail that Defendants made "aggressive sales of at least ███ May Contracts on April 20".

¶157. Vega made aggressive purchases of only [approximately] ███ May contracts on April 20th.

¶158. Accordingly, Vega's "total net aggressive sales" of May Contracts on April 20th constitute approximately ███ **contracts or** ███ **of the total net aggressive sales by the entire market on April 20th**. ¶161. Again, these aggressor sales were all "hit the bids" transactions which were

---

[17] Two other cases have found that the same manipulation was plausibly alleged to constitute a manipulation under the CEA. *Amaranth Advisors,* 554 F. Supp. 2d at 533; *In re Amaranth,* 587 F.Supp.2d at 530.

"almost certain" to reduce prices. *Hunter*, 2010 WL 232835, at *33-*34 (Commission found evidence conclusively showed Hunter knew natural gas futures market could be manipulated and that buying or selling significant volume during short periods could impact prices). Under this Court's standards articulated in *Mervyn*, *Weifang*, and numerous other cases, it is at least highly plausible that the VTDs had not just the ability but a large, and very significant ability to influence prices on April 20th. *Compare* ¶161 *with* McGrath Decl. Ex. 1 (investigators were shocked to learn that Vega had the "biggest impact" on May Contract prices during the afternoon of April 20).

3. **Defendants' Ammo Trades Had An Especially High Ability To Influence May Contract Prices Between 1:00 And 1:30 p.m.**

Again, "ammo" transactions are well-recognized by regulators in the United States and the United Kingdom as manipulative devices. (¶¶2, 103-106) and Defendants do not contest the plausibility of this allegation. ECF 71, 73, 77 *passim.*

a. **Through Their "Ammo" Transactions, Defendants Greatly Increased Their Already Significant Ability To Influence May Contract Prices.**

In exact conformity with "ammo" transactions,[18] between 1:00 and 1:30pm, Defendants made accelerated rates of sales and aggressor sales of May Contracts. *See* "Introduction B" above. Because Defendants' extraordinarily large cumulative net sales had eaten through a good part of the order book, and Defendants then greatly accelerated the rate, quantity, and aggressor quality of their May Contract sales, Defendants were able to cause May Contract prices to plunge

---

[18] Again, "ammo" transactions, as the name implies, are transactions in which the trader fires at the market in order to move market prices. A trader who wishes to depress prices makes a sufficient number of sales to lower prices, and a trader wishing to raise prices makes a sufficient number of purchases to move prices higher.

into a downward trend and not recover through 1:30pm. *Id.; ¶¶*112-113. In this way as well, Defendants possessed the ability to influence May Contract prices.

4. **Defendants' structure, training and background prior to April 20 made them ideally suited to use cumulative net sales, net aggressor sales, and "ammo" trading to influence prices**.

**Defendants' Training Prior To April 20th.** VTD (*see* fn. 5) [Trader 1] was a trader on the International Petroleum Exchange ("IPE")[19] from at least the 1990s until it closed. ¶114. [Trader 1] then joined one of a number of proprietary trading groups, comprised of former IPE traders. ¶¶116-117. Known as the "five families", these groups worked in London until [Trader 1] branched off and started his own "family" of traders, which became the VTDs in this case. ¶¶117-118. [Trader 1] [Trader 3 and Trader 5] ¶¶126-128, 191. As part of [Trader 1] training of the other VTDs, "[r]eportedly, the Vega Defendants frequently make trades in the same contracts at around the same time to move prices." ¶119.

**a. The VTDs' Conspiratorial Manipulation-Enhancing Structure.** [Trader 1] ¶¶36, 123-124; McGrath Decl. Ex. 3. ¶¶4, 122, 187.

---

[19] Reportedly "Traders on the IPE reportedly combined together to make transactions in opposition directions in the futures contract and related TAS contract. For example, they would purchase the TAS contract and sell the futures contracts. By engaging in increasing selling as the day wore on, the IPE traders could cause the TAS contract prices to be lower. By depressing the TAS price, the IPE futures traders could make a profit on the difference between their higher priced sales earlier in the day and their lower prices at which they purchased at the end of the day by virtue of the lower settlement they caused and which, through the TAS mechanism, became their purchase price." ¶115

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ¶¶139-145.

Among other things, this wholly avoided any need for all VTDs to act in "lockstep" at the end of

trading or other sensitive times when they would all benefit by ensuring the movement of

prices.[20] ¶¶119, 130. By working, practicing, and training in the overarching structure of the

pooling and cross-guaranteeing of their accounts, the VTDs became proficient at "blitzing" the

markets to their mutual advantage in a method in which each VTD played his own role and the

VTDs could maximize their chances to evade detection. *See* ¶¶119, 130, 179.

████████ Trader 9 ██████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████ ¶179 [emphasis added].

In large part, Plaintiff alleges that the VTDs "**blitzed**" through the May Contract on April 20th by

(a) their sell, sell, sell and don't buy cumulative net sales, (b) by their cumulative net aggressor

sales, and (c) especially between 1:00 and 1:30 p.m. their "ammo" and uneconomic sales. The

foregoing conduct sent false signals to the market. See pp. 30-31 and pp. 46-50.

Thus, it was part of each and every VTD's individual strategy on April 20th to make

cumulative net sales of the May Contract by overwhelmingly diverting their buying pressure out

of the May Contract and into the TAS contract. *See* ¶¶6, 42, 44, 46, 48, 50, 52-53, 55-59, 87-92,

108-112, 133, 156, 173-175.

---

[20] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████



¶129; *see* ¶190 ( Trader 1 ████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████ ) [emphasis added].

Here, Plaintiff plausibly alleges that the VTDs believed that the May Contract market was thin, and then greatly accelerated the rates of their cumulative net aggressor and other sell orders between 1:08:23 and 1:30pm by a factor of more than 10 over their same cumulative rate between 9-11am. ¶163. Defendants did so in order to overwhelm the vulnerable May Contract market, and, thereby, committed an especially egregious and additional form of manipulation known as exacerbation. *See* fn. 13 above (collecting cases).

5. **Defendants' fail their burden to demonstrate that they did not have the ability to influence prices.**

Defendants argue: "Plaintiff does not attempt to allege that a handful of proprietary traders whose sales of the May Contract amounted to approximately ████ of the sales on April 20, 2020, controlled the crude oil futures market …." ECF 71, p. 27. In the English language and caselaw, "influence" is much less than "control" or "dictate". Merriam-Webster Dictionary (available at https://www.merriam-webster.com/dictionary/influence) ("influence" means "the power or capacity of causing an effect in indirect or intangible ways."). *Compare In re DiPlacido*, 2008 WL 4831204 at *33 ("To the extent that DiPlacido suggests that he was not the sole cause of price artificiality, as noted above, Commission precedent has recognized that there may be multiple causes of an artificial price and that a manipulation charge may be sustained if the respondent's actions were a proximate cause of the artificial price."), *aff'd DiPlacido v.*

*CFTC*, 364 Fed.App. 657 (2d Cir. 2009), *citing In re Hohenberg Bros. Co.*, [1975–1977 Transfer Binder] No. 75–4, Comm. Fut. L. Rep. (CCH) ¶ 20,271, 1977 WL 13562, at *7 (CFTC Feb. 18, 1977) ("A dominant or controlling position in the market is not a requisite element to either manipulation or attempted manipulation…").

Second, as previously demonstrated, Plaintiff plausibly alleged that Defendants actually made a far greater percentage of the total May Contract sales in the market between 9:00am and 1:30pm. ¶¶2, 129, 145; *see* "I.C", pp. 7-14 above; *see Hunter*, 2010 WL 232835, at *16 (finding that the alleged manipulators' trades constituted at least 14.4% of the trading volume during the closing period, which was sufficient to sustain three separate manipulations of natural gas futures contracts). More important, using the type of percentage comparison Defendants propose greatly understates Defendants' percentage of the total net sales of May Contracts on April 20th.[21] *See* I.C above.

Defendants only remaining argument is that, because May Contract market prices slightly increased for a few hours after 1:30pm on April 20th, Defendants supposedly had no ability to influence prices whatsoever prior to 1:30pm. ECF 71, pp. 27-28. First, this is illogical and a *non-sequitur*: whatever happened to prices after 1:30pm, did not negate Defendants' plausibly alleged ability to influence prices prior to 1:30pm. Second, the movement in prices on April 20 and April 21st further demonstrates Defendants' ability to influence prices. *See* I.C above.

**6. Defendants** ▮Trader 7, Trader 11, Trader 10, and Trader 8▮ **have failed their burden to demonstrate that they did not have the ability to influence prices**

---

[21] Defendants' cumulative net sales as the numerator to the total gross sales by the entire market as the denominator, produces a percentage which understates Defendants' actual ability to influence prices. ¶¶139, 145. Again, a market participant who both buys and sells in the same market, as Plaintiff did (¶29), tends to offset and reduce its buying or selling pressure. ¶¶94-95. After discovery, a much more informative indicator of Defendants' true ability to influence prices will be one in which the numerator is Defendants' cumulative net sales and the denominator is the cumulative net sales of all market participants who had cumulative net sales.

Defendants ██Trader 7, Trader 11, Trader 10, and Trader 8██ ████████ argue they supposedly did not have the ability to influence the price of the May Contract because (a) they sold too few May Contracts; and (b) there is no allegation that they traded in coordination with other VTDs. Br., pp. 7-8. Both arguments fail. Contrary to ████, a **single transaction**, coupled with manipulative intent, is sufficient to constitute manipulation in violation of the CEA. *Compare* II(C) below (discussing manipulative intent) *with In re Amaranth*, 587 F.Supp. 2d at 535 ("the combination of wrongful intent (or, more accurately, the lack of a legitimate economic motive) and a legitimate transaction would constitute manipulation.") and *In re DiPlacido*, 2008 WL 4831204 at *30 ("when a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial"). Moreover, ██████ ignore the following allegations. ██ Trader 7 ██████

████████████████████████████████████████████████████████████

████████ ¶¶120, 193. Plaintiff alleges ██████ each sold May Contracts in an "aggressive" manner, which has been held to "virtually guarantee" a lower price even when the market is not "thin." ¶¶56-59; *Hunter,* 2010 WL 232835, at *19 (finding that hitting a bid, the equivalent of an aggressive sale, "almost guarantees a lower price"). ██████, like the other VTDs, put net selling pressure into the May Contract and avoided putting offsetting buying pressure into the May Contract by selling May Contracts outright purchasing May Contracts via TAS. ¶¶56-59. This also puts downward pressure on prices. ¶¶94-95. Like the other VTDs, ██████ each sold May Contracts late in the trading day on April 20: (a) ██████ each sold during the last 90 minutes of trading (¶145(c)); ██Trader 7, Trader 11, and Trader 10██ sold May Contracts during the last thirty minutes of trading (145(d)); and ██Trader 7 and Trader 11██ sold May Contracts during the last 22 minutes of trading when prices were negative. ¶145(e). ██Trader 10██ also sold May Contracts on the ICE exchange. ¶203. ██Trader 7, Trader 11, and Trader 10██ each sold May contracts in larger volumes than at least two

prior cases have found sufficient to not merely plausibly allege the "ability" to influence prices, but to establish actual manipulation (intentional causation of artificial prices) after a full hearing on the merits. *Compare* fn. 6 above *with* ¶140 (█Trader 7█ sold ███ May contracts, █Trader 11█ sold ██ May contracts, and ██ Trader 10 ██ sold ██ May contracts)

Although the foregoing is sufficient to establish ███'s ability to influence prices, Plaintiff has also plausibly alleged that ████ conspired, combined and coordinated with the other VTDs to depress the price of the May Contract. *See* VII below. Each VTD, including ████, traded the exact same May Contract on April 20, in the exact same direction (selling), purchased May Contracts the exact same way (via TAS), sold May Contracts late in the trading day, and had previously traded together to move prices. ¶¶139, 145. Also, like the other VTDs, ████ each agreed to pool their trading capital and guarantee one another's losses and thereby had a backup participation in all other VTDs' trades. ¶122. ████'s combination with the other VTDs gave ████ a further ability to influence prices.

### C.  Plaintiff Plausibly Alleges Manipulative Intent

Manipulative intent is the "*sine qua non* of manipulation." *In The Matter of Indiana Farm Bureau Cooperative Ass'n, Inc.*, No. 75-14, 1982 WL 30249, at *6 (CFTC Dec. 17, 1982). Manipulative intent "is a subjective inquiry and 'must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the circumstances.'" *Kohen*, 244 F.R.D. at 482, *aff'd,* 571 F.3d 672 (7th Cir. 2009). Here, Plaintiff plausibly alleges a "totality of circumstances" that permits an inference that the Defendants specifically intended to depress May Contract prices on April 20th.

### 1.     The VTDs' "ammo" selling supports an inference of manipulative intent.

████████████ Trader 9 and Trader 12 █████████████

26

██████████████████████████████████████████████████████████

████████████████████████████████████ ECF 71, 73, 77 *passim*; *see, e.g., Dennis v. JPMorgan Chase & Co.*, 345 F. Supp. 3d 122, 177 and n. 261 (S.D.N.Y. 2018) (denying motion to dismiss based on alleged "uneconomic transactions" that included "discussing plans to acquire 'ammo' on March 9, 2011."). ████████████████████████ Trader 12 ██████

███████████████████████████████ Def. Br. at 32 (emphasis added), ███████████

██████████████████████████████████████████████████████████

███████████████████████ Def. Br. at 32 (emphasis added); *see id.* (███████████████████

██ Trader 12 ████████████████████████████████████████).

Under the standards governing this motion, this Court should reject Defendants' foregoing denial of the Complaint and, in any event, Defendants' interpretation of the communication is counterfactual and based upon an implausible spin. ████████████████

██████████████████████████████████████████████ This is because, in the bilateral futures contract, one half of the market is long and the other half of the market is short, ██████████████████████████████████ *Compare* ¶¶70-106 (explaining background of the market, including "ammo") *with* ¶¶2, 103-106. ████████████████████

██████████████████████████████████████████████████████████

██████████ (Def. Br. at 32 (emphasis added)), ██████████████████████████████

██████████████████████████████████████████████████████████

¶167 [emphasis added]. ████████████████████ Trader 9 and Trader 12 ████████████████

████████████████████████████████████████████████████████ *See id.*

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████ ¶167.

