UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MISH INTERNATIONAL MONETARY INC., on behalf of itself and others similarly situated, | ) ) ) | |
| | ) | 20 C 4577 |
| Plaintiff, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| VEGA CAPITAL LONDON, LTD., TRADERS 1-12, INDIVIDUAL A, and DOES 1-100, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Mish International Monetary Inc. alleges in this putative class action that Vega Capital

London, Ltd., its owner ("Individual A"), and twelve traders associated with Vega ("Trading

Defendants") combined and conspired to manipulate the futures market of West Texas

Intermediate ("WTI") Light Sweet Crude Oil in a manner that violated Section 1 of the Sherman

Act, 15 U.S.C. § 1, and several provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C.

§ 1 *et seq*. Doc. 40. Defendants move to dismiss the complaint under Civil Rule 12(b)(6).

Docs. 70, 76. The motions are granted as to Vega, Individual A, and Traders 7, 8, 10, and 11,

and are granted in part and denied in part as to Traders 1-6, 9, and 12.

**Background**

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative

complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v.*

*N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider

"documents attached to the complaint, documents that are critical to the complaint and referred

to in it, and information that is subject to proper judicial notice," along with additional facts set

1

forth in Mish's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019-20 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Mish as the pertinent materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

### A.     The Crude Oil Futures Market

This case involves the futures market for WTI Light Sweet Crude Oil. Doc. 40 at ¶ 1. That market is a commodity futures market, in which parties enter contracts to buy or sell a specific amount of crude oil, at a predetermined price, on a specific date in the future. *Id*. at ¶ 73. The buyer of a futures contract holds a "long" position and the seller holds a "short" position. *Ibid*. The buyer must receive delivery and pay for the crude oil if it holds the contract on the delivery date; likewise, the seller must deliver the crude oil if it holds the contract on the delivery date. *Ibid*. The delivery date for the WTI futures contracts involved in this case was April 21, 2020. Doc. 40 at ¶ 81; *see* Doc. 72 at 11. This meant that anyone holding a long position on such a contract on that date was required to receive delivery of WTI crude oil specified in the contract. Doc. 40 at ¶ 73.

Most crude oil futures contracts are not delivered, but rather are satisfied or liquidated through trading. *Id*. at ¶ 75. To satisfy a futures contract through trading, a trader offsets its positions—for example, a trader who holds a long position to accept delivery of X barrels on Y date can sell a contract to deliver the same amount on the same date, thereby liquidating both positions. *Id*. at ¶ 76.

The WTI crude oil futures contracts here were placed primarily on the Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms. *Id*. at ¶¶ 22, 80.

Using those platforms, a trader can place an "order," which is a request to buy or sell a certain number of futures contracts. *Id*. at ¶ 96. An order seeking to buy futures contracts is a "bid," and one seeking to sell is an "offer." *Ibid*. When there is a price match between the price a bidder is willing to pay and an offeror is willing to accept, a contract is formed. *Ibid*. An aggressive order is one that immediately triggers a trade by making a bid that matches an order in the market, or an offer that matches a bid in the market. *Id*. at ¶ 147; Doc. 95 at 20. Daily settlement prices of WTI crude oil futures are determined between 1:28 p.m. and 1:30 p.m. Central Time. *Id*. at ¶ 82. Trading at Settlement ("TAS") contracts allow a trader to enter contracts at the daily settlement price—*i.e.*, a trader can buy or sell a contract before the two-minute settlement window, at any time during the trading day, at what later will become the settlement price. *Id*. at ¶¶ 87-88; Doc. 72 at 13-14.

As with most markets, futures contract prices rise when demand exceeds supply and fall when supply exceeds demand. Doc. 40 at ¶¶ 93-95. In general, sales of futures contracts depress prices and purchases increase prices. *Id*. at ¶ 93. The more contracts a trader sells and the less it purchases generally will result in cumulative net sales and downward pressure. *Id*. at ¶ 94. A trader who makes more aggressive sales than aggressive purchases exerts greater downward pressure on prices. *Id*. at ¶ 154.

B.     **The Parties**

Mish is a corporation that traded on the CME through its brokers on April 20, 2020. *Id*. at ¶ 29. Vega is a corporation that maintains a trading account with G.H. Financials LLC, its futures commissions merchant ("FCM"), which allows it to trade on the CME. *Id*. at ¶¶ 30-31. Individual A is Vega's sole owner. *Id*. at ¶ 34. Traders 1-12 are persons who maintained accounts with Vega and traded in the name of and through Vega on April 20, 2020. *Id*. at ¶¶ 31-32, 39. (The court allowed Traders 1-12 and Individual A to proceed anonymously, without

prejudice to any party or non-party moving to reveal their identities. Doc. 81. No such motion has been filed.) Trading Defendants committed their capital to Vega and guaranteed one another's losses. Doc. 40 at ¶ 4.

### C. The Alleged Scheme

This suit stems from Trading Defendants' trading activity on April 20, 2020, the day before the May 2020 WTI contracts were set to expire. Doc. 40 at ¶¶ 129, 183; *see* Doc. 72 at 11. The complaint alleges that Trading Defendants conspired to purchase large volumes of May contracts via TAS. Doc. 40 at ¶ 138. Having made those purchases, they had a financial incentive to depress the prices of May contracts. *Ibid.* To accomplish that goal, they sold large volumes of May contracts using a manipulative tactic, which the complaint calls "ammo" selling, that artificially depressed prices. *Id.* at ¶¶ 134-136. During their final period of ammo selling, Trading Defendants helped to cause May contracts to sell at negative prices for the first time in history. *Id.* at ¶ 136. All told, Trading Defendants sold 16,205 May contracts and purchased 16,268 May contracts on the CME via TAS, earning a profit of $632,814,390. *Id.* at ¶ 139.

Four of the Trading Defendants (Traders 3, 5, 9, and 10) engaged in the same manipulative strategy on the Intercontinental Exchange ("ICE"). *Id.* at ¶¶ 197, 201, 203. Traders 3, 5, 9, and 10, along with four unidentified traders, sold approximately 1,641 ICE May contracts and purchased 1,636 ICE May contracts on the ICE via TAS, earning a profit of about $71,880,100. *Id.* at ¶ 203.

