**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

MISH INT'L MONETARY INC.,
on behalf of itself and
All others similarly situated,

      v.

VEGA CAPITAL LONDON, LTD.
And JOHN DOES 1-100

Case No. 20-cv-04577

Judge Gary S. Feinerman

Magistrate Judge Jeffrey T. Gilbert

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS THE**
**SECOND AMENDED CLASS ACTION COMPLAINT**

**FILED UNDER SEAL**

**CORREDTED COPY**

**Errata**

| | |
|---|---|
| Corrected Table of Contents and Table of Authorities | |
| Changed "Vega, served" to "Vega while also serving" | 7 |
| Deleted parenthetical | 11 |
| Revised footnote for accuracy | Fn. 6 |
| Revised parenthetical | Fn. 7 |
| Changed "Plaintiff newly alleges expressly that Vega had profit sharing interests in the profits" to "Plaintiff newly alleges expressly the relative magnitude of Vega's share of the profits" | 17 |
| Changed "▓Trader 8▓ Sub-Account funding" to be "1. ▓Trader 8▓ Fragment And Sub-Account Funding" | 18 |
| Changed "fee splitting" to "profit splitting" | 19 |
| Replaced "independent contractors" with "employees" | 26 |
| Replaced "GH Financials" with "▆▆▆" | 26 |
| Changed "agreement or anywhere else" to agreement" "or elsewhere" (*compare* Vega-▆▆ Agreement 6.2) | 26 |
| Changed "nothing else" to "nothing 'anywhere else'" | 26 |
| Changed "scope of the office" to "scope of [their] …. Office" | 27 |
| Changed "its" to "the", and "agents" to "agent" | 30 |
| Deleted comma, and deleted "'s" | 30 |
| Changed "continued to breach" to "continued to monitor but breached" | 33 |
| Inserted SAC citations | 33 |
| Changed "repeatedly engaged" to "repeatedly observed the VTDs engage" | 34 |
| Changed "Instead follow" to "Instead, they followed" | 35 |
| Changed "provide access" to "provide a green light, including access" and changed "plausibly" to "plausible" | Fn. 13 |
| Changed "their obligations" to "their 'monitoring/viewing' obligations" | 36 |
| Changed "▆▆▆▆▆▆▆▆" to "▆▆▆▆▆▆▆▆▆▆" | 40 |
| Changed "under *Mish* to" to "under *Mish* now suffice to" | 43 |
| Changed "with supervising Defendant" to "with an additional supervisory duty over Defendants ▓Trader 7▓", changed "(and only Defendant ▓Trader 7▓)" to "which did not apply to other VTDs", and inserted citation. | 43 |

# TABLE OF CONTENTS

I.     The Motion By Vega And ▮Individual A▮ Should Be Denied…………………..…………………3

       A.     Defendants Vega And ▮Individual A▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
              ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
              ▮▮▮▮▮▮▮….……………………………………………………..…….4

       B.     Vega/▮Individual A▮ Agreed To Be Familiar With The Manipulation Alarms Under
              The Market Abuse Regime, And Impliedly Agreed To Take Reasonable
              Steps To Prevent And Avoid Engaging In Such Manipulative Conduct………….5

       C.     During At Least 2019-2020, The SVD's Repeatedly Engaged At Vega
              In Conduct To Manipulate Prices, Including On The Penultimate
              Trading Day Of Various WTI Futures Contracts…………………………...…….7

              1.     The SVD's Conduct Repeatedly Set Off MAR Manipulation
                     Alarms…………………………………………………………………..7

              2.     Non-Award Winning New Articles Have Repeatedly Provided
                     One Part Of The Plausible Bases For Allegations Of Misconduct
                     And Knowledge Thereof…………………………………..…………..13

       D.     During 2019-2020, Vega/▮Individual A▮ Repeatedly Observed The SVD's At
              Least "Potentially Manipulative Trading Activities" Especially On
              The Penultimate Days Of Trading In WTI Contracts And In Other
              Contracts In Which There Was Potentially Low Volume Of Trading……..…….14

       E.     Vega/▮Individual A▮ Repeatedly Committed Breaches Of Their Responsibility
              To "Identify" And Prevent The SVDs Potentially Manipulative Trading
              Which Set Off MAR Manipulation Alarms………………………………………..15

       F.     Because Of Vega's Substantial Profit Interest In The Outcome Of
              Vega Traders' Trading, Vega And ▮Individual A▮ Made Substantial Profits
              By Repeatedly Breaching Their Duty To Identify And Prevent
              The SVDs' Manipulative Trading……………………………………………17

              1.     ▮Trader 8▮ Fragment And Sub-Account Funding…………………………..18

       G.     The Long Relations And Interchanging Roles Of The Principals
              Of Vega And ▮▮▮▮, Further Plausibly Indicate That Vega and ▮Individual A▮
              Intentionally Helped The SVDs Manipulate Prices……………………….……..20

       H.     Separately, Plaintiffs' New Allegations Also Show That Vega Is
              Additionally Responsible For The VTDs' Conduct On April 20

i

(And Before) Because Vega Was The Principal And
The VTDs Were Acting For Vega In Committing Such Conduct……...……...…22

    1.    Under The Vega-GH Financial Agreement, Vega Was The
Principal And The VTDs Were Acting As Vega's Agents………………22

    2.    Under The Vega-■■■ Agreement, Vega Was The Principal
And The VTDs Were Independent Contractors………...……………….23

I.    Plaintiff Plausibly Alleges Section 2(a)(1)(B) Claims Against Vega And
Individual A………………………………………………………………………26

J.    Plaintiff Plausibly Alleges Section 6(c )(1) Manipulation Claims
Against Vega And Individual A…………………………………...………………31

K.    Plaintiff Plausibly Alleges Aiding And Abetting Claims Against Vega
And Individual A……………………………………………………..……………33

L.    Plaintiff Plausibly Alleges Section 9(a)(2) Manipulation Claims
Against Vega and Individual A………………………………..………………..35

M.    Plaintiff Plausibly Alleged Unjust Enrichment Against Vega And
Individual A……………………………………………………..………………36

II.    Plaintiff Plausibly Alleges Sherman Act, CEA and Unjust Enrichment
Claims Against Defendant Trader 11……………………….……………………36

III.    Plaintiff Can Plausibly Allege Sherman Act, CEA and Unjust Enrichment
Claims Against Defendant Trader 8……………………………………………..39

IV.    Plaintiff Plausibly Alleges Section 2(a)(1)(B) Claims Against All VTDs………...……41

V.    Plaintiff Plausibly Alleges Sherman Act, CEA and Unjust Enrichment Claims
Against Defendant Trader 7……………………………………………………..42

VI.    Conclusion…………………………………………………………………….43

**Table of Authorities**

**Cases**                                                                    **Page(s)**

*Bian v. MG Fin., LLC*, No. R,
2009 WL 3863292 (C.F.T.C. Oct. 28, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir. 2015), *reh'g denied,* 807 F.3d 839 (7th Cir. 2015) *cert denied,*
------ U.S. -----, 136 S. Ct. 1607 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Bogard v. Abraham–Reitz & Co. West, Inc.*,
1984 WL 48236 (C.F.T.C. July 5, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Brian Hunter*,
130 FERC ¶ 63004, 2010 WL 232835 (FERC Jan. 22, 2010) . . . . . . . . . . . . . . . . . . . . 12

**Carbone, et al. v. Brown University, et al.**,
2022 WL 3377249 (N.D. Ill. Aug. 15, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Carlson v. CSX Transp., Inc.*,
758 F.3d 819) (7th Cir. July 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*CFTC v. Amaranth Advisors, LLC*,
523 F.Supp.2d 328 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Coyle Nissan, LLC v. Nissan North America, Inc.*,
2020 WL 1469830 (S.D. Ind. March 26, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gaines v. Chicago Board of Education*,
2020 WL 1182767 (N.D. Ill. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Amaranth Nat. Gas Commod. Litig.*,
587 F.Supp.2d 513 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
244 F.R.D. 469 (N.D. Ill. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Lobb v. J.T. McKerr & Co.*,
1989 WL 242384 (Dec. 14, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Mervyn v. Nelson Westerberg, Inc.*,
2012 WL 6568338 (N.D. Ill. Dec. 17, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 25

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
2022 WL 1202679 (N.D. Ill. Mar. 31, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Papasan v. Allain*,
478 U.S. 265 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Simpson v. Ferry*,
202 F. Supp. 3d 444 (E.D. Pa. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*U.S. Commodities Futures Trading Com'n v. Amaranth Advisors, L.L.C.*,
554 F.Supp.2d 523 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Statutes**

7 U.S.C. § 2(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

7 U.S.C. § 13c(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

7 U.S.C. § 9(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

7 U.S.C. § 9(a)(2) and 6(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

**Rules**

Fed. R. Civ. P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 27, 30

**Regulations**

17 C.F.R. § 180.1(a)(1), (3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Plaintiff Mish International Monetary Inc. ("Plaintiff") respectfully submits this

Consolidated Memorandum and the accompanying Opposition Declaration of Christopher

McGrath, Esq., ("McGrath.Decl.")[1] in order to demonstrate that this Court should deny

Defendants' motions (ECF 135, 140, 143, and 146) to dismiss claims in the Second Amended

Complaint ("SAC") (ECF130).

As this Court has previously held:

> On a Rule 12(b)(6) motion, the court assumes the truth of the complaint's well-pleaded factual allegations but not its legal conclusions. *See Munson v. Gaetz,* 673 F.3d 630, 632 (7th Cir.2012); *Reger Dev., LLC v. Nat'l City Bank,* 592 F.3d 759, 763 (7th Cir.2010). The court must construe those facts in the light most favorable to Mervyn, the party opposing dismissal. *See Gomez v. Randle,* 680 F.3d 859, 864 (7th Cir.2012). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Mervyn's brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (7th Cir.2012). The following facts are set forth as favorably to Mervyn as permitted by the complaint and the other materials that must be considered on a Rule 12(b)(6) motion.

*Mervyn v. Nelson Westerberg, Inc.*, No. 11 C 6594, 2012 WL 6568338, at *1 (N.D. Ill. Dec. 17,

2012) (Feinerman, J) ("*Mervyn*"); see ECF 93 pp. 12-13. Plaintiff alleges that the Vega Trading

Defendants[2] combined, conspired and agreed to manipulatively depress the prices of the May

2020 NYMEX West Texas Intermediate ("WTI") Light Sweet Crude Oil futures contract ("May

---

[1] The McGrath.Decl. attaches documents newly produced by Defendants Vega Capital London Ltd., and Defendant ██ Individual A ██ on July 28, 2022, i.e., well after Plaintiff filed the SAC and even after Defendants made their motions to dismiss. Plaintiff utilizes the newly produced documents in the context of argument below.

