1                  IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF ILLINOIS
2                        EASTERN DIVISION

3    MISH INTERNATIONAL MONETARY    )  Docket No. 20 C 04577
        INC., on behalf of itself and  )
4    all others similarly situated, )
                                )
5                  Plaintiff,    )  Chicago, Illinois
                                )  October 7, 2022
6                v.             )  11:02 a.m.
                                  )
7    VEGA CAPITAL LONDON, LTD., et   )
        al.,                        )
8                  Defendants.    )

9

10       TRANSCRIPT OF TELEPHONIC PROCEEDINGS - Motion Hearing
              BEFORE THE HONORABLE GARY FEINERMAN

11

12    APPEARANCES:

13

14    For the Plaintiff:       LOVELL STEWART HALEBIAN LLP by
                                MR. CHRISTOPHER LOVELL
15                        MR. CHRISTOPHER M. McGRATH
                                 500 Fifth Avenue, Suite 2440
16                        New York, NY  10110

17                        MILLER LAW LLC by
                        MR. ANDREW SZOT
18                        145 South Wells Street, 18th Floor
                        Chicago, IL  60606

19

20

21

22    Court Reporter:         GAYLE A. McGUIGAN, CSR, RMR, CRR
                        Official Court Reporter
23                        219 S. Dearborn Street, Room 2504
                        Chicago, IL 60604
24                        312.435.6047
                        gayle_mcguigan@ilnd.uscourts.gov

25

```
 1     APPEARANCES:   (Continued)

 2

 3     For Vega Capital          AKERMAN LLP by
       London and                MR. MICHAEL P. KELLY
 4     Individual A:             750 Ninth Street, Suite 750
                                 Washington, DC  20001
 5
                                 AKERMAN LLP by
 6                               MS. AMY GRAHAM DOEHRING
                                 71 South Wacker Drive, 47th Floor
 7                               Chicago, IL  60606

 8     For Traders 1-6 and       DECHERT LLP by
       Traders 8-12:             MR. MATTHEW MAZUR
 9                               1095 Avenue Of The Americas
                                 Three Bryant Park
10                               New York, NY  10036

11     For Trader 7:             MOLOLAMKEN LLP by
                                 MS. MEGAN CUNNIFF CHURCH
12                               300 North LaSalle Street, Suite 5350
                                 Chicago, IL  60654
13
                                 MOLOLAMKEN LLP by
14                               MR. KENNETH E. NOTTER III
                                 600 New Hampshire Avenue, N.W.
15                               Washington, DC  20037

16

17

18

19

20

21

22

23

24

25
```

 1          (Telephonic proceedings heard as follows:)

 2              THE CLERK:  20 C 4577, Mish International versus Vega

 3     Capital.

 4              THE COURT:  For the plaintiff?

 5          (No response.)

 6              THE COURT:  Who is on the line for Mish?

 7              MR. LOVELL:  Chris Lovell, your Honor.  I'm sorry.  I

 8     heard the words, but it didn't register.

 9              And I think Chris McGrath is also on the phone.

10     Sorry, Judge.

11              And thank you, Judge, for rescheduling for my schedule

12     from your -- from this busy court from the earlier date --

13          (Audio interruption.)

14              MR. LOVELL:  -- you had set.

15              THE COURT:  Sure.  No problem.  Sorry for bouncing

16     everything around in terms of timing.

17              Anyone else on the line for the plaintiff?

18          (No response.)

19              THE COURT:  All right.  For Vega --

20          (Unintelligible crosstalk.)

21              MR. SZOT:  Sorry, Judge.  This is Andy Szot also on

22     behalf of the plaintiffs.  Sorry to interrupt.

23              THE COURT:  All right.  For the Vega defendant?

24              MR. KELLY:  Good morning, your Honor.  This is Michael

25     Kelly and Amy Doehring from Akerman on behalf of both Vega and

1    Individual A.

2              THE COURT:  For Trader Number 7?

3              MS. CHURCH:  Good morning, your Honor.  Megan Church

4    and Kenneth Notter from MoloLamken on behalf of Trader 7.

5              THE COURT:  And then for the other traders?

6              MR. MAZUR:  Good morning, your Honor.  This is Matthew

7    Mazur from Dechert on behalf of Traders 1 through 6 and 8

8    through 12.

9              THE COURT:  Anyone else for those traders?

10             MR. MAZUR:  Your Honor, some of my colleagues may be

11   on the line, but I'm the only one who is going to be speaking.

12             THE COURT:  All right.

13             So we have three motions to dismiss for the amended

14   complaint.  I had dismissed, in part, the original complaint.

15   And I had the parties serve 26(a)(1) disclosures.  And there

16   was some written discovery.  But, otherwise, discovery is

17   stayed, and nobody moved to lift that stay.

18             So I've had a chance to review all the recently filed

19   papers.

20             The defendants were last heard in writing.

21             So let me ask the plaintiff, anything in the reply

22   briefs that you would like to respond to orally this morning?

23             MR. LOVELL:  Thank you, your Honor.  This is Chris

24   Lovell.

25             Yes.  Yes, there is.  I'd like to start with Vega and

1    Individual A.

2         The reply brief tries to say that the operations of

3    Vega were undertaken without specifically alleged knowledge

4    that the Vega trading defendants had repeatedly manipulated the

5    market, but the only arguments that are made duck the main

6    arguments which the plaintiff made in the opposition brief and

7    the important allegations in the complaint.

