UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MISH INTERNATIONAL MONETARY INC., on behalf of itself and others similarly situated, | ) ) ) |
| | ) 20 C 4577 |
| Plaintiff, | ) |
| | ) Judge Gary Feinerman |
| vs. | ) |
| | ) |
| VEGA CAPITAL LONDON, LTD., TRADERS 1-12, INDIVIDUAL A, and JOHN DOES 1-100, | ) ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Mish International Monetary Inc. brought this putative class action against Vega Capital

London, Ltd., its owner ("Individual A"), and twelve traders associated with Vega ("Trading

Defendants"), alleging that they conspired to manipulate the West Texas Intermediate ("WTI")

Light Sweet Crude Oil futures market in violation of Section 1 of the Sherman Act, 15 U.S.C.

§ 1, several provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq*., and state

law. Doc. 37. Defendants moved to dismiss the amended complaint, and the court denied the

motions as to (most of) the claims against Traders 1-6, 9, and 12; granted the motions as to

Traders 7-8 and 10-11, Vega, and Individual A; and gave Mish an opportunity to replead.

Docs. 116-117 (reported at 596 F. Supp. 3d 1076 (N.D. Ill. 2022)). Mish filed a second amended

complaint, Doc. 129, which Defendants move under Civil Rule 12(b)(6) to dismiss in its entirety,

Docs. 135, 140, 146, except as to the claims against Traders 1-6, 9, and 12 that survived

dismissal in the court's prior opinion, Doc. 140 at 1. The present motions to dismiss are granted

in part and denied in part.

**Background**

In resolving Defendants' Rule 12(b)(6) motions, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Mish's brief opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013). The facts are set forth as favorably to Mish as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

A.     **The Parties**

Mish is a corporation that traded on the Chicago Mercantile Exchange ("CME") through its brokers on April 20, 2020. Doc. 129 at ¶ 29. Vega is a corporation that maintains a trading account with G.H. Financials LLC, a futures commissions merchant, which allows Mish to trade on the CME. *Id.* at ¶¶ 30-31. Individual A is Vega's sole owner. *Id.* at ¶ 34. Traders 1-12 are persons who maintained accounts with Vega and traded in the name of and through Vega on April 20, 2020. *Id.* at ¶¶ 31-32, 38. (The court allowed Traders 1-12 and Individual A to proceed anonymously, without prejudice to any party or non-party moving to reveal their identities. Doc. 81. No such motion has been filed.)

The Trading Defendants committed their own capital to Vega to guarantee each other's losses. Doc. 129 at ¶ 4. Pursuant to a Group Trader Agreement among Vega, the Trading Defendants, and Futures Trading Facilities Limited—a company owned in part by Trader 1—the

Trading Defendants paid Vega facility and commission fees for trading in Vega's name. *Id*. at ¶¶ 36, 122, 238-239; Doc. 159-3 at 5. Pursuant to a separate (and apparently oral) agreement, Vega was entitled to a share of Futures Trading Facilities' profits, which are determined in part by the trading profits of Traders 11 and 12, who owed a share of their profits to Futures Trading Facilities. Doc. 129 at ¶¶ 36, 122. Notwithstanding Vega's financial interest in the Trading Defendants' trades, each trader was "solely responsible for all trading decisions on the Sub-Account allocated to him/her." *Id*. at ¶ 239; Doc. 159-3 at 6.

### B. The Alleged Scheme

As explained in greater detail in the court's earlier opinion, 596 F. Supp. 3d at 1085-90, this case concerns Defendants' alleged scheme to profit from coordinated manipulation of the WTI futures market on April 20, 2020. The WTI futures market is a commodity futures market in which parties enter contracts to buy or sell a specific amount of crude oil, at a predetermined price, on a specific date in the future. Doc. 129 at ¶ 72. The buyer of a futures contract holds a "long" position and the seller holds a "short" position. *Ibid*. The buyer must receive physical delivery and pay for the oil if he holds the contract on the delivery date; likewise, the seller must physically deliver the oil if he holds the contract on the delivery date. *Id*. at ¶¶ 72, 79. The delivery date for the WTI futures contracts involved in this case (the May 2020 WTI futures contracts) was April 21, 2020. *Id*. at ¶¶ 1, 81; *see* Doc. 72 at 11; Doc. 99 at 6-7. This meant that persons holding a long position on April 21 (the day after Defendants' alleged market manipulation) were required to receive delivery of WTI crude oil as specified in the contracts they held. Doc. 129 at ¶ 72.

