# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MISH INTERNATIONAL MONETARY INC., on behalf of itself and all others similarly situated, | |
| *Plaintiff*, | Case No. 1:20-cv-04577 |
| v. | Hon. Gary S. Feinerman |
| VEGA CAPITAL LONDON, LTD., et al., | Magistrate Judge Jeffrey T. Gilbert |
| *Defendants.* | |

## ANSWER AND ADDITIONAL DEFENSES OF PAUL COMMINS TO SECOND AMENDED CLASS ACTION COMPLAINT

Defendant Paul Commins, by and through his undersigned counsel, hereby answers the Plaintiff's Second Amended Complaint as follows. To the extent the Complaint's headings, subheadings, and footnotes constitute allegations to which a response is required, Mr. Commins denies all such allegations. Mr. Commins answers on his behalf only.

Pursuant to this Court's Order (dated March 31, 2022, Dot. No. 117) ("Order"), Plaintiff complains[1] of Defendants (including in the new allegations made at paragraphs 37, 55, 57, 209-333 pursuant to the Order) as follows:

**Answer:** Mr. Commins admits that the Plaintiff complains as set forth in the paragraphs of the Second Amended Complaint, including the new allegations made at paragraphs 37, 55, 57, 209-333. Mr. Commins denies the remaining allegations contained in the Introductory Paragraph of the Second Amended Complaint.

## SUMMARY OF ALLEGATIONS

1. From at least as early as April 2020, the Vega Defendants[2] combined, conspired, and agreed to depress on April 20, 2020 prices of the May 2020 West

---

[1] Plaintiff complains based on personal knowledge as to ¶29 and information and belief as to all other paragraphs. Plaintiffs' information includes CME records, Vega records produced to the CME, news articles, the materials referenced and alleged in this Complaint, and the investigation of counsel.

[2] As used in this complaint, the "Vega Defendants" means VEGA CAPITAL LONDON, LTD., Adrian Spires, Paul Commins, George Commins, Christopher Roase, Elliott Pickering, Aristos Demetriou, Connor Younger, ███████████, James Biagioni, Henry Lunn, ███████████, Paul Sutton, Matthew Rhys Thompson, and Vega Defendant John Does 1-4.

Texas Intermediate ("WTI") Light Sweet Crude Oil futures contract ("May Contract") which is traded on the Chicago Mercantile Exchange ("CME") Globex platform. See ¶¶ 30-59 (specifying the Vega Defendants).

**Answer:** Paragraph 1 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 1 of the Second Amended Complaint.

2. Though not a necessary condition to the manipulation of a futures contract price, each of the following steps is a sufficient condition to manipulate a futures contract price.

a. A combination of market participants exerts significant cumulative net selling pressure on a futures contract over a specific time period. Cumulative net selling pressure means a market participant's sales of a futures contract minus their purchases of such futures contract during a specified time period. See ¶ 129 below. Here, Defendants agreed to and did abuse the Trade at Settlement ("TAS") feature of the May Contract to build up their cumulative net selling pressure on the May Contract.[3] See ¶129.

---

[3] As recently stated by Commodity Futures Trading Commission ("CFTC") Commissioner Dan Berkovitz on November 24, 2020: "The potential for TAS trading to artificially affect the settlement price of a contract is well known; indeed, the CFTC has brought two enforcement cases based on the use of TAS to manipulate the price of futures contracts." See https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement112320a. Commissioner Berkovitz also expressed his view that the CFTC should look into the TAS

b.     A market participant uses their sales in a futures contract as manipulative "ammo". See ¶ 103. "Ammo" has been recognized by the United States CFTC and the United Kingdom Financial Control Authority ("FCA") as a term used by manipulators. See ¶¶104-105; and fn. 5-6. The term "ammo" signifies possession of the ability to make a quantity of transactions in a manner in which the transactions will depress or inflate futures contract prices. See ¶¶ 103-105. Here, Defendants Thompson and Lunn c



[Emphasis added]. Based upon the Vega Trading Defendants' actual conduct, Plaintiff has good grounds to believe and does allege that Defendants agreed to and did use their sales as manipulative "ammo" to depress May Contract prices from

---

trading activity in its investigation of the precipitous drop and rebound of WTI oil trading prices on April 20-21.

approximately 12 pm on April 20 through the TAS settlement of the May Contract by 1:30 pm on that day. See ¶145(c)-(e) below.

c.     A market participant is responsible for an increasing share of the net sales made by the entire market, including at times when the market participant already has exerted substantial cumulative net selling pressure on such futures contract. Here, after Defendants had built up substantial net selling pressure on the May Contract, Defendants engaged in a frenzy of selling which greatly increased their sales per minute and caused their percentage of the entire market's sales to exceed 30% in this worldwide market. See ¶ 145.

d.     A market participant builds up a significant cumulative net "aggressive" sales pressure on a futures contract over a specified time. See ¶ 146-164 (alleging the CME's definition of "aggressive" transactions and Defendants' buildup of their significant cumulative net aggressive sales pressure).

**Answer:**     Paragraph 2 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins responds as follows: To the extent Paragraph 2 refers to trade data or written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 2 of the Second Amended Complaint.

3.     Although any one of the above steps would have sufficed to manipulatively depress prices, Defendants agreed to and did engage in **all** of the foregoing types of manipulative steps and thereby greatly depressed May Contract prices on April 20.

**Answer:**     Paragraph 3 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 3 of the Second Amended Complaint.

4.     Regarding Defendants' combination and agreement to depress prices, the manipulation of an entire market is something that persons can better accomplish working in a combination and pursuant to an agreement rather than individually. Yet even the broadest agreements and best manipulations entail risks. Here, the Vega Trading Defendants each committed their capital to Vega to guarantee one another's losses. Such Defendants effectively acted as co-guarantors to Vega of one another's financial outcomes. This is exactly the type of agreement which would facilitate joint efforts to manipulate prices as well as Vega's involvement with such efforts.

**Answer:**     Mr. Commins denies the allegations in Paragraph 4 of the Second Amended Complaint.

5. Also indicating Defendants' agreement, Defendant Paul Commins, in his own words, ███████ all but two of the other Vega Trading Defendants. Further indicative of an agreement, the five Vega Trading Defendants who build up the largest May Contract short positions, did so in a manner that is extremely highly correlated on a minute-by-minute basis with one another as well as with Defendant Paul Commins' buildup of his May Contract short position. See ¶¶142-43. This is extremely unlikely to happen by independent decision making or freak occurrence. It is highly consistent with a very carefully executed agreement to build cumulative net selling pressure on the market in a manner which will succeed in depressing prices.

**Answer:** Mr. Commins denies the allegations in Paragraph 5 of the Second Amended Complaint.

6. Confirming that these multiple high correlations among many Defendants' May Contract short positions did not result from chance, there was a high degree of communications among Vega Trading Defendants on April 20. This includes communications in which they coordinate trades (which helps to explain the high degree of correlation in the growth of their positions). They also communicated to track what one another was doing and make sure they were going short May Contracts and long TAS contracts to build up net selling pressure on the May Contract. See below.

**Answer:** Mr. Commins denies the allegations in Paragraph 6 of the Second Amended Complaint.

7. Likewise, when Defendants exulted in the successful outcome of their manipulation after the close of trading in the May Contract on April 20, Defendant Lunn stated ███████████████████████████████████████████ ███████████████. See ¶ 179 below. In fact, the Vega Trading Defendants had used the foregoing four means of manipulation (alleged at ¶2 a-d) to overwhelm and "blitz" through the limited buying pressure in the May Contract. As the Vega Defendants' cumulative net selling pressure and manipulative ammo sales reached their highest levels, Vega caused the May Contract to experience all-time record price declines. See ¶¶136-137.

**Answer:** Mr. Commins denies the allegations in Paragraph 7 of the Second Amended Complaint.

8. Defendant George Commins ███████ Defendant Paul Commins and apparently resides at and definitely trades out of Defendant Paul Commins' residence. ███████████████████ Defendant George Commins ████████████████████████████████████████████ ███████████████████████████████████ See ¶180 below. This further indicates coordination and joint conduct.

**Answer:** Mr. Commins admits that Defendant George Commins ███

███ and that Defendant George Commins resided with and traded out of his

residence on certain occasions. To the extent Paragraph 8 refers to written

discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same. Mr. Commins

denies the remaining allegations contained in Paragraph 8 of the Second Amended

Complaint.

9.      GH Financial is a company located in this District and was the futures

brokerage firm for Defendant Vega. On April 21, GH Financial informed Vega as

follows: The trading by Vega in the May Contract on April 20 had set off multiple

market alert alarms at GH Financial. Accordingly, the futures brokerage firm

wanted to know whether the Vega persons doing the trading were acting together.

Similarly, GH Financial wanted to know whether such persons appreciated

exchange rules about market manipulation. And GH Financial asked numerous

other questions about specific trades or traders, including relating to attempted

manipulation. See ¶120 below. Soon after receiving Vega's responses, GH

Financial gave notice to Vega that it was dropping Vega as a customer. This notice

was due to the events which occurred on April 20 and GH Financial' s concerns

about the "risks" of continuing to do business with Defendant Vega and the Vega

Trading Defendants. Id.

**Answer:** To the extent Paragraph 9 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge sufficient to form a belief about the location of GH Financials and denies the remaining allegations of Paragraph 9 of the Second Amended Complaint.

10. As a result of Defendants extensive combination to overwhelm and depress the May Contract prices on April 20, Defendants proximately caused extremely artificial prices in the May Contract.

**Answer:** Paragraph 10 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 10 of the Second Amended Complaint.

11. Futures market "spreads" are the difference between the price of a futures contract expiring in one month and the price of a futures contract expiring in a different month.

**Answer:** Mr. Commins denies the allegations in Paragraph 11 of the Second Amended Complaint.

12. Using futures contract spreads is a standard way to analyze whether the prices of a futures contract have deviated from supply and demand or are artificial in an economic sense of the term. The supply and demand for crude oil

was substantially similar and the same on Friday April 17, Monday April 20, and Tuesday April 21. Based on a statistical analysis of the spread between the prices of the May Contract and the June WTI contract, and using a control period of January 2 until April 17, 2020, Plaintiff has good grounds to believe and does allege as follows.

**Answer:**     Mr. Commins denies the allegations in Paragraph 12 of the Second Amended Complaint.

13.     During trading on April 20, the spread between the May Contract price and the June Contract price declined by an extreme amount. In fact, the amount of the decline was 138 standard deviations. A computer calculation of the probability of this occurring in a competitive market untainted by manipulation returns a result of exactly zero.

**Answer:**     Mr. Commins denies the allegations in Paragraph 13 of the Second Amended Complaint.

14.     However, after 1:30 p.m. on April 20, Vega no longer had market power over May Contract trading. The May June spread then snapped back and increased to (and above) the levels on which such spread had closed on April 17, 2020. The statistical chance of this occurring in a competitive market is extraordinarily small. And the statistical chance that the May June spread, in a

competitive market, would decline by so much on April 20 and then snapback so much on April 21 is even smaller.

**Answer:** The allegation regarding "market power" is a legal conclusion to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegation. Mr. Commins denies the remaining allegations contained in Paragraph 14 of the Second Amended Complaint.

15. Because there were virtually no changes in supply and demand for crude oil between April 17 and April 21, much less dramatic decreases in the supply demand balance on April 20 followed by overwhelming increases in the supply demand balance on April 21, the fundamentals cannot explain what happened to prices here. However, Vega's four types of manipulative conduct were present in the May Contract on April 20 until 1:30 pm and then were removed from the May Contract after 1:30 pm on April 20.

**Answer:** Mr. Commins denies the allegations in Paragraph 15 of the Second Amended Complaint.

16. Accordingly, the Vega Defendants' blatantly manipulative "ammo" selling and other manipulative steps alleged in ¶2 (a)-(d) are the proximate cause of the artificially depressed May Contract prices on April 20.

**Answer:** Paragraph 16 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 16 of the Second Amended Complaint.

17. Plaintiff and members of the Class (as defined in ¶210) were directly injured by the Vega Defendants' agreement and conduct. Among other things, Plaintiff and Class members were injured in that they sold May crude oil futures contracts to liquidate their long positions at artificially low prices. See ¶¶ 218-220 below.

**Answer:** Paragraph 17 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 17 of the Second Amended Complaint.

## JURISDICTION AND VENUE

18. The CME Group's global headquarters are located in this District at 20 South Wacker Drive, Chicago, Illinois 60606. The May Contracts traded on the CME Group's electronic trading platforms Globex and ClearPort. The CME Group's electronic Globex trading platform is housed approximately thirty-five miles from the CME Group's headquarters in Aurora, Illinois. All May Contract

transactions, including Plaintiff's and Defendants' May Contract transactions, were entered and executed in this District.

**Answer:** Mr. Commins admits that the CME Group's headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606 and that the May Contracts traded on the CME Group's trading platforms. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 18 of the Second Amended Complaint and, therefore, denies those allegations.

19. WTI crude oil is a "commodity" and is the "commodity underlying" the WTI crude oil futures contracts traded on the CME Globex, as those terms are defined and used in Sections la(4) and 22 of the CEA, 7 U.S.C. §§ la(4) and 25(a)(1)(D), respectively.

**Answer:** Paragraph 19 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins admits only that WTI crude oil futures contracts are traded on CME Globex platform. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 19 of the Second Amended Complaint and, therefore, denies those allegations.

20.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this complaint.

**Answer:**     Paragraph 20 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 20 of the Second Amended Complaint.

21.     The Court has subject matter jurisdiction over this action pursuant to 7 U.S.C. §25, Section 4 of the Clayton Act, 15 U.S.C. §15 and 28 U.S.C. §§1331 and 1337.

**Answer:**     Paragraph 21 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins admits only that Plaintiff purports to base the Court's jurisdiction on the statutes referenced in Paragraph 21 of the Second Amended Complaint and denies the remaining allegations.

22.     The Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22. Defendants have minimum contacts with the United States, transacting business in this District, including by electronically placing trades in NYMEX WTI crude oil futures contracts on the

Chicago Mercantile Exchange ("CME") Globex and CME ClearPort trading platforms.

**Answer:** Paragraph 22 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins admits only that he placed trades electronically on the CME's Globex trading platform and that Plaintiff purports to base the Court's jurisdiction on the statutes referenced in Paragraph 22 of the Second Amended Complaint. Mr. Commins denies the remaining allegations in Paragraph 22 of the Second Amended Complaint.

23. General venue is proper in the Northern District of Illinois pursuant to 7 U.S.C. §25(c), 15 U.S.C. §22 and 28 U.S.C. §1391(b), (c), and (d).

**Answer:** Paragraph 23 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins admits only that Plaintiff purports to base its allegation that venue is proper in the Northern District of Illinois on the statutes referenced in Paragraph 23 of the Second Amended Complaint and denies the remaining allegations.

24. The Court also has personal jurisdiction over Defendants and venue is proper pursuant to Section 22 of Commodity Exchange Act, 7 U.S.C. § 22.

Defendants transact business in this judicial district and the CEA violations occurred in this District.

**Answer:** Paragraph 24 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins admits only that Plaintiff purports to base the Court's jurisdiction on the statutes referenced in Paragraph 24 of the Second Amended Complaint and denies the remaining allegations.

25. Plaintiff's and Defendants' brokers are located in this District. See ¶¶27, 67. The price manipulation occurred and the claims arose in this District. Also, a substantial part of the events or omissions giving rise to the claims arose in this District.

**Answer:** Paragraph 25 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations regarding the locations of "Plaintiff's and Defendant's brokers" and, therefore, denies those allegations. Mr. Commins denies the remaining allegations contained in Paragraph 25 of the Second Amended Complaint.

26. ████████████████████████████████████████

████████████████████████

**Answer:** Mr. Commins admits that ███████████████

███████████████████████████████████

███████████████████████████████████

███████████████ and, therefore, denies the allegation in Paragraph 26 of

the Second Amended Complaint.

27. ███████████████████████████

███████████████████████████████████

███████████████████████████████

███████████████████

**Answer:** Mr. Commins lacks knowledge or information sufficient to

form a belief about the truth or falsity of the allegations in Paragraph 27 of the

Second Amended Complaint and, therefore, denies those allegations.

28. The ICE has a colocation data center in this District as well as in

Mahwah, New Jersey and Basildon, United Kingdom.

https://www.theice.com/connectivity-and-feeds/icecolocation

**Answer:** To the extent Paragraph 28 refers to publicly available

information, Mr. Commins asserts that those materials speak for themselves and

denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the remaining

allegations contained in Paragraph 28 of the Second Amended Complaint and, therefore, denies those allegations.

## PARTIES

### A.    Plaintiff

29.    Plaintiff Mish International Monetary, Inc. is a California corporation with its principal place of business in Menlo Park, California. On the afternoon of April 20, 2020, Plaintiff Mish sold, through his brokers located in this District, ten (10) May Contracts at negative prices in order to liquidate a long position in such contract. Plaintiff Mish incurred a net loss of approximately $92,490 in connection with the foregoing transactions executed in this District. Plaintiff sold at the artificially low May Contract prices registered which occurred in this District due to Defendants' manipulative impact on the trading executed and the order book maintained for May Contracts in this District. As alleged hereafter, Plaintiff is entitled to recover damages from Defendants, including actual damages, treble damages and other relief.

**Answer:**    Paragraph 29 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations regarding

Plaintiff's trading and, therefore, denies those allegations. Mr. Commins denies the remaining allegations of Paragraph 29 of the Second Amended Complaint.

## B. Defendants

30. Defendant Vega Capital London, Ltd. ("Vega") is a corporation organized and existing under the laws of the United Kingdom, incorporated on May 13, 2016, with a registered office in Essex, England and a principal place of business in London, England. Defendant Vega maintained a trading account with United States Futures Commissions Merchant ("FCM") G.H. Financial LLC. See ¶¶ 248, 263 below. ███████████████████████████████████

████████████████████████████████

**Answer:** Mr. Commins admits that Vega Capital London, Ltd. is a corporation organized and existing under the laws of the United Kingdom incorporated on May 13, 2016. Mr. Commins further admits that Vega Capital London, Ltd.'s registered office is in Essex, England, and that its principal place of business is London, England. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 30 of the Second Amended Complaint and, therefore, denies those allegations.

31. In its trading account with GH Financial, Vega maintained multiple accounts and scores of sub-accounts. Part of these sub-accounts, those in ███████,

contained the accounts of the Vega Trading Defendants, whose names are alleged in ¶39 below, except for Defendant ████████████, whose account was in ████████. But the Vega Trading Defendants did **not** have accounts with GH Financial and GH Financials' only customer was Vega. Defendant Vega's accounts included a master account ████████████.

> **Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 31 of the Second Amended Complaint and, therefore, denies those allegations.

32. All of the Vega Trading Defendants entered their orders and made their trades (of which Plaintiff is so far aware in the May Contract) with GH Financial in the name of and through Defendant Vega.

> **Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 32 of the Second Amended Complaint and, therefore, denies those allegations.

33. On October 26, 2017, Defendant Vega registered with the FCA as an Appointed Representative of Starmark Investment Management Limited ("Starmark"). Defendant Vega terminated its registration with the FCA on August 13, 2019.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 33 of the Second Amended Complaint and, therefore, denies those allegations.

34. Currently, Vega is wholly owned by Defendant Adrian William Spires (see ¶34 below). As of Vega's incorporation on May 13, 2016, Anthony Gibson was its sole shareholder. On July 1, 2017, Dean George Scott acquired all outstanding shares from Mr. Gibson. On September 26, 2017, Adrian Spires and Tommy Gaunt each acquired half of Mr. Scott's shares, so that they co-owned the company equally. On October 23, 2019, after Defendant Vega had de-registered with the FCA, Defendant Spires acquired all of Mr. Gaunt's shares.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 34 of the Second Amended Complaint and, therefore, denies those allegations.

35. According to its filings with the UK's Companies House, Defendant Vega had zero employees in 2017, 3 employees in 2018 and 7 in 2019. Vega states on its website and has stated for years that the website is "currently in development".

**Answer:** To the extent Paragraph 35 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 35 of the Second Amended Complaint and, therefore, denies those allegations.

36. █████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████

**Answer:** Mr. Commins admits that he partly owned █████████
████████████████ and that Mr. Commins ███████████████
█████ with Defendant Vega. To the extent Paragraph 36 refers to written discovery material, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. With respect to the allegations in the second and third sentences of Paragraph 36, Mr. Commins admits that

█████████████████████████████████████████
██████████████████. Mr. Commins denies the remaining allegations in Paragraph 36 of the Second Amended Complaint.

22

37.     Defendant Vega describes the individual trading defendants, whose names are alleged below, as ██████████████ of Vega. However, the relationship between and among Vega, ███, and the Vega Trading Defendants is alleged in detail at ¶¶209-261 below.

**Answer:**     Paragraph 37 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins incorporates by reference his Answers to Paragraphs 209-261.  Mr. Commins denies the remaining allegations in Paragraph 37 of the Second Amended Complaint.

38.     Defendant Adrian Spires is a natural person residing in the UK. Defendant Adrian Spires is Defendant Vega's sole shareholder, sole owner and sole director. Prior to Vega's de-registration with the FCA on August 13, 2019, Defendant Spires was registered with the FCA to provide financial services to the public as an appointed representative of both Starmark and Vega. Defendant Spires is still registered with the FCA as a representative of Starmark. The Vega Trading Defendants are Defendants Paul Commins, George Commins, Aristos Demetriou, Henry Lunn, Elliott Pickering, Christopher Roase, ██████████, Paul Sutton, Matthew Thompson, Connor Younger, ██████████, and Michael Biagioni.

**Answer:**     Mr. Commins admits only that Adrian Spires is a natural person and that the Plaintiff has listed the parties named as Defendants in this action

except for ███████ and ███████ because their claims are dismissed. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 38 of the Second Amended Complaint and, therefore, denies those allegations.

39.     Defendant Paul Commins is a natural person residing ███████ ███████ Mr. Commins is registered with the FCA to provide financial services to the public as an appointed representative of Starmark. Defendant Paul Commins maintained an account with Defendant Vega. Defendant Paul Commins ████████████████████████████████████████ ███████

**Answer:**     Mr. Commins admits that he is a natural person who resided in ███████. Mr. Commins further admits that he was registered with the FCA as an appointed representative of Starmark and maintained a trading account with Vega Capital London, Ltd.  Mr. Commins denies the remaining allegations in Paragraph 39 of the Second Amended Complaint.

40.     Defendant Paul Commins ████████████████████████ ████████████████████████ In Defendant Paul Commins' ████████████████████████

**Answer:**     Mr. Commins admits only that he knows the other named Vega Trading Defendants.  To the extent Paragraph 40 refers to written discovery

materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

41.     Defendant Paul Commins coordinated and worked with the other Vega Trading Defendants to depress the prices of the May Contract on April 20.

(a) Defendant Paul Commins' minute to minute pattern in his May Contract short position on April 20 is almost identical to and holds an extremely high correlation with the patterns in which Defendants Younger, Pickering, Demetriou, and Roase added to their May Contract short positions on April 20. See ¶¶45, 47, 49, 51 (identifying Defendants Younger, Pickering, Demetriou and Roase) and ¶143 (alleging the correlations). Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or from randomly independent trading decisions.

(b) Defendant Paul Commins exploited the TAS device to place selling pressure in the May Contract to net sell a total of ▮ May Contracts and avoid placing offsetting purchase pressure in the May Contract by purchasing ▮ TAS contracts on April 20.

(c) Defendant Paul Commins sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

**Answer:** To the extent Paragraph 41 refers to trading data or other discovery material, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 41 of the Second Amended Complaint.

42. Defendant George Commins ███████ Defendant Paul Commins and also maintained an account with Defendant Vega. Defendant George Commins resides at, and traded on April 20, 2020 █████████████████████████

████████████████████████████████████████████

██████ Defendant George Commins also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of ███████████████

**Answer:** Mr. Commins admits that Defendant George Commins ███

███, that Defendant George Commins maintained an account with Defendant Vega, and that Defendant George Commins traded out of his residence on April 20, 2020. Mr. Commins further admits that Defendant George Commins was registered with the FCA as an authorized representative of Starmark. Mr. Commins denies the remaining allegations contained in Paragraph 42 of the Second Amended Complaint.

43.     Defendant George Commins worked with other Vega Defendants to depress the prices of the May Contract on April 20. Among other things, Defendant George Commins communicated with other Vega Defendants about the May Contract put selling pressure into the May Contract on April 20 by net selling ███ May Contracts, and avoided putting offsetting buying pressure into the May Contract by net purchasing ███ TAS contracts. Defendant George Commins sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶ 111, 164 below.

**Answer:**     To the extent Paragraph 43 refers to trading data or other discovery material, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 43 of the Second Amended Complaint and, therefore, denies those allegations.

44.     Defendant Connor Grant Younger is the son of a friend of Defendant Paul Commins. Defendant Younger is a natural person residing ████████ ████████████████████████████████████████████████████████ ██████████████████ Defendant Younger also maintained an account with Vega,

is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Paul Commins trading team.

**Answer:**    Mr. Commins admits that Defendant Connor Grant Younger is a natural person, that Defendant Younger maintained an account with Defendant Vega, and that Defendant Younger was registered with the FCA as an authorized representative of Starmark.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 44 of the Second Amended Complaint and, therefore, denies those allegations.

45.    (a) Defendant Connor Younger's minute to the minute pattern of adding to his May Contract short position on April 20 is almost identical to and holds an extremely high correlation with the patterns in which Defendants Paul Commins, Pickering, Demetriou, and Roase added to their May Contract short positions on April 20. See ¶143 (identifying Defendants Paul Commins, Pickering, Demetriou and Roase) and ¶143 (alleging the .919 correlation to Defendant Commins' trades). Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or from randomly independent trading decisions.

(b) Defendant Younger exploited the TAS device to place selling pressure in the May Contract to net sell a total of █████ May Contracts and avoid placing

offsetting purchase pressure in the May Contract by net purchasing ████ TAS

contracts on April 20.

(c) Defendant Younger sold a large portion of his May Contracts in an

aggressive manner and used his May Contracts as "ammo" during April 20,

including during the last hour of trading.

**Answer:** To the extent Paragraph 45 refers to trading data or other

discovery material, Mr. Commins asserts that those materials speak for themselves

and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge

or information sufficient to form a belief about the truth or falsity of the allegations

in Paragraph 45 of the Second Amended Complaint and, therefore, denies those

allegations.

46. Defendant Aristos Demetriou ████████████████████████ 

████████████████████████████████ Chris Roase ████

████████████████████████████ Defendant

Demetriou has been a director of an entity called ██████████████, along

with Defendant Commins and Defendant Pickering. Additionally, Defendant

Demetriou co-owned a firm called ██████████████ with Defendant Paul

Commins. Defendant Demetriou is a natural person residing ██████████

████████████████████████████████████

████████ Defendant Demetriou also maintained an account with Vega, is also

registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Paul Commins trading team.

      **Answer:**    Mr. Commins admits that he was a director of ███ ████████████, that Defendants Pickering and Demetriou were briefly directors of ███████████████, and that he and Defendant Demetriou co-owned ███████████████. Mr. Commins further admits that Mr. Demetriou is a natural person, that Mr. Demetriou maintained an account with Vega, and that Mr. Demetriou was registered with the FCA as an authorized representative of Starmark. To the extent Paragraph 46 refers to discovery material or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 46 of the Second Amended Complaint and, therefore, denies those allegations.

     47.    (a) Defendant Demetriou's minute to the minute pattern of adding to his May Contract short position on April 20 is almost identical to and holds an extremely high correlation with the patterns in which Defendants Paul Commins, Pickering, Younger, and Roase added to their May Contract short positions on April 20. See ¶142 (identifying Defendants Paul Commins, Pickering, Younger and Roase) and ¶143 (alleging the .974 correlation to Defendant Commins' trades).

Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or from randomly independent trading decisions.

(b) Defendant Demetriou exploited the TAS device to place selling pressure in the May Contract to sell a total of ███ May Contracts and avoid placing offsetting purchase pressure in the May Contract by purchasing ███ TAS contracts on April 20.

(c) Defendant Demetriou sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

**Answer:**     To the extent Paragraph 47 refers to trading data or other discovery material, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 47 of the Second Amended Complaint and, therefore, denies those allegations.

48.     Defendant Elliott Edward Clark Pickering has been a director of an entity called ██████████████, along with Defendant Commins and Defendant Demetriou. Defendant Pickering is a natural person residing ███

██████████████████████████████████

██████████████████████████████████████████████ Defendant Pickering also

maintained an account with Vega, is also registered with the FCA as an authorized

representative of Starmark, and also is a member of Defendant Paul Commins

trading team.

**Answer:**   Mr. Commins admits that he was a director of ████

█████████████, along with Defendants Pickering and Demetriou.  Mr.

Commins further admits that Defendant Elliott Edward Clark Pickering is a natural

person, that Defendant Pickering maintained an account with Defendant Vega, and

that Defendant Pickering was registered with the FCA as an authorized

representative of Starmark. Mr. Commins lacks knowledge or information

sufficient to form a belief about the truth or falsity of the remaining allegations in

Paragraph 48 of the Second Amended Complaint and, therefore, denies those

allegations.

49.    (a) Defendant Pickering's minute to the minute pattern of adding to

his May Contract short position on April 20 is almost identical to and holds an

extremely high correlation with the patterns in which Defendants Paul Commins,

Demetriou, Younger, and Roase added to their May Contract short positions on

April 20. See ¶142 (identifying Defendants Paul Commins, Demetriou, Younger

and Roase) and ¶143 (alleging the .940 correlation to Defendant Commins' trades).

Such high correlations with one trader, much less many traders, have an extremely

low likelihood of occurring by chance or from randomly independent trading decisions.

(b) Defendant Pickering exploited the TAS device to place selling pressure in the May Contract to net sell a total of ▮▮▮ May Contracts and avoid placing offsetting purchase pressure in the May Contract by net purchasing ▮▮▮ TAS contracts on April 20.

(c) Defendant Pickering sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

**Answer:**    To the extent Paragraph 49 refers to trading data or other discovery material, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 49 of the Second Amended Complaint and, therefore, denies those allegations.

50.    Defendant Christopher Roase ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮ Defendant Commins ▮▮▮▮. Defendant Roase is a natural person residing ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Defendant Roase also maintained an account

with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Paul Commins trading team.

**Answer:** Mr. Commins admits that Defendant Christopher Roase is a natural person, that Mr. Roase was previously a trader operating at the International Petroleum Exchange, that Mr. Roase maintained an account with Defendant Vega, and that Mr. Roase was registered with the FCA as an authorized representative of Starmark. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 50 of the Second Amended Complaint and, therefore, denies those allegations.

51. (a) Defendant Roase's minute to the minute pattern of adding to his May Contract short position on April 20 is almost identical to and holds an extremely high correlation with the patterns in which Defendants Paul Commins, Pickering, Younger, and Demetriou added to their May Contract short positions on April 20. See ¶142 (identifying Defendants Paul Commins, Pickering, Younger and Demetriou) and ¶143 (alleging the .976 correlation to Defendant Commins' trades). Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or randomly independent trading decisions.

(b) Defendant Roase exploited the TAS device to place selling pressure in the May Contract to sell a total of ███ May Contracts and avoid placing offsetting purchase pressure in the May Contract by purchasing ███ TAS contracts on April 20.

(c) Defendant Roase sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

**Answer:**    To the extent Paragraph 51 refers to trading data or other discovery material, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 51 of the Second Amended Complaint and, therefore, denies those allegations.

52.    Defendant Henry Lunn is a natural person residing ██████████ ████████████████████████████████████████████████████████ ██████ Defendant Lunn also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Paul Commins trading team.

(a) Defendant Lunn's minute to the minute pattern of adding to his May Contract short position on April 20 is almost identical to and holds an extremely

high correlation with the patterns in which Defendants Paul Commins, Pickering, Younger, Roase, and Demetriou added to their May Contract short positions on April 20. See ¶142 (identifying Defendants Paul Commins, Pickering, Younger, Roase and Demetriou) and ¶143 (alleging the .946 correlation to Defendant Commins' trades). Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or randomly independent trading decisions.

(b) Defendant Lunn exploited the TAS device to place selling pressure in the May Contract by net selling ███ May Contracts and avoid placing offsetting purchase pressure in the May Contract by net purchasing ███ TAS contracts on April 20.

(c) Defendant Lunn sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

**Answer:** Mr. Commins admits that Defendant Henry Lunn is a natural person, that Defendant Lunn maintained an account with Defendant Vega, and that Defendant Lunn was registered with the FCA as an authorized representative of Starmark. To the extent Paragraph 52 refers to trading data or other discovery material, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 52 of the Second Amended Complaint and, therefore, denies those allegations.

53.     The five largest Vega traders accounted for 69% of the total Vega volume, and their minute by minute positions have extremely strong correlations (between 96.2% and 99.7%) with each other.

    a.  Younger's sales of May Contracts on April 20 were the largest sales of any Vega defendant on April 20. Younger's minute by minute positions in the May Contract had an extremely strong tendency (between .962 and .996) to increase as to the other largest Vega Traders on April 20 (Roase, Lunn, Demetriou, and Pickering).

    b.  Pickering's sales of May Contracts on April 20 were the second largest sales of any Vega defendant on April 20. Pickering's minute by minute positions in the May Contract had an extremely strong tendency (between .973 and .996) to increase as to the other largest Vega Traders on April 20 (Roase, Lunn, Younger, and Demetriou).

    c.  Demetriou's sales of May Contracts on April 20 were the third largest sales of any Vega defendant on April 20. Demetrious minute by minute positions in the May Contract had an extremely strong

tendency (between .977 and .997) to increase as to the other largest Vega Traders on April 20 (Roase, Lunn, Younger, and Pickering).

    d.  Roase's sales of May Contracts on April 20 were the fifth largest sales of any Vega defendant on April 20. Roase's minute by minute positions in the May Contract had an extremely strong tendency (between .962 and .997) to increase as to the other largest Vega Traders on April 20 (Demetriou, Lunn, Younger, and Pickering).

    e.  Lunn's sales of May Contracts on April 20 were the fourth largest sales of any Vega defendant on April 20. Lunn's minute by minute positions in the May Contract had an extremely strong tendency (between .981 and .993) to increase as to the other largest Vega Traders on April 20 (Roase, Demetriou, Younger, and Pickering).

**Answer:**    To the extent Paragraph 53 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 53 of the Second Amended Complaint and, therefore, denies those allegations.

54.    Defendant Matthew Rhys Thompson is a natural person residing ▪

█████ Defendant Thompson also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Paul Commins trading team.

(a) Defendant Thompson's minute to the minute pattern of adding to his May Contract short position on April 20 is almost identical to and holds an extremely high correlation (.979) with the patterns in which Defendants Paul Commins, Pickering, Younger, Roase, Lunn and Demetriou added to their May Contract short positions on April 20. See ¶¶ 142-143. Such high correlations with one trader, much less many traders, have an extremely low likelihood of occurring by chance or randomly independent trading decisions.

(b) Defendant Thompson exploited the TAS device to place selling pressure in the May Contract by selling █████ May Contracts and avoid placing offsetting purchase pressure in the May Contract by purchasing █████ TAS contracts on April 20.

(c) Defendant Thompson sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading.

**Answer:** Mr. Commins admits that Defendant Matthew Rhys Thompson is a natural person, that Defendant Thompson maintained an account with Defendant Vega, and that Defendant Thompson was registered with the FCA as an

authorized representative of Starmark. To the extent Paragraph 54 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 54 of the Second Amended Complaint and, therefore, denies those allegations.

55. Defendant ███████████████████ is a natural person residing ████████████████████████████████ ███████████████████████████ Defendant ██████ also maintained an account with Vega, completed compliance oversight training with Starmark to qualify as and later registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Paul Commins trading team. Defendant █████ worked with other Vega Defendants to depress the prices of the May Contract on April 20. Among other things, Defendant █████ communicated with other Vega Defendants about the May Contract, put selling pressure into the May Contract on April 20 by net selling █ May Contracts, and avoided putting offsetting buying pressure into the May Contract by purchasing █ TAS contracts. Defendant █████ sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶139, 145 below.

**Answer:** The allegations contained in Paragraph 55 relate to dismissed claims and, therefore, no response is required. To the extent a response is requested or necessary, Mr. Commins answers as follows. Mr. Commins admits only that Defendant ███████████████████████ is a natural person. To the extent Paragraph 55 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 55 of the Second Amended Complaint and, therefore, denies those allegations.

56.     Defendant Paul William Sutton is a natural person residing ███ ███████████████████████████████████████████ ██████ Defendant Sutton also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Paul Commins trading team. Defendant Sutton worked with other Vega Defendants to depress the prices of the May Contract on April 20. Among other things, Defendant Sutton communicated with other Vega Defendants about the May Contract, put selling pressure into the May Contract on April 20 by net selling ██ May Contracts, and avoided putting offsetting buying pressure into the May Contract by purchasing ██ TAS contracts. Defendant Sutton sold a large

portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶139, 145 below.

**Answer:**    Mr. Commins admits that Defendant Paul William Sutton is a natural person, that Defendant Sutton maintained an account with Defendant Vega, and that Defendant Sutton was registered with the FCA as an authorized representative of Starmark. To the extent Paragraph 56 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 56 of the Second Amended Complaint and, therefore, denies those allegations.

57.    Defendant ███████████ is a natural person residing in the ██████ ████████████████████████████████████████████████████ ██████. Defendant ██████ also maintained an account with Vega, completed compliance oversight training with Starmark to qualify as an authorized representative of Starmark, and also is a member of Defendant Paul Commins' trading team. Defendant ██████ worked with other Vega Defendants to depress the prices of the May Contract on April 20. Among other things, Defendant ██████ communicated with other Vega Defendants about the May Contract, put selling

pressure into the May Contract on April 20 by net selling ▆ May Contracts, and avoided putting offsetting buying pressure into the May Contract by purchasing ▆ TAS contracts. Defendant ▆ sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶139, 145 below.

**Answer:** The allegations contained in Paragraph 57 relate to dismissed claims and, therefore, no response is required. To the extent a response is requested or necessary, Mr. Commins answers as follows. Mr. Commins admits only that Defendant ▆ is a natural person. To the extent Paragraph 57 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 57 of the Second Amended Complaint and, therefore, denies those allegations.

58. Defendant James Michael Biagioni is a natural person residing ▆ ▆ ▆ Defendant Biagioni also maintained an account with Vega, is also registered with the FCA as an authorized representative of Starmark, and also is a member of Defendant Paul Commins trading team. Defendant Biagioni worked with other Vega Defendants to depress the prices of the May Contract on April 20.

Among other things, Defendant Biagioni communicated with other Vega Defendants about the May Contract, put selling pressure into the May Contract on April 20 by net selling ▮ May Contract, and avoided putting offsetting buying pressure into the May Contract by purchasing ▮ TAS contract. Defendant Biagioni sold a large portion of his May Contracts in an aggressive manner and used his May Contracts as "ammo" during April 20, including during the last hour of trading. See ¶¶139, 145 below. Defendant Biagioni made ▮ price moving trades for Defendant Sutton between 13:31:21 and 13:31:24. These trades were transferred to Defendant Sutton after Defendant Biagioni made them.

**Answer:**     Mr. Commins admits that Defendant James Michael Biagioni is a natural person, that Defendant Biagioni maintained an account with Defendant Vega, and that Defendant Biagioni was registered with the FCA as an authorized representative of Starmark. To the extent Paragraph 58 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 58 of the Second Amended Complaint and, therefore, denies those allegations.

59.     Starmark Investment Management Limited is a private limited company organized and existing under the laws of the United Kingdom, formed on

June 3, 1998, and having a registered office and principal place of business in London, England. Starmark has a supervisory role over Defendant Vega Capital that initiated with the latter's FCA registration as an Appointed Representative of Starmark, its Principal, from October 26, 2017 through August 13, 2019, the day Vega Capital's FCA registration terminated. Vega has a supervisory role of Defendant Spires who is a representative of Starmark.

**Answer:** Paragraph 59 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 59 of the Second Amended Complaint and, therefore, denies those allegations.

60. Eldon John Kerr, Starmark's co-founder, "currently focuses on monitoring Appointed Representative and CF30 trading activity," according to Starmark's website. As such, Mr. Kerr would have supervised Vega Capital in its role as Starmark's Appointed Representative until August 13, 2019. Despite the termination of Vega Capital's FCA registration as an Appointed Representative of Starmark on such date, Mr. Kerr's inclusion by GH Financials on April 21, 2020 correspondence with Vega Capital regarding the previous day's trading

irregularities suggests that Starmark's supervisory role over Defendant Spires or Defendant Vega's trading activities persists.

**Answer:**     To the extent Paragraph 60 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 60 of the Second Amended Complaint and, therefore, denies those allegations.

61.     In addition to its supervisory role over Defendant Vega, Starmark also directly supervises Defendants James Biagioni, Paul Commins, Aristos Demetriou, Henry Lunn, Elliott Pickering, Christopher Roase, Adrian Spires, Paul Sutton, Matthew Thompson and Connor Younger, all of whom are registered with the FCA as Starmark representatives.

**Answer:**     Paragraph 61 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 61 of the Second Amended Complaint and, therefore, denies those allegations.

62.     (a) Vega John Doe #1. Unknown Vega Defendant is one of the Vega accounts. This Defendant financially benefited from the manipulation of the May Contract by Defendant Vega and the Vega Trading Defendants.

(b) Vega John Doe #2. Unknown Vega Defendant is one of the Vega accounts. This Defendant financially benefited from the manipulation of the May Contract by Defendant Vega and the Vega Trading Defendants.

(c) Vega John Doe #3. Unknown Vega Defendant is one of the Vega accounts. This Defendant financially benefited from the manipulation of the May Contract by Defendant Vega and the Vega Trading Defendants.

(d) Vega John Doe #4. Unknown Vega Defendant is one of the Vega accounts. This Defendant financially benefited from the manipulation of the May Contract by Defendant Vega and the Vega Trading Defendants.

**Answer:**     Paragraph 62 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 62 of the Second Amended Complaint and, therefore, denies those allegations.

63.     John Doe Defendants 20-100 are persons or entities who worked with Defendants or on whose behalf Defendant Vega Capital worked to manipulate and fix prices of NYMEX crude oil futures contracts.

**Answer:**     Paragraph 63 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 63 of the Second Amended Complaint and, therefore, denies those allegations.

64.     G.H. Financials, LLC ("GHF LLC" or "GHF") has been a Delaware corporation since May 31, 2011. GHF became operational as a clearing Futures Commission Merchant the same year. An FCM is a futures broker. As such, it solicits or accepts orders to buy or sell futures contracts, and accepts money or other assets from customers to support such orders. GHF was Defendant Vega's broker until shortly after April 20, 2020 and made, as Vega's agent the sales on the May Contract.

**Answer:**     To the extent Paragraph 64 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity

of the allegations contained in Paragraph 64 of the Second Amended Complaint and, therefore, denies those allegations.

65.     GHF LLC is regulated by the Chicago Mercantile Exchange ("CME") which is a Delegated Self-Regulatory Organization ("DSRO") on behalf of the CFTC.

**Answer:**     Paragraph 65 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 65 of the Second Amended Complaint and, therefore, denies those allegations.

66.     GHF LLC is located at 311 South Wacker Drive, Suite 1550, Chicago, Illinois 60606, and is a member of the National Futures Association ("NFA"). GHF LLC also holds memberships on the CME, NYMEX and ICE Futures US.

**Answer:**     To the extent Paragraph 66 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 66 of the Second Amended Complaint and, therefore, denies those allegations.

67.     GHF acted as the FCM. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ On April 20, Vega was the customer of GHF which made all the manipulative trades alleged herein. GHF was the FCM and exchange member which made all those trades. The accounts held by the Vega Trading Defendants were sub accounts of the Vega accounts under the ██████ designation with different sub accounts.

**Answer:**     To the extent Paragraph 67 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 67 of the Second Amended Complaint and, therefore, denies those allegations.

68.     G.H. Financials Limited is a Private limited Company incorporated on January 4, 1993 and registered at Companies House as No. 02775278, with the nature of its business defined as security and commodity contract dealing activities (SIC 66120) and its registered office located at 29 Ludgate Hill, 4th Floor, London

ECAM 7JR ("GHF Ltd"). See: https://find-and-update.company-information.service.gov.uk/company/02775278

**Answer:** To the extent Paragraph 68 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 68 of the Second Amended Complaint and, therefore, denies those allegations.

## BACKGROUND

### A. Commodity Futures; How Futures Contract Trading Profits Or Losses Are Determined Using The May Contract As An Example.

69. A person may act as a futures contract exchange or board of trade only if that person is approved and designated to do so by the Commodity Futures Trading Commission. The CFTC approves such a designation only if the proposed exchange sufficiently demonstrates (a) that it has rules, such as position limit rules, to prevent price manipulation, and (b) that it has procedures to enforce such anti-manipulation rules.

**Answer:** Paragraph 69 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in

Paragraph 69 of the Second Amended Complaint and, therefore, denies those allegations.

70.     The NYMEX is designated by the CFTC as a board of trade. NYMEX is the world's largest physical commodity futures exchange. The NYMEX applies to the CFTC for permission to trade each commodity in which the NYMEX offers a contract. The NYMEX must establish, among other things, that the proposed contract is not prone to price manipulation in order to win approval to trade such contract. NYMEX members and clearing members have to follow the rules of the NYMEX. This includes the most important rules, the rules prohibiting manipulation.

**Answer:**     Paragraph 70 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 70 of the Second Amended Complaint and, therefore, denies those allegations.

71.     Also, commodity futures professionals licensed as associated persons, futures commissions merchants, commodity trading advisors, and commodity pool operators are required to be familiar with CFTC and exchange requirements. This includes the most important requirements, those prohibiting price manipulation.

**Answer:** Paragraph 71 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 71 of the Second Amended Complaint and, therefore, denies those allegations.

72. A commodity futures contract is an agreement to buy or sell a commodity, such as WTI, at a date in the future. Futures contracts are bilateral contracts with two sides. The "long" side is the buyer of the contract. The buyer is obligated to take delivery and pay for the commodity if the buyer holds the contract until the specified delivery dates. Buyers are referred to as "longs." The "short" side of the futures contract is the seller of the contract. The seller is obligated to make delivery of the commodity on the delivery dates. Sellers are referred to as "shorts."

**Answer:** Mr. Commins admits that a commodity futures contract is an agreement to buy or sell a commodity at a future date and that the buyer is considered the "long" side and the seller the "short" side of the contract. Mr. Commins denies the remaining allegations contained in Paragraph 72 of the Second Amended Complaint.

73.     Almost every aspect of a futures contract is standardized, except the price and quantity. Futures markets are specifically designed to facilitate and ease trading in one central marketplace for traders who are located throughout the United States and the world.

**Answer:**     Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 73 of the Second Amended Complaint and, therefore, denies those allegations.

74.     In practice, very few deliveries occur and most futures contracts are satisfied or "liquidated" in the trading market. For example, significantly less than I% of all WTI futures contracts traded result in deliveries. Well over 99% of the WTI futures contracts which are traded are satisfied through liquidation trading.

**Answer:**     Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 74 of the Second Amended Complaint and, therefore, denies those allegations.

75.     In order to satisfy a futures contract through trading in the futures market, a trader who holds a long position of one contract **sells** one contract. That creates one long position and one short position in such futures contract for the trader. These offsetting positions cancel out or liquidate the trader's obligations to purchase a commodity and make delivery of a commodity under the contracts. Likewise, a trader who holds a short position of one contract **buys** one contract in

order to trade out of the position. This, again, creates one long position and one short position for such trader. And this, again, cancels and liquidates the trader's original obligation to deliver the commodity by creating a separate obligation to purchase the commodity.

**Answer:**    Mr. Commins admits that buying and selling the same futures contract can result in offsetting long and short positions.  Mr. Commins denies the remaining allegations contained in Paragraph 75 of the Second Amended Complaint.

76.    The difference between the price at which a trader buys the contract and the price at which the trader sells the contract establishes the profit or loss on the contract.

**Answer:**    Mr. Commins denies the allegations contained in Paragraph 76 of the Second Amended Complaint.

77.    For example, suppose a trader sold one May Contract to establish a short position. Suppose the trader purchased back such May Contract later on the same day. Suppose that the sales price was $2.50 per barrel. Suppose that the purchase price was minus $37.50 per barrel. In this example, the profit (exclusive of trading commissions) would be $40.00 per barrel. Each May Contract consists of 1,000 barrels of WTI crude oil. The profit on that one contract (exclusive of commissions) would be $40,000.00.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the hypothetical allegations contained in Paragraph 77 and, therefore, denies those allegations.

78. Open interest is defined as the total number of futures contracts in a delivery month or market that has been entered into and not yet offset or cancelled. Each open transaction has a buyer (a long) and a seller (a short). The open interest in commodity futures contracts tends to fluctuate from day to day. The open interest and trading volumes in a futures contract begin to decrease very substantially during the last month of trading in a futures contract. As such contract approaches its final expiration date and all trading must cease, the last few days of trading the volume and open interest continue to their lowest levels.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 78 of the Second Amended Complaint.

**B. The WTI Contract**

79. One of the futures contracts traded on the CME is the light sweet crude oil (WTI) futures contract. The size of a WTI crude oil futures contract is 1,000 barrels. The WTI crude oil futures contracts call for settlement by physical delivery at a variety of pipelines or storage facilities in or around Cushing, Oklahoma.

**Answer:** Mr. Commins admits the allegations contained in Paragraph 79 of the Second Amended Complaint.

80.     Pursuant to NYMEX and CME rules, trading is conducted in WTI futures contracts expiring in each calendar month from the current month and continuing for the next ten calendar years plus two additional contract months. Trading in WTI crude oil futures contracts terminates on the third business day prior to the twenty-fifth calendar day of the month preceding the delivery month. If the twenty-fifth calendar day is not a business day, trading terminates four business days prior to the twenty-fifth calendar day of the month prior to the contract month.

**Answer:** To the extent Paragraph 80 refers to NYMEX and CME rules or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 80 of the Second Amended Complaint and, therefore, denies those allegations.

81.     Daily settlement prices of WTI crude oil futures are settled at the volume-weighted average price ("VWAP") of trades occurring on CME Globex between 1:28 and 1:30 p.m. Midwest time. The settlement price for the active

month contract is determined by trades in the active month and trades in other contract expirations are determined by calendar spread transactions.

**Answer:** To the extent Paragraph 81 refers to NYMEX and CME rules or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 81 of the Second Amended Complaint and, therefore, denies those allegations.

82. Trading in WTI crude oil futures contracts is subject to the rules and regulations of the NYMEX and CME, and prices are quoted in U.S. dollars and cents per barrel.

**Answer:** To the extent Paragraph 82 refers to NYMEX and CME rules or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins admits that trading on NYMEX is subject to NYMEX and CME Rules, and that prices are quoted in US dollars and cents.

83. The crude oil marketing hub in Cushing, Oklahoma is the most significant marketing and trading hub for crude oil in North America. Cushing serves as the delivery point for light sweet crude oil futures contracts traded on the CME.

**Answer:** To the extent Paragraph 83 refers to NYMEX and CME rules or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 83 of the Second Amended Complaint and, therefore, denies those allegations.

84. WTI crude oil is one of the most actively traded domestic crude oils, operates as the United States benchmark grade and is the primary deliverable grade under the WTI crude oil futures contracts.

**Answer:** To the extent Paragraph 84 refers to market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 84 of the Second Amended Complaint and, therefore, denies those allegations.

85. Like other commodity futures contracts which call for physical delivery, the open interest (see ¶79) and the daily trading volume in a WTI futures contract tend to decline dramatically as the last days of trading and the beginning of deliveries approach.

**Answer:** To the extent Paragraph 85 refers to market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 85 of the Second Amended Complaint and, therefore, denies those allegations.

86. In Trading at Settlement (or "TAS") for WTI contracts, a market participant agrees to purchase or sell a WTI futures contract at a price that is to be determined by the end of day settlement price of a particular WTI futures contract.

**Answer:** Mr. Commins admits the allegations contained in Paragraph 86 of the Second Amended Complaint.

87. Trade at Settlement is a capability that allows a commodities trader to execute an order to buy or sell an eligible futures contract at the settlement price or at a spread to the settlement price. The spread may be at a price up to a specified number of ticks (minimum price fluctuations) above or below the settlement price for that particular type of commodity contract. See e.g.,

www.theice.com/publicdocs/futures_us/TAS_FAQ.pdf

**Answer:** To the extent Paragraph 87 refers to NYMEX, CME, and ICE rules or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

Mr. Commins admits that traders may execute TAS trades at a premium or discount to the settlement price but lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 87 of the Second Amended Complaint and, therefore, denies those allegations.

88.     Similarly, traders who buy TAS contacts as they sell May Contracts have a motive to depress prices in order to make the prices approaching and at the end of the day as low as possible. Again, the cost band for TAS contracts is from minus ten cents to plus ten cents on the outright contracts, and minus twenty cents to plus twenty cents on the spreads. The NYMEX Rulebook provides: "Unless otherwise specified by the Exchange, a TAS transaction may be executed at the current day's settlement price or at any valid price increment ten ticks higher or lower than the settlement price." Chapter 5, Section 524.A.3 (TAS Transactions), available at:

https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/5.pdf

**Answer:**     To the extent Paragraph 88 refers to NYMEX, CME, and ICE rules or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 88 of the Second Amended Complaint.

89.     There are separate bids and offers for TAS contracts than for WTI contracts. TAS contracts are bought and sold at a price differential from the daily settlement price, so the final price of the TAS contract is the settlement plus or minus a premium or discount. The allowable price increments and differential are defined by NYMEX. See *Interim Staff Report; Trading in NYMEX WTI Crude Oil Futures Contract Leading up to, on, and around April 20, 2020* (CFTC Nov. 23, 2020). In the TAS contract market, the price may range ten ticks higher or lower than the settlement price. NYMEX Rule 524.

**Answer:**     To the extent Paragraph 89 refers to NYMEX, CME, and ICE rules or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins admits that traders may execute TAS trades at a premium or discount to the settlement price but lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 89 of the Second Amended Complaint and, therefore, denies those allegations.

90.     TAS contracts may serve valuable functions in physical delivery markets, including by allowing institutions and others to pay a small sum in order to lock in a trade at the settlement price determined between 1:28 and 1:30 pm Chicago time for a given WTI contract. However, even in well-designed and well-

regulated futures contracts such as the WTI futures contract, the use of TAS

contracts is subject to abuse when certain constraints exist in the market. See

¶¶107-112 below.

**Answer:**    Mr. Commins admits that TAS serves a valuable function in

physical delivery markets but denies in the remaining allegations in Paragraph 90

of the Second Amended Complaint.

91.    As recently stated by CFTC Commissioner Dan Berkovitz on

November 24, 2020: "The potential for TAS trading to artificially affect the

settlement price of a contract is well known; indeed, the CFTC has brought two

enforcement cases based on the use of TAS to manipulate the price of futures

contracts." See

https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement112320a.

Commissioner Berkovitz also expressed his view that the CFTC should look into

the TAS trading activity in its investigation of the precipitous drop and rebound of

WTI oil trading prices on April 20-21.

**Answer:**    To the extent Paragraph 91 refers to Commissioner Berkovitz's

public statements, Mr. Commins asserts that those statements speak for themselves

and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge

or information sufficient to form a belief about the truth or falsity of the remaining

allegations in Paragraph 91 of the Second Amended Complaint and, therefore, denies those allegations.

### C. Buying Pressure, Selling Pressure, Cumulative Net Sales And Cumulative Selling Pressure

92.    All else equal, sales of futures contracts exert downward pressure on prices, and the larger the number of sales, the greater the downward pressure on prices. All else equal, purchases of futures contracts exert upward pressure on prices, and the greater the number of purchases, the greater the upward pressure on prices.

**Answer:**    Mr. Commins denies the allegations contained in Paragraph 92 of the Second Amended Complaint.

93.    All else equal, the more that a market participant (or a group of market participants) sells a commodity futures contract and the less that they say a commodity futures contract during a trade day, the more cumulative net sales they will make and downward pressure on prices that they exert.

**Answer:**    Mr. Commins denies the allegations contained in Paragraph 93 of the Second Amended Complaint.

94.    All other things equal, buying pressure in a commodity futures contract will tend to make prices higher than they otherwise would have been. Selling pressure in a commodity futures contract will tend to make prices lower than they otherwise would have been.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 94 of the Second Amended Complaint.

95.     Bids are orders to buy a futures contract. Offers are orders to sell a futures contract. When the highest bid equals or exceeds the lowest offer, an agreement to purchase and sell a futures contract is made. Because the prices in the futures market are determined by the lowest offer and the highest bid, the futures markets are sometimes referred to as a dual auction market. After the match creating an execution, the bid and offer are removed from the order book to the extent of the match. The remaining bids and offers determine the prices.

**Answer:**     Mr. Commins admits that bids are orders to buy and offers orders to sell a futures contract.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 95 of the Second Amended Complaint and, therefore, denies those allegations.

96.     Orders to purchase or sell may be submitted in two general types. One is a "limit" order, which is an order to sell or buy at a price limit. A bid for $10 per barrel or better, is a bid to buy at a maximum of $10 and less than $10 if possible. An offer to sell at $10 per barrel is an offer to sell at $10 per barrel or higher, but not less than $10 per barrel.

**Answer:** Mr. Commins admits that a limit order is an order to buy or sell up to a certain price limit but denies in the remaining allegations in Paragraph 96 of the Second Amended Complaint.

97. A market order is an order to buy at or above the available offer, or to sell at or below the available bid in the market. Limit orders which seek to buy at or above the lowest offer or sell at or below the highest bid are, in effect, market orders to that extent.[4] A market order to sell 10 contracts is an offer to sell 10 contracts at whatever the bid is in the market. If there are three contracts bid at $10 per barrel, three contracts bid at $9.95 per barrel, three contracts bid at $9.90 per barrel, and one contract bid at $9.85 per barrel, the 10 contract market offer will, all other things equal, remove all of those from the order book and execute with the last price of $9.85 per barrel. The bid after that transaction will be whatever the highest bid is below $9.85 per barrel.

**Answer:** Mr. Commins admits that a market order is an order to buy at or above the available offer, or to sell at or below the available bid in the market, and that a limit order is an order to buy or sell up to a certain price limit. Mr. Commins also admits that a market order to sell 10 contracts is an offer to sell 10 contracts at whatever the bid is in the market. Mr. Commins lacks knowledge or information

---

[4] These are sometimes referred to as "marketable limit orders".

sufficient to form a belief about the truth or falsity of the remaining hypothetical allegations contained in Paragraph 97 and, therefore, denies those allegations.

98.     All other things equal, market order sells exert downward pressure on prices and market order buys exert upward pressure on prices.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 98 of the Second Amended Complaint.

99.     Making offers to sell below the highest bid in a volume greater than the highest bid causes prices to decline and "sells through the market". This removes from the order book the bids at the higher level. This is a sufficient, but not necessary condition to cause prices to decline.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 99 of the Second Amended Complaint.

100.    This can also execute the next bids and, depending on the size of the marketable offers and the size of the bids, take them out of the order book. If a trader adds marginal (*i.e.*, extra) offers to a market which exceed the bids in the market at a given price, then the trader or traders will cause prices to move down.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 100 of the Second Amended Complaint.

101.    If a trader is able to add marginal offers at a given price that cause the total offers to exceed the total bids, then there will be downward pressure on prices

and prices will move down. This is a significant but not a necessary condition to depress prices.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 101 of the Second Amended Complaint.

**The United States Commodity Futures Trading Commission And The United Kingdom Financial Control Authority Have Recognized That The Use By Traders Of Their Trades As "Ammo" Constitutes A Manipulative Device**

102. Regulators recognize that "ammo" is a term used by manipulators. Although the exact meaning of "ammo" varies in the context of the specific manipulation, the use of the term "ammo" signifies possession of the ability to make a quantity of transactions in a manner in which the transactions will depress or inflate futures contract prices.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 102 of the Second Amended Complaint.

103. The FCA has previously explained that the use of the word "ammo" was part of a manipulative strategy to influence prices.[5]

---

[5] https://fca-legacy.videomarketingplatform.co/secret//62508029/a45a0407be96952c359daa5be8158bcc (video presentation showing multiple firms using the phrase "leaving you with the ammo" as part of the collusive conversation in an attempt to fix and move rates); see also FCA Final Notice against UBS, https://www.fca.org.uk/publication/final-notices/final-notice-ubs.pdf. https://www.ft.com/content/47c32ec4-6a34-11e4-8fca-00144feabdc0 ("Furthermore, traders in a chatroom with net orders in the opposite direction to the desired movement at the fix sought to transact before the fix with traders outside the chatroom. The FCA said this practice was commonly referred to as "leaving you with the ammo", building the volume of orders held by the traders in the chatroom in the desired direction and increasing their potential influence on the fix.")

**Answer:** To the extent Paragraph 103 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 103 of the Second Amended Complaint and, therefore, denies those allegations.

104. The United States Commodity Futures Trading Commission also recognized the use of the term "ammo" as being part of a manipulative device in the consent order in ISDAFix. There, the CFTC stated that "...traders would use limited "ammo" and timing techniques to attempt to manipulate...". https://www.cftc.gov/sites/default/files/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfroyalorder020317.pdf

**Answer:** To the extent Paragraph 104 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 104 of the Second Amended Complaint and, therefore, denies those allegations.

105.    The CFTC, in providing "Examples of Misconduct in Private Chat Rooms"[6], discusses the use of the word "ammo". In an example under the heading, "Traders Share 'Ammo', the CFTC quotes a conversation where traders at different banks discuss "more ammo for you...."

**Answer:**    To the extent Paragraph 105 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 105 of the Second Amended Complaint and, therefore, denies those allegations.

## UNDERLYING ALLEGATIONS

### A.    The Abuse Of TAS Transactions To Manipulate Prices

106.    The use of TAS contracts may cause a fragmentation of order flow. Part of the order flow to purchase and sell, in this case, May Contracts, goes into the bids and asks for May Contracts. A different part of the order flow to purchase and sell May Contracts may be put into the TAS market.

**Answer:**    Mr. Commins denies the allegations in Paragraph 106 of the Second Amended Complaint.

---

6

https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/hsbcmisconduct111114.pdf

107.     Peer reviewed economic literature shows that this "fragmentation" of order flow into two different markets tends to (a) cause individual orders for the futures contract (here the May Contract) to have somewhat greater price impact; and that the purchase order in the TAS market does not exert buying pressure which offsets or equals the selling pressure in the futures contract, here the May Contract. Craig Pirrong, *The Economics Of Commodity Market Manipulation: A Survey*, Journal of Commodity Markets, Vol. 5, pp. 1-17, (March 2017).

**Answer:**     To the extent Paragraph 107 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 107 of the Second Amended Complaint and, therefore, denies those allegations.

108.     Thus, persons who purchased TAS contracts prior to or as they sell May Contracts during April 20, create for themselves an increasingly large financial interest in lower settlement prices for the May Contract. After their May Contract sales and TAS purchases go beyond an insignificant amount, certain types of traders have an increasingly large motive to make large net sales of the May Contract in order to exert downward pressure on the settlement price and create a profit for themselves.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 108 of the Second Amended Complaint.

109. Similarly, this type of manipulative trader, also has a large financial motive to recruit an increasingly large group of traders to follow the same modus operandi of selling the futures contract and buying the TAS contract. Combined, this group can exert cumulative net selling pressure on the (in this instance) May Contract as the day progresses.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 109 of the Second Amended Complaint.

110. Then, as the end of trading approaches (in the last hour or half hour of trading), this type of trader has a motivation to ramp up their own sales to a large percentage of the market and exert further causation of depression through blatantly using their sales as "ammo" to depress prices.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 110 of the Second Amended Complaint.

111. By doing the foregoing and also combining with other traders, this type of trader can bring its maximum pressure to bear on prices at the end of trading. Specifically, as the trading group's net cumulative sales of the futures contract are reaching their highest levels and reaching the most cumulative downward effect on prices (by removing the largest cumulative amounts of bids

from the order book), the trading group also increases its percentage of sales in the market and does so in an aggressive manner that converts that significant percentage of the share of the sales in the market into the manipulative device of "ammo". Both the large percentage of sales and the greater impact per sale of making the sale as "ammo" (i.e., very aggressively to intentionally move down prices) exert separate and further downward impacts on prices.

**Answer:**    Mr. Commins denies the allegations contained in Paragraph 111 of the Second Amended Complaint.

112.    The foregoing profile is exactly what the Vega Trading Defendants did in the May Contract.

**Answer:**    Mr. Commins denies the allegations contained in Paragraph 112 of the Second Amended Complaint.

**B.    Defendant Commins' background and formation of a group that could execute a TAS manipulation.**

113.    Defendant Paul Commins ███████████████████████████

████████████████████████████████████████████████████

███ Defendant Commins ███████████████████████████████

████████████████

**Answer:**    Mr. Commins admits that ████████████████████████

████████████████████████████████████████████████████

██████. Mr. Commins denies the remaining allegations contained in Paragraph 113 of the Second Amended Complaint.

114.   Traders on the IPE reportedly combined together to make transactions in opposition directions in the futures contract and related TAS contract. For example, they would purchase the TAS contract and sell the futures contracts. By engaging in increasing selling as the day wore on, the IPE traders could cause the TAS contract prices to be lower. By depressing the TAS price, they IPE futures traders could make a profit on the difference between their higher priced sales earlier in the day and their lower prices at which they purchased at the end of the day by virtue of the lower settlement they caused and which, through the TAS mechanism, became their purchase price.

**Answer:**   Mr. Commins denies the allegations contained in Paragraph 114 of the Second Amended Complaint.

115.   After the closing of the IPE, former floor traders banded together at "arcades" or "prop" (proprietary trading) shops with five of these groups, known as the "five families" based in London. One advantage of having these groups is that they could exploit the TAS mechanism exactly by trading in a group.

**Answer:**   Mr. Commins denies the allegations contained in Paragraph 115 of the Second Amended Complaint.

116.   Reportedly, Defendant Commins and other traders worked for one of the "five families" – ███████████████████ – for a long time.

**Answer:**   Mr. Commins admits that he traded through ███████████ ███████ but denies the remaining allegations contained in Paragraph 116 of the Second Amended Complaint.

117.   However, Defendant Commins then reportedly started his own group which consists at least of the other Vega Trading Defendants.

**Answer:**   Mr. Commins admits that he started trading through Vega Capital London Ltd. and introduced some of the other Vega Trading Defendants to Vega but denies the remaining allegations contained in Paragraph 117 of the Second Amended Complaint.

118.   Reportedly, the Vega Defendants frequently make trades in the same contracts at around the same time to move prices.

**Answer:**   Mr. Commins denies the allegations contained in Paragraph 118 of the Second Amended Complaint.

119.   ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████

**Answer:** To the extent Paragraph 119 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies allegations contained in Paragraph 119 of the Second Amended Complaint to the extent they suggest that he engaged in any misconduct.

120. ███████████████████████████ Defendant Spires and Commins ████████████████████████████████████ ████████████████

**Answer:** Paragraph 120 refers to written discovery materials, and Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

121. ████████████████████████████

██████████████████████████████████████

█████████████████████████████████ That is, the Vega Trading Defendants commit their trading capital to fund one another's risks, which is similar to a joint venture in which the co-venturers commit their trading capital to help any member of the combine.

**Answer:** To the extent Paragraph 121 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins admits that he committed his individual capital to Vega Capital London, Ltd. but denies the remaining allegations contained in Paragraph 121 of the Second Amended Complaint.

122.  Defendants Matthew Thompson and Paul Sutton Defendant Paul Commins

**Answer:** To the extent Paragraph 122 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. With respect to the allegations in the second sentence of Paragraph 122, Mr.

---

[7] VEGA_M1SH_000042676
[8] VEGA_M1SH_000042676
[9] *See* https://find-and-update.company-information.service.gov.uk/company/07158619

Commins admits that ███████████████████████████████████████████ ███████████████████████████████████. Mr. Commins admits that he owned 25% of the equity of Futures Trading Facilities Limited and that David Kavanagh owned 50% of the same. Mr. Commins denies the remaining allegations contained in Paragraph 122 of the Second Amended Complaint.

123. ██████████████████████████████████████ Defendant Commins ███████████████████████████ Defendants Thompson and Sutton.

**Answer:** To the extent Paragraph 123 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins admits that Defendant ███████████████████████████ ███████████████████████████████. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 123 of the Second Amended Complaint and, therefore, denies those allegations.

124. Also, Vega has a financial motive to see that Thompson and Sutton are in a position to try to make lots of profits; however, provided that the pool of capital is sufficient from the Vega Traders, Vega has no downside. I.e., the more risk that Thompson and Sutton take, the more that Vega stands to gain.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 124 of the Second Amended Complaint.

125.    Defendant Paul Commins ███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 125 of the Second Amended Complaint.

126.    Thus, Defendant Commins speaks on behalf of all the other Defendants. In such position, Defendant Commins not only knows the reasons behind what each trader was doing, but that the reasons were the exact same.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 126 of the Second Amended Complaint.

127.    When people act for exactly the same reasons, they are more likely to be in an agreement, especially if an agreement to combine together makes them more likely to achieve their goals and make their reasons work out. This is even more true when the reasons are a market power manipulation in which the traders are combining their cumulative net sales of the May Contract and separate purchases of TAS contracts to have the largest financial motive to manipulate and the largest ability to manipulatively depress May Contract prices at the close of trading on April 20. Finally, what they were doing on April 20 is exactly parallel to

a TAS manipulation (described in ¶¶87-92, 107-113 above) and the type of TAS manipulations that occurred on the IPE (described in ¶¶114-116 above). It is also a type of manipulation which "families" of traders are well positioned to engage. See ¶¶116-117 above. Reportedly, Commins and other traders at Vega vacation together, socialize together, and drink together.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 127 of the Second Amended Complaint.

### C. The Vega Defendants Manipulative Depression of May Contract Prices

128. On April 20th, the Vega Defendants believed that the May Contract was in its next to last day of trading and was a "thin" market in which there was not great depth of trading and orders to purchase. The Vega Defendants believed that the May Contract was vulnerable to price depression by a concerted group of traders pursuing the following method. The traders would exert an increasing cumulative net selling pressure on the May Contract. As that cumulative net selling pressure reached high levels, the Vega Defendants would use their sales as manipulative "ammo". See above. The use of the "ammo" would both depress prices directly, and also increase Vega's rate of sales and the percentage of the total volume of May Contract sales that the Vega Defendants' sales constituted. This combination of increasing cumulative net selling pressure (which had been removing purchase orders from the market), the use of manipulative "ammo" sales,

and the large increases in Vega's percentage of the overall volume of sales in the market would manipulatively depress May Contract prices during April 20th including at the time of the determination of the TAS. Thereby, the Vega Defendants would reap substantial profits from the higher prices at which they made their May Contract sales and the lower prices at which they would purchase as determined by the artificially depressed settlement price.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 128 of the Second Amended Complaint.

129. As with all manipulations, there were risks to the manipulators of the success of their manipulation. But the Vega Defendants reportedly had prior experience with trading together at the same times to move prices. And they successfully executed their manipulative depression of May Contract prices.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 129 of the Second Amended Complaint.

130. On April 20th, the May Contract price was approximately $11.69 per barrel at 9:00 a.m. in Chicago. From at or about 9:00 am on April 20th until at or about 11 am, the May Contract price declined from $11.69 to $10.33. During this time, the Vega Defendants placed increasing cumulative net selling pressure on the May Contract price. This caused the May Contract prices to be lower than they otherwise would have been.

**Answer:** To the extent Paragraph 130 refers to trading data, market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 130 of the Second Amended Complaint.

131. Similarly, during the next time periods of the day (alleged below) the Vega trading Defendants continued to increase their cumulative net selling pressure on the May Contract price. During each of these periods, the Vega Trading Defendants placed increasing cumulative net selling pressure on the May Contract and caused the May Contract prices to be lower than they otherwise would have been.

**Answer:** To the extent Paragraph 131 refers to trading data, market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 131 of the Second Amended Complaint.

132. A manipulator seeks to sell at a high price and buy at a low price. The Vega Defendants followed this pattern. They exerted less pressure on May Contract prices until their cumulative net selling pressure had built up a substantial short position in the May Contract and a substantial TAS position to liquidate

(purchase back) that short position at whatever that May Contract price turned out to be at the end of trading.

   **Answer:**    Mr. Commins denies the allegations contained in Paragraph 132 of the Second Amended Complaint.

   133.   ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

   **Answer:**    Mr. Commins denies the allegations contained in Paragraph 133 of the Second Amended Complaint.

   134.   During this time period, the Vega Defendants

   a.   Substantially increased their number of May Contracts sold per minute.

   b.   Substantially increased their percentage of the total sales of May Contracts made by the entire market.

   c.   Exerted greater depressive impact on prices, per each new May Contract sold, by selling in a manipulative "ammo" fashion.

   **Answer:**    To the extent Paragraph 134 refers to trading data, market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr.

Commins denies the remaining allegations contained in Paragraph 134 of the Second Amended Complaint.

135.    During the Vega Defendants' final frenzy of manipulative ammo selling, they caused and help cause the May Contract to move into negative prices for the first time in history, and to experience the vast majority of its all-time record price decline on April 20th during a brief 20 minute period between 1:08 and 1:28 pm.

**Answer:**    To the extent Paragraph 135 refers to trading data, market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 135 of the Second Amended Complaint.

136.    Specifically, due to the combination of all Vega's foregoing steps, the May Contract declined from minus one penny per barrel to as low as minus 42 dollars per barrel.

**Answer:**    To the extent Paragraph 136 refers to trading data, market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 136 of the Second Amended Complaint.

**D.     The Vega Trading Defendants Combined, Conspired and Worked In Concert For The Purpose of Depressing the Price of the May 2020 WTI Crude Oil Futures Contract on April 20, 2020**

137.   On April 20, 2020, each Vega Trading Defendant engaged in the **exact same manipulative strategy:** purchasing May Contracts via TAS and selling May Contracts for the purpose of depressing its price, which also allowed them to increase their position limits because they had less risk of the TAS.[10] Having purchased large volumes of May Contracts via TAS, the Vega Trading Defendants had a large financial incentive for the price of the May Contract to go lower.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 137 of the Second Amended Complaint.

138.   On the trading day for April 20, 2020, each of the below Vega Trading Defendants purchased May Contracts via TAS and sold May Contracts in approximately the amounts set forth below. In total, the Vega Trading Defendants sold approximately ███ May 2020 Contracts ████████████████ ████████████████ and purchased approximately ████ May Contracts via TAS.[11] The Vega Trading Defendants' profits in connection with their trading of the May Contract on April 20, 2020 totaled approximately ████████

---

[10] Transactions in the May Contract, including sales, move prices. TAS transactions in the May Contract, including TAS purchases, have minimal or sometimes no impact on prices.

[11] On the trading day for April 20, 2020, the Vega Trading Defendants purchased approximately ███ May 2020 NYMEX WTI futures contracts via outright trades. Approximately 40% of these



a. Defendant Connor Younger ███████████████

b. Defendant Elliott Pickering ████████

c. Defendant Aristos Demetriou ████

d. Defendant Henry Lunn ████

e. Defendant Christopher Roase █████

f. Defendant ████

purchases ████████████ came after 1:30 p.m. On the trading day for April 20, 2020, the Vega Trading Defendants sold ██ May Contracts via TAS.

g. Defendant Mathew Thompson 

h. Defendant Paul Commins

i. Defendant George Commins

j. Defendant Paul Sutton

k. Defendant

      May 2020 NYMEX WTI crude oil futures contract on April 20, 2020.

l. Defendant James Biagioni

m.

████████████████████████████████████
████████████

**Answer:**     To the extent Paragraph 138 refers to trading data or written

discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same. Mr. Commins

denies the remaining allegations contained in Paragraph 138 of the Second

Amended Complaint.

139.    ████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

| Connor Younger |
| Elliott Pickering |
| Aristos Demetriou |
| Henry Lunn |
| Christopher Roase |
| ██████████ |
| Matthew Thompson |
| Paul Commins |
| George Commins |
| Paul Sutton |
| ██████████ |
| ██████████ |
| James Biagioni |

**Answer:**     To the extent Paragraph 139 refers to trading data or written

discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 139 of the Second Amended Complaint.

140. Despite representing to the CME that the Vega Trading Defendants acted "independently" on April 20, 2020 *(see* ¶¶ 37, 126), the five Vega Trading Defendants with the highest volume of May Contract sales (approximately 69% of Vega's total sales)—Defendants Younger, Pickering, Demetriou, Lunn and Roase—sold May Contracts in virtual lockstep as reflected in the below chart. Based upon information and belief, Plaintiff alleges that the Vega Trading Defendants entered trades manually, and not by computer program.



Vega Traders' K20 Positions by Minute on 4/20/2020

**Answer:** To the extent Paragraph 140 refers to trading data, market data or written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 140 of the Second Amended Complaint.

141. A statistical correlation analysis of the minute-by-minute positions of Defendants Younger, Pickering, Demetriou, Lunn and Roase reflects that these five traders' positions in the May Contract on April 20 were very highly correlated. Specifically, the minute-by-minute positions of these five traders in the May

Contract had an extremely strong tendency **(between 96.2% and 99.7%)** to move in the same direction at the very same time throughout the day on April 20.

| | Demetriou | Roase | Lunn | Younger | Pickering |
|---|---|---|---|---|---|
| **Demetriou** | ■ | ■ | ■ | ■ | ■ |
| **Roase** | ■ | ■ | ■ | ■ | ■ |
| **Lunn** | ■ | ■ | ■ | ■ | ■ |
| **Younger** | ■ | ■ | ■ | ■ | ■ |
| **Pickering** | ■ | ■ | ■ | ■ | ■ |

**Answer:** To the extent Paragraph 141 refers to trading data, market data or written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 141 of the Second Amended Complaint.

142. Further, each of the above Defendants additions to its positions was highly correlated with those of Defendant Paul Commins.

| Defendant | | |
|---|---|---|
| | ■ Defendant Paul Commins | |
| Defendant Younger | ■ | |
| Defendant Demetriou | ■ | |
| Defendant Pickering | ■ | |
| Defendant Roase | ■ | |
| Defendant Lunn | ■ | |

**Answer:** To the extent Paragraph 142 refers to trading data, market data or written discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same. Mr. Commins

denies the remaining allegations contained in Paragraph 142 of the Second

Amended Complaint.

143. In order to depress the price of the May 2020 NYMEX WTI crude oil

futures contract (and thereby reap large profits by purchasing via TAS May

Contracts at an extremely low price), the Vega Trading Defendants combined and

conspired to sell large volumes of May Contracts in the final hours before the

settlement price of the May Contract was to be determined at approximately 1:30

p.m. CST on April 20. *See* below.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 143

of the Second Amended Complaint.

144. As detailed below, the Vega Trading Defendants' large sales of the

May Contract constituted an increasingly larger share of the total trading volume

of the May Contract (growing to more than 30% of the total volume during the last

approximately 22 minutes of trading) at the same times that the prices of the May

Contract were increasing their rate of decline. Specifically:

    a. During the time period 9:00 a.m. CST until 11:00 a.m. CST on April
   20, 2020, the Vega Trading Defendants sold approximately ██
   May Contracts, which constituted approximately **6.7%** of the total
   volume in the May Contract during the same time period. During this
   time period, the Vega Trading Defendants sold, on average, ██ May
   Contracts per minute. The price of the May Contract decreased by
   approximately $1.36 per barrel from 9:00 a.m. CST (approximately
   $11.69 per barrel) to 11:00 a.m. CST ($10.33 per barrel).



i. Defendant Elliott Pickering ███████████████

ii. Defendant Aristos Demetriou ███████████████

iii. Defendant Christopher Roase ███████████████

iv. Defendant Conor Younger ███████████████

v. Defendant ███████████████

vi. Defendant Paul Commins ███████████████

vii. Defendant Henry Lunn ███████████████

viii. Defendant Matthew Thompson ███████████████

ix. Defendant George Commins ███████████████

x. Defendant Paul Sutton ███████████████

b. During the time period 11:00 a.m. CST until noon CST on April 20, 2020, the Vega Trading Defendants sold approximately ███ May Contracts, which constituted approximately **16.4%** of the total volume in the May Contract during the same time period. During this time period, the Vega Trading Defendants sold, on average, ███ May Contracts per minute. The price of the May Contract decreased by approximately $5.41 per barrel from 11:00 a.m. CST (approximately $10.33 per barrel) to noon CST ($4.92 per barrel).

i.   Defendant Aristos Demetriou 

ii.  Defendant Elliott Pickering

iii. Defendant Christopher Roase

iv.  Defendant Henry Lunn

v.   Defendant Conor Younger

vi.  Defendant

vii. .   Defendant Matthew Thompson

viii. Defendant Paul Commins

ix.  Defendant George Commins

x.   Defendant

xi.  Defendant Paul Sutton

xii.

xiii. Defendant James Biagioni

c. During the last 1.5 hours of trading (noon CST until 1:30 p.m. CST), the Vega Trading Defendants sold approximately ▮▮ May Contracts, which constituted approximately **23.6%** of the total volume in the May Contract during the same time period. During this time period, the Vega Trading Defendants sold, on average, ▮▮ May Contracts per minute. The price of the May Contract decreased by approximately $42.55 per barrel from noon CST (approximately $4.92 per barrel) to 1:30 p.m. CST (negative $37.63 per barrel).

    i.  Defendant Conor Younger ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   ii.  Defendant Elliott Pickering ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

   iii.  Defendant Aristos Demetriou ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   iv.  Defendant Henry Lunn ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   v.  Defendant Christopher Roase ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   vi.  Defendant Matthew Thompson ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   vii.  Defendant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   viii.  Defendant Paul Commins ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   ix.  Defendant George Commins ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

   x.  Defendant Paul Sutton ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

xi. Defendant 

xii.

xiii. Defendant James Biagioni

d. During the last half hour of trading (1:00 p.m. CST to 1:30 p.m. CST), the Vega Trading Defendants sold approximately ▮▮ May Contracts, which constituted approximately **29.2%** of the total volume in the May Contract during the same time period. During this time period, the Vega Trading Defendants sold, on average, ▮▮ May Contracts per minute. The price of the May Contract decreased by approximately $38.29 per barrel from 1:00 p.m. CST (approximately $0.66 per barrel) to 1:30 p.m. CST (negative $37.63 per barrel). The average price decline of the May Contract during this time period was approximately $1.28 a barrel per minute.

i. Defendant Conor Younger 

ii. Defendant Elliott Pickering

iii. Defendant Aristos Demetriou

iv. Defendant Matthew Thompson

v. Defendant Christopher Roase

vi. Defendant Paul Commins



vii. Defendant Henry Lunn

viii. Defendant George Commins

ix. Defendant

x. Defendant Paul Sutton

xi. Defendant

xii.

e. During the last approximately 22 minutes of trading *(i.e.*, from the time when the first May Contract traded at a negative price (approximately 1:08:23 p.m. CST) until the 1:30 p.m. CST,) the Vega Trading Defendants sold approximately ▇▇ May Contracts, which constituted approximately **30.5%** of the total volume in the May Contract during the same time period. During this time period, the Vega Trading Defendants sold, on average, ▇▇ May Contracts per minute. The price of the May Contract decreased by approximately $37.62 per barrel from approximately 1:08:23 CST (approximately negative $0.01 per barrel) to 1:30 p.m. CST (negative $37.63 per barrel). The average price decline of the May Contract during this time period was approximately $1.71 a barrel per minute.

i. Defendant Conor Younger

ii. Defendant Elliott Pickering



iii. Defendant Aristos Demetriou

iv. Defendant Matthew Thompson

v. Defendant Paul Commins

vi. Defendant George Commins

vii. Defendant Christopher Roase

viii. Defendant

ix. Defendant Henry Lunn

x. Defendant Paul Sutton

xi.

**Answer:**    To the extent Paragraph 144 refers to trading data, market data or written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 144 of the Second Amended Complaint.

## E.     Net Cumulative Aggressive Sales Pressure.

145.    Though not a necessary condition for manipulation, a sufficient condition for manipulation the creation of significant net aggressive selling pressure on a futures contract.

**Answer:**     Paragraph 145 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 145 of the Second Amended Complaint.

146.    The CME provides an aggressor indicator in its market depth data for individual trades. The CME states

> "An aggressor is defined as any customer order that triggers a trade immediately upon entering the book.
>
> Tag 5797-AggressorSide indicates if the trade had an aggressor and, if so, which side of the book it was on. When an Aggressor Side is defined (1 = Buy, 2 = Sell), the first Order Detail level related to the Summary Level represents that aggressor order.
>
> - The aggressor quantity (tag 32) in the first Order Detail entry is equal to the Summary Level fill quantity (tag 271)
> - If the aggressor quantity (tag 32) in the first Order Detail entry is equal to the sum of the remaining Order Detail entries quantity associated with that Summary Level, only customer orders were filled in the trade
> - If the aggressor quantity (tag 32) is **not** equal to the sum of the remaining Order Detail entries quantity associated with that Summary Level, customer and

implied orders were filled in the trade. The unreported quantity are the participating implied orders.

- There may be only **one** Order Detail entry present, which means an aggressing customer order traded against implied orders only.
- The aggressor quantity (tag 32) in the first Order Detail entry is **not** equal to the Summary Level fill quantity (tag 271)
- In this case, the aggressor joined a pool of resting orders and thereby created sufficient quantity to trigger a trade.
- This scenario can occur in any ratio spread where a different minimum quantity is required for each leg in order for the spread to trade. Examples include IVR and butterfly spreads."

https://www.cmegroup.com/confluence/display/EPICSANDBOX/MDP+3.0+-+Trade+Summary+Order+Level+Detail Last reviewed on 1/22/2021.

**Answer:** To the extent Paragraph 146 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

147. The CME describes the impact of an aggressor or an aggressing order as follows:

> An "Aggressor" or "Aggressing Order" by definition is an incoming order matching with one or more orders resting on the order book. The Aggressor pulls liquidity out of the order book by triggering a match event removing resting quantity and potentially price level from the order book.

> The Aggressor is identified in each order match during the continuous trading period and reported on all three customer interfaces, Order Entry, Market Data, and Post-Matching/Clearing. There is no Aggressor indicator for

trades occurring at the end of the market opening auction
or any other state other than continuous trading.

https://www.cmegroup.com/confluence/display/EPICSANDBOX/Order+Function
alities [last reviewed on 1/22/2021].

 **Answer:** To the extent Paragraph 147 refers to publicly available
information, Mr. Commins asserts that those materials speak for themselves and
denies Plaintiff's characterization of the same.

 148. The CME describes multiple situations in which a transaction is not
assigned an aggressor tag even if it has the impact of matching with one or more
orders resting on the order book (and thereby "removing resting quantity and
potentially price level from the order book"). These situations include the use of
the mixing of a spread order and outright order to create an implied order for the
execution, and during the market open re-open resolution trades.

https://www.cmegroup.com/confluence/display/EPICSANDBOX/MDP+3.0+-
+Trade+Summary+Order+Level+Detail [last reviewed on 1/22/2021].

 **Answer:** To the extent Paragraph 148 refers to publicly available
information, Mr. Commins asserts that those materials speak for themselves and
denies Plaintiff's characterization of the same.

 149. Also, the CME does not report an aggressor tag for market open and
re-open resolution trades. *Id.*

**Answer:** To the extent Paragraph 149 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

150. Likewise, for spread trading the CME states

> "For trades involving spread instruments, the Aggressor is reported at the spread level only. Meaning, that the aggressor flag is only present in the Fill Notice for the spread summary and the flag is not present in the Fill Notices submitted for the leg components of the spread."

https://www.cmegroup.com/confluence/display/EPICSANDBOX/Order+Function alities [last visited on 1/26/2021].

**Answer:** To the extent Paragraph 150 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

151. Accordingly, even transactions that do not appear in the CME aggressor column, may functionally constitute "aggressor" transactions if they remove resting bids or offers from the order book.

**Answer:** To the extent Paragraph 151 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

152.    The CME record of aggressor sales minus the aggressor purchases for a given period *(e.g.*, April 20, 2020) is one indication of the cumulative net selling pressure placed on the market during that period.

**Answer:**    Mr. Commins denies the allegations contained in Paragraph 152 of the Second Amended Complaint.

153.    If a market participant's aggressive sales exceed that participant's aggressive buys over a given period, then that participant will exert downward pressure on prices during that period. The greater the difference between the participant's aggressive purchases and sales, the more selling pressure and the greater the decline in prices that participant will cause over that period, all else equal. The greater the percentage that a market participant's net aggressive sales represent of the entire market's net aggressive sales over a given period, the larger the proportion of the price decline during that period the market participant may cause.

**Answer:**    Mr. Commins denies the allegations contained in Paragraph 153 of the Second Amended Complaint.

154.    **Total CME Net Aggressor Sales Of May Contracts On April 20.** The CME Market Depth FIX records reflect aggressive sales of approximately 47,077 May Contracts and aggressive purchases of approximately 20,769 May Contracts on April 20. Subtracting the May Contracts transacted in aggressive

purchases from the May Contracts transacted in aggressive sales on April 20, produces a net aggressive sales of May Contracts on April 20 of 26,306 contracts for the Chicago trading day from 9am.

**Answer:**     To the extent Paragraph 154 refers to trading data, market data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

155.   Through their coordinated selling pressure on the May Contract and their coordinated diversion of buying pressure into the TAS contract, the Vega Trading Defendants also made on April 20 aggressive sales of May Contracts that were much greater than their aggressive purchases of May Contracts.

**Answer:**     To the extent Paragraph 155 refers to trading data, market data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 155 of the Second Amended Complaint.

156.   **Estimating Vega's Aggressive Sales.** The CME has a column which designates trades as "aggressor" trades in its Order Entry, Market Data, and Post-Matching/Clearing. A comparison between the exact prices and the exact times (to the nanosecond) of the transactions reflected in the CME's Market Data as aggressive sales, with the exact prices and exact times (to the nanosecond) of

Vega's sales of May Contracts reflected in Vega's records, produces an estimate of the approximate amount of aggressive sales made by the Vega Defendants during April 20. Based on this comparison, Plaintiff estimates that the Vega Defendants made aggressive sales of at least ███ May Contracts on April 20.

**Answer:**     To the extent Paragraph 156 refers to trading data, market data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 156 of the Second Amended Complaint.

157.    **Estimating Vega's Aggressive Purchases.** A comparison between the exact prices and exact times to the nanosecond of the transactions reflected in the CME market data as aggressive purchases, with the exact prices and exact times (to the nanosecond) of Vega's purchase of May Contracts reflected in Vega's records, produces an estimate of the approximate amount of May Contracts of which Vega made aggressive purchases of approximately ███ contracts on April 20.

**Answer:**     To the extent Paragraph 157 refers to trading data, market data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins

denies the remaining allegations contained in Paragraph 157 of the Second

Amended Complaint.

158.   Based upon the comparison of the data sets, Plaintiff has good

grounds to believe and does allege that Vega made aggressive sales of at least

████ May Contracts and aggressive purchases of approximately ███ May

Contracts during April 20. Discovery is needed to determine the exact extent of

Vega's aggressor purchases and sales.

**Answer:**      To the extent Paragraph 158 refers to trading data, market data

or discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same.  Mr. Commins

denies the remaining allegations contained in Paragraph 158 of the Second

Amended Complaint.

159.   **Estimating Vega's Net Aggressive Sales.** Subtracting Vega's

estimated aggressive purchases of ███ contracts from Vega's estimated aggressive

sales of ████ May Contracts on April 20 produces a net aggressive sales by Vega

on April 20, of at least ████ contracts.

**Answer:**      To the extent Paragraph 159 refers to trading data, market data

or discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same.  Mr. Commins

denies the remaining allegations contained in Paragraph 159 of the Second Amended Complaint.

160. **Estimating The Percentage That Vega's Net Aggressive Sales Constituted Of The Entire Market's Net Aggressive Sales On April 20.** The net aggressive sales by Vega of ▮ May Contracts on April 20 constitutes approximately 26.4% of the total net aggressive sales of ▮ May Contracts by the entire market on April 20.

**Answer:**     To the extent Paragraph 160 refers to trading data, market data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 160 of the Second Amended Complaint.

161.   Applying the same methodology as applied above to the time periods within May 20, Plaintiff has good grounds to believe and does allege as follows.

**Answer:**     To the extent Paragraph 161 refers to trading data, market data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 161 of the Second Amended Complaint.

162. In addition to having a large share of the total volume of the May Contract, the Vega Trading Defendants had an even larger share of the cumulative total net aggressor sales. Specifically:

a. From 9:00 a.m. CST until 11:00 a.m. CST, the Vega Trading Defendants had a minimum of approximately ███ net aggressor sales of May Contracts out of a total of approximately ███ net aggressive sales of May Contracts in the market during this same time period. Thus, the Vega Trading Defendants' sales of May Contracts during this time period constituted at least ███ of the total net aggressive sales of the total market during this time period.

b. From 11:00 a.m. CST until noon CST, the Vega Trading Defendants had a minimum of approximately ███ net aggressor sales of May Contracts out of a total of approximately ███ net aggressive sales of May Contracts in the market during this same time period. Thus, the Vega Trading Defendants' sales of May Contracts during this time period constituted at least ███ of the total net aggressive sales of the total market during this time period.

c. From noon CST until 1:30 CST, the Vega Trading Defendants had a minimum of approximately ███ net aggressor sales of May Contracts out of a total of approximately ███ net aggressive sales of May Contracts in the market during this same time period. Thus, the Vega Trading Defendants' sales of May Contracts during this time period constituted at least ███ of the total net aggressive sales of the total market during this time period.

d. From 1:00 p.m. CST until 1:30 p.m. CST, the Vega Trading Defendants had a minimum of approximately ███ net aggressor sales of May Contracts out of a total of approximately ███ net aggressive sales of May Contracts in the market during this same time period. Thus, the Vega Trading Defendants' sales of May Contracts during this time period constituted at least ███ of the total net aggressive sales of the total market during this time period.

e. From 1:08:23 p.m. CST until 1:30 p.m. CST, the Vega Trading Defendants had a minimum of approximately ███ net aggressor sales of May Contracts out of a total of approximately ███ net aggressive sales of May Contracts in the market during this same time period. Thus, the Vega Trading Defendants' sales of May Contracts

during this time period constituted at least ███ of the total net aggressive sales of the total market during this time period.

**Answer:** To the extent Paragraph 162 refers to trading data, market data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 162 of the Second Amended Complaint.

163. Plaintiff has good grounds to believe and does allege that discovery will show that the Vega Defendants exerted an increasing cumulative net aggressive selling pressure on the May Contract during April 20; that their net aggressive sales ramped up during the last hours, the last hour, and the last 30 minutes of trading; and that the combination of these steps exerted a substantial downward effect on prices during April 20.

**Answer:** To the extent Paragraph 163 refers to trading data, market data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 163 of the Second Amended Complaint.

**F.** **High Degree Of Communications Among Most Vega Defendants And The Common Plan For Everyone To Be Short And Use Manipulative "Ammo" At The End Of Trading.**

164. In furtherance of their agreement to depress May Contract prices, the Vega Trading Defendants communicated, in real time, about their sales of the May Contract and related matters. To do so, such Defendants employed text messages, group text messages, phone calls, and private "bulletin board" texting available via mobile phone "apps" such as "WhatsApp".

**Answer:** To the extent Paragraph 164 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 164 of the Second Amended Complaint.

165. Through these means, the Vega Trading Defendants discussed their May Contract positions, their selling of WTI futures, their buying of TAS positions, and their plans for depressing WTI futures contract prices.

**Answer:** To the extent Paragraph 165 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 165 of the Second Amended Complaint.

166. Pursuant to Defendants agreement, Defendants Matt Thompson and Henry Lunn ███████████████████████████████



**Answer:** To the extent Paragraph 166 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 166 of the Second Amended Complaint and, therefore, denies those allegations.

167. By 1:05 Chicago time, Defendants had substantially ramped up their sales of May Contracts and their impact on prices. ███████████████

████████████████████████████████████

Defendants' selling pressure on the May Contract had moved prices down and was

getting very close to causing the May Contract prices to become negative. ████

████████████████████████████████ Defendant Lunn ████████████████

██████████████ and Defendant Thompson ████████████████████████

████████ Also between 1pm and 1:30, the Vega Defendants increased their rate of

sales to ████ contracts per minute, and increased the amount of depression they

caused per contract sold through the use of the manipulative device of "ammo"

sales. See allegations **"D"** immediately preceding this section.

> **Answer:**     To the extent Paragraph 167 refers to written discovery
>
> materials, Mr. Commins asserts that those materials speak for themselves and
>
> denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or
>
> information sufficient to form a belief about the truth or falsity of the allegations in
>
> Paragraph 167 of the Second Amended Complaint and, therefore, denies those
>
> allegations.

168.   Pursuant to Defendants' agreement, three Vega Trading Defendants

Lunn, Connor and Pickering ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

> **Answer:**     To the extent Paragraph 168 refers to written discovery
>
> materials, Mr. Commins asserts that those materials speak for themselves and
>
> denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 168 of the Second Amended Complaint and, therefore, denies those allegations.

169. As is revealed by a comparison of all the records in this communication with Defendant Lunn's statements alleged above in his communication with Defendant Thompson, Defendant Pickering ███████ ████████████████████████████████████████████████ However, Plaintiff has good grounds to believe and does allege that Defendant Pickering ██████████ Defendant Lunn or Defendant Thompson ████████████████ ██████████████████████████████████████████ Defendant Pickering sold █████ May Contracts from 1 p.m. Chicago time to 1:30 pm.

**Answer:** To the extent Paragraph 169 refers to trading data or market data, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 169 of the Second Amended Complaint and, therefore, denies those allegations.

170. Some of these conversations include the following:

a) [Henry Lunn]: ██████████████████████████
███████████████████████ Connor Younger Fresh:
████████████████████████████████████████

Device owner Lunn: ██████████████ Elliot
Pickering: ██████████████████████

b) Connor Younger ████████████████████████████
████████ Lunn ████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

**Answer:** To the extent Paragraph 170 refers to discovery materials, Mr.

Commins asserts that those materials speak for themselves and denies Plaintiff's

characterization of the same. Mr. Commins lacks knowledge or information

sufficient to form a belief about the truth or falsity of the remaining allegations in

Paragraph 169 of the Second Amended Complaint and, therefore, denies those

allegations.

171. Also pursuant to their combination and agreement, Defendants Paul

Commins and Demetriou engaged in various conversations to keep one another

apprised of their positions and intentions via texts on WhatsApp. Among other

things, they compared their trading positions and confirmed their mutual intentions

to sell May Contracts outright.

a. ██████████████████████████ Defendant Commins tells
Defendant Demetriou ████████████████████████ to
which Demetriou responds ██████████████████████████

b. ██████████████████████████ Defendant Demetriou asks
Defendant Commins ████████████████████████████
██████████████████████████ Defendant Commins
responds ████████████████████████ to Mr. Demetriou.

c. ████████████████████████ Defendant Demetriou responds ████████

**Answer:** To the extent Paragraph 171 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 171 of the Second Amended Complaint.

172. Plaintiff has good grounds to believe and does allege that Defendants Paul Commins and Defendant Demetriou confirmed to one another that the other Vega Trading Defendants were engaged in the same pattern of placing cumulative net selling pressure into the May Contract and diverting buying pressure away from the May Contract and into the TAS market.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 172 of the Second Amended Complaint.

173. ████████████████████████ Defendant Demetriou ████████████████████████████████████████████ ████████████████████████████████████████████ Defendant Commins responds ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

**Answer:** To the extent Paragraph 173 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's

characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 173 of the Second Amended Complaint.

174. The communications between Defendant Commins and Demetrious also indicate Defendants' mutual knowledge of their concerted diversion of buying pressure away from the May Contract and into TAS contracts. ███████████ ████████████



a. ████████████████████████ Defendant Commins ██ Defendant Demitriou ████████████████████████

b. ██████████████████████ Defendant Commins ████████████████████████████████████ ██████████████ Defendant Commins' ████████ ████████████████████████████ ████████████████████████

c. ████████████████████████ Defendant Commins ██████████████████████████████████ ████████████████████████

d. ████████████████████████ Defendant Commins ██████████████████████████████████ ████████████████████ Both Defendant Commins and Defendant Demetriou, ████████████████████████████ ████████████████████████

e. ████████████████████ Defendant Demetriou ████████ Defendant Commins ████████████ Mr. Demetriou's ████████████████████████ ████████████████████████

**Answer:** To the extent Paragraph 174 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's

characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 174 of the Second Amended Complaint.

175.  ██████████████████████████████████ Defendants Roase and Demetriou (or Defendants Roase and Commins) ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████ Defendant Roase' ██████████████

██████████████ Defendant Demetriou and Commins, and Defendant Demetriou's

██████████████████████████ with Defendant Commins.

**Answer:**   To the extent Paragraph 175 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 175 of the Second Amended Complaint.

176.  ████████████████████████████████████████

████████████████████████████████████████ Defendant Roase

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████

**Answer:**    To the extent Paragraph 176 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 176 of the Second Amended Complaint and, therefore, denies those allegations.

177.    ███████████████████████████████████████

████████ Defendant Roase (Dog) and Defendant Demetriou.



**Answer:**    To the extent Paragraph 177 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 177 of the Second Amended Complaint and, therefore, denies those allegations.

178.    ███████████████████████████████████████

Defendant Henry Lunn stated ███████████████████████████████████

███████████████████████████████████████

Defendant Lunn 

**Answer:** To the extent Paragraph 178 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 178 of the Second Amended Complaint and, therefore, denies those allegations.

179.

Defendant George Commins

**Answer:** To the extent Paragraph 179 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's

characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 179 of the Second Amended Complaint.

180.    The Commins Defendants' 

**<u>Answer:</u>**    To the extent Paragraph 180 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 180 of the Second Amended Complaint.

181.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████

**<u>Answer:</u>**    To the extent Paragraph 181 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations

contained in Paragraph 181 of the Second Amended Complaint and, therefore,

denies those allegations.

182. 



**Answer:**   To the extent Paragraph 182 refers to discovery materials, Mr.

Commins asserts that those materials speak for themselves and denies Plaintiff's

characterization of the same.  Mr. Commins lacks knowledge or information

sufficient to form a belief about the truth or falsity of the remaining allegations

contained in Paragraph 182 of the Second Amended Complaint and, therefore,

denies those allegations.

183.



Adrian Spires

[Henry Lunn]

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████ Spires ██████████████████

██████████████████████ [Henry Lunn], █████████████

██████████████████████████████████████████████

████████████████████████████████

**Answer:**      To the extent Paragraph 183 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 183 of the Second Amended Complaint and, therefore, denies those allegations.

184.   ████████████████████████████████████████

██████████████████████████████████████████████

████████████████ Adrian Spires ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████ (Demetriou and roase) ███████████████████████████████████████

████████████████████████████████████████████████ [Paul Commins];

████████ [Demetriou]; ████████ [Roase]; ████████ [George Commins];

████████ [Lunn]; ████████ [Younger]; ████████ [Thompson]; ████████

[Pickering]; ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

**Answer:**     To the extent Paragraph 184 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 184 of the Second Amended Complaint and, therefore, denies those allegations.

185.     ████████████████████████ Adrian Spires ████████████ Paul Commins ████████████████████████████████████████████

████████████████████████████

**Answer:** To the extent Paragraph 185 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 185 of the Second Amended Complaint.

186. ███████████████████████ Adrian Spires ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████ (Defendant Paul Commins) ███████████████████

███████████████████████ (Defendants Aristos Demetriou and Christopher

Roase). ███████████████████████████████ (Defendants Aristos

Demetriou, Christopher Roase, and Henry Lunn), ███████████████████

███████████████ [Defendant Henry Lunn] ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ [Defendant George Commins] ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████

**Answer:**　　To the extent Paragraph 186 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 186 of the Second Amended Complaint and, therefore, denies those allegations.

187.　██████████████████████████ Henry Lunn ███████████████

████████████ Adrian Spires ████████████████████████████

████████████████████████████████

**Answer:**　　To the extent Paragraph 187 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 187 of the Second Amended Complaint and, therefore, denies those allegations.

188.　██████████████████████████ Henry Lunn ██████████████

Adrian Spires ████████████████████████████████████████

████████████████████

**Answer:**　　To the extent Paragraph 188 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information

sufficient to form a belief about the truth or falsity of the allegations in Paragraph 188 of the Second Amended Complaint and, therefore, denies those allegations.

189. ██████████████████████████ Paul Commins ████████████ ████ Adrian Spires ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██████████████████

**Answer:** To the extent Paragraph 189 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 189 of the Second Amended Complaint.

190. ████████ Commins' ██████████████████████████

████████████████████████████████████████

████████████████████████████████████

[Defendants Aristos Demetriou and Christopher Roase]. ███ Defendants Aristos Demetriou and Christopher Roase ██████████████████████

████████████████████████████████

████████████████████████████████ Paul Commins ████████████████████████████████

**Answer:** To the extent Paragraph 190 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 190 of the Second Amended Complaint.

191. ████████████████████████████████████████ George Commins ████████████████████ Aristos Demetriou ████████████ ████████████████████████████████████ Adrian Spires ████████████████████████████████████████ ████████

**Answer:** To the extent Paragraph 191 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 191 of the Second Amended Complaint and, therefore, denies those allegations.

192. ████████████████████████████████████████ ████████ Adrian Spires ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

**Answer:**     To the extent Paragraph 192 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 192 of the Second Amended Complaint and, therefore, denies those allegations.

193.     ████████████████████████ Adrian Spires ███████████████████

████████████████████████████████████████████████

████████████████

**Answer:**     To the extent Paragraph 193 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations

contained in Paragraph 193 of the Second Amended Complaint and, therefore,

denies those allegations.

194. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Adrian Spires ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Paul Commins ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

**Answer:** To the extent Paragraph 194 refers to discovery materials, Mr.

Commins asserts that those materials speak for themselves and denies Plaintiff's

characterization of the same. Mr. Commins lacks knowledge or information

sufficient to form a belief about the truth or falsity of the remaining allegations

contained in Paragraph 194 of the Second Amended Complaint and, therefore,

denies those allegations.

G.     **The ICE WTI Crude Oil Futures Contract Price Is Explicitly
       Determined By The Price of the NYMEX WTI Crude Oil Futures
       Contract and Numerous Vega Trading Defendants Profited on the
       ICE Due to Artificially Depressing the May Contract Price on the
       NYMEX**

195. The Defendants had an additional motivation to intentionally cause

(and they did cause) artificially depressed prices of the May Contract. This is

because the closing price of the May 2020 NYMEX WTI crude oil futures contract

on April 20, 2020 determined the settlement price of the May Contract that expired

on April 20, 2020.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 195 of the Second Amended Complaint.

196. The Intercontinental Exchange ("ICE") offers trading in effectively the same WTI crude oil futures contracts as the NYMEX *(i.e.*, representing 1,000 barrels of WTI crude oil) with one important difference.

**Answer:** Mr. Commins admits that ICE offers trading in a futures contract that may relate to WTI but denies the remaining allegations contained in Paragraph 196 of the Second Amended Complaint.

197. Unlike NYMEX WTI futures contracts, which may be settled by physical delivery with trading terminating three business days prior to the 25th calendar day of the month prior to the contract month, trading in ICE WTI futures contracts terminate on the fourth business day prior to the 25th calendar day of the month by "cash settlement," not physical delivery.

**Answer:** To the extent Paragraph 197 refers to market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

198. More specifically, ICE WTI futures contracts cash settle to the penultimate settlement price of the corresponding NYMEX WTI crude oil futures contract. For example, on April 20, 2020, the May Contract cash settled to the

settlement price of the May 2020 NYMEX WTI crude oil futures contract on April 20, 2020 (*i.e.*, negative $37.63).

**Answer:** To the extent Paragraph 198 refers to market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

199. On April 20, 2020, the total volume of May Contracts traded was approximately 20,789 contracts. At the end of trading on April 20, 2020, a total of approximately 23,241 May Contracts remained open and thereby were cash settled to the settlement price of the May Contract on April 20, 2020 (*i.e.*, negative $37.63).

**Answer:** To the extent Paragraph 199 refers to market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

200. On April 20, 2020, numerous Vega Trading Defendants engaged in a manipulative trading strategy on the ICE that was virtually identical to the manipulative trading strategy employed by the Vega Trading Defendants on the NYMEX (*see* ¶¶138-139 above): selling May Contracts and buying May Contracts via TAS. *See* ¶¶203 below.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 200 of the Second Amended Complaint.

201. Because the settlement price of the May Contract on April 20, 2020 would be, by its express terms, determined by the closing price of the May 2020 NYMEX WTI futures contract on April 20, 2020 *(see* ¶¶ 198-99 above), the Vega Trading Defendants' artificial suppression of the May 2020 NYMEX WTI futures price alleged herein **necessarily** resulted in an artificially depressed price of the May Contract.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 201 of the Second Amended Complaint.

202. On April 20, 2020, each of the below Vega Trading Defendants purchased May Contracts via TAS and sold May Contracts in approximately the amounts set forth below. 

a. Defendant Aristos Demetriou

Demetriou

b. Defendant Henry Lunn

Defendant Lunn

c. Defendant Christopher Roase

Defendant Roase



**Answer:**     To the extent Paragraph 202 refers to market data or other publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 202 of the Second Amended Complaint.

**H.     Vega Also Made Its Sales In An Aggressive Manner.**

203.   Another means that may be used to depress prices is to make sales in an aggressive manner.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 203 of the Second Amended Complaint.

204.   Thus, when an "aggressor" sale is executed, it "pulls liquidity out of the order book" by "removing resting" bid or bids to purchase contracts. In the context of the imbalance of sell orders over buy orders on April 20, the more that the bids were pulled out of the order book by executions, the closer that the sell orders were to "blitzing" through the orders and causing a rapid decline in prices.

**Answer:**   To the extent Paragraph 204 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 204 of the Second Amended Complaint.

205.   Plaintiff has good grounds to believe and does allege that considerably more than one half of Vega's sales were "aggressor" sales. Plaintiff has good grounds to believe that discovery will reveal that up to 90% or more of Vega's sales were aggressor sales. Plaintiff's grounds for these allegations include the following.

**Answer:**   To the extent Paragraph 205 refers to trading data, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in contained in Paragraph 205 of the Second Amended Complaint and, therefore, denies those allegations.

206.    

**Answer:**    To the extent Paragraph 206 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

207.    ████████████████████████████████████████████████

████████████████████████.

**Answer:**    To the extent Paragraph 207 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 207 of the Second Amended Complaint.

208.    Fourth, making "aggressive" sales is consistent with the Vega Defendants conduct otherwise alleged herein, including at ¶¶42, 44, 46, 48, 50, 52-53, 55-59, 112, 146, 154-61, 163-64, 204, 209.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 208 of the Second Amended Complaint.

## NEW ALLEGATIONS MADE PURSUANT TO THE ORDER

### I. The Extensive Interconnections, And Formal Contract Among Vega, ███, And The Vega Trading Defendants.

209. Vega's contract governing its relations with the Vega Trading Defendants was an agreement made among (a) Vega, (b)  ███, and (c) the Vega Trading Defendants. See ¶¶239-243 below.

**Answer:** To the extent that Paragraph 209 refers to a document that is in writing, Mr. Commins asserts that it speaks for itself and denies Plaintiff's characterization of the same.

### A. The Extensive Interconnections.

#### 1. The Profit Interests Of Defendants Vega And Spires In ███.

210. Until April 1, 2021, ███████████████ was  owned 25% by Defendant Paul Commins, 25% by ███████████, and 50% by ███████████ who was another trader and FCA approved representative of Starmark.[12] ¶123. Defendant Commins was listed as an office manager and director of the company.

**Answer:** Mr. Commins admits that until April 1, 2021, he partly owned ███████████████. To the extent Paragraph 210 refers to

---

[12] *See* https://find-and-update.company-information.service.gov.uk/company/07158619

publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 210 of the Second Amended Complaint and, therefore, denies those allegations.

211. On April 1, 2021, ███ filing with the Companies House disclosed for the first time that Adrian Spires was also a person with a significant interest and, in fact, control of ███. The filing disclosed that Spires "holds, directly or indirectly, 75% or more of the voting rights in the company", and that ███ ███████████████████ were removed as directors of ███. Based on this filing, Plaintiff alleges that, from some point prior to or as of April 1, 2021 forward, Spires owned a (substantial) share of the equity and held a (substantial) share of the voting rights of ███.

**Answer:** To the extent Paragraph 211 refers to publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remainder of the allegations in Paragraph 211 of the Second Amended Complaint and, therefore, denies those allegations.

212.   On March 1, 2022, ▮▮▮▮ was dissolved pursuant to an application co-signed by Defendants Spires and Commins, and no further information was provided.

**Answer:**   Mr. Commins admits that ▮▮▮▮ was dissolved effective March 1, 2022.  With respect to the remainder of the allegations, Paragraph 212 of the Second Amended Complaint references material that is in writing and speaks for itself, and Mr. Commins denies Plaintiff's characterization of the same.

213.   As alleged below (¶¶214-223), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendant Spires' ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defendant Spires ▮▮▮▮▮▮▮▮▮▮

**Answer:**   To the extent that Paragraph 213 refers to written discovery, those materials speak for themselves, and Mr. Commins denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 213 of the Second Amended Complaint and, therefore, denies those allegations.

214. ███████████████████████████████████████

████████████████████████ ████████████████████████

███████████████████████████ Thompson and Sutton. ████████

████████████████████████ Thompson's ████████████████

███████████████████████████████████████████████

████████████████████████

**<u>Answer:</u>** Mr. Commins admits that he partly owns ████████████

████████████████████ and that Mr. Commins agreed ████████████████

████████ Defendant Vega. To the extent Paragraph 214 refers to written

discovery material or publicly available information, Mr. Commins asserts that

such information speaks for itself and denies Plaintiff's characterization of the

same. Mr. Commins admits that Defendants ████████████████████████

████████████████████████. Mr. Commins denies the remaining

allegations in Paragraph 214 of the Second Amended Complaint.

215. ████████████████████ Defendant Thompson's profits, Defendants

Matt Thompson and Henry Lunn ████████████████████████████

████████████

████████████████████████ ████



---

[13] VEGA_MISH_000042676 ████████████████████████████

████████████████████████



Elliot Pickering

**Answer:**     To the extent Paragraph 215 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 215 of the Second Amended Complaint and, therefore, denies those allegations.



216.    

Defendant Sutton, Mr. Sutton

George Commins

See ¶¶328-333 below. As a result of their consulting with one another in their trading of the May Contract, Defendant Sutton's trading had an extraordinarily high minute to minute correlation with Defendant George Commins' positions of .99. See ¶319 below. And Defendant

Sutton's trading also had high correlations of .988 to .951 with the trading of Defendants Younger, Pickering, and Lunn. *Id.*

**Answer:**     To the extent Paragraph 216 refers to trading data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 216 of the Second Amended Complaint and, therefore, denies those allegations.

217.   As previously alleged, Defendant Thompson made approximately  and Defendant Sutton made approximately ███████ from their manipulative trades on April 20th. ██████████████████████ ███ Defendant Thompson ████████████ and Defendant Sutton ████ ████████████████████████████████████████████ ████████████████ Defendants Thompson and Sutton ████████████

**Answer:**     To the extent Paragraph 217 refers to trading data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 217 of the Second Amended Complaint and, therefore, denies those allegations.

218. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

**Answer:** To the extent Paragraph 218 refers to trading data or discovery

materials, Mr. Commins asserts that those materials speak for themselves and

denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the allegations in

Paragraph 218 of the Second Amended Complaint and, therefore, denies those

allegations.

219. ███████████████████████████████ Thompson and

Sutton ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ Defendants Thompson and Sutton ████████

███████████████████████████████████████████████

█████ See ¶218.

**Answer:** To the extent Paragraph 219 refers to trading data or discovery

materials, Mr. Commins asserts that those materials speak for themselves and

denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the allegations in

Paragraph 219 of the Second Amended Complaint and, therefore, denies those allegations.

220. ██████████████████████████████████████ Thompson-Sutton ██████████████████████████████████ Thompson and Sutton ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ See ¶218.

**<u>Answer:</u>** Mr. Commins admits that he agreed ████████████████████ ██████████████████████. To the extent Paragraph 220 refers to written discovery material or publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins admits that ████████████████████████████████ ████████████████████████████. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations in Paragraph 220 of the Second Amended Complaint and, therefore, denies those allegations.

221. ████████████████████████████████████████████

████████ Thompson-Sutton █████████████████████████████████

████████████████████████████████████████████████████

████████████ See ¶218.

**Answer:** To the extent Paragraph 221 refers to trading data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 221 of the Second Amended Complaint and, therefore, denies those allegations.

222. ████████████████████████████████

████████████████████████ Spires ████████████████

████████████████████████████████████████

████████████████████████████

**Answer:** Paragraph 222 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 222 of the Second Amended Complaint.

223. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 223 of the Second Amended Complaint and, therefore, denies those allegations.

## 2. The Formation Of Vega.

### a. During 2015 And 2016, The United Kingdom Announces And Implements Enhanced Prohibitions Of Manipulation

224. By as early as May 11, 2015, the U.K.'s Financial Conduct Authority published its policy proposals and handbook of rules and guidance to support the implementation of the new European Market Abuse Regulation regime, to apply from July 3, 2016. *FCA consults on Market Abuse Regulation policy proposals and Handbook changes*, FCA Press Release (May 11, 2015), at https://www.fca.org.uk/news/press-releases/fca-consults-market-abuse-regulation-policy-proposals-and-handbook-changes; *see* FCA's website *Market Abuse Regulation*, at https://www.fca.org.uk/markets/market-abuse/regulation, hyperlink *"EU Market Abuse Regulation"* (Regulation (EU) No. 596/2014 of the European Parliament and of the Council of April 16, 2014 on market abuse (market abuse regulation) and repealing Directive 2003/6/EC of the European Parliament and of the Council and Commission Directives 2003/124/EC, 2003/125/EC and 2004/72/EC) (last visited Apr. 27, 2022).

**Answer:** To the extent Paragraph 224 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and

denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 224 of the Second Amended Complaint and, therefore, denies those allegations.

225. By December 17, 2015, the European Union supplemented the EU Market Abuse Regulation. *See* E.U. Commission Delegated Regulation (EU) 2016/522 (applicable from July 3, 2016), at https://www.fca.org.uk/markets/market-abuse/regulation, hyperlink "*Delegated Regulation 2016/522*" (last visited Apr. 27, 2022).

**Answer:** To the extent Paragraph 225 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 225 of the Second Amended Complaint and, therefore, denies those allegations.

226. Effective July 3, 2016, the EU Market Abuse Regulation was automatically applicable in the UK under UK and EU law without the need for any domestic implementing legislation as the UK was a member of the EU at the time of implementation, and the UK amended its Financial Services and Market Act 2000 to give effect to and make it compatible with the EU Market Abuse

Regulation. Financial Services and Market Act 2000 (Market Abuse) Regulations 2016, Part 1.1 (Statutory Instruments, 2016 No. 680) ("UK MAR"). See Market Abuse (Amendment) (EU Exit) Regulations 2019, UK Statutory Instruments (2019 No. 310) (substantially retaining EU Market Abuse Regulation following the end of the Brexit transition period, pursuant to the European Union (Withdrawal Act 2018), available at https://www.legislation.gov.uk/uksi/2019/310/contents/made (last visited April 28, 2022).

**Answer:** To the extent Paragraph 226 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 226 of the Second Amended Complaint and, therefore, denies those allegations.

227. For purposes of Article 12(1)(a) of the UK MAR, which prohibits manipulation, the UK MAR explicitly sets forth non-exhaustive indicators of manipulative trading, effective July 3, 2016. UK MAR, Annex I (https://www.fca.org.uk/markets/market-abuse/regulation#revisions, at hyperlink "Market Abuse Regulation (MAR)") ("UK MAR, Annex I"). The indications include:

> (a) the extent to which orders to trade given or transactions undertaken represent a significant proportion

of the daily volume of transactions in the relevant financial instrument ..., in particular when those activities lead to a significant change in their prices;

(b) the extent to which orders to trade given or transactions undertaken by persons with a significant buying or selling position in a financial instrument..., lead to significant changes in the price of that financial instrument, related spot commodity contract, or auctioned product based on emission allowances;

**** 

(e) the extent to which orders to trade given or transactions undertaken are concentrated within a short time span in the trading session and lead to a price change which is subsequently reversed;

****

(g) the extent to which orders to trade are given or transactions are undertaken at or around a specific time when reference prices, settlement prices and valuations are calculated and lead to price changes which have an effect on such prices and valuations.

UK MAR, Annex I.

**Answer:** To the extent Paragraph 227 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 227 of the Second Amended Complaint and, therefore, denies those allegations.

### b. These Enhanced Protections Against Manipulation Created Greater Financial And Legal Risks For Firms Which Carried Accounts For Manipulators.

228.   After the announcements in 2015 about the increased regulations against manipulations and market abuses, it was clear that there would be greater legal and financial risks for registered persons to hold the accounts of manipulators, including persons who manipulated prices at or around the time of the determination of the TAS.

**Answer:**      To the extent Paragraph 228 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 228 of the Second Amended Complaint and, therefore, denies those allegations.

229.   These legal and financial risks created incentives to form and opened opportunities for persons to form trading firms that could assume the substantial legal and financial risk of working with persons who engaged in TAS manipulations. Such firms could seek to create a series of norms, trading procedures, and compliance (or lack thereof) that facilitated and would help defend against charges of TAS manipulations.

**Answer:** To the extent Paragraph 229 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 229 of the Second Amended Complaint and, therefore, denies those allegations.

230. In the foregoing context, Vega was incorporated on May 13, 2016, with Anthony Gibson as its sole shareholder. See ¶34.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 230 of the Second Amended Complaint and, therefore, denies those allegations.

### c. Vega's Apparent Founder, Anthony Gibson, Is A Business Partner With Defendant Commins, Including In █████ ████████████████

231. Anthony Gibson and Defendant Paul Commins are or have been business partners in various ventures.

**Answer:** Mr. Commins admits that Anthony Gibson is or has been his business partner in certain construction ventures. To the extent Paragraph 231 refers to written discovery material, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same.

232.    These include, without limitation, ████████████████

████████████████ and ████████████████████

████.

**Answer:**    Mr. Commins admits that Anthony Gibson is or has been his

business partner in ████████████████████████ and

████████████████████████. To the extent Paragraph

232 refers to written discovery material or publicly available information, Mr.

Commins asserts that such information speaks for itself and denies Plaintiff's

characterization of the same.

233.    On November 9, 2018, Commins, Gibson and Demetriou incorporated

████████████████ as a private limited company ████████

████. According to Companies House records, Demetriou resigned as

Director on October 7, 2019 and was replaced the same day by Elliott Pickering,

identified as "Derivatives Trader." Pickering resigned as Director on May 7, 2020.

All four owned significant shares in ████ during their directorships, with Commins

and Gibson still continuing as Directors of ████████, which has an

active company status with the latest confirmation statement filed on November

18, 2021.

**Answer:** To the extent Paragraph 233 refers to written discovery material or publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same.

234. Defendant Spires worked at ▮▮▮▮▮▮ and knew Defendant Commins while at ▮▮▮▮▮▮ during 2007 and later. According to the Businessweek article "The Essex Boys: How Nine Traders Hit a gusher With Negative Oil," Commins did know Spires while Commins was running "an off-site offshoot of Tower Trading Group," and when Spires and Gaunt left to "start their own outfit," Commins and his team of traders joined him.

**Answer:** Mr. Commins admits that he traded through ▮▮▮▮▮▮ ▮▮▮▮▮▮ and knew Mr. Spires. Mr. Commins denies the remaining allegations contained in Paragraph 234 of the Second Amended Complaint. To the extent Paragraph 234 refers to written discovery material or publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same.

235. It was also Commins' partner, Anthony Gibson who signed on behalf of Vega the agreement with GH Financials alleged below.

**Answer:** To the extent Paragraph 235 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 235 of the Second Amended Complaint and, therefore, denies those allegations.

### d. Vega's High Turnover Of Four Owners In Three Years Before Spires Becomes Sole Shareholder.

236.    As previously alleged, Vega had four different owners within three years. See ¶34. By February 3, 2020, Defendant Spires was the sole owner of Defendant Vega.

**Answer:**    Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 236 of the Second Amended Complaint and, therefore, denies those allegations.

237.    Between October 26, 2017 and August 13, 2019, Vega was registered with the United Kingdom Financial Control Authority as an Appointed Representative of Starmark.

**Answer:**    Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 237 of the Second Amended Complaint and, therefore, denies those allegations.

### B.    The Written Agreement Between And Among Vega, ███, And The Vega Trading Defendants.

238.    In Autumn 2017 and thereafter, a ████████████████████████ ██████ ("Agreement") was made between and among ████████████████

██████████████████████████████████████

███████████████████████████████████████

███████████████████████

**Answer:**     To the extent Paragraph 238 refers to written information, Mr.

Commins asserts that such information speaks for itself and denies Plaintiff's

characterization of the same. Mr. Commins lacks knowledge or information

sufficient to form a belief about the truth or falsity of the allegations in Paragraph

238 of the Second Amended Complaint and, therefore, denies those allegations.

239.   Pursuant to this Agreement ██████████████████████





**Answer:**     To the extent Paragraph 239 refers to written information, Mr.

Commins asserts that such information speaks for itself and denies Plaintiff's

characterization of the same. Mr. Commins denies the remaining allegations

contained in Paragraph 239 of the Second Amended Complaint.

240. 

**Answer:** To the extent Paragraph 240 refers to written information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 240 of the Second Amended Complaint and, therefore, denies those allegations.

241.

**Answer:** To the extent Paragraph 241 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 241 of the Second Amended Complaint and, therefore, denies those allegations.

242. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

**Answer:** To the extent Paragraph 242 refers to publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations in Paragraph 242 of the Second Amended Complaint and, therefore, denies those allegations.

**C.** **In Its "Market Facing" Agreement With GH Financials, Vega Expressly Agreed That It Was The Principal For Each Trade By A Vega Trading Defendant And That The Vega Trading Defendants Were Acting As Vega's "Agent" Or Otherwise Acting For Or On Behalf Of Vega.**

243. GH Financials (see ¶65 above) was a clearing member of the CME. Pursuant to a "GH FINANCIALS LIMITED TERMS OF BUSINESS FOR EXCHANGE TRADED FUTURES AND OPTIONS BUSINESS" ("TOB") (Version 15.1) dated July 12, 2016, and signed by Anthony Ross Gibson on behalf

of Vega Capital London Ltd., Vega agreed in entering its relationship with GH

Financials that:



TOB ¶27 (f). ███████████████████████████████████

███████████████████

**Answer:**   To the extent Paragraph 243 refers to written discovery

materials or publicly available information, Mr. Commins asserts that those

materials speak for themselves and denies Plaintiff's characterization of the same.

Mr. Commins lacks knowledge or information sufficient to form a belief about the

truth or falsity of the allegations contained in Paragraph 243 of the Second

Amended Complaint and, therefore, denies those allegations.

244.   **Vega Expressly Agreed That Trades In Its Accounts Would Be**

**Made On Vega's Behalf By Authorized Persons.** Pursuant to Vega's agreement

with GH Financials, only ████████████████ of Vega were permitted to perform

acts on behalf of Vega.





TOB ¶9 [emphasis added].

**Answer:**     To the extent Paragraph 244 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 244 of the Second Amended Complaint and, therefore, denies those allegations.

245.   Plaintiff alleges that an ████ under ¶9 of Vega's Agreement with GH Financials quoted above, included the placing of ██████, and the holding of orders that were ███████ as trades.

**Answer:**     To the extent Paragraph 245 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 245 of the Second Amended Complaint and, therefore, denies those allegations.

246. Each Vega Trading Defendant typically placed "orders" for its sub-account which were "executed" by GH Financials.

**Answer:** Mr. Commins admits that he placed orders in a Vega sub-account that were executed by GH Financials. To the extent Paragraph 246 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 246 of the Second Amended Complaint and, therefore, denies those allegations.

247. As such, pursuant to Vega's TOB with GH Financials, ¶9, each Vega Trading Defendant was acting either as Vega's ████████████████████ or had otherwise been granted ████████ by Vega to ████████████ of Vega to enter trades, or had otherwise been granted authority by Vega in its trades.

**Answer:** To the extent Paragraph 247 refers to written discovery materials or publicly available information, Mr. Commins asserts that such information speaks for itself and denies Plaintiff's characterization of the same. Mr. Commins denies the allegations contained in Paragraph 247 of the Second Amended Complaint.

248.  Plaintiff further alleges that, pursuant to TOB ¶9, Vega was the

███████████ for all trades made by each Vega Trading Defendant.

**Answer:**  Paragraph 248 of the Second Amended Complaint contains legal conclusions to which no response is required.  To the extent a response is required, Mr. Commins states that Paragraph 248 refers to written material that speaks for itself denies Plaintiff's characterization of the same.

249.  Vega and GH Financials also entered a "Clearing Module" on July 12, 2016. They later entered, on or about November 16, 2017, an updated Terms of Business for Exchange Traded Futures and Options Business.

**Answer:**  To the extent Paragraph 249 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 249 of the Second Amended Complaint and, therefore, denies those allegations.

250.  Neither the Clearing Module nor the updated November 16, 2017 agreement purported to modify or amend the foregoing provisions of the TOB in any way.

**Answer:**  Paragraph 250 contains legal conclusions to which no response is requires.  To the extent a response is required, Mr. Commins states that

Paragraph 250 refers to written materials which speak for themselves, and Mr. Commins denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 250 of the Second Amended Complaint and, therefore, denies those allegations.

251.    On the contrary, the 2017 TOB expressly provides and adds to the former clause 27(f) (quoted above):



2017 TOB ¶6(b).

**Answer:**    To the extent Paragraph 251 refers to written materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 251 of the Second Amended Complaint and, therefore, denies those allegations.

252.    "Applicable Regulations" is defined in ¶5 of the 2017 TOB as meaning:





2017 TOB ¶5. For transactions on the CME, applicable laws include U.S. laws, including, but not limited to the laws prohibiting manipulation, and agreements to fix and manipulate prices.

**Answer:** To the extent Paragraph 252 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 252 of the Second Amended Complaint and, therefore, denies those allegations.

253.    When GH Financials terminated its business with Vega after the May Contract manipulation on April 20th, GH Financials did not terminate the business only with the Vega Trading Defendants. Instead, GH Financials terminated **all** business with Vega.

**Answer:** To the extent Paragraph 253 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the

truth or falsity of the allegations contained in Paragraph 253 of the Second

Amended Complaint and, therefore, denies those allegations.

1. **Long Before April 20, 2020, Defendants Vega And Spires Well Knew That The VTDs Traded In Unison To Manipulate Prices.**

254. The Vega Trading Defendants "regularly" acted in unison to make

transactions which moved the TAS price at the time of settlement.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 254

of the Second Amended Complaint.

255. For example, in an award-winning article authored by Liam Vaughan,

Kit Chellel & Benjamin Bain, *London Traders Hit $500 Million Jackpot When Oil*

*Went Negative*, Bloomberg Businessweek (August 4, 2020) explicitly reported as

follows:

> Vega's jackpot [on April 20, 2020 in the May contract]
> ...involved about a dozen traders aggressively selling oil
> in unison before the May West Texas Intermediate
> contract settled at 2:30 p.m. in New York...It's **a tactic**
> **Vega's traders used regularly, according to another**
> **person familiar with the firm's strategy**…

*See* full copy of article, annexed as Exhibit 2 to this Amended Complaint.

**Answer:** To the extent Paragraph 255 refers to public articles, without

conceding the accuracy of the content of those public articles, Mr. Commins

asserts that those articles speak for themselves and denies Plaintiff's

characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 255 of the Second Amended Complaint.

256. In another award-winning article authored by Liam Vaughan, *The Essex Boys: How Nine Traders Hit a Gusher With Negative Oil*, Bloomberg, (December 10, 2020) explicitly reported that

> **…trading records and people who worked alongside them** [the VTDs] indicate they [the VTDs] frequently operated in a similar fashion [to their conduct on April 20th in the May Contract], buying or selling in the same direction at key moments.

*See* full copy of article, annexed as Exhibit 1 to this Amended Complaint.

**Answer:** To the extent Paragraph 256 refers to public articles, without conceding the accuracy of the content of those public articles, Mr. Commins asserts that those articles speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 256 of the Second Amended Complaint.

257. The articles won the British Journalism award for Crime and Legal Affairs Journalism in 2021. https://pressgazette.co.uk/british-journalism-awards-winners-2021/

**Answer:** To the extent Paragraph 257 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 257 of the Second Amended Complaint and, therefore, denies those allegations.

258.  The award-winning journalism quoted above reports that "trading records", "people who worked alongside" the Vega Trading Defendants, and "a person familiar with the firm's strategy", all show or indicate that, prior to April 20, 2020, the Vega traders "regularly" or "frequently" traded in a similar fashion to their manipulative trading on April 20th. Regarding the reference to "trading records" in the award winning article quoted above, Vega and Spires also had **complete knowledge** of the trading records of the Vega Trading Defendants. This included real time knowledge of what the VTDs were trading and doing. Prior to COVID, Vega and Spires had at times worked in the same office and "alongside" at least some of the VTDs in the trading arcade.

**Answer:**      To the extent Paragraph 258 refers to public articles, without conceding the accuracy of the content of those public articles, Mr. Commins asserts that those articles speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 258 of the Second Amended Complaint.

259.  In fact, Defendants Vega and Spires had access to much more than simply the trading records. Based on the allegations set forth below, Defendants

Vega and Spires had sophisticated detailed analytical tools in real time. This enabled Defendants Vega and Spires easily to detect trading patterns in real time, as these patterns developed. This included ***high degrees of correlation of the trading between and among the accounts***. Among other things:

█████████████████████████████████████████

█████████ Adrian Spires, ██████████████████

█████████████████████████████████████████

████████████████████████████████

████████████████

b. ██████████████████████████ Spires, ████████

█████████████████████████████████████████

████████████████████████████████

████████████████

c. █████████████████████████████████████

██████████████████████████████████

████████████████████ Adrian Spires ████████

████████████████████████

d. █████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████████



j.  Spires,

k.

l.

**Answer:** To the extent Paragraph 259 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 259 of the Second Amended Complaint.

260. Corroborating the award winning journalism based upon the multiple sources alleged above, VTD Lunn stated that " See ¶179 above. VTD

Lunn's ███████████████████████████████████████████████

███████████████████████████████

**Answer:**     To the extent Paragraph 260 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 260 of the Second Amended Complaint.

261.   As of April 20, 2020, Defendants Vega and Spires also had handled the VTDs' trading for ██████. Vega and Spires also well knew that the Vega Trading Defendants had for years traded together to ██████ markets by making trades in unison to move prices.

**Answer:**     To the extent Paragraph 261 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 261 of the Second Amended Complaint.

> **2.  The Vega Trading Defendants Engaged in Coordinated Trading In WTI Crude Oil Futures Contracts A Month Prior to Engaging in Substantially Similar But More Extreme Conduct on April 20, 2020**

262.   By March 19, 2020, the penultimate trading day in the April 2020 NYMEX WTI crude oil futures contract, the trading volume in the April 2020 contract had been significantly reduced. The low volume (*i.e.*, "thin" market) made the April 2020 contract susceptible to manipulation by "ammo" trading.

**Answer:** To the extent Paragraph 262 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 262 of the Second Amended Complaint.

263. The average trading volume in the April 2020 contract for the twenty (20) trading days preceding March 19, 2020 was approximately 881,814 contracts. The trading volume in the April 2020 contract on March 19, 2020 was approximately 136,722 contracts, an 84.5% decrease in the average volume for the preceding twenty (20) trading days.

**Answer:** To the extent Paragraph 263 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 263 of the Second Amended Complaint.

264. On March 19, 2020, the Vega Trading Defendants sold approximately ███ April 2020 contracts, purchased approximately ███ May 2020 contracts, purchased approximately ███ April 2020 contracts via TAS and sold approximately ███ May 2020 contracts via TAS. ██████████████

█████████████████████████████████████████████

███████████████████████.[14]



   a.  Defendant Demetriou (████████████████████████

   b.  Defendant Roase ████████████████

   c.  Defendant Pickering ████████████

   d.  Defendant Paul Commins ████████

   e.  Defendant Matthew Thompson ████

   f.  Defendant Younger ████████

   g.  Defendant Lunn ████████████

---

[14] Defendants ████, Biagioni, Sutton and ████ did not trade NYMEX WTI futures on March 19, 2020.

[15] Defendant Demetriou also sold ████ May 2020 contracts and purchased ████ May 2020 contracts via TAS.

[16] Defendant Pickering also purchased ████ April 2020 contracts and sold ████ May 2020 contracts.

[17] Defendant Younger also purchased ████ April 2020 contracts, sold ████ April 2020 contracts via TAS, sold ████ May 2020 contracts and purchased ████ May 2020 contracts via TAS.

h. Defendant George Commins ███████████████
███████████████████████
███████████████████████████████
███████████████████████

**Answer:**    To the extent Paragraph 264 refers to trading data or other

discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks

knowledge or information sufficient to form a belief about the truth or falsity of the

allegations contained in Paragraph 264 of the Second Amended Complaint and,

therefore, denies those allegations.

265.   The foregoing short April and long May "spread" positions, along

with the corresponding TAS orders to buy the April contract and sell May contract

at their respective settlement prices, gave each of the above Vega Trading

Defendants an incentive to depress the price of the April contract relative to the

price of the May contract.

**Answer:**    To the extent Paragraph 265 refers to trading data or other

discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same.  Mr. Commins

---

[18] Defendant Lunn also sold ██ May 2020 contracts.

denies the remaining allegations contained in Paragraph 265 of the Second Amended Complaint.

266. █████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

**Answer:**    To the extent Paragraph 266 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.

267. █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

**Answer:**    To the extent Paragraph 267 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the

allegations contained in Paragraph 267 of the Second Amended Complaint and, therefore, denies those allegations.

268. Based upon Plaintiff's interpretations of ████████████████ ████████████████████████████ and CME market depth data for March 19, 2020, Plaintiff alleges as follows with respect to the intra-day trading of the Vega Trading Defendants on March 19, 2020.

**Answer:** To the extent Paragraph 268 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 268 of the Second Amended Complaint and, therefore, denies those allegations.

269. During the final hour of trading on March 19, 2020 (*i.e.*, 12:30 to 1:30 pm central time) the Vega Trading Defendants sold a total of approximately ████ April 2020 contracts.[19] That is, the Vega Trading Defendants waited until late in the trading day and compressed **more than** ████ of their total April 2020 contract sales during the final hour of trading. During the final hour of trading, the price of the April-May spread decreased from approximately negative 53 cents at 12:30 pm

---

[19] The Vega Trading Defendants also purchased ████ April 2020 contracts during the final hour of trading.

to approximately negative 69 cents at 1:30 pm. During the final hour of trading, the

Vega Trading Defendants sold the April 2020 contract in the following volumes.



a.  Defendant Demetriou ███████████████

b.  Defendant Pickering ███████████████

c.  Defendant Younger ███████████████

d.  Defendant Roase ███████████████

e.  Defendant Matthew Thompson ███████████

f.  Defendant Lunn ███████████████

g.  Defendant Paul Commins ███████████████

h.  Defendant George Commins ███████████

**Answer:**    To the extent Paragraph 269 refers to trading data or other

discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same. Mr. Commins

denies the remaining allegations contained in Paragraph 269 of the Second

Amended Complaint.

270.   During the final thirty (30) minutes of trading on March 19, 2020 *(i.e.,*

*1:00* to 1:30 pm central time) the Vega Trading Defendants sold a total of

---

[20] Defendant Pickering also purchased ███ April 2020 contracts during the final hour of trading.
[21] Defendant Younger also purchased ███ April 2020 contracts during the final hour of trading.

approximately ███ April 2020 contracts.[22] That is, the Vega Trading Defendants waited until late in the trading day and compressed **more than** ███ of their total April 2020 contract sales during the final thirty (30) minutes of trading. During the final thirty (30) minutes of trading, the price of the April-May spread decreased from approximately negative 49 cents at 1:00 pm to approximately negative 69 cents at 1:30 pm. During the final thirty (30) minutes of trading, the Vega Trading Defendants sold the April 2020 contract in the following volumes.



a. Defendant Pickering ███████████████████████

b. Defendant Demetriou ███████████████████████

c. Defendant Younger █████████████████████████████

d. Defendant Lunn ███████████████████████

e. Defendant Matthew Thompson █████████████████████

f. Defendant Paul Commins ██████████████████████████

g. Defendant George Commins █████████████████████

**Answer:** To the extent Paragraph 270 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins

---

[22] The Vega Trading Defendants also purchased ███ April 2020 contracts during the final thirty minutes of trading.
[23] Defendant Pickering also purchased ███ April 2020 contract.
[24] Defendant Younger also purchased ███ April 2020 contracts.

denies the remaining allegations contained in Paragraph 270 of the Second Amended Complaint.

271. During the final two (2) minutes of trading on March 19, 2020 *(i.e.*, 1:28 to 1:30 pm central time) the Vega Trading Defendants sold a total of approximately ████ April 2020 contracts. During the final two (2) minutes of trading, the price of the April-May spread decreased from approximately negative 65 cents at 1:28 pm to approximately negative 69 cents at 1:30 pm. During the final two (2) minutes of trading, the Vega Trading Defendants sold the April 2020 contract in the following volumes.

    a. Defendant Demetriou ████████████████████████
████████

    b. Defendant Paul Commins ███████████████████████
████████.

    c. Defendant Pickering ██████████████████████████
██████

    d. Defendant Matthew Thompson ██████████████████
████████████

    e. Defendant George Commins █████████████████████
████████

**Answer:**    To the extent Paragraph 271 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 271 of the Second Amended Complaint.

272.     Based on time and sales information in the CME market depth data ████████████████████████████████████████████████, the Vega Trading Defendants' (a) sales of approximately ████ April 2020 contracts during the final hour of trading constituted approximately ████ of the volume of April 2020 contracts during that time period; (b) sales of approximately ████ April 2020 contracts during the final thirty (30) minutes of trading constituted approximately ████ of the volume of April 2020 contracts during that time period; and (c) sales of approximately ████ April 2020 contracts during the last two (2) minutes of trading constituted approximately ████ of the volume of April 2020 contracts during that time period.

**Answer:**     To the extent Paragraph 272 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 272 of the Second Amended Complaint and, therefore, denies those allegations.

273.     At the close of trading on March 19, 2020, the April-May spread settled at negative 69 cents. The closing spread price of negative 69 cents on March 19 was an all-time low for the spread price of the April-May 2020 contracts

and was more than **four standard deviations** lower than the mean spread over the prior year of trading.

**Answer:** To the extent Paragraph 273 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 273 of the Second Amended Complaint and, therefore, denies those allegations.

274. At the close of the next trading day on March 20, 2020, the April-May spread settled at negative 20 cents. Thus, on March 20, 2020, after Vega's trading on March 19 had ceased, the spread price rebounded substantially by 49 cents.

**Answer:** To the extent Paragraph 274 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 274 of the Second Amended Complaint and, therefore, denies those allegations.

275. In total, the Vega Trading Defendants generated net profits of approximately ███████ in connection with their trading of April and May 2020 contracts on March 19, 2020:

a. Defendant Roase 

b. Defendant Demetriou

c. Defendant Paul Commins

d. Defendant Pickering

e. Defendant Thompson

f. Defendant Younger

g. Defendant Lunn

h. Defendant George Commins

**Answer:** To the extent Paragraph 275 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 275 of the Second Amended Complaint and, therefore, denies those allegations.

**3. Based on the Vega Trading Defendants' Activities on March 19, 2020 and Other Reasons, Defendants Vega Capital and Spires Knew That The Vega Trading Defendants Were Engaged in Manipulative Trading And Affirmatively Took Steps To Facilitate The Manipulation.**

276. The potential for abuse of TAS trading in order to affect the price of a commodity futures contract is well known. The Commodity Futures Trading Commission ("CFTC") has brought multiple cases involving TAS trading, including TAS trading in the WTI crude oil futures market.

**Answer:**     Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 276 of the Second Amended Complaint and, therefore, denies those allegations.

277. In 2016 new regulations were passed in the U.K. that included a non-exhaustive list of manipulative trading indicators. Such indicators included: (a) significant buying or selling of a financial instrument that leads to significant changes in the price of that financial instrument; (b) transactions concentrated within a short time span in the trading session and lead to a price change which is subsequently reversed; and (c) transactions undertaken at or around the time when settlement prices are calculated which have an effect on such prices. All three of these indicators were present in respect of the Vega Trading Defendants' trading activity on March 19, 2020. *See* ¶¶224-227 above.

**Answer:** To the extent Paragraph 277 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 277 of the Second Amended Complaint and, therefore, denies those allegations.

278. As part of Vega agreement with GH Financials, Vega represented, warranted and agreed, among other things, that ███████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

**Answer:** To the extent Paragraph 278 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the

truth or falsity of the allegations contained in Paragraph 278 of the Second Amended Complaint and, therefore, denies those allegations.

279. ████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

**Answer:** To the extent Paragraph 279 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 279 of the Second Amended Complaint and, therefore, denies those allegations.

280. As part of its agreement with GH Financials, Vega agreed to ████████████████████████████ As part of Vega's agreement with the Vega Trading Defendants, Vega agreed to ████████████ GHF TOB Annex 3, Section 3

**Answer:** To the extent Paragraph 280 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the

truth or falsity of the allegations contained in Paragraph 280 of the Second Amended Complaint and, therefore, denies those allegations.

281. ██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████ Spires ██████████████████████████

██████████████████████████████████████████████

██████████████

**<u>Answer:</u>** To the extent Paragraph 281 refers to written discovery materials or publicly available information, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 281 of the Second Amended Complaint and, therefore, denies those allegations.

282. According to Bloomberg's award-winning reporting, a person familiar with Vega's strategy stated that Vega's traders "regularly" traded in unison.

**<u>Answer:</u>** To the extent Paragraph 282 refers to public articles, without conceding the accuracy of the content of those public articles, Mr. Commins asserts that those articles speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 282 of the Second Amended Complaint.

283.    Far beyond being merely "familiar" with the Vega Trading

Defendants' strategy, Defendants Vega and Spires had real time access to all

trading in Vega's accounts and received daily statements of all trading in Vega's

accounts, ███████████████████████████████████

████████

**Answer:**    To the extent Paragraph 283 refers to written discovery

materials or publicly available information, Mr. Commins asserts that those

materials speak for themselves and denies Plaintiff's characterization of the same.

Mr. Commins denies the remaining allegations contained in Paragraph 283 of the

Second Amended Complaint.

284.    A review of Vega's trading on March 19, 2020, just a month before

April 20, would have revealed the following "red flags" to Defendants Vega and

Spires: (a) each of the eight Vega Trading Defendants that traded NYMEX WTI

crude oil futures traded in the exact same direction in both the April and May

contracts; (b) each of the eight traders that traded NYMEX WTI crude oil futures

also used TAS orders in the same direction for both the April and May contracts;

(c) the traders traded a significant volume of contracts in the April contract (more

than ██████ contracts or more than ████████████████████ barrels of

oil), which was set to expire the following day; (d) a substantial volume of

transactions by the Vega Trading Defendants were concentrated near the end of

trading on March 19, 2020; and (e) the April-May spread price moved in the direction of Vega's trading on March 19, 2020 and then reversed on the next trading day on March 20, 2020. *See* above.

**Answer:**     To the extent Paragraph 284 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 284 of the Second Amended Complaint.

285.   Despite the coordinated ammo trading in the April 2020 contract on March 19, which, like the May 2020 contract on April 20, was set to expire the following day, Defendants Vega and Spires did not take steps to prevent the Vega Trading Defendants from engaging in substantially similar manipulative conduct on a much larger scale on April 20, 2020.

**Answer:**     To the extent Paragraph 285 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 285 of the Second Amended Complaint.

286.   Going well beyond the trading on March 19, on April 20, twelve Vega Trading Defendants, █████████, engaged in coordinated trading and the Vega

Trading Defendants doubled their volume of trades on April 20 (more than █████ contracts on April 20 in the front month contract versus more than █████ contracts on March 19 in the front month contract).

**Answer:** To the extent Paragraph 286 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 286 of the Second Amended Complaint.

287. ██████████████████████████████████
████████████████████████████████████████████
████████████████████ that Defendants Vega and Spires revoked the Vega Trading Defendants' access to Vega's trading accounts.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 287 of the Second Amended Complaint and, therefore, denies those allegations.

### 4. The VTDs Stalked Futures Contracts To Determine Those Most Vulnerable To Manipulation, And Then Blitz The Market By Making Trades In Unison To Move Prices.

288. Plaintiff has good grounds to believe and does allege that when Defendants Lunn stated shortly after the close on April 20th that ████████
████████, his reference to ████ referred to the Vega Trading Defendants; his use

of the word ███████ referred to the VTDs' extensive ammo trades to drive down prices between 1pm and 1:30; and his reference to ████ referred to the May Contract and, specifically, the last 30 minutes of trading therein.

**Answer:** To the extent Paragraph 288 refers to discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 288 of the Second Amended Complaint.

289. The VTDs' ██████████ of futures contracts to manipulate the final settlement prices or prices at other key times, was most likely to be successful in markets which were thinly traded and had less new entrants into the market. In such market conditions, the VTDs' chances to trade in unison to successfully blitz the market and manipulate prices were much higher.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 289 of the Second Amended Complaint and, therefore, denies those allegations.

290. The VTDs often had greater volumes of trades in contracts which, like the April WTI contract and the May WTI contract, were near the end of trading and less likely to have new entrants. Such contracts were more likely to have lower trade volume than earlier during the life of the contract when there were more new entrants into the market.

**Answer:** To the extent Paragraph 290 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 290 of the Second Amended Complaint.

291. In addition to the April 2020 and May 2020 WTI contracts, the VTDs traded significant volumes of contracts in other contracts which were near expiration and likely to have less new entrants.

**Answer:** To the extent Paragraph 291 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 291 of the Second Amended Complaint.

292. For one example, seven of the VTDs (Defendants Paul Commins, Demetriou, Roase, Lunn, Younger, ████, and ████) traded ████ April ICE gasoil futures contracts on March 25, 2020 when the volume in that contract was approximately 1/3 of its trailing 30 day average.

**Answer:** To the extent Paragraph 292 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks

knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 292 of the Second Amended Complaint and, therefore, denies those allegations.

### 5. Defendants Vega And Spires Actively Facilitated The April 20th Manipulation, Profited Therefrom, And Specifically Intended That The Trades Which Vega Was Making In The May Contract Would Manipulatively Depress May Contract Prices

293.    Defendant Spires worked in and was ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

See ¶¶ 114-117.

**Answer:**    Mr. Commins admits that Mr. Spires worked at ██████████ but lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 293 of the Second Amended Complaint and, therefore, denies those allegations.

294.    According to a former compliance person at the IPE, the IPE should have had restrictions relating to TAS which made TAS manipulation on the IPE more difficult. *See* Oil Bonanza at U.K. Firm Casts Light on Price-Blind Trades, Liam Vaughan and Benjamin Bain (August 7, 2020), https://www.bloomberg.com/news/articles/2020-08-07/oil-bonanza-at-u-k-firm-casts-spotlight-on-price-blind-trades. After leaving the IPE, such compliance

person learned that the wrongdoing on the IPE in TAS manipulation was "blatant". *Id.*

**Answer:**     To the extent Paragraph 294 refers to public articles, without conceding the accuracy of the content of those public articles, Mr. Commins asserts that those articles speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 294 of the Second Amended Complaint and, therefore, denies those allegations.

295.   In general, there are two types of compliance people. The first type consists of persons who seek to enforce compliance with the rules. The second type seek to facilitate the violation of the rules (here, manipulation) but use their compliance knowledge simultaneously to try to avoid adverse consequences from such violation.

**Answer:**     Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 295 of the Second Amended Complaint and, therefore, denies those allegations.

296.   On and well before April 20th, the work of Defendants Spires and Vega in fulfilling their duties to achieve compliance with the rules and prevent manipulation, greatly facilitated manipulation and sought to avoid the adverse

consequences from manipulation. And Defendant Spires and Vega consistently did not seek to prevent manipulation.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 296 of the Second Amended Complaint and, therefore, denies those allegations.

297. With full knowledge of what had happened on the penultimate trading day of the prior expiring WTI contract (that is, the April Contract on March 19th, see above), Defendants Vega and Spires facilitated the manipulation of May Contract on its penultimate day of trading.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 297 of the Second Amended Complaint and, therefore, denies those allegations.

298. ███████████████████ Spires ████████████████████
████████████████████████████████████████████
███████████████

**Answer:** To the extent Paragraph 298 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations

contained in Paragraph 298 of the Second Amended Complaint and, therefore, denies those allegations.

299. ████████████████████ Spires ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

**Answer:** To the extent Paragraph 299 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 299 of the Second Amended Complaint and, therefore, denies those allegations.

300. ████████████████████ Spires ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**Answer:** To the extent Paragraph 300 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 300 of the Second Amended Complaint.

301. ██████████████████ Spires ████████████████████████

████████████████████████████████████████████████████

████████

   **Answer:**    To the extent Paragraph 301 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 301 of the Second Amended Complaint.

302. ██████████████████ Spires ████████████████████

████████████████████████████████████

   **Answer:**    To the extent Paragraph 302 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 302 of the Second Amended Complaint.

303. ██████████████████ Spires ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**Answer:**    To the extent Paragraph 303 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 303 of the Second Amended Complaint.

304. ███████████████████ Spires ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**Answer:**    To the extent Paragraph 304 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 304 of the Second Amended Complaint.

305. 

**Answer:** To the extent Paragraph 305 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 305 of the Second Amended Complaint.

306. But instead of sending emails or other written communications demanding explanations from the VTDs about what they were doing, Defendants Vega and Spires did nothing to stop the manipulation.

**Answer:** To the extent Paragraph 306 refers to trading data or other discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 306 of the Second Amended Complaint.

307. On the contrary, consistent with the long train of facts beginning with the creation of Vega after more restrictive prohibitions of manipulation (including TAS manipulation) had been announced, the only affirmative actions in which Defendants Vega and Spires had engaged were those which facilitated the

manipulation, e.g., ██████████████████████████████████████ In

addition to failing to ask any questions of anyone, Defendants Vega and Spires did

not, for example, restrain the amounts of trades that the VTDs could make. Nor did

Vega and Spires take any other steps to avoid manipulation.

**Answer:** To the extent Paragraph 307 refers to trading data or other

discovery materials, Mr. Commins asserts that those materials speak for

themselves and denies Plaintiff's characterization of the same. Mr. Commins

denies the remaining allegations contained in Paragraph 307 of the Second

Amended Complaint.

308.  Instead, Defendants Vega and Spires continued to allow the

manipulation to succeed ███████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████

**Answer:** To the extent Paragraph 308 refers to written discovery

materials, Mr. Commins asserts that those materials speak for themselves and

denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining

allegations contained in Paragraph 308 of the Second Amended Complaint.

309. Plaintiff has good grounds to believe and does allege that the specific intention of Defendants Vega and Spires on April 20th was to facilitate the manipulation by the VTDs of the May Contract. Defendants Vega and Spires had a substantial financial motivation for doing so based on their profit shares of Defendants Thompson and Sutton. Defendants Spires and Vega could see in real time the large short positions that Defendants Thompson and Sutton were developing in the May Contract. Plaintiff has good grounds to believe and does allege that Defendants Vega and Spires had other financial reasons to facilitate the manipulation.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 309 of the Second Amended Complaint.

310. In the vacuum of compliance conduct by Defendants Vega and Spires, GH Financials began to send trading alerts and ask questions on the afternoon of April 20th. Defendants Vega and Spires demonstrated no initiative or efforts additional to GH Financials' questions to uncover a manipulation by the VTDs. Instead, Defendants Vega and Spires merely acted as a vessel to answer the questions put by GH Financials.

**Answer:** To the extent Paragraph 310 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and

denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 310 of the Second Amended Complaint.

311. But as the GH Financials questions were beginning, Defendants Spires sought to avoid detection of the manipulation and minimize the adverse consequences therefrom by telling Defendant Lunn (the ebullient Defendant who said that, after years of training, the VTDs had ██████████████████████ ████████████████████████████████████ Specifically, Defendant Lunn stated to ████████ and others on the morning of April 21st:

**Henry:** ████████████████████████

**Henry "Normal":** ████████████████████████ ████████████████

[emphasis added] Vega_Mish_00021-25. Defendant ████████ positions in the May Contract had an extremely high minute to minute correlation with other VTDs, *e.g.*, .965 (Defendant Lunn); .965 (Defendant Roase); .960 (Defendant Demetriou) and .946 (Defendant Pickering).

**Answer:** To the extent Paragraph 311 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 311 of the Second Amended Complaint.

312. Both "Henry" and "Henry Normal" are identified as being Defendant Henry Lunn in the Vega letter to the CME. Vega_MISH_000042691. Plaintiff has

good grounds to believe and does allege that the explanation for the difference in display names may be that Defendant Lunn switched electronic devices; in any event, both Henry and Henry Normal signify that it is Henry Lunn talking.

**Answer:**    To the extent Paragraph 312 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 312 of the Second Amended Complaint and, therefore, denies those allegations.

313.   Plaintiff has good grounds to believe and does allege as follows. First, "Adrian" as used by Defendant Lunn above, refers to Adrian Spires. Plaintiff alleges that it was Adrian Spires who called Defendant Lunn and told him not to tell ███████████████████████████

  a.   One basis for Plaintiff's foregoing belief is that no ████████, other than Adrian Spires, appears in any of the scores of names included in the production to Plaintiff.

  b.   Another basis is the long train of conduct by Defendants Spires and Vega alleged below, which further supports Plaintiff's allegations that Defendant Spires and Vega knew about and participated in Defendants' manipulations.

**Answer:** To the extent Paragraph 313 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 313 of the Second Amended Complaint and, therefore, denies those allegations.

314. Based on the foregoing, Defendant Spires' statement to Defendant Lunn ███████████████████ on April 20th, constitutes a further manipulative act intended to minimize the likelihood of detection of the VTDs manipulation on April 20th, and avoid the adverse consequences of such detection.

**Answer:** Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 314 of the Second Amended Complaint and, therefore, denies those allegations.

**6. Defendant ███████**

315. (a) **First**, Defendant ████ admits that ██████████████████ ████████████████████████████████████ ████████████

(b) **Second**, Defendant ████ expressly admits ████████████████ ██ ██████████████████████████

VEGA_MISH_000042650. ███████ includes Defendant Spires and others at Vega.

**Answer:**    The allegations contained in Paragraph 315 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins answers as follows. To the extent Paragraph 315 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 315 of the Second Amended Complaint and, therefore, denies those allegations.

316.   Defendant ██████ foregoing admitted ████████████████████



**Answer:**    The allegations contained in Paragraph 316 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins answers as follows. To the extent Paragraph 316 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr.

Commins denies the remaining allegations contained in Paragraph 316 of the Second Amended Complaint.

317. That Defendant ███ did, during this excellent **opportunity** to conspire, actually reach an agreement with the VTDs, is strongly corroborated by the following.

**Answer:** The allegations contained in Paragraph 317 relate to dismissed claims and, therefore, no response is required. To the extent a response is requested or necessary, Mr. Commins answers as follows. To the extent Paragraph 317 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 317 of the Second Amended Complaint.

318. Defendant ███ May Contract trading has an extremely high minute to minute correlation of .989 to Defendant George Commins minute to minute positions.

**Answer:** The allegations contained in Paragraph 318 relate to dismissed claims and, therefore, no response is required. To the extent a response is requested or necessary, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 318 of the Second Amended Complaint and, therefore, denies those allegations.

319.   Defendant ▓ minute to minute correlation on April 20th with Defendant Sutton's minute to minute positions is an extraordinarily high .984.

**Answer:**   The allegations contained in Paragraph 319 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 319 of the Second Amended Complaint and, therefore, denies those allegations.

320.   Defendant ▓ minute to minute correlation on April 20th with Defendant Younger's minute to minute positions is an extraordinarily high .975.

**Answer:**   The allegations contained in Paragraph 320 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 320 of the Second Amended Complaint and, therefore, denies those allegations.

321.   Defendant ▓ minute to minute correlation on April 20th with Defendant Pickering's minute to minute positions is an extraordinarily high .971

**Answer:**   The allegations contained in Paragraph 321 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins lacks knowledge or information sufficient to

form a belief about the truth or falsity of the allegations contained in Paragraph 321 of the Second Amended Complaint and, therefore, denies those allegations.

322.   Defendant ███ minute to minute correlation on April 20th with Defendant Lunn's minute to minute positions is a very high .944.

**Answer:**   The allegations contained in Paragraph 322 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 322 of the Second Amended Complaint and, therefore, denies those allegations.

323.   The foregoing extremely high correlations are very contrary to independent conduct. They are extremely consistent with an agreement between ███ and the VTDs to depress May Contract prices.

**Answer:**   The allegations contained in Paragraph 323 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins denies the allegations contained in Paragraph 323 of the Second Amended Complaint.

324.   Also, Defendant ███ also made increasing amounts of aggressor sales in the May Contract beginning at 11 am.

**Answer:**   The allegations contained in Paragraph 324 relate to dismissed claims and, therefore, no response is required.  To the extent a response is

requested or necessary, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 324 of the Second Amended Complaint and, therefore, denies those allegations.

325. Additionally, Defendant ▉ made aggressor, uneconomic "ammo" sales between 1 and 1:30pm including while the CME was entering stop trading orders to attempt to maintain orderly May Contract trading.

**Answer:** The allegations contained in Paragraph 325 relate to dismissed claims and, therefore, no response is required. To the extent a response is requested or necessary, Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 325 of the Second Amended Complaint and, therefore, denies those allegations.

326. By joining other VTDs in making uneconomic aggressor "ammo" sales at increasingly lower prices between 1 and 1:30pm, Defendant ▉ and the other VTDs overcame the CME's orderly-market trading halts, and greatly depressed May Contract prices.

**Answer:** The allegations contained in Paragraph 326 relate to dismissed claims and, therefore, no response is required. To the extent a response is requested or necessary, Mr. Commins denies the allegations contained in Paragraph 326 of the Second Amended Complaint.

327.   Because Defendant ███ trading pattern manipulatively sought to depress prices on a public market, and manipulation of a public market is more likely to succeed through an agreement with others than by one's own trading, it is extremely plausible that Defendant ███ and other VTDs were trading on April 20th pursuant to an agreement to depress prices.

**Answer:**   The allegations contained in Paragraph 327 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins denies the allegations contained in Paragraph 327 of the Second Amended Complaint.

### 7.  Defendant Paul Sutton

328.   In addition to the parallel conduct in which Defendant Sutton and the other VTDs engaged, Sutton's communications with other VTDs include at least 48 text communications which Sutton initiated with Defendant George Commins on April 20, 2020 as they coordinated their trading in the May Contract.

**Answer:**   To the extent Paragraph 328 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 328 of the Second Amended Complaint.

329.   As a result of such coordination, Defendant Sutton's minute to minute positions on April 20th in the May Contract has an extraordinarily high correlation to Defendant George Commins' minute to minute positions of 99.3%.

**Answer:**     To the extent Paragraph 329 refers to trade data or discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the remaining allegations contained in Paragraph 329 of the Second Amended Complaint and, therefore, denies those allegations.

330.   Such Defendants' high degree of coordination of their May Contract trading includes, for example, the following communications.

    a.   At 3:15 am Chicago time (9:15 am London time) Sutton states to Defendant Commins "It's all about wti now".

    b.   At 9:24 to 9:25 Chicago time, George Commins and Paul Sutton





**Answer:**      To the extent Paragraph 330 refers to written discovery

materials, Mr. Commins asserts that those materials speak for themselves and

denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the allegations

contained in Paragraph 330 of the Second Amended Complaint and, therefore,

denies those allegations.

331.   Defendant Sutton ███████████████████████████████

Defendant Commins ███████████████████████████████████████

███████████ Approximately two minutes after the request, at 12:58pm Chicago

Time, Defendant Sutton sent Defendants Commins ██████████████████████

Sutton ███████ Defendant George Commons ████████████████████

███

**Answer:**      To the extent Paragraph 331 refers to written discovery

materials, Mr. Commins asserts that those materials speak for themselves and

denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or

information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 331 of the Second Amended Complaint and, therefore, denies those allegations.

332.   Also, Defendant Sutton's minute by minute positions in the May Contract was 94.9% correlated with the overall minute to minute positions of Defendants Paul Commins, George Commins, Christopher Roase, Elliott Pickering, Aristos Demetriou, Connor Younger, Henry Lunn, and Matthew Rhys Thompson.

**Answer:**     To the extent Paragraph 332 refers to written discovery materials, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same.  Mr. Commins denies the remaining allegations contained in Paragraph 332 of the Second Amended Complaint.

333.   The extremely high correlations of Defendant Sutton's trading with that of the other manipulators, combined with the numerous explicit communications coordinating his trading with Defendant Commins, is highly consistent with an agreement to manipulate May Contract prices and directly contrary to independent individual decision making by Defendant Sutton.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 333 of the Second Amended Complaint.

# CLASS ALLEGATIONS

334. Plaintiff brings this action on behalf of itself, and all others similarly situated, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities that purchased and/or sold during the period from at least April 20, 2020 through at least April 21, 2020 a May 2020 light sweet crude oil (WTI) futures contract traded on the NYMEX and/or the ICE. Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates and all federal governmental entities.[25]

**Answer:** Mr. Commins denies the allegations contained in Paragraph 334 of the Second Amended Complaint, except Mr. Commins admits that Plaintiff purports to bring its action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and as representative of the putative class as outlined in Paragraph 334 of the Second Amended Complaint. By way of further response, Mr. Commins denies that Plaintiff's action can be maintained properly as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) or any other applicable laws and rules.

335. The Class is so numerous that joinder of all members is impracticable. Due to the nature of the commerce involved, the members of the Class are

---

[25] Plaintiff reserves the right to amend the definition of the Class in the class motion or otherwise.

geographically dispersed throughout the United States. Plaintiff believes there are hundreds of members of the Class.

**Answer:**     Paragraph 335 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 335 of the Second Amended Complaint.

336.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether Defendants combined, conspired, and agreed to manipulate and fix the prices of NYMEX and/or ICE WTI crude oil futures contracts in violation of the Sherman Act;

b. whether Defendants manipulated NYMEX and/or ICE WTI crude oil futures contracts in violation of the CEA;

c. whether such manipulation caused NYMEX and/or ICE WTI crude oil futures contracts to be artificial;

d. whether such manipulation caused cognizable legal injury under the CEA;

e. whether such injury or the extent of such artificiality may be established by common, class-wide means, including, for example, by regression analysis, econometric formula, or other economic tests;

f. whether Defendants were unjustly enriched to the detriment of Plaintiff and the Class; and

g. the operative time period and extent of Defendants' foregoing violations.

**Answer:** Paragraph 336 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 336 of the Second Amended Complaint.

337. Plaintiff's claims are typical of the claims of the other members of the Class he seeks to represent. Plaintiff and members of the Class all sustained damages arising out of Defendant's same course of unlawful conduct alleged herein.

**Answer:** Paragraph 337 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 337 of the Second Amended Complaint.

338.   Plaintiff will fully and adequately protect the interests of all members of the Class. Plaintiff has retained counsel experienced in complex commodity futures manipulation and antitrust class actions. Plaintiff has no interests that are adverse to or in conflict with other members of the Class.

**Answer:**   Paragraph 338 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 338 of the Second Amended Complaint.

339.   The questions of law and fact common to the members of the Class predominate over any questions which may affect only individual members.

**Answer:**   Paragraph 339 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 339 of the Second Amended Complaint.

340.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would also create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies

of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated. It would do so without sacrificing procedural fairness or bringing about other undesirable results.

**Answer:** Paragraph 340 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 340 of the Second Amended Complaint.

341.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Plaintiff anticipates no difficulty in the management of this action as a class action.

**Answer:** Paragraph 341 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 341 of the Second Amended Complaint.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

342.   During the Class Period, Plaintiff and Class members transacted in WTI crude oil futures contracts at artificial prices and were deprived of a lawfully operating market.

**Answer:**     Mr. Commins denies the allegations contained in Paragraph 342 of the Second Amended Complaint.

343.     Further, by reason of the alleged violations of the CEA and Sherman Act, Plaintiff and Class members sold at prices that were not what they would have paid in the absence of the extensive unlawful conduct alleged herein. As a result, Plaintiff and Class members have suffered a legally cognizable injury due to Defendants' alleged violations of the CEA and Sherman Act.

**Answer:**     Paragraph 343 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 343 of the Second Amended Complaint.

344.     Defendants' manipulation caused fluctuating amounts of artificiality in the prices of NYMEX WTI crude oil futures contracts beginning at least as early as April 20, 2020 and continuing until at least until April 21, 2020.

**Answer:**     Paragraph 344 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 344 of the Second Amended Complaint.

345.     The specific amounts of actual damages under the CEA and damages under the Sherman Act have not yet been determined because such determination

will require discovery of the conduct of Defendants, the NYMEX, and other non-parties.

**Answer:**     The allegations in Paragraph 345 are a statement of relief that Plaintiff seeks in the Second Amended Complaint and do not constitute averments of fact, and, therefore, no response is required. To the extent a response is or may be deemed to be required, Mr. Commins admits that Plaintiff purports to seek damages but denies that Mr. Commins violated the Sherman Act, denies that Plaintiff or any purported class it seeks to represent are entitled to damages, and denies the remaining allegations and legal conclusions contained in Paragraph 345 of the Second Amended Complaint.

## AS AND FOR A FIRST CLAIM
## AGAINST ALL DEFENDANTS

**(Violation of Section 1 of the Sherman Antitrust Act 15 U.S.C. §1 *et seq.*)**

346.   Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

**Answer:**     Mr. Commins incorporates and reasserts the answers to all preceding paragraphs of the Second Amended Complaint as though set forth herein at length.

347.   Defendants Vega Capital London, Ltd., Adrian Spires, the Vega Trading Defendants *(see* ¶¶39-59 above), and John Doe Defendants 1-100 entered into and engaged in a combination and conspiracy in an unreasonable and unlawful

restraint of trade in violation of Section 1 of the Sherman Act Antitrust Act, 15 U.S.C. §1 *et seq.* ("Sherman Act").

**Answer:**     Paragraph 347 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 347 of the Second Amended Complaint.

348.   Defendants combined, conspired, and agreed to manipulate and fix NYMEX WTI crude oil futures prices and ICE WTI crude oil futures prices during at least the Class Period.

**Answer:**     Paragraph 348 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 348 of the Second Amended Complaint.

349.   Defendants' conspiracy to fix and manipulate prices was spectacularly successful and allowed Defendants to greatly profit from their violations of Section 1 of the Sherman Act.

**Answer:**     Paragraph 349 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 349 of the Second Amended Complaint.

350.   Defendants used instrumentalities of interstate commerce and adversely affected and restrained trade and commerce through their conspiracy and effects on prices.

**Answer:**   Paragraph 350 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 350 of the Second Amended Complaint.

351.   Defendants' conspiracy to manipulate and fix the prices of NYMEX WTI crude oil futures contracts and ICE WTI crude oil futures contracts deprived Plaintiff and members of the Class of the ability to transact in a market free from manipulated and fixed prices.

**Answer:**   Paragraph 351 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 351 of the Second Amended Complaint.

352.   The conspiracy alleged herein is *a per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the NYMEX and ICE WTI crude oil futures markets. There is no legitimate business justification for, and no pro-competitive benefit caused by, Defendants' conspiracy and overt acts taken in furtherance thereof. Any ostensible

pro-competitive benefits are pretextual or could have been achieved by less restrictive means.

**Answer:**     Paragraph 352 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 352 of the Second Amended Complaint.

353.   As a direct, material, and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiff and the Class suffered injury to their business and property, including but not limited to transacting at the artificial and fixed prices caused by Defendants, within the meaning of Section 4 of the Clayton Antitrust Act, 15 US.C. §12 *et seq.* ("Clayton Act").

**Answer:**     Paragraph 353 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 353 of the Second Amended Complaint.

354.   Plaintiff and the Class seek treble damages for Defendants' violations of Section 1 of the Sherman Act and under Section 4 of the Clayton Act.

**Answer:**     The allegations in Paragraph 354 are a statement of the relief that Plaintiff seeks in the Second Amended Complaint and do not constitute averments of fact, and therefore no response is required.  Mr. Commins admits that

Plaintiff purports to be seeking treble damages but denies that Mr. Commins

violated the Sherman Act or Clayton Act, denies that Plaintiff or members of the

putative Class are entitled to any damages in relation to this litigation, and denies

the remaining allegations and legal conclusions contained in Paragraph 354.

## AS AND FOR A SECOND CLAIM
## AGAINST ALL DEFENDANTS

### (Manipulation In Violation Of The Commodity Exchange Act
### 7 U.S.C. §1 *et seq.*)

355.   Plaintiff incorporates by reference and re-alleges all the allegations in

this complaint, as though fully set forth herein.

**Answer:**     Mr. Commins incorporates and reasserts the answers to all

preceding paragraphs of the Second Amended Complaint as though set forth herein

at length.

356.   Defendants Vega Capital London, Ltd., Adrian Spires, the Vega

Trading Defendants, and John Doe Defendants 1-100 manipulated and conspired to

manipulate the prices of NYMEX WTI crude oil futures contracts and ICE WTI

crude oil futures contracts in violation of the Commodity Exchange Act, 7 U.S.C.

§1 *et seq.* ("CEA"). Defendant Vega Capital having held or otherwise financed the

manipulative trades alleged herein for each of the Vega Trading Defendants, is

fully responsible for the manipulation and conspiracy to manipulate alleged herein.

Defendant Spires, as sole director of Defendant Vega Capital who, again, held or

otherwise financed the manipulative trades alleged herein, is also fully responsible for the manipulation and conspiracy to manipulate alleged herein.

**Answer:**     Paragraph 356 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 356 of the Second Amended Complaint.

357.   Plaintiff and members of the Class purchased and/or sold one or more NYMEX WTI crude oil futures contract and/or ICE WTI crude oil futures contract during the Class Period at artificial prices caused by Defendants and were injured as a result of Defendants' intentional manipulation and conspiracy to manipulate the prices of those futures contracts in violation of the CEA, 7 U.S.C. §1 *et seq.*

**Answer:**     Paragraph 357 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 357 of the Second Amended Complaint.

358.   In addition to the previously alleged all-time record deviation between May Contract prices and June WTI contract prices, there was also an all-time record deviation between May Contract prices and the June Brent futures contract price.

**Answer:** To the extent Paragraph 358 refers to market data, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins lacks knowledge or information sufficient to form a belief about the truth or falsity of the allegations contained in Paragraph 358 of the Second Amended Complaint and, therefore, denies those allegations.

359. The spread between the May Contract and the Brent crude June futures contract price fell 80 standard deviations on April 20. This occurrence was extremely unlikely in a competitive market. But after Vega's market power was removed, the spread between the May Contract and the June Brent contract snapped back to almost exactly the same level as it had been on April 17 (-9.32 on April 21 and -9.81 on April 17).

**Answer:** To the extent Paragraph 359 refers to market data, Mr. Commins asserts that those materials speak for themselves and denies Plaintiff's characterization of the same. Mr. Commins denies the remaining allegations contained in Paragraph 359 of the Second Amended Complaint.

360. Again, there was no fundamental supply and demand explanation for these unprecedented deviations in prices of the May Contract from their normal benchmark on April 20 followed by their unprecedented snapbacks to normality on April 21, 2020.

**Answer:** Mr. Commins denies the allegations contained in Paragraph 360 of the Second Amended Complaint.

361. The deleterious effects of the Vega Defendants' concerted conduct and market power during April 20 were a proximate and substantial cause, as well as a contributing factor to the extraordinary widening of spreads on April 20. The removal of Vega's concerted conduct and market power, was a substantial and proximate cause of the snapback in spreads on April 21. The supply-demand fundamentals were then again expressed in price levels, as they had been on April 17.

**Answer:** Paragraph 361 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 361 of the Second Amended Complaint.

362. Defendants' conduct and trading activity alleged herein constituted a manipulation of NYMEX WTI crude oil futures contract prices and ICE WTI crude oil futures contract prices in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

**Answer:** Paragraph 362 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or

may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 362 of the Second Amended Complaint.

363.   As result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered actual damages and transacted at artificial prices to which they would not have been subject but for the unlawful conduct of Defendants as alleged herein.

**Answer:**   Paragraph 363 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 363 of the Second Amended Complaint.

364.   Plaintiff and members of the Class are each entitled to damages for Defendants' violations of the CEA alleged herein.

**Answer:**   Paragraph 364 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins admits that Plaintiff and members of the putative Class purport to be seeking damages but denies that they are entitled to any damages in relation to this litigation.

## AS AND FOR A THIRD CLAIM
## AGAINST ALL DEFENDANTS

**(Principal-Agent Liability In Violation Of The Commodity Exchange Act
7 U.S.C. §1 *et seq.*)**

365.   Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

**Answer:**   The allegations contained in Paragraph 365 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins incorporates and reasserts the answers to all preceding paragraphs of the Second Amended Complaint as though set forth herein at length.

366.   Defendants Vega Capital London, Ltd., Adrian Spires, the Vega Trading Defendants, and John Doe Defendants 1-100 were principals, agents, co-venturers and/or guarantors of one another. As agents, co-venturers and/or guarantors of one another, the Defendants engaged in a manipulative scheme and conspiracy to manipulate prices alleged herein on behalf of one another and with one another's knowledge and authorization.

**Answer:**   The allegations contained in Paragraph 366 relate to dismissed claims and states legal conclusions, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins denies the allegations contained in Paragraph 366 of the Second Amended Complaint.

367.   Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B),
Defendants are liable for the acts of their agents.

**Answer:**   The allegations contained in Paragraph 367 relate to dismissed
claims and states legal conclusions, therefore, no response is required.  To the
extent a response is requested or necessary, Mr. Commins denies the allegations
contained in Paragraph 367 of the Second Amended Complaint.

368.   Plaintiff and members of the Class are each entitled to damages for
the violations of the CEA alleged herein.

**Answer:**   The allegations contained in Paragraph 368 relate to dismissed
claims and states legal conclusions, therefore, no response is required.  To the
extent a response is requested or necessary, Mr. Commins denies the allegations
contained in Paragraph 368 of the Second Amended Complaint.

## AS AND FOR A FOURTH CLAIM
## AGAINST ALL DEFENDANTS

**(Aiding and Abetting Liability In Violation Of The Commodity Exchange Act
D. U.S.C. §1 *et seq.*)**

369.   Plaintiff incorporates by reference and re-alleges all the allegations in
this complaint, as though fully set forth herein.

**Answer:**   Mr. Commins incorporates and reasserts the answers to all
preceding paragraphs of the Second Amended Complaint as though set forth herein
at length.

370.   Defendants Vega Capital London, Ltd., Adrian Spires, the Vega Trading Defendants and John Doe Defendants 1-100 each played their component role and each knowingly aided, abetted, counseled, induced, and/or conspired or procured the violations of the CEA alleged herein. Defendants knew of the manipulative scheme and conspiracy to manipulate alleged herein, intended to help the other Defendants perpetrate such manipulative scheme and conspiracy to manipulate and committed one or mor acts in furtherance of such manipulative scheme and conspiracy to manipulate.

**Answer:**      Paragraph 370 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 370 of the Second Amended Complaint.

371.   Each of the Vega Trading Defendants utilized or shared trading accounts held in the name of Defendant Vega Capital London, Ltd. Defendant Spires is the sole director of Defendant Vega Capital. As the sole director of Defendant Vega Capital, the entity that held the trading accounts used to make the manipulative trades alleged herein, Defendants Spires and Vega Capital knew of the manipulative scheme and conspiracy to manipulate, intended to help the other Defendants perpetrate the manipulative scheme and conspiracy to manipulate (which generated large profits for the Defendants) and committed one or more acts

in furtherance of such manipulative scheme and conspiracy to manipulate, including by holding or otherwise financing the manipulative positions and/or trades alleged herein.

**Answer:**     Paragraph 371 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins admits that he had a trading account with Vega Capital London, Ltd. and that Defendant Adrian Spires has served as a director of Vega Capital London, Ltd., and denies the remaining allegations contained in Paragraph 371 of the Second Amended Complaint.

372.   Each of the Vega Trading Defendants aided and abetted the manipulative scheme and conspiracy to manipulate including by conspiring to sell large volumes of May 2020 NYMEX WTI crude oil futures contracts for the purpose of depressing the price of such contract and the price of the May 2020 ICE WTI crude oil futures contract.

**Answer:**     Paragraph 372 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 372 of the Second Amended Complaint.

373.   Under Section 13 of the CEA, 7 U.S.C. §13c (a), Defendants are liable for willfully intending to assist the manipulation.

**Answer:** Paragraph 373 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 373 of the Second Amended Complaint.

374. Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

**Answer:** Paragraph 374 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins admits that Plaintiff and members of the putative Class purport to be seeking damages but denies that they are entitled to any damages in relation to this litigation.

## AS AND FOR A FIFTH CLAIM
## AGAINST ALL DEFENDANTS

### (Manipulation In Violation of the Commodity Exchange Act, 7 U.S.C. §§1, *et seq.* and Regulation 180.1(a))

375. Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

**Answer:** Mr. Commins incorporates and reasserts the answers to all preceding paragraphs of the Second Amended Complaint as though set forth herein at length.

376.    Defendants Vega Capital London, Ltd., Adrian Spires, the Vega Trading Defendants and John Doe Defendants 1-100 intentionally or recklessly, used or employed, attempted to use or employ or conspired to use or employ, one or more manipulative devices, schemes or artifices to defraud and/or engaged, attempted to engage, or conspired to engage, in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of the 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. §9, and Section 22 of the CEA, as amended, 7 U.S.C. §25, and Regulation 180.1, 17 C.F.R. §180.1.

**Answer:**    Paragraph 376 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 376 of the Second Amended Complaint.

377.    Defendants engaged in a conspiracy to depress prices of the NYMEX and ICE May 2020 WTI crude oil futures contracts by selling large volumes of the May 2020 NYMEX WTI crude oil futures contracts and by sending false signals to the market, including false price signals resulting from their manipulative and anti-competitive trading that was not reflective of supply and demand. Defendants' cumulative net selling pressure, aggressor sales and later their "ammo" sales sent

signals to the market of a frenzy of selling. Defendants did not disclose their manipulation to the market.

**Answer:** Paragraph 377 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 377 of the Second Amended Complaint.

378. Defendants' conduct proximately caused injury to Plaintiff and other members of the Class who transacted in an artificial and manipulated market at artificial and manipulated prices during the Class Period.

**Answer:** Paragraph 378 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 378 of the Second Amended Complaint.

379. Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

**Answer:** Paragraph 379 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins admits that Plaintiff and members of the putative Class purport to be seeking damages but denies that they are entitled to any damages in relation to this litigation.

## AS AND FOR A SIXTH CLAIM
## AGAINST ALL DEFENDANTS

### (Principal-Agent Liability In Violation Of The Commodity Exchange Act
### 7 U.S.C. §1 *et seq.* and Regulation 180.1(a))

380.   Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

**Answer:**   The allegations contained in Paragraph 380 relate to dismissed claims and, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins incorporates and reasserts the answers to all preceding paragraphs of the Second Amended Complaint as though set forth herein at length.

381.   Defendants Vega Capital London, Ltd., Adrian Spires, the Vega Trading Defendants, and John Doe Defendants 1-100 were principals, agents, co-venturers and/or guarantors of one another. As agents, co-venturers and/or guarantors of one another, the Defendants engaged in an intentional or reckless use of one or more manipulative devices, schemes or artifices to defraud and/or engagement in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of the CEA as alleged herein on behalf of one another and with one another's knowledge and authorization.

**Answer:**   The allegations contained in Paragraph 381 relate to dismissed claims and states legal conclusions, therefore, no response is required.  To the

extent a response is requested or necessary, Mr. Commins denies the allegations contained in Paragraph 381 of the Second Amended Complaint.

382.   Under Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B), Defendants are liable for the acts of their agents.

**Answer:**   The allegations contained in Paragraph 382 relate to dismissed claims and states legal conclusions, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins denies the allegations contained in Paragraph 382 of the Second Amended Complaint.

383.   Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

**Answer:**   The allegations contained in Paragraph 383 relate to dismissed claims and states legal conclusions, therefore, no response is required.  To the extent a response is requested or necessary, Mr. Commins admits that Plaintiff and members of the putative Class purport to be seeking damages but denies that they are entitled to any damages in relation to this litigation.

**AS AND FOR A SEVENTH CLAIM**
**AGAINST ALL DEFENDANTS**

**(Aiding and Abetting Liability In Violation Of The Commodity Exchange Act**
**7 U.S.C. §1 *et seq.* and Regulation 180.1(a))**

384.   Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

**Answer:** Mr. Commins incorporates and reasserts the answers to all preceding paragraphs of the Second Amended Complaint as though set forth herein at length.

385. Defendants Vega Capital London, Ltd., Adrian Spires, the Vega Trading Defendants and John Doe Defendants 1-100 each played their component role and each knowingly aided, abetted, counseled, induced, and/or conspired or procured the intentional or reckless use of one or more manipulative devices, schemes or artifices to defraud and/or engagement in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of the CEA as alleged herein. Defendants knew of the manipulative devices, schemes or artifices and/or the acts, practices or courses of business that operated as a fraud or deceit, intended to help the other Defendants perpetrate such manipulative devices, schemes or artifices and/or the acts, practices or courses of business that operated as a fraud or deceit and committed one or more acts in furtherance of same.

**Answer:** Paragraph 385 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 385 of the Second Amended Complaint.

386.    Each of the Vega Trading Defendants utilized or shared trading accounts held in the name of Defendant Vega Capital London, Ltd. Defendant Spires is the sole director of Defendant Vega Capital. As the sole director of Defendant Vega Capital, the entity that held the trading accounts used to make the manipulative trades alleged herein, Defendants Spires and Vega Capital knew of the manipulative devices, schemes or artifices and/or the acts, practices or courses of business that operated as a fraud or deceit, intended to help the other Defendants perpetrate same (which generated large profits for the Defendants) and committed one or more acts in furtherance of same, including by holding or otherwise financing the manipulative positions and/or trades alleged herein.

**Answer:**    Paragraph 386 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins admits that he had a trading account with Vega Capital London, Ltd. and that Defendant Adrian Spires has served as a director of Vega Capital London, Ltd., and denies the remaining allegations contained in Paragraph 386 of the Second Amended Complaint.

387.    Each of the Vega Trading Defendant aided and abetted the manipulative devices, schemes or artifices and/or the acts, practices or courses of business that operated as a fraud or deceit, including by selling large volumes of the May 2020 NYMEX and ICE WTI crude oil futures contracts and by sending

false signals to the market, including false price signals resulting from their manipulative and anti-competitive trading that was not reflective of supply and demand.

**Answer:** Paragraph 387 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 387 of the Second Amended Complaint.

388. Under Section 13 of the CEA, 7 U.S.C. §13c(a), Defendants are liable for willfully intending to assist the manipulation.

**Answer:** Paragraph 388 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 388 of the Second Amended Complaint.

389. Plaintiff and members of the Class are each entitled to damages for the violations of the CEA alleged herein.

**Answer:** Paragraph 389 of the Second Amended Complaint states legal conclusions to which no response is required. If and to the extent a response is or may be deemed to be required, Mr. Commins admits that Plaintiffs and members of the putative Class purport to be seeking damages but denies that they are entitled to any damages in relation to this litigation.

# AS AND FOR AN EIGHTH CLAIM
## AGAINST ALL DEFENDANTS

## (Common Law Unjust Enrichment and Restitution/Disgorgement)

390.   Plaintiff incorporates by reference and re-alleges all the allegations in this complaint, as though fully set forth herein.

**Answer:**      Mr. Commins incorporates and reasserts the answers to all preceding paragraphs of the Second Amended Complaint as though set forth herein at length.

391.   Defendants Vega Capital London, Ltd., Adrian Spires, the Vega Trading Defendants and John Doe Defendants 1-100 greatly profited financially ███████████████████████ from their unlawful acts alleged herein to the detriment of Plaintiff and members of the Class. In addition to being unlawful, Defendants' acts were also unfair and inequitable such that permitting Defendants' retention of their financial benefits resulting from their unlawful and unjust acts alleged herein violates the fundamental principles of justice, equity, and good conscience.

**Answer:**      Paragraph 391 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins denies the allegations contained in Paragraph 391 of the Second Amended Complaint.

392.    Defendants' unlawful, inequitable and unjust acts alleged herein caused Plaintiff and the members of Class to suffer injury, lose money and transact at artificial prices. Each Defendant should be required to pay the full amount of its own unjust enrichment to Plaintiff and members of the Class.

**Answer:**    Paragraph 392 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins admits that Plaintiff and the members of the Class purport to be seeking damages but denies that they are entitled to any damages in relation to this action.

393.    Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits obtained by Defendants from their unjust enrichment and inequitable conduct alleged herein.

**Answer:**    Paragraph 393 of the Second Amended Complaint states legal conclusions to which no response is required.  If and to the extent a response is or may be deemed to be required, Mr. Commins admits that Plaintiff and members of the putative Class purport to be seeking the establishment of a constructive trust but denies that they are entitled to any damages or other relief in relation to this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A. for a declaratory judgment that Defendants combined, conspired and agreed to manipulate and fix prices of NYMEX and ICE WTI crude oil futures contracts in violation of the Sherman Act, 15 U.S.C. §1 *et seq.*;

B. for a declaratory judgment that Defendants intentionally manipulated and conspired to manipulate NYMEX and ICE WTI crude oil futures prices, and caused such prices to become artificial, in violation of the CEA, 7 U.S.C. §1 *et seq.*;

C. for a declaratory judgment that Defendants are liable for the acts of their agents for their manipulation and conspiracy to manipulate in violation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B);

D. for a declaratory judgment that Defendants aided and abetted the manipulation and conspired to manipulate in violation of Section 13 of the CEA, 7 U.S.C. §13c(a);

E. for a declaratory judgment that Defendants intentionally or recklessly employed one or more manipulative devices, schemes or artifices to defraud and/or engaged in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of section 6(c)(1) of the CEA, as amended, codified at 7 U.S.C. §9, and Section 22 of the CEA, as amended, 7 U.S.C. §25, and Regulation 180.1, 17 C.F.R. §180.1;

F. for a declaratory judgment that Defendants are liable for the acts of their agents for their intentional or reckless employment of one or more manipulative devices, schemes or artifices to defraud and/or engagement in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of Section 2(a)(1)(B) of the CEA, 7 U.S.C. §2(a)(1)(B);

G. for a declaratory judgment that Defendants aided and abetted the intentional or reckless employment of one or more manipulative devices, schemes or artifices to defraud and/or engagement in one or more acts, practices, or courses of business, which operated or would operate as a fraud or deceit in violation of Section 13 of the CEA, 7 U.S.C. §13c(a);

H. for an order impressing a constructive trust temporarily, preliminarily, permanently or otherwise on the full amount of each Defendant's unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

I. for an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiff as the Class representative and his undersigned counsel as Class counsel;

J. for a judgment awarding Plaintiff and the Class damages against Defendants for their violations of the Sherman Act, including treble damages, with prejudgment interest at the maximum rate allowable by law;

K. for a judgment awarding Plaintiff and the Class damages against Defendants for each of their violations of the CEA, together with prejudgment interest at the maximum rate allowable by law;

L. for a judgment awarding Plaintiff and the Class damages equal to each Defendant's unjust enrichment, including the portions thereof that were obtained at the expense of Plaintiff and the Class;

M. for an award to Plaintiff and the Class for their costs of suit, including reasonable attorneys' fees and expert fees and expenses; and

N. for such other and further relief as the Court may deem just and proper.

**Answer:**    Mr. Commins denies that Plaintiff and members of the Class are entitled to any relief.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

**Answer:**    The jury trial demand does not constitute an averment of fact and, therefore, no response is required.

# ADDITIONAL DEFENSES

Mr. Commins reserves the right to assert any and all applicable defenses to the Plaintiff's claims. Mr. Commins reserves the right to amend or otherwise supplement this pleading in following discovery in this action. Without limiting the generality of the foregoing and without regard to whether defenses set forth below are affirmative defenses within the meaning of Federal Rule of Civil Procedure 8(c), and without conceding that any such defenses must be set forth in its answer or assuming any burden of proof that it would not otherwise bear, Mr. Commins states as follows:

## FIRST ADDITIONAL DEFENSE

Plaintiff and others claimed to be members of the alleged class or classes have failed to state a claim against Mr. Commins upon which relief may be granted.

## SECOND ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes fail to allege sufficiently or otherwise properly define a relevant market for the purpose of asserting an antitrust claim.

## THIRD ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred because they have not suffered any actual, cognizable antitrust injury or injuries.

## FOURTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred because they failed to mitigate any injuries or damages allegedly sustained.

## FIFTH ADDITIONAL DEFENSE

Plaintiff and others claimed to be members of the alleged class or classes lack standing to bring or maintain this action against Mr. Commins.

## SIXTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred in whole or in part because their alleged damages, if any, are too speculative or remote, and because of the impossibility of the proof and allocation of those alleged damages.

## SEVENTH ADDITIONAL DEFENSE

Each of Plaintiff's claims or causes of action is barred, in whole or in part, because Plaintiff's claims are not properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

## EIGHTH ADDITIONAL DEFENSE

Each of Plaintiff's claims or causes of action is barred, in whole or in part, because the named Plaintiff is not a proper class representative.

## NINTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class are barred in whole or in part by the doctrines of laches, estoppel, waiver, and/or unclean hands.

## TENTH ADDITIONAL DEFENSE

Plaintiff and others claimed to be members of the alleged class or classes have not suffered any damages or injury resulting from any act or omission of Mr. Commins.

## ELEVENTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred, in whole or in part, because there are one or more intervening and/or superseding causes of the claimed injuries, including but not limited to market circumstances outside Mr. Commins' control.

## TWELFTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred, in whole or in part, because any alleged injuries or damages were not legally or proximately caused by any acts or omissions of Mr. Commins and/or were caused, if at all, solely and proximately by the conduct of third parties, including without limitation the prior intervening or superseding conduct of such third parties.

## THIRTEENTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred, in whole or in part, because they are subject to mandatory arbitration provisions.

## FOURTEENTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred, in whole or in part, because the conduct alleged did not unreasonably restrain trade.

## FIFTEENTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred, in whole or in part, because it is preempted by the Commodity Exchange Act, including the rules and regulations promulgated thereunder, which limits a private plaintiff's remedy to actual damages.

## SIXTEENTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes for unjust enrichment are barred, in whole or in part, because there is no direct relationship, trading or otherwise, between Defendants and Plaintiff or the putative class members.

## SEVENTEENTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes for unjust enrichment are barred, in whole or in part, because they seek to recover damages that Plaintiff is not entitled to recover in this case and award of the judgment sought by Plaintiff would unjustly enrich Plaintiff.

## EIGHTEENTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes under the Commodity Exchange Act are barred in whole or in part because Plaintiff cannot establish the required ability to influence prices.

## NINETEENTH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes under the Commodity Exchange Act are barred in whole or in part because Plaintiff cannot establish an artificial price.

## TWENTIETH ADDITIONAL DEFENSE

The claims of Plaintiff and others claimed to be members of the alleged class or classes are barred in whole or in part because Plaintiff cannot establish the requisite intent.

## TWENTY-FIRST ADDITIONAL DEFENSE

Mr. Commins adopts and incorporates by reference any and all other defenses asserted by any other Defendant to the extent he may share in such a defense.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Commins respectfully requests that this Court:

1.      Enter judgment in favor of Defendants and against Plaintiff and any other claimants on all claims;

2.      Deny any motion to certify a class;

3.      Dismiss the Second Amended Complaint with prejudice;

4.      Award Mr. Commins appropriate costs incurred to defend this action; and

5.      Grant such additional relief as this Court deems just and proper.

## **JURY DEMAND**

Mr. Commins demands a trial by jury on all issues that are triable by law to a jury.

Dated: February 21, 2023

Respectfully submitted,

*/s/ Matthew L. Mazur*
Roger A. Burlingame
Matthew L. Mazur
**DECHERT LLP**
160 Queen Victoria Street
London EC4V 4QQ, United Kingdom
Telephone: +44 20 7184 7000
Roger.Burlingame@dechert.com
Matthew.Mazur@dechert.com

Steven E. Bizar
Julia Chapman
**DECHERT LLP**
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2222
Steven.Bizar@dechert.com
Julia.Chapman@dechert.com

***Attorneys for Paul Commins***