**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| MISH INTERNATIONAL MONETARY INC., on behalf of itself and all others similarly situated, | Case No. 1:20-cv-04577 |
| *v.* | Judge Manish S. Shah |
| VEGA CAPITAL LONDON, LTD., *et al.* |  |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR CLASS CERTIFICATION**

**CORRECTED COPY**

## **ERRATA**

| Page/Line Number | Correction |
|---|---|
| | |
| Tables | Conform Table of Contents and Table of Authorities to memorandum. |
| *Passim* | Correct and insert citations to the declaration of Benjamin M. Jaccarino, Esq. ("JD") and the expert report of Professor Craig Pirrong ("PR"). |
| *Passim* | Correct and insert internal citations. |
| 2:1-3, 18-24 | Correct quoted materials. |
| 3:6 | Add "material" before "impact". |
| 3:10 | Correct quoted materials. |
| 5:12-15 | Correct quoted materials. |
| 32:20 | Change "Aprill" to "April" |
| 36:20 | Change "net settling pressure" to "net selling pressure." |

# TABLE OF CONTENTS

I.      STATEMENT OF COMMON CLASS-WIDE EVIDENCE……………………..…………1

II.     THE COURT MAY DRAW ADVERSE INFERENCES FROM ███████
        █████████████            ███████████████…………………………………………………..…………..6

III.    LEGAL STANDARDS……………………………………...…………………..…………………….8

IV.     THE CLASS IS ASCERTAINABLE……………………...…………………………….9

V.      THE FOUR REQUIREMENTS OF RULE 23(a) ARE SATISFIED……………………10

        A.      Rule 23(a)(1):  The Proposed Class is so Numerous Joinder is
                Impracticable…………………………...…………………………………………10

        B.      Rule 23(a)(2):  There are Questions of Law and Fact Common to the Class……...11

        C.      Rule 23(a)(3):  Plaintiff's Claims are Typical of The Claims of the Class…………13

        D.      Rule 23(a)(4):  Plaintiff and Class Counsel Will Continue to Fairly and
                Adequately Represent the Class……………………………………...……………14

VI.     RULE 23(b)(3) IS SATISFIED…………………………………………...……………18

        A.      Rule 23(b)(3) Predominance is Satisfied, Including Because the Same
                Common Class-Wide Evidence Will be Used to Establish Each Class
                Members' Sherman Act, CEA and Unjust Enrichment Claims…………..……….18

                1.      Common Questions Predominate on the Sherman Act Claim……..……..19

                2.      Common Questions Predominate on the CEA Claims……………………21

                3.      Common Questions Predominate on The Unjust Enrichment Claim……..24

                4.      Common Class-Wide Evidence of Defendants' Impact on Prices…..…….24

                        a.      Dr. Pirrong's Analyses of Defendants' Uneconomic Trading……...25

                        b.      Dr. Pirrong's Price Impact Model…………………………………27

                        c.      Dr. Pirrong's Analyses Show tha ███████████
                                ████████████████████████……………………..32

                5.      Common Methodology for Calculating Damages…………...……………..33

B.      Rule 23(b)(3) Superiority is Satisfied, Including Because a Class Action Is Superior to Other Available Methods, If Any, To Adjudicate This Action………....…34

VII.    THE INFORMATION SOUGHT BY VEGA'S RULE 45 DOCUMENT SUBPOENAS ARE NOT RELEVANT TO CLASS CERTIFICATION………...………36

CONCLUSION………………………………………………………………………………..40

**Cases**                                                                                                    **Page(s)**

*Amchem Products, Inc. v. Windsor*
   521 U.S. 519 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Barnes v. Airline Pilots Ass'n, Int'l,*
   310 F.R.D. 551 (N.D. Ill. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Beaton v. SpeedyPC Software,*
   907 F.3d 1018 (7th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bell v. Farmers Ins. Exch.,*
   115 Cal. App. 4th 715 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Bell v. PNC Bank, Nat. Ass'n,*
   800 F.3d 360 (7th Cir. 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Brian Hunter,*
   130 FERC No. IN07-26-004, 2010 WL 232835 (Jan. 22, 2010). . . . . . . . . . . . . . . . . . . 22

**Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.**
   429 U.S.477 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Carnegie v. Household Int'l, Inc.,*
   376 F.3d 656 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*CFTC v. Oystacher,*
   2016 WL 3693429 (N.D. Ill. July 12, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*CFTC v. Skudder,*
   2022 U.S. Dist. LEXIS 227686, 2022 WL 17752392 (N.D. Ill. Dec. 19, 2022) . . . . . . . . . . 26

*Davis v. Northside Realty Assocs., Inc.,*
   95 F.R.D. 39 (N.D. Ga. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Dennison v. BP Corp.*
   No. 06-3334 (N.D. Ill.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Fond Du Lac Bumper Exchange, Inc. v. Jui Li Enterprise Co., Ltd.,*
   2016 WL 3579953 (E.D. Wis. June 24, 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Amaranth Nat. Gas Commodities Litig.,*
   269 F.R.D. 366 (S.D.N.Y. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 38

*In re Amaranth Nat. Gas Commodities Litig.,*
   587 F. Supp.2d 513 (S.D.N.Y. Oct. 6, 2008)…………………………………………………..22

*In re Broiler Chicken Antitrust Litig.,*
   2022 WL 1720468 (N.D. Ill. May 27, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 24

*In re David G. Henner,*
   30 A.D. 1151 (CEA No. 161, Sept. 15, 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re High Fructose Corn Syrup Antitrust Litig.,*
   295 F.3d 651 (7th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Int'l Trading Group, Ltd. Customer Account Litig.,*
   No. 89-5545 (C.D. Cal.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.,**
   626 F. Supp. 3d 814 (D. Md. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*In re Nat. Gas Commodities Litig.,*
   231 F.R.D. 171 (S.D.N.Y. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 28,29, 35,37

*In re Polyurethane Foam Antitrust Litig.,*
   2014 WL 10890818 (N.D. Ohio April 9, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Ready-Mixed Concrete Antitrust Litig.,*
   261 F.R.D. 154 (S.D. Ind. Sept 9, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Sulfuric Acid Antitrust Litig.,*
2007 WL 898600 (N.D. Ill. Mar. 21, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 19

*In re Sumitomo Copper Litig.,*
182 F.R.D. 85 (S.D.N.Y. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 37

*In re Sumitomo Copper Litig.,*
194 F.R.D. 480 (S.D.N.Y. 2000),
*petition for review denied, 262 F.3d 134(2d Cir. 2001).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Sumitomo Copper Litig.,*
262 F.3d 134 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**In re Term Commodities Cotton Futures Litig.,**
2020 U.S. Dist. LEXIS 181704, 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020). . . . . . . . . . . . . . . . . . . . . . . . 28,30

*In re Term Commodities Cotton Futures Litig.,*
2022 WL 485005 (S.D.N.Y. Feb. 17, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 14

*In the Matter of Anthony J. DiPlacido,*
2008 WL 4831204 (C.F.T.C. Nov. 5, 2008)
*aff'd in re Diplacido*, 364 Fed. Appx. 657 (2nd Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Kleen Prod. LLC v. Int'l Paper Co.,*
831 F.3d 919 (7th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Kohen v. Pac. Inv. Mgmt. Co. LLC,*
244 F.R.D. 469 (N.D. Ill. 2007)
*aff'd* 571 F.3d 672 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . 9, 11, 12, 14, 17, 21, 37, 38, 39

*Lacy v. Cook Cty., Illinois,*
897 F.3d 847 (7th Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**LidoChem, Inc. v. Stoller Enters. Inc.,**
2013 WL 12224209 (W.D. Mich. May 7, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Long v. Trans World Airlines, Inc.,*
761 F. Supp. 1320 (N.D. Ill. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 18, 19, 33, 34, 39

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
596 F. Supp. 3d 1076 (N.D. Ill. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 7, 22, 40

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
648 F. Supp. 3d 980 (N.D. Ill. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 1, 17,19, 21, 23
24

*Moehrl v. National Association of Realtors*
2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 19

*Morrow v. City of Tenaha*,
277 F.R.D. 172 (E.D. Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 35

*Phillips v. Asset Acceptance, LLC*,
736 F.3d 1076 (7th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Ploss v. Kraft Foods Grp., Inc.*,
431 F. Supp. 3d 1003 (N.D. Ill. 2020) . . . . . . . . . . . . . . . . . 9, 12, 13, 14, 17, 19, 20, 37, 38, 39

*Premium Plus Partners, L.P. v. Davis*,
2008 WL 3978340 (N.D. Ill. Aug. 22, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*
648 F.3d 533 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Prokhorov v. IIK Transp., Inc.*,
2023 WL 2711599 (N.D. Ill. Mar. 30, 2023) . . . . . . . . . . . . . . . . . 9, 11, 13, 15, 17, 18, 34, 39

*Rohlfing v. Manor Care, Inc.*,
172 F.R.D. 330 (N.D. Ill. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Samaritan Inns v. D.C.*,
   1995 WL 405710 (D.D.C. June 30, 1995),
*aff'd in part, rev'd in part on other grounds*, 114 F.3d 1227 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . 28

*Schmidt v. Smith & Wollensky, LLC*,
   268 F.R.D. 323 (N.D. Ill. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*SEC v. Lek Sec. Corp.*,
   2019 U.S. Dist. LEXIS 77874, 2019 WL 2114067 (S.D.N.Y. May 8, 2019) . . . . . . . . . . . 25, 26

*SEC v. Lek Securities Corp.*,
   370 F.Supp.3d 384 (S.D.N.Y. March 14, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*SEC v. Terraform Labs Pte. Ltd.*,
   2023 U.S. Dist. LEXIS 230518, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) . . . . . . . . . . . 28

*Srail v. Vill. of Lisle*,
   249 F.R.D. 544 (N.D. Ill. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Stampley v. Altom Transp., Inc.*,
   2015 WL 5675095 (N.D. Ill. Sept. 24, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

*Suchanek v. Sturm Foods, Inc.*,
   764 F.3d 750 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 34

*Tyson Foods Inc. v. Bouaphakeo*,
   136 S.Ct. 1036 (2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 34

*United States v. Coscia*,
   4 F.4th 454 (7th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Vorley*,
  2021 U.S. Dist. LEXIS 51142, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021),
*aff'd sub nom. US v. Chanu*, 40 F.4th 528, 533 (7th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . 25

*Viacom, Inc. v. Comcast Corp.*,
   951 F.3d 429 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Wagner v. NutraSweet Co.,*
 95 F.3d 527 (7th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wal-Mart Stores, Inc.* v. Dukes
 564 U.S. 338 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 33

## Statutes and Regulations

7 U.S.C. §1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

7 U.S.C. § 9(1) [ § 6(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

7 U.S.C. § 13(a)(2) [CEA § 9(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 23, 24

7 U.S.C. § 13a-1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

15 U.S.C. §1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CFTC Reg. 180.1, 70 C.F.R. 180.1…………………………...……………………………………23

## Rules

Fed. R. Civ. P.  23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9, 11, 19, 38

Fed. R. Civ. P.  23(a), and 23(a)(1)-23(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 10,13,14

Fed. R. Civ. P. 23(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 18, 33, 34, 35

Fed. R. Civ. P. 23(g)(1)(A)-(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## Other Authorities

 2 William B. Rubenstein, *Newberg on Class Actions* (6th ed. 2022). . . . . . . . . . . . . . . . . 13, 19, 33

William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2012). . . . . . . . . . . . . . . . . . . . . . . 18

Aitken, M., Cumming, D., & Zhan, F., *High Frequency Trading and End-of-Day Price Dislocation.* Journal of Banking & Finance 59 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Carhart, M.M., Kaniel, R., Musto, D.K., & Reed, A. V., *Leaning for the Tape: Evidence of gaming Behavior in Equity Mutual Funds.* The Journal of Finance, 57(2) (2002) . . . . . . . . . . . . . . . . . 33

Comerton-Forde, C., & Putnins, T.J., *Measuring Closing Price Manipulation*, Journal of Financial Intermediation (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* (3d ed. 2005) . . . . . . . . . . . . . . 18

Ben-David, I. T. Z. H. A. K., Franzoni, F., Landier, A., & Moussawi., R., *Do Hedge Funds Manipulate Stock Process?* The Journal of Finance, 68(6) (2013) . . . . . . . . . . . . . . . . . 33

Hasbrouck,J.,"*Measuring the Information Content of Stock Trades*, The Journal of Finance, 46(1)(1991)……………………………………………………………………….…..28

Hasbrouck, J., "The Summary Informativeness of Stock Trades: An Economic Analysis." The Review of Financial Studies, 6(1) (1991)……………………………………..………..…………28

Hasbrouck, J., *Assessing the Quality of a Security Market: A New Approach to Transaction-cost Measurement."* The Review of Financial Studies, 6(1) (1993) ……………………………..……….28

Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiff Mish International Monetary Inc. ("Plaintiff") respectfully submits this memorandum and the accompanying evidentiary materials[1] to demonstrate that ascertainability, the four requirements of Rule 23(a), and the two requirements of Rule 23(b)(3), are all satisfied by the proposed Class defined as:

> All persons and entities that sold a May 2020 light sweet crude oil (WTI) futures contract ("May contract") traded on the New York Mercantile Exchange between 9:00 a.m. CST and 1:30 p.m. CST (inclusive) on April 20, 2020 (including by trade at settlement ("TAS")), to liquidate a long position in the May contract. Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, or affiliates and federal governmental entities.

## I. STATEMENT OF COMMON CLASS-WIDE EVIDENCE

Plaintiff has plausibly stated claims against the Defendants[2] under the Sherman Antitrust Act, 15, U.S.C. §1 *et seq.* ("Sherman Act"), the Commodity Exchange Act, 7 U.S.C. §1, *et seq.* ("CEA") and common law unjust enrichment. *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 596 F. Supp. 3d 1076 (N.D. Ill. 2022) ("*Mish I*"); *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 648 F. Supp. 3d 980 (N.D. Ill. 2022) ("*Mish II*"). Common, class-wide evidence is capable of proving each claim against Defendants on behalf of the entire Class. Such evidence includes the following:

**Sell. Sell. Sell. "You've just got to keep selling."** In commodity futures markets, aggressor trades move prices. PR, ¶¶13, 75, 272, 280. Aggressor sales tend to depress prices. *Id.* Aggressor buys tend to increase prices. *Id.* On April 20, 2020, Trading Defendant Matthew Thompson repeatedly pressured defendant Henry Lunn to sell sell sell[3] the May 2020 NYMEX West Texas Intermediate ("WTI") Light Sweet Crude Oil futures contracts ("May Contract"):

---

[1] Submitted herewith is the expert report of Professor Craig Pirrong ("PR") and the declaration of Benjamin M. Jaccarino, Esq. ("JD").
[2] Defendants refers to Vega Capital London Ltd., Adrian Spires, and the Vega Trader Defendants (or "VTDs"), Paul Commins, George Commins, Christopher Roase, Elliott Pickering, Aristos Demetriou, Connor Younger, James Biagioni, Henry Lunn, Paul Sutton, and Matthew Thompson.
[3] A "short" position is developed by selling a futures contract. The more futures contracts sold, the greater the size of the short position. The greater the size of the short position, the greater the financial interest in lower prices of the futures contract at which the holder of the short position

- "Just keep selling it [the May Contract] every 5 points…"
- "You've just got to keep selling…"
- "Everyone is going to be short and have ammo…"

JD, Exs. 43, 44, 45.[4]

When asked in essence whether these comments and this type of selling conduct were intended to depress May Contract prices by keeping selling pressure on the May Contract, and whether "ammo" meant firing extra sales at the May Contract to depress prices during the last 30 minutes of trading, defendants Lunn and Thompson repeatedly ██████████ ████████████████████████ JD, Exs. 20, 40:20-41:16, 16:16-20; 77:14-21; 21, 58:10-59:8, 60:4-11; 80:10-15. Defendants' trading on April 20 triggered █████████████████████████ ██████████████████████████ PR, ¶161 ███████████████████████ ██████████████████████████████████████ Plaintiff's economist, Professor Pirrong, has found that Defendants did sell sell sell the May Contract on April 20. They made fully ████ ██████████████████████████████████████████████████ ██████████ PR, ¶¶14, 281.

But not all aggressor sales are created equal. When aggressing into new positions, a trader could uneconomically place their offers significantly below the best bid in order to try to take out one or more of the best bids and thereby walk the market down to lower prices. *E.g.,* PR, ¶314

█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████

---

could make purchases to buy back the short position. The lower the actual buy back price, the greater the potential profit. Here, Professor Pirrong, Plaintiff's economist, found that Defendants made at least ████████ in profits from their alleged manipulation of the May Contract. PR, ¶¶401-402.

[4] The term "ammo" or "ammunition" has been recognized as a term manipulators use to designate selling or buying power that is used to move prices. JD, Exs. 23 at 6-7; 24 at 8-9, 11-13.

██████████████████████████████████████████████
███████████ ██ ████████████

*Id.* [emphasis added]

Nor are all times of day created equal. The VTDs made █████████████████████████ ████████████████████████████████████ on April 20. *Id.* ¶13(b). The VTDs diverted almost all of their purchases of May Contracts into a different market, called the May Trade-At-Settlement ("TAS") contract. *Id.* ¶¶284-99. Dr. Pirrong found that purchases of the May TAS Contract had no material impact on May Contract prices. *Id.* ¶¶100, 282. But the price which the owner of the TAS contract paid in order to passively purchase the May Contract at 1:30pm, was the Volume Weighted Average Price ("VWAP") of the May Contract transactions *during the last two minutes of trading. Id.*, ¶43. This provided an extraordinary financial incentive for the VTDs to sell sell sell but also to save "ammo" for the last half hour of trading. *See* fn. 4 (financial regulators' comments reflecting price manipulators' use of the term "ammo"). The TDs could use that selling power for the last half hour of May Contract trading to try to put May Contract prices into a downspin by ramping up their rate of aggressor selling to overwhelm the market.

And ███████████████████████████████████████████████ ████████████████████████████████ PR, ¶¶126-37. At or around this time, Defendants Lunn, Pickering, and Younger confirmed with one another that they were going to add to their positions, including "late" in the session. JD, Ex. 41 at 1.

As the VTDs succeeded in depressing prices, and prices approached zero, Defendant Lunn texted Defendants Younger and Pickering: "F**king mental. I wanna see negative wti" prices." JD Ex. 42 at 1. Under the continued onslaught of Defendants' ramped up aggressor (and extremely aggressive) sales, May Contract prices did reach negative levels (for the first time ever in the WTI futures contract) at 1:08:23pm. PR, ¶¶ 10, 18, 23, 126-137.

Having helped cause negative prices, Defendants then sprang into action to dramatically separate their trading from the rest of the market. Between 1:08:23 and the final 1:30pm close, Defendants made ██████████████████████████████████ May Contracts made by the entire market. PR, ¶21, 281. Adding former defendant ████ who was uniquely supervised by Defendant Spires, the VTDs and former defendant ██████████████████████████████████████ ████████████████████████████████████ *Id.*; JD, Ex. 34 at 1.

Plaintiff's economist, Pirrong, conducted compare and contrast analyses of the VTDs' conduct and the conduct of all other market participants. PR, ¶¶8, 10, 21, 26, 154-163, 228-259, 280-321. He concluded that VTDs were ████████████████████████████████ ████████████████████████████ *Id.* The VTDs' ██████████████████████████ ████████████████████ *Id.*

Between 12:50 and 1:30pm, the CME trading systems ████████████████████████████ ██████████████████████ PR, ¶¶23, 148-153. But the Defendants' ████████████████ ████████████████████████ overcame the CME's best efforts to restore an orderly market. *Id.*, ¶¶21, 281. In the unprecedented circumstances of the first time ever in which a WTI futures contract was trading at negative prices, market participants watched the CME's futile efforts to restore order through their multiple trading halts, and the high amount of aggressor sales which were succeeding in driving May Contract prices down at a rapid rate further into negative price territory.

Thanks to Defendants' high volume of aggressor sales, the market became increasingly disorderly until, at 1:24:56, a flash crash occurred in the May Contract. PR, ¶¶10, 24-27, 107-120, 233-259. A flash crash is a situation in which there is an extreme lack of liquidity. *Id.* The bids in the market dried up quickly and the best bid vapor locked down from -$38.97 per barrel to -$46.37 per barrel to -$110.58 per barrel. *Id.*, ¶¶25, 127-145.

Based upon the descriptions in the peer reviewed literature of what causes a flash crash (which include high amounts of sales and other conduct in which the Defendants engaged prior to the flash crash here), Professor Pirrong opines that ██████████████████████████ ██████████████████████████████████████████████████████████████ ████████████ PR, ¶¶26, 256-57.

A reasonable jury, based upon the normal meaning of the words used by VTDs Lunn, Younger, and Pickering shortly after May Contract trading ended, could find that Messrs. Lunn, Younger, and Pickering agree with Pirrong that Defendants smashed and blitzed through bids to depress prices. Specifically, shortly after the May Contract settled at -$37.63 per barrel (culminating in an all-time record price collapse of $37.63 in less than 22 minutes), Defendants Lunn, Younger, and Pickering texted one another as follows:

- Defendant Lunn: "We've pushed each other so hard for years for this one moment. And we f**king **blitzed** it boys xx".
- Defendant Pickering: "We are the best of the best at this job!!! FACT"….
- Defendant Younger: "f**king **smashed** it!!! Xxx."

JD Ex. 46 at 8-9 (emphasis added). Adding to the normal meaning of the independent evidence of these Defendants' own contemporaneous text messages, Mr. Lunn ██████████████████████ ████████████████████████████ about whether they were admitting that they had depressed prices. JD Ex. 21 at 77:2-79:15; 81:2-83:8.

Defendants Adrian Spires and Vega Capital were obligated to identify potential instances of manipulation, to provide a Code of Conduct and Risk Management Policies to the Defendants, and to take steps to prevent manipulation and violations of the Market Abuse Regime. JD, 47 at 1, 5-6. Contrary to their contract obligations and duty to identify, such Defendants did nothing to stop the VTDs manipulation of the May Contract on April 20. On the contrary, ██████████████████ ██████████████████████████████████████████████████████████████

██████████████████████████████████████████ JD, 37-38; 40.  Additionally, Spires and/or Vega had a share of the profits of at least two Defendants (Defendants Thompson and Sutton).  JD, 40 at 2-3.  And Defendant Spires was personally responsible to supervise ████████████ who was the only other May Contract participant revealed by the CME data to trade in the same pattern as the VTDs.  PR, ¶¶11, n. 2, 287-321.  Spires has since taken over the voting control of the Futures Trading Facilities Ltd. company of Defendant Paul Commins and others, under whose contract with Vega Capital the VTDs traded.  JD Ex. 25; 26; 27.

Professor Pirrong has offered three types of quantitative analysis, each of which demonstrates that ███████████████████████████████████████████



Dr. Pirrong opines that ██████████████████████████████████████████████

██████████████████████ PR, ¶¶338-388.  On the contrary, by 7:10 pm on April 20 (*i.e.*, less than 5 trading hours after Defendants' conspiratorial trading was removed from the market), May Contract prices were positive again.  PR, ¶139.  And as the time for deliveries approached and the May Contract terminated all trading on April 21, its price continued to increase, closing at $10.01 per barrel.  *Id.*  Thus, it was Defendants' aggressor trading, not some phantom problem of storage, which caused the all-time record price decline on April 20 through 1:30pm.  Thus, an all-time record one day increase in WTI prices occurred from the time Defendants' trading ended at 1:30 pm on April 20 until it was time for deliveries to begin on April 21.  PR, ¶¶18-23.

**II.    THE COURT MAY DRAW ADVERSE INFERENCES FROM** ████████████
████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████  ██████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ In September 2023,

the Court compelled, over the VTDs' objections, depositions of four VTDs to occur before

December 31, 2023.  ECF No. 271.  Each of the four traders deposed (*i.e.*, defendants Paul

Commins, Elliot Pickering, Matthew Rhys Thompson, and Henry Lunn)████████████████

████████████████████████████████████ JD, Exs. 18-21.

For example, defendant Lunn██████████████████████whether numerous

contemporaneous communications on April 20 that Defendants used "ammo" trading to "smash"

and "blitz[]" the market meant Defendants had smashed and depressed May contract prices.  JD,

Ex. 21 at 50:24-51:14; 78:10-79:15; 81:2-83:8.  These are some of the same April 20 communications

the Court recognized as "highly suspicious."  *Mish I*, 596 F.Supp.3d at 1098.

The "general rule is that an adverse inference may be drawn from████████████████

██████████████████ in a civil case."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d

651, 663 (7th Cir. 2002).  Antitrust defendants who have█████████████████ in civil cases

in this Circuit have had negative inferences drawn against them regarding the existence and impact

of the alleged conspiracy at the class certification stage.  *See, e.g., In re Ready-Mixed Concrete Antitrust

Litig.,* 261 F.R.D. 154, 171 and n.19 (S.D. Ind. Sept. 9, 2009)████████████████████

████████████████████████████████████████



District courts have also drawn adverse inferences in connection with Rule 23 class motions when a defendant has ████████████████████████████████████████████ ████████████████████████████████. *See, e.g.*, *Morrow v. City of Tenaha*, 277 F.R.D. 172, 186 (E.D. Tex. 2011) (holding ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████. *In Re: Polyurethane Foam Antitrust Litigation.,* Trade Reg. Rep. ¶ 78,969 (C.C.H.), 2014 WL 10890818 (N.D. Ohio April 9, 2014) (court found adverse inferences to be drawn from employees of four defendants that ████████████████████████████ ██████████was common evidence of liability for purposes of class certification); *Davis v. Northside Realty Assocs., Inc.*, 95 F.R.D. 39, 45 (N.D. Ga. 1982) ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████ for purposes of predominance in certification of a Clayton Act §4 class action).

The Court may draw adverse inferences from ████████████████████████████ █████████ The availability of adverse inferences is a common legal question, and any adverse inferences will serve as common evidence applicable to the claims of all Class members.

## III. LEGAL STANDARDS

A proposed class must be sufficiently definite that its members are "ascertainable." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). The class must also meet the four requirements of Rule 23(a)—generally referred to as numerosity, commonality, typicality, and

adequacy of representation. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). One subsection of Rule 23(b) must also be satisfied. *Id.* A plaintiff seeking certification under Rule 23(b)(3) must show that issues common to the class members predominate over questions affecting only individual members, and that a class action is superior to other available adjudication methods. *Id.* A plaintiff must demonstrate compliance with Rule 23's requirements by a preponderance of the evidence. *Id.*

Courts have repeatedly certified classes in cases alleging manipulation of commodity futures contract prices in violation of the CEA and/or Sherman Act.[5]

---

[5] *In re Term Commodities Cotton Futures Litig.*, 12-cv-5126, 2022 WL 485005 (S.D.N.Y. Feb. 17, 2022), (certified CEA and Sherman Act class included two cotton futures contracts and "cotton on call" contracts involving physical cotton during a non-consecutive, 66-day class period and where class included intraday traders, spread traders, cotton merchants, hedgers, and speculators, as well as cash market participants), *petition for review denied*, 22-472 (2d Cir. 2022); *Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003 (N.D. Ill. 2020) (certified CEA and Sherman Act class included two wheat futures contracts and dozens of different option contracts on such wheat futures contracts during 43-day class period and where class included intraday traders, spread traders, hedgers, wheat millers, and speculators) *petition for review denied*, No. 20-8001 (7th Cir. 2020); *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469 (N.D. Ill. 2007) (certified CEA class included persons and entities who purchased a U.S. Treasury note futures contract to liquidate a short position in such contract during 55-day class period), *aff'd*, 571 F.3d 672 (7th Cir. 2009); *In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366 (S.D.N.Y. 2010) (certified CEA class included persons and entities who purchased and sold at least 14 natural gas futures contracts during 224 day class period and where plaintiffs alleged defendants artificially inflated natural gas spread prices through dominant positions and also artificially depressed the settlement prices of three different natural gas contracts by "slamming the close") *petition for review denied*, 10-4110-mv (2d Cir. 2010); *In re Nat. Gas Commodities Litig.*, 231 F.R.D. 171 (S.D.N.Y. 2005) (certified CEA class included persons and entities who purchased and sold dozens of different natural gas futures contracts during a three-year class period where defendants were alleged to have manipulated prices both up and down and where the class included numerous types of traders, including purchasers, sellers, speculators and hedgers), *petition for review denied*, (2d Cir. 2006); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85 (S.D.N.Y. 1998) (certified CEA class of purchasers of approximately 36 copper futures contracts during a two-year class period and also included both a "long subclass" and a "short subclass" in action where defendants were alleged to have engaged in a rolling manipulation); and *In re Sumitomo Copper Litig.*, 194 F.R.D. 480 (S.D.N.Y. 2000) (certified CEA class included purchasers of approximately 30 copper futures contracts traded over a non-consecutive, two and one-half-year class period where defendants were alleged to have engaged in a rolling manipulation) *petition for review denied*, 262 F.3d 134 (2d Cir. 2001).

## IV.    THE CLASS IS ASCERTAINABLE

A class is ascertainable when it is clearly defined, objectively based, and not premised on the merits. *Mullins*, 795 F.3d at 659-60, 72; *Prokhorov v. IIK Transp., Inc.*, 20-cv-6807, 2023 WL 2711599, at *3 (N.D. Ill. Mar. 30, 2023) (Shah, J.).  A clear class definition is one that "identif[ies] a particular group, harmed during a particular time frame, in a particular location, in a particular way." *Mullins,* 795 F.3d at 660.  This "weak" version of ascertainability has long been the law of the Seventh Circuit. *Mullins*, 795 F.3d at 659.  At the certification stage, a plaintiff need not "prove that there is a reliable and administratively feasible way to identify all who fall within the class definition." *Stampley v. Altom Transp., Inc.*, 14-cv-3747, 2015 WL 5675095, at *3 (N.D. Ill. Sept. 24, 2015) (Shah, J.).

The Class (*see* p. 1 above) is defined clearly and by objective criteria.  It identifies a particular group (traders of one specific WTI crude oil futures contract on one specific futures exchange), harmed during a particular time frame (between 9:00 a.m. and 1:30 p.m. on April 20), in a particular location (on the centralized NYMEX marketplace), in a particular way (trading in a market manipulated by Defendants and selling a May contract at artificially depressed prices caused by Defendants).  Also, Class membership is not defined by success on the merits, *i.e.*, it is not a "fail-safe" class.  Courts have found broader and more complex classes ascertainable in prior cases involving allegations of commodity futures price manipulation. *See* fn. 5 above; *In re Amaranth*, 269 F.R.D. at 381 ("the proposed class is not rendered unascertainable by the limitation that the class members held *net* long or short positions on specific contracts at specific times.").

## V.    THE FOUR REQUIREMENTS OF RULE 23(a) ARE SATISFIED

### A.    <u>Rule 23(a)(1):  The Proposed Class is so Numerous Joinder is Impracticable</u>

Rule 23(a)(1) requires "the class is so numerous that joinder of all members is impracticable."  The exact number of class members need not be shown, and the Court is entitled to make "common sense assumptions" concerning numerosity. *Barnes v. Airline Pilots Ass'n, Int'l*, 310

F.R.D. 551, 557 (N.D. Ill. 2015) (collecting cases); *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 326 (N.D. Ill. 2010). Classes with as few as forty (40) members have been found to be sufficiently numerous to satisfy Rule 23(a)(1). *Id.*

The record reflects there are likely hundreds of geographically dispersed Class members.



Plaintiff recognizes an individual Class member could have traded May contracts on April 20 through more than one account such that the number of unique accounts may not equal the number of individual Class members. However, many Class members (like Plaintiff) likely did trade through a single account on April 20. In addition to the large number of Class members, Joinder of, at a minimum, hundreds of Class members located around the world would be impracticable. The foregoing evidence is more than sufficient for the Court to find the Class is sufficiently numerous that joinder would be impracticable.

**B.    Rule 23(a)(2): There are Questions of Law and Fact Common to the Class**

Rule 23(a)(2) requires there be "questions of law or fact common to the class." Commonality is "a low hurdle that is easily surmounted." *Kohen*, 244 F.R.D. at 476. "[E]ven a single common question will do to fulfill Rule 23's commonality requirement. The critical point is the need for *conduct* common to members of the class. Class members don't need to present identical factual situations. What matters is whether there is a common contention whose truth or falsity will resolve an issue that is central to the validity of each claim." *Prokhorov*, 2023 WL 2711599, at *4 (internal citations and quotations omitted).

Here, Plaintiff and every Class member assert the same legal claims, against the same Defendants and such claims are based on Defendants' same course of alleged (mis)-conduct. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("'Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.'"). Thus, there are numerous common legal and fact questions, including (1) whether Defendants engaged in a conspiracy to manipulate the price of the May 2020 contract on April 20, 2020, and (2) whether Defendants' conspiracy to manipulate artificially depressed prices in the marketplace. A third common question is whether ██████████████████████████████ ████████████████████████████████████████████████████████████ entitle Plaintiff (and the Class) to adverse inferences. *See* "II" above.

This Court has recognized similar common questions existed in prior cases alleging commodity futures contract price manipulation in violation of the CEA and Sherman Act. *See, e.g.*, *Ploss,* 431 F.Supp.3d at 1014 ("The parties agree…there are two common questions in this case: (1) whether Kraft engaged in the alleged long wheat futures scheme; and (2) whether that scheme inflated futures prices in the marketplace."); *Kohen,* 244 F.R.D at 480 ("the Court agrees, that the predominant issue in this case will be whether defendants unlawfully manipulated prices of the June Contract in violation of the CEA.").[6] The existence of these overarching common questions also serve to demonstrate typicality and adequacy are satisfied. *Wal-Mart Stores, Inc.*, 564 U.S. at 349 n. 5; *see* "C"-"D" below (addressing typicality and adequacy).

The above common questions are capable of class-wide resolution because they can resolve issues central to the validity of the claims of each Class member "in one stroke." *Wal-Mart Stores,*

---

[6] This Court has repeatedly found commonality satisfied in Sherman Act Section 1 price-fixing cases by the single question of whether a conspiracy to fix prices existed. *See, e.g., Moehrl v. Nat'l Ass'n of Realtors*, 19-cv-01610, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023); *In re Sulfuric Acid Antitrust Litig.*, 03-cv-4576, 2007 WL 898600, at *4 (N.D. Ill. Mar. 21, 2007).

564 U.S. at 350.  Resolution of the question of whether Defendants conspired to manipulate prices and the question of whether Defendants caused artificial prices are central to each Class member's claims.  These common questions can be resolved through common class-wide proof—including Defendants' internal communications, Defendants' trading activity, market data from the CME and expert analysis and opinions.  *See* "VI.A" below (discussing predominance).  Answers to the common questions will not vary by Class member.  Similarly, whether Plaintiff and Class members are entitled to adverse inferences because of ███████████████████████████ may also be resolved in one stroke for all Class members.  In sum, Class members assert the same exact legal claims that depend upon the same exact common proof and findings pertaining to the Defendants' same exact common course of alleged misconduct.

C.    **Rule 23(a)(3):  Plaintiff's Claims are Typical of The Claims of the Class**

Rule 23(a)(3) requires "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  "The test for typicality is not demanding" and "[p]utative antitrust plaintiff classes are particularly likely to satisfy the typicality requirement."  Newberg and Rubenstein on Class Actions § 3:29 and § 20.40 (6th ed.)  "Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members."  *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).[7]  "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory."  *Ploss*, 431

---

[7] Thus, "[t]he existence of individual defenses…does not defeat typicality."  *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, 09-CV-0852, 2016 WL 3579953, at *4 (E.D. Wis. June 24, 2016) (Section 1 price-fixing case).  Indeed, a "representative may satisfy the typicality requirement even though that party may later be barred from recovery by a defense particular to him that would not impact other class members."  *In re Term Commodities*, 2022 WL 485005, at *6 (S.D.N.Y. Feb. 17, 2022) (internal citations and quotations omitted); *see In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 95–96 (S.D.N.Y. 1998) (allegations of unique defenses defeat neither typicality nor adequacy).

F.Supp.3d at 1011 *citing Lacy v. Cook City., Illinois*, 897 F.3d 847, 866 (7th Cir. 2018). As such, a plaintiff's claims are not atypical because there may be differences between class members that are immaterial to the common questions. *Prokhorov*, 2023 WL 2711599, at *7.[8]

Plaintiff satisfies typicality because it traded the same standardized May 2020 contract in the same centralized marketplace as did every other Class member. *Kohen*, 244 F.R.D. 477-478. Plaintiff and all Class members seek relief from the same Defendants pursuant to the same set of statutes and laws—the Sherman Act, CEA, and common law unjust enrichment. ECF No. 130 ("Complaint"), *passim*. The claims of all Class members, including Plaintiff, arise from Defendants' same exact common course of misconduct alleged in detail in the Complaint. Similarly, the claims of all Class members, including Plaintiff, are based on the same exact legal theory—*i.e.*, Defendants conspired to manipulate downward the prices of the May contract on April 20 by abusing the TAS mechanism, selling the May contract "aggressively," engaging in manipulative "ammo" selling, and otherwise putting extraordinarily large downward pressure on May contract prices. *Ploss*, 431 F.Supp.3d at 1011-1012 (finding Rule 23(a)(3) typicality satisfied where plaintiff and the class' claims "target the same conduct, and seek relief under the Commodity Exchange Act and the Sherman Act based on the same legal theories and on the same facts."); *Kohen*, 244 F.R.D. at 477 (finding Rule 23(a)(3) typicality satisfied where "Defendants are alleged to have engaged in a course of conduct that manipulated prices for the June Contract. All class members purchased the same futures contract within the class period, and, thus, all members were affected by defendants' same course of conduct and alleged price manipulation."). Typicality is satisfied.

---

[8] Factual differences surrounding the named plaintiff's purchases and those of the class members will not defeat typicality in Section 1 price-fixing case such as this, *see Moehrl v. Nat'l Ass'n of Realtors*, 19-CV-01610, 2023 WL 2683199, at *12 (N.D. Ill. Mar. 29, 2023) *& Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 335 (N.D. Ill. 1997), or in cases alleging CEA manipulation claims. *In re Term Commodities Cotton*, 2022 WL 485005, at *4; *Kohen*, 244 F.R.D. at 475 & 478 (class representative not atypical even if defendants proved that a market announcement which occurred in the middle of the class period affected market prices for the futures contract in question).

### D. Rule 23(a)(4): Plaintiff and Class Counsel Will Continue to Fairly and Adequately Represent the Class

Rule 23(a)(4) requires "the representative parties will fairly and adequately protect the interests of the class." "'[A]dequacy of representation is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members.'" *Stampley*, 2015 WL 5675095, at *5 (internal quotation omitted).

Plaintiff is Adequate. To be adequate "[a] named plaintiff must be a member of the putative class and have the same interest and injury as other members." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027-28 (7th Cir. 2018); *Prokhorov*, 2023 WL 2711599, at *8 ("The class representative cannot have 'antagonistic or conflicting' interests to the class as a whole and cannot present severe credibility problems."). A "conflict" must be "fundamental" to even potentially defeat adequacy. *Srail v. Vill. of Lisle*, 249 F.R.D. 544, 555 (N.D. Ill. 2008) ("A conflict or potential conflict alone will not . . . necessarily defeat class certification—the conflict must be 'fundamental.'") (internal quotes omitted). "The Seventh Circuit has made clear that the bar for a named plaintiff's adequacy is not set high." *Stampley*, 2015 WL 5675095, at *5. Indeed, "[t]he role is nominal." *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1080 (7th Cir. 2013); *Stampley*, 2015 WL 5675095, at *5 (quoting same).[9]

Plaintiff is a California corporation that deals in rare coins and precious metals. JD, Ex. 16 ("Mish Dep."), 30:20-31:8; 34:4-8; 286:25-287:15. Plaintiff has operated as a small, successful family business in Menlo Park, California since 1980. Mish Dep., 25:14-16; 30:20-31:8; 34:4-8; 99:17-20; 286:25-287:15. Mr. Robert Mish, the sole owner of Plaintiff, is an Air Force veteran and has

---

[9] For instance, that a class representative did not rely on certain information that other members of the class may (or may not) have relied upon is irrelevant to the adequacy determination because such is not required to establish the elements of a CEA manipulation claim. *In re Nat. Gas*, 231 F.R.D. at 184–85 (rejecting argument that named plaintiffs were inadequate for their alleged failure to rely upon published spot price indices in determining whether to bury or sell futures contracts).

operated the business since it opened in 1980. Mish Dep., 30:20-31:8; 285:11-19. Mr. Mish, on behalf of Plaintiff, has decades of experience trading in a variety of commodity futures contracts. Mish Dep. 77:8-11; 77:16-79:11. On April 20, Plaintiff sold ten (10) May contracts to liquidate a long position in such contract and lost $92,490. Mish Dep., 111:20-112:14; JD., Ex. 30 (Plaintiff's trading on April 20). Thus, Plaintiff is a Class member. *Compare* p. 1 above (Class definition).

Plaintiff and all Class members suffered the same exact injury due to Defendants' alleged violations of the CEA and Sherman Act—*i.e.*, each sold the May 2020 contract at an artificially low price and thus received less money for such sale than they would have absent the artificially depressed price. Plaintiff and all Class members thus have the exact same interest in establishing Defendants conspired to manipulate and artificially depress the price of the May 2020 contract.

Plaintiff has been vigorously representing the interests of the Class since filing this action more than three years ago in August 2020. ECF No. 1. Plaintiff has been involved in this action since its inception and has spent a significant amount of time working on this case on behalf of the Class, including conferring with class counsel, reviewing Court decisions and filings, responding to Defendants' discovery requests, and preparing for and attending a deposition where Mr. Mish testified on behalf of Plaintiff and himself. Mish Dep., 14:14-15:21; 16:6-18; 19:2-19; 20:3-21:3; 21:10-22:21. Mr. Mish (who is 77 years old) testified for eight hours on the record and responded to questions from two different defense attorneys. Mish Dep. *passim*. Mr. Mish's deposition testimony demonstrates his knowledge of the legal claims herein, the underlying facts of the case, his significant involvement in the discovery process (*e.g.*, having spent days assisting counsel responding to document requests and in preparing for his deposition), and his understanding of the Class and his role as a Class representative. Mish Dep., 14:14-15:21; 16:6-18; 19:2-19; 20:3-21:3; 21:10-22:21; 122:17-24; 126:16-128:16; 383:21-385:3; 392:8-18; 405:2-9.

Plaintiff and Mr. Mish do not have credibility problems, let alone "severe" ones. Plaintiff is in "good" standing with the State of California and has been in operation for almost 45 years. Mr. Mish has never been charged with a criminal offense. Mish Dep., Mish, 32:9-11. Plaintiff and Mr. Mish have never been charged with a civil or regulatory violation. Mish Dep., Mish, 32:18-23. Plaintiff does not have any "fundamental" conflicts with the Class.

Counsel is Adequate. In determining the adequacy of counsel, a district court "must consider" the Rule 23(g)(1)(A) factors and "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Prokhorov*, 2023 WL 2711599, at *8 (citing and applying Fed. R. Civ. P. 23(g)(1)(A)-(B)).

Lovell Stewart Halebian Jacobson LLP ("Lovell Stewart") and Miller Law LLC ("Miller Law," collectively "Plaintiff's Counsel") investigated and identified the potential claims herein and filed the first complaint in August 2020 against defendant Vega. ECF No. 1. Thereafter, Lovell Stewart obtained (over Vega's objections) documents Vega produced to the CME in connection with the CME's investigation of Defendants. ECF No. 21. Lovell Stewart then prepared and filed an amended complaint that named eleven additional defendants and included detailed allegations of Defendants' trading, communications, and impact on prices (ECF Nos. 37, 41) and substantially defeated Defendants' motions to dismiss. *Mish II, passim.*

Plaintiff's Counsel (including their predecessor members) have been litigating complex class actions (like this one) involving Sherman Act and CEA claims for over 45 years. *See* JD., Ex. 2 (Lovell Stewart resume), www.lshllp.com; and JD., Ex. 3 (Miller Law resume), www.millerlawllc.com. During the last three-plus years, Lovell Stewart has committed (and will continue to commit) significant resources to represent the interests of the Class in the prosecution of this action, including retaining numerous experts and consultants. Lovell Stewart has been appointed by this Court and other courts as counsel for classes in numerous actions alleging

violations of the CEA and Sherman Act. *See, e.g.*, *Ploss*, 431 F.Supp.3d at 1011 (Lovell Stewart appointed as co-lead counsel for certified class); *Kohen*, 244 F.R.D. at 479 ("…the Court is satisfied that plaintiffs' counsel [Lovell Stewart and Miller Law] will vigorously prosecute this case."). The nearly half-a-century long tradition of federal courts selecting Miller Law as class counsel has similarly remained consistent over the years. *See e.g.*, *In re Int'l Trading Group, Ltd. Customer Account Litig.*, No. 89-5545 (C.D. Cal.); *In re Sumitomo Copper Litig.*, No. 96- 4584 (S.D.N.Y.); *Dennison v. BP Corp.*, No. 06-3334 (N.D. Ill.) (commodity manipulation class actions in which Marvin Miller was appointed co-lead class counsel).

## VI.    RULE 23(b)(3) IS SATISFIED

### A.    Rule 23(b)(3) Predominance is Satisfied, Including Because the Same Common Class-Wide Evidence Will be Used to Establish Each Class Members' Sherman Act, CEA and Unjust Enrichment Claims

Rule 23(b)(3) requires "questions of law or fact common to class members predominate over any questions affecting only individual members." "The predominance inquiry 'asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non common, aggregation-defeating, individual issues." *Tyson Foods Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (*quoting* W. Rubenstein, Newberg on Class Actions § 4:49, at 195-96 (5th ed. 2012)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods*, 136 S. Ct. at 1045 (*quoting* 7AA C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1778, at 123-24 (3d ed. 2005)). "[A] common question predominates over individual claims if 'a failure of proof on the [common question] would end the case' and the whole class 'will prevail or fail in unison." *Prokhorov*, 2023 WL 2711599, at *9 (internal citation and quotation omitted).

The predominance analysis "begins with" the elements of the underlying causes of action. *Messner,* 669 F.3d at 815. Based on the elements of Plaintiffs' Sherman Act, CEA, and unjust enrichment claims (*see* below), there are at least two overarching, common questions that cause common questions to predominate: (1) whether Defendants engaged in a conspiracy to manipulate the price of the May 2020 contract on April 20, 2020, and (2) whether Defendants' conspiracy to manipulate artificially depressed May contract prices. *Ploss,* 431 F.Supp.3d at 1014 (finding predominance satisfied in CEA and antitrust manipulation case that involved similar common questions). Common, class-wide evidence may be used to answer the two foregoing questions. *Compare* "1" – "5" below *with Ploss,* 431 F.Supp. 3d at 1013 ("a plaintiff can meet the predominance requirement by showing that common evidence will be used to prove the class members' claims.").

### 1.    Common Questions Predominate on the Sherman Act Claim

"[A]s a rule, the allegation of a price-fixing conspiracy is sufficient to establish predominance of common questions." Newberg and Rubenstein on Class Actions § 20:52 (6th ed.). Indeed, courts have repeatedly found common questions predominate in cases involving claims for price fixing in violation of the Sherman Act. *Messner*, 669 F.3d at 814 ("In antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification."); *Amchem*, 521 U.S. 519, 624 ("Predominance is a test readily met in certain cases alleging…violations of the antitrust laws.").[10] The elements of Plaintiff's Section 1 Sherman Act claim are: (1) defendants had a contract, combination, or conspiracy ('an agreement'); (2) as a result, trade in the relevant market was unreasonably restrained; and (3) [the plaintiff was] injured. *Mish II*, 648 F. Supp. 3d at 989.

<u>Common Evidence of An Agreement in Restraint of Trade</u>. Proof of Defendants' agreement to restrain trade and depress May contract prices on April 20 will be the same across the

---

[10] *E.g., Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 927 (7th Cir. 2016); *Moehrl*, 2023 WL 2683199, at *14; *In re Broiler Chicken Antitrust Litig.*, 16-cv-8637, 2022 WL 1720468, at *7 (N.D. Ill. May 27, 2022); *In re Sulfuric Acid Antitrust Litig.*, 03-cv-4576, 2007 WL 898600, at *7 (N.D. Ill. Mar. 21, 2007).

Class and includes: Defendants' "highly suspicious" April 20 communications reflecting real-time, coordinated efforts to depress May contract prices (*see* "I" above ("Facts")), Defendants' trading records reflecting that each of the ten VTDs traded the May contract the same way on April 20 (PR, ¶¶154-161) and had a shared financial incentive to have the May contract settle at the lowest possible price on April 20 (*see* Facts above), CME audit trail data reflecting that ███████████ ████████████████████████████████████████████ (PR, ¶¶334-37), CME data reflecting the███████████████████████████████████████████████████ ████████████████████████ ██ ███████████████████████████████ ████████████████████ (PR, ¶¶13-14), expert testimony reflecting the ████████████ ██████████████████████████████ (PR, ¶¶284-333); and documents reflecting ████████████████████████████████████ (JD, Exs. 37; 38, 40 at 16-17). *Ploss*, 431 F.Supp.3d 1003 (the defendant "does not really contest that the class's proof as to the existence of the scheme will be the same across the class."). Additionally, ██████████ ████████████████████████████████████████████████████████ ██████████████████ may entitle Plaintiff and Class members to adverse inferences, which may serve as common class-wide proof of the conspiracy. *See* "II" above.

Common Evidence of Antitrust Injury. Antitrust injury is a common class-wide question. Antitrust injury is any "injury of the type the antitrust laws were intended to prevent" and "flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.* 429 U.S.477, 489 (1977); *Viacom v. Comcast Corp.,* 951 F.3d 429,481 (7ᵗʰ Cir. 2020) (same). Here, Plaintiff contends Defendants' anticompetitive conspiracy intended to and did depress prices of the May contract and that Plaintiff (and every Class member) sold one or more May contracts at the artificially depressed prices caused by Defendants and was thereby injured. Plaintiff can prove Defendants artificially depressed May contract prices through common class-wide evidence,

including Defendants' contemporaneous admissions that they successfully "blitzed" and "smashed" prices (*see* Facts above), expert testimony and analysis that the VTDs' trading depressed May contract prices (PR, ¶222-259), Professor Pirrong's price impact model (*see* "4" below), and adverse inferences (*see* "II" above).

## 2. Common Questions Predominate on The CEA Claims

Courts have repeatedly found common questions predominate in CEA manipulation cases. *See e.g., Kohen*, 244 F.R.D. at 482 ("Other courts considering class certification for price manipulation claims under the CEA have also found common questions to predominate."); *see also* pp. 1 above (collecting cases certifying CEA classes).

Section 9(a)(2) Claim. The elements of Plaintiff's Section 9(a)(2) claim are: "(1) the defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *Mish II*, 648 F.Supp.3d at 992. Each of the foregoing elements presents common class-wide questions that may be answered by common class-wide proof. These common issues predominate.

*Manipulative Intent.* Manipulative intent "is a subjective inquiry and 'must of necessity be inferred from the objective facts and may, of course, be inferred by a person's actions and the totality of the circumstances.'" *Kohen*, 244 F.R.D. at 482. Evidence of Defendants' intent to artificially depress the price of the May contract is common to the Class and includes: Defendants' "highly suspicious" April 20 communications indicating Defendants acted together in order to artificially depress May contract prices (*see* Facts above), Defendants' uneconomic and uncommercial conduct (PR, ¶¶284-332), Defendants' large and common financial motive to depress May contract prices so they could purchase the May contract via TAS at the lowest possible price (*see* Facts above), the VTDs' shared profit interests in having the May contract price settle at the lowest possible price (*see* Facts above), Vega and Spires' ███████████████████████████

on April 20 (JD, Exs. 37-38; 40 at 16-17), and efforts to conceal the nature of their actions on April 20 (JD, Ex. 39 at 6).

*Defendants' Causation of An Artificial Price.* A price is "artificial" when it "does not reflect the market or economic forces of supply and demand." *Mish I*, 596 F.Supp.3d at 1095-96. "[W]hen a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial." *Id.* Also, a "price may be artificial if it is higher than it would have been absent [the] defendants' conduct." *Id.* To be a cause of an artificial price, "it is enough" that Defendants' conduct "contributed to the price [movement]." *Id.*

Defendants' uneconomic sales of May contracts designed to register the lowest possible May contract prices were manipulative, illegitimate and necessarily resulted in an artificial price. *In the Matter of Anthony J. DiPlacido,* 2008 WL 4831204 at *30 (C.F.T.C. Nov. 5, 2008) ("when a price is affected by a factor which is not legitimate, the resulting price is necessarily artificial") *aff'd In re Diplacido*, 364 Fed. Appx. 657 (2d. Cir. 2009); *Amaranth*, 587, F.Supp. 2d at 535 ("the combination of wrongful intent (or, more accurately, the lack of a legitimate economic motive) and a legitimate transaction would constitute manipulation."). Moreover, as Defendants engaged in high volumes of aggressive sales of May contracts, which has been held to "almost guarantee a lower price." *Brian Hunter,* 130 FERC ¶ 63,004, 2010 WL 232835, at *19 at ¶84 (finding that hitting a bid, the equivalent of an aggressive sale, "almost guarantees a lower price").

Just as the May contract experienced its sharpest price declines (including between 1:00 and 1:30 pm) Defendants were exerting their highest levels of selling pressure on the market. *Mish*, 596 F.Supp.3d at 1091, 1096; PR, ¶¶284-332. Similarly, after Defendants' manipulative trading ceased on April 20, the price of the May contract bounced all the way back from negative $37.63 at the close of trading on April 20 to positive $10.01 at the close of trading on April 21, *i.e.,* approximately the same price level as the May contract at the start of trading on April 20. *Id*; PR, ¶¶20-23, 53, 121-22. In

addition to the foregoing common evidence of causation that "speaks for itself," Plaintiff has also offered common expert testimony that Defendants caused the May contract to be artificially depressed on April 20, including Plaintiff's expert's price impact model. *See* below. Also, the VTDs' uneconomic sales of May contracts also serves as common evidence that they caused artificial prices. *See, e.g., In re David G. Henner*, 30 A.D. 1151, 1174, 1192 (CEA No. 161, Sept. 15, 1971) ("[t]he inference is inescapable that the respondent paid more than he had to…for the purpose of causing the closing price to be at that high level. No further proof is needed to show that the closing price…was artificially high"); PR, ¶¶13-23, 77-106, 154-61, 233-59, 267-337, 351, 390.

*Ability to Influence Prices.* The above common evidence that Defendants caused an artificial price also serves as evidence of Defendants' ability to influence prices. Additional common evidence of Defendants' ability to influence the price of the May contract includes the following.

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████  ███  █████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

Section 6(c)1 Claim. Section 6(c)(1) of the CEA prohibits the use of "any manipulative or deceptive device or contrivance" in violation of Commodity Futures Trading Commission ("CFTC") regulations. 7 U.S.C. § 9(1). CFTC Regulation 180.1, in turn, prohibits the intentional or reckless use of "any manipulative device, scheme, or artifice to defraud," as well as the intentional or reckless "[e]ngag[ment], or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person." *Mish II*, 648 F.Supp.3d at 992. Evidence that Defendants violated Section 6(c)1 of the CEA includes all the above common

evidence Defendants violated Section 1 of the Sherman Act and Section 9(a)(2) of the CEA.

Additional common proof concerning the Section 6(c)1 claim includes ███████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████

Section 13 Claim.  The elements of Plaintiff's Section 13 claim for aiding and abetting

include a substantive CEA claim against a principal and that the aiding and abetting defendant: "(1)

had knowledge of the principal's intent to commit a violation of the CEA ...; (2) had the intent to

further that violation; and (3) committed some act in furtherance of the scheme." *Mish II*, 648

F.Supp.3d at 994.  Knowledge, intent to further the CEA violation and an act in furtherance are all

common class-wide issues that concern Defendants' state of mind and conduct.  Proof of these

elements are common to the Class and include all the same common evidence for Plaintiff's

Sherman Act claim and Section 9(a)(2) and 6(c)1 manipulation claims.  *See* above.  Additional

common evidence includes ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████

### 3.     Common Questions Predominate on The Unjust Enrichment Claim

"[U]njust enrichment is a common law claim under state law against '[a] defendant [who] has

unjustly retained a benefit to the plaintiff's detriment,' and whose 'retention of the benefit violates

the fundamental principles of justice, equity, and good conscience.' *Mish II*, 648 F.Supp. 3d at 995.

Plaintiff's unjust enrichment claim is based on the same (common) misconduct of Defendants as

Plaintiff's Sherman Act and CEA claims.  *In re Broiler Chicken*, 2022 WL 1720468, at *20.  The only

additional issue is the amount of Defendants' illicit profits.  The amount of Defendants' profits

(approximately ███████ is a common class-wide issue and may be established through common

class-wide evidence, including Defendants' trading records, CME data and other documents reflecting the amounts of their profits in May contracts.  *See* Facts above; PR, ¶¶398-401.

### 4. Common Class-Wide Evidence of Defendants' Impact on Prices

Dr. Pirrong offers three mutually reinforcing categories of expert opinion demonstrating that Defendants' trading on April 20 was uneconomic, had the overall effect of depressing the price of the May contract, and was a substantial cause of the "flash crash" which occurred in the May contract starting at 1:24:56 p.m. Dr. Pirrong thus demonstrates that well-accepted market microstructure analyses can be applied to determine (i) how Defendants' trades impacted order flow and made Defendants' TAS trade-based strategy possible; (ii) the impact of and damages arising from Defendants' conduct; and (iii) that Defendants' trading was, in fact, a direct and substantial cause of the dramatic price movements and declines in the last five minutes of trading on April 20.

### a. Dr. Pirrong's Analyses of Defendants' Uneconomic Trading

First, Dr. Pirrong evaluates and compares the timing, quantities and types of Defendants' trades with those of other market participants in order to explain how Defendants' trades impacted order flow and made Defendants' manipulative strategy possible. *See* PR¶¶ 154-161, 175, 226-259, 284-314, 321. Numerous cases have approved such analyses. *See, e.g., CFTC v. Oystacher*, No. 15-CV-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) (admitting CFTC's expert Bessembinder's market microstructure testimony on alleged manipulative trading in crude oil futures market, which included analysis of market and order data, trading patterns, timing, quantities and types of orders, price aggressiveness, and order imbalances); *United States v. Coscia*, 4 F.4th 454, 463, 480 (7th Cir. 2021) (affirming, Seventh Circuit credited government expert's analyses of "order imbalances regarding Coscia's trades as compared to other high frequency traders."); *United States v. Vorley,* No. 18 CR 00035, 2021 U.S. Dist. LEXIS 51142, *17-18, 2021 WL 1057903 (N.D. Ill. Mar. 18, 2021), *aff'd sub nom. US v. Chanu,* 40 F.4th 528, 533 (7th Cir. 2022) (affirming, Seventh Circuit credited expert

testimony: "if a buy order arrives, typically the price of the commodity will move higher. And the larger the buy order that is made visible to market participants, the larger… the price response typically [will be] in the financial market.") (internal quotations omitted); *SEC v. Lek Sec. Corp.*, No. 17cv1789 (DLC), 2019 U.S. Dist. LEXIS 77874, *8, 2019 WL 2114067 (S.D.N.Y. May 8, 2019) (reaffirming admission of [SEC's expert's] report, noting that "[p]lacing orders in the market usually provides traders with information about market liquidity and the interest of other market participants in buying or selling securities, whether the trader placing the orders is engaged in manipulation schemes or not.").

As Dr. Pirrong explains, for a TAS trade-based downward manipulation to be profitable, sales of the instrument underlying the TAS—here, the May contract—must have a larger impact on prices than purchases of the TAS. PR¶¶ 77, 98-100, 105-06, 282, 285, 320-21. Dr. Pirrong's analyses shows that ███████████████████████████████████████████████

██████████████ PR¶ 210-16, 282; and, by contrast, ████████████████████████

█████████████████████████████████████ PR¶¶ 154-162, 228-232, 240-259, 287-314, 321.

Defendants' ████████████████████████████████████████████████████████████

█████████ ████████████████████████████████████████████

█████████ between 1:00 p.m-1:30 p.m. *See* PR¶¶ 157-58, 241-43, 258-59, 304-314. CME aggressiveness indicators, in fact, significantly understate the aggressiveness of Defendants' trading. PR¶¶ 304-314. As Dr. Pirrong shows, ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████ PR¶¶ 249-255, 306-314 ████████████████████████

██████████████████████ PR¶ 309.

Based on such granular and comparative evaluations of Defendants' trading, Dr. Pirrong performs several quantitative analyses which show that ███████████████████████████████ ███████████████████████████████████████████████ PR¶¶ 237- 259. *See also CFTC v. Skudder*, No. 22 CV 1925, 2022 U.S. Dist. LEXIS 227686, 2022 WL 17752392 (N.D. Ill. Dec. 19, 2022) (Shah, J.) (addressing allegations that spoof orders "created [order] imbalance in the market ….."). For example, consistent with Defendants' aggressive trading, Dr. Pirrong shows that ██████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████████████ ████████████ PR¶¶ 237-238. Dr. Pirrong's analyses identify ████████████████ ███████████████████████████████████████████████ █████████████████████████ PR¶ 240. On this basis, Dr. Pirrong shows that the ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████ PR¶¶ 240-259, 321, 388.

### b. Dr. Pirrong's Price Impact Model

Second, to analyze the price impact of the Defendants' trading, Dr. Pirrong estimates an empirical market microstructure model, closely following accepted empirical models in peer-reviewed studies. *See* PR¶¶ 164-207, 222, Appendix A. The "workhorse" model for estimating price impact and decomposing it into temporary and permanent components, thereby modelling the dynamic response of a market to trading, is vector autoregressions ("VAR"). Variations customize the VAR model for different datasets and empirical settings[11]; and where, as here, data is time-

---

[11] Where, as here, market microstructure techniques are grounded in peer reviewed economic research, courts flatly *reject* arguments that such techniques cannot be reliably adapted and applied to facts presented in litigation. *See, e.g., SEC v. Lek,* 370 F.Supp.3d at 406 (rejecting defendants'

varying, Dr Pirrong demonstrates that, among the most rigorous of all such models, a VAR with time-varying parameters can be applied to determine the impact of and damages arising from Defendants' manipulative conduct. PR¶¶ 178-207, 222-232. Numerous courts have approved use of autoregressive models and techniques. *See, e.g.*, *In re Term Commodities Cotton Futures Litig.,* No. 12 Civ. 5126 (ALC), 2020 U.S. Dist. LEXIS 181704, at *69, 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) (approving Dr. Pirrong's use of generalized autoregressive conditional heteroskedasticity model); *see also SEC v. Terraform Labs Pte. Ltd.,* 2023 U.S. Dist. LEXIS 230518, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) (S.D.N.Y. Dec. 28, 2023) (approving expert's use of VAR model); *In re Natural Gas Commodities Litigation,* 231 F.R.D. 171, 182 (S.D.N.Y. 2005) (same).[12]

Dr. Pirrong's economic model in this case is based on a variant of the VAR model developed and elaborated by Joel Hasbrouck.[13] Hasbrouck's VAR has become the standard market microstructure method for quantifying the impact of trades on prices involving non-time-varying data. As recently explained by Judge Rakoff:

---

argument that SEC's market microstructure expert's "model is novel and developed for this litigation[,]" finding that "[m]any of the analytical tools he employed … are tools described and employed in articles appearing in peer-reviewed journals. Much of his report is supported by citations to published works in the field of economics. A methodology may be reliable even if novel."); *LidoChem, Inc. v. Stoller Enters. Inc.,* No. 9-cv-204, 2013 WL 12224209, at *5 (W.D. Mich. May 7, 2013) ("Of course, [the] application of [time-series forecasting] methodology to the facts of this particular case have not been subject to peer review, but that is not what is meant by peer review. It is the methodology and principles that are peer reviewed, not the given case.").

[12] VAR models are a class of well accepted autoregressive time-series econometric techniques. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.,* 626 F. Supp. 3d 814, 826–30 (D. Md. 2022) (admitting expert's use of "autoregressive integrated moving average" model); *Samaritan Inns v. D.C.,* No. CIV.A.93 CV 2600 RMU, 1995 WL 405710, at *24–25 (D.D.C. June 30, 1995), *aff'd in part, rev'd in part on other grounds*, 114 F.3d 1227 (D.C. Cir. 1997) (admitting expert's use of "Box–Jenkins Autoregressive Integrated Moving Average methodology").

[13] Hasbrouck' s three pioneering papers: (i) Measuring the Information Content of Stock Trades, The Journal of Finance, 46(1), 179-207 (1991), (ii) The Summary Informativeness of Stock Trades: An Economic Analysis. The Review of Financial Studies, 6(1), 191-212 (1991), and (iii) Assessing the Quality of a Security Market: A New Approach to Transaction-cost Measurement. The Review of Financial Studies, 6(1), 191-212 (1993) have a total of 3,974 citations as of the time of this filing (according to Google Scholar).

Hasbrouck's model has proved highly influential and has been cited in more than 2,000 later publications, including in multiple papers of defendants' expert Dr. Hendershott. … All parties agree on the soundness of Hasbrouck's work.

*SEC v. Terraform Labs,* 2023 U.S. Dist. LEXIS 230518, at *19; *see also id.* at *19-20 (noting that "Defendants concede that Hasbrouck's methodology can be used to study what price changes [Jump's] May 23, 2021 trading might have predicted," and rejecting argument that VAR model's ability to predict impact of trading differed from showing causation, stating, "in the instant context, this distinction between 'predicted' and 'caused' is largely semantic and immaterial", and finding that because VAR model "*takes into account all the other factors that might be influencing the price, … [it] enables [one] to isolate the impact of Jump's trading from other factors.*" (internal citations omitted; emphasis added)); *In re Natural Gas Commodities Litigation,* 231 F.R.D. at 182 (approving expert's use of "regression analysis, specifically, a 'vector autoregressive' model ('VAR'), to demonstrate and quantify the interaction between the natural gas spot prices published in industry publications and NYMEX futures contract prices.").

As Dr. Pirrong explains, Hasbrouck paved the way for a modeling framework of the relationships between trades and prices by proposing a model of price changes and trade signs for studying how prices incorporate information. *See* PR¶¶ 164-66. In the model, a system of equations is estimated, where each variable is specified to depend on its own lagged values and lagged values of the remaining variables. Sets of coefficients capture key features of the dynamic interaction between trades and prices, and an "impulse response function" estimates the immediate and longer-term impacts of trading. *See* PR¶¶ 166, 171-32, 196. The model documents robust empirical findings demonstrating that a trade can cause a contemporaneous price change, and order flow influences prices. *See* PR¶¶ 164-66.

The standard Hasbrouck VAR assumes that model coefficients are constant over the estimation period, and that shocks to the variables in the system have constant variances and

covariances over the estimation period. *See* PR¶ 174. However, as Dr. Pirrong explains, large and persistent order imbalances, like those that occurred on April 20, can affect market liquidity and thereby result in changes in coefficients, variances, and covariances; and the economic literature recognizes that it is often empirically necessary to allow for random parameter, variance, and covariance changes in VAR models.[14] *See* PR¶¶ 174-77. In particular, it is common in the academic literature to work with time-varying parameter VARs ("TVP VARs") where the VAR coefficients evolve over time and multivariate stochastic volatility is present. Considered among the most advanced and robust of such models, the TVP VAR model proposed by Primiceri (2005, 2015) is broadly used. *See* PR¶¶ 181, 187.[15]

Here, as Dr. Pirrong  PR¶ 176. On this basis, Dr. Pirrong opines that PR¶ 180. Given the broad acceptance of the TVP VAR model first analyzed by Pirmiceri, Dr. Pirrong utilizes a TVP VAR model with stochastic volatility (*i.e.*, a time series displaying random fluctuations) to quantify the price impact of the Defendants on April 20, 2020. Dr. Pirrong's model preserves the basic structure of Hasbrouck's VAR, *i.e.*, is a time series model that explains the joint evolution of economic variables through their own lags, but, following Primiceri, models the coefficients, variances, and covariances as stochastic processes. *See* PR¶ 186.

Specifically, Dr. Pirrong estimates the model to include six variables, which include prices

---

[14] Thus, for example, in *Cotton*, in order to estimate time-varying volatility of residuals, Dr. Pirrong used, and the district court approved, a generalized autoregressive conditional heteroskedasticity model. *See In re Term Commodities Cotton Futures Litig.,* 2020 U.S. Dist. LEXIS 181704, at *69.
[15] At the time of this filing, Primiceri's model has been cited 3219 times in the academic literature.

and signed trades[16]: (i) the change in the May midpoint over a 15 second interval; (ii) the change in the May-June spread midpoint over a 15 second interval; (iii) the change in the June price over a 15 second interval; (iv) the May order imbalance in a 15 second interval; (v) the May-June spread order imbalance in a 15 second interval; and (vi) the June order imbalance in a 15 second interval. PR¶¶192-93, 222-232, Appendix A. Dr. Pirrong also designed a series of further analyses that confirm the reliability of his methodology.[17]

While the original Hasbrouck model was a simpler two-equation model, Dr. Pirrong's application is necessary to account for trading in several closely related futures contracts with different expiration dates and spreads between them. The inclusion of these additional variables is done to account for the informational and/or arbitrage linkages between these different instruments. Further, in Dr. Pirrong's application, the occurrence of multiple trades in some instruments and the absence of trades in others during the same sub-seconds supports aggregation of order flow and price change variables into time intervals. Implementing the analysis using 15 second time intervals means that each observation utilizes the sum of each net order flow variable during a 15 second interval, and each of the price changes over an interval of that length. This permits robust explanation of price impacts, variances, and covariances. *See* PR¶¶ 180-87, 191-95. Following Primiceri (and many others using his methodology), Dr. Pirrong's implementation allows for heteroskedasticity in the pricing errors (*i.e.*, where the variance is not constant), but also estimates coefficients jointly with all other model parameters using a fully Bayesian approach. *See* PR¶ 187. As

---

[16] The CME Globex system can determine whether a particular transaction is initiated by a buyer or seller, and the Globex data includes an aggressor code.  PR¶ 167.

[17] Dr. Pirrong separately runs the model with inclusion of TAS contracts, and transactions (instead of time intervals), and with 5 second intervals, confirming the robustness of the model; and he performs several additional quantitative and other analyses which also further support the conclusions derived from his market analyses and TVP VAR results.  *See* PR, ¶¶ 169 n.56, 209-221, 247, 338-388 (analyzing fundamental economic factors and explaining why they cannot explain the price movements).

discussed, the standard way of representing the impact of trades in the VAR framework is through an "impulse response function," which, as presented here, identifies significant variation in price impacts on April 20 specifically caused by Defendants' trades. *See* PR¶¶ 196-207.

The residuals in the model capture factors that can influence prices and trades beyond those variables included in the model, highlighting an important aspect of Dr. Pirrong's model. *See* PR¶¶ 334-37, 350, 379-380. His analyses effectively control for non-trade-related factors, and specifically for market factors unrelated to Defendants' trading. Therefore, the model does *not* attribute to the Defendants price movements caused by other factors, and specifically caused by information related to fundamental and technical factors. Trade impacts are quantified separately, and Defendants' trades are identified with particularity. Thus, where prices move in the model for other reasons, those price movements are not attributed to Defendants. In this regard, shocks to prices in the model (unrelated to order flow-caused price movements) capture myriad factors, including, among other things, information about future storage conditions at Cushing, information related to the impact of COVID on demand, and shocks to liquidity. *See* PR¶¶ 334-37, 350, 379. For example, the fact that the contribution of such non-order flow-based shocks to price movements increased during the last 30 minutes of trading on April 20 means that the model does not falsely attribute price movements that occurred during this period to the Defendants. PR¶¶ 334-337.

Thus, the TVP VAR model (and CME audit trail data that identifies the Defendants' transactions) enables Dr. Pirrong to isolate the price impact of Defendants' sales from the impacts of the aggressive trades of other market participants, and other information or factors that caused prices to change on April 20. As Dr. Pirrong explains, TVP VAR-derived artificiality estimates can be used in a formulaic way to calculate the damages incurred by each class member due to Defendants' conduct. PR, ¶¶389-396.

      **c.**     **Dr. Pirrong's Analyses Show tha** ███████████████████████████

Third, Dr. Pirrong performs additional statistical analyses providing further evidence that  █████ ████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████████ The results support the conclusions derived from Dr. Pirrong's order flow toxicity analyses and TVP-VAR results.

Specifically, these additional analyses demonstrate ███████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ PR¶¶ 379-383, Dr. Pirrong's analyses show that ██████████████████████████████████ ████████████████████████████████████████████████ Thereafter, post-1:24 p.m. price movements include both the large price decline that commenced around that time and the subsequent recovery in prices. Because, as Dr. Pirrong explains, ██ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████[8]

### 5.  Common Methodology for Calculating Damages

[18] An empirical hallmark of studies of closing price manipulation is the price impact at the end of the day *reversing*, as happened here. *See, e.g.,* Comerton-Forde, C., & Putniņš, T. J. (2011). Measuring closing price manipulation. Journal of Financial Intermediation, 20(2), 135-158; Carhart, M. M., Kaniel, R., Musto, D. K., & Reed, A. V. (2002). Leaning for the tape: Evidence of gaming behavior in equity mutual funds. *The Journal of Finance, 57*(2), 661-693; Ben-David, I. T. Z. H. A. K., Franzoni, F., Landier, A., & Moussawi, R. (2013). Do hedge funds manipulate stock prices? *The Journal of Finance, 68*(6), 2383-2434; Aitken, M., Cumming, D., & Zhan, F. (2015). High frequency trading and end-of-day price dislocation. *Journal of Banking & Finance, 59*, 330-349.

It has long been settled that Rule 23(b)(3) does not require common proof of damages. *See, e.g., Messner*, 669 F.3d at 815; *Wal-Mart Stores, Inc.*, 564 U.S. at 362 (it is "clear that individualized monetary claims belong in Rule 23(b)(3)."); 2 Newberg and Rubenstein on Class Actions § 4:54 (6th ed.) ("[P]redominance requirement is satisfied despite the need to make individualized damage determinations."). As the Supreme Court stated:

> When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) ***even though other important matters will have to be tried separately, such as damages . . . peculiar to some individual class members***."

*Tyson Foods*, 136 S. Ct. at 1045 (emphasis added).

"[T]hat some class members' claims will fail on the merits if and when damages are decided [is] a fact generally irrelevant to the district court's decision on class certification." *Messner*, 669 F.3d at 823; *see also Suchanek*, 764 F.3d at 757 ("[i]f the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong.").

Plaintiff's expert has proposed a common methodology for calculating Class member damages. The common methodology is, in effect, to calculate the amount of "artificiality paid" and "artificiality received" for each Class member purchase and sale of May contracts. PR, ¶¶392-398. There are only two inputs to the common methodology: (1) estimates of price artificiality in the May contract (if any) found by the jury and (2) each Class member's trades in those contracts. *Id.* Applying the common methodology to Plaintiff's trading on April 20 and Plaintiff's expert's estimates of artificiality in the May 2020 contract, results in net artificiality of $36,200. *Id.*, at ¶307. In any event the Court later determines that "offsets" in non-Class instruments are appropriate, such offsets can be calculated using common class-wide formulas. PR, ¶399.

### B. Rule 23(b)(3) Superiority is Satisfied, Including Because a Class Action Is Superior to Other Available Methods, If Any, To Adjudicate This Action

Rule 23(b)(3) requires a class action be "superior to other available methods for fairly

and efficiently adjudicating the controversy." The "matters pertinent" to this inquiry include the four issues set forth in Rule 23(b)(3)(A)-(D). Class actions are generally superior in at least two contexts—class action treatment would achieve economies of time, effort and expense and promote uniformity of decision and where small recoveries would not provide incentive for persons to bring individual actions. *Prokhorov*, 2023 WL 2711599 at *10. Particularly in antitrust cases, "courts regularly invoke the importance of class actions in enforcing the substantive law as one of the reasons that a class action is a superior method of adjudication." Newberg, § 4:66.

First, each of the above Rule 23(b)(3) factors support a finding of superiority. No Class member has filed an individual action or, to Plaintiff's knowledge, has expressed interest in doing so. Thus, there is no Class member interest in individually controlling the prosecution of the claims herein. This Court is a desirable forum for the litigation. The CME is in this District and the Court has expended significant time and resources resolving numerous motions and otherwise has considerable experience with the issues in this case. There are no unmanageable difficulties. This action has been litigated for almost four years without any such difficulties. *Mullins*, 795 F.3d at 663 (there is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns").

Second, permitting Class members to pursue their claims in the aggregate is superior because it will promote judicial economy and uniformity of decision. Different courts will not have to resolve the same questions common to all Class members, thereby expending duplicative and unnecessary time and effort while risking different outcomes. Third, a class action is superior because it would not be economic for many Class members to pursue individual actions because of "negative value claims," *i.e.*, the high cost of litigating the complex claims here would exceed a potential individual recovery. *In re Natural Gas*, 231 F.R.D. at 185; *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual

suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.").  For example, the high

costs of just the motion to dismiss phase of this litigation far exceeded Plaintiff's out-of-pocket

losses alleged in the Complaint (*i.e.*, $92,490).  Complaint, ¶29.  This Court and other courts have

repeatedly found class actions superior in complex cases (like this one) alleging commodity futures

contract price manipulation.  *See* fn. 3 above (collecting cases).

## VII.  THE INFORMATION SOUGHT BY VEGA'S RULE 45 DOCUMENT SUBPOENAS ARE NOT RELEVANT TO CLASS CERTIFICATION

In November 2023, Vega and Spires began to issue Rule 45 document subpoenas directed to

entities they described as "sophisticated traders frequently trading WTI contracts on the NYMEX"

and "large traders" in the May contract.  ECF Nos. 282 at 3; 296 at 1, 4.  In total, Vega and Spires

issued subpoenas to twenty-eight (28) entities.  *Id.*  Among other things, the substantially similar

subpoenas sought documents concerning trading details of May contracts on April 20-21, and

communications with third parties concerning May contracts.  ECF No. 296-1.  Plaintiff addresses

below arguments Vega and Spires have raised concerning the subpoenas prior.

Preliminarily, Plaintiff notes the documents produced in response to the subpoenas thus far

reflect a stark contrast between Defendants' conduct on April 20 and the conduct of the

subpoenaed entities.  The documents **do not** indicate that the subpoenaed entities undertook to

exert high amounts of net selling pressure on the May contract by aggressively selling high volumes

of May contracts outright and buying back through the TAS market.  Moreover, there is no

indication that the subpoenaed entities coordinated or conspired with other traders for the purpose

of depressing the price of the May contract.  And, totally the opposite of defendants Vega and

Spires who had a duty to supervise the VTDs and prevent manipulation in Vega's trading accounts,

the documents produced by at least one subpoenaed entity █████████████████████████

████████████████████████████ █ ███████████████████  JD, Ex. 31.

Certain of the documents produced also reflect that market participants did not believe fundamental

factors could explain the historic drop in prices on April 20 █████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████ JD, Ex. 36 at 2.

Of the thirteen entities that have provided documents, only one appears to have produced records sufficient to demonstrate membership in the Class.  *See* Exhibit A hereto (matrix of subpoenaed entities).  Vega and Spires make numerous arguments comparing non-party █████ to Plaintiff.  ECF No. 289 at 7-8. ████████████████████████████████████████████████

██████████████████████████████████████████ Thus, ██████ is not even a Class member such that Vega's comparisons of Plaintiff to █████ are wholly irrelevant to class certification.  Vega's attempts to support the relevance to class certification of documents from any subpoenaed entities that could qualify as Class members are misguided.   First, Vega and Spires argue the subpoenaed information is "relevant to assessing whether Mish's claims are typical of the putative class" and cite *Premium Plus Partners, L.P. v. Davis*, 2008 WL 3978340, at *4 (N.D. Ill. Aug. 22, 2008) ("*Premium*").  JD. Ex. 22 at 10.[19]  However, *Premium*'s finding that typicality was not established because class members used different "trading strategies" is contrary to CEA precedent before[20] and after[21] *Premium* was decided.  Moreover, *Premium* was implicitly overruled by the

---

[19] The denial of class certification was affirmed in *Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, but that decision arose out of three separate appeals and the Seventh Circuit did not consider or make any findings as to the August 22, 2008, class certification decision in *Premium* because other holdings were dispositive.  648 F.3d 533 (7th Cir. 2011).

[20] *In re Nat. Gas*, 231 F.R.D. at 183 (rejecting argument class certification was improper because "the proposed class contains investors in a diversity of positions with respect to the natural gas futures contract market, including purchasers and sellers, speculators and 'hedgers'"); *In re Sumitomo*, 182 F.R.D. at 92–94 ("factual differences in the amount of damages, date, size or manner of purchase, the type of purchaser, the presence of both purchasers and sellers, and other such concerns will not defeat class certification" and "[T]he simple fact that Class members may have purchased and sold copper futures at different times, for different purposes, does not detract from the fact that every class member purchased or sold the same fungible ... contract in the same centralized ... market.").

[21] *Ploss*, 431 F. Supp. 3d at 1019 (rejecting argument that inclusion of hedgers defeated certification).

Seventh Circuit's 2009 decision in *Kohen*. *Kohen* affirmed certification of a class of U.S. Treasury futures traders and rejected arguments that the presence of traders who employed different trading strategies such as hedgers (who trade to offset price risk) and speculators (who trade to profit from price changes) precluded certification. *Kohen*, 571 F.3d at 679-680. [22]

Moreover, the class record in *Premium* is 180 degrees the opposite of the record herein. *Premium* found the plaintiff could not satisfy typicality because it did not proffer any "methodology or formula" that could be used to demonstrate whether the defendants' alleged misconduct injured class members using different trading strategies. *Premium*, 2008 WL 3978340 at *4. The sparse twelve-page expert report submitted by the plaintiff in *Premium* did not present any price impact model or any other common evidence of impact and instead opined certain tests or analyses could possibly be conducted. *Premium*, Dkt. 162-6 at 2-13. Here, Plaintiff has proffered substantial common evidence that Defendants' conduct did artificially depress May contract prices (*see* above) and Plaintiff's expert has proffered a common methodology capable of demonstrating Defendants' impact on May contract prices and Class member damages regardless of the "strategy" any Class member may have used to trade May contracts. PR, ¶¶334-337, 389-97.

Second, Vega and Spires cite *Kohen* as support their "random sample of class members" and argue the subpoenaed information is relevant to whether individual issues will predominate. JD. Ex. 22 at 9-10. Vega and Spires have not clearly identified any specific individual issues, nor have they explained how any individual issues would supposedly predominate over the numerous common questions here. *See* VI.A above (demonstrating predominance). To any extent Vega and Spires have suggested the subpoenaed information will supposedly be relevant to showing that individual issues

---

[22] *Premium* has only been cited two times by any court in the past 25 years. *See In re Amaranth*, 269 F.R.D. 366 (S.D.N.Y. 2010); *Ploss*, 431 F. Supp. 3d 1003. In neither instance was *Premium* considered as part of a typicality analysis and, moreover, it was rejected in the context of other Rule 23 factors.

will predominate with respect to impact, they are wrong. As this Court has repeatedly recognized, "there is a difference between a class including members who could not have been harmed at all by the defendants' conduct, and those who ultimately were not harmed. The former, but not the latter, can preclude certification." *Ploss II*, 431 F.Supp. 3d at 1019; *Prokhorov*, 2023 WL 2711599 at *3 (same). The "critical" distinction between members who "could not have been harmed" and those that "were not harmed," has been consistently repeated by the Seventh Circuit.[23] Again, Plaintiff and every single Class member was injured by Defendants' alleged misconduct in the same way— selling a May contract at an artificially depressed price caused by the Defendants and receiving less money than they would have absent the manipulation.

Moreover, the issue in *Kohen* concerning the "random sample" related to a class-wide aggregate damages model. *Kohen v. PIMCO*, 08-1075, ECF No. 20-1, pp. 34-35 (2d Cir.) (defendant argued that aggregate damages model "wildly overstated" estimated damages because the class supposedly included "net gainers").[24] Dr. Pirrong's expert model in this case is a price impact/artificiality model (not an aggregate damages model) and quantifies the amount of Defendants' impact on May contract prices during the Class period on April 20. PR, ¶¶336-339. There is no "net gainer" issue here.

Third, Vega and Spires have argued the subpoenaed information is relevant to the merits of

---

[23] *E.g.*, *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 380 (7th Cir. 2015) ("A class will often include persons who have not been injured by the defendant's conduct, but this possibility or, indeed inevitability, does not preclude class certification . . . . If, however, a class [includes] a great number of members who . . . could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification."); *Messner*, 669 F.3d at 824 ("[A] class is defined too broadly" if it "include[s] a great number of members who for some reason *could not* have been harmed by the defendant's allegedly unlawful conduct.").

[24] As the cases cited by *Kohen* reflect, the import of a "random sample" is to quantify the percentage of a class that may not be shown to have damages (the "net gainers") to determine if the class-wide aggregate damages model is appropriately calibrated. *Kohen*, 571 F.3d at 679 (*citing, e.g., Bell v. Farmers Ins. Exch.*, 115 Cal. App. 4th 715, 755 (2004), *as modified on denial of reh'g* (Mar. 9, 2004) (discussing sampling of class members in context of proof of aggregate damages); *Long v. Trans World Airlines, Inc.*, 761 F. Supp. 1320, 1332 (N.D. Ill. 1991) (same)).

the case and specifically whether the price of the May contract was artificial. JD, Ex. 22 at 1, 5, 9. Although Plaintiff disagrees with Vega and Spires on the merits, Vega and Spires' merits argument implicitly concedes that the (common) question of whether the price of the May contract was artificial is a class-wide issue (not an individual issue) and is susceptible to being answered through common class-wide proof (the subpoenaed documents, according to Vega and Spires). Vega and Spires argue the record price decline in the May WTI contract price on April 20 was the result of market fundamentals, namely the Coronavirus pandemic and a resulting decrease in demand and increase in supply of crude oil and storage of crude oil being close to full at the NYMEX delivery point in Cushing, Oklahoma. *Id.* at 3. This argument is deeply flawed. Vega and Spires do not (and cannot) explain what *change* in market fundamentals on April 20 could have caused the price of the May contract to open at approximately $11.85 at the start of trading on April 20 at 8:30 a.m. CST, then plummet to -37.63 at the end of trading on April 20 (at 1:30 p.m.) and then snap all the way back to $10.01 twenty-four hours later on April 21 at 1:30 p.m. There were no material *changes* in supply or demand fundamentals on April 20 that can begin to explain the historic price movements in the May contract. PR, ¶¶377-87. Moreover, the storage situation in Cushing, OK had been much worse many times before while the NYMEX WTI crude oil futures contract traded at significantly positive levels and nowhere near negative levels. PR, ¶¶19, 338-88. Defendants' alleged misconduct occurred at the **same time** as the historic price decline as this Court has already recognized. *Mish II*, 596 F.Supp.3d at 1096. After Defendants' conduct was removed from the market on the afternoon of April 20, the price of the May contract snapped back to pre-April 20 levels twenty-four hours later on April 21 when the May contract settled at $10.01. *Id.*

## CONCLUSION

The Court should certify the Class, appoint Plaintiff as Class representative, and appoint Plaintiff's Counsel as counsel for the Class.

Dated: February 23, 2024

Respectfully submitted,

*/s/ Christopher M. McGrath*
Christopher Lovell
Christopher M. McGrath
Benjamin Jaccarino
Travis H. Carter
**LOVELL STEWART HALEBIAN
    JACOBSON LLP**
500 5th Avenue, Suite 2440
New York, New York 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

Marvin A. Miller
Andy Szot
**MILLER LAW LLC**
115 S. LaSalle Street, Suite 2910
Chicago, Illinois 60603
Telephone: (312) 332-3400

*Counsel for Plaintiff and Proposed Class Counsel*

*Rule 45 Document Subpoenas Issued by Defendants Vega and Spires[1]*

| Subpoenaed Entity | Class Membership Status Based on Documents Produced[2] |
|---|---|
| 1 ▮▮▮▮▮ | Trading records provided indicate ▮▮▮▮▮ |
| 2. ▮▮▮▮▮ | Trading records provided indicate ▮▮▮▮▮ |
| 3 ▮▮▮▮▮ | Trading records provided indicate ▮▮▮ purchased but did not sell any May contracts on April 20 and therefore is not a member of the Class. |
| 4. ▮▮▮▮▮ | No trading data provided indicating ▮▮▮▮ traded the May contract on April 20. |
| 5 ▮▮▮▮▮ | No trading data provided indicating ▮▮▮▮ traded the May contract on April 20. |
| 6 ▮▮▮▮▮ | No trading data provided indicating ▮▮▮▮ traded the May contract on April 20. |
| 7 ▮▮▮▮▮ | No trading data provided indicating ▮▮▮ traded the May contract on April 20. |
| 8 ▮▮▮▮▮ | Trading records provided indicate ▮▮▮▮▮ |
| 9. ▮▮▮▮▮ | Trading records provided indicate ▮▮▮▮▮ |
| 10 ▮▮▮▮▮ | Trading records provided indicate ▮▮▮▮▮ |
| ▮▮▮▮▮ | ▮▮▮▮▮ |
| 12. ▮▮▮▮▮ | Trading records provided indicate ▮▮▮▮▮ |
| 13 ▮▮▮▮▮ | Plaintiff recently received production of certain ▮▮▮▮ documents on |

---

[1] Vega and Spires issued twenty-eight (28) Rule 45 document subpoenas. ECF No. 282 at 3. Based on the information provided to Plaintiff by counsel for Vega and Spires, the entities identified in the above matrix have produced documents in response to the subpoenas. The remaining fifteen entities (*see* ECF No. 282 at 3) have not yet produced any documents in response to the subpoenas.

[2] Plaintiff's analysis of the Class membership status of the subpoenaed entities is based on Plaintiff's review to date of the documents provided to Plaintiff. Additional information such as account numbers, Tag 50s, and any open May contract position prior to the start of the Class period would permit the CME audit trail data to be used to determine Class membership.

| ██████ | February 14. Based on Plaintiff's review thus far, the trading records produce ████████████████████████████████████████████████████ ████████████████████████████████████████ Plaintiff's review is ongoing. |
|---|---|