Strongly corroborating the foregoing is the larger context. ███████ Trader 5 ███████

███████████ Trader 1 █████████████████████████████████████████████.

*Id.* at ¶ 174 (emphasis added). Defendants do not challenge that █████████████████████

█████████████████. ECF 71, 73, 77 *passim*. More important, symmetrically, ███████

Trader 5 ███████████████████████████████████████████████████

Trader 12 ██████████████████ Trader 9 █████████████████████████████████

Trader 1 █████████████████████████████████████████████████████

███████████████████████████████████████ *id.* ¶191 (emphasis added), and

stated that █████████████████████████████████. ¶¶126-128, 191. It is at least

plausible that the █████████████████████████████████ Trader 5 ███████

████████████████████████████████████ Trader 12 ████████████████████

██████

████████████████ Trader 1 ██████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████ ¶¶126-28, 190. Trader 1 ██████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████ Trader 1 █████████████████████████ Trader 5 ████████████

███████████████████████████████ ¶174.

████████████████████████████████████ Trader 1 ██████████████████████

███████████████████████████████████████████████████████████

█████ Trader 9 and Trader 12 █████████████████████████████████████████

████████████

                ███████████████ Trader 9 and Trader 12 ██████████████████████

███████████████████████████████████████████████████████████████

█████████████ Trader 12 and Trader 9 ███████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ *See* I.B ███████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████ Trader 12 ███████████████████████ Trader 9 ████████████

█████████████████████████████████████ Trader 4 ███████████████████████

████████████████████████████████ ¶168 (emphasis added).

In fact, ████████ ██ Trader 4, Trader 12, Trader 9, and Trader 6 ██████ ████████

██████████████████████████████████████████████████████ ¶¶ 167-68,

170-74), ████████████████████████████████████████████████████

¶¶ 46, 50, 53, 55. ████████████████████████████████████████████████

█████████████████████████████ Trader 8 ██████████████████████████████

██████ In the "totality of circumstances" required for analysis of manipulative intent, it is at

least plausible (a) ████████████████ Trader 12 ███████████████████████

██████████████████ and (b) ████████████████████████████████████████

████████████

Again, ammo trading is a well-recognized manipulative device. ¶¶2, 103-106. ████████████

█████ Trader 9, Trader 12, Trader 4, ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ Trader 6, Trader 5, and
Trader 3 . ¶¶ 42-59. As to the remaining VTDs, it is a reasonable inference that birds of a feather

flock together. Construing the "totality of the circumstances" in the light most favorable to

Plaintiff, it is a reasonable inference that all Defendants specifically intended to depress May

Contract prices in order to profit on their own May Contracts and avoid losses on their guarantee

obligations to other VTDs on their May Contracts.

     2.    **The extremely highly correlated trading of VTDs** Trader 1, Trader 5,

Trader 9, Trader 4, Trader 3, Trader 12, and Trader 6 **establishes manipulative intent as to**

**these defendants, and also supports an inference of manipulative intent as to the remaining**

**defendants.** Again, VTDs Trader 1, Trader 5, Trader 9, Trader 4, Trader 3, Trader 12, and

Trader 6 knew what one another was doing because they traded in an extremely highly

correlated manner that is inconsistent with independent decision making and engaged in a high

degree of communications to coordinate their trading. ¶¶140-43, 157-59, 175-76. Their high

degree of coordination is totally contrary to independent decision making and supports an

inference that they were working together to exert greater impact on the May Contract by

moving prices in a direction that would favor them. In the "totality of the circumstances"

(including those set forth in the different sub-headings of this manipulative intent section), this

establishes manipulative intent as to these seven Defendants.

     In addition, there were multiple other communications among defendants that further

indicate that they knew what one another was doing in the May Contract. ¶¶ 2, 167, 169-71

(█████ Trader 9, Trader 4, and Trader 6 ), ¶¶2, 167 ( Trader 9 and Trader 12 ), ¶¶8, 180 (on April 20,

Defendant ███████ Trader 2 ██████████████████ Trader 1 ██████████████

████████████████████████), ¶179 (████████ Trader 9 █████████████

██████████████). According to the Merriam Webster dictionary (https://www.merriam-webster.com/dictionary/blitz), "blitz" means "a fast intensive nonmilitary campaign or attack".

The foregoing permits a reasonable inference that all VTDs knew that their group engaged in "fast, intensive, non-military campaigns or attacks" on futures contracts. The spearhead of the blitz of seven VTDs steadily adding to their May Contract short position was likely information known to all VTDs.

Importantly, all VTDs acted in a homogenous group, most socialized with one another, and they all had worked together in the past "regularly" to depress oil prices. ¶¶114-119, 128. It is a reasonable inference that the VTDs knew exactly what type of trading one another was doing, and that many VTDs were engaged in a spearhead or blitz to sell sell sell and not buy the May Contract. This further supports a reasonable inference of manipulative intent as to the remaining VTDs.

3.  **Defendants' financial interdependence and common motive to depress prices further enhances the inference of manipulative intent.** Although motive is not required to show manipulative intent, motive is very probative of manipulative intent.[22] *Kohen,* 244 F.R.D. at 484, *aff'd* 571 F.3d 672 (7th Cir. 2009); *In re Amaranth,* 587 F.Supp.2d at 530; *see In re*

---

[22] In order to make gains on their own trading and avoid large losses, and guarantees of the other VTDs' accounts, Plaintiff alleges in detail that each VTD shared a common financial motive to depress May Contract prices and cause them to plummet into a substantial downtrend between 1:00 and 1:30pm so as to end trading on April 20th at the lowest prices possible. ¶¶89, 109-110, 125, 128, 134. Again, this was because each VTD would buy back its May Contracts based on the TAS price set by the VWAP during 1:28 and 1:29pm on April 20th. ¶¶82, 87-92. Accordingly, if Defendants could help cause a substantial downward trend in prices between 1:00 and 1:30, this would and, in fact, it allegedly did, cause the VTDs (a) to avoid losses on their obligations to cross-guarantee one another's losses, and (b) to reap in excess of ████████ in profits from the difference between the prices at which each VTD made their sales of May Contracts and the greatly reduced TAS closing price at which they purchased back those May Contracts. ¶¶139, 145, 163, 203.

*DiPlacido,* 2008 WL 4831204, at \*29 (demonstrable motive supports inference of intent);

*Amaranth Advisors,* 554 F.Supp.2d at 533 (profit motives "render the inference of intent even

more plausible"). Plaintiff plausibly alleges that Defendants created profits for themselves in

excess of ███████ by depressing May Contract prices on April 20th. ¶¶139, 203. ███████

███████ ██ Trader 1 ██████████████████████████████████████████

███████████ Trader 3 and Trader 5 ██. ¶¶190-191 (Defendants ██ Trader 1, Trader 3, and Trader 5 ██

had an extremely high degree of communications as they coordinate with one another to enter

their trades on April 20th). ███████████ Trader 5 ███████████ Trader 1 ██████

███████████████ ███████████████████ Trader 1 ███████

¶174.

███████████ Trader 1 █████████████████████

███████████████████████████████████████████

███████████████████ Trader 1 █████████████████

███████████████████████ ¶¶2.b., 41-43, 89, 128, 129-

137, 165-167, 173-175, 187, 190-191; McGrath Decl. Ex. 2. Each VTD knew from their own

short position that they had a personal financial motive in lower May Contract prices. Each VTD

knew from their communications with Defendant ██ Trader 1 ██ and other VTDs, that many VTDs

were going to be short the May Contract on April 20th. This triggered each VTD's obligations to

guarantee Vega in the event that the May Contract trading did not turn out well. From these and

other circumstances, it is a reasonable inference that all the VTDs knew that they had a

significant exposure to the May Contract, and an interest in seeing May Contract prices decline

after 1pm on April 20th.

4.     **The conspiracy on April 20th and trading together prior to April 20th to depress oil prices further supports an inference of manipulative intent.** Two facts plausibly alleged here which have rarely been present in prior cases are that (a) Defendants "regularly" worked and practiced together prior to April 20th to blitz and depress oil futures prices (*see* I.B, pp. 20-21 above citing to ¶¶119, 130, 179); and (b) Defendants also agreed, combined, and conspired to depress May Contract prices on April 20, 2020. *Compare* I.B above *with* pp. 57-66 below (summarizing allegations indicating that Defendants agreed to work together to depress prices on April 20th). Obviously, manipulating an entire public market could be more easily done by working in an agreement with others rather than individually. *See Strobl v. New York Mercantile Exch.,* 582 F. Supp. 770, 774 (S.D.N.Y. 1984) *aff'd,* 768 F.2d 22 (2d Cir. 1985). These two rarely-present facts suffice to show the specific intent of all Defendants.

Again, all VTDs were experienced professionals who had been trained by Defendant ▮▮▮ ▮ Trader 1 ▮ or, as to Defendants ▮ Trader 3 and Trader 5 ▮, were in an extremely high degree of communications with Defendant ▮ Trader 1 ▮ during April 20th in order to coordinate their trades. ¶¶ 126-127, 165-180, 187. As experienced market participants, all Defendants knew basic trade mechanics and how given types of trades influenced prices. Thus, each VTD well knew that the objective effects of their cumulative net sales of May Contract were to depress prices. Moreover, all VTDs were engaged in indirect backup participation in one another's sales of May Contracts due to their respective guarantees to Vega of any losses of one another. Pooling capital and making guarantees have been found very supportive of criminal and civil conspiracy charges.[23]

---

[23] In the context of criminal conspiracies, the Seventh Circuit has repeatedly held that the pooling or sharing of money or resources is evidence of a conspiracy. *U.S. v. Hopper*, 934 F.3d 740, 755 (7th Cir. 2019); *U.S. v. Calderon*, 559 Fed. Appx. 554, 556 (7th Cir. 2014) (unpublished); *U.S. v. Harris*, 567 F.3d 846, 851 (7th Cir. 2009); *U.S. v. Haywood*, 324 F.3d 514, 517 (7th Cir. 2003); *U.S. v. Baker*, 40 F.3d 154, 160 (7th Cir. 1994).

Apparently, all VTDs likewise knew that the May Contract was supposedly a thin market vulnerable to manipulation. ¶¶129, 190. Each Defendant reasonably knew, foresaw, and specifically intended that Defendants' ongoing conduct was depressing May Contract prices. None disassociated themselves from their involvement on April 20th, and all continued to participate.

***Uneconomic conduct***. Plaintiff need not allege uneconomic conduct to show manipulative intent or otherwise state a claim for manipulation. *Cargill,* 452 F.2d at 1163. But if the allegations give rise to an inference of uneconomic conduct, then that strongly supports manipulative intent. This is because, in commodity futures, "[t]ypically, traders want to buy at low prices and sell at higher ones." *Shak,* 2013 WL 7085760, at *3 ("[Rather than seeking to buy at low prices, the respondents intentionally] … bought at higher prices in order to ultimately benefit from pushing prices higher during the Close."); *Hunter*, 2010 WL 232835, at *19 (same; finding manipulation under the Natural Gas Act where the manipulator's sales were made to "hit bids" and thereby be ["almost certain"] to reduce prices). *See, e.g., In re Henner,* 30 S.D. at 1174; *In re DiPlacido*, 2008 WL 4831204 at *30; *Hunter*, 2010 WL 232835, at *19; and *Cargill,* 452 F.2d at1163.

Between 1:00 and 1:30 pm, Defendants  made sales of May Contracts at negative prices in a

---

In a case cited by Defendants and ████, at least one court has denied defendants' motion to dismiss charges of a civil conspiracy in which plaintiffs' allegations included risk sharing by co-conspirators. *In re Ins. Brokerage Antitrust Litig.*, 04-CV-5184 (CCC), 2017 WL 3642003, at *3 (D.N.J. Aug. 23, 2017) ("According to the SAC, '[t]hrough the LMA, Defendants and their co-conspirators share sensitive information and discuss, coordinate and agree on virtually every aspect of how the Lloyd's Market functions, including pricing, terms, broker compensation, risk sharing and avoidance of legal liability.'").

declining market. ¶ 145(e). In all the circumstances of their prior working together to depress oil prices and the other facts recounted above, it is a reasonable inference that these VTDs engaged in uneconomic conduct by irrationally selling at increasingly lower prices exactly when they had a motive to do so in order to cause May Contract prices to go into a downturn and not recover from such downturn through 1:30pm. The "totality of circumstances" required to be considered give rise to a reasonable inference that Defendants ███████ Trader 1, Trader 5, ██████████ ███████ Trader 3, Trader 2, Trader 9, Trader 6, Trader 12, Trader 4, ███████ ██████ Trader 11, Trader 7, ████████ ████████ knowingly engaged in uneconomic conduct. This strongly supports manipulative intent.

### 5. ██████ Have Failed Their Movant's Burden To Establish That Plaintiff Has Not Plausibly Alleged Manipulative Intent

████'s manipulative intent argument is based on the (false) premise that the "only" allegations in the Complaint that suggest manipulative intent are messages or communications involving other VTDs. Manipulative intent is determined from the "totality of the circumstances" and is not limited to text messages. *Kohen*, 244 F.R.D. at 482.[24] Plaintiff has alleged multiple indicia of manipulative intent, including trading near the close (████ each traded during the last 90 minutes of trading on April 20 and Trader 7 and Trader 11 traded during the last 22 minutes when prices were negative) (¶145), aggressive sales by each ████, which virtually guarantee a lower price (*id.*, ¶¶56-59), a financial motive for each ████ to have a lower May Contract price by virtue of TAS purchases (*id.*, ¶¶56-39,89,139) and ████ combining together to execute the same

---

[24] Although the Complaint does not quote text messages involving ████, it does allege that Defendant Trader 1, who trained ████, spoke to each of the VTDs, including ████, "on a daily basis." ¶191. The Complaint also alleges that the VTDs, including ████, "discuss their views on the market on a daily basis." ¶187.

exact trading strategy for the exact same reasons as each of the other VTDs, which increased the likelihood of successfully depressing the May Contract price. *Id.*, ¶¶127-128.[25]

### 6. Vega Has Failed Its Movant's Burden To Establish That Plaintiff Has Not Plausibly Alleged Manipulative Intent

Vega's supplemental motion argues that it is supposedly not alleged to have undertaken any acts or engaged in any trading and therefore lacks manipulative intent. Br., pp. 4-5,9.[26] However, Vega did undertake acts and did engage in trading. Plaintiff alleges that all of the allegedly manipulative orders, trades and positions were executed and held through trading accounts in Vega's name. ¶¶30-32. Vega expressly authorized the VTDs' trading in its accounts and Vega sought to profit (and did profit) from its arrangement with the VTDs. *Id.* Thus, the entire premise for Vega's motion is wrong. In *PIMCO*, the Court denied a motion to dismiss by PIMCO Funds, which was alleged to have held the allegedly manipulative positions. *Kohen*, 244 F.R.D. at 481-82. Even though PIMCO Funds had not made any decisions with respect to the trading in its accounts, the Court held plaintiffs had sufficiently alleged PIMCO Funds' manipulative intent, ability to influence prices and had otherwise pled a claim for manipulation in violation of Section 9(a)(2) of the CEA. *Id.* Vega's motion does not address the lower "reckless" standard for Plaintiff's Section 6(c)(1) claim. Plaintiff plausibly alleges Vega acted recklessly for all the foregoing reasons and because Plaintiff has alleged the VTDs had a history of frequently trading together in order to move prices. ¶119.

---

[25] ██████ assert Plaintiff must allege "uneconomic trading." Br., p. 7. Again, uneconomic conduct is not an element of a CEA manipulation claim, nor is it otherwise required to state a claim for manipulation. *See* C.4, p.34 above. However, Plaintiff has plausibly alleged uneconomic conduct. *See Id.* above.

[26] Vega's motion does not address the other elements of Plaintiff's primary manipulation claims. To the extent Vega has adopted the arguments in the VTDs' motion, Plaintiff has responded to those points. *See* above.

**7.** **[Individual A] Has Failed His Movant's Burden To Establish That Plaintiff Has Not Plausibly Alleged Manipulative Intent**

[Individual A] argues the Complaint supposedly does not allege he had manipulative intent because he did not agree to the manipulative conduct, did not participate in the trading on April 20 and did not communicate with the VTDs on April 20 about their trading.[27] Br., pp. 4-5, 13. First, Plaintiff has plausibly alleged that [Individual A] and the VTDs combined and conspired to manipulate prices. *See* II.D. below. This alone is sufficient to plausibly allege [Individual A] manipulative intent. Second, contrary to [Individual A], he is alleged to have participated in and (as Vega's sole owner) profited from the allegedly manipulative trading. [Individual A] authorized the VTDs' to trade in brokerage accounts held in Vega's name and set risk and position limits in a manner that gave the VTDs the ability to manipulate prices. Third, allegations of text messages or email communications are not required to plausibly allege manipulative intent. Manipulative intent is determined from the "totality of the circumstances." *Kohen*, 244 F.R.D. at 482. Given that [Individual A] facilitated the VTDs trading in Vega's accounts, sought to profit from such trading and did profit from the allegedly manipulative trading, ███████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ Plaintiff has plausibly alleged that [Individual A] intended to cause artificial prices. [Individual A] motion does not address the lower "reckless" standard for Plaintiff's Section 6(c)(1) claim. Plaintiff plausibly alleges [Individual A] acted recklessly for all of the foregoing reasons.

### D. Plaintiff Has Plausibly Alleged Defendants Caused An Artificial Price.

---

[27] [Individual A] motion does not address the other elements of Plaintiff's primary manipulation claims. To the extent [Individual A] has adopted the arguments in the VTDs' motion, Plaintiff has responded to those points. *See* "II".

Courts have uniformly held that the causal element of a claim for manipulation requires only that the violation be a **substantial or contributing cause**, not the sole cause, of price artificiality.[28] Causation has generally been held to be ill-suited for determination even on summary judgment. *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 CIV. 5762 (PAE), 2016 WL 3098842, at *14 (S.D.N.Y. June 1, 2016) ("causation is generally a jury question").

For all of the reasons developed extensively in Plaintiff's demonstration that Defendants possessed the ability to influence May Contract prices, Plaintiff has plausibly alleged that the Defendants were at least one proximate cause of the artificially depressed May Contract prices. *See* p. 9 above.

Again, Plaintiff plausibly alleges that the net quantity, the rate, and the quality of commodity futures trades affect commodity futures prices. *Id.* Plaintiff plausibly alleges (1) that the VTDs built up extremely large cumulative net sales of May Contracts during April 20th, *i.e.,* their net selling pressure on the market grew throughout the day which tended to depress prices (*id.*), (2) Defendants made their cumulative net sales at an increasingly accelerated pace as April 20th progressed, *i.e.,* Defendants' rate of selling kept price-depressive selling pressure on the May Contract (*id.*), (3) five Defendants made approximately 69% of the VTDs depressant sales in an extremely highly correlated manner which is inconsistent with individual decision making, and kept steady selling pressure on prices (*id.*), and (4) Defendants initially made substantially

---

[28] *In re DiPlacido*, 2008 WL 4831204 at *33 ("To the extent that DiPlacido suggests that he was not the sole cause of price artificiality, as noted above, Commission precedent has recognized that there may be multiple causes of an artificial price and that a manipulation charge may be sustained if the respondent's actions were a proximate cause of the artificial price.") *aff'd DiPlacido v. CFTC*, 364 Fed.App. 657 (2d Cir. 2009); *CFTC v. Parnon Energy Inc.*, 875 F.Supp.2d 233, 248 (S.D.N.Y. 2012) ("defendants assert the Commission fails to allege that defendants' conduct was the proximate cause of the artificial prices and that the Commission fails to describe the means by which defendants widened the spread prices. But, it is enough for purposes of a finding of manipulation in violation of sections 6(b) and 9[(a)(2)] of the [CEA] that respondents' action contributed to the price [movement].") (citations omitted).

and, as April 20th progressed, made increasingly greater amounts of net aggressor sales which represented percentages of the total net aggressor sales made by the entire market of ▮▮▮ (9am to 11am), ▮▮▮ (11am to noon), ▮▮▮ (noon to 1:30pm), ▮▮▮ (1pm to 1:30pm), and ▮▮▮ (1:08:23pm to 130pm). ¶163. That is, on all three scales to determine whether trades tend to depress prices, the Defendants organized themselves and engaged in the types of conduct which exerted multiple types of price depressing pressure on the May Contract.

Further, after and as Defendants engaged in such price depressing conduct, May Contract prices did in fact decline. They declined from $11.69 per barrel at 9am to $10.33 per barrel at 11am, $4.92 per barrel at 12 noon, and $0.66 per barrel at 1pm. ¶145. For these reasons, Plaintiff plausibly alleges Defendants caused declines in May Contract prices.

For the same reasons that Plaintiff demonstrated in the treatment of manipulative intent and artificial prices in "2" and "3" above, the lower prices which Defendants artificially caused were, **artificially** low prices.

**1:00-1:30pm.** Plaintiff plausibly alleges the VTDs engaged in a frenzy of price depressing aggressive sales shortly before and as the May Contract price fell by more than $38 per barrel. ¶¶145, 163-64. That is, the VTDs were engaged in the manipulative act of "ammo" selling before and as the May Contract registered **78% of its all-time record price decline** on April 20th. *See ¶¶* 7, 136-137. This pattern of a substantial manipulative act followed by a substantial movement in price in the direction expected to be caused by that manipulative act, presents "a case where the market pattern speaks for itself" as to causation. *Cargill*, 452 F.2d at 1169-70; *see also* Prohibition of Market Manipulation, Notice of Proposed Rulemaking, 75 Fed. Reg. 67657, 67661 (Nov. 3, 2010) (The CFTC "stresses [] that an illegal effect on price can often be conclusively presumed from the nature of the conduct in question and other factual

circumstances not requiring expert economic analysis."). *Compare Term I*, 2013 WL 9815198, at *19 (finding causation adequately alleged where plaintiffs pled that as defendant added to their long positions the rate of backwardation in the futures market also increased).

**9:00am to 1:00pm.** Because the VTDs all followed the same pattern of selling in the May Contract market, buying in the TAS market, and guaranteeing Vega against one another's losses so as to pool their capital, they were able to make extraordinary cumulative net sales in the May Contract of ▊▊ contracts. ¶¶139, 140. Had they sold and bought in the May Contract, they would have made zero cumulative net sales. The VTDs intended that their cumulative net selling would become profitable when they engaged in "ammo" trading between 1:00 and 1:30pm, and that is exactly what occurred. *See* ¶¶2.a-b, 123-127, 129-137, 139-141, 165-180, 209.

The VTDs' cumulative net sales of May Contracts reached ▊▊ contracts by 11am (¶145); ▊▊ contracts by 12 noon (*id.*); and ▊▊ contracts by 1pm. *Id.*

Again, Plaintiff plausibly alleges that sales tend to decrease prices. ¶¶93-95. Making large sales in these amounts strongly tended to depress prices, and May Contract prices declined from $11.69 per barrel at 9am to $5.41 per barrel at 11am, to $4.92 per barrel at 12 noon, and $0.66 per barrel at 1pm. ¶145.

More important, the VTDs made a substantial percentage of net aggressor sales in the May Contract between 9am and 1:30pm. ▊▊ net aggressor sales by 11am (¶163); ▊▊ net aggressor sales by 12 noon (¶163); and ▊▊ net aggressor sales by 1pm. ¶163. These sales did much more than nick May Contract prices. Plaintiff plausibly alleges that the foregoing price depressive conduct by the VTDs prior to 1:00pm depressed May Contract prices to some extent. Based upon Plaintiff's uncontested plausible allegations, it is extremely reasonable to infer that

the VTDs caused some depression in prices before 1:00pm. *Compare* ¶¶14, 235-37 (After the VTDs cumulative net sales had been removed from the market, May Contract prices bounced back to close at April 21 at $10.01, which was far higher than May Contract prices at 11am, 12 noon, and 1pm). Again, the VTDs need only be one proximate cause of the price decline between 9am and 1pm. *In re DiPlacido*, 2008 WL 4831204 at *33 ("To the extent that DiPlacido suggests that he was not the sole cause of price artificiality, as noted above, Commission precedent has recognized that there may be multiple causes of an artificial price and that a manipulation charge may be sustained if the respondent's actions were a proximate cause of the artificial price."), *aff'd DiPlacido v. CFTC*, 364 Fed.App. 657 (2d Cir. 2009).

**The All-Time Record Bounce Back Of May Contract Prices Further Supports An Inference Of Causation On April 20th.** Second, Plaintiff plausibly alleges that the VTDs' "power" to depress prices was removed from the market by 1:30pm on April 20th when all of the VTDs' cumulative net sales were automatically liquidated pursuant to the TAS mechanism. ¶¶13-15. Just as the VTDs' frenzy of manipulative activity preceded 78% of the price decline on April 20th, the removal of the VTDs' positions from the market at 1:30pm on April 20th preceded an extraordinary increase in May Contract prices. Indeed, the May Contract increased by an all-time record amount on April 21st, and the spread between the May Contract and July Contract prices snapped back to levels which were actually higher than the levels of trading when trading began on April 20th. ¶¶13-15, 235-237. Plaintiff plausibly alleges that there were no changes in supply and demand between April 17 and April 21. ¶¶12-15, 236, 253. *In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 87 (S.D.N.Y 1998) ("*Sumitomo*") (substantial decline in prices after the alleged manipulation ended was an indication that the accused had caused artificial prices.).

Plaintiff plausibly alleges that changes in supply and demand cannot explain the foregoing yo-yo pattern of an extraordinary collapse in prices after Defendants began their manipulative selling on April 20 and an all-time record rebound in prices after Defendants' manipulative pressure was removed from the market. ¶¶13-15.

Defendants have effectively conceded that their aggressive selling was a contributing factor in the decline of the price of the May Contract on April 20th. Def. Br. p. 31 ("If 'aggressive' selling by the Vega Trading Defendants played any role in moving prices lower, it was as part of the historic, precipitous decline in prices, driven by the natural forces of supply and demand, as predicted in advance by the CME."). Such an admission on a Rule 12(b)(6) motion has previously been recognized as a basis to infer causation. *Ploss*, 197 F. Supp. 3d at 1063 (finding causation adequately alleged where defendant conceded their trades could have affected prices even though the defendant contended that its conduct was not manipulative).

### E. Defendants Fail Their Burden To Demonstrate That Plaintiffs' Allegations Do Not Plausibly Indicate That May Contract Prices Were Artificial

Defendants fail to cite to any case which dismissed at the pleading stage a complaint for failure to allege artificial prices. ECF 71, 73, 77 *passim*. Much less do Defendants cite a case in which the allegations of artificial prices were greater than those made by Plaintiff, yet the claim was dismissed for failure to allege artificial prices. *Id.*

Plaintiff plausibly alleges artificial prices. Courts have recognized that plaintiffs may plausibly allege or satisfactorily prove the existence of artificial prices based on objective economic indicators. *Minpeco, S.A. v. ContiCommodity Svcs.,* Inc., 673 F.Supp. 684, 689-90 (S.D.N.Y. 1987) ("objective economic indicators" of artificial silver prices included greater than normal price volatility and unusual futures contract spread prices); *Cargill Inc.,* 452 F.2d at 1167

42

(same). Here, Plaintiff alleges all-time record volatility with May Contract prices declining by an all-time record amount on April 20th and then turning around and increasing by an all-time record amount on April 21st. Further, Plaintiff alleges that 78% of the all-time record price decline on April 20th occurred when the VTDs greatly increased the quantity, rate, and manipulative quality of their selling. ¶145(e). Plaintiff also alleges that the VTDs greatly increased the quantity, rate, and manipulative quality of their selling at just the times when they had their greatest motive to sell irrationally in order to depress prices, the uneconomically compressed a large volume of sales in a shortened period of time in order to effectuate such depression of prices. ¶¶128, 145. Plaintiff further alleges that the VTDs were out of the market on April 21st, and their trades were not impacting prices any longer such that prices did bounce back to their appropriate levels. *Compare* ¶¶14-15 *with Sumitomo,* 182 F.R.D. at 87 ("when Sumitomo, under intense government scrutiny, liquidated forward contracts for thousands of tons of unneeded copper…the prices of copper futures contracts traded on the Comex declined dramatically").

The VTDs admit that artificial prices may be established by alleging prices that deviate from supply and demand or that are the result of "factors which are extraneous to the pricing system [and] … not a legitimate part of the economic pricing of the commodity". ECF 71, p.29 *citing to Frey*, 931 F.2d at 1175 *and Ploss,* 197 F. Supp. 3d at 1062. Further, the VTDs have admitted that the Court may consider, in determining whether an artificial price exists, such factors as "historical prices, supply and demand factors, price spreads". ECF 71, p.29 *citing to In re London Silver Fixing, Ltd., Antitrust Litig*., 213 F. Supp. 3d 530, 566 (S.D.N.Y. 2016). To attempt to carry its movants' burden to show that what the VTDs admit are proper indicators of whether prices are artificial, the VTDs simply deny the Complaint's well pled allegations.

43

Plaintiff explicitly alleges:

13.     During trading on April 20, the spread between the May Contract price and the June Contract price declined by an extreme amount. In fact, the amount of the decline was 138 standard deviations. A computer calculation of the probability of this occurring in a competitive market untainted by manipulation returns a result of exactly zero.

14.     However, after 1:30 p.m. on April 20, Vega no longer had market power over May Contract trading. The May June spread then snapped back and increased to (and above) the levels on which such spread had closed on April 17, 2020. The statistical chance of this occurring in a competitive market is extraordinarily small. And the statistical chance that the May June spread, in a competitive market, would decline by so much on April 20 and then snapback so much on April 21 is even smaller.

15.     Because there were virtually no changes in supply and demand for crude oil between April 17 and April 21, much less dramatic decreases in the supply demand balance on April 20 followed by overwhelming increases in the supply demand balance on April 21, the fundamentals cannot explain what happened to prices here. However, Vega's four types of manipulative conduct were present in the May Contract on April 20 until 1:30 pm and then were removed from the May Contract after 1:30 pm on April 20.

¶¶13-15. The VTDs fail ever to mention or even cite to these allegations. ECF 71, *passim*.

Instead, the VTDs blithely deny these allegations by arguing as follows:

Despite its 269 paragraphs, Plaintiff's Amended Complaint studiously avoids describing the unique context for the events of April 20, 2020.

****

In light of these unprecedented conditions, in the weeks leading up to April 20, CME Group, Inc. ("CME"), which owns the NYMEX exchange, issued repeated warnings that crude oil futures contracts could trade at negative prices, meaning that sellers would pay buyers to take oil off of their hands. *See* Ex. A (April 3), Ex. B (April 8), Ex. C (April 13), Ex. D (April 15), Ex. E (April 20). On April 20, the CME's predictions came true.

ECF 71, pp.1-2

However, an efficient market reflects news immediately after the news is announced.

Therefore, the well-publicized issues with Covid-19 reducing demand for oil, supposed supply

storage shortages at Cushing (which is the delivery point for the May Contract), and the

44

possibility of negative prices were incorporated into the May Contract trading price as those news announcements hit the market. That is, if one wants to see the effect of the impact on prices of the prospective possibility that negative prices could occur, one looks at the efficient market results on April 3, April 8, April 13, and April 15 when end of day prices fluctuated between $28.34 and $18.27.

In seeking to carry their movants' burden to demonstrate that there are no allegations of artificial prices, the VTDs criticize Plaintiff's statistical analyses and emphases that the May Contract experienced an all-time record decrease in prices on April 20th and an all-time record increase in prices on April 21st. *Compare* ECF 71, p.29 *with* ¶¶13, 14, 235-237.

Specifically, the VTDs attempt to contradict the well-pled allegations of the Complaint with a "counterpunch"[29] to the effect that Plaintiff's allegations "fail to account" for the unprecedented forces of supply and demand at play on April 20th. ECF 71, p.29. However, those same forces of supply and demand were known and "at play" from April 17 through 21 and, more generally, from at least April 3rd forward. What they indicated was determined by the market—before the VTDs' manipulative conduct on April 20th—to result in a price in the range of $10 - $20 per barrel.

The reports of supply, demand, Cushing supplies, or reports show, at core, that the May Contract may have been vulnerable to a manipulation—such as that which the VTDs executed through net selling pressure and greatly increased ammo selling—on April 20th when 78% of the price decline occurred as the VTDs put their maximum selling pressure on prices. But it did not

---

[29] *Dubensky v. City of Chicago*, 2017 WL 3034651, at *2 (N.D. Ill. July 18, 2017) (Feinerman, J) ("The parties' **punches and counter-punches** concern the weight of the evidence [the plaintiff] might offer to prove his claim, but evidence is not required at the pleading stage. Instead, on a motion to dismiss, the court must accept the well-pleaded facts as true and then determine, on that factual predicate, whether the plaintiff has a plausible claim to relief.").

indicate that there was a different supply and demand picture or "different forces at play" before April 20th. Nor after April 20th.

### III. Plaintiff plausibly alleges market abuse manipulation in violation of § 6(c)(1)

Section 6(c)(1) of the CEA, 7 USC §9(1), provides "It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, … any *manipulative or deceptive device* or contrivance …." [emphasis added]. CFTC Regulation 180.1(a)(1) provides: "It shall be unlawful for any person, directly or indirectly, … to *intentionally or recklessly*: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud" [emphasis added].

Determining that a violation of Section 6(c)(1) and Regulation 180.1 has occurred requires consideration of "all relevant facts and circumstances." 76 Fed. Reg. at 41, 406-407. Further, Section 6(c)(1) and Regulation 180.1 are to be interpreted and applied "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id.* Section 6(c)(1) is intended to "cover transactions … where the fraud or manipulation has [even] the *potential* to affect cash commodity, futures, or swaps markets or participants in these markets," *id.* [emphasis added], and thus imposes liability regardless of whether the conduct in question was intended to or did create an artificial price. *Ploss*, 197 F. Supp. 3d at 1054.

In its Fifth Claim for relief, Plaintiff alleges that Defendants employed manipulative devices within the meaning of Section 6(c)(1) of the Act and Regulation 180.1.[30] These multiple

---

[30] Defendants' argument that all claims under Section 6(c)(1) and Regulation 180.1 necessarily sound in fraud is not supported by the authorities they cite. In *Ploss*, the court recognized that manipulation claims based on explicit misrepresentations sound in fraud and are subject to Rule 9(b), while those based solely on deceptive market activity may be subject to the more liberal Rule 8(a) standard, 197 F. Supp. 3d at 1057; and *Sullivan & Long*, 47 F.3d 857 (7th Cir. 1995), specifically notes that SEC Rule 10b-5 requires proof of *either* deception *or* manipulation, 47 F.3d at 864-65. As discussed above, courts have taken a case-by-case approach to determine if a manipulative scheme is based on fraud or abuse of market power. If, as Defendants posit, their manipulative behavior can be taken for routine market activity, Rule 8(a)

devices include the following. Defendants agreed and conspired to depress May Contract prices. ¶¶ 30-59, 63, 138-145. They combined to abuse the TAS mechanism (*see* I.B above) by selling May Contracts in the May Contract market and overwhelmingly diverting their purchases into the TAS market. ¶¶2, 6, 42(b), 44, 46(b), 48(b), 50(b), 52(b), 53(b), 55(b), 56-59, 128-129, 133, 138-139, 144, 156, 173-175, 201, 203. Seven Defendants, Defendants ▌Trader 1, Trader 5,▐ ▌Trader 9, Trader 4, Trader 3, Trader 12, and Trader 6▐ sold May Contracts in an extremely highly coordinated pattern, which was contrary to independent decision making and released a coordinated drum beat of selling into the May Contract market. ¶¶42, 46, 48, 50, 52, 53, 55, 141-143. Between 1:00-1:30pm, the VTDs engaged in a frenzy of aggressor and other sales of May Contracts which constituted the unlawful manipulative device of "ammo" trading and was uneconomic and gives rise to a reasonable inference that the sales were purposely uneconomic. *Compare* ¶¶2, 103-106, 111, 129, 134-136, 167, 170 *with* I.B and II.C. During this first time ever in which NYMEX crude oil futures prices had traded at negative levels, Defendants' rapid ammo selling at progressively lower levels helped cause a downtrend in market prices that sent signals to other market participants that selling made sense and buying did not make sense notwithstanding the facts that selling seemed to be especially uneconomic when prices were negative and buying seemed to be favorable when prices were negative (and someone would be paid in order to have the right to receive the commodity). *See* pp. 8-9 above.

Defendants engaged in all the foregoing manipulative devices in order to depress May contract prices, including by making such prices go into a substantial downtrend after 1:00 pm

---

should apply. But whichever standard applies, Plaintiff's allegations of who, what, when, and why May Contract prices were manipulated is sufficient. The Complaint alleges, in exacting detail, when the manipulative scheme was executed, the precise timing of the manipulative sales on April 20, the precise volumes of sales and timing of sales for each of the Vega Trading Defendants and alleges that the manipulative scheme was intended to (and did) artificially depress prices of the May Contract.

from which they did not recover prior to the 1:30pm completion of the calculation of the TAS price at which all Defendants bought back their May Contracts. ¶¶2, 6, 42, 44, 46, 48, 50, 52-53, 55-59, 108-112, 129, 133-136, 145, 156, 163-64, 167, 170 173-175.

In *Ploss*, a case cited by Defendants, the Court sustained a claim under Section 6(c)(1) based on far less detailed allegations. *Ploss*, 197 F.Supp. at 1053-1061. The manipulative device at issue in *Ploss* was the "long wheat futures scheme," which involved Kraft purchasing and maintaining a large long futures position to its economic detriment in order to force physical wheat prices in a direction favorable to Kraft. *Ploss*, 197 F.Supp. at 1053. *Ploss* found that Kraft's acquisition of a large long futures position sent a false signal to the market. Like in *Ploss*, Plaintiff has alleged that by acting to its economic detriment in selling May Contracts for losses, Defendants intentionally injected false information into the market regarding the May Contract, thus creating a false value and sending a signal of false value for the May Contract for the purpose of influencing and capitalizing on Defendants' cross-market TAS positions. [31]

Defendants allegedly engaged in precisely the type of conduct that courts have consistently held to be manipulative. For example, in *In re Amaranth*, Amaranth and its principal trader, Brian Hunter, executed open-market trades to ensure the profitability of related derivatives—specifically, natural gas swaps that were valued by reference to the NYMEX natural gas closing price, and whose profitability to the defendants depended on the decrease of the NYMEX closing price. *See id.* at 525, 528. On separate occasions, defendants accumulated a substantial number of gas futures contracts that traded on the NYMEX. *Id.* at 530. On the final

---

[31] Defendants' reliance on *Sullivan*, 47 F.3d at 861, is similarly misplaced. The primary holding in *Sullivan* was that defendant's conduct was not market manipulation because it was *eliminated* artificial price differences and was therefore pro-competitive. *Id.* at 862, 865; *see also In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 389 & n.171 (S.D.N.Y. 2003) (distinguishing *Sullivan* and upholding market manipulation claims where "nature, purpose and effect" of defendant's conduct was to artificially affect price of securities).

day of trading, during the last 30 minutes, Amaranth flooded the NYMEX natural gas markets with offers to sell its gas futures. *Id.* at 527. The trading was found to be manipulative, in part, because the sales were designed to induce other traders to further the downward pricing momentum by selling for fear of a price collapse. The sales, themselves, involved use of two distinct manipulative triggers that sent false signals: (i) the sales lost money on a stand-alone basis and (ii) were executed in a manner designed to mislead other traders by sending a signal to sell into the dip and carry the price lower.

Defendants' scheme involves use of both of these signaling triggers. By placing successive offers at a price specifically designed to lose money on a stand-alone basis, Defendants' out-of-step bids skewed the market value of the asset. By increasing the rate, quantity and manipulative quality of their successive uneconomic offers, Defendants increased the likelihood that their offers would be executed because, necessarily, such uneconomic offers would face increasingly diminished competition. Under these circumstances, Defendants' cumulative net selling pressure, aggressor and "ammo" sales both moved prices lower and reinforced the directional (downward) false price signal to the market.

The CFTC has repeatedly asserted that TAS schemes like that alleged here violate Section 6(c)(1) of the CEA. In *Shak*, the CFTC found Shak's TAS scheme violated Sections 6(c) and 9(a)(2) of the CEA. *Id*. *Shak* involved a strategy to manipulate the price of WTI futures higher to benefit a large net short TAS position—and involved facts that mirror (in directionally opposite manner) Defendants' TAS trading scheme here. The scheme in *Shak* had three key elements. First, Shak and SHK established substantial short positions by selling TAS WTI futures contracts. Second, immediately prior to the close, Shak and SHK offset some of their TAS positions by buying outright futures contracts at a rapid pace to start driving the price of the

contracts higher. This buying effort accounted for 29.3% of all outright buys during the three minutes prior to the close. Third, Shak and SHK bought at a rapid pace during the close. *CFTC v. Optiver US, LLC*, 08-cv-6560 (LAP/THK), 2012 WL 1632613 (S.D.N.Y. Apr. 19, 2012) was another successful enforcement action that involved trading a significant volume of futures contracts in the opposite direction of the TAS position, before and during the close of the contracts. The court entered a final consent order which, among other things, permanently restrained, enjoined and prohibited the Optiver defendants from engaging in any conduct that violates Sections 6(c), 6(d) and 9(a)(2) of the CEA. Optiver Consent Order, 2012 WL 1632613 at *1- *7.

Defendants' conduct, as alleged here, involves similar objective and circumstantial evidence of Defendants' manipulative trading strategy, including the uneconomic acts of aggressively selling May Contracts at increasingly lower prices in order to increase the profitability of their long TAS positions. For these reasons, Defendants TAS trading scheme constituted the use of a manipulative device that violated Section 6(c)(1) and Regulation 180.1(a)(1).

## IV. Plaintiff Plausibly Alleges Section 2(a)(1)(B) Claims Against Defendants

A "principal-agent" relationship is sufficient—but not necessary—to establish strict liability under Section 2(a)(1)(B) of the CEA.[32] Liability under Section 2(a)(1)(B) attaches where Plaintiff has plausibly alleged the person or entity violating the CEA was "acting for" another in

---

[32] *In the Matter of Gary Glass and Zoltan (Lou) Guttman, Respondents*, 1996 WL 518121, at *9, 13 (C.F.T.C. Sept. 11, 1996) (Section 2(a)(1)(B) "focuses on whether one is acting for another when violating the Act. Rather than undergoing 'an exercise in semantics' by limiting itself to the terms of the common law principal/agent theory, this Court will focus on the issue of whether Magid was acting for Guttman.") *petition for review denied Guttman v. Commodity Futures Trading Comm'n*, 197 F.3d 33, 39 (2d Cir. 1999) ("it is enough if Magid was 'acting for' Guttman in executing the illegal trades").

connection with the alleged manipulative scheme. 7 U.S.C. §2(a)(1)(B).[33] No showing of "control" is required. *Guttman*, 1996 WL 518121, at *9 ("Importantly, control is not required to establish whether one is acting for another.") *citing Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir.1986).[34] Whether one person or entity was acting for another depends "on an overall assessment of the totality of the circumstances in each case." *Id.*

**Vega**. Plaintiff plausibly alleges the VTDs were "acting for" Vega. All of the allegedly manipulative orders, trades and positions that were made, executed and held by the VTDs were executed through accounts controlled by Vega and in Vega's name. ¶¶30-32. By agreement, Vega authorized the VTDs to trade crude oil futures contracts in its trading account such that the trading at issue herein was expressly authorized by Vega. *Id.* Vega stood to profit by authorizing the VTDs to trade in Vega's name and through its brokerage accounts. ¶36. Thus, all of the allegedly manipulative orders and trades entered by the VTDs were made in Vega's name, on Vega's behalf, authorized by Vega, and such trades substantially benefited Vega. *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at *25 (S.D.N.Y. Sept. 20, 2016) (holding where the complaint alleged conduct by traders "acting for the benefit" of the defendants, "[n]othing more is required" to plead a claim under Section 2(a)(1)(B)).[35]

---

[33] Section 2(a)(1)(B) of the CEA provides: "The act, omission, or failure of any official, agent, **or other person acting for** any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person." (Emphasis supplied).

[34] *In re Platinum & Palladium Commodities Litig.*, 828 F. Supp. 2d 588, 599 (S.D.N.Y. 2011) (the CEA imposes no requirement of "control" to plead a claim under Section 2(a)(1)(B) and finding that *In re Amaranth*'s holding that "control over key aspects" is required is at odds with the Second Circuit's decision in *Guttman*).

[35] Vega's motion does not challenge that the VTDs were acting for Vega. Instead, Vega's motion asserts two principal arguments: the Complaint supposedly does not plausibly allege (1) the VTDs were acting as "agents" for Vega (Br., pp. 9-13); and (2) Vega had sufficient "control" over the VTDs. Br., pp. 11-13.

Although not required, Plaintiff plausibly alleges the VTDs were agents of Vega.[36]

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████. McGrath Decl., Ex. 3 at

VEGA_MISH_000008671. Vega also required that the VTDs pool their capital so that Vega was

protected from losses. ¶122. Vega retained all of this control over the trading in its accounts

because, if the VTDs could not cover the losses of one or more VTDs, then Vega, as the account

holder, was ultimately responsible to cover the losses in its trading accounts. Accordingly, Vega

authorized the VTDs to act on Vega's behalf for purposes of trading in Vega's brokerage

accounts, Vega retained control over key aspects of the trading that occurred in its accounts,

Vega stood to benefit (and did benefit) from such trading, and the VTDs consented to the

foregoing.[37]

██Individual A██. Plaintiff alleges that ██Individual A██ is the "sole shareholder, sole owner and sole director"

of Vega, *i.e.*, he is a principal of Vega. ¶38. █████████████████████████████

██████████████████████████████████████████████████████████



However, neither control nor agency are required for liability under Section 2(a)(1)(B). *See* pp. 23, 45 above.

[36] A principal-agent relationship exists "when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Schutz v. Arrow Fin. Servs., LLC*, 465 F. Supp. 2d 872, 877 (N.D. Ill. 2006) *quoting* Restatement (Third) of Agency § 1.01 (2006). Contrary to Vega, actual control is not required, the principal need only have the "*right* to control." *Id*.

[37] Vega argues the VTDs were ██████████████████████ and therefore the VTDs cannot be Vega's agents. However, Vega's label is not dispositive. An agency relationship depends on the totality of the specific facts and circumstances of a particular case. *See, e.g., Rankow v. First Chicago Corp.*, 870 F.2d 356, 359 (7th Cir. 1989) ("In determining the existence and scope of an agency relationship the fact finder must examine 'the facts and circumstances surrounding the particular case,'…and 'reference may be made to the situation of the parties, their acts, and other relevant circumstances.'"). Vega also argues Vega acted as a broker and the VTDs as its customers such that the VTDs cannot be Vega's agents. Again, agency depends on all facts and circumstances. Plaintiff has plausibly pled the VTDs acted as Vega's agents. That certain aspects of the relationship between Vega and the VTDs resembled that of a broker and customer does not operate to nullify the agency relationship.

████████ ████ Individual A ████ ███████████████████████████████ McGrath Decl., Ex. 3 at VEGA_MISH_8680 (emphasis supplied); McGrath Decl., Ex. 4 at VEGA_MISH_8691 (signature). By trading through accounts held in Vega's name, where such trading was authorized by ███████ as the sole director of Vega, the VTDs were "acting for" ███████, including to generate profits for him, in connection with the VTDs trading in Vega's accounts. *See* pp. 36-37, 51-52 above.

Even if an agency relationship were required (it is not), Plaintiff plausibly alleges ███████ was a principal of Vega and the VTDs. As sole director and owner of Vega, it may be reasonably inferred that ███████ had total control over Vega or, at a minimum, he had the *right* to exercise total control. ███████ █████████████████████████████████████████ ████████████████████████████████████████████████████████████

*See* pp. 37, 52 above. ███████, as sole owner and director of Vega, also had authority to direct that the VTDs cease all trading of crude oil futures in Vega's accounts.[38]

**Vega Trading Defendants**. Plaintiff alleges that the VTDs, including Defendants █████████████████████████████████ ████████████, coordinated, conspired and otherwise worked together as a team and on one another's behalf in order to depress the price of the May Contract with each VTD actively executing manipulative trades. *See* VII below.[39] The more the VTDs

---

[38] ███████████████████████████████████████████ ██████████████████████████████ Individual A ████████ ████████████ Individual A █████████████████████████ ██████████████████████ Individual A ████████████████ *Id.*; *see Rosenthal*, 802 F.2d at 966 ("Principals are strictly liable for their agents' acts—even if the agents are not employees—**if the principals authorize or ratify the acts or even just create an appearance that the acts are authorized**. This is so even though in a case of ratification or apparent authority the principal does not himself direct the act and may indeed know nothing about it when it occurs…") (emphasis supplied).

[39] *In re Natural Gas Commodity Litig.*, 337 F.Supp.2d 498, 500-03, 509-12 (S.D.N.Y. 2004) (sustaining CEA aiding and abetting claims based on allegations of collusive manipulative activity).

could depress the May Contract price by acting together, the more each VTD would profit from their long TAS positions. ¶128. The VTDs, including ███, pooled their trading capital and guaranteed one another's losses. ¶122. Thus, Plaintiff plausibly alleges the VTD were "acting for" one another, including for one another's benefit, in executing the allegedly manipulative trades.[40] Although not required, Plaintiff also plausibly alleges the VTDs acted as principals and agents for one another. It can be plausibly inferred from Plaintiff's fund pooling and loss guarantee allegations that the VTDs, including ███, authorized one another to trade the group's pooled capital and that the VTDs retained control over how the group's pooled capital was traded by the VTDs.

## V. Plaintiff Plausibly Alleges Aiding and Abetting Claims Against Defendants

To state a claim for aiding and abetting in violation of Section 13(a) the CEA, 7 U.S.C. §13c(a), Plaintiff must plausibly allege Defendants (1) had knowledge of another Defendant's intent to violate the CEA; (2) had an intent to further the violation and (3) committed an act in furtherance of the violation. *Kohen*, 244 F.R.D. at 482. Liability under Section 13(a) extends to those who act "in combination or concert with any other person" in connection with a violation of the CEA. 7 U.S.C. §13c(a). Plaintiff has plausibly alleged that each of the Defendants combined, conspired, and agreed to manipulate prices in violation of the CEA. *See* pp. 60-61 below. Thus, each Defendant is liable for the acts of their co-conspirators under Section 13(a).

███Individual A███. Plaintiff plausibly alleges ███Individual A███ knowledge of the manipulation, an intent to further the manipulation and acts in furtherance of the violation. The VTDs were reported to have previously traded together frequently in order to move prices. ¶119. In this context, on

---

[40] The VTDs motion asserts Plaintiff has supposedly not established a primary violation of the CEA, which is a prerequisite for liability under Section 2(a)(1)(B). As set forth in Section II above, Plaintiff has plausibly alleged primary violations of the CEA against all Defendants.

April 20<sup>th,</sup> the VTDs traded more than ▉▉▉ WTI crude futures contracts (▉▉▉ barrels of

oil) in Vega's trading accounts (which were to be monitored by Vega daily), the price of crude

oil went negative for the first time in the history of the CME, the VTDs trading profits exceeded

▉▉▉▉ and Vega also earned profits as a result of the VTDs trading. ¶¶36, 139, 203. Thus,

"it strains credulity to suggest" that ▉Individual A▉ (the sole owner of Vega) was unaware of the alleged

manipulation that occurred on one of the most notable days in the history of the CME. *In re*

*Amaranth,* 587 F. Supp. 2d at 543 (it "strains credulity to suggest" that hedge fund owner was

unaware of the alleged manipulation that earned tens of millions of dollars), *aff'd,* 730 F.3d 170

(2d Cir. 2013). With respect to ▉Individual A▉ intent and acts taken to further the manipulation, ▉Individual A▉

(as Vega's sole director) authorized the VTDs to trade in Vega's accounts, which provided the

VTDs with the ability to manipulate prices, and ▉Individual A▉ had the right to control key aspects of the

VTDs' trading. *See* p.53 above. ▉Individual A▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉Individual A▉

▉▉▉▉ ¶¶36-37. ▉Individual A▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ¶¶121-127.

**Vega**. All of the allegedly manipulative trading positions were held and executed in and

through Vega's trading accounts. As the account holder, it is reasonable to infer that Vega had

knowledge of the trading in its own accounts. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ McGrath Decl.,

Ex. 3 at VEGA_MISH_00008672. Although the VTDs executed the manipulative trades, Vega,

as the account holder, held the manipulative positions. In *Kohen*, defendant PIMCO Funds, the

holder of the allegedly manipulative positions, had its motion to dismiss plaintiffs' aiding and

abetting claims denied because "it can be reasonably inferred from the alleged facts that PIMCO

Funds knew that PIMCO intended to manipulate the futures market by accumulating large positions in the June Contract and the CTD Treasury note, and by acting as the purchaser of such notes, PIMCO Funds intended and actually furthered PIMCO's objective." *Kohen*, 244 F.R.D. at 482. The foregoing allegations in *Kohen* were sufficient to sustain a *primary* manipulation claim against PIMCO Funds. *Id*. Going beyond *Kohen*, Plaintiff also alleges the VTDs engaged in manipulative trading practices prior to April 20th ████████████ █████ Individual A █████████

████████████████████████████████████████████████████████████

████████████████████ ¶¶121-127.

**VTDs**. Each of the VTDs, including █████[41], engaged in **exactly the same** manipulative strategy on April 20th: buying May Contracts via TAS and selling May Contracts outright, thereby exerting net selling pressure on the May Contract. ¶¶139-140. Furthermore, the trading was highly correlated, with the six highest volume VTDs selling May Contracts in virtual lockstep. ¶¶141-143. ████████████████████████████████████

████████████████ ¶¶165-181. ██████████ Trader 1 ██████████████████████

████████████████████████████████ ██ ¶190. Given that the VTDs engaged in the same TAS strategy, on the same day, for the same reasons, and that the vast majority of the

---

[41] █████ attempt to distance themselves from the other VTDs based on a supposed lack of manipulative intent and knowledge of the scheme. Here, Plaintiff has plausibly alleged █████'s manipulative intent and knowledge of the scheme: (1) █████, like the other VTDs, each sold May Contracts in an "aggressive" manner on April 20; (2) █████ each traded in the exact same direction as the other VTDs (selling) and each purchased May Contracts in the same way as the other VTDs (TAS), which put netting selling pressure into the May Contract; (3) █████ each traded during the last hour of trading on April 20, with Defendants Trader 7 and Trader 11 trading during the last 22 minutes when prices were negative; (4) █████ and the VTDS each shared the same common financial motive to depress the May Contract price; (5) ████████████████████████████████ (5) the VTDs had, prior to April 20, "regularly" traded together in order to move prices; and (6) █████████████████████ ██████████████ Trader 1 █████████████████████ ████ ¶¶187, 191.

trading was highly correlated to the minute, it is reasonable to infer that all VTDs had knowledge of the manipulative scheme.

Each VTD, including ███, intentionally assisted and acted in furtherance of the manipulative scheme by **actively participating therein** and executing manipulative trades. ¶145. By coordinating, conspiring and otherwise working as a team, the VTDs increased the chances that their TAS scheme would be successful. ¶128; *In re Natural Gas,* 337 F. Supp. 2d at 500-03, 509-12 (denying motion to dismiss CEA aiding and abetting claims based on collusive manipulative activity). The VTDs, including ███, committed capital to guarantee one another's losses, such that they effectively acted as co-guarantors to one another's financial outcomes. ¶¶4, 122-125, 187, 242. These pooling and guarantee arrangements provided further assistance to the scheme and further plausibly infer that VTDs had knowledge of one another's trading activities.

### VI. Plaintiff Has Plausibly Pled Actual Injury and Actual Damages

Section 22(a) of the CEA provides for the recovery of "actual damages" resulting from a violation of the CEA. 7 U.S.C. §25(a). The issue of actual damages involves a "complex factual inquiry," that is generally inappropriate to resolve at the pleading stage. *Crude Oil*, 913 F. Supp. 2d at 61.

Defendants assert Plaintiff has supposedly not alleged enough specifics about its trading in the May Contract in order to plausibly allege injury as a result of the alleged manipulation. This is wrong; Plaintiff has alleged actual injury caused by the manipulation. Plaintiff alleges the specific crude oil futures contract it traded (May Contract), the day it traded (April 20, 2020), the number of contracts it traded (10 contracts purchased and 10 sold), that the 10 May Contracts were sold at negative prices (which occurred for the first time on April 20th beginning at

approximately 1:08 pm), that its trade resulted in a net loss of $92,490, and that the 10 May Contracts were sold at artificially low prices caused by Defendants. ¶29.[42] Selling at an artificially low price was to Plaintiff's detriment. Plaintiff alleges that its sale at negative prices was made in order to "liquidate a long position," which means the long position was established prior to sale of the May Contracts at negative prices. *Id*. The net loss of $92,490 means the purchase price was higher than the sale at negative prices. *Id*. Plaintiff's sale of 10 May Contracts at negative prices on April 20, *i.e.*, between 1:08 p.m. and 1:30p.m., occurred during the same time Defendants were engaged in "ammo" selling that constituted 30.5% of the total volume in the May Contract between 1:08 pm and 1:30 pm. ¶¶29, 145(e). That is, Plaintiff has alleged that it sold May Contracts at precisely the same time of day Defendants were engaged in their maximum price-depressive conduct in the May Contract. Defendants' claim that Plaintiff must allege that it sold in the TAS market or at the settlement price on April 20th ignores that Plaintiff alleges that May Contract prices were artificial throughout the day on April 20th, which includes, but is not limited to, the settlement price. *See* II(D) above.[43]

In fact, Plaintiff has pled what Defendants' own case has recognized to be the "most direct" type of injury, which is that it traded and lost money in the **same** contract type that

---

[42] Where, like here, Plaintiff alleges it transacted "at artificial prices, injury may be presumed." *In re Platinum & Palladium Antitrust Litig.*, No. 1:14-CV-9391-GHW, 2017 WL 1169626, at \*28 (S.D.N.Y. Mar. 28, 2017) (collecting cases and finding actual damages sufficiently alleged where, like here, plaintiffs alleged they sold at artificially low prices caused by defendants), *on reconsideration*, 449 F. Supp. 3d 290 (S.D.N.Y. 2020).

[43] Defendants assert Plaintiff is supposedly required to allege the precise prices at which it bought and sold the May contract on April 20 in order to plausibly allege injury. However, Defendants cite no case that requires this particularly where, like here, Plaintiff has pled that it sold the May contract at artificially low prices on April 20 and has further alleged that the May contract sales were at negative prices, which occurred on April 20 between 1:08 and 1:30 pm. In any event, discovery will show that on April 20, 2020, Plaintiff bought 10 May 2020 contracts at $2.15, sold 9 May contracts at negative $7.10 and sold 1 May 2020 contract at negative $7.09. Again, Plaintiff's sales of May contracts were made at artificially low prices and at the same time Defendants were engaging in their most extensive price depressive conduct.

Defendants were trading, on the **same** futures exchange on which Defendants were trading and at the **same** time and place as Defendants were allegedly manipulating the same market. ¶29. *Harry v. Total Gas & Power N. Amer., Inc.*, 889 F. 3d 104, 111 (2d Cir. 2018) (holding actual damages are alleged in the "most direct" way where "a plaintiff plead[s] that she traded and lost money (or failed to gain as much money as she otherwise would have) during a bout of defendant's alleged market manipulation in the same contract type in the same exchange for delivery at same time and place, her pleading of injury is likely to be nearly as good as if she had pled privity.")[44]

### VII. Plaintiff Plausibly Alleges A *Per Se* Violation Of Section 1 Of The Sherman Act

*A.* **Legal Standard.** Section 1 of the Sherman Act prohibits any contract, combination, or conspiracy which unreasonably restrains trade. Certain types of agreements are unreasonable *per se*. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 221-222 (1940) ("*Socony*") (holding that "agreements to raise or *lower* prices whatever machinery for price-fixing was used" are "illegal agreements under the Sherman Act" and further, that "[*e]ven*

---

[44] Defendants rely on highly inapposite cases. For example, *In re CBOE Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845 (N.D. Ill. 2020) involved a situation where plaintiff did not even allege whether prices were artificially high or low and therefore could not establish that the manipulated price was to their detriment. *In re CBOE*, 434 F. Supp. 3d at 869-870. Here, Plaintiff alleges that the manipulation resulted in artificially low May Contract prices and that it sold May Contracts at such artificially low prices. ¶29. For another example, Defendants rely on several cases involving "episodic manipulations" where the alleged manipulation was alleged to have resulted in artificially high prices, artificially low prices or even non-artificial prices on varying days during the class period. *See*, *e.g., In re CBOE*, 434 F. Supp. 3d at 869-870 and *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 621-622 (S.D.N.Y. 2013). However, Plaintiff has not alleged an episodic manipulation. Plaintiff has alleged what Defendants' cases may refer to as a "persistent suppression" manipulation because Plaintiff alleges May Contract prices were artificially low throughout the day on April 20th. *Compare In re Libor,* 962 F. Supp. 2d at 622 (finding plaintiffs had adequately alleged actual damages where they pled that Eurodollar futures contracts had been depressed throughout the class period and they sold Eurodollar futures at the artificially low prices even where plaintiffs did not plead the day they traded). Even in the context of an episodic manipulation (which is inapplicable here), Defendants' cases hold that plaintiffs need only allege they engaged in a transaction at a time when prices were artificial and that the artificiality was adverse to their position. *In re CBOE*, 435 F. Supp. 3d at 869. Plaintiff has done that here by alleging that it sold 10 May contracts at artificially low prices caused by Defendants. ¶29.

though the members of the price-fixing group were in no position to control the market, to the

extent that they *raised, lowered,* or stabilized prices *they would be directly interfering with the*

*free play of market forces.* The [Sherman] Act *places all such schemes* beyond the pale and

protects that vital part of our economy against any degree of interference." (emphasis added));

accord *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 705 (7th Cir. 2021)

(citing *Socony* for the proposition that "A Sherman Act combination 'formed for the purpose and

with the effect of raising, depressing, fixing, pegging, or stabilizing the price' in the marketplace

is illegal *per se*.").

Here, Plaintiff plausibly alleges that Defendants combined and agreed to depress the

prices of the May Contract. *See* ¶¶227-229. That this agreement constitutes a "*per se* violation"

(¶ 228), if adequately alleged, Defendants do not question. ECF 71, 73, 77 *passim.*[45] Rather,

Defendants argue only that Plaintiff does not plausibly allege that Defendants agreed and fixed

May Contract prices. However:

> "[a]sking for plausible grounds to infer an agreement does not impose a
> probability requirement at the pleading stage; it simply calls for enough fact to
> raise a reasonable expectation that discovery will reveal evidence of
> illegal agreement."

*Bell A. Corp. v. Twombly*, 550 U.S. 544, 556-557 n.4 (2007); *Alarm Detection Sys., Inc. v.*

*Village of Schaumburg*, 930 F.3d 812, 827 (7th Cir. 2019). For example, has plaintiff

"sufficiently alleged (1) parallel conduct and (2) additional factual circumstances, or 'plus

---

[45] Notwithstanding their express agreement to guarantee the losses in one another's accounts, the VTDs are each independent contractors who made their own trading decisions and are actually competitors who enter the competitive futures trading price formation process at the same level in order to purchase or sell and determine the contract price. *See* Jerry W. Markham, Fiduciary Duties Under the Commodity Exchange Act, 68 Notre Dame L. Rev. 199, 270, n.1 (1992) (explaining that the only term negotiated in a futures contracts is the price that traders and brokers compete for). Agreements by actual competitors not to compete are *per se* violations of section 1. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).

factors,' indicating an agreement.'" *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019) (internal citations omitted); *see In re Text Messaging Antitrust Litig.,* 630 F.3d 622, 628 (7th Cir. 2010) (labeling such sufficient allegations as "parallel plus" behavior).

When alleging such an agreement, a plaintiff's claims against a co-conspirator will survive a motion to dismiss even if it is still unclear as to the co-conspirator's role and, moreover, notwithstanding that such individualized allegations are limited to mere parallel behavior. *Guaranteed Rate, Inc. v. Conn*, 264 F. Supp. 3d 909, 932 (N.D. Ill. 2017) (internal citation and parenthetical omitted). Likewise:

> a complaint need not individually describe the particular actions of each defendant. Instead, the complaint should be read 'sensibly and as a whole' to determine whether there is 'genuine uncertainty regarding who is responsible for what.' A complaint may allege that multiple defendants acted 'jointly,' so long as the accusation does not devolve into 'vague references' of collective responsibility.

*Golbert v. Aurora Chicago Lakeshore Hosp., LLC*, 19-CV-08257, 2021 WL 952560, at *5 (N.D. Ill. Mar. 11, 2021) (internal citations omitted); *see Slep-Tone Ent. Corp. v. Coyne*, 41 F. Supp. 3d 707, 714 (N.D. Ill. 2014) ("It is not impermissible lumping to allege that each defendant, on his or her own, engaged in precisely the same misconduct."). [46]

Under these standards, Plaintiff plausibly alleges an unlawful agreement between and among Vega[47] and the VTDs, and also of the VTDs with one another – including VTDs ▇ Trader 8, Trader 11, Trader 10, and Trader 7 ▇.

---

[46] *See Savory v. Cannon*, 17-CV-204, 2021 WL 1209129, at *3 (N.D. Ill. Mar. 31, 2021) ("[W]here, as here, the nature and circumstances of the alleged wrongdoing do not allow the plaintiff to know at the pleading stage who among 'a collective body' did precisely what, failure to plead those specifics is 'not by itself a proper ground for the dismissal of the suit.'") (internal citations and parentheticals omitted)).

[47] Vega is a corporation organized under the laws of the United Kingdom, *see* Complaint ¶ 30, and is therefore a "person" capable of conspiring with another person for purposes of the Sherman Act. *See* 15 U.S.C. § 7. And because Vega is wholly owned by ▇Individual A▇ *see* ¶¶ 34, 38, Defendant Vega, as a principal, is liable for the acts of its agent, Defendant ▇Individual A▇ *See Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565-66 (1982).

**B.** **Defendants Engaged In Extensive Parallel Price Moving Behavior And Even Participated In One Another's Price Moving Behavior.** Contrary to Defendants' assertions (ECF 71, p. 16), Plaintiff alleges that the VTDs engaged in extensive price moving parallel behavior and that Defendants mutually participated in one another's price moving behavior. *See* pp. 3, 59-61.

1) Each VTD, including ███, sold for their own account, and Vega also sold, as a nominal owner for all the VTD accounts, May Contracts in order to depress May Contract prices.[48] ¶¶139, 140.

2) Each VTD purchased, and Vega actually made the purchases in its name of TAS contracts in order to divert purchasing pressure into TAS contracts and keep buying pressure out of the May Contract. ¶¶139, 140.

3) Each Defendant roughly balanced, and Defendant Vega on behalf of all of them roughly balanced, their May Contract sales and TAS contract purchases in order to place large net selling pressure on May Contract prices (¶¶2(c)(d), 6-7, 42-59, 107-137, 139, 140, 156, *see* table on p. 3).

4) Each VTD mutually guaranteed Vega against losses in one another's accounts. ¶¶ 4, 122, 125, 187. Thereby, each VTD engaged in back-up participation in the trades of all other VTDs to the extent of such guarantee. A demonstrative exhibit of the VTDs' back up participation in one another's price moving sales would involve lines from each VTD's box to the boxes of all other VTDs (approximately 169 lines among the boxes).

---

[48] ███████████████████████████████████ Trader 12 and Trader 11 . ¶¶ 36, 123. Contrary to Trader 7 attempt to portray himself as a peripheral Defendant, he sold the sixth highest amount of May Contracts (**higher** than) Trader 12, Trader 1, Trader 2, and Trader 11 ). ¶¶ 139, 140.

5) Each VTD aggressed into the May Contract, and Vega did all the aggressing on behalf of the other VTDs into the May Contract during April 20th. ¶¶2(d), 42-59, 146-64.[49]

Plaintiff alleges that, after Defendants engaged in their foregoing price depressing parallel conduct, including through "ammo" transactions, May Contract prices fell (¶145) and that, as Defendants' parallel price-moving conduct reached its highest levels, the "vast majority" (¶136) of the May Contract decline on April 20th occurred during a time in which there were no changes in supply and demand which could explain such collapse of May Contract prices. ¶¶13-15, 107-209. After the all-time record decline in May Contract prices when Defendants were engaged in their extraordinarily large price depressing conduct on April 20th, the May Contract experienced an all-time record price increase on April 21st as Defendants' depressive price pressure was removed from the market. ¶¶7, 14-15, 136, 236-37.

Such allegations of parallel price moving behavior, and its impact on prices, are greater than that which courts have held support an inference of a conspiracy. *See In re Local TV Advert. Antitrust Litig.*, 18-CV-6785, 2020 WL 6557665, at *8 (N.D. Ill. Nov. 6, 2020) (finding that specific data showing that each defendant changed its prices **around** the same time, along with aggregate data demonstrating that defendants' conduct caused prices to rise, adequately alleged parallel behavior) [emphasis added];[50] *Strobl*, 582 F. Supp. at 775–76 *aff'd*, 768 F.2d 22, 24 (2d

---

[49]Vega maintained accounts of all the VTDs, including a master account, and all of the VTDs entered their orders and made their trades with GH Financial in the name of and through Vega. ¶¶ 31-32, 68. In essence, Vega acted a broker for its ██████████████████ traders (*i.e.*, the VTDs). ¶ 37. As such, Vega enabled all of the VTDs to enter into parallel trades.

[50] Moreover, and contrary to Defendants' assertions, ECF 71, p. 15, precisely simultaneous trading behavior is not required. The "Supreme Court has long held that simultaneous action is a not a requirement to demonstrate parallel conduct." *In re Broiler Chicken Antitrust Litig.*, 290 F.Supp.3d 772, 791 (N.D.Ill. 2017); *see Kleen Products, LLC v. Packaging Corp. of Am.*, 775 F.Supp.2d 1071, 1080 n. 15 (N.D.Ill. 2011) ("Defendants point to a few situations where they did not follow each other's announced price increases, but such arguments 'fail[ ] to distinguish between the existence of a conspiracy and its efficacy.'") (internal citations and quotation omitted). Though not required, the fact that Defendants engaged in their price moving conduct within the same day and, indeed, within the same four hour period, involves a far greater amount of simultaneity than has been present in other cases in which the price

Cir. 1985) (finding that alleged co-conspirators' parallel trading conduct and its unusual nature constituted evidence a jury could consider in determining the existence of a conspiracy and caused the price decline); *Minpeco,* 673 F. Supp. at 698 (finding evidence of four types of trading conducted by defendant which paralleled the conduct of other defendants as consistent with conspiratorial conduct once plus factors were considered). As such, Plaintiff has plausibly alleged extensive parallel behavior to move prices, especially, as in *Minpeco* and other cases, when considered in light of the plus factors demonstrated below.

**C.     The "Plus Factors" Relating To Defendants' Conduct Here Go Far Beyond Those Present In Cases In Which The Agreement Was Upheld.** Plus factors are circumstances giving rise to a less direct inference of conspiracy, such as a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of communications. *In re Local TV*, 2020 WL 6557665, at *9.

Here, Plaintiff alleges numerous plus factors, *e.g.*:

**First**, Defendants had trained to manipulate and practiced manipulating prices by trading together prior to April 20th. ¶¶5, 41, 126, 187, 118-19, 190-91. Defendants cite no case in which the defendants had previously rehearsed either the making or the execution of their price fixing agreement. ECF 71, 73, 77 *passim*. Because Defendants worked together and practiced moving prices *before* April 20th, it is more likely that they agreed to and did do so pursuant to an agreement on April 20th.[51]

---

moves occurred over a period of years. *See In re Local TV*, 2020 WL 6557665, at *1; *Broiler Chicken*, 290 F. Supp. 3d at 779; *MarNA Products*, 775 F. Supp. 2d 1071 at 1076; *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 994 (N.D. Ill. 2011); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 879 (N.D. Ill. 2009).

[51] In addition, evidence that a defendant trained co-conspirators in illicit activities – as has been alleged here, *see* Complaint ¶ 187 – is evidence of a criminal conspiracy. *See, e.g., U.S. v. Fuller*, 532 F.3d 656,

**Second**, Defendants' agreement involved the fixing and depression of prices in an entire public market. The fixing and the depression of prices "of an entire [futures] market is something that persons can better accomplish working in a combination and pursuant to an agreement rather than individually." ¶4; *accord, Strobl*, 582 F.Supp. at 775, *aff'd*, 768 F.2d 22, 24 (2d Cir. 1985).

**Third**, each VTD pledged their entire account to guarantee Vega against losses incurred by any other VTD for trades made on April 20th. Though this plus factor is also a price moving parallel act, it has been found to be extremely indicative of an agreement even in criminal conspiracy cases where, as here, there was a contractual pooling of assets. *See* fn. 23 above.

**Fourth**, as an agreement-facilitating bridge which implemented their prior training together to move market prices, Defendants had a high degree of communications before and during April 20th. ¶¶165-196.



_____

664 (7th Cir. 2008); *U.S. v. Jordan*, 374 Fed. Appx. 3, 5 (11th Cir. 2010) (unpublished); *Johnson v. U.S.*, 10-CR-973 (SAS), 2015 WL 7169589, at *6 (S.D.N.Y. Nov. 12, 2015); *see also U.S. v. Andreas*, 96-CR-762, 1999 WL 515484, at *2 (N.D. Ill. July 15, 1999) (for purposes of sentencing, training co-conspirators on how to manipulate sales demonstrated leadership in conspiracy), *aff'd and remanded*, 216 F.3d 645 (7th Cir. 2000).

It is a reasonable inference that discovery will reveal many more communications among all Defendants, including ███ and other Defendants. Defendants cite no cases in which the real time communications by the conspirators about where to make their sales, purchases, and other comments were nearly as extensive as that alleged here *but the court nonetheless granted a motion to dismiss at the pleading stage.* ECF 71, 73, 77 *passim.* The foregoing extensive use of communications to facilitate the agreement and execution of the agreement goes far beyond that regarded as probative of an agreement in other cases. *See Dairy Farmers of Am., Inc.*, 767 F. Supp. 2d at 900 ("[Plaintiffs] allege that the individual defendants communicated specifically about their purchases of long positions on the CME Class III milk futures market and the CME spot cheese market."); *compare Text Messaging*, 630 F.3d at 628; *In re Local. TV*, 2020 WL 6557665, at *9; *In re Plasma-Derivative Protein Therapies*, 764 F. Supp. 2d at 1000, 1002.[52]

**Fifth**, Defendants had the incentive to conspire because of their large financial motives to make profits from the trading ███████████████████████████████

███ Trader 12 ████████████████ Trader 11 █████████████████

███████████████████ ¶¶, 36, 122-23, 125, 139(g)(j), 187. The large "swing" between significant losses or significant profits renders the financial motive to agree, in the context of having to manipulate an entire public market (*see Strobl*) a plus factor that is very probative of agreement here. *See Alarm Detection Sys.*, 930 F.3d at 828 ("Profits through coordination can be relevant to whether a conspiracy is inferable[.]"); *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016) ("A [m]otive to conspire may be inferred where

---

[52] As another indication of the ability to communicate, most of the VTDs, including ███, occupied the same office before the COVID-19 lockdown. Complaint ¶ 187. As to Vega and Individual A, Individual A could and did communicate with the VTDs around the time of the manipulation, *i.e.*, Individual A ██████████████████████████████████████████████████████████████████████████████████. *Id.* at ¶¶ 56, 184-95.

the parallel action taken [by defendants] had the effect of creating a likelihood of increased

profits." (internal quotations omitted)); *id.* at 662-63 (crediting argument "that Defendants were

incentivized artificially to suppress the Fix Price because" they held net short gold futures

positions and a variety of other instruments, the value of which were dependent upon the gold

fix).

     **Sixth,** 

. ¶¶26-27, 30. Plaintiff also alleges that the CFTC and

the U.S. Attorney are investigating. ¶¶ 2(a) fn.2, 92.[53] In sum, Plaintiff has alleged numerous

plus factors that are indicative of a conspiracy among the Defendants.

     **D.**    **Defendants' Justifications Have, At Most, A Limited Role At The Pleading**

**Stage.** Defendants ignore Plaintiffs' detailed allegations.[54] However, once a plaintiff has put

forward a plausible version of events – as has been done here – the court is not to credit

alternative explanations or interpretations of comments, behavior, or conduct, regardless of

whether or not they are "more plausible". *In re Dealer Mgt. Sys. Antitrust Litig.*, 313 F. Supp. 3d

931, 952-53 (N.D. Ill. 2018) (stating that whether defendants' "innocent explanations" and

"exculpatory interpretations" are "more plausible" than "plaintiff's inculpatory ones" is **not** the

---

[53] Defendants' own cases (ECF 71 p.20) support the fact that an investigation could properly be
considered as part of a Sherman Act conspiracy claim but not as evidence of **parallel conduct** nor as
**direct evidence** of a conspiracy. *Cf. In re Treasury Sec. Auction Antitrust Litig.*, 15-MD-2673 (PGG),
2021 WL 1226670, at *15 (S.D.N.Y. Mar. 31, 2021) (observing that subpoenas and investigations merely
cited by plaintiffs – without revealing any details as to any specific defendant – were "not themselves
evidence of *parallel* conduct") (emphasis added); *In re Graphics Processing Units Antitrust Litig.*, 527 F.
Supp. 2d 1011, 1024 (N.D. Cal. 2007) (finding that an ongoing DOJ investigation carried no weight in
alleging *direct allegations* of a conspiracy).
[54] Such disregard is telling in and of itself: "the individual defendants minimize the allegations against
them in the complaint, completely omitting certain paragraphs from a list of quoted paragraphs that they
suggest is exhaustive. Whether this omission was an intentional attempt to pull the wool over the Court's
eyes or not, it is telling because, at the very least, Defendants seem to overlook the significance of
Plaintiffs' allegations." *Dairy Farmers of Am., Inc.*, 767 F. Supp. 2d at 898.

proper inquiry at the motion to dismiss stage );[55] *see Dubensky v. City of Chicago*, 17-CV-1700, 2017 WL 3034651, at \*2 (N.D. Ill. July 18, 2017) (Feinerman, J.) (observing that "parties' punches and counter-punches concern the weight of the evidence [the plaintiff] might offer to prove his claim, but evidence is not required at the pleading stage"); *In re Plasma-Derivative Protein Therapies*, 764 F. Supp. 2d at 1002. Because Plaintiff has plausibly alleged extensive parallel price moving behavior and truly extensive plus factors, he has more than alleged a plausible conspiracy and, thus, the inquiry goes no further under the law.[56]

Even if the Court were to consider Defendants' self-serving justifications, their explanations are contrary to the standards of Rule 12(b)(6) and common sense. *See* Point "I.C" above. Defendants argue that the text messages quoted by Plaintiff do not include exchanges between *every* VTD. *See* ECF 71, pp. 19-20. But "[p]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Broiler Chicken*, 290 F. Supp. 3d at 803 (internal citation omitted). Rather,

> "the underlying analysis is whether the complaint, as a whole, creates the plausible inference that each defendant is liable for the act complained of. If any group pleadings, taken along with any individual pleadings, create such a plausible inference, then the complaint is sufficient and survives a motion to dismiss."

---

[55] This Court has held the same in a legion of cases. *See In re Local TV*, 2020 WL 6557665, at \*9; *Hyatt Hotels*, 376 F.Supp.3d at 839; *Broiler Chicken*, *supra* at 788; *Brown v. Cook County*, 17-CV-8085, 2018 WL 3122174, at \*4 (N.D. Ill. June 26, 2018). As such, Vega and Individual A uninspired supplemental argument need not even be considered by the Court. *See* ECF 77, pp. 6-8. Indeed, they ask the Court to do exactly what it is *not* to do under *Twombly* and its progeny – weigh competing theories in the face of well-pled allegations. *See Id.* p. 8 ("Forwarding communications back and forth *is equally consistent* with Vega and Individual A having no involvement in the events of April 20") (emphasis added).

[56] This distinguishes the line of cases cited by Defendants, ECF 71 at 17-18 & ECF 73 at 6, in which plaintiffs failed to plausibly allege an agreement before the court ultimately credited alternative explanations offered by defendants.

*Martinez v. Wexford Health Services, Inc.*, 3:18-CV-50164, 2021 WL 1546429, at *3 (N.D. Ill. Apr. 20, 2021).

**Plaintiff Adequately Alleges Antitrust Injury and Standing.** An antitrust injury is any "injury of the type the antitrust laws were intended to prevent" and "flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* 429 U.S.477, 489 (1977); *Viacom v. Comcast Corp.,* 951 F.3d 429, 481 (7th Cir.2020)(same). It is "caused by anti-competitive behavior as opposed to mere economic loss." *Loeb Indus. v. Sumitomo Corp.,* 306 F.3d 469, 481 (7th Cir. 2002) ("*Loeb*"), quoting *Brunswick, supra,* 429 U.S. at 487-489. Here, Plaintiff alleges that the VTDs' anticompetitive conspiracy intended to and did depress May Contract prices and Plaintiff sold at such depressed May Contract prices on April 20. ¶¶ 107-114, 128-138, 140, 144-145, 156-164, 201-203; *see also* ¶¶ 17, 29, 219, and 228. Plaintiff adequately alleges antitrust injury.

Defendants fail to mention the controlling authorities in this Circuit on antitrust injury and standing in the commodity futures market context. *Loeb*, *supra*, *cert. den.* 539 U.S. 403(2003) and *Sanner v. Board of Trade,* 62 F.3d 918 (7th Cir.1995) ("*Sanner*"). Both *Loeb* and *Sanner* cite to and apply the Supreme Court authority of *Assoc. Gen. Contractors of Calif., Inc. v. Calif. St. Council of Carpenters*, 459 U.S. 519, 534 (1983) ("*AGC*"); *Sanner,* 62 F.3d at 926-928, *Loeb*, 306 F.3d at 487,494. Both *Loeb* and *Sanner* upheld antitrust standing where an alleged Section 1 conspiracy was based on the defendants' manipulation and restraint of trade in futures contract markets, which had also caused direct injuries to plaintiffs **in the related physical/cash markets for those respective commodities**. *Sanner,* 62 F.3d at 929-930, *Loeb*, 306 F.3d at 487-489, 494-495. Here, Plaintiff did not transact in a separate cash market from the May Contract. Again, Plaintiff sold and lost money in the self-same May Contract market in

which Defendants sold and depressed prices. ¶¶ 107-114, 128-138, 140, 144-145, 156-164, 201-203; *see also* ¶¶ 17, 29, 219, and 228. Neither *Loeb* nor *Sanner* require a plaintiff to either transact directly with a defendant or transact in a market that a defendant dominates or controls by a specific percentage for plaintiff to satisfy standing.[57] Such arguments by Defendants are contrary to the controlling authority in this Circuit.

In *Loeb,* plaintiffs/purchasers of physical copper in the cash market alleged defendants conspired to artificially manipulate prices of copper cathode in the futures market, which impacted the cash market prices paid by plaintiffs. The Court ruled that antitrust standing existed not just for traders in copper cathode futures markets, but for plaintiffs / purchasers of copper cathode and rod in the cash market who "suffered a direct and independent injury [from the futures traders] and are the best situated participants in the physical copper market to bring a lawsuit." *Id*. at 475. Accordingly, *Loeb* recognized that "different injuries in distinct markets may be inflicted by a single antitrust conspiracy, and thus, that differently situated plaintiffs might be able to raise claims" for distinct injuries. *Id.*

In *Sanner*, the Circuit Court affirmed antitrust standing for a class of plaintiffs/ soybean farmers who alleged they were forced to sell their soybeans in the cash market at depressed prices, due to defendants' alleged conspiracy to manipulate and restrain trade in the soybean futures market. *Sanner* rejected the CBOT defendants' arguments that other factors were a "superseding cause of the price decline" and "influenced the cash market for soybeans", respectively, noting that these matters "should not be resolved on a motion to dismiss." Id. at 925-926. The Court further warned that on a Rule 12(b)(6) motion to dismiss, a defendant cannot "refute the complaint or []present a different set of allegations", *citing Gomez v. Ill. State Bd. Of*

---

[57] *Loeb* held that *Illinois Brick* does not stand for the proposition "that a defendant cannot be sued under the antitrust laws by any plaintiff to whom it does not sell (or from whom it does not purchase). *Id.* at 42.

*Educ.*, 811 F.2d 1030 (7th Cir. 1987) at 1039. The Court thus found antitrust standing for the class of farmers who sold in the cash market at the precipitously low prices caused by defendants and held that "futures market participants were not more likely to be injured than cash market participants…because both markets were affected by the allegedly anticompetitive conduct."

Here, as in *Loeb* and *Sanner*, Plaintiff and class members are alleged to have suffered direct injuries from Defendants' conspiracy to fix and depress May Contract prices as low as possible. But, again, the facts supporting antitrust injury and standing here are much **stronger** than those in *Loeb* and *Sanner* because (1) Defendants conspired to and did sell **directly** in the ***very same*** May Contract market on the very same day and as Plaintiff was making their purchases in that self-same market, and (2) Plaintiff's resulting injuries are thus far more direct than those of the plaintiff in *Loeb* and *Sanner*, whose injuries occurred in markets tied to but separate from the futures markets yet standing was upheld.

Because *Loeb* and *Sanner* upheld antitrust standing, despite challenges from defendants under some of the same *AGC* factors Defendants challenge here, *i.e.* causal connection, directness of injury, and speculativeness of damages, ECF 71, pp.21-22, 25-26, Plaintiff *per force* satisfies standing here. However, as just discussed, Plaintiff's injuries are much more direct than those upheld in *Loeb* and *Sanner* and, accordingly, are much less speculative than the damages basis for standing upheld in *Loeb* and *Sanner*.

In *Loeb*, *supra*, the Court of Appeals rejected the defendants' argument that only direct purchasers of defendants can have antitrust standing.[58] Contrary to Defendants, Plaintiff's proof of impact does not require speculation or attenuated theories of causation. Plaintiff's May Contract

---

[58] *See In re Copper Antitrust Litig.,* 98 F. Supp. 2d 1039, 1053 (W.D. Wis. 2000) (same); *Strax v. Commodity Exch. Inc*., 524 F. Supp.936 (S.D.N.Y. 1981). This case also is factually distinct from *Illinois Brick* as it does not involve a typical series of sales in a vertical chain of distribution, where the end purchaser, typically the consumer, has no standing to sue for price-fixing under Section 1.

claims are tied to specific identifiable transactions in which it participated and, the resulting damages it suffered were caused by and constitute the direct effects of Defendants' anticompetitive agreement to depress prices of May Contracts. *See e.g., Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 816 (7th Cir. 2012)(suggesting that determining antitrust impact is relatively simple in a case involving commodities traded on an exchange and thus, supporting Plaintiff's position that commodity futures market prices are ideal for regression analyses and determining the amount of price impact).

In these circumstances, and at this stage, it would be premature to rule that Plaintiff's damages are speculative.[59] On the contrary, Plaintiff was "directly injured" (¶17) when it sold May Contracts at the artificially low prices caused by Defendant to liquidate Plaintiff's long position in the May Contract. *Id.* Thus, on "the afternoon of April 20…Plaintiff … sold…ten (10) May Contracts at negative prices…to liquidate a long position" and "incurred a net loss of approximately $92,490." ¶29. Contrary to Defendants (ECF 71, p.22), Plaintiff does allege the specifics of "when" it purchased its ten May Contracts. Though the precise purchase and sale numbers have never been required, discovery will show that Plaintiff earlier purchased on April 20th its May Contracts at $2.15 per barrel, and subsequently sold on April 20th its May Contracts at negative $7.10 and negative $7.09 per barrel. *Compare* McGrath Decl. Ex. 1 (investigators find that Defendants had the biggest impact on May Contract prices on the afternoon of April 20th) *with* ¶¶ 136, 145e (negative prices did not start until 1:08:23 and trading ended at 1:30 pm) *and* ECF 71, p. 28 (Defendants' price chart showing the exact level of prices at each time).

---

[59] *See Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 135 (2014) (the "potential difficulty in ascertaining and apportioning damages is not ... an independent basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects.").

Finally, Defendants again trot out their alternate explanations, intervening events, and various macroeconomic factors. However, as demonstrated repeatedly above, this argument is contrary to the Complaint and common sense. *See* Point "I.C". Given Defendants' ███████████ ███████████████ blatant "ammo" selling behavior (and uneconomic sales) between 1:00 and 1:30, the likely best case for Defendants during discovery will be that "both things can be true". That is, there might be some supply demand factor that indicates that prices should go lower during April 20th. But, moreover, Defendants' conspiracy intentionally exploited that factor which rendered the May Contract vulnerable to manipulation through their conspiratorial depression of the May Contract prices. In sum, Plaintiff's claim presents a much stronger argument for antitrust injury and antitrust standing than those upheld in the more attenuated facts of *Loeb* and *Sanner*. Moreover, the commodity futures markets are especially conducive to the determination of the amounts of price impact and damages. *Messner, supra* at 816. Thus, this distinction in which the conduct and injury **both** occur in the futures market here whereas they occurred in separate markets in *Loeb* and *Sanner* greatly improves Plaintiff's qualification for antitrust standing and injury.

Compounding their failure to cite to the controlling authority of *Sanner* and *Loeb,* Defendants cite to several out of Circuit "benchmark cases" that are contrary to *Socony, Loeb,* and *Sanner*. ECF 71, pp. 23-25. Because their reasoning and holdings are contrary to *Loeb* and *Sanner*, these decisions are, at a minimum, not persuasive authority. Moreover, the Court of Appeals for the Second Circuit (where these cases were decided) has not passed on antitrust standing in any of these lower court rulings in which the Southern District of New York has raised the bar for antitrust claims against leading banks.[60]

---

[60] VTD's reliance on *Gelboim v. Bank of Am. Corp.,* 823 F.3d 759 (2d Cir. 2016) is misplaced. *Gelboim* did not rule on antitrust standing. It reversed the dismissal of a Section 1 claim as to the USD LIBOR

Further, unlike the facts presented in the inapposite benchmark cases to which Defendants cite, here Plaintiff transacted in the self-same May Contract market in which the Defendants transacted and manipulated. That is, the facts of a direct manipulation in the same market present here were absent in Defendants' benchmark cases which, again, are directly contrary to the rulings in *Loeb* and *Sanner*. As quoted at the outset, *Socony* held that a *per se* violation need not involve a market dominated or controlled by Defendants. *Socony*, 310 U.S. at 221-222. In this respect as well, Defendants' out of Circuit benchmark cases are wholly unpersuasive.

Finally, Defendants' cited cases dismissing antitrust claims or denying antitrust standing decided by courts in this Circuit are completely inapposite on their specific facts, were decided on or after summary judgment on a full record after discovery, were not strictly price-fixing cases, or if they involved price-fixing, involved purchasers that were deemed indirect purchasers in a chain of distribution precluded by *Illinois Brick*. Again, that is not this case. *Cf. Kochert v. Greater Lafayette Health Servs., Inc.* 463 F.3d 710 (7th Cir. 2006) (affirming summary judgment in favor of defendant hospitals and rival anesthesiology practice accused by plaintiff of exclusionary practices violating both Sections 1 and 2 of Sherman Act; no antitrust standing or injury established by plaintiff/anesthesiologist where, *inter alia*, evidence indicated defendants had no improper motive, consumers or insurers would be more efficient claimants; and plaintiff was not even practicing anesthesia full time when some of the alleged anticompetitive conduct occurred); *Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir. 1993) (in case alleging exclusionary conduct and restraint of trade by oil companies with respect to plaintiffs' sale and distribution of gasohol fuel incorporating ethanol, Court affirms lower

---

benchmark, found antitrust injury sufficiently alleged, and remanded to the district court on standing and damages issues.

court's grant of summary judgment to defendants, finds the evidence fails to establish any

agreement among defendants under Section 1 to restrain trade; that trade associations through

which defendants allegedly acted in concert to restrain trade in gasohol did not act with unlawful

purpose or stray from certain normal procedures; ethanol sales actually increased 4000% during

the time period of the alleged violations; Court further holds that while plaintiffs showed

defendants engaged in anticompetitive behavior that violated the Gasohol Competition Act, they

failed to establish antitrust injury thereunder because evidence showed that at least eight

"alternate explanations" and intervening market factors could account for plaintiffs' injuries and

an expert for plaintiff even admitted that certain labeling laws had "killed ethanol in the

marketplace" and substantially lowered gasohol sales.); *In re Humera (Adalimumab) Antitrust

Litig.,* 465 F.Supp.3d 811 (N.D. Ill.2020) (appeal pending) (Humira buyers, indirect purchasers,

have alleged neither any antitrust violation nor an antitrust injury in their Section 1 "rule of

reason" lawsuit claiming AbbVie restrained competition for Humera drug by using tactics such

as market allocation and "pay for delay" schemes, along with patent litigation and settlements, in

concert with other drug makers to block cheaper biosimilars from coming onto the market in the

U.S.); *Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995) (on appeal from summary

judgment, Court held that plaintiffs had established antitrust standing in one of two alleged

markets, *eg.* in the retail shopping center market, but still dismissed the Section 1(non-price-

fixing) and Section 2 (monopolization) claims since they had failed to establish a genuine issue

of triable fact as to the existence of a conspiracy to restrain trade or to monopolize sales and

development in that relevant market); *Premium Plus Partners, L.P. v. Davis*, 2005 WL 711591 at

*16-17 (N.D. Ill. March 28, 2005) (in complaint alleging defendants benefitted from insider

trading and advanced knowledge of suspension of 30-YearTreasury Bond sales, court dismisses

the Section 1 (non-price fixing) antitrust claim without prejudice and plaintiff "does not dispute" that "Rule of Reason" analysis applies).

Defendants have woefully failed to carry their heavy burden to show at the pleading stage that Plaintiff has failed to allege antitrust injury or antitrust standing.

### VIII.    Plaintiff Has Plausibly Alleged a Claim for Unjust Enrichment

A claim for adjustment enrichment is available against "a defendant [who] has unjustly retained a benefit to the plaintiff's detriment," and whose "retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Ploss*, 197 F.Supp. 3d at 1074 *quoting Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011). Plaintiff alleges Defendants manipulated and conspired to manipulate the prices of the May Contract in violation of the CEA and Sherman Act and that Plaintiff suffered damages as a result thereof. *See* II-VII above. The VTDs earned trading profits in excess of ███████ in connection with the manipulation on April 20th. ¶¶139, 203, 267. Vega (and thereby ███Individual A███ as its sole owner) benefitted as well. ¶¶34-38. Permitting Defendants to retain the substantial benefits of their unlawful acts that damaged Plaintiff would be inequitable and violate the fundamental principles of justice, equity, and good conscience. *Ploss*, 197 F.Supp. 3d at 1074-75 (upholding unjust enrichment claims where defendants allegedly manipulated wheat futures prices in violation of the CEA and caused damages to plaintiffs). Defendants' sole argument in support of dismissal of Plaintiff's unjust enrichment claim—that Plaintiff has supposedly failed to state any CEA or Sherman Act claim against them—fails for all the reasons set forth above.

### IX.    Conclusion

To any extent the Court determines any item is lacking, Plaintiff respectfully requests

leave to replead.[61]

Dated: August 25, 2021

Respectfully submitted,

*/s/ Christopher Lovell*
Christopher Lovell
Christopher M. McGrath
**LOVELL STEWART HALEBIAN JACOBSON LLP**
500 Fifth Avenue, Suite 2440
New York, New York 10110
212.608.1900
clovell@lshllp.com
cmcgrath@lshllp.com

Marvin A. Miller
Andy Szot
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, Illinois 60603
312.332.3400
mmiller@millerlawllc.com
aszot@millerlawllc.com
*Attorneys for Plaintiff Mish International Monetary Inc.*

---

[61] See ECF No. 35, at 1 (January 28, 2021) (citing *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and N.W. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015), which recognizes that "[o]rdinarily, however, a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed. We have said this repeatedly.")); see also *Mohiuddin v. N.W. Med. C. DuPage Hosp.*, 18-CV-313, 2019 WL 918479, at *4 (N.D. Ill. Feb. 25, 2019) (Feinerman, J.); *Smith v. NVR, Inc.*, 17-CV-8328, 2018 WL 2718038, at *5 (N.D. Ill. June 6, 2018) (Feinerman, J.); *Marvin H. Maurras Revocable Tr. v. Bronfman*, 12-CV-3395, 2013 WL 5348357, at *29 (N.D. Ill. Sept. 24, 2013) (Feinerman, J.); *Winkfield v. City of Chicago*, 12-CV-3750, 2013 WL 1809920, at *3 (N.D. Ill. Apr. 29, 2013) (Feinerman, J.).