The complaint grounds its submission that Trading Defendants conspired to use this manipulative trading scheme on the following allegations:

- Between 9:00 a.m. and 11:00 a.m. on April 20, Trading Defendants sold approximately 1,661 May contracts, or about 6.7% of the total trading volume during that time. That was on average 13.4 contracts per minute, with the price decreasing approximately $1.36 per barrel during that time. *Id.* at ¶145(a).

- o Specifically, during those two hours, Trader 1 sold approximately 186 contracts, Trader 2 sold approximately 11 contracts, Trader 3 sold approximately 250 contracts, Trader 4 sold approximately 285 contracts, Trader 5 sold approximately 285 contracts, Trader 6 sold approximately 195 contracts, Trader 7 sold approximately 188 contracts, Trader 9 sold approximately 140 contracts, Trader 11 sold approximately 1 contract, and Trader 12 sold approximately 120 contracts. *Ibid*.

- Between 11:00 a.m. and 12:00 p.m. on April 20, Trading Defendants sold approximately 5,034 May contracts, or about 16.4% of the total trading volume during that time. That was on average 83.9 contracts per minute, with the price decreasing approximately $5.41 per barrel during that time. *Id*. at ¶ 145(b).

  - o Specifically, during that hour, Trader 1 sold approximately 280 contracts, Trader 2 sold approximately 58 contracts, Trader 3 sold approximately 740 contracts, Trader 4 sold approximately 775 contracts, Trader 5 sold approximately 860 contracts, Trader 6 sold approximately 670 contracts, Trader 7 sold approximately 597 contracts, Trader 8 sold approximately 1 contract, Trader 9 sold approximately 680 contracts, Trader 10 sold approximately 40 contracts, Trader 11 sold approximately 19 contracts, and Trader 12 sold approximately 310 contracts. *Ibid*.

- Between 12:00 p.m. and 1:30 p.m. on April 20, Trading Defendants sold approximately 9,115 May contracts, or about 23.6% of the total trading volume during that time. That was on average 101.3 contracts per minute, with the price decreasing approximately $42.55 per barrel, into negative territory, during that time. *Id*. at ¶ 145(c).

  - o Specifically, during those 90 minutes, Trader 1 sold approximately 230 contracts, Trader 2 sold approximately 178 contracts, Trader 3 sold approximately 814 contracts, Trader 4 sold approximately 1,962 contracts, Trader 5 sold approximately 1,291 contracts, Trader 6 sold approximately 2,500 contracts, Trader 7 sold approximately 270 contracts, Trader 8 sold approximately 1 contract, Trader 9 sold approximately 1,226 contracts, Trader 10 sold approximately 40 contracts, Trader 11 sold approximately 53 contracts, and Trader 12 sold approximately 530 contracts. *Ibid*.

- Between 1:00 p.m. and 1:30 p.m. on April 20, Trading Defendants sold approximately 4,209 May contracts, or about 29.2% of the total trading volume during that time. That was on average 140.3 contracts per minute, with the price decreasing approximately $38.29 per barrel, into negative territory, during that time. *Id*. at ¶ 145(d).

  - o Specifically, during those 30 minutes, Trader 1 sold approximately 200 contracts, Trader 2 sold approximately 120 contracts, Trader 3 sold approximately 204 contracts, Trader 4 sold approximately 1,187 contracts,

Trader 5 sold approximately 581 contracts, Trader 6 sold approximately 1,290 contracts, Trader 7 sold approximately 97 contracts, Trader 9 sold approximately 171 contracts, Trader 10 sold approximately 20 contracts, Trader 11 sold approximately 29 contracts, and Trader 12 sold approximately 300 contracts. *Ibid*.

- Between 1:08 p.m. and 1:30 p.m. on April 20, Trading Defendants sold approximately 3,378 May contracts, or about 30.5% of the total volume during that time. That was on average 153.5 contracts per minute, with the price decreasing approximately $37.62 per barrel during that time. *Id*. at ¶ 145(e).

  o Specifically, during those 22 minutes, Trader 1 sold approximately 170 contracts, Trader 2 sold approximately 110 contracts, Trader 3 sold approximately 104 contracts, Trader 4 sold approximately 962 contracts, Trader 5 sold approximately 451 contracts, Trader 6 sold approximately 1,140 contracts, Trader 7 sold approximately 87 contracts, Trader 9 sold approximately 41 contracts, Trader 11 sold approximately 24 contracts, and Trader 12 sold approximately 280 May contracts. *Ibid*.

- The five Trading Defendants with the highest volume of May contract sales on April 20—Traders 3, 4, 5, 6, and 9—sold in "virtual lockstep." Like the other Trading Defendants, those traders entered their trades manually, not by computer program. *Id*. at ¶ 141.

- The minute-by-minute trading positions of Traders 3, 4, 5, 6, and 9 are highly correlated. They had an "extremely strong tendency (between 96.2% and 99.7%) to move in the same direction at the very same time throughout the day on April 20." *Id*. at ¶ 142.

- To a somewhat lesser extent, the trading positions of Traders 3, 4, 5, 6, and 9 were highly correlated (between 91.9% and 94.6%) with those of Trader 1. *Id*. at ¶ 143.

- Traders 2 and 5 communicated via text message beginning on April 17. *Id*. at ¶ 192.

- Traders 9 and 12 communicated via text message on April 20. Between 10:51 a.m. and 12:00 p.m., the messages included: "Just keep selling it every 5 points," "You've just got to keep selling," "I just sold a load more s[***] at 14," "I was on the phone to [a person likely to be Trader 4]," "Everyone is going to be short and have ammo," and "I've got 300 left for late." *Id*. at ¶ 167.

- At 1:05 p.m. on April 20, Trader 12 sent a text message to a person likely to be Trader 9, stating: "F[******] mental. I wanna see negative WTI prices." Around the same time, Trading Defendants increased their rate of sales and increased the degree of price depression. *Id*. at ¶ 168.

- Traders 4, 6, and 9 communicated on April 20 via a WhatsApp group titled "Legends XXX." Among other things, Trader 9 wrote: "I'm short 160 spreads and 40 wti … . Are you boys adding to this." Trader 6 responded: "I'm short 1250 and 500 not doing anymore until late." Trader 9 then stated: "I'm 1100 and 310." And Trader 4 stated: "1300 and 500." Trader 6 stated that he had "200 for late," and Trader 9 said, "Ok cool I will do the same." Trader 9 mentioned that the market showed a one cent bid, and he sold 500 ICE May contracts two minutes later. *Id*. at ¶¶ 169, 171.

- Traders 1 and 5 communicated on April 20 via WhatsApp. At 7:36 a.m., Trader 1 wrote: "If you need to do anything let me know." Trader 5 responded: "Okay cheers fam can do ti [WTI futures contract] here." At 9:20 a.m., Trader 5 asked Trader 1 if he "sold ti front yet," and Trader 1 responded, "Yep 50 lots … Have you." Trader 5 replied, "yea sold it." About ten minutes later, Trader 5 asked, "is everyone short ti front," and Trader 1 responded, "Yep but not loads." *Id*. at ¶¶ 172, 174. At another point, Trader 1 stated: "If you want to do anything or a load of tas trade I'll let you know." Trader 5 responded: "I'm doing a fortune on tas haha." *Id.* at ¶ 175.

- Between 7:00 a.m. and 7:15 a.m. on April 20, Trader 3 had several communications with Trader 1, 2, *or* 5 (the complaint is not clear as to which one) that reflected real-time trade coordination. *Id*. at ¶¶ 176-177.

- Between 8:51 a.m. and 9:17 a.m. on April 20, Traders 3 and 5 had several communications that reflected real-time trade coordination. *Id*. at ¶ 178.

- At 3:13 p.m. on April 20, Trader 2 texted persons likely to be some of the Trading Defendants: "Please don't tell anyone what happened today lads x." *Id*. at ¶ 180.

- At 3:29 p.m. on April 20, Trader 9 stated to persons likely to be some of the Trading Defendants: "We pushed each other so hard for years for this one moment … And we f[******] blitzed it boys." *Id*. at ¶ 179.

The complaint further alleges that Trading Defendants imposed cumulative net aggressive selling pressure on the market by making more aggressive sales than aggressive purchases of May contracts. *Id*. at ¶ 156. Specifically, Trading Defendants made aggressive sales of at least 7,007 May contracts and aggressive purchases of about 207 May contracts on April 20—resulting in their having made approximately 26.4% of the total net aggressive sales that day. *Id*. at ¶¶ 159, 161. From 9:00 a.m. to 11:00 a.m., Trading Defendants made at least

17.4% of the net aggressive sales; from 11:00 a.m. to 12:00 p.m., they made at least 21.7% of the net aggressive sales; from 12:00 p.m. to 1:30 p.m., they made at least 34.1% of the net aggressive sales; from 1:00 p.m. to 1:30 p.m., they made at least 40.3% of the net aggressive sales; and from 1:08 p.m. to 1:30 p.m., they made at least 41.1% of the net aggressive sales. *Id.* at ¶ 163.

On April 21, Gary Knight, a trade surveillance officer of G.H. Financials, Vega's FCM, emailed Individual A: "[W]e have a number of alerts generated from our trade surveillance system for several Vega Capital Traders for activity in Nymex Crude May20 contract, we can see these trades appear to be offset against TAS." *Id.* at ¶¶ 35, 183. The flagged accounts belonged to Traders 1-6, 9, and 12. *Id.* at ¶ 183. Knight asked Individual A to describe the purpose, strategy, and intent behind those traders' activity and whether the entry of sell orders into negative territory was intended. *Ibid.* About an hour later, Knight again emailed Individual A indicating that G.H. Financials had received several alerts regarding Trader 9 that "may appear as an attempt to manipulate the market," and sought a response from Trader 9 to many of the same questions. *Id.* at ¶ 184.

Later that day, Tracy Hetherington, G.H. Financials's global head of compliance, emailed Individual A seeking information to "better understand the connection" among many of the Trading Defendants. *Id.* at ¶ 185. Noting that she was aware that Traders 3 and 5 had discussed trading strategies, Hetherington sought a better understanding of the relationship among Traders 1, 2, 4, 5, 6, 7, 9, and 12, including whether they were part of the same groups, whether they "have connections, funding, training of the others," and whether there was "any possibility that they could have any pre-trade communications with each other etc." *Ibid.*

On April 22, Individual A responded to Hetherington, stating: (a) Trader 1 was the head of the group and trained all the traders other than Traders 3 and 5; (b) all traders other than Traders 3, 5, and 9 occupied the same office before the COVID lockdown; (c) Trader 9 moved to his own office and trains new traders; (d) Individual A believed that the traders "discuss their views on the market on a daily basis despite now trading for separate locations"; (e) Trader 2 is Trader 1's son; and (f) "as part of the commercial arrangement between Vega and the group, all of the group's funding is pooled for risk purposes." *Id*. at ¶ 187. On April 22 and 23, Traders 7 and 9 emailed Individual A responses to Knight's questions, which Individual A forwarded to Knight. *Id*. at ¶¶ 189, 192-194.

Also on April 22, Trader 1 emailed Individual A, stating: "I am writing on behalf of all traders in my group as I have trained a majority of them up and whilst they trade individually, the reasoning behind the trades will be the same." *Id*. at ¶ 190. Trader 1 added that he was Trader 2's father, that he started the trading office twelve years ago and trained the other traders except for Traders 3 and 5, and that Traders 3 and 5 were "under [his] trading umbrella until recently." *Id*. at ¶ 191. Trader 1 explained that he speaks to everyone daily except for Traders 3 and 5. *Ibid*. Finally, Trader 1 explained that he is the "link between everyone." *Ibid*. Individual A forwarded those responses to Knight on April 24. *Id*. at ¶ 195. G.H. Financials stopped doing business with Vega after April 20. *Id*. at ¶ 30.

Regarding Traders 3, 8, 11, and 12, the CME asked Vega to describe "how quantities were determined when aggressing into the May20 CL TAS and non-TAS markets on April 20, 2020," and to "[d]iscuss what information was referenced and how quantities and products were decided … throughout the day and specifically between [1:08-1:30]." *Id*. at ¶ 207. The CME is investigating Defendants' conduct on April 20. *Id*. at ¶ 26.

On April 20, Mish purchased May contracts at $2.15 per barrel. Doc. 95 at 86. On the afternoon of April 20, Mish sold May contracts at negative $7.09 and negative $7.10 per barrel to liquidate its long position, incurring a net loss of $92,490. Doc. 40 at ¶ 29; Doc. 95 at 86.

## Discussion

Count I of the complaint alleges that Defendants "combined, conspired, and agreed to manipulate and fix" WTI crude oil futures prices, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Doc. 40 at ¶¶ 222-230; *see* 15 U.S.C. § 15(a) (creating a private right of action for antitrust violations). Count II alleges that Defendants violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), by manipulating and conspiring to manipulate WTI crude oil futures contract prices. Doc. 40 at ¶¶ 231-240; *see* 7 U.S.C. § 25(a) (creating a private right of action for CEA violations). Count V alleges that Defendants violated Sections 6(c)(1) of the CEA, 7 U.S.C. § 9(1), which prohibits the use of "any manipulative or deceptive device or contrivance" in violation of CFTC regulations—specifically, Regulation 180.1, 17 C.F.R. § 180.1(a)(3). Doc. 40 at ¶¶ 251-255. Counts III and VI allege that Defendants are liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for each other's CEA violations because they were "principals, agents, co-venturers and/or guarantors of one another." Doc. 40 at ¶¶ 241-244, 256-259. Counts IV and VII allege that Defendants are liable under Section 13 of the CEA, 7 U.S.C. § 13c(a), for aiding and abetting each other's CEA violations. Doc. 40 at ¶¶ 245-250, 260-265. Count VIII alleges common law unjust enrichment. *Id*. at ¶¶ 267-269.

## I.     Sherman Act Claim

Defendants argue that Mish's Sherman Act claim fails because Mish lacks antitrust standing, fails to allege antitrust injury, and fails to state a viable claim on the merits. Doc. 72 at 21-35; Doc. 78 at 5-8.

A.    **Antitrust Injury and Standing**

A private plaintiff seeking redress under the Sherman Act must have antitrust standing and have suffered antitrust injury. *See Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, __ F.4th __, 2022 WL 818751, at *5 n.7 (7th Cir. Mar. 22, 2022); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993). To demonstrate antitrust injury, a plaintiff must show that its alleged injury is "of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To demonstrate antitrust standing—which examines the "connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction," *Greater Rockford*, 998 F.2d at 395—a plaintiff must show a "direct link between the antitrust violation and the antitrust injury." *Sanner v. Bd. of Trade of Chi.*, 62 F.3d 918, 926-27 (7th Cir. 1995) (internal quotation marks omitted). The standing inquiry requires "a case-by-case analysis of the plaintiff's harm, the alleged wrongdoing by the defendants and the relationship between them." *Id*. at 927 (internal quotation marks omitted). The considerations pertinent to antitrust standing are: "(1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002).

Defendants argue that Mish lacks antitrust injury and antitrust standing because it fails to show a causal nexus between their alleged wrongdoing and any non-speculative injury. Doc. 72 at 30. Defendants first contend that Mish's failure to allege when and at what prices it established a long position in the WTI futures market undermines causation because, absent such

11

information, it is impossible to know if Defendants' conduct impacted Mish's position. *Id*. at 31. But Mish alleges it purchased its May WTI contracts at $2.15 per barrel on April 20—a purchase that must have occurred before 1:08:23 p.m., when prices entered negative territory—and that it liquidated its position by selling contracts at negative $7.09 and negative $7.10 per barrel later that day, incurring a net loss of over $92,000. Doc. 40 at ¶ 29; Doc. 72 at 37; Doc. 95 at 86. Mish further alleges that the prices dropped most dramatically when Defendants exerted the most pressure on the market and that there was a substantial rebound in prices on April 21. Doc 40 at ¶¶ 183-195, 207; Doc. 95 at 27-28. These allegations make it plausible that Trading Defendants played at least some role in causing Mish's injuries. *See Greater Rockford*, 998 F.2d at 401 (holding that "[a]n antitrust violation need not be the sole cause of the alleged injuries," but only a "material element of, and substantial factor in producing, the injury").

Next, Defendants cite *Greater Rockford* for the proposition that the "many alternative explanations for [Mish's alleged] injuries" preclude Mish from plausibly alleging causation. Doc. 72 at 31-32. As Defendants note, April 20 was an historic day in WTI crude oil trading. *Id*. at 32. The COVID-19 pandemic had severely disrupted economic activity, and although demand for oil had plummeted, oil-rich countries continued to oversupply the market. *Id*. at 10. Physical storage space at a key storage hub had begun to run out, and May contracts were set to expire on April 21. *Id*. at 10-11. Under those circumstances, anybody left holding WTI contracts on April 21 would have had to take physical delivery of oil with no place to store it, which led the CME to issue warnings that crude oil contracts could begin to trade at negative prices. *Id*. at 11.

*Greater Rockford* affirmed summary judgment for an antitrust defendant on the ground that there were many alternative explanations for the plaintiff's alleged injury. *See* 998 F.2d at

402. The case does not, however, warrant dismissal of Mish's antitrust claim on the pleadings. As an initial matter, *Greater Rockford* had the benefit of a fully developed evidentiary record, while here the court has only Mish's allegations, and a reasonable inference from those allegations is that Defendants' conduct played at least some materially causal role in its alleged injuries. Moreover, in *Greater Rockford*, there were eight separate alternative causes that, taken together, defeated causation as a matter of law, while here there is only one posited alternative cause, the market dislocation caused by the pandemic. *See id*. at 402-04 ("Standing alone one of these alternative causes of the plaintiffs' injuries might be insufficient to put causation-in-fact in question. Taken together, however, the plaintiffs have failed to show with a fair degree of certainty that "but for" the alleged antitrust violation, the plaintiffs would not have suffered the injuries of which they complain.").

Defendants next argue that Mish's alleged damages are impermissibly speculative. Doc. 72 at 34. Mish correctly responds that its damages are not speculative because they arose from specific transactions, made in the market in which Trading Defendants were trading, that were directly affected by Defendants' conduct. Doc. 95 at 86; *see* Doc. 40 at ¶¶ 17, 29, 136, 145. Drawing reasonable inferences in its favor, Mish sufficiently alleges non-speculative damages. *See Sanner*, 62 F.3d at 929-30 (holding that the plaintiffs sufficiently pleaded antitrust standing and injury even though they and the defendant traded in different but related markets).

In sum, Mish plausibly alleges antitrust injury and antitrust standing.

### B.     Merits

To state a Section 1 claim, a plaintiff must allege facts sufficient to show "three things: (1) defendants had a contract, combination, or conspiracy ('an agreement'); (2) as a result, trade in the relevant market was unreasonably restrained; and (3) [the plaintiff was] injured." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 762 (7th Cir. 2015). To allege

13

an agreement, a plaintiff must allege facts sufficient to "infer that the alleged conspirators had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id*. at 762-63 (internal quotation marks omitted). Absent an express agreement, a plaintiff can allege facts showing "parallel action" along with "additional circumstances—so-called 'plus factors'— which, when viewed in conjunction with the parallel conduct, would permit a factfinder to infer a conspiracy." *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018) (internal quotation marks omitted); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (similar). Defendants contend that Mish fails to allege either parallel conduct or the plus factors. Doc. 72 at 24-29.

### 1. Parallel Conduct

Mish contends that the following acts are indicative of parallel conduct: (1) each of the Trading Defendants sold May contracts to depress prices; (2) each purchased TAS contracts to divert purchasing pressure into TAS contracts and buying pressure out of the May contract; (3) each roughly balanced their May contract sales and TAS contract purchases; (4) each guaranteed Vega against losses in one another's account; (5) each aggressed into the May contract; (6) each depressed prices through ammo transactions; (7) each benefitted from the depressed prices; and (8) each engaged in price depressive trading behavior around the same time and some did so in a highly correlated manner. Doc. 40 at ¶¶ 136-145; Doc. 95 at 76-78.

Mish's allegations of parallel conduct are plainly sufficient as to Traders 1, 3-6, and 9. Traders 1, 3-6, and 9 traded in a highly correlated manner. Doc. 40 at ¶¶ 142-143; Doc. 72 at 25 (Defendants admitting that the complaint alleges correlated trading by those six traders). The minute-by minute positions of Traders 3-6 and 9 had between a 96.2% and 99.7% tendency to move in the same direction at the same time on April 20, and those traders had between a 91.9%

and 94.6% correlation with Trader 1. Doc. 40 at ¶¶ 142-143. Defendants cite *In re Treasury Securities Auction Antitrust Litigation*, 2021 WL 1226670, at \*13-16 (S.D.N.Y. Mar. 31, 2021), for the proposition that such correlations do not support the existence of a conspiracy. Doc. 72 at 26. Defendants are incorrect, as the statistical analyses in *Treasury Securities* "did not focus … on the conduct of any particular [defendant]," 2021 WL 1226670, at \*13, while Mish's statistical analyses do.

Defendants next contend that Mish fails to place the correlated trades in the context of the unique market circumstances on April 20—circumstances in which one would expect there to be correlations. Doc. 72 at 25. True enough, there may be explanations for the correlated trading that do not involve collusion. However, the high degree of correlation among Traders 1, 3-6, and 9 makes Mish's allegation of parallel conduct eminently plausible.

Although the trading of Traders 2, 7-8, and 10-12 was not as highly correlated as that of Traders 1, 3-6, and 9, Mish sufficiently alleges parallel conduct as to them as well. As noted, all Trading Defendants traded in largely the same manner on the same day. Doc. 40 at ¶¶ 136-139, 145. Specifically, each Trading Defendant purchased May contracts via TAS and sold May contracts in a manner designed to lead to depressed prices, roughly balanced their May contract sales and TAS contract purchases, aggressed into the May contract, and engaged in ammo transactions around the same time throughout the day. *Ibid*. That is sufficient, at least at the pleadings stage, to allege parallel conduct.

Defendants argue that Trading Defendants' trading behavior was not parallel because their trading times varied. Doc. 72 at 25; Doc. 74 at 6-7. That argument is unpersuasive, as simultaneity is not an essential aspect of parallel conduct. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("It is elementary that an unlawful conspiracy may be and often

is formed without simultaneous action or agreement on the part of the conspirators."); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791 (N.D. Ill. 2017) (collecting cases holding that simultaneity is not required to plead parallel conduct). Defendants' argument that the Trading Defendants' conduct was not parallel because their respective trading volumes varied fails as well, at least at the pleading stage. *See Broiler Chicken*, 290 F. Supp. 3d at 791-92 (collecting cases for the proposition that uniformity in "methods and amounts" is not required to plead parallel conduct).

Mish does not allege parallel conduct as to Vega or its owner, Individual A. The complaint does not allege *any* conduct by Vega or Individual A on April 20. That Vega allowed Trading Defendants to trade in its name does not give rise to a plausible inference that it or Individual A entered into an anticompetitive agreement with them regarding trading on April 20. Similarly, the facts that Vega had a contract allowing it to share in the traders' profits, or that the traders agreed to reimburse Vega for losses, do not suggest that Vega or Individual A knew of or took part in any parallel conduct by the traders on April 20. At most, the complaint alleges that Individual A, on Vega's behalf, responded to G.H. Financials's inquiries after April 20, but those communications do not comprise parallel conduct or plausibly allege his or Vega's part in a conspiracy to engage in anticompetitive conduct on April 20.

### 2. Plus Factors

"Plus" factors "may include traditional evidence of a conspiracy: statements permitting an inference that the defendants entered into an agreement. They may also include evidence of other circumstances giving rise to a less direct inference of conspiracy, such as a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual

economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Anderson News*, 899 F.3d at 104 (internal quotation marks omitted).

Mish has sufficiently alleged plus factors as to Traders 1-6, 9, and 12. The complaint alleges substantial communications on April 20 among those traders, including statements reflecting real-time trade coordination and others strongly indicative of coordination, such as "[j]ust keep selling it every 5 points," "[y]ou've just got to keep selling," "I'm short 160 spreads and 40 wti … . Are you boys adding to this," "is everyone short ti front," to which the reply was "[y]ep but not loads," "[f][******] mental. I wanna see negative WTI prices," "[w]e pushed each other so hard for years for this one moment … And we f[******] blitzed it boys," and "[p]lease don't tell anyone what happened today lads x." Doc. 40 at ¶¶ 165-180, 192. The content of their communications, along with the high degree of correlative trading among most of them, give rise to a highly plausible inference of an agreement among them. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 900 (N.D. Ill. 2011) (denying dismissal of a Section 1 claim where the plaintiffs "allege[d] communications between the individual defendants throughout the course of the execution of the scheme"); *see also In re Loc. TV Advert. Antitrust Litig.*, 2020 WL 6557665, at *10 (N.D. Ill. Nov. 6, 2020) (finding several "plus" factors, including an exchange of competitively sensitive information).

Mish has not sufficiently alleged plus factors as to Traders 7-8 and 10-11. None of the suspicious April 20 communications involved those four traders, and the mere fact that Trader 1 trained them does not yield a plausible inference that they conspired with the others. Nor does the allegation that Trading Defendants guaranteed each other's losses give rise to that inference. The one civil antitrust case cited by Mish for the proposition that a risk sharing agreement qualifies as a plus factor, *In re Insurance Brokerage Antitrust Litigation*, 2017 WL 3642003, at

*3 (D.N.J. Aug. 23, 2017), is inapposite because the defendants there—unlike Traders 7-8 and
10-11—agreed to share sensitive information and coordinate virtually every aspect of how they
acted in their particular market, not only risk sharing, but also pricing, terms, broker
compensation, and avoidance of legal liability.  Finally, the fact that the CME commenced
investigations into the April 20 trading conduct of Traders 7-8 and 10-11 does not qualify as a
plus factor giving rise to an inference of an agreement.  *See In re Loc. TV Advert.*, 2020 WL
6557665, at *8 (collecting cases for the proposition that "where allegations are sparse, the mere
presence of a DOJ investigation is insufficient to give rise to the possibility of parallel conduct").

* * *

In sum, Mish may proceed on its Section 1 claim against Traders 1-6, 9, and 12, but not
against Vega, Individual A, or Traders 7-8 and 10-11.

## II.     CEA Claims

### A.      Section 9(a)(2) Claim

Section 9(a)(2) of the CEA makes it unlawful to "manipulate or attempt to manipulate the
price of any … commodity in interstate commerce, or for future delivery on or subject to the
rules of any registered entity."  7 U.S.C. § 13(a)(2).  To state a price manipulation claim, a
plaintiff must allege facts giving rise to a plausible inference that: "(1) the defendants possessed
the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial
price; and (4) the defendant specifically intended to cause the artificial price."  *In re Dairy
Farmers*, 801 F.3d at 764-65.  As with its Sherman Act claim, Mish states a viable Section
9(a)(2) price manipulation claim against Traders 1-6, 9, and 12, but not against Vega, Individual
A, or Traders 7-8 and 10-11.

### 1.    Ability to Influence Prices

As to the first element of its claim, Mish alleges that Trading Defendants were able to influence prices by making a substantial number of cumulative net sales and net aggressor sales on April 20.  Doc. 40 at ¶¶ 129, 131-132, 155-158, 161; Doc. 95 at 31-35.  Trading Defendants' net aggressor sales comprised approximately 26.4% of the total net aggressor sales in the WTI market that day.  Doc. 40 at ¶ 161; Doc. 95 at 33.  At various points that day, Trading Defendants' net cumulative sales comprised from 6% to 30.5% of the market's net cumulative sales.  Doc. 40 at ¶ 145.  Trading Defendants accelerated their ammo transactions throughout the day, prompting at least part of the record price decline between 1:00 and 1:30 p.m.  Doc. 40 at ¶¶ 145, 161-164, 206-209; Doc. 95 at 27, 34-35.  And when Trading Defendants placed the greatest selling pressure on prices, prices experienced their most substantial declines.  Doc. 40 at ¶¶ 145, 163; Doc. 95 at 30-31.  Those allegations suffice to plausibly claim that Trading Defendants' behavior had the ability to influence prices.  *See CFTC v. Enron Corp.*, 2004 WL 594752, at *5 (S.D. Tex. Mar. 10, 2004) ("[B]uying or selling in a manner calculated to produce the maximum effect upon prices, frequently in a concentrated fashion and in relatively large lots[,] is one form of manipulation … .") (internal quotation marks omitted); *see also CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1020 (N.D. Ill. 2015) (discussing *Enron*).

### 2.    Existence of an Artificial Price

A price is "artificial" for purposes of Section 9(a)(2) when it "does not reflect the market or economic forces of supply and demand."  *Kraft Foods*, 153 F. Supp. 3d at 1022 (*quoting Ind. Farm Bureau Coop. Ass'n*, 1982 WL 30249, at *4 n.2 (CFTC Dec. 17, 1982)).  As the CFTC has explained:

> [T]o determine whether an artificial price has occurred, one must look at the
> aggregate forces of supply and demand and search for those factors which are

19

> extraneous to the pricing system, are not a legitimate part of the economic pricing of the commodity, or are extrinsic to that commodity market. When the aggregate forces of supply and demand bearing down on a particular market are all legitimate, it follows that the price will not be artificial. On the other hand[,] when a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial. Thus, the focus should not be as much on the ultimate price as on the nature of the factors causing it.

*Ind. Farm Bureau*, 1982 WL 30249, at *4 n.2; *see also Kraft Foods*, 153 F. Supp. 3d at 1022

(adopting this standard); *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1057 (N.D. Ill. 1995)

(same).

Defendants argue that given the unprecedented market conditions on April 20, Mish fails

to plausibly allege that Trading Defendants' conduct created an artificial price in the WTI futures

market. Doc. 72 at 38-39. That argument fails to persuade. A "price may be artificial if it is

higher than it would have been absent [the d]efendants' conduct." *Kraft Foods*, 153 F. Supp. 3d

at 1022 (quoting *CFTC v. Parnon Energy Inc.*, 875 F. Supp. 2d 233, 247 (S.D.N.Y. 2012)). It

follows that Mish need not allege that Trading Defendants' conduct was the *only* cause of the

price decline; rather, "it is enough" for Mish to allege "that [their] action *contributed to* the price

[movement]." *Parnon Energy*, 875 F. Supp. 2d at 248 (internal quotation marks omitted). A

significant portion of the record price decline on April 20 occurred when Trading Defendants

increased the quantity, rate, and manipulative quality of their selling. Doc. 40 at ¶ 145; Doc. 95

at 57. And the sharpest price drops occurred when their allegedly manipulative trading was at its

peak. Doc. 40 at ¶ 145; Doc. 95 at 27-28, 30-31. That is sufficient at the pleadings stage to

allege the existence of an artificial price. *See Kraft Foods*, 153 F. Supp. 3d at 1021-23 (holding

that the complaint sufficiently pleaded an artificial price by alleging that the price decline was

caused not solely by legitimate market forces, but also by the defendant's illegitimate actions,

and where the plaintiff alleged specific information concerning the market effects of the

defendant's actions).

### 3. Causation

Mish also plausibly alleges that Trading Defendants' trading behavior caused the artificial price. As noted, Mish alleges that WTI futures prices experienced the sharpest declines on April 20 when Trading Defendants exerted their most pressure on the market, that prices recovered on April 21 after their trading behavior ceased, and that their behavior prompted inquiries from G.H. Financials. Doc 40 at ¶¶ 183-195, 207; Doc. 95 at 27-28, 30-31. As also noted, Mish alleges that Trading Defendants' net aggressor sales comprised approximately 26.4% of the net aggressor sales in the market on April 20. Doc 40 at ¶ 161; Doc. 95 at 30-33. Those allegations are sufficient at the pleadings stage to claim that Trading Defendants' behavior "contributed" to the price decline. *Parnon Energy*, 875 F. Supp. 2d at 248.

### 4. Manipulative Intent

As for manipulative intent, Mish must allege facts giving rise to a plausible inference that Trading Defendants "acted (or failed to act) with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *Kraft Foods*, 153 F. Supp. 3d at 1020 (quoting *CFTC v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523, 532 (S.D.N.Y. 2008)). Mish satisfies its burden as to Traders 1-6, 9, and 12 by pointing to their highly suspicious April 20 communications. Defendants argue that those communications, read in context, do not evidence manipulative intent. Doc. 72 at 42. At the pleadings stage, however, the communications must be viewed with reasonable inferences drawn in Mish's favor, and applying that lens, they evidence a concerted effort by Traders 1-6, 9, and 12 to impact the market and, significantly, an effort to conceal the nature of their actions. The inference of intent is strengthened by the high level of correlation among most of their trading positions.

A different result obtains for Traders 7-8 and 10-11. Mish acknowledged at the motion hearing, Doc. 107, that its allegations against those defendants—who were not involved in the April 20 communications—are weaker than those against Traders 1-6, 9, and 12. That Traders 7-8 and 10-11 traded in a manner akin to the other Trading Defendants on April 20 is insufficient, on its own, to show manipulative intent. *See In re Amaranth Nat'l Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539 (S.D.N.Y. 2008) ("[E]ntering into a legitimate transaction knowing that it will distort the market is not manipulation—only intent, not knowledge, can transform a legitimate transaction into manipulation.").

Nor does Mish plausibly allege manipulative intent as to Vega and Individual A. As noted, those two defendants are not alleged to have engaged in any conduct on April 20. The fact that Trading Defendants traded in the name of and through Vega does not give rise to a plausible inference that Vega or Individual A *themselves* intended to manipulate the WTI futures market, particularly given the lack of any allegation that they communicated with Traders 1-6, 9, and 12 that day. *Cf. Kohen v. PIMCO LLC*, 244 F.R.D. 469, 481-82 (N.D. Ill. 2007) (denying dismissal of a price manipulation claim against a defendant, even though that defendant did not execute any manipulative trades, because it controlled the entity that did execute those trades).

### B.     Section 6(c)(1) Claim

Section 6(c)(1) of the CEA prohibits the use of "any manipulative or deceptive device or contrivance" in violation of CFTC regulations. 7 U.S.C. § 9(1). Regulation 180.1, in turn, prohibits the intentional or reckless use of "any manipulative device, scheme, or artifice to defraud," as well as intentionally or recklessly "[e]ngag[ing], or attempt[ing] to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 180.1(a)(1), (3). The parties dispute whether Mish's Section 6(c)(1) claim is governed by the heightened pleading standard of Civil Rule 9(b) or the ordinary

pleading standard of Civil Rule 8(a). Doc. 72 at 44; Doc. 95 at 60. The answer does not matter, as Mish satisfies Rule 9(b) as to Traders 1-6, 9, and 12, and fails to satisfy Rule 8(a) as to Vega, Individual A, and Traders 7-8 and 10-11.

Under Rule 9(b), a plaintiff "must describe the who, what, when, where, and how of the fraud … ." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (internal quotation marks omitted). In the market manipulation context, a plaintiff must plead with particularity "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the commodities at issue." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1056-57 (N.D. Ill. 2016) (internal quotation marks omitted); *see also Kraft Foods*, 153 F. Supp. 3d at 1012 (same).

For much of the same reasons that Mish has stated a plausible Section 9(a) price manipulation claim against Traders 1-6, 9, and 12, it also states a plausible Section 6(c)(1) manipulative conduct claim against them. Specifically, Mish alleges that those traders coordinated and participated in a scheme to depress WTI futures contract prices by purchasing a substantial number of May 2020 contracts via TAS, selling a similarly large number of May contracts, and engaging in aggressive and ammo transactions. Doc. 40 at ¶¶ 136-145; Doc. 95 at 62. As Mish further alleges, their trading behavior "injected false information into the market regarding the May contract, thus creating a false value and sending a signal of false value for the May contract." Doc. 95 at 62; *see also* Doc. 40 at ¶ 253. Moreover, Mish alleges specific details about the number of purchases, sales, and ammo or aggressive transactions those traders made, the timing of their trades, and communications among them about their trades. Doc. 40 at ¶¶ 145, 163, 167-180, 192. Those allegations satisfy Rule 9(b)'s heightened pleading standard.

A Section 6(c)(1) claim alleging a violation of Regulation 180.1 requires that the defendant acted "intentionally or recklessly." 17 C.F.R. § 180.1(a). A plaintiff may satisfactorily plead intentional or reckless conduct by alleging facts showing "an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Kraft Foods*, 153 F. Supp. 3d at 1014 (internal quotation marks omitted). For the reasons set forth above in discussing the Section 9(a) claim, Mish plausibly alleges that Traders 1-6, 9, and 12 acted in that manner.

Mish's allegations do not give rise to a plausible inference of intent or recklessness by the other defendants. As noted, Vega and Individual A are not alleged to have engaged in any conduct on April 20. That Vega allowed Trading Defendants to trade in Vega's name and protected itself with an indemnity agreement—common practices in the commodity futures industry, *see R.J. O'Brien & Assocs. v. Forman*, 298 F.3d 653, 654-55 (7th Cir. 2002)—does not show an extreme departure from the standards of ordinary care, especially given Mish's acknowledgement that the traders "made their own trading decisions." Doc. 95 at 74 n.45. Likewise, that Traders 7-8 and 10-11 traded in a manner akin to that of other traders and pooled resourced with the Vega defendants is not indicative of intent or recklessness even under the ordinary pleading standards of Rule 8(a).

### C.     Section 13 Claims

Section 13 of the CEA, 7 U.S.C. § 13c(a), prohibits aiding and abetting CEA violations committed by others. *See Damato v. Hermanson*, 153 F.3d 464, 471 (7th Cir. 1998) (noting that Section 22(a)(1), 7 U.S.C. § 25(a)(1), creates a private right of action against those who aid and abet a CEA violation). To state a viable aiding and abetting claim, a plaintiff first must state a substantive CEA claim against a principal. *See Dairy Farmers*, 801 F.3d at 765. A plaintiff also

24

must allege that the defendant "(1) had knowledge of the principal's intent to commit a violation of the CEA … ; (2) had the intent to further the violation; and (3) committed some act in furtherance of the scheme." *Ibid.* For the reasons set forth above, Mish's allegations do not give rise to a plausible inference that Vega, Individual A, or Traders 7-8 and 10-11 intended to further the alleged violations committed by Traders 1-6, 9, and 12. By the same token, Mish has plausibly alleged that Traders 1-6, 9, and 12 knew of each other's intent to violate the CEA, intended to further those violations, and acted in furtherance of their common scheme.

### D. Section 2(a)(1) Claims

Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), makes principals vicariously liable for their agents' violations of the CEA. Section 2(a)(1) "enacts a variant of the common law principle of respondeat superior." *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986). A vicarious liability claim requires the existence of an underlying violation. *See Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018). The principal and agent need not have an employer-employee relationship. *See Rosenthal*, 802 F.2d at 966. Moreover, the plaintiff need not allege that the principal controlled the agent's action, so long as the agent was "acting for" the principal in committing the conduct in question. *See Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999) (citing *Rosenthal*, 802 F.2d at 966).

Mish alleges that Trading Defendants served as agents for Vega, Individual A, and each other, and therefore that all Defendants are liable for Trading Defendants' violations of Sections 6(c) and 9(a). Doc. 40 at ¶¶ 242, 257. To support its submission that Trading Defendants acted for Vega, Mish contends that Vega exerted control over their trading activities by setting and enforcing risk limits, requiring them to pool their capital, and allowing them to trade in its name. Doc. 40 at ¶¶ 122, 262; Doc. 95 at 65-66. But Mish acknowledges that Trading Defendants "are each independent contractors who made their own trading decisions and are actually competitors

who enter the competitive futures trading price formation process at the same level in order to purchase or sell and determine the contract price." Doc. 95 at 74 n.45. And the agreement that authorized Vega to set and enforce risk limits stated that "[t]he relationship of the Traders to [Vega] is of independent contractors and nothing shall render any of them an employee, worker, agent, or partner of Vega and no Trader shall hold itself out as such." Doc. 91 at 27.

Given those facts, the court cannot draw a plausible inference that Trading Defendants acted for Vega—or its owner, Individual A—in making their trading decisions. And particularly given Mish's submission that Trading Defendants are "each independent contractors who made their own trading decisions and are actually competitors," Doc. 95 at 74 n.45, it is not plausible that any Trading Defendant acted as an agent for any other Trading Defendant.

## III. Unjust Enrichment Claim

Unjust enrichment is a claim against "a defendant [who] has unjustly retained a benefit to the plaintiff's detriment," and whose "retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (internal quotation marks omitted). Where, as here, "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Id*. at 517. It follows that Mish's unjust enrichment claim fails as to Vega, Individual A, and Traders 7-8 and 10-11, and survives as to Traders 1-6, 9, and 12.

### Conclusion

Defendants' motions to dismiss are granted in part and denied in part. Mish's claims against Vega, Individual A, and Traders 7-8 and 10-11 are dismissed. Mish's Section 2(a)(1) claims against Traders 1-6, 9, and 12 are dismissed. The dismissal of those claims is without prejudice, and Mish has until April 28, 2022, to file a second amended complaint. *See Runnion*

*ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) ("Ordinarily, … a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed."). If Mish does not file a second amended complaint, the dismissal will convert automatically to a dismissal with prejudice, and Traders 1-6, 9, and 12 shall answer the surviving portions of the amended complaint by May 11, 2022. If Mish files a second amended complaint, Defendants shall file a responsive pleading by June 1, 2022, though Traders 1-6, 9, and 12 should not again move to dismiss the claims that survived dismissal on grounds rejected in this opinion.

March 31, 2022

_____
United States District Judge