[2] The Vega Trading Defendants are Defendants ██ Trader 1 ██ ("████"), ██ Trader 2 ██ ("████"), ██ Trader 5 ██ ("████"), ██ Trader 9 ██ ("████"), ██ Trader 4 ██ ("████"), ██ Trader 3 ██ ("████"), ██ Trader 10 ██ ("████"), ██ Trader 11 ██ ("████"), ██ Trader 12 ██ ("████"), ██ Trader 6 ██ ("████"), ██ Trader 7 ██ ("████"), and ██ Trader 8 ██ ("████").

Contract") on April 20, 2020. SAC ¶1.

In its initial Memorandum Opinion and Order, *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, No. 20 C 4577, 2022 WL 1202679, at *1 (N.D. Ill. Mar. 31, 2022) ("*Mish*"), this Court ruled that Plaintiff had plausibly stated all but one of its claims against eight Vega Trading Defendants: ▉▉▉ Trader 5 ▉▉▉, ▉▉▉ Trader 3 ▉▉▉, ▉▉▉ Trader 4 ▉▉▉, ▉▉▉ Trader 6 ▉▉▉, ▉Trader 12 ▉▉▉▉▉▉, ▉▉▉ Trader 2 ▉▉▉, ▉▉▉ Trader 1 ▉▉▉, and ▉▉▉ Trader 9 ▉▉. These eight Defendants are sometimes referred to as the Senior Vega Defendants ("SVDs").

This Court also ruled that Plaintiff failed to state a claim under Section 2(a)(1) of the Commodity Exchange Act, 7 U.S.C. §2(a)(1)(B), against the SVDs (Id. at *13-14), and did not state any claim against six Defendants: Vega Capital London, Ltd. ("Vega"), ▉▉ Individual A ▉▉ ("▉▉▉▉▉"), ▉▉ Trader 10 ▉▉, ▉ Trader 11 ▉▉, ▉▉ Trader 7 ▉▉, ▉▉▉ Trader 8 ▉▉▉. Id. at *12. The Court granted Plaintiff leave to replead. Id. at *14. Plaintiff filed its operative SAC on May 19, 2022, ECF 130.

Regarding the SVDs', this Court previously found:

- "The content of their [the SVDs] communications, along with the high degree of correlative trading among most of them, give rise to a **highly plausible** inference of an agreement among them." Id. at *17. (Emphasis added).
- Plaintiff's "**eminently plausible**" allegations of parallel conduct by the SVDs, in combination with "**sufficiently alleged** plus factors," further support the inference of conspiracy. Id. at *8 (Emphasis added).
- Plaintiff "sufficiently alleged plus factors" against the SVDs to further support the inference of conspiracy. Id. at *9.
- Plaintiff stated "a viable [CEA] Section 9(a)(2) price manipulation claim" against the SVD. Id. at *10.
- Plaintiff's fact allegations were "sufficient at the pleadings stage to allege the

existence of an artificial price". Id. at *10.

-        Plaintiff "plausibly allege[d] that Trading Defendants' trading behavior caused the artificial price". Id. at *11.

-        The SVDs' alleged communications "evidence[d] a concerted effort" by the SVDs to impact the market and, significantly, an effort to conceal the nature of their actions. Id. at *11.

-        Plaintiff stated a plausible Section 6(c)(1) manipulative conduct claim against the SVDs, satisfying even FRCP 9(b)'s heightened pleading standard. Id. at *12.

-        Plaintiff "plausibly" alleged that the SVDs acted "intentionally or recklessly" in violation of CFTC Regulation 180.1. Id. at *13.

-        Plaintiff "plausibly alleged" that the SVDs "knew of each other's intent to violate the CEA, intended to further those violations, and acted in furtherance of their common scheme" thereby establishing a viable Section 13 aiding and abetting CEA violation claim). Id. at *13.

-        Plaintiff plausibly alleged communications among the SVDs on April 20, 2020 that reflected "real-time trade coordination" and were "strongly indicative of coordination". Id. at *9.

Among the communications that the Court found were "strongly indicative of coordination", was the admission by ███ Trader 9 ███ shortly after trading closed on April 20, 2020, that: "██████████████████████████████████████████ ████████████". Id. [emphasis added].

## I.        The Motion By Vega And ███Individual A███ Should Be Denied

Defendant ███Trader 9's███ above quoted statement, which the Court found to be one of the statements that was "strongly indicative of coordination", likely (or at least plausibly) states or means that the SVDs had "████████████████████████" to develop/coordinate their trading together to blitz/move prices. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (Posner, J.) (plausibility need not rise to the level of a "preponderance" but

"must establish a nonnegligible probability").[3]

Consistent with this obvious (or at least plausible) interpretation of Defendant ▓Trader 9's▓ statement, Plaintiff has now alleged numerous new facts. These facts --- along with the new documents belatedly produced by Vega/▓Individual A▓ (McGrath.Decl. Ex. 10) --- gives rise to the reasonable inference that the VTDs traded together at Vega to blitz / move prices during at least 2019-2020, including on the penultimate days of trading on WTI futures contracts. See *infra*; SAC *e.g.,* ¶¶234, 255-61, 262-275, 281, 282, 284-85, 287, 298-99; see below (recounting ▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ reflected in the recent production).

### A. Defendants Vega And ▓Individual A▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

Defendants Vega and ▓Individual A▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓



▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. SAC ¶ 281 [emphasis added]. Vega and ▓Individual A's▓ foregoing responsibility was not limited to only "completed and actual manipulations". SAC ¶ 280.  On the contrary, their responsibility was to "identify" any even "**potential manipulative trading activities**". Id. [emphasis added]. Merriam-Webster's defines "potentially" as "in a potential or **possible** state or condition —used to describe the possible results or effects of something." [emphasis added] https://www.merriam-webster.com/dictionary/potentially Merriam-Webster's defines "potential" as "existing in

---

[3] *See also Carlson v. CSX Transp., Inc*., 758 F.3d 819, 826-27) (7th Cir. July 2014) (*Citing Swanson v. Citibank, N.A.,* 614 F.3d 400, 404-05 (7th Cir. 2010) reversing and remanding the districts court's dismissal and holding that plaintiff must include "enough details about the subject-matter of the case to present a story that holds together" at the pleadings stage to plausibly argue that the alleged events "could [ ] have happened, not *did* they happen")).

4

possibility: capable of development into actuality" or "expressing possibility".

https://www.merriam-webster.com/dictionary/potential.

### B. Vega / [Individual A] Agreed To Be Familiar With The Manipulation Alarms Under The Market Abuse Regulation, And Impliedly Agreed To Take Reasonable Steps To Prevent And Avoid Engaging In Such Manipulative Conduct

Plaintiff newly alleges that Vega entered two agreements with its CME clearing member, GH Financials. SAC ¶¶243, 249. One agreement was the "GH FINANCIALS LIMITED TERMS OF BUSINESS FOR EXCHANGE TRADED FUTURES AND OPTIONS BUSINESS" ("2016 TOB") (Version 15.1) dated July 12, 2016". SAC ¶243; McGrath.Decl. Ex. 1. The second agreement was the "Terms of Business for Exchange Traded Futures and Options Business" dated November 16, 2017. SAC ¶249; McGrath.Decl. Ex. 2. Section 27 of the 2016 TOB required that Vega "█████████████████████████████████████████████████████████ ████████████████████████████████████████████[4]████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████" (TOB §27 [██████████████████ ████████████████]). [Emphasis added] McGrath.Decl. Ex. 1 p. 11.

The "market abuse regime" referred to the United Kingdom's Financial Conduct Authority (FCA) Market Abuse Regulation (MAR). SAC ¶¶224-227. The MAR provided examples of market abuse conduct that serve, in effect, as alarms that actual or potential manipulation has occurred/is occurring. Id. Plaintiff specifically alleges that various alarms

---

[4] TOB §46 [████████████] provides ██████████████████████████████████████████ ███████████████████████████████████████. McGrath.Decl. Ex. 1 (TOB §46).

provided by the Market Abuse Regulation apply to

(a) the SVDs' abuse of the Trade-At-Settlement ("TAS"), compare UK MAR Annex 1A(g) with SAC ¶¶86, 276-77, 227;

(b) the SVDs' buildup of a substantial net selling pressure position that would be liquidated based on the price established by the TAS, compare UK MAR Annex 1A(a) and 1A(g) with SAC ¶¶276-77, 227;

(c) the SVDs' intentional explosions in the amounts and frequencies of their sales late in the day around the time the TAS approached, compare UK MAR Annex 1A(b) and 1A(g) with SAC ¶¶276-77, 227;

(d) the SVDs' success in significantly moving prices through a high volume of trading during the time leading up to the fixing of the TAS, compare UK MAR Annex 1A(b) and 1A(g) with SAC ¶¶276-77, 227; and

(e) the significant bounce back of prices on the trading days following the removal from the market of the SVDs' manipulative conduct. Compare UK MAR Annex 1A(e) with SAC ¶227; 277.

Specifically, the MAR manipulation alarms include:

(a) the extent to which orders to trade given or transactions undertaken represent a significant proportion of the daily volume of transactions in the relevant financial instrument …, in particular when those activities lead to a significant change in their prices;

(b) the extent to which orders to trade given or transactions undertaken by persons with a significant buying or selling position in a financial instrument…, lead to significant changes in the price of that financial instrument, related spot commodity contract, or auctioned product based on emission allowances;

****

(e) the extent to which orders to trade given or transactions undertaken are concentrated within a short time span in the trading session and lead to a price change which is subsequently reversed;

****

6

> (g) the extent to which orders to trade are given or transactions are undertaken at or around a specific time when reference prices, settlement prices and valuations are calculated and lead to price changes which have an effect on such prices and valuations.

SAC ¶227, quoting Financial Conduct Authority (FCA) Market Abuse Regulation (MAR) ("UK MAR") Annex IA. (Indicators of manipulative behavior relating to false or misleading signals and to price securing).

Based on Vega/■■■■■ "responsibility" to identify potentially manipulative trading activities as well as Vega's explicit contract duty to be familiar with the MAR, and ■■■■■ status as a registered representative of Starmark and as sole owner and principal of Vega while also serving as a daily active part of Vega's risk management team, Vega/■■■■ were required to prevent and avoid manipulative conduct, including the recurrence of conduct that set off MAR manipulation alarms.

**C. During At Least 2019-2020, The SVDs Repeatedly Engaged At Vega In Conduct To Manipulate Prices, Including On The Penultimate Trading Day Of Various WTI Futures Contracts.**
**1. The SVDs' Conduct Repeatedly Set Off MAR Manipulation Alarms**

Consistent with the plain (or at least plausible) meaning of Defendant ■■■■■ admission (quoted at p. 4 above), Plaintiff now plausibly alleges that:

a.     the SVDs not only manipulated the May Contract on its penultimate trading day but also manipulated the CME April 2020 WTI futures contract ("April Contract") on its penultimate trading day, **March 19, 2020**. SAC ¶¶262-275.

b.     ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■ SAC ¶¶ 26, 266-67.

c.     The SVDs' manipulative conduct on the penultimate trading day of the April Contract was almost identical to their conduct in the May Contract on April 20, except that the

amount of trading was approximately only one half as much (that is, the VTDs' were continuing to practice and improve their coordinated blitzing of futures contracts). *Compare* ¶264 (the amount of April Contract trading by each SVD during each time window on March 19) *with* ¶138 (the amount of May Contract trading by each SVD on April 20th).

      d.     The VTDs' trading on other days amounted to hunting for thinly traded contracts which would prove to be sufficiently thinly traded that Defendants could use their coordinated blitzing to manipulate prices in those contracts. SAC ¶¶288-292.

      e.     Scrupulously sourced journalism which Plaintiff earlier cited, has now won prestigious awards. SAC ¶¶ 255-58, 282; SAC Ex. 1, 2. Such award-winning journalism reports, based on a substantial variety of well-placed sources:

- "U.S. authorities and investigators from [CME subsidiary] NYMEX trawled through trading data for insights into **who exactly was driving the action on April 20.** According to people familiar with their thinking, they were **shocked to discover that the firm that appeared to have had the biggest impact on prices that afternoon** was… Vega Capital London Ltd." [Emphasis added] SAC Ex. 1, p. 1, (*"The Essex Boys: How Nine Traders Hit a Gusher With Negative Oil,"* Bloomberg, Liam Vaughan, (December 10, 2020)).

- "Defendants' **aggressive selling** of oil on April 20th **is a tactic Vega's traders used regularly**, **according to another person familiar with the firm's strategy**." SAC Ex. 2 [emphasis added] (Bloomberg, August 4, 2020, "*London Traders Hit $500 Million Jackpot When Oil Went Negative*").

- "**trading records and people who worked alongside them** [the VTDs] indicate they [the VTDs] **frequently operated in a similar fashion, buying or selling in the same direction at key moments.**" [Emphasis added] SAC Ex. 1, p. 3.

Also consistent with the plain meaning of Defendant Trader 9's " ▮▮▮▮▮ " admission, Plaintiff further newly alleges in detail that the SVDs manipulated the WTI April Contract on March 19, 2020. *E.g.*:

      264.    On March 19, 2020, the Vega Trading Defendants sold approximately
      ▮▮▮ April 2020 contracts, purchased approximately ▮▮▮ May 2020 contracts,
      purchased approximately ▮▮▮ April 2020 contracts via TAS and sold

approximately ██ May 2020 contracts via TAS. Specifically, the Vega Trading Defendants traded the April and May 2020 NYMEX WTI crude oil futures contracts in the following volumes.



265. The foregoing short April and long May "spread" positions, along with the corresponding TAS orders to buy the April contract and sell May contract at their respective settlement prices, **gave each of the above Vega Trading Defendants an incentive** to depress the price of the April contract relative to the price of the May contract.

SAC ¶¶264-65 [emphasis added]. Plaintiff then makes detailed allegations of how much the

SVDs' sold within each time period on March 19 and the resulting effect on prices. SAC ¶¶268-275.

Plaintiff's foregoing allegations reflect numerous similarities between the SVDs' conduct and its effects on March 19, and the SVDs' conduct and its effects on April 20th.[5] **First**, the SVDs engaged in a sell sell sell and don't buy strategy in which they injected substantial net selling pressure into the April Contract. *Compare* SAC ¶¶264, 284 (April Contract) *with* ¶¶144, 162 (May Contract) *and Mish* at *2 (this Court notes the price depressive effects of net selling pressure). **Second**, the SVDs sold at a rate between 8:00 am and 12:29 pm that averaged approximately ■ April contracts per minute for a total sale of ■ April Contracts during the 8:00 am and 12:29 pm portion of March 19th. ¶¶264, 272.

**Third,** after gradually building up this net selling pressure on the April Contract and developing a substantial financial motive in the outcome of the TAS price, the SVDs then greatly ramped up their rate of selling to approximately ■ contracts per minute between 12:30pm and the close of trading at 1:30 pm. That is, the SVDs sold at a rate that was ■ times higher during the last hour of trading then their rate during the first four and a half hours of the day. *Compare* ¶272 *with* ¶¶128-144 (Defendants also sold at a much higher rate per minute during the last 30 minutes of trading on April 20 in the May Contract than their rate of selling prior to the last 30 minutes) *and Mish*, *4, 11. **Fourth,** during the last half hour of trading on March 19, the Vega traders ramped up their April Contract sales to a rate of ■ contracts per minute (SAC ¶270) which was ■ times their rate of selling during the first four and a half hours of trading. *See*

---

[5] Plaintiff did not receive production of the same level of detail for the April Contract as for the trading by the SVDs in the May Contract; accordingly, Plaintiff could not allege numerous additional facts, such as the minute to minute trading correlation, for which they had sufficient information to allege as to the May Contract.

SAC ¶264; see *Mish* at *4, 11.

During the last two minutes of trading on March 19th, the SVDs further accelerated their sales to a rate of ▮▮ contracts per minute (SAC ¶271) which was ▮▮ times the rate of their selling during the first 81% of the trading day, *i.e.,* 8am - 12:30pm. SAC ¶264. The above trading activity, as well as the percentage that the SVDs' trading constituted of the entire market's trading are summarized below:

| Mar 19, 2020 | Sale Apr | % of market volume | Sales per minute |
|---|---|---|---|
| Whole day | ▮▮ | ▮▮ | ▮▮ |
| Final hour | ▮▮ | ▮▮ | ▮▮ |
| Last 1/2 hour | ▮▮ | ▮▮ | ▮▮ |
| Last 2 minutes | ▮ | ▮▮ | ▮▮ |

By selling ▮▮ April contracts and buying ▮▮ May contracts in the thin trading on March 19, the SVDs put substantial pressure on the April-to-May price spread. Bloomberg reports the spread between those contracts stood at -0.46 (minus 46 cents) at the close of trading on March 18, 2020. By 12:30 pm on March 19, that spread stood at -0.53. ¶269. It declined to -0.65 by 1:28 pm and fell again in the final two minutes of trading to settle at -0.69 at 1:30 pm. ¶271. This extraordinary closing spread price was **four standard deviations** from the mean for that spread during the prior year. ¶273; *compare* SAC ¶135 (the May Contract closing price on April 20 constituted an all-time record low).

The following day, March 20, the selling April/buying May pressure from the SVDs was removed from the market for April Contracts. With the removal of such manipulative pressure,

the April May spread posted an **enormous** rebound to settle at -0.20. ¶274.[6] This strongly indicates that, on March 19, 2020, the SVDs manipulatively depressed the price of the April Contract relative to the price of the May Contract, *and that prices bounced back to non-manipulated level after the SVDs trading was removed from the market*.

More important, the SVDs manipulated the market through the same manipulative trading pattern which the SVDs' used in the May Contract, and had been developing "███████" (according to Defendant Trader 9). SAC ¶260. However, the SVDs approximately doubled the size of their selling and caused a much greater amount of price distortion in the May Contract than even the substantial distortion they caused in the April Contract. SAC ¶¶298-99. Also, the SVDs made significant profits on March 19 (SAC ¶275) and the percentage that the SVDs' total trading in the April Contract constituted of the total April Contract volume that day, is consistent with the percentages of trading in other energy contracts which were found to be manipulative.[7]

Plaintiff does not have **any** records of Vega's trading sufficient to understand what Vega was doing prior to March 19, 2020. That is, the only two penultimate days of trading in a NYMEX WTI contract for which Plaintiff had records sufficient to permit inferences, are March 19 and April 20, 2020. These records overwhelmingly show that the SVDs engaged in essentially the exact same coordinated blitzing in the April Contract as the May Contract. Albeit, the

---

[6] Though not alleged in the SAC, based on Bloomberg trading data for the 55 trading days prior to March 19, the 0.49 change from Mar 19 to Mar 20 is more than 11 standard deviations from the mean daily change of -0.016 for that period. Moreover, this 49 cent movement in the April May spread was its highest daily change for the 300 trading days going back to January 2019.

[7] *E.g., Brian Hunter,* 130 FERC ¶ 63004, 2010 WL 232835 (FERC Jan. 22, 2010) (finding --- based on the same facts as were at issue in *CFTC v. Amaranth Advisors, LLC,* 523 F.Supp.2d 523 (S.D.N.Y. 2007), *reconsideration denied,* 554 F.Supp.2d 523 (S.D.N.Y. 2008) and *In re Amaranth Nat. Gas Commod. Litig.,* 587 F.Supp.2d 513 (S.D.N.Y. 2008) --- that the alleged manipulators' trades constituted at least 14.4% of the trading volume during the closing period, which was sufficient to sustain three separate manipulations of natural gas futures contracts).

expanded size of the SVDs' trading in the May Contract greatly increased the amount of the manipulative pressure on prices on April 20th.

Finally, based on the recent production by Defendants and Plaintiff's continuing investigation, Plaintiff has good grounds to believe and would allege in an amended complaint that production of the SVDs' trading records at Vega for 2019-2020 (especially in the NYMEX WTI contract on the penultimate day) will reveal further examples of the SVDs' "pushing one another so hard … to blitz the market" through making rapid trades in unison or at similar times. Although Plaintiff has not had access to any such records, the sources in two award-winning articles, "*The Essex Boys: How Nine Traders Hit a Gusher With Negative Oil*" and "*The Day Oil Went Negative, These Unlikely Traders Made $660 Million*", did have access to extensive information. These two articles have now received the 2021 British Journalism Awards for Crime and Legal Affairs Journalism. SAC ¶¶257-58; SAC Ex. 1, and 2. Specifically, these now-award winning articles: (a) carefully disclosed that the reporters had based their statements upon information from various sources who either had seen the Vega traders' "trading records", were "people who worked alongside" the Vega Trading Defendants, or included "a person familiar with the firm's strategy" (Id. ¶¶255-56, 258-61); and (b) reported, based upon such authoritative sources, that the Vega traders "regularly" or "frequently" traded in "unison" (at Vega), "buying or selling in the same direction at key moments." *Id*.

### 2. Non-Award Winning News Articles Have Repeatedly Provided One Part Of The Plausible Bases For Allegations Of Misconduct And Knowledge Thereof

Non-award winning news articles and reports have repeatedly provided one part of the plausible bases for allegations of misconduct and knowledge thereof.[8] Here, Plaintiff relies on

---

[8] *e.g., Gaines v. Chicago Board of Education*, 2020 WL 1182767, *3 (N.D. Ill. 2020) (court finds claims of constitutional deprivations involving beating of student at school were sufficiently alleged and

the combination of all the foregoing items, including Defendant ▆▆▆ admission; the extensive

allegations of the March 19 blitzing of the market; ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ the

explicit contract duty of Vega/▆▆▆ to identify the trading activity here as at least "potentially"

manipulative because it triggered all four MAR red flags quoted above; and the other facts

developed above. In that context, and given ▆▆▆ admission that strongly indicates the VTDs

engaged in this conduct "▆▆▆▆", the award-winning articles' strongly sourced reporting that

the VTDs regularly engaged in trading in unison or trading rapidly together at key times to move

prices, at least plausibly indicates that there were many more instances of VTD blitzing at Vega

which Vega and ▆▆▆ witnessed.

D. **During 2019-2020, Vega / ▆▆▆ Repeatedly Observed The SVDs' At Least "Potentially Manipulative Trading Activities" Especially On The Penultimate Days Of Trading In WTI Contracts And In Other Contracts In Which There Was Potentially Low Volume Of Trading.**

In carrying out their responsibility to view trading activity in Vega's accounts for the

purposes of identifying "potentially manipulative trading activities", Vega and ▆▆▆ were

obligated to "continuously monitor" Vega's trades. SAC ¶¶278-280. Through such monitoring,

---

supported not only by assertions of *de facto* policy of failing to investigate or discipline staff regarding student beatings but also through complaint's reference to a 2009 investigative report documenting many sustained allegations of similar school beatings at Chicago Public Schools and noting that relatively few staff were terminated in response); *Simpson v. Ferry*, 202 F. Supp. 3d 444, 448 (E.D. Pa. 2016) (relying partly on news articles attached to the complaint to conclude that a *Monell* claimant had plausibly alleged a municipal custom of tolerating excessive force."); *Coyle Nissan, LLC v. Nissan North America, Inc.*, 2020 WL 1469830 (S.D. Ind. March 26, 2020) (sustains amended complaint on motion to dismiss and notes that plaintiff, operating a Nissan car dealership first became aware of the " Illegal Incentive Program" for certain car dealers being alleged in its complaint through a news article detailing another Nissan dealer's involvement in said illegal program and a similar lawsuit); *Carbone, et al. v. Brown University, et al.*, 2022 WL 3357249, *8 (N.D. Ill. Aug. 15, 2022) (court upholds Sherman Act, Section 1 antitrust complaint and finds plausible plaintiffs' definition of a relevant market that is derived from *U.S. World & News Report* rankings of certain elite private national universities from 2001 to 2021); *see also Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639-640, n.1 (7th Cir. 2015) ("no reason why [plaintiff] may not also add [to amended complaint] even non-evidentiary materials (such as newspaper articles) to illustrate what she plans to prove…"), *reh'g denied*, 807 F.3d 839 (7th Cir. 2015), *cert. denied*, ⸺ U.S. ⸺, 136 S. Ct. 1607 (2016); *Papasan v. Allain*, 478 U.S. 265, 269, n.1 (1986)(in reviewing complaint court is not precluded "from taking notice of items in the public record").

Vega and ▮Individual A▮ observed (a) The SVDs behavior on March 19, 2020 (SAC ¶¶264, 269-271, 275);  (b) The SVDs behavior on a larger scale on April 20, 2020 (SAC ¶¶137-144, 159-163, 202); (c) The strong similarity in the SVDs' conduct on the penultimate days of the April Contract and the May Contract (SAC ¶¶137-144, 202, 262-275, 284-286); (d) The SVDs' hunting for thin contracts in which to trade and potentially manipulate (SAC ¶¶138, 144, 264, 269, 27); and (e) All the other times during the prior years when the SVDs worked together to blitz markets. SAC ¶¶7, 178, 260-61; see above.

Based on the totality of the circumstances, it is at least very plausible that Defendants Vega and ▮Individual A▮ repeatedly watched the SVDs engage at Vega in "potentially manipulative activities" that managed to set off all four MAR manipulation alarms quoted above.  But Defendants Vega and ▮Individual A▮ did nothing to "identify" this potentially manipulative activity. Only because of this were the SVDs able to ramp up their manipulative trading activities to its highest levels on April 20 to "blitz" and overwhelm the May Contract. Defendant ▮Individual A▮ was registered with the FCA as an appointed representative of both Starmark and Vega. SAC ¶38. Defendant ▮Individual A▮ had top roles in compliance, including at ▮▮▮▮▮ for at least a dozen years prior to April 20, 2020. SAC ¶293. Defendant ▮Individual A▮ well knew the MAR manipulation alarms. Despite the fact that four separate alarms were simultaneously ringing after the VTDs' March 19 blitz of the April Contract on its penultimate day, Vega and ▮Individual A▮ **still** did not identify any potentially manipulative trading by the SVDs.

### E.  Vega / ▮Individual A▮ Repeatedly Committed Breaches Of Their Responsibility To "Identify" And Prevent The SVDs Potentially Manipulative Trading Which Set Off MAR Manipulation Alarms

The trading activities by the SVDs on March 19 and April 20 constitute potentially manipulative trading activities under not just one but all four of the MAR provisions quoted

15

above. **First**, the SVDs' transactions represent a "significant portion of the volume" in the respective contracts (SAC ¶272(e) ▮▮▮▮ of the April Contract on March 19 (during the final 30 minutes of trading) and ¶144(e) ▮▮▮▮ of the May Contract on April 20 (during the last approximately 22 minutes of trading)). *Compare* UK MAR, Annex I (a) (quoted at SAC ¶227) *with* SAC ¶¶128-144, 154-163, 262-275. **Second**, the SVDs clearly had a "significant buying or selling position" in the respective contracts, and their end of day trades did "lead to significant changes in the price" of that contract. *Compare* UK MAR, Annex I (b) (quoted at SAC ¶227) *with* SAC ¶¶128-144, 154-163, 262-275. **Third**, the SVDs did "concentrate" a large amount of their trades within a short time span in the trading session which led to a price change which was subsequently reversed. *Compare* UK MAR, Annex I (e) (quoted at SAC ¶227) *with* SAC ¶¶13-15, 128-144, 154-163, 203-208, 262-275, 284. **Fourth**, the increase in the SVDs' trading during the last 30 minutes and 60 minutes on March 19 and April 20 occurred "around a specific time when reference prices, settlement prices and valuations are calculated". *Compare* UK MAR, Annex I (g) (quoted at SAC ¶227) *with* SAC ¶¶41-58, 81, 86, 90, 143-144, 163, 195-202, 269-274, 288. **Fifth**, the large changes in prices caused by the SVDs specifically led to price changes which had a substantial "effect on such prices and valuations" of the TAS determinant of such Defendants' financial outcome. *Compare* UK MAR, Annex I (g) (quoted at SAC ¶227) *with* SAC ¶¶2, 86-91, 106-112, 127-144, 201-202, 262-275. **Sixth**, the price change caused by the SVDs' manipulative trading was "subsequently reversed" on the very next trading day notwithstanding the fact that supply and demand remained similar. *Compare* UK MAR, Annex I (e) (quoted at SAC ¶227) *with* SAC ¶¶12-15, 273-274, 284, 359-360.

Despite the fact that all four MAR manipulation alarms were simultaneously ringing, Vega/▮Individual A▮ still failed to identify and prevent "potentially manipulative trading activities".

16

**F. Because Of Vega's Substantial Profit Interest In The Outcome Of Vega Traders' Trading, Vega And ██████ Made Substantial Profits By Repeatedly Breaching Their Duty To Identify And Prevent The SVDs' Manipulative Trading.**

Plaintiff newly alleges expressly the relative magnitude of Vega's share of the profits of Vega Trading Defendants ██████ and ██████. SAC ¶¶36, 122. Plaintiff further alleged that if Vega had a ██████ or a ██████ interest in such profits in the May Contract on April 20th, Vega's profit interests would be between ██████ times and ██████ times more than total commissions that Vega made that day on the VTDs trading in the May Contract. SAC ¶¶217-221. This strong profit interest in the successful and completed manipulation provided Vega with a financial motive not to "identify" the potentially manipulative trading activities. Id.

Such large profit interest strongly further supports a finding that Vega and ██████ repeatedly saw potentially manipulative trading but failed to identify same.

Defendants point out that in the SAC, Plaintiff described the initial funding of the Vega Sub-Accounts as: "███████████████████████████████████████████████████████████████████████████████" (SAC ¶239(g)).  ECF 148 p.7. But Plaintiff did not correctly quote language ██████ ███████████████████████████████████████████████████ (the Vega-██████████████████ ("██████") Agreement, McGrath.Decl. Ex 3, §1.1) ████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ (Vega-██ agreement,

McGrath.Decl. Ex 3, §§6.1- 6.3 [████████])

██████████████████████████████████████████

██████████████████████████████████████ (Vega-██

agreement, McGrath.Decl. Ex 3, §3 [███]) ████████████████████

███████████████████████████████████████

████████████████████████████████ (Vega-███ agreement,

McGrath.Decl. Ex 3, §5 [██████])

Accordingly, the actual language of the Vega-███ agreement (McGrath.Decl. Ex 3)

contradicts Vega's following statements (which, again, are heavily based on Plaintiff's slight

misquote in the SAC of the agreement's language): "███████████████████████████

████ cited by Mish in paragraphs 239 and 240-242 of its second amended complaint was ███

██████████████" (ECF 148 p.7), and "the customers were using their own funds and

their own discretion to make trades while using Vega's subaccounts to do so." Id.  p.8).

1.  **Trader 8** Fragment And Sub-Account Funding

For the first time Plaintiff has received in the most recent discovery production ██

████████████████████████████████████████████████████, in

this case for ███ Trader 8 ███, based on two fragmentary WhatsApp communications between ███ Trader 8 ███ and ███ Trader 4 ███. (███ Trader 8 ███ Fragment Vega_Mish_000043353 and ███ Trader 4 ███ Fragment Vega_Mish_000043355)

In the ███ Trader 8 ███ communication, ████████████████████ ████████████████████████████████████████ ████████████████████████████ (███ Trader 8 ███ Fragment, McGrath.Decl. Ex.9).

While the fragment produced is not sufficiently comprehensive to ascertain what amounts were contributed by whom to activate the ███ Trader 8 ███ ████████, Plaintiff's interpretation is that:

██ ████████████████████████████████ ██ ████████████████████████████████ ████████████████████ ██████████████████████████████████████ ████████████████████████████ (███ Trader 8 ███ Fragment, McGrath.Decl. Ex.9) Again, Plaintiff's interpretation is that these references to different splits at various account funding levels show or strongly indicate that ███ Trader 8 ███ had an ongoing profit-sharing arrangement with Vega and perhaps ███.

Thus, under the correct language of the Vega-███ Agreement and the newly produced ███ Trader 8 ███ profit splitting document (which was produced after Vega filed its motion to dismiss), Plaintiff's interpretation is that Vega did fund or may have funded other VTD sub-accounts. To that extent, Vega would also have had further profit-sharing agreements with the VTDs (in addition to Vega's profit-sharing rights as to Defendants ███ Trader 12 ███ and ███ Trader 11 ███).

G. **The Long Relations And Interchanging Roles Of The Principals Of Vega And ███, Further Plausibly Indicate That Vega And ▉Individual A▉ Intentionally Helped The SVDs Manipulate Prices.**

▉Individual A▉ and Defendant ▉ Trader 1 ▉ worked together for many years beginning in 2007 at ███████████████ ("█████"). ¶¶116, 234, 293. On May 13, 2016, the business partner of Defendant ▉ Trader 1 ▉, ████████████, incorporated Vega Capital London Ltd. SAC ¶30. On July 12, 2016, █████ executed, for Vega, its agreement with GH Financials. Id. ¶243.

In Autumn 2017, Vega, per ▉Individual A▉ and ███, per ▉ Trader 1 ▉, executed a ██████████ ████████. SAC ¶238. The agreement was made between and among ████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████. Id.

Until April 1, 2021, █████ was owned 25% by Defendant ▉ Trader 1 ▉, 25% by ████ ████████ (believed to be ▉ Trader 1's ▉ ███), and 50% by ██████████ who was another trader and FCA approved representative of Starmark. SAC ¶210.

On April 1, 2021, █████ filing with the Companies House disclosed for the first time that Defendant ▉Individual A▉ was also a person with a significant interest and, in fact, control of ███. SAC ¶211. The filing disclosed that ▉Individual A▉ "holds, directly or indirectly, 75% or more of the voting rights in the company", and that ████████████ and ████████████ were removed as directors of ███. *Id*.

On March 1, 2022, █████ was dissolved pursuant to an application co-signed by Defendants ▉Individual A▉ and ▉ Trader 1 ▉, and no further information was provided. Id. 212. That is, the sole owner of Vega, assumed voting control of ████ before it was dissolved. SAC ¶¶210-212.

On November 9, 2018, ██Trader 1██, ████ and ██Trader 5██ incorporated ████ ████████████████ as a private limited company (Company No. ████████). SAC ¶233. According to Companies House records, ██Trader 5██ resigned as Director on October 7, 2019 and was replaced the same day by ██Trader 4██, identified as "Derivatives Trader." Id.

Vega went through four owners in the three years ending 2020. SAC ¶34. By February 3, 2020, ██Individual A██ was the sole owner of Vega. SAC ¶236. But ████████████, who founded Vega, maintains a residence in Dubai. On April 20, a ████████ communicated with ██Trader 2██ ████████. McGrath.Decl. Ex. 8, VEGA_MISH_000000021. In this text exchange, ████████ said to Defendant ██Trader 2██ "████████████████████████████ ████████████████". Id. If discovery shows that ████████ is ████████, then the founder of Vega ████████████████████ ████████████████████████.

Earlier on April 20, ████████ former business partner ██Trader 1██ and ████ ████████ were ████████████████████. McGrath.Decl. Ex. 4. ████ ████████████████████████████████████████ ████ Id.

As of May 31, 2020, Vega was holding in excess of $████████. McGrath Decl. Ex. 6. As of May 31, 2021, Vega had roughly $████████. Id. Ex. 7. Although Vega ████████████ ████████████████████████, Defendant ██Individual A██ as the sole owner of Vega caused Vega to release roughly $████████ from Vega. Because the Vega traders profits were believed to be in excess of $████████, it is not known how much of the transfers went to Vega traders and how much went to Defendant ██Individual A██.

H. **Separately, Plaintiffs' New Allegations Also Show That Vega Is Additionally Responsible For The VTDs' Conduct On April 20 (And Before) Because Vega Was The Principal And The VTDs Were Acting For Vega In Committing Such Conduct.**

   1. **Under The Vega-GH Financials Agreement, Vega Was The Principal And The VTDs Were Acting As Vega's Agents.**

Plaintiff has newly quoted at length from the agreement which Vega made with its

Chicago Mercantile Exchange ("CME") clearing broker, GH Financials, dated July 12th, 2016.

SAC ¶¶243-248.



243. Pursuant to a "GH FINANCIALS LIMITED TERMS OF BUSINESS FOR EXCHANGE TRADED FUTURES AND OPTIONS BUSINESS" ("TOB") (Version 15.1) dated July 12, 2016, and signed by ███████████████ on behalf of Vega Capital London Ltd., Vega agreed in entering its relationship with GH Financials that: (f) ███ ████████████████████████████████████████████████████████████████ ████████████████████ TOB ¶27 (f). ██████████████████████████ ████████████████████████████ [Emphasis added.]

244. Vega Expressly Agreed That Trades In Its Accounts Would Be Made On Vega's Behalf By Authorized Persons. Pursuant to Vega's agreement with GH Financials, only "████████████████" of Vega were permitted to perform acts on behalf of Vega. ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ TOB ¶9 [Emphasis added].

245. Plaintiff alleges that an "act" under ¶9 of Vega's Agreement with GH Financials quoted above, included the placing of "orders", and the holding of orders that were "executed" as trades.

246. Each Vega Trading Defendant typically placed "orders" for its subaccount which were "executed" by GH Financials.

247. As such, pursuant to Vega's TOB with GH Financials, ¶9, each Vega Trading Defendant was acting either as Vega's "officer, employee, or agent" or had otherwise been granted "authority" by Vega to "act on … behalf" of Vega to enter trades, or had otherwise been granted authority by Vega in its trades.

248. Plaintiff further alleges that, pursuant to TOB ¶9, Vega was the "principal" for all trades made by each Vega Trading Defendant.

22

SAC ¶¶243-248.

Thus, Vega clearly agreed with GH Financials that Vega's trades in its accounts with GH Financials were made by Vega acting as "principal" and sole beneficial owner (but not as trustee where you have full authority from the sole beneficial owner)". SAC ¶243 quoting the Vega GH Financial Terms of Business ¶27. Vega also agreed that the persons (like the Vega traders) who entered orders for Vega were acting as Vega's "officers, employees, or agents".  SAC ¶244 quoting TOB ¶9. Because the Vega traders were not officers or employees of Vega, then, under the Vega-GH Financials agreement, the Vega traders were acting as Vega's "agents" in entering their orders for Vega. Id.

Vega/█████ argue that the language in TOB ¶27(f) that provides "(or you have full authority from the beneficial owner)" supposedly is applicable to Vega's fact situation with the VTDs which, accordingly, means that Plaintiff's interpretation that Vega was acting as a principal cannot be plausible. ECF 147 p. 11. However, with full knowledge of the agreement that Vega had made with GH Financials, Vega then turned around approximately 15 months later and entered an agreement with ████████████████████ ("████"). SAC ¶238. This agreement was dated "████", and was open to and subscribed by those Vega Trading Defendants which agreed to its terms. Id. Nowhere in the Vega-████ Agreement was there any provision that the Vega traders were the "sole beneficial owners" of the trades or the sub-accounts Vega provided for them. McGrath.Decl.Ex.3 (the agreement) *passim*; SAC ¶¶238-239.

## 2. Under The Vega-████ Agreement, Vega Was The Principal And The VTDs Were Independent Contractors.

On the contrary, the Vega-████ Agreement provided as follows:

████████████████████████████████████████████



█████████████████████████████

SAC ¶239.

Thus, Vega was the principal which retained ████ and the "██████" to perform services on behalf of Vega. SAC ¶239(a)-(c). But the Vega traders were not the "████████████" of the sub-accounts or the trades therein. On the contrary, the sub-accounts would "████████ ████████████████████████████████████████" of the agreement, "██████████████ ██████" else whether contained in the Agreement "████████████". SAC¶239 (h) quoting from Section 6.2 of the agreement. Therefore, Vega/ Individual A's argument that the controlling language of the Vega-GH Financials agreement is the "██████████████████████████████████████" parenthetical phrase in TOB ¶27(f), is directly contrary to the Vega-████ agreement. That agreement provides that ████████████████████████████████████████████████ ████████████████████. SAC¶239(h). Further, the VTDs' rights were dumbed down solely to rights to withdraw profits in certain situations in which the definition of profits could be satisfied. SAC¶239(n). Accordingly, Plaintiff's allegations that Vega was the "████████" under the Vega-GH Financials agreement is at least plausible (and in fact is the only possible construction, given the Vega-████ agreement's provision that Vega was the principal which retained and engaged the VTDs). *Mervyn v. Nelson Westerberg, Inc.*, No. 11 C 6594, 2012 WL 6568338, at *1 (N.D. Ill. Dec. 17, 2012) (Feinerman, J.) (Feinerman, J) (the Court assumes the truth of the complaint's well-pleaded allegations and must construe those facts in the light most favorable to the party opposing dismissal).

Although the Vega traders were independent contractors under the Vega-████ agreement, they were acting as "██████" of Vega in entering the orders into the market and under the terms of the market facing agreement between Vega and GH Financials. Thus, the Vega-████

agreement carefully provided that "nothing in this agreement" would make the VTDs into agents or employees. Agreement Section 20.1, quoted in SAC ¶239(f). But, unlike other provisions in the Vega-■■ Agreement, the language did not specify that "nothing in this agreement" "*or elsewhere*" (*compare* Vega-■■ Agreement 6.2) would make the VTDs into agents of Vega.

In sum, both the Vega-GH Financials agreement and the Vega-■■ Agreement make clear that Vega is the principal. But whereas the Vega-GH Financials agreement states that the VTDs are acting as "agents" in entering their trades, the Vega-■■ agreement states that they were "acting as independent contractors" and, moreover, "nothing in this agreement" would make them into agents. Again, the Vega ■■ agreement did **not specify** that nothing "anywhere else" would make the VTDs into agents. Accordingly, reading the two agreements together, when the VTDs placed their orders and held their positions in the respective sub-accounts at Vega, Vega was the principal and the Vega traders were acting for Vega as agents. Solely for purposes of the Vega-■■ agreement, the VTDs acted as independent contractors.

## I.   Plaintiff Plausibly Alleges Section 2(a)(1)(B) Claims Against Vega and ■Individual A■

Section 2(a)(1)(B) of the Commodity Exchange Act provides:

> The act, omission, or failure of any official, agent, **or other person acting for** any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, **agent, or other person**.

7 U.S.C. §2(a)(1)(B) (emphasis added).

Under a literalist interpretation of the foregoing language, Plaintiff need only show (1) that the VTDs were "persons acting for" Vega and (2) that the VTD's act was "within the scope… of his office".  If those showings are made, then the VTD's act "shall be deemed the act" of Vega.

Vega does not contest that, in entering the orders for Vega, the VTDs were acting on behalf of Vega. Nor does Vega contend that the VTDs were not acting "within the scope…of the office" for Vega when the VTDs made their trades. ECF 148 *passim*. In the Vega-███ agreement, Vega retained and engaged the Vega traders exactly in order to perform the "services" of making trades in "futures or options" on behalf of Vega. SAC ¶239(a)- (n) (quoting contract language). Similarly, under the Vega-GH Financials TOB agreement, the VTDs were agents acting on behalf of the principal, Vega, when the VTDs entered orders. Thus, under the plain meaning of the statutory language, and the plain meanings of the language in both the Vega-GH Financials agreement and the Vega-███ agreement, the VTDs were acting within the "scope of [their] … office" for Vega when they made and held their transactions. See "H.1" and "H.2" above.

Vega's motion does not even mention much less challenge Plaintiff's new allegations concerning these portions of Vega's operative agreements. *Compare* ECF 148, *passim*. Unable to meaningfully challenge Plaintiff's new allegations concerning Vega's own written agreements, Vega and ███Individual A███ rehash the same arguments they previously asserted in its prior Rule 12(b)(6) motion. ECF No. 148, pp. 18-21. Each of Vega's arguments fails. None of them is sufficient to demonstrate Plaintiff has failed to plausibly allege that Vega and ███Individual A███ are liable under Section 2(a)(1)(B).

First, Vega argues that Plaintiff is "making the same fundamental allegations as it did in the amended complaint." ECF No. 148, p. 19. This is wholly incorrect. Unlike the amended complaint, Plaintiff now alleges Vega agreed in writing to act as principal for each transaction in its accounts and further agreed that persons trading in Vega's accounts would be acting on its behalf. SAC, ¶¶243-244. The SAC also now alleges that the Vega ███████ Agreement

provided that Vega was in the business of trading futures and that Vega **engaged** the VTDs to provide "services" of trading futures and options for Vega. See SAC ¶239. Vega has failed to address virtually all of these new allegations (except Vega's incorrect "sole beneficial owner" challenge, which Plaintiff addressed in "H" above).

Second, Vega points to the Vega-█ Agreement and asserts that the VTDs were responsible for making their own trading decisions and supposedly traded their own money.[9] ECF 148, p. 20. But agents or persons acting on behalf of a "proprietary trading firm" (*i.e.,* Vega) under an agreement such as the Vega-█ agreement have been retained by the proprietary trading firm to make trades on its behalf. The first step is when the VTD makes the trade. It is then "acting for Vega" within the meaning of Section 2(a)(1)(B) both because Vega has retained the VTD to provide this service of making trades, and because, under the Vega-GH Financials agreement, ████████████. See Section "H.1" and "H.2". Step two is when the VTD holds the trade in the sub-account (absent special permission, trades were not to be held overnight). Because each Vega sub-account "notwithstanding anything else" was the property of Vega, such step of "holding" the trade was also taken on behalf of Vega. SAC ¶239(h). Step three is the sale of the contract which, again, the VTD does as the agent for Vega (under the GH Financials agreement) or acting for Vega under the Vega-█ agreement. Accordingly, to the fullest extent that the VTDs made their own trading decisions, they were "acting for" Vega in doing so.

Vega's foregoing argument also runs into the responsibility of Vega and Individual A "for viewing trading activity in Vega's accounts for the purpose of identifying potentially

---

[9] As Plaintiff previously explained, the actual language of the Vega-█ agreement provided that █ ████████████. See "F" above. Accordingly, the money in the VTDs' accounts may have come from the VTDs, Vega, or some combination.

manipulative trading activities". SAC ¶280. Vega and [Individual A] were themselves responsible to make decisions to stop and prevent MAR abuses and other "potentially manipulative trading activities". Thus, whenever the VTDs made decisions to engage in "potentially manipulative trading", those decisions overlapped with the decision of Vega and [Individual A] to prevent and avoid such conduct. That is, decisions relating to manipulative trading in Vega's sub-accounts had to be made by both the VTD and Vega and [Individual A] in their supervisory roles in order for the trading activity to remain in place. Vega's "control" of the VTDs, including control of its trading decisions, is not an element of or required for Section 2(a)(1)(B) liability. But Vega and [Individual A] did have such "control" over manipulative trading and "potentially manipulative trading".

Third, Vega points to the Vega-███ Agreement and asserts that the VTDS were "independent contractors" and not employees, agents or partners of Vega. ECF No. 148, p. 20. However, Vega ignores that its agreement with GH Financials (which was entered into *before* the Vega-███ Agreement) provides that Vega would act as principal for all transactions and that, in effect, the VTDs were "█████" of Vega in entering trades. See "H" above.

Moreover, the Commodity Futures Trading Commission ("CFTC") has rejected attempts (like Vega's here) to manufacture a situation whereby it can enjoy the **benefits** of the VTDs' manipulative trading in Vega's accounts, yet take **no responsibility** for the VTDs' manipulative conduct in those same accounts. *Bogard v. Abraham–Reitz & Co. West, Inc.,* No. R 77–315, 1984 WL 48236, at *4 (C.F.T.C. July 5, 1984) (rejecting situation whereby principal could obtain benefits of alleged person's services yet take no responsibility for his fraud and holding that "even if Abraham were an independent contractor whose conduct in the performance of the services undertaken was not controlled by Shearson [the purported principal], that status would

29

not itself preclude his being Shearson's agent").[10]

Additionally, Vega was specifically charged with monitoring all the trades made by these independent contractors and explicitly charged with watching for and identifying and preventing "potentially manipulative trading" which set off MAR manipulation alarms. See "B" supra.

Fourth, pointing to the GH Agreement, Vega asserts that the VTDs placed orders in the sub-accounts which were executed by GH Financials. ECF No. 148, p. 20. But the same GH Agreement on which Vega relies provides that Vega agreed to act as principal for such orders and that the persons placing such orders (the VTDs) were doing so on Vega's behalf. SAC, ¶244; described in "H" above. Fifth, Vega asserts that Plaintiff has made a "new allegation" that GH Financials is an agent of Vega. ECF No. 148, p. 20. However, this same allegation appeared in the prior amended complaint. *Compare* ECF No. 41, ¶65 *with* SAC, ¶64. But Vega failed to raise it in its prior Rule 12(b)(6) motion. To the extent the Court considers this argument, it should be rejected. Vega argues that because Plaintiff has alleged that GH Financials is Vega's agent, that renders Plaintiff's allegation that Vega was the principal for the VTDs "implausible." ECF No. 148, pp. 20-21. This is simply wrong. Vega, as the principal, authorized its agents (the VTDs) to transmit its orders to GH Financial for execution on the exchange on behalf of Vega. Once the VTD, who was acting as Vega's agent transmitted the order to GH Financials, then GH Financials (also as Vega's agent), executed the transaction for

---

[10] *See also Bian v. MG Fin., LLC*, No. R 08–17, 2009 WL 3863292, at *9 (C.F.T.C. Oct. 28, 2009) ("The reference to 'other person acting for' another person or entity [in section 2(a)(1)(B) ] implies that *respondeat superior* under the Act applies to persons who act for others, but who do not fall within the usual definition of 'agent.'"); *Lobb v. J.T. McKerr & Co.*, No. R85–185, 1989 WL 242384, at *12 n. 13 (C.F.T.C Dec. 14, 1989) ("The category of relationships covered by Section [2(a)(1)(B) ] not only includes agents but also any 'official ... or other person acting for any individual, association, partnership, corporation or trust.' Our reference in this opinion to the term 'agent' should be understood as a short-hand reference to the complete statutory category rather than an implicit limitation of the category to common-law agents.").

Vega as principal.[11]

### J. Plaintiff Plausibly Alleges Section 6(c)(1) Manipulation Claims Against Vega and ▮Individual A▮

Section 6(c)(1) of the CEA prohibits the use of "any manipulative or deceptive device or contrivance" in violation of CFTC regulations. *Mish*, at *12 citing 7 U.S.C. § 9(1). CFTC Regulation 180.1 prohibits the intentional or reckless use of "any manipulative device, scheme, or artifice to defraud," as well as intentionally or recklessly "[e]ngag[ing], or attempt[ing] to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person." *Id.* citing 17 C.F.R. § 180.1(a)(1), (3). A plaintiff may plead intentional or reckless conduct by alleging facts showing "an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* The Court previously held that Plaintiff's allegations in the amended complaint did not give rise to a plausible inference of intent or recklessness by Vega or ▮Individual A▮ because Vega and ▮Individual A▮ were not alleged to have engaged in any conduct on April 20. *Mish*, at *13.

The SAC now alleges that Vega and ▮Individual A▮ engaged in conduct on April 20 and such

---

[11] The basis for Vega's argument is that Vega's relationship to the VTDs is supposedly the same as GH Financials' relationship with Vega. This is contrary to the SAC's allegations. There are many key differences in the Vega-▮▮ Agreement and the Vega-GH Financials Agreement. For example, the Vega-▮▮ Agreement provides that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. McGrath Declaration, Ex. 3. The GH Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Ex. 1. The ▮▮▮ Agreement provides that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Ex. 3. The GH Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Ex. 1. The ▮▮▮ Agreement provides that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Ex. 3. The GH Agreement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.*, Ex. 1.

conduct was reckless.  Specifically, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████                  ████████████████████

████████████████████████████████

                      ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  Just four weeks prior to April 20, eight of the VTDs

(including █ Trader 5 █ ) engaged in (manipulative) conduct that was virtually identical to that

which occurred on April 20.  SAC, ¶¶262-275.

Specifically, very similar to April 20, the SVDs conduct on March 19 had numerous

hallmarks of manipulation. See "C" above. Such hallmarks of manipulative trading included: (a)

sell sell sell and don't buy strategy in which they injected substantial net selling pressure via

TAS; (b) the SVDs slowly put net selling pressure into the contract until 12:30 pm; (c) the large

long TAS position gave each of the SVDs a large financial incentive to depress the price of the

expiring April contract and the April May spread; (d) the SVDs then greatly ramped up their rate

at which hthey sold prior to 12:30; (e) more than ████ of their sales on March 19 occurred during

the final hour of trading; (f) the SVDs sales of April contracts were a substantial portion (████)

of the total volume of sales in the last hour of trading; (g) the expiring spread price settled at an

extremely low that was more than four standard deviations away from the average price of the

prior year of trading; and (h) the price of the contract substantially rebounded the following

trading day after the SVDs' manipulative trading pressure had been removed from the market. *Id*.

The above conduct on March 19, 2020 would later be repeated (with substantially greater trading volume) on April 20. The VTDs highly unusual trading on both March 19 and April 20 occurred in the context of Vega and ▮Individual A▮ having undertaken the duty to monitor and supervise the VTDs' trading in Vega's accounts, including to prevent manipulation. SAC, ¶¶280-281. In the foregoing context, Vega/▮Individual A's▮ request to substantially increase the trading limits for ▮Trader 5▮ and Vega on April 20th either was specifically intended to help the manipulation of the May Contract succeed or was, at best, reckless.

Vega argues that Vega and ▮Individual A▮ "are still not alleged to have engaged in any conduct on April 20." ECF No. 148, p. 17. This is false. As detailed above, Vega and ▮Individual A▮ (a) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and (b) Vega itself made all the trades on April 20 acting through its agents because the VTDs were retained to act for Vega and did act for Vega in entering those trades. Third, Vega further "acted" in connection with those trades because Vega and ▮Individual A▮ continued to monitor but breached their responsibility to identify and prevent even potentially manipulative trading activities. SAC ¶¶164, 175, 258-259(a)-(l), 283, 297-309. Vega's foregoing and other conduct on April 20th was at least "reckless" and/or intentional. SAC ¶309.

### K. Plaintiff Plausibly Alleges Aiding and Abetting Claims Against Vega and ▮Individual A▮

Section 13 of the CEA, 7 U.S.C. §13c(a), prohibits aiding and abetting CEA violations committed by others. *Mish*, at *13. To state a claim for aiding and abetting, there must first be an underlying violation of the CEA. *Id*. Here, the Court has sustained Section 9(a) and 6(c)(1) CEA manipulation claims against eight VTDs. *Id*. at *10-13. An aiding and abetting claim also

requires plausible allegations that the aider and abettor "(1) had knowledge of the principal's intent to commit a violation of the CEA…; (2) had the intent to further the violation; and (3) committed some act in furtherance of the scheme." *Id*. at *13. The SAC and its new allegations plausibly allege each of these elements as to Vega and ███████.

**Knowledge**. The SAC alleges that Vega and ███████ had an affirmative duty to "continuously" monitor the trading of the VTDs for potential manipulation and also had a duty to otherwise prevent manipulation in Vega's trading accounts. SAC, ¶¶280-281. The SAC alleges that Vega and ███████ had access to numerous analytical tools, including real time tools, to monitor the trading in the Vega's accounts. *Id*., ¶259. As Plaintiff has previously demonstrated, Defendants Vega and ███████ repeatedly observed the VTDs engage in trading together to commit TAS manipulations, including on March 19. See supra; ¶¶262-275.[12]

**Acts in Furtherance and Intent to Further**. As set forth at pp.4-7 above, Vega and ███████ repeatedly committed breaches of their duty to identify potentially manipulative trading,

---

[12] That is, just four weeks prior to the plausibly alleged manipulative ammo and TAS trading scheme on April 20, eight of the same VTDs engaged in virtually identical manipulative conduct in the preceding WTI futures contract. *Id*. The manipulative trading on March 19 included multiple hallmarks of manipulation that Vega was contractually required to be aware of, such as high a high volume of transactions undertaken in a short period of time that led to a price change that is subsequently reversed. SAC, ¶¶227, 284. The SAC also alleges that persons with much more limited knowledge and access to the VTDs' trading concluded that the VTDs frequently bought and sold in the same direction at key moments. *Id*., ¶¶255-259.

As detailed below, Vega and ██████'s knowledge of the VTDs' intent to manipulate prices on April 20 is further supported by the SAC's allegations that Vega and ███████ ████████████████████████████████████████████████████ SAC, ¶¶293-299. ████████████████████ ███████████████████ The SAC plausibly alleges Vega and ███████ had knowledge of the VTDs' intent to manipulate WTI futures prices on April 20.

Vega and ███████ correctly point out that the communication involving "████████████████" is more plausibly attributed to Defendant ████████ than Defendant ███████. *Compare* SAC 311-313 *with* ECF 148 pp. 8-9.

and detect MAR abuses. See "B" and "C". Instead, they followed their profit interest and allowed the VTDs' "blitzing" of the market to continue. See "F".[13]

### L.  Plaintiff Plausibly Alleges Section 9(a)(2) Manipulation Claims Against Vega and Individual A

A claim for manipulation in violation of Section 9(a)(2) of the CEA requires: (1) the ability to influence prices; (2) an artificial price; (3) causation of the artificial price; and (4)

---

[13] Also, the SAC alleges that Vega and ▇▇▇ took numerous steps to further, and intended to further, the VTDs' manipulative trading on April 20.  SAC, ¶¶293-314.  Such acts included ▇▇▇▇▇▇▇ *Id.* ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇ *Id.* ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇  Fourth, Defendant ▇Trader 5's▇ trading on March 19, and the trading of the other seven VTDs, had multiple hallmarks of manipulation.  SAC, ¶284.  Again, Vega and ▇▇▇ had a duty to monitor the trading in Vega's accounts for potential manipulation.  Instead of investigating ▇Trader 5's▇ conduct, Vega and ▇▇▇ gave him more ammunition.  Fifth, ▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇  These same acts also plausibly reflect an intent to further the manipulation, including an intent to provide access to additional "ammo" on the very same day that the VTDs engaged in substantial volumes of ammo selling.

▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇  It is even more plausible because such increases came just weeks after eight of the same VTDs engaged in virtually identical ammo trading on March 19.

manipulative intent.  *Mish*, 2022 WL 1202679, at \*10.  The Court previously held that Plaintiff had plausibly alleged the first three elements.  *Id*., at \*10-12.  However, the Court held that Plaintiff had not plausibly alleged manipulative intent as to Vega or ███████ including because Plaintiff had not alleged that Vega or ███████ engaged in any conduct on April 20.  *Mish* at \*11-12.  Vega and ███████ argue that the SAC does not allege that Vega and ███████ did "anything on April 20" to plausibly suggest they intended to manipulate WTI futures prices.  ECF No. 148, p. 16.

Contrary to such argument, Vega and ███████ engaged in extensive affirmative conduct. They ████████████████████████████, affirmatively continued to violate their "monitoring/viewing" obligations to identify and prevent potentially manipulative trading activities that set off four different MAR manipulation alarms simultaneously, and continued to follow their ███████████████████████████████████ ███████████████████████████████████████████. *See* "B", "F", and "J"; SAC ¶¶217-221; *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 484 (N.D. Ill. 2007), *aff'd* 571 F.3d 672 (7th Cir. 2009) (motive is probative of manipulative intent).

**M. Plaintiff Plausibly Alleges Unjust Enrichment Against Vega /** ███████

Having now plausibly alleged the CEA violation against Vega and ███████ Plaintiff has also stated a claim for unjust enrichment against them.

**II.    Plaintiff Plausibly Alleges Sherman Act, CEA and Unjust Enrichment Claims Against Defendant** ██████

Plaintiff now makes the same types of incriminating communication and high minute to minute correlation allegations against ██████, which previously sufficed to sustain Plaintiff's claims against the SVD.  *Compare* SAC ¶¶328-333 *with Mish* at \*1-11. First, Defendant ██████

36

had an extraordinarily high degree (███████) text communications during an ██████ period on April 20th with Defendant ███ Trader 2 ███. SAC ¶¶216, 330(a), 330(b), 330(c), and 328-333 generally. This Court has already upheld the Sherman Act, CEA, and unjust enrichment claims against Defendant ██ Trader 2 ██. *Mish* at *1, 8-10, 14.

Defendant Trader 11's high degree of communications with plausible manipulator, ██ Trader 2 ██, demonstrate that they decided to focus their trading on April 20 in the May Contract, discussed how to coordinate and sell the May Contract and buy the TAS, shared information that others were selling the May Contract, even shared their positions with one another, advised one another on what steps to take, and otherwise coordinated with one another their sales of May Contracts and purchases of TAS. SAC, ¶¶328-331.[14]

As the Court previously held, these allegations of soups to nuts coordination in placing the May Contract trades, while discussing that other VTDs were doing likewise give rise to a highly plausible inference of an agreement to manipulate prices. *Mish*, at *8-11.

Second, as a direct result of this high degree of coordination, Defendant Trader 11's

---

[14] An example of the high degree of coordination of the May Contract trading by Defendant Trader 11 occurred at 9:15am London time on April 20th when Defendant Trader 11 stated to Defendant ██ Trader 2 ██ that "████████████████." *Id.* at ¶330(a). In other words, they agreed that they were going to trade in the May Contract that day.

████████████████, Defendants ██ Trader 2 ██ and Trader 11 ████████████████████████████████████████████████. *Id.* at ¶330(b). In other words, ████████████ ████████████████████████████████████.

Further, Defendant ███ Trader 2 ███ shares with Defendant Trader 11 ████████ ███████████████████████████████████████████████████████████████████████. SAC ¶¶330-331. ████████████████████████████████████ ████████████████████ *Id.*

This goes beyond any previous coordination and sharing of information alleged against the SVDs.

positions on April 20 in the May Contract had an extraordinarily high minute to minute correlation with Defendant ███ Trader 2 ███ positions of .99. SAC ¶319. Also, Defendant Trader 11's positions also had very high correlations of .988 to .951 with the positions of Defendants Trader 6 , Trader 4 , and Trader 9 . *Id*.

Additionally, Vega and Individual A's newly produced documents (received long after Plaintiffs filed the SAC) reveal (a) that Defendant Trader 2 ████████████████████████ ██████████████████████████████████████████████ (McGrath.Decl. Ex. 4 at VEGA_MISH_000043304-05); and (b) Defendant Trader 8 ████████████████ ███████████████████████ ████████████████████████ ██████████████████████. McGrath.Decl. Ex. 4 at (VEGA_MISH_000043306)

That is, while communicating at least ██████ with one another, Defendant Trader 2 and Defendant Trader 11 ███████████████████████████████ ████████████████████████████████.

In sum, the extraordinary high degree of specific communication that Defendant ███ Trader 2 ███ and Defendant Trader 11 had about the May Contract and how to trade same, is augmented by the facts that they each were having communications with additional VTDs about the May Contract.

<u>Sherman Act Claim</u>. The Court previously held that allegations of highly correlated trading are sufficient to plausibly allege parallel conduct. *Mish*, at *8. Plaintiff has now plausibly alleged an extraordinarily high minute to minute correlation between Trader 11's positions and Defendant ███ Trader 2 ███ positions of .99. SAC, ¶319. Defendant Trader 11 also had very high correlations with other VTDs. *Id*. With respect to "plus factors" the Court previously held that

communications on April 20 including real-time trade coordination are "strongly indicative of coordination." *Mish*, at *9.  The at least ▮ text messages between Defendant ▮Trader 11▮ and Defendant ▮ Trader 2 ▮ reflect real time trade coordination and virtually constitute an agreement to work with one another to conduct their May Contract trading.

Section 9(a)(2) and 6(c)(1) Claims.  With respect to the Section 9(a)(2) and 6(c)(1) claims, Plaintiff has plausibly alleged manipulative intent and recklessness as to ▮Trader 11▮.  The Court previously found manipulative intent and recklessness plausibly alleged where the VTDs engaged in a high degree of communications, traded the exact same contracts in the same direction on the same day, and had a high level of correlation among their trading positions. *Mish*, at *11-13.  As detailed above, the SAC includes such allegations as to Defendant ▮Trader 11▮.

Section 13 Claim.   For all the same reasons that Plaintiff has plausibly alleged conspiracy and manipulation claims against Defendant ▮Trader 11▮, Plaintiff has also plausibly alleged that ▮Trader 11▮ knew of the other VTDs' intent to manipulate, ▮Trader 11's▮ intent to further the manipulation and acts in furtherance of the manipulation.  *Mish*, at *13.

Unjust Enrichment Claim.  Because Plaintiff has plausibly alleged numerous claims against ▮Trader 11▮, Plaintiff has also stated an unjust enrichment claim.  The SAC alleges ▮Trader 11's▮ unlawful conduct generated approximately $2.8 million in illicit profits.  SAC, ¶138.

### III.  Plaintiff Can Plausibly Allege Sherman Act, CEA and Unjust Enrichment Claims Against Defendant ▮Trader 8▮

Newly produced documents by Defendant Vega in July 2022 (after the SAC was filed) reveal that ▮Trader 8▮ ████████████████████████████████████████ ████████████████████████████████████████████████

██████████████████████████████████████████.[15]  McGrath Decl., Ex. 4.  These

belatedly produced documents reveal that Trader 8 ███████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████.  *Id.*

     ███████████████████████████████████████████████

████████████████████████████  (against whom this Court has already sustained all but

one claim, *Mish* *1, 8-10, 14). McGrath Decl., Ex. 9.[16]  Here again, ███████████████

███████████████████████████████████████████████████████

████████████████████████████.  *Id.*; see fn. 16.  Further, █████████████████████

████████████████████████████████████.  *Id.*[17]

     In addition to Defendant Trader 8's foregoing extensive communications with Defendant

Trader 11 and communications with Defendant Trader 4 █████████████████████████████,

Defendant Trader 8 ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████.  The foregoing real-time communications ████████████████████████████

███████████████████████████████████████████████████████

████████████████, plausibly suggest that Trader 8 was part of and participated in the agreement

_____

[15] "███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████" McGrath Decl., ¶4

[16] ████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

[17] ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

to manipulate prices on April 20 through coordinated selling of May contracts with other VTDs.

Defendant ███Trader 8's███ motion to dismiss correctly points out that Plaintiff had alleged

███████████ in the SAC by and for ███Trader 8███ on April 20. But the communications and other

documents received **after** the filing of the SAC reveal that Defendant ███Trader 8███ had a high degree

of communications on April 20th. Also shown is a transfer on April 21 of $██████ from ███Trader 11███

to ███Trader 8███. This strongly indicates that ███Trader 11███ made May Contract sales for ███Trader 8███ and shared

the profits from such sales with ███Trader 8███. Again, ███Trader 11's███ own trading positions were extremely

highly correlated with numerous other VTDs. SAC, ¶¶ 216, 319, 329, 332. Accordingly,

Plaintiffs may plausibly allege that ███Trader 8's███ recently disclosed $██████ profit received from

███Trader 11███ resulted from May Contract positions that were highly correlated with the positions of

other VTDs. This tends to satisfy the correlation prong of the Court's earlier reasoning.

In sum, the newly produced documents now permit Plaintiff, for the first time, to make

important new communication and correlation allegations against Defendant ███Trader 8███. Such

allegations should be sufficient under the Court's prior Order to plausibly allege claims for

conspiracy in violation of the Sherman Act, manipulation in violation of Sections 9(a)(2), 6(c)(1)

and 13 of the CEA, and unjust enrichment. *Mish*, at *8, 12.

### IV. Plaintiff Plausibly Alleges Section 2(a)(1)(B) Claims Against All VTDs

This Court previously held Plaintiff had plausibly alleged a conspiracy among the SVDs

to fix and manipulate May Contract prices on April 20. *Mish*, at *8-9. Where a co-conspirator

acts in furtherance of a conspiracy, it is "acting for" the conspiracy. *Compare Textor v. Bd. Of

Regents of N. Illinois Univ.,* 711 F.2d 1387, 1392 (7th Cir. 1983) (recognizing "time honored

notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the

other members of the conspiracy.") *with* Section 2(a)(1)(B) (strict liability includes persons

41

"acting for" another).

Here, the VTDs, through their coordinated selling of May Contracts and otherwise each acted in furtherance of the conspiracy. Thus, when each of the SVDs engaged in their manipulative conduct to depress the May Contract, they were "acting for" the conspiracy of the other VTDs. To this extent, each SVD was "acting for" the conspiracy consisting of the seven other SVDs. This renders each SVD vicariously liable under Section 2(a)(1)(B) of the CEA because they were committing manipulative acts while they were "acting for" the conspiracy and other individual SVDs.

V. **Plaintiff Plausibly Alleges Sherman Act, CEA and Unjust Enrichment Claims Against Defendant** Trader 7

Plaintiff newly alleges that Defendant Trader 7's positions in the May Contract exhibited extraordinarily high minute to minute correlations with the May Contract positions of numerous VTDs who this Court has ruled were plausibly engaged in a conspiracy to depress May Contract prices. *Compare* SAC ¶¶318-323 *with Mish*, at *1, 8-10, 14. Trader 7's May contract positions had a .989 minute to minute correlation with Trader 2 , .984 correlation with Trader 11 , .0975 correlation with Trader 6 , .971 with Trader 4 and .944 with Trader 9 . SAC, ¶¶318-323. Many of those correlations are **higher than** the correlations which previously sufficed to show coordinated trading.

Defendant Trader 7 does not mention the extremely high minute to minute correlations of his positions with the foregoing plausible manipulators' positions.

Plaintiff further alleges that ██████████████████████████████████████ ████████████. SAC, ¶315. "██████" includes Individual A and others at Vega, including the VTDs. *Id.* In fact, ████████████████████████████████████ *E.g.*,

VEGA_MISH_000042617 (█████████████████████████████████

███████████████████████████████████) (emphasis supplied); *accord*

https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#L (the

CFTC Glossary defines a "local" as "An individual with exchange trading privileges who trades

for his own account, traditionally on an exchange floor, and whose activities provide market

liquidity. See Floor Trader, E-Local."[18]). Apparently unable to respond to the extraordinarily

high correlations, Defendant Trader 7 ███████████████████████████████

███████████████████████████████████. ECF 136, p. 3. ██████████████████

████████████████████████, Plaintiff has plausibly alleged, under the common

usage of the terms locals, that locals includes Individual A and others at Vega. Trader 7 may not deny that

allegation now.

Although Trader 7 has asserted that ████████████████████████████████

███████ does not include Defendant Individual A Discovery shows that Defendant Individual A was

charged with an additional supervisory duty over Defendant Trader 7, which did not apply to other

VTDs. VEGA_MISH_000042979.

Plaintiff respectfully submits that the foregoing allegations and facts under *Mish* now

suffice to plausibly allege claims for conspiracy in violation of the Sherman Act, claims for

manipulation under the Sections 9(a)(2), 6(c)(1) and 13 of the CEA and unjust enrichment.

*Mish*, at *6-14.

## VI.    Conclusion

---

[18] The CFTC then defines the "E-Local" as "A **person with trading privileges** at an exchange with an electronic trading facility **who trades electronically** (rather than in a pit or ring) for his or her own account, **often at a trading arcade**." See
https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm#elocal
[emphasis added].

Defendants' motions to dismiss claims in the SAC should be denied.[19]


Dated: August 30, 2022


                                      Respectfully submitted,

                                      */s/ Christopher Lovell*
                                      Christopher Lovell
                                      Christopher M. McGrath
                                      **LOVELL STEWART HALEBIAN**
                                      **JACOBSON LLP**
                                      500 Fifth Avenue, Suite 2440
                                      New York, New York 10110
                                      Telephone:    (212) 608-1900
                                        Facsimile:    (212) 719-4775

                                        Marvin A. Miller
                                        Andy Szot
                                        **MILLER LAW LLC**
                                      145 S. Wells Street, 18th Floor
                                      Chicago, Illinois 60606
                                      Telephone:    (312) 332.3400

                                        *Attorneys for Plaintiff Mish International*

                                        *Monetary Inc.*

---

[19] Plaintiff acknowledges that the SACs allegations and the materials available to Plaintiffs to oppose the motions do not satisfy the test in *Mish* to state a claim against Defendant Trader 10.