8         To read the reply brief, you would think that they --

9    there needs to be advanced astrophysics for Vega or anybody

10   operating, a principal, to know that the trades that are being

11   made in its good name are manipulative.  It's beyond anybody's

12   ability to -- to know.  But that's totally contrary to the

13   plausibly alleged allegations, which we emphasized at length in

14   our opposition brief.

15        Now, first, your Honor, we newly alleged the MAR

16   rules.  That's the Market Abuse Regime in the United Kingdom.

17   And we emphasized three of those considerations under those

18   rules which set off alarm bells for manipulation.  No mention

19   of these MAR rules.

20        And I'd like to just go over these three, your Honor,

21   very, very briefly.

22        One of them is that the transactions made are made

23   around the time that a benchmark price is set and have an

24   effect on the benchmark.  And that's exactly what happened here

25   on March 19th in the April contract where the same Vega -- Vega

1    trading defendants, whom your Honor has found are plausibly

2    alleged to have manipulated the May contract on the penultimate

3    day of trading in that contract, manipulated the April contract

4    on the penultimate day of trading in the April contract.  And

5    how did they do it?  We alleged, in painstaking detail, that

6    they made -- that they each --

7        (Audio interruption.)

8        MR. LOVELL:  -- sold, sold, sold, put in that selling

9    pressure, built up these large positions gradually and slowly

10   until 12:30 again in the day, same as the April 20th pattern

11   that your Honor found in considerable detail in the decision on

12   the motion to dismiss.  Then, having done that, they ramped up

13   their trading to much higher multiples per minute of trades and

14   engaged in ammo trading for the last hour of trading,

15   especially in the last half hour and the last two minutes.  And

16   they moved the spread between the April contract and the May

17   contract from the level it was at 12:30, when they were going

18   to have a loss, to a record move and a great standard deviation

19   movement in the spread, and it produced a profit for them.

20       And we give the amounts in detail and go through the

21   same numerous subtype of -- numerous subparagraphs and show

22   that the conduct was, in the words of the rule, concentrate --

23   the transactions were concentrated in a short time and led to a

24   price change and was subsequently reversed.

25       Now, that's the UK Market Abuse Regime Annex 1,

1    consideration (e), which is alleged in 224 to 227 of our

2    complaint.  They don't mention this.  And that's exactly the

3    pattern that they looked at.

4         We also allege that in Vega's agreement with G.H.

5    Financials, Vega agreed to be familiar with the rules and to be

6    complying with the rules, including the MAR, at all times.

7         We also alleged, which they do not dispute, that they

8    had a duty to monitor the account at all times and to identify

9    even any potentially manipulative trading.

10        So, here, we have the reprise of the same manipulation

11   by the same eight defendants, at the same time, through the

12   same methodology, with the same horrible numbers, on

13   March 19th.  And the amount of trading in the last half hour is

14   18.5 percent.  We cite to the *Amaranth* case, which had

15   14.4 percent for manipulation.  The only thing we see them say

16   is, "Well, the price movement was only 16 cents."

17        Well, in one of the *Amaranth* manipulations, the

18   alleged price movement was only 3 cents.

19        It's not a question of the amount.  It's a question of

20   whether these red alarms -- or red flags of manipulation of the

21   Market Abuse Regime, which they were contractually obligated to

22   know and follow, were triggered.  And the extent to which the

23   transactions reflect a significant interest is there.  That's

24   the (b) one.

25        The (e) one is concentrated within a short time, lead

1    to a price change, and subsequently reversed.  The day

2    following March 19th, the April contract spread fell back to

3    normal.

4    And then (g) is the extent to which the transactions

5    undertaken would -- during a specific time would impact

6    reference prices, or prices that are calculated to change

7    reference prices, and the trader has an interest in those

8    reference prices.  Every single liquidation order by the Vega

9    trading defendants on March 19th was determined by the TAS

10   price.  By bombarding the market in a manipulative fashion,

11   including 18.8 percent of the market, more than the *Amaranth*

12   case, they manipulated the TAS.

13   It's just -- just screaming -- the alarm bells are

14   screaming that they're manipulating in the same type of

15   situation a month earlier.

16   Now, they -- so that's number one that they don't

17   mention.

18   Number two, they do not --

19   THE COURT:  You know what?  I have limited time, so

20   I'm going to ask that you make your point -- get to the

21   punchline quicker than maybe you were planning on.

22   MR. LOVELL:  Sorry, Judge.

23   And let me try to -- I'm focusing right now,

24   eliminating and sorting.

25   Also in the reply brief by Vega and Individual A,

1    they -- just to boil it down, they -- I'm trying to not go

2    through all the details.

3              They -- they mention the *Bloomberg* articles, your

4    Honor, but they do not mention our emphasis in our brief on the

5    statement by Defendant Lunn who said, you know, "We pushed each

6    other so hard for years, we F-ing blitzed it today," at the end

7    of trading in the May contract on April 20th.  We argued at

8    length that the plausible meaning of this statement is that

9    these defendants repeatedly manipulated the market in the past.

10   It's corroborated by what happened on March 19th, which the CME

11   asked for, and that it's corroborated by two now award-winning

12   articles in *Bloomberg* which quote sources and trading records

13   to say that they frequently, the Vega trading defendants,

14   traded in unison.  No mention at all of Lunn's statement.

15   Nobody tries in any -- if any brief, nobody tries to say --

16   explain why Mr. Lunn's statement doesn't mean what the

17   plaintiff has argued that it does mean.  These mutually

18   corroborating facts, the violation of the MAR, the manipulation

19   on March 19th, *Bloomberg*'s now award-winning articles -- which

20   are alleged in detail in the complaint, your Honor -- and

21   Lunn's statement, which we go on at length what the at least

22   plausible meanings are, which they avoid -- I think they

23   don't -- I think -- and then discovery shows that this did

24   happen a lot.  They do not want to have predicated the motion

25   to dismiss on the notion that they didn't manipulate, so they

1    avoid that.

2         So our main thing as to defendants, the Individual A

3    and Vega, are those points, which are -- which are just not

4    addressed, and which show that this group of people repeatedly

5    manipulated the market, including on the very prior contract

6    that -- the CME was looking into the prior contract,

7    investigating it, and that Vega and Individual A well knew of

8    that.  And far from doing anything to identify even a

9    potentially manipulative activity, they did nothing.  They said

10   nothing about it.

11        Now, last, your Honor, on this, we also allege eight

12   steps that Vega and Individual A engaged in affirmatively on

13   April 20th.  And this includes watching the same sell, sell,

14   sell pattern develop early in the day, watching the gradual

15   orders build up, watching the net selling pressure put in the

16   contract, and then watching everybody ramp up and do the same

17   thing they had done a month earlier.  No emails, no saying,

18   "Hey, what are you doing with our good name?  Why are you doing

19   this?"  Nothing.  And they had a duty to identify potentially

20   manipulative behavior.  They had seen what happened before, the

21   *Bloomberg* -- everything going on.

22        We think we've plausibly alleged, your Honor, that the

23   Vega trading defendants repeatedly manipulated in the good name

24   of Vega.

25        And that satisfies, your Honor, the -- your Honor made

1   specific findings in the initial decision to dismiss.  And the

2   key your Honor found through the 6(e) claim, which involves

3   manipulation or manipulative device undertaking knowingly or

4   recklessly, your Honor said the key was an extreme departure

5   from normal conduct.

6           This is an extreme, extreme departure from normal

7   conduct.  It's way -- it's just joining in with the

8   manipulators when Vega is doing the trades in its name,

9   et cetera.

10          So on the legal points, that's the point.

11          Now, the other point, as quickly as I can go -- sorry

12  I'm taking a little too long maybe, your Honor.

13          The other point is the agency point or how --

14          THE COURT:  Let me stop you right there, and let me

15  turn the mic over to the Vega defendants.

16          I'd like your thoughts on what counsel just said

17  regarding those two defendants.

18          MR. KELLY:  Sure.  Your Honor, this is Michael Kelly

19  from Ackerman on behalf of Vega and Individual A.

20          Your Honor, we do believe that the motion can be

21  decided on the papers, and all of the arguments that Mr. Lovell

22  just set forth we believe have been responded to in the papers.

23  And, in fact, many of these arguments have been raised in

24  connection with the first amended complaint that the Court

25  dismissed against Vega and Individual A.

1    I would just say, at a broad level -- and I'm happy to

2    answer any particular question the Court has -- is that I don't

3    question Mr. Lovell's sincerity and that he believes that if he

4    were Vega or Individual A, he would have been running these,

5    you know, very particular and complicated tasks that are set

6    forth in the briefs in a very compressed time frame, but that

7    doesn't plausibly allege that Vega or Individual A were running

8    those kinds of tests and were looking at the world in the same

9    way that Mr. Lovell does.  And I think that's the standard that

10   they have to meet, under *Twombly*, is -- it's not enough to say,

11   well, I believe this happened and I've got these speculative

12   theories that I think you should have seen this and should have

13   seen that.  What you need to do is allege -- and, Judge, you

14   know, a plausible allegation of the facts that plausibly

15   alleges that you did know those things and you did do those

16   things.  I don't think you can combine sort of a mix of

17   negligence kind of allegations alleging it wasn't rocket

18   science.  We don't see the CME or Futures Commission Merchants

19   issue any kind of alerts on April 20th.  And we don't think

20   it's plausible to allege that Vega should or Individual A

21   should have known that.

22   So I know you're pressed for time, your Honor.  I

23   could go on, but that would be my overall response to

24   Mr. Lovell and, again, would rest on the papers on those

25   points.

1          THE COURT:  Understood.

2          All right.  So, plaintiff, any -- anything with

3     respect to the other defendant?

4       (No response.)

5          THE COURT:  Plaintiff?

6       (No response.)

7          THE COURT:  Mr. Lovell, are you still with us?

8          MR. LOVELL:  I had the mute on.  I was asking you, if

9     I may -- so I'm sorry.

10         I was asking if you heard me.  I'm sorry.

11         I was asking if I might just briefly address the

12    agency point in the contract and based on --

13         THE COURT:  Yes.  Please go ahead.

14         MR. LOVELL:  Yeah, okay.  Thank you.

15         Your Honor, we have quoted the contract provisions

16    here in the new complaint.  We quoted the contract provisions

17    with G.H. Financials, and we quoted the contract positions

18    between -- contract conditions between Vega and the futures

19    facility, Vega facility, and each Vega defendant subscribed the

20    agreement.  Your Honor went through -- we hadn't quoted any of

21    that in the original complaint, your Honor.  And we had said,

22    correctly, that the services that Vega provided was kind of

23    like a broker or an aggregator.  But when you look at the

24    language -- and your Honor said that's not enough, the way you

25    pled this.  So we pled all these facts.  And in our opposition

1   brief, we went at length through the different provisions in

2   the contract.  And, you know -- and we went through the

3   formation of Vega and everything.  This is from paragraphs 240

4   to beyond 250 in the amended complaint, your Honor.

5           Now -- now, Vega and Individual A come back, and they

6   say, oh, but there's a provision in the agreement with

7   G.H. Financials that says that we were -- we are the principal,

8   and the people who put in Vega as the principal, and the

9   people -- the Vega traders who put in the orders are the

10  agents, or you have authority from the beneficial owner to do

11  so.  And the beneficial owner of these transactions is the Vega

12  trading defendants because they had Vega -- they had trading

13  discretion.  And we have answered that at length in our papers.

14  We've gone through the contract provisions and shown that the

15  Vega -- that the initial trading balance in the account was not

16  a deposit.  The sub-accounts were the exclusive property of

17  Vega during the term of the agreement.  The traders had no

18  right to obtain the trading balance that they put in.  They

19  only had a right, a limited dumbed-down right, to request

20  profits.  And the definition of profits means you have to pay

21  all these expenses we've paid you -- we've charged you.  You

22  have to do all these other things that are involved.  They had

23  a -- to give information for possible trades, and they had

24  different things that were providing -- you have to pay those

25  expenses.  And you also have to be responsible for others, and

1  we can withhold for this and we can withhold for that, and the

2  sub-accounts are ours.  So there's no right to get the futures

3  contract.  They don't have discretion to even hold the futures

4  contract overnight.  They have a contract right, limited to a

5  contract right, to get, quote, profits, and they can't get

6  their initial balance back.

7          Meanwhile, after they make -- after Vega makes the

8  agreement with G.H. Financials, they could have said in the

9  agreement with the traders and futures facility, they make that

10  agreement later, they could have said you are the beneficial

11  owners.  They don't ever say they're the beneficial owners.

12  Instead, they limit them down to having this contract -- yes,

13  they have the discretion to make a trade during the day or not.

14  But what happened to the outcome of that?  They couldn't get

15  the futures contract.  They didn't have any beneficial owner

16  right to that.  They didn't have any beneficial owner right to

17  the money they put in.  They didn't have any beneficial owner

18  right to the outcome of the trade.  They had a contract right

19  to the profits that are left over after all of Vega's charges.

20  And that, your Honor, we -- so we've argued that we've

21  plausibly alleged that they were not a beneficial owner.

22          We noted -- we noted that -- we know what the other

23  agreements are in discovery.  And we're very confident that,

24  when discovery happens, it's going to be very clear that

25  when -- that these traders cannot be the beneficial owners.

 1    And if they were the beneficial owners, it would be in conflict

 2    with other agreements that Vega made with Starmark and other

 3    things that haven't been alleged, your Honor.  And so the one

 4    out that they had in their opening brief, they really have not

 5    done anything to answer our arguments on.

 6         Thank you, your Honor, for letting me go into that

 7    point.

 8         THE COURT:  Sure.

 9         And I'll turn the mic back over to the Vega

10    defendants.

11         MR. KELLY:  Thank you, your Honor.  This is Mike Kelly

12    again for Vega and Individual A.

13         I would have three responses to what Mr. Lovell just

14    said, one of which is -- and I think we pointed this out in the

15    brief -- is that the plaintiffs have misquoted the

16    G.H. Financials' agreement which makes it clear that G.H. --

17    that Vega would have authority from the sole beneficial owner

18    as an alternative.

19         We also don't believe that Vega -- I'm sorry, that the

20    plaintiffs have correctly quoted the trader agreement, which

21    indicates that the initial capital can be put in by the

22    individuals or by Vega, but there's no allegation that Vega

23    actually put the capital in.  That's just something that the

24    plaintiffs are kind of surmising.

25         And the third point I would make is, if you look at

1   the Exhibits 6 and 7 that the plaintiffs submitted with their

2   response to the motion to dismiss, those were the financial

3   statements from Vega.  And you'll see that Vega purports that

4   it has creditors in the amounts of money that the plaintiffs

5   think were profits from the trading.  But if it were Vega's

6   money, Vega wouldn't be reporting it as money owed to

7   creditors.  It would be money that Vega would owe.

8          So I would say that the exhibits that the plaintiff

9   submitted with their response actually just undercuts their

10  claim that somehow that -- that Vega was the party that

11  established the amounts that were contributed to these initial

12  accounts.  And, again, I think the underlying or overriding

13  kind of theme is that they can't allege things based on what

14  they think may have happened; they have to have a factual basis

15  to allege that it did happen.  And that they don't have.

16          THE COURT:  All right.  Thank you.

17          Plaintiff, anything further?

18      (No response.)

19          THE COURT:  Plaintiff?

20          MR. LOVELL:  I did the same thing with the mute.

21          Your Honor, just very briefly, in less than ten

22  seconds, the Biagioni fragment, which we mentioned in the -- in

23  the brief, we say that that shows that -- it's not 100 percent

24  clear, but it shows to plaintiff that Vega did contribute

25  capital -- or -- to the initial balance.  But if Vega did not

1   contribute to the initial balance, it makes the agreement even

2   more one-sided, and as though Vega is being paid off for taking

3   high-risk manipulative business in and doing it in its name,

4   because Vega gets the initial balance back.  That they do not

5   question.  There is no right to get the deposit back.  It's not

6   a deposit.  It's -- it goes to Vega.  There's all these

7   payments to Vega that are consistent with undertaking a

8   high-risk business to facilitate manipulation in Vega's name.

9          Okay, so -- that's been more than ten seconds, your

10  Honor.  That is -- that was the main point that I had.

11         I think that -- on the traders, your Honor, do you

12  still have time for me to talk a little bit about the traders?

13         THE COURT:  Yes, why -- let me ask that you focus in

14  on -- let me ask that you focus in on Trader 7.

15         MR. LOVELL:  Yes, your Honor.

16         Well, unlike the other traders, the production of

17  documents by Trader 7 did not provide us with incriminating

18  communications, communicating with the other traders and -- and

19  making orders for one another and -- and all the other facts

20  that we have as to Traders 8, 11 and -- you know, a high degree

21  of communications.  So we don't have the communications.  And

22  to the extent, as I -- we said in the brief, your Honor, to the

23  extent that the standard in the first Mish decision by your --

24  and your Honor did say in that that the plus factor was

25  communications.  To go against myself, but to be an officer of

1    the court, your Honor, your Honor said that the plus factor was

2    communication, and the high degree of correlation was not

3    called just merely parallel conduct.  It was called to be

4    plausible indication of conspiracy.  But your Honor did not

5    list it as a plus factor.

6         So with regard to Trader 7, Trader 7 is at a lower

7    level that -- that plaintiff has Trader 7 at a lower level than

8    everyone else.

9         And the question -- in the confines in which the

10   plaintiff is operating is what I'd like to bring out, your

11   Honor.

12        There are -- there's -- you know, it's something we've

13   had discovery -- no, we haven't had discovery.  Thanks to your

14   Honor, we were allowed to get copies of whatever was produced

15   to the CME and -- and also it was added, in late August or

16   early September, it was added, some documents, that have been

17   produced by Vega to G.H. Financials and could have gone to the

18   CME.  I don't know what happened.  And within the confines of

19   those documents, the statement by Trader 7 is that Trader 7 did

20   not talk to anybody about the May contract during a certain

21   time window, which includes April 20th.  So plaintiff has not,

22   in good faith, alleged a manipulative, conspiratorial

23   communication in the complaint.

24        However, however -- and that's the difference, your

25   Honor.

1        Now, the correlation -- the position correlation

2    between Trader 7 and other traders we allege and have in there

3    is higher than the correlation of others.

4        Trader 7 is the only trader who -- this is in our

5    brief, your Honor -- is the only trader who was supervised by

6    Individual A from Vega.  And there was -- as we argued in our

7    original brief, but it was not accepted, your Honor, and

8    continue to argue -- there was an opportunity to conspire, big

9    time.

10       And in the reply brief from Trader 7, Trader 7 says --

11   and I think this is done in -- ethically because of what could

12   happen in discovery, but I don't know, just based on doing this

13   for 40-plus years, that's what I think they were doing -- they

14   said, okay, well, if we did communicate with Individual A or

15   anybody else about the market, then we communicated with them

16   about the market, but our statements stand that we didn't talk

17   to them about the May contract at this time.

18       And we're not able to allege the types of

19   communications that sufficed in Mish 1 as to them, and we put

20   them last in what we briefed.

21       But, your Honor, we respectfully submit that that high

22   degree of correlation did not happen through accident.  And the

23   highest degree of correlation is between Trader 7 and -- and

24   others, and that the opportunity to conspire was here.

25       The communications that happened between Trader 7 and

1    anyone else during this time are a matter for discovery.  And

2    there are at least plausible indications from how similar

3    Trader 7's trading was.  There's not a small amount of trading.

4    There's a lot at risk.  And all the huge profits that Trader 7

5    made are -- excuse -- add -- Trader 7's trading added to the

6    impact on the market and all the profits that Trader 7 made are

7    attributable through the manipulation to the extent it's found

8    that the manipulation moved prices, so that Trader 7 is also a

9    great beneficiary of what the other Vega traders were doing.

10           And based on those grounds, comma, and everything

11   else, your Honor, that I don't have time to go into, comma, we

12   respectfully submit that there's still enough there on

13   Trader 7.

14           Thank you, your Honor.

15           THE COURT:  Sure.

16           You had mentioned that there's something that you are

17   of the view ought to be a plus factor and I held that it

18   wasn't.  What is that in particular?  Is it just the high

19   degree of correlation?

20           MR. LOVELL:  Well, yes, your Honor.  I thought that

21   the high degree -- the high degree of correlation --

22           THE COURT:  I'm sorry.  So what -- what is it that you

23   think ought to be a plus factor and I said is not?

24           MR. LOVELL:  Well, your Honor, I think it's very

25   probative.  The high degree of -- let me put it this way.

1          Let me just answer the facts first and then go to the

2   plus -- I'm not -- I have not said that your Honor should have

3   found it to be a plus factor.

4          I'm saying that --

5          THE COURT:  By the way, it's okay.  It's okay to

6   disagree with the analysis in the first opinion.  I just want

7   to know what your position is.  Tell me what your position is.

8   Is there something that I said --

9      (Unintelligible crosstalk.)

10         THE COURT:  Let me ask my question.

11         Is there something that I said is not a plus factor

12  that you think ought to be a plus factor?  If so, what is that?

13         And, second, what authority do you have for that legal

14  proposition?

15         MR. LOVELL:  Your Honor, the -- the -- it's very

16  probative, whether it rises to the level of a plus factor or

17  not, that the method of trading used by Trader 7 is sell, sell,

18  sell, puts net selling pressure on, and then increase the

19  selling during the last hour.  That -- those are not just

20  parallel acts.  They are parallel acts that have the impact of

21  hitting the market.

22         Now, that's one point.

23         And then add in this, they -- they're executed in a

24  way that has a high minute-to-minute position correlation

25  highest with -- with other defendants.  If there was any

1  movement by Trader 7 that would go against the impact on

2  prices, that would destroy the correlation.  But every step

3  that Trader 7 took is consistent with moving those prices and

4  profiting with it.

5          So bringing this all together in that context of

6  everything you have to go through, and what we alleged,

7  paragraph by -- you know, all the subparagraphs, your Honor,

8  it's all parallel conduct throughout that.

9          And so what I would say is when there's so much

10  unusual conduct that achieves the same outcome, that is, puts

11  selling -- net selling pressure on prices and ramps up that

12  selling pressure during the last hour, that that's enough

13  unusual parallel conduct to justify an inference of trading

14  agreement.

15          Their own case is *Twombly* and *Iqbal* that they cite

16  repeatedly -- well, I might be getting them mixed up.  Vega

17  cites repeatedly to *Twombly* and *Iqbal*.  They recognize that

18  highly unusual parallel conduct that has the purpose of moving

19  the price and is -- is something that's -- you know, is

20  something that's indicative of conspiracy.  It's not legitimate

21  business conduct.  And that -- so that's the argument, your

22  Honor, without saying that I have a case that says that a high

23  correlation is a plus factor.  That's -- that's something for

24  your judgment and discretion, and I'm not going in that box.

25  But I am saying that with all these other circumstances, I

1    think we've alleged much more than just mere parallel conduct

2    by Trader 7.  I think we've alleged parallel conduct that has

3    all the effects of manipulating the prices and is too much like

4    what everybody else did to win a motion to dismiss on the

5    grounds that nothing here passed me by, I'm not the same as

6    them, even though we don't have the communications and -- on

7    the record so far, we don't have any -- we can't -- given what

8    Trader 7 said, we can't, in good faith, make that type of

9    allegation as to Trader 7.

10         THE COURT:  All right.  Let me turn the mic over to

11   Trader 7 and get your thoughts on the past few moments of

12   discussion.

13         MS. CHURCH:  Yes, your Honor.  Megan Church on behalf

14   of Trader 7.

15         We appreciate plaintiff's counsel's recognition that

16   essentially they have no plus factors.  They have the great

17   hope for plus factors, but they don't currently have those plus

18   factors.  And that's essentially what is required under the law

19   to withstand a motion to dismiss.

20         They have had many opportunities and substantial

21   discovery already.  The fact that they do not have

22   communication --

23         (Audio interruption.)

24         MS. CHURCH:  -- with Trader 7 -- I'm hearing someone

25   else on the line.  I'm not sure --

1          (Audio interruption.)

2               MS. CHURCH:  Someone must not be on mute --

3               THE COURT:  Yes.  So I think Ms. Church has the floor,

4     so if everybody else can put themselves on mute, please.

5               Go ahead.

6               MS. CHURCH:  Sorry, your Honor.

7               The fact that there are no communications between

8     Trader 7 and any of the other traders during this period of

9     time, which we think would exist if they did, is something that

10    plaintiff cannot get beyond.  They simply do not have it at

11    this point.  And it's based on the other well-pled allegations

12    as well as the documents that plaintiffs reference, Trader 7

13    simply didn't have those communications.  And while they have

14    hope that he did, the evidence that your Honor can consider at

15    this point in time, based on those materials, is that he simply

16    did not.  And what is required to withstand the motion to

17    dismiss are those plus factors.  They just aren't there.  They

18    don't exist.

19              And after these multiple rounds, Trader 7 should be

20    allowed to get out of this case, Judge, to state it very

21    plainly.  There is simply no there there.  And plaintiff has

22    the burden of establishing that they should be moving forward,

23    and they simply cannot at this point with what they have.

24              So we're happy to answer any questions you have about

25    Trader 7, but, otherwise, we would stand on our briefs.

1          THE COURT:  All right.  Thanks.

2          And then just in the few moments that we have, let me

3   just ask the counsel for the other traders, everybody but 7, to

4   address 8 and 11.

5          And 11, you know, there's an allegation of high

6   trading correlation, which, at least by my (inaudible) is not

7   enough, but then there's 48 texts over an 8-hour period with

8   Trader 2 discussing shorting strategy, and then the lengthy

9   phone call with Trader 8, which kind of ropes Trader 8 into --

10  into what Trader 11 was doing.  If you could -- if you could

11  give me your thoughts on those two.

12         MR. MAZUR:  Thank you, your Honor.  This is Matt Mazur

13  on behalf of Traders 8 and 11 in this instance.

14         Your Honor, obviously, these are among the smallest

15  traders.  And if you look at page 7 of our initial brief, you

16  can see just how small they are.  Not people who could possibly

17  hope to have an impact on the global market for West Texas

18  Intermediate Crude futures.  We appreciate -- I appreciate what

19  you just said about the minute-to-minute correlation not being

20  enough.  And, obviously, we agree.

21         We would also say that simply the fact of a

22  communication with another trader, also not a particularly

23  large trader, if you look at Trader 2, about trading strategy

24  brings somebody within the ambit of an agreement to restrain

25  trade within market manipulation.

1    I think that the plaintiff seems to have read the

2  Court's decision in the earlier round of motions to dismiss to

3  mean, well, you know, if we can show that somebody sold the May

4  contract and a communication, that that is necessarily making

5  out a plause -- a plausible case for an agreement to restrain

6  trade and manipulation.

7    But that's not, I think, how we read the decision, and

8  it's not the law.  You have to look at what the communications

9  are.

10    In this case, we can actually see what they are.  And

11  they're not of the nature of those communications that the

12  Court previously said, you know, raised -- you know,

13  constituted plus factors.

14    So simply saying, you know, what are you doing here,

15  are you selling, you know, simply asking, you know -- one of

16  the traders, Trader 2, is a very young, new trader, and was

17  asking, you know, how to read his screen.  And he says you just

18  add up these numbers and offset them against each other.

19    These are not communications along the lines that the

20  Court had seen with respect to other traders, which we think,

21  frankly, don't raise an inference of manipulation or an

22  agreement to restrain trade either.

23    But we understand that the Court had issued its prior

24  ruling, and we would ask not to litigate it again, and we're

25  not.

1        But I'd like to point out just that the communications

2   here are simply not of that quality.  It's not that we don't

3   know what the communications are.  We do.  And we've attached

4   them to the brief, and they --

5        (Audio interruption.)

6        THE COURT:  Right, but wasn't the subject of the

7   communications shorting strategy on a day when the allegation

8   is that there was this shorting strategy that pushed things in

9   the negative territory?

10       MR. MAZUR:  But, your Honor, this is a day -- and we

11  tried to say this from the beginning -- this is a day when any

12  trader of oil in the market, in the world, would have seen,

13  given the factors in the market, right -- which is an

14  oversupply of oil, a global pandemic where people -- where

15  demand for oil is going down to nothing, and storage facilities

16  at the place where the contract -- the physical delivery has to

17  take place -- everybody could understand that this price was

18  going down and that the right thing to do would be to short the

19  market.  It was so obvious to everybody that the CME put out

20  notices multiple times in the weeks leading up to April 20,

21  2020, and on the day that the price of this contract could go

22  negative.  It told people make sure your computer systems can

23  handle negative pricing here.  This was a market where

24  everybody knew the direction that it was going.  And anybody

25  who was doing what our clients do for a living understood that

1    they were going to have to be short in order to make money

2    here.  And that's what they did.

3            When you look at these traders, they didn't trade --

4    Mr. Lovell described the strategy as building up a big position

5    in the TAS market and then trading to push the settlement price

6    down.  These guys didn't trade in the two-minute window between

7    1:28 and 1:30 p.m. when the settlement price is determined.

8    They're like everybody else looking at the market and saying

9    this market looks like it's going down and, as a trader, I

10   would like to sell at the price it's at now and buy at the

11   price that it settles at.  And the fact that they were talking

12   about it on the -- on text messages and asking about it and one

13   told the other one, look, my computer is not working great

14   today, I'm trading from home and the internet connection is not

15   great, would you do some of that for me, none of that puts them

16   within the ambit of a conspiracy or suggests in any way that

17   they're trying to manipulate the market.

18           And, you know, overwhelmingly, the size that they're

19   trading, I think, speaks volumes.

20           And, you know, essentially there still are no plus

21   factors when you look at the totality of the circumstances that

22   are alleged.

23           It would simply bring the bar way too low on a motion

24   to dismiss to suggest that anybody who sold the May contract in

25   this market and had communications about the shorting strategy

1    would -- you know, has to go through a federal lawsuit and the

2    cost of discovery and litigation because they had these

3    communications, when they couldn't possibly have had any impact

4    on the market, that simply would be the wrong outcome here.

5         And if you actually scrutinize what is alleged in the

6    second amended complaint, there is still a lack of a plausible

7    case.

8         THE COURT:  All right.  Your chart does show that

9    Trader 11 did trade throughout the day and accelerated towards

10   the end.  Trader 8, there's just one contract -- or two

11   contracts that Trader 8 was trading through Trader 11.  Right?

12        MR. MAZUR:  Trader 8 asked Trader 11 to place some

13   trades.  29 contracts in the last half hour -- that's not the

14   settlement window at the end there.  These are not numbers that

15   could possibly impact the global WTI market, and they don't

16   compare at all to the numbers that you see elsewhere in the

17   chart.  You know, there are -- they're just not at the level

18   where you have any impact in a global market --

19        THE COURT:  What's the authority for the proposition

20   that the lower volume -- the lower number of contracts is

21   pertinent either under Section 1 of the Sherman Act or the

22   Commodity Exchange Act?

23        MR. MAZUR:  Well, the theory -- the plaintiff's theory

24   is that -- that people dumped large volumes, and these guys

25   didn't do that.  They just didn't act in the parallel way that

1    the plaintiff says is so significant here.

2          And that, I think, is really the -- is the point that

3    I'm trying to make, not that there's a certain number of

4    contracts that is simply too small.

5          It's really that, you know, A, they couldn't possibly

6    have had the impact in a market of this size; but, B, that when

7    you see the size that they're trading, they didn't do what the

8    plaintiff is alleging is the manipulation.

9          THE COURT:  All right.  If --

10         (Unintelligible crosstalk.)

11         MR. LOVELL:  Thank you, your Honor --

12         THE COURT:  If you could give me five minutes.

13         MR. LOVELL:  Yes.  Will do, your Honor.  And I'm

14   trying to integrate here.

15         The reason conspirators join together is that they

16   don't have the power on their own to do something.  It's not

17   that -- there is no -- nothing in the law that I know of that

18   the smaller people who are in on an agreement are excused.  And

19   there's some -- it's always the people -- and so, here, there's

20   a chain of traders, and Trader 11 dealt with -- actually, we're

21   allowed to -- I think -- we're allowed to now say the eight

22   trader names who --

23         THE COURT:  Let's just use numbers.  Let's just use

24   numbers.

25         MR. LOVELL:  Okay.  Will do, your Honor.  Trader 2 --

1      Trader 11 spoke to Trader 2 all day long.  And they discussed

2      early on, before the market opened, that WTI is the game,

3      they're going to go short.  They went back and forth.  They

4      shared trading positions.  Trader 2 is with Trader 1 all day,

5      plus are on other things, so that everything is hooked

6      together, and they're all acting together and the

7      communications are flowing.  And this is just on a limited part

8      that the curtain has been pulled back that we've looked at.  So

9      there's a direct communication flow from Trader 2, who is with

10     Trader 1, who is this hub of everything, that goes to

11     Trader 11, and goes back to Trader -- from 11 back to Trader 2,

12     and Trader 11 is helping Trader 2 execute the steps, so that

13     it's all on that selling pressure if you accept the innocent

14     explanation -- the innocent interpretation of the

15     communications just provided.

16          So that does not -- you know, what's the plausible

17     interpretation of the totality of the circumstances, and also

18     given that the -- Trader 11 and Trader 8 and Trader 2 were

19     guaranteeing Vega against everybody else's losses, the

20     plausible interpretation is that they worked together because

21     none of them alone had the ability to ensure the outcome.  And

22     there is a communication that relates to them, and that is the

23     communication that says is everybody short?  And we've shown

24     that the word "everybody" is used to refer to all these

25     traders, and the answer is yes, back and forth, between other

1   traders that day.

2        So, yes, there is a communication that relates to

3   them.  And there's all these 45 commun -- 48, whatever it is,

4   between Trader 2 and Trader 11, and then it connects up to

5   Trader 8.  And Trader 8 and Trader 11 mutually make trades for

6   one another, and there's a transfer to Trader -- from Trader 11

7   to Trader 8 on the next day of $750,000, which we now see from

8   the later documents was a share of the profits from the

9   trading.

10       And your Honor -- your Honor's original question,

11  basically, is what is the ratio of the trades that were done

12  before the last half hour of trading when all the ramp-up

13  occurred and during the last half hour.

14       And with the new documents and the profits, it's clear

15  that the worst ratio of all of making your transactions,

16  apparently, if those transactions were all done during the last

17  half hour, and were done for Trader 8, Trader 8, small in

18  their -- in his own account, actually has the worst ratio of

19  all of ammo transactions.  And we have to get discovery and

20  make sure that that's what it is, but that's certainly a

21  plausible interpretation.

22       Now, the other argument behind this, your Honor, is

23  smallness.

24       And I began with the point on the agreement, and to

25  try to finish within five minutes, I just want to point out

1    that to go back to Trader 7, Trader 7 is large.  Trader 7 has

2    what Trader 11 and Trader 8 are arguing is the key to being in

3    the agreement.

4            This argument actually reinforces the argument and the

5    case law that says it's not necessary to have an express

6    agreement.  It's not necessary to be able to quote

7    communications at the beginning of the case.

8            And, yes, they are a plus factor, but it's not

9    necessary to have that to plausibly allege the agreement.

10           I respectfully assert that the argument you've heard

11   is an argument that cuts against Trader 7's argument because

12   Trader 7 did do all these highly unusual acts which have the

13   effect of driving down the price and did it in a very large

14   size and has the highest correlation.

15           Thank you, your Honor.  I hope I stayed within the

16   time.

17           THE COURT:  Barely.

18           MR. MAZUR:  Your Honor, could I just reply to one

19   thing?  This is Mr. --

20           THE COURT:  Yeah, just very briefly, because I have to

21   hop off.

22           MR. MAZUR:  Okay.  Your Honor, I just want to, you

23   know, make --

24           THE COURT:  You are who?

25           MR. MAZUR:  Sorry, this is Matt Mazur again on behalf

1    of Traders 8 and 11, just responding to what Mr. Lovell just

2    said.

3              "Possible" is not the same as "plausible."  Right?

4              It is not illegal to ask another trader what he's

5    doing, what others are doing during the day.  It doesn't raise

6    an inference that you've agreed with that trader to manipulate

7    the market.

8              And certainly if you look at the trading and you look

9    at the size and you look at the way that it doesn't meet the

10   pattern, that doesn't raise a plausible inference.

11             And it's not an argument to say we need discovery in

12   order to find out what really happened here.

13             So that's the only thing I wanted to say.

14             Thank you.

15             THE COURT:  All right.  Thanks to everybody, all

16   counsel, for your excellent briefs and for responding to my

17   questions this morning.  I guess for some of you it's

18   afternoon.  I'm going to take the motion under advisement.

19             Jackie, can you please set this for the week of

20   December 12?

21             THE CLERK:  Sure.  One moment.

22             How about we set you for December 13th at 9:30 a.m.?

23             THE COURT:  It will be my aim to issue a ruling before

24   then.  If I'm able to do so, we'll kind of narrow what the

25   contours of the case will be going forward.  If I'm not able to

1    do so, I'll just kick the status out by another month or so.

2                Thanks, everybody, and stay safe and be well.

3                MULTIPLE SPEAKERS:  Thank you, your Honor.

4         (Proceedings concluded at 11:56 a.m.)

5                      C E R T I F I C A T E

6         I certify that the foregoing is a correct transcript, to

7    the extent possible, of the record of proceedings in the

8    above-entitled matter, given the limitations of conducting

9    proceedings via telephone.

10

11

12   */s/ GAYLE A. McGUIGAN*                    *November 9, 2022*
     Gayle A. McGuigan, CSR, RMR, CRR                Date
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25