Most crude oil futures contracts are not delivered, but rather are satisfied or liquidated through trading. *Id*. at ¶ 74. To satisfy a futures contract through trading, a trader offsets his

positions. *Id*. at ¶ 75. For example, a trader who holds a long position to accept delivery of a certain number of barrels on a particular date can sell a contract to deliver the same amount on the same date, thereby liquidating both positions. *Ibid*.

Persons trading on the CME can place an "order," which is a request to buy or sell a certain number of futures contracts. *Id*. at ¶ 95. An order seeking to buy futures contracts is a "bid," and one seeking to sell is an "offer." *Ibid*. A sale occurs when there is a price match between the price a bidder is willing to pay and the price an offeror is willing to accept. *Ibid*. An aggressive order is one that immediately triggers a trade by making a bid that matches an offer already in the market or an offer that matches a bid already in the market. *Id*. at ¶ 146.

Daily settlement prices of WTI crude oil futures are determined each trading day between 1:28 p.m. and 1:30 p.m. Central Time. *Id*. at ¶ 81. Trading at Settlement ("TAS") contracts allow a trader to enter contracts at the daily settlement price. *Id*. at ¶ 86. That is, a trader can buy or sell a contract before the two-minute settlement window, at any time during the trading day, at what later will become the settlement price. *Id*. at ¶¶ 86-87.

As with most markets, futures contract prices rise when demand exceeds supply and fall when supply exceeds demand. *Id*. at ¶¶ 92-94. In general, sales of futures contracts depress prices while purchases increase prices. *Id*. at ¶ 92. The more contracts a trader sells and the less he purchases generally will result in cumulative net sales and downward pressure on futures prices. *Id*. at ¶ 93. A trader who makes more aggressive sales than aggressive purchases exerts greater downward pressure on prices. *Id*. at ¶ 153.

Mish alleges that Defendants coordinated on April 20, 2020 to buy a large number of May 2020 contracts via TAS while also selling a large number of May 2020 contracts, with progressively greater sales as the two-minute TAS window approached. *Id*. at ¶¶ 132-135. The

intent of the heavy selling, according to Mish, was to artificially lower the May 2020 contract price, allowing the Trading Defendants to obtain a large number of May 2020 contracts via TAS at that artificially low price. *Id*. at ¶¶ 88, 133-135. As Mish tells it, the effort to manipulate the market was successful: WTI futures price went negative for the first time in history, reaching as low as negative $42 per barrel. *Id*. at ¶¶ 135-136. Negative prices mean that traders were willing to pay to avoid holding a contract on the delivery date, as they might do to avoid incurring the cost of accepting physical delivery of crude oil. *Id*. at ¶ 85; *see* Doc. 72 at 10-11; Doc. 99 at 6-7. The alleged scheme was lucrative: The Trading Defendants sold 16,205 May 2020 contracts and purchased 16,268 May 2020 contracts via TAS, ultimately realizing a single-day profit of $632,814,390. Doc. 129 at ¶ 138.

### C. The Court's Prior Opinion

As noted, Mish asserts claims under Section 1 of the Sherman Act, several provisions of the CEA, and state law. *Id*. at ¶¶ 346-393. In its earlier opinion, the court allowed the Section 1 claim to proceed against Traders 1-6, 9, and 12 based on allegations of parallel trading conduct on April 20, 2020 and communications among those traders plausibly indicating an agreement to manipulate the WTI futures market that day. 596 F. Supp. 3d at 1093-94. For much the same reasons, the court permitted most of the CEA claims to proceed against Traders 1-6, 9, and 12. *Id*. at 1095-98. Only the CEA claim for vicarious liability under Section 2(a)(1), 7 U.S.C. § 2(a)(1), failed against those traders, as none was alleged to have had the principal-agent relationship necessary to support such a claim. 596 F. Supp. 3d at 1099.

As to Traders 7-8 and 10-11, the court's opinion dismissed all claims. *Ibid*. While the amended complaint alleged parallel trading conduct on behalf of Traders 7-8 and 10-11, it did not allege any other conduct sufficient to sustain the Section 1 claim. *Id*. at 1093-94. The CEA

claims against those traders failed on a substantially similar analysis. *Id*. at 1095-99. The court also dismissed all claims against Vega and Individual A. For the Section 1 claim and all but one of the CEA claims, the ground for dismissal was that the amended complaint alleged no conduct by Vega or Individual A on April 20, 2020. *Id*. at 1093-94. The remaining CEA claim for vicarious liability under Section 2(a)(1) failed because Mish acknowledged that the Trading Defendants were independent contractors who competed with each other and made their own trading decisions. *Id*. at 1099.

In dismissing the claims against Traders 7-8 and 10-11, Vega, and Individual A (as well as the Section 2(a)(1) claim against Traders 1-6, 9, and 12), the court permitted Mish to file a second amended complaint. *Id*. at 1099-1100. Mish also had brought a state law unjust enrichment claim; that claim rested on the same conduct alleged in the Section 1 and CEA claims, and it therefore survived only as to Traders 1-6, 9, and 12. *Id*. at 1099.

### D. The Second Amended Complaint's New Allegations

As the court allowed it to do, Mish filed a second amended complaint, adding allegations that it says remedy the deficiencies in the amended complaint identified by the court's previous opinion. Doc. 129. Mish now alleges that the Trading Defendants engaged in a similar coordinated trading strategy one month earlier, on March 19, 2020—which, like April 20, 2020, was a trading day immediately preceding a delivery date—in order to profit from an artificial price reduction in the April 2020 WTI contract. *Id*. at ¶¶ 262-275. That coordinated effort was also successful, though the Trading Defendants' trading volume was only about half as much as the April 20 trading in the May 2020 contract, and the March 19 manipulation netted Defendants just under $1 million in profit. *Id*. at ¶¶ 138, 264, 275. The CME, when investigating

Defendants' April 20 trading conduct, requested trading records for March 19. *Id*. at ¶¶ 26, 266-267.

Mish also now alleges that Vega and Individual A had a duty to monitor the Trading Defendants' trading conduct. In response to questions from the CME regarding trading on April 20, Vega and Individual A said that they were "responsible for reviewing trading activity in Vega's accounts for the purpose of identifying potentially manipulative trading activities." *Id*. at ¶ 281. And, pursuant to its agreement with its clearing member, G.H. Financials, Vega was contractually obligated to monitor its trading accounts, *id*. at ¶ 280, and to be familiar with the United Kingdom's Financial Conduct Authority Market Abuse Regulation. *Id*. at ¶¶ 243, 278; Doc. 162 at 12.

Despite their obligation to identify manipulative trading conduct, Vega and Individual A did not report or prevent the Trading Defendants' alleged manipulative conduct on April 20. Doc. 162 at 23. Instead, Vega and Individual A obtained position limit increases that raised the total number of trades that the Trading Defendants could make. Trader 5 requested, and Vega and Individual A obtained from G.H. Financials, a 1,500 position limit increase, amounting to a 40% increase for that trader. *Id*. at 39; Doc. 129 at ¶ 298; *see* Doc. 174 at 9. Vega and Individual A also obtained a position limit increase from 5,000 to 9,000 for Vega's master account. Doc. 129 at ¶ 299. The master account limit could be allocated among individual traders. Doc. 162 at 42 n.13; Doc. 174-2 at 17.

Mish also now alleges additional communications among the Trading Defendants. Trader 11 exchanged "at least 48" text messages with Trader 2 during an eight-hour period on April 20. Doc. 129 at ¶ 328; Doc. 162 at 43-44. Trader 2 informed Trader 11 that other Trading Defendants were selling May 2020 contracts, and the traders discussed selling May 2020

contracts in conjunction with purchasing May 2020 contracts via TAS. Doc. 129 at ¶¶ 330-331.

And, as shown by documents produced by Vega and Individual A after the second amended

complaint was filed, Traders 8 and 11 had a video call on April 20, during which there was

discussion of "short[ing] spreads." Doc. 162 at 45. Trader 11 made some trades in the May

2020 WTI futures market on behalf of Trader 8 (who net sold only one May 2020 contract on his

own account on April 20) and transferred $750,000 in profit to Trader 8 the next day. *Id*. at 48;

Doc. 170 at 8. The newly produced documents also show that Trader 2 (who exchanged at least

48 messages with Trader 11) was sitting next to Trader 1 during the April 20 workday and that

Trader 1 had hours of video calls with other Trading Defendants that day. Doc. 162 at 45.

### Discussion

As noted, Defendants move to dismiss the second amended complaint in its entirety,

except as to the claims against Traders 1-6, 9, and 12 that survived dismissal in the court's

previous opinion. Doc. 140 at 1. In its opposition brief, Mish concedes that it does not state a

viable claim against Trader 10. Doc. 162 at 51 n.19. The claims against Trader 10 are

accordingly dismissed with prejudice, and the court considers Defendants' motions to dismiss as

to the other claims.

### I. Sherman Act Claim

To state a Section 1 claim, a plaintiff must allege facts sufficient to show "three things:

(1) defendants had a contract, combination, or conspiracy ('an agreement'); (2) as a result, trade

in the relevant market was unreasonably restrained; and (3) [the plaintiff was] injured." *In re*

*Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 762 (7th Cir. 2015). To allege

an agreement, a plaintiff must allege facts sufficient to "infer that the alleged conspirators had a

conscious commitment to a common scheme designed to achieve an unlawful objective." *Id*. at

762-63 (quoting *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011)). Absent direct evidence of an agreement, a plaintiff can allege facts showing "parallel action" along with "additional circumstances—so-called 'plus factors'—which, when viewed in conjunction with the parallel conduct, would permit a factfinder to infer a conspiracy." *Anderson News, LLC v. Am. Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018) (internal quotation marks omitted); *see also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (similar).

### A.     Traders 7-8 and 11

In ruling on Defendants' earlier motions to dismiss, the court held that the amended complaint failed to allege an agreement to restrain trade among Traders 7-8 and 11. 596 F. Supp. 3d at 1095. While the amended complaint alleged parallel trading conduct by those traders, *id*. at 1093, it failed to allege any additional conduct plausibly indicating an unlawful agreement, *id*. at 1094. Mish contends that its new allegations of April 20 communications supply the necessary plus factors, at least as to Traders 8 and 11. Doc. 162 at 43-44, 46-48.

In some cases, communication among competitors may support an inference of an unlawful agreement to restrain trade. *See Text Messaging*, 630 F.3d at 628; *Anderson News*, 899 F.3d at 105. The mere fact of such communications, however, does not permit such an inference. *See Kleen Prods. LLC v. Ga.-Pac. LLC*, 910 F.3d 927, 938 (7th Cir. 2018) ("Especially when companies have legitimate business reasons for their contacts, plaintiffs must offer some evidence that moves beyond speculation about the content of what was conveyed."); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015) ("[A]s there is no evidence of what information was exchanged at these meetings, there is no basis for an inference that [the defendants] were using the meetings to plot prices increases."). In *Kleen Products*, for

example, twenty calls among executives of competitors did not permit an inference at summary judgment of a conspiracy, where trading among the competitors provided an innocent explanation for the communications that the plaintiff had failed to refute. 910 F.3d at 938-39.

On April 20, Trader 2—against whom the court held that Mish has stated a Section 1 claim—and Trader 11 discussed strategy for trading the May 2020 WTI contract. Traders 8 and 11 held a video call during which they discussed May 2020 WTI trading strategy. (Although Mish made these allegations for the first time in its response brief—based on documents produced by after it filed the second amended complaint—the court may consider them because they are consistent with the pleadings. *See Phillips*, 714 F.3d at 1020.) And Trader 11 made some trades in the May 2020 WTI futures market on Trader 8's behalf and transferred to him $750,000 in profits the following day.

Those communications, in conjunction with trading activity parallel to that of other Trading Defendants, plausibly indicate an unlawful agreement involving Traders 8 and 11. The communications occurred during trading hours, on the day of the alleged manipulative conduct, and concerned trading strategy for the market that the Trading Defendants allegedly manipulated. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 898-900 (N.D. Ill. 2011) (holding that communications among milk futures traders were sufficient to state a Section 1 claim where the traders communicated their trading positions with one another and their market activity was consistent with the communications); *cf. In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 328 F. Supp. 3d 217, 229 (S.D.N.Y. 2018) (holding that messages among gold futures traders did not plausibly suggest an agreement because the messages were sent at night, not at the time of the alleged price fixing). Such communications "raise a reasonable expectation that discovery will reveal evidence of

illegal agreement," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007), and Mish accordingly states a Section 1 claim against Traders 8 and 11.

As to Trader 7, however, Mish does not state a Section 1 claim. At the motion hearing, Mish conceded that it has not alleged April 20 communications between Trader 7 and any of the other Trading Defendants. Doc. 186 at 20:18-20. Mish nonetheless argued that parallel trading conduct, on its own, permits the inference of an unlawful agreement. *Id*. at 20:21-21:13. The argument conflicts with the court's previous opinion, which held that Trader 7's parallel conduct could not, on its own, establish an unlawful agreement under Section 1. 596 F. Supp. 3d at 1094. Mish's argument asks the court to alter its earlier determination without alleging new material facts or citing new legal authority. Without such new allegations or authority, the court declines to upend its previous conclusion.

### B.    Vega and Individual A

Vega and Individual A point out that Mish's opposition brief does not clearly advance the Section 1 claim against them. Doc. 174 at 3. The brief instead devotes substantial space to outlining allegations against Vega and Individual A generally, Doc. 162 at 10-33, before arguing that Mish has stated CEA claims against them, *id*. at 33-43. While Mish's briefing could have been clearer, the court reads its recitation of the allegations against Vega and Individual A to advance an implicit argument for a Section 1 claim against those defendants.

In its previous opinion, the court held that Mish had not stated a Section 1 claim against Vega and Individual A because the amended complaint did not allege any April 20 conduct by those defendants. 596 F. Supp. 3d at 1093-94. Mish now adds allegations that the Trading Defendants had engaged in the same manipulative trading strategy one month earlier, on March 19, and that Vega and Individual A were obligated to identify potentially manipulative trading

strategies among the Trading Defendants. Despite these obligations, Vega and Individual A—who allegedly had a profit interest in the trading activity of Traders 11 and 12—failed to prevent the Trading Defendants' conduct on April 20.

That Trading Defendants may have previously engaged in a similar trading strategy, that Vega and Individual A arguably should have been aware of that past behavior, and that Vega and Individual A had a profit interest in the Trading Defendants' trading activity might not themselves permit the inference of an unlawful agreement involving Vega and Individual A. Arguably, those allegations suggest only that Vega and Individual A should have been aware of the Trading Defendants' alleged scheme and that they might have profited from it. But they arguably imply no conduct, parallel or otherwise, by which Vega and Individual A might have entered an agreement to restrain trade on April 20.

Critically, however, Mish also alleges that Vega and Individual A obtained position limit increases on April 20 to further the Trading Defendants' alleged market manipulation. Doc. 162 at 38-39, 43. (Although Mish mentions this allegation in a portion of its response brief nominally devoted to the CEA, the court reads the allegation to apply as well to the Section 1 claim.) As explained, Vega and Individual A obtained a 1,500 position limit increase for Trader 5 (a 40% increase for that trader) and a 4,000 position limit increase for Vega's master account (an 80% increase). *Id*. at 38-39; Doc. 129 at ¶¶ 298-299. Mish contends, Doc. 162 at 38-39, 43, and the court agrees, that the combination of the Trading Defendants' prior conduct, Vega's financial stake, *and* the increased trading limits—obtained on April 20, just one month after the Trading Defendants' March 19 alleged manipulation—plausibly indicate that Vega and Individual A had agreed to join the Trading Defendants' alleged scheme.

Pressing the contrary view, Vega and Individual A contend that the position limit increases were innocent business decisions, not an effort to manipulate the May 2020 WTI futures market. Specifically, they maintain that obtaining a position limit increase for a single trader is done in the ordinary course of business, Doc. 174 at 6, and that the master account increase was intended to ease the Trading Defendants' transition to a new trading platform, *id*. at 6-7; Doc. 174-2 at 16-17. Vega and Individual A further contend that the traders did not in fact use the increased trading limits on April 20. Doc. 147 at 15; Doc. 162 at 42 n.13.

Vega and Individual A identify potential arguments against liability. But those arguments do not warrant dismissal of the Section 1 claim at the pleadings stage. Based on the pleadings, the court cannot conclude that a position limit increase for a single trader was in fact a routine business decision, nor can it take Vega and Individual A's explanation for the master account increase as indisputably true. And regardless of whether the increased limits were *used* on April 20, the fact that Vega and Individual A *obtained* the increases arguably speak to their intentions, including whether they had agreed with the Trading Defendants to manipulate the May 2020 WTI futures market. Mish accordingly plausibly alleges that Vega and Individual A conspired with the Trading Defendants, thereby stating a Section 1 claim against Vega and Individual A.

## II.    CEA Claims

### A.    Section 9(a)(2) Claim

Section 9(a)(2) of the CEA makes it unlawful to "manipulate or attempt to manipulate the price of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity." 7 U.S.C. § 13(a)(2). To state a price manipulation claim, a plaintiff must allege facts giving rise to a plausible inference that: "(1) the defendants possessed the

ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Dairy Farmers*, 801 F.3d at 764-65. In its earlier opinion, the court held that the amended complaint pleaded the first three elements as to all Defendants but not the fourth element as to Traders 7-8 and 10-11, Vega, and Individual A. 596 F. Supp. 3d at 1095-97.

The parties do not ask the court to revisit its analysis as to the first three elements, so the only dispute is whether Mish now plausibly alleges that Traders 7-8 and 11, Vega, and Individual A specifically intended to cause an artificial price. Mish does so for Traders 8 and 11. Those traders' communications on April 20, in conjunction with their parallel trading conduct, permit the reasonable inference that they wanted to artificially decrease the price of WTI futures. Mish also states a Section 9(a)(2) claim against Vega and Individual A for the same reasons it has stated a Section 1 claim against them. Vega and Individual A's duty to monitor the Trading Defendants' trading conduct, their profit interest in that trading conduct, and their procurement of position limit increases on April 20 plausibly evince a specific intention to artificially decrease the price in the May 2020 WTI futures market.

As to Trader 7, however, Mish does not plausibly allege a Section 9(a)(2) claim. For the same reasons that Mish does not plausibly allege that Trader 7 conspired in violation of Section 1, it fails to plausibly allege that he specifically intended to cause an artificial price.

### B. Section 6(c)(1) Claim

Section 6(c)(1) of the CEA prohibits the use of "any manipulative or deceptive device or contrivance" in violation of Commodity Futures Trading Commission ("CFTC") regulations. 7 U.S.C. § 9(1). CFTC Regulation 180.1, in turn, prohibits the intentional or reckless use of "any manipulative device, scheme, or artifice to defraud," as well as the intentional or reckless

"[e]ngag[ment], or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 180.1(a)(1), (3). A plaintiff may plead intentional or reckless conduct by alleging facts showing "an extreme departure from the standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1015 (N.D. Ill. 2015) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)).

In litigating the previous motions to dismiss, the parties disagreed whether the heightened pleading standard of Civil Rule 9(b) or the ordinary pleading standard of Civil Rule 8(a) applies to the Section 6(c)(1) claims. 596 F. Supp. 3d at 1097. The court then explained that it did not matter which standard applied, "as Mish satisfie[d] Rule 9(b) as to Traders 1-6, 9, and 12, and fail[ed] to satisfy Rule 8(a) as to Vega, Individual A, and Traders 7-8 and 10-11." *Ibid*. Here, again, the court need not decide which pleading standard applies. Under either Rule 8(a) or Rule 9(b), Mish has stated a Section 6(c)(1) claim against Traders 8 and 11, Vega, and Individual A, but not against Trader 7.

Under Rule 9(b), a plaintiff "must describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (internal quotation marks omitted). In the market manipulation context, a plaintiff must plead with particularity "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the commodities at issue." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1056-57 (N.D. Ill. 2016) (internal quotation marks omitted); *see also Kraft Foods*, 153 F. Supp. 3d at 1012 (same).

Mish states a Section 6(c)(1) claim against Traders 8 and 11 for substantially the same reasons that it states a Section 9(a)(2) claim against them. Specifically, Mish alleges that Traders 8 and 11 participated in a coordinated scheme by which they sold May 2020 WTI contracts in order to artificially decrease the price and realize a profit through the purchase of contracts at that artificially low price. Mish further alleges details as to the timing and number of trades made by Traders 8 and 11 on April 20, including that Trader 11 made trades on Trader 8's behalf and transferred to him $750,000 in profits the next day. Those allegations satisfy Rule 9(b)'s heighted pleading standard.

Mish states a Section 6(c)(1) claim against Vega and Individual A as well. Mish alleges a very specific and plausible scheme among many of the Trading Defendants to artificially decrease the May 2020 WTI contract price. And although Vega and Individual A had duties to monitor the Trading Defendants' trading conduct for potentially manipulative activity, Vega sought and obtained trading limit increases on the day of the alleged manipulation. In response, Vega contends that procuring such limit increases was not an extreme departure from the normal course of business. Doc. 174 at 10. As explained, however, the court at the pleading stage has no basis for accepting Vega's version of what is a normal business practice versus a departure indicative of intentional or reckless conduct.

Mish does not state a Section 6(c)(1) claim against Trader 7. That Trader 7 traded in a manner akin to that of other traders is not, on its own, indicative of an intentional or reckless act to defraud others even under Rule 8(a)'s ordinary pleading standards.

**C.    Section 13 Claim**

Section 13 of the CEA, 7 U.S.C. § 13c(a), prohibits aiding and abetting CEA violations committed by others. *See Damato v. Hermanson*, 153 F.3d 464, 471 (7th Cir. 1998) (noting that

16

Section 22(a)(1), 7 U.S.C. § 25(a)(1), creates a private right of action against those who aid and abet a CEA violation). To state an aiding and abetting claim, a plaintiff first must state a substantive CEA claim against a principal. *See Dairy Farmers*, 801 F.3d at 765. A plaintiff also must allege that the defendant "(1) had knowledge of the principal's intent to commit a violation of the CEA … ; (2) had the intent to further that violation; and (3) committed some act in furtherance of the scheme." *Ibid*.

For the reasons set forth above, Mish's allegations do not reasonably permit the inference that Trader 7 aided or abetted a CEA violation. By the same token, Mish has plausibly alleged that Traders 8 and 11, Vega, and Individual A knew of each other's intent to violate the CEA, intended to further those violations, and acted in furtherance of their common scheme. Mish therefore states a Section 13 claim against Traders 8 and 11, Vega, and Individual A, but not against Trader 7.

### D. Section 2(a)(1) Claim

Section 2(a)(1) of the CEA is a vicarious liability provision under which the acts of an agent "acting for" a principal "within the scope of his employment or office" are imputed to the principal. 7 U.S.C. § 2(a)(1). The provision "enacts a variant of the common law principle of respondeat superior." *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir. 1986). A Section 2(a)(1) claim requires the existence of an underlying violation. *See Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018). The principal and agent need not have had an employer-employee relationship. *See Rosenthal*, 802 F.2d at 966. Moreover, the plaintiff need not allege that the principal controlled the agent's action, so long as the agent was "acting for" the principal in committing the conduct in question. *See Guttman v. CFTC*, 197 F.3d 33, 39 (2d Cir. 1999) (citing *Rosenthal*, 802 F.2d at 966).

17

Mish argues that the Trading Defendants were in principal-agent relationships with each other because a conspiracy existed among them and because each acted for that conspiracy. Doc. 162 at 48-49. That argument is unpersuasive because it incorrectly conflates a principal-agent relationship, the requirements of which are outlined just above, with acts in furtherance of a conspiracy. Accordingly, Mish fails to state a Section 2(a)(1) claim against the Trading Defendants.

Mish likewise fails to state a Section 2(a)(1) claim against Vega and Individual A. Mish's argument to the contrary is based on Vega's contract with its clearing member, G.H. Financials. That contract provides that Vega "act[s] as principal and sole beneficial owner (but not as trustee) (or you have full authority from the sole beneficial owner) in entering into this Agreement and each Transaction." Doc. 129 at ¶ 243. The contract also states that Vega should provide G.H. Financials with a list of "officers, employees or agents who are authorised … to act on [Vega's] behalf." *Id*. at ¶ 244. In Mish's view, those provisions establish that the Trading Defendants acted for Vega in trading on the CME. Doc. 162 at 30.

In response to Vega and Individual A's previous motion to dismiss, Mish acknowledged that the Trading Defendants were independent contractors who made their own trading decisions. 596 F. Supp. 3d at 1099. Although the lack of an employer-employee relationship did not itself preclude liability under Section 2(a)(1), *see Rosenthal*, 802 F.2d at 966, the fact that the Trading Defendants traded for themselves (and not for Vega) did. 596 F. Supp. 3d at 1099. It is not clear how Vega's agreement with G.H. Financials—an agreement between Vega and a third party, not Vega and the Trading Defendants—could alter Vega's legal relationship with the Trading Defendants. And indeed, the G.H. Financials agreement is perfectly consistent with the Trading Defendants acting as independent entities who traded on their own behalf. While Mish

emphasizes that the agreement says that Vega is the "principal and sole beneficial owner," Mish ignores that the same sentence states "or you have full authority from the sole beneficial owner." Doc. 174 at 11-12. That is, the G.H. Financials agreement recognizes that Vega may not own the transactions carried out in its name on the CME.

In a further attempt to establish Vega as vicariously liable for the acts of the Trading Defendants, Mish points to the Group Trader Agreement. Mish observes specifically that that agreement provides that the sub-accounts held by Vega were to "remain the property of [Vega] and shall remain so during the Term" of that agreement. Doc. 129 at ¶ 239(h); Doc. 162 at 30-33. The argument, it seems, is that Vega was the Trading Defendants' principal because it is described as the owner of the sub-accounts. But that the accounts are described as Vega's property does not mean that the Trading Defendants "act[ed] for" Vega within the meaning of Section 2(a)(1) by trading on the CME. *Guttman*, 197 F.3d at 39. As explained in the court's earlier opinion, the Group Trader Agreement describes the Trading Defendants as "independent contractors" who may trade in Vega's name on the CME. 596 F. Supp. 3d at 1099. The "independent contractor" label is borne out in substance, as the agreement provides that each trader "is solely responsible for all trading decisions on the Sub-Account allocated to him/her." Doc. 129 at 239(e); Doc. 159-3 at 6. Accordingly, the Trading Defendants did not act for Vega when trading on the CME, and Vega therefore is not vicariously liable for the Trading Defendants' acts. *Cf. Guttman*, 197 F.3d at 40 (holding the defendant liable under Section 2(a)(1) for the acts of his business partner, where the defendant agreed to a scheme of noncompetitive options trades, authorized the partner to act on his behalf in making the trades, and regularly reminded the partner to make the trades).

19

III.     **Unjust Enrichment**

Unjust enrichment is a common law claim under state law against "[a] defendant [who] has unjustly retained a benefit to the plaintiff's detriment," and whose "retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)).  Where, as here, "an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Id*. at 517.  It follows that Mish's unjust enrichment claim fails as to Trader 7, and survives as to Traders 8 and 11, Vega, and Individual A.

**Conclusion**

Defendants' motions to dismiss are granted in part and denied in part.  Mish's claims against Traders 7 and 10 are dismissed, as are the CEA Section 2(a)(1) claims against all Defendants.  The dismissal of those claims is with prejudice.  Mish has already filed two amended complaints, and it does not explain how an additional amended complaint would cure the defects with those claims.  *See Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015) ("District courts … have broad discretion to deny leave to amend … where the amendment would be futile.") (internal quotation marks omitted).  The case will proceed against Traders 1-6, 8-9, and 11-12, Vega, and Individual A on the Sherman Act claim, the CEA Section 9(a)(2), Section 6(c)(1), and Section 13 claims, and the unjust enrichment claim.  Defendants shall answer the surviving portions of the second amended complaint by January 17, 2023.

December 28, 2022

_____
United States District Judge