**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

|  |  |
|---|---|
| MISH INTERNATIONAL MONETARY INC., on behalf of itself and all others similarly situated, | |
| *Plaintiff*, | Case No. 1:20-cv-04577 |
| *v.* | Judge: Hon. Manish S. Shah |
| VEGA CAPITAL LONDON, LTD., *et al.*, | |
| *Defendants.* | |

## AMENDED CLASS CERTIFICATION EXPERT REPORT OF PROFESSOR

## CRAIG PIRRONG

**Changes to Corrected Expert Report of Dr. Craig Pirrong, dated February 23, 2024**

| Corrected Expert Report ¶ No. (unless noted otherwise) | Changes |
|---|---|
| Figure 14 | Corrected Figure 14. |
| 121-139, 141-144, 153-161,189, 197, 199, 201-203, 205, 209-213, 217, 218, 220, 226, 227, 230-232, 237, 238, 240, 241, 243-245, 247 249, 250-256, 258, 263-265, 280, 281, 282, fn.91, 287-290, 292-295, 297-299, 301-305, 307-311, 313, 314, 341, 343, 344, 346, 347, 351-356, 358, 360, 362-364, 366, 367, 369-371, 373, 376, 380, 384, 386, 395, 399, 400, 401 | Inserted citations to Appendix E. |
| | Inserted Appendix E (identifying certain support, instructions and changes). |
| | Inserted Appendix F. |

# TABLE OF CONTENTS

I.    Overview of Analyses and Opinions..............................................................................1

    A.    Summary of Reasons For My Opinions .............................................................3

II.    Crude Oil Futures Market Overview…………………...................................................9

    A.    The Instruments...............................................................................................9

    B.    Crude Oil Futures Contracts and Their Trading Mechanism ........................14

    C.    Market Participants…..................................................................................... 17

    D.    Trading basics…………………………………………...…………………..18

III.    Trade-Based Manipulation and Market Microstructure…………………………………24

    A.    Theoretical Overview ....................................................................................24

    B.    Manipulative Trading….................................................................................33

    C.    Flash Crashes ................................................................................................34

IV    April 20, 2020 WTI Trading: A Chronology………….................................................39

    A.    Prior to 1:00 P.M. CT…………………… .................................................. 39

    B.    1:00 P.M. – 1:30 P.M. CT.............................................................................42

    C.    Post – 1:30 P.M……………………………………………………...............46

    D.    Market Chronology Summary……………….................................................. 47

    E.    Trading Halts…………………………………………………………………..49

    F.    Trading Defendants' Trading Chronology…………………………………..50

V.    There Are Standard Econometric Models That Can Quantify the Price Impact of Defendants' Trades and Therefore Determine the Amount of Artificiality Attributable to Defendants' Conduct…..................................................…………….54

VI.    The TVP-VAR Model Results....................................................................................64

    A.    Price Impacts Derived From the TVP-VAR…………………………………64

    B.    Evidence of Large Differences in Market Dynamics and Operation

Pre- and Post – 1:24 P.M…………………………..……………………………………..71

C. The Cumulative Impact of Order Imbalances on the May and May-June Spread Prices…………………………………………………………………….77

D. The Impact of Trading Defendants' Trades on the May and May-June Spread Prices…………………………………………………….…………79

VII. Trading Defendants' Conduct and the Post-1:00 P.M ████████ in the May Crude Oil Futures Market ……………………………………………………………81

VIII. The Breakdown of the Normal Relationship Between CME and ICE Prices Provides Further Economic Evidence of a ████████…………………………………92

IX Trading Defendants Had Market Power in the Relevant Marke and the Ability to Cause an Artificial Price……………………………………………………… ......94

X Trading Defendants' Trading Was Uneconomic and Corresponded Exactly to The Economic Definition of Manipulative Conduct…………….... ..................................99

XI The Analysis Specifically Quantifies the Price Impact of the Trading Defendants' Uneconomic Conduct and Does Not Attribute to Them Price Movements Caused by Other Factors, Other Traders, or Market Developments…………… ...............115

A. The Price Artificiality Estimates Only Price Changes That Occurred as the Direct Result of Trading Defendants' Uneconomic Trading…………………115

B. Fundamental Economic Factors Cannot Explain the Price Movements on 20 April 2020………………………………………………...……………..116

XII. Damages Caused by Trading Defendants' Uneconomic Conduct…………………….....132

XIII. Trading Defendants' Profits From Their Uneconomic Conduct……………………....…134

Appendix A…………………………………………………....……………………….139

Appendix B…………………………………………………...…………………….157

Appendix C……………………………………………………….……………………..160

Appendix D……………………………………………………………………….167

Appendix E……………………………………………………………………..171

Appendix F…………………………………………………………………………..189

Highly Confidential

1.      My name is Stephen Craig Pirrong. I serve as Professor of Finance, and Director of the Gutierrez (formerly Global) Energy Management Institute at the Bauer College of Business of the University of Houston. After obtaining undergraduate and PhD degrees in economics from the University of Chicago, I have taught undergraduate and graduate industrial organization, other economics, and finance courses for the last 35+ years.

2.      During this time, I have authored 11 peer reviewed articles on the economics of futures trading and a book titled *The Economics, Law, and Public Policy of Market Power Manipulation* on the subject.

3.      I have repeatedly consulted or acted as a consultant or expert for United States and foreign governmental agencies, derivatives exchanges, trading firms, and other persons regarding manipulation of futures contracts, appropriate structure of futures contracts to avoid manipulation, and other futures contract trading matters.

4.      My *curriculum vitae* is attached as Appendix A. It lists all of the publications that I have authored in the last ten years. It also lists cases in which I have testified as an expert at trial or by deposition within the preceding four years. The materials I have relied upon are listed in Appendix B.

5.      I am being compensated on a time and charges basis. My hourly rate is my standard rate of $1100 per hour. My pay is not contingent on the outcome of this case. Nor is it contingent upon the outcome of my research and opinions.

## I.      Overview of Analyses and Opinions

6.      Plaintiff's Counsel have asked my opinion whether, after discovery, Plaintiff may present economic and finance methodologies which show whether Defendants'[1] conduct

---

[1] The Defendants are Paul Commins, George Commins, Christopher Roase, Elliott Pickering, Aristos Demetriou, Connor Younger, James Biagioni, Henry Lunn, Paul Sutton, and Matthew

depressed prices of May 2020 NYMEX West Texas Intermediate ("WTI") Light Sweet Crude Oil futures contracts ("May Contracts") on April 20, 2020 ("April 20"), and provide reasonable estimates of the amounts of such price depression.

7.      My opinion is that the answer is "yes", and that such common methodologies will fall into essentially three categories.

8.      One category involves analyses of the methods of the trading of Defendants, including comparisons and contrasts between Defendants' method of trading, and the methods that all other market participants in the May Contract used. I also performed various quantitative tests relating to Defendants' trading, the trading of other market participants, and the likelihood of various outcomes, including whether random traders would trade as Defendants did. See ¶¶154-163, 191, 228-259, 280-321. Also included in this part of my work are quantitative analyses of whether Defendants transactions in the May Contract Trade-At-Settlement ("TAS") contract (see ¶¶42-44 explaining the TAS contract) had any impact on May Contract prices during the May Contract trading day. See ¶¶38, 98-100, 208-221, 282.

9.      In another category of analyses, I prepare, test, and examine from different aspects a proposed econometric model which makes reasonable estimates of the approximate amounts of the direct impact of each of Defendants' trades on May Contract prices.

10.     My final category of economic analysis focuses on the causes of the ███████ which I find occurred in the May Contract at approximately ███████ See ¶¶25-27, 107-120, 128-135, 143, 208-21, 233-59. Based upon my numerous analyses, I reach the additional opinion that the Defendants ████████████████████████████████████

████████████████████████████████████

Rhys Thompson (collectively, "Trading Defendants" or "TDs"), Vega Capital ("Vega"), and Adrian Spires.

Highly Confidential

(when the TAS prices were set). See ¶¶18, 21, 23, 155-58, 249-55, 281, 303-12, 321. I find that Defendants were a direct and substantial economic cause of such ███████ and the resulting further depression of May Contract prices.

### A. Summary of Reasons For My Opinions

11. All of the TDs traded ████████████████████████████████████

████████████████████████████ See ¶¶155-61, 287-321.

12. The TDs' unique manner involved ████████████████ which allowed them to depress May Contract prices (see ¶¶77, 106, 228-259) and simultaneously position themselves to profit from such price depression. See ¶¶77, 106, 282-293.

13. (a) The financial outcome of a trade in commodity futures contracts, is determined by the difference between the price of the purchase of the futures contract and the price of the sale of the contract. See ¶¶ 36-44, 57. Aggressor trades are the types of trades that move prices. See ¶¶75, 272, 280. Aggressor sales tend to depress prices, and aggressor purchases tend to increase prices. See ¶¶272-74.

(b) ██████████████████████████████████████████████

████████████████████████



See ¶314 below.

---

2 ████████████ who also traded through Vega Capital, ████████████████ I have been informed tha ████████████████████████ ████████████

Highly Confidential

(c) The TDs' ██████████████████████ sales on April 20 had an increasingly depressive effect on May Contract prices and increasingly exacerbated the order imbalance in the May Contract.  ¶¶226-32, 233-59.

14.    Based on my analyses, ███████████████████████



15.    I have performed detailed analyses of Defendants' sales per minute, aggressor sales per minute, the degree of aggressivity of Defendants' sales (including the amount by which each sale was below the best bid in the market at the time of such sale), the activities of the other participants in the market, and the amounts of the order imbalance. ¶¶121-147, 154-190, 289-321, 351.

16.    I find that, █████████████████████████████



████████████████ (see ¶¶157, 287, 289, 291), █████████

█████████████████████████

████████████ See ¶¶159-160, 289, 321. I also find that ████████

█████████████████████████

████████████ See ¶160.

---

[3] Adding Vega Trader ██████████ to the total aggressor sales by the TDs would show that ████████████████████████████████

Highly Confidential

17.     The consistent effect of Defendants' foregoing ███████████████ enabled Defendants to continue to add to Defendants' cumulative depressive impact on May Contract prices. See ¶¶121-39, 140-47, 191-232, 280-81 below. Defendants' foregoing ████████████ directly caused a substantial decrease in the May Contract prices ████████████████████████████████ See ¶¶121-25, 154-61.

18.     ████████████████████████████

████████████████████████████

████████████████████████████

███████████████ Between ███████████ the May Contract price fell from ███████. This rapid decline was an all-time record decline.

19.     I have tested whether fundamental factors could explain the foregoing and other price movements in the May Contract on April 20. This includes whether the amount of storage space available for delivery on the May Contract in the storage tanks in Cushing, Oklahoma and the connected pipelines, could likely have caused the extraordinary declines in May Contract prices on April 20. ¶¶46, 338-88. My quantitative and other analyses show that it is extremely unlikely that such a storage situation could have caused any such impact. ¶¶343-49, 361-83. The storage situation had been much worse many times before while May Contracts traded at significantly positive levels *and never anywhere near negative levels*. ¶¶357-58, 387-89.

20.     Moreover, after Defendants' trading in the May Contract ended at ██████ May Contract prices fluctuated for a while, but then registered an all-time record increase. They reached ███ by █████ on April 20 ███████████████████████████ ███████████ They ██████████████, ending all trading on April 21 at $10.01 per barrel at the

Highly Confidential

time of the last trade before May Contract participants were obligated to satisfy their contracts by deliveries. See ¶¶138-139, 348 below. That is --- beginning a short while after ████████████

████████████ --- the closer the May Contract prices got to the time when deliveries at Cushing were the only way to satisfy the May Contract, the more the May Contract prices ████████████

████████████

21.　　Furthermore, when May Contract prices ████████████████████████████████

████████████████████████████████████████ I find that ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ See ¶¶126-34, 154-61,

281. That is, ████████████████████████████████████████████████████

████████████████████████████████████████████████████

See ¶¶191-207, 258-59.[4]　Accordingly, ████████████████████████████████

████████████████████████████████

22.　　Similarly, I find that ████████████████████████████████████████

████████████████████████████ ¶¶222-27, 243.

23.　　During the TDs' ████████████████████ in the May Contract, its price ████████████████████████ between ████ and ████, from ██ to ████ per barrel, and the publicly observable order imbalance continued to grow.　Between 12:50-1:30pm, the CME trading systems ordered ████████ trading halts in the May Contract. ¶¶148-153.

24.　　Such stop trading orders were publicly observable as were the increasing rates of price depression and increasing amounts of order imbalances in the May Contract. See ¶¶148-

---

[4] Adding Vega Trader ████████████ to the total aggressor sales by the TDs would show that ████████████████ That is, ████████████████████████████████████████ .

Highly Confidential

161, 222-27, 228-32. Though these trading halts were designed to restore orderly trading, May Contract trading became extremely disorderly, resulting in the extreme disorderliness of a ████ ████ See ¶¶233-259 below.

25.     Specifically, in a period of .37 seconds during ████████, the best bid in the May-June Spread fell from ██████ per barrel to ██████ per barrel. See ¶¶127-29. The best offer in the market ████████████. See ¶¶128-29. As a result, the May-June Spread bid-ask midpoint ████████████ See ¶¶121, 142-45, 232, 247-48.

26.     In my opinion, the foregoing behavior of the market is consistent with and qualifies as a ██████





models in which large order imbalances can lead to crashes.

See ¶¶141-46, 203-08, 380-85 below.

Highly Confidential

See ¶112 and n.49 below. Here, Defendants were the ████████████ of "large selling pressure". Defendants also were directly ████████████████████████. And Defendants' conduct had ██████████████████████████████████████ numerous public CME trading halts which were designed to restore orderly trading. See ¶¶148-153, 155-58, 233-259 below. As I find below:



¶¶256-57 *infra*.

27.    In my opinion, the direct impacts by the Trading Defendants on prices estimated by an econometric model (see ¶28-29, 190 below) should be supplemented to capture additional impacts on May Contract prices which the Trading Defendants caused between ██████ and ██████ See ¶¶351-88, 394 below. Accordingly, in my opinion, the estimates of total artificial depression of May Contract prices by the Trading Defendants should be presented in two ways. The first method presents the direct and cumulative impact on May Contract prices of the TDs' May Contract trades using an econometric analysis (see next paragraph below describing one type of econometric method which is available here). In addition to the direct impact by each Defendant's individual trades, there should be a second method which supplies the reasonable

Highly Confidential

estimate of the additional depression in May Contract prices which Defendants' conduct caused through the ▮▮▮▮▮. See ¶¶190, 233-59, 394 below.

28.     My remaining type of economic analysis considers whether an econometric or other statistical analysis may be used to make reasonable estimates of the amounts of direct impacts of the individual trades by the Trading Defendants on May Contract prices. My answer is yes.  See ¶¶190-232 below (explaining and describing one such method).

29.     In preparing this econometric model, I have been guided by important finance principles for modeling price phenomena in markets, as well as basic market microstructure principles for analyzing trades and by econometric principles. Although the assumption that every trade has the same impact throughout the day is not necessarily contradicted by microstructure principles, finance principles for analyzing behavior in markets and the characteristics of trading on April 20 make it optimal to employ a model that allows price impacts to vary over time.  Though more complex, this model provides more reasonable estimates of the actual amounts of impact during the different conditions which invariably arise in markets, especially in conditions like that on April 20.  Moreover, the more complex model "nests" a simpler model with constant intraday price impacts, meaning that if impacts were indeed constant, the model would find this.  The fact it does not further supports the need to employ a time-varying model.

## II.     Crude Oil Futures Market Overview

### A.  The Instruments

30.     A futures contract is a contractual obligation to purchase or sell a commodity at a future date.  The parties enter into an agreement on a given date prior to the designated future date.  The parties agree to a price at the time they enter the contract.

31.    Futures contracts in the United States are traded on organized exchanges regulated by the United States Commodity Futures Trading Commission ("CFTC").  In the present litigation, the relevant exchange is the New York Mercantile Exchange ("NYMEX"), which is a division of the CME Group.  The NYMEX is a "designated contract market" ("DCM") under the Commodity Exchange Act.  All futures trading in the United States must take place on a designated contract market.

32.    Another exchange of interest is the International Continental Exchange ("ICE").

33.    DCMs—exchanges—provide a platform for market participants to interact to buy and sell futures contracts: I describe the trading platform relevant here *infra*. Exchanges also perform various self-regulatory functions to ensure that market participants trade in compliance with relevant laws and regulations.

34.    Futures contracts specify an expiration date.  Trading in a particular futures contract ceases on this date.

35.    Most commodity futures contracts that are held until the end of trading must be settled by physical delivery of the relevant commodity: these are called "delivery settled" contracts.  For example, in the present case, NYMEX Light Sweet Crude Oil Futures contracts held to expiration must be satisfied by delivery of the commodity under terms specified by the exchange.  The contract seller (the "short") is obligated to deliver the commodity.  The contract buyer (the "long") is obligated to take delivery of the commodity and pay the previously agreed price to the short.

36.    Although delivery on delivery-settled contracts is mandatory for contracts held to the end of trading ("expiration"), few futures contracts actually result in delivery.  Instead, prior to expiration, holders of futures positions engage in offsetting transactions to "liquidate" their

positions. For example, a short will buy futures. The purchases offset the short position. In most futures contracts, only a small percentage (*e.g.*, one percent or less) of contracts outstanding are settled by delivery. The remainder that represents the vast majority are offset/liquidated prior to expiration.

37.     Some futures contracts are "cash settled," and if held to expiration give rise to no obligation to make or take delivery. Instead, contracts held to expiration are settled by the exchange of cash between the parties. In Crude Oil Futures, the cash payment on cash settled contracts depends on the difference between the settlement price of a related delivery-settled contract and the price the parties agreed to at the initiation of the contract. For example, if the final settlement price on the reference contract is $80/bbl, and the parties initially agreed to a price of $77/bbl, the seller owes the buyer $3/bbl.

38.     This case involves the May 2020 NYMEX West Texas Intermediate ("WTI") Light Sweet Crude Oil futures contracts ("May Contracts") created by the NYMEX division of the CME: hereafter I refer to this as the CME Crude Oil Futures contract. The May Contract could be traded in various forms. One transaction is a strict purchase or sale of a May Contract itself, sometimes called an "outright" transaction. Another transaction is the purchase or sale of a May Contract which is combined with the sale or purchase of a later expiring futures contract to form a spread. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████    ████████████████████████████    See        also

https://www.cmegroup.com/confluence/display/EPICSANDBOX/Implied+Orders. "An implied order is an order CME Globex identifies as existing in the spread market based on orders in the

Highly Confidential

outright market (IMPLIED IN) OR, an order CME Globex identifies as existing in the outright market based on orders in the spread market (IMPLIED OUT)". ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████  ██████████

████████████████████████████████████  ████████

████████████████  ██████████████  █  ████████  ████████

████████████████████████████████  ████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

39.     In futures markets, and futures markets for physical commodities like crude oil in particular, market participants trade "spreads" between different contracts.  Spreads can be "calendar spreads," in which a market participant buys a particular futures contract for one delivery date and simultaneously sells a contract on the same commodity with a different delivery date.  For example, the purchase of a May-June 2024 Crude Oil Futures spread involves the purchase of a May 2024 Crude Oil Futures contract and the simultaneous sale of a June 2024 Crude Oil Futures contract. The gain or loss on the spread position depends on how the difference between the prices of the two "legs" of the spread changes over time.  In the May-June 2024 example, the gain or loss on the spread depends on how the difference between the May and June prices changes over time.

40.     Market participants may trade spreads to speculate on price differences. Moreover, spreads are a common way for a market participant to liquidate a futures position that is nearing expiration. For example, in early April 2024 the holder of a long position in the May 2024 Crude Oil Futures contract may sell a May-June 2024 Crude Oil spread. By doing so, he offsets his May 2024 Crude Oil Futures position, and establishes a long June 2024 Crude Oil Futures position. This is sometimes referred to as "rolling" the position forward, with the June position replacing the May position.

41.     In addition to calendar spreads, inter-product spreads are widely traded. For example, a gasoline "crack spread" trade involves the purchase (sale) of Crude Oil Futures and the sale (purchase) of gasoline ("RBOB") Futures. Given the large number of different commodity futures contracts traded, there are a huge number of potential spread positions. As with calendar spreads, inter-product spreads may be created by "legging" into a May Contract transaction and a transaction in another product. And May Contracts that are parts of inter-product spreads are included in the May Contract open interest. https://www.cmegroup.com/confluence/display/EPICSANDBOX/Implied+Intercommodity+Ratio+Spreads.

42.     The prices of traditional "outright" futures contracts are determined by the purchase price and the sales price at the time of the transaction. In addition to such futures contracts, futures markets generally, and CME/NYMEX specifically, offer "Trade-at-Settlement" ("TAS") contracts. A TAS contract establishes an obligation to buy or sell the underlying futures contract, but the price at which the contract is bought or sold is not determined at the time of the TAS transaction. Instead, the purchase/sale price is set equal to the final settlement price of the underlying futures contract on the day of the TAS transaction.

43.     For example, the purchaser of a TAS contract on May 2024 Crude Oil Futures on April 8, 2024 is obligated to buy the May 2024 Crude Oil Futures contract at a price equal to the final settlement price on April 8, 2024.  Typically, for Crude Oil Futures, the final settlement price is equal to the volume-weighted average price of the underlying futures contract during the two-minute period ending at 1:30:00 p.m. Central Time.  A TAS contract is an example of "derived pricing" because the price of the underlying contract is derived from a price to be determined at another time.

44.     On NYMEX, TAS contracts are traded in increments of one cent, in a range of plus or minus 10 cents.[5]  For example, a trader who purchases a TAS contract on May 2024 Crude Oil Futures on April 8, 2024 at a price of 5 cents pays the May 2024 Crude Oil Futures settlement price on April 8, 2024 plus 5 cents to purchase a May 2024 Crude Oil Futures contract.

### B. Crude Oil Futures Contracts and Their Trading Mechanism

45.     Futures contracts on West Texas Intermediate Light Sweet Crude Oil are traded on two exchanges: the New York Mercantile Exchange division of the CME Group ("CME") and the InterContinental Exchange ("ICE").  Hereafter, I will refer to the CME and NYMEX interchangeably.

46.     The CME trades a physically settled Crude Oil Futures contract.  This contract requires delivery of 1000 barrels of crude oil meeting quality terms established by NYMEX in storage tanks or pipelines at Cushing, OK on all contracts held until the end of trading.[6]  In addition, the CME trades options on Crude Oil Futures.  CME also offers a "cash settled"

---

[5] NYMEX also offers TAS contracts on spreads.  The price range in TAS spread contracts is +/- 20 cents/bbl.
[6] NYMEX Rule 200 gives the terms of the Crude Oil Futures contract, including the quality requirements for delivered crude oil.

Highly Confidential

contract on Crude Oil.  If held to expiration, the cash settled contract is settled by an exchange of money between the parties rather than delivery of physical crude oil.  The final settlement price of the NYMEX cash-settled Crude Oil Futures contract is equal to the final settlement price of the delivery-settled Crude Oil Futures contract for the same contract month.

47.     The CME delivery-settled contract has the highest volume and open interest (the number of contracts outstanding at any point in time).  Therefore, unless otherwise indicated, the term Crude Oil Futures contract will refer to the delivery-settled contract, rather than the CME's cash-settled contract.

48.     NYMEX Crude Oil Futures contracts are traded with monthly expiration dates extending up to 10 years in the future.   Trading on a futures contract for a given month (*e.g.*, April 2024) terminates three business days prior to the 25th calendar day of the month prior to the delivery month.  Thus, trading of the May 2024 Crude Oil Futures contract ends on April 22, 2024.  Those with open positions then are obligated to make or take delivery.

49.     NYMEX Crude Oil futures trade in dollars and cents per barrel.  The price increment in the contract is one cent ($.01).  This price increment is commonly referred to as the "tick" size.  Thus, one tick in Crude Oil Futures is one cent.  For a 1000-barrel contract, a one tick price movement therefore results in a change in value of $10.

50.     Presently, and in April 2020, virtually all Crude Oil Futures trading takes place on the CME's Globex electronic/computerized trading system.  Market participants submit orders *via* electronic message to the central Globex computer.  Globex receives all orders, checks them for errors, and then processes them for potential execution.  Upon receipt of an order, Globex determines whether there is an order on the other side of the market at a price that matches the price of the incoming order.  In this event, the orders are matched.  For example, if a sell order is

submitted at a price of $20.00/bbl, and there is an outstanding buy order at a price of $20.00/bbl, the Globex computer matches the orders thereby creating a trade for the two parties. Globex sends an electronic message to the parties to the trade. If an incoming order cannot be matched against an existing contra order, the incoming order is stored in the Globex "order book" for potential future execution.

51. Since multiple orders may be submitted at a given price, Globex must assign secondary priority rules determining which same-priced order is executed first. For Crude Oil Futures, Globex assigns time priority: orders received earlier in time are executed before same price orders received later.

52. As noted *supra*, spread trading is common in commodity futures markets generally, and Crude Oil Futures markets specifically. Spreads can be traded as a separate product on Globex. For example, market participants can submit orders to Globex for the May-June 2024 Crude Oil Futures spread. A spread buy order can be matched against a spread sell order. Also, Globex has an implied spread functionality. For example, a buy order for the May-June 2024 Crude Oil Futures spread could be matched simultaneously against a May 2024 Crude Oil Futures sell order and a June 2024 Crude Oil Futures buy order.

53. ICE trades a cash settled Crude Oil Futures contract. ICE sets the final settlement price of the ICE contract equal to the final settlement price of the corresponding NYMEX delivery settled contract. For example, the final settlement price of the ICE May 2024 Crude Oil Futures contract is equal to the final settlement price of the NYMEX Crude Oil Futures contract on the penultimate day of the NYMEX Crude Oil Futures contract. The ICE contract is sometimes referred to as a "NYMEX look-alike." On April 20, 2020, the final settlement price of the NYMEX May Contract was -$37.63 per barrel. Accordingly, the final settlement price for

the ICE May Contract was also -$37.63 per barrel. In my opinion, to the extent that the final NYMEX settlement price was artificially depressed due to Defendants' conduct, the ICE final settlement price was likewise artificially depressed by the same amount.

54.     ICE Crude Oil Futures contracts are traded on ICE's electronic system.   ICE maintains its own matching engine and order book, and ICE trading is operationally separated from CME trading, even though many market participants (including the Defendants) trade on both exchanges.

**C. Market Participants**

55.     There are a variety of different types of participants in Crude Oil Futures markets. These participants fall into three broad categories.

56.     Hedgers enter Crude Oil Futures contracts to offset oil price risks arising from other business activities.  For example, an oil producer (who is "long" physical oil and is thereby harmed by oil price declines) may sell Crude Oil Futures as a hedge.   If prices decline, the hedger's profit on Crude Oil Futures tend to offset his losses on the sale of physical crude oil. As another example, an airline may purchase Crude Oil Futures as a hedge.  If oil prices rise, the airline's fuel costs rise, but this is offset by a gain on the Crude Oil Futures position.

57.     Speculators trade Crude Oil Futures contracts to earn a profit.  That is, they take on oil price risk in anticipation of earning a profit.  For example, a speculator who believes oil prices will increase can buy Crude Oil Futures.  If he is correct and prices do rise, this "long" position earns a profit: if he is wrong and prices fall, the speculator loses money.

58.     Note the complementarity between hedging and speculation.  Hedgers endeavor to reduce risk exposure whereas speculators willingly accept risk exposure.  By trading futures with speculators, hedgers transfer price risk to speculators.  This process is referred to as the "risk transfer" function of futures markets.

59.     At any point in time, the trading orders of hedgers and speculators may not collectively offset: that is, combined hedger net purchases/sales may not exactly equal combined speculator net sales/purchases.  These "order imbalances" create a niche for traders who act as so-called "market makers" who absorb these temporary imbalances.  That is, market makers supply "liquidity" to the market by supplying bids to buy and/or offers to sell Crude Oil Futures. If there is a sell order imbalance, these market makers buy in anticipation of selling into a future buy order imbalance.  These market makers tend to trade frequently, both buy and sell throughout the day, and often endeavor to end their trading day with a zero (or small) position.

60.     Market makers include traders who enter orders manually *via* computers.[7]  They also include algorithmic traders, including "high frequency traders" ("HFTs") who program computers to enter orders based on proprietary algorithms and market data.

### D. Trading basics

61.     There are a variety of different types of orders that those trading on the CME Globex system can utilize.[8]  The most basic type of order is a "limit order."  A limit order is an order that specifies the price at which the order submitter is willing to trade.  A buy limit order (a "bid") specifies the price at which the submitter is willing to purchase.  A bid of $10.00/bbl means that the submitter is willing to buy at any price up to $10.00/bbl.  A sell limit order (an "ask" or "offer") specifies the price at which the submitter is willing to sell.  An offer of $10.00/bbl means that the submitter is willing to sell at any price at or above $10.00/bbl.[9]

---

[7] Order entry by manual traders is described *infra* at ¶67.

[8] "A limit order is an order that specifies a direction, quantity, and acceptable price." Joel Hasbrouck, *Empirical Market Microstructure: The institutions, economics, and econometrics of securities trading*, (2007) at 10.

[9] A limit order may contain certain conditions, particularly time in force conditions.  One condition is that the order remains in force until canceled by the submitter.  Another condition is a day order: the order remains in effect until canceled or until the end of the trading day. Another is a "fill-or-kill" which means that the order is canceled if it is not filled at the time of

62.     The highest price on all buy orders (bids) outstanding at a given time and the lowest price on all sell orders (offers) outstanding at that time represent the "inside market." That is, these are the prices available to someone who wants to buy or sell immediately. Buy orders submitted at prices at or below the best bid, and sell orders submitted at or above the best offer, are stored in the Globex "order book" for potential future execution. The difference between the highest bid and lowest offer is referred to as the "bid-ask spread."

63.     To buy immediately, a transactor can submit a limit buy offer at a price equal to or above the best offer. To sell immediately, a transactor can submit a limit sell order at a price equal to or below the best bid. Such orders are called "marketable limit orders" or "market orders" because they are immediately executable at the best prices available in the market.[10] The Globex system checks orders for possible matches and executes buy orders with bid prices at or below the offer prices of some outstanding orders. That is, Globex includes a "matching engine" that compares and executes orders submitted by market participants.

64.     Marketable limit orders are "aggressive," in the sense that they result in immediate execution. Orders that do not result in immediate execution are "passive," in the sense that they are not executed unless another party acts aggressively and "hits" the bid or "lifts" the offer.

---

submission. "Markets often permit qualifications and/or variations on the basic limit order. The time-in-force (TIF) attribute of an order specifies how long the order is to be considered active. It is essentially a default cancellation time, although it does not preclude the sender from canceling before the TIF is reached." Hasbrouck, *id*. at 11.

[10] "A trader may desire that an order be executed "at the market," that is, at the best available price." Hasbrouck, *supra* note 8 at 11.

Highly Confidential

65.     Liquidity generally means the ability to buy or sell immediately without significantly impacting the price.[11]   Those submitting passive orders supply liquidity to the market.  That is, they submit orders that others can execute against immediately.  Submitters of passive orders supply liquidity to the market: they are liquidity (or market) makers.  Submitters of aggressive orders demand liquidity: they are liquidity takers.[12]

66.     Market participants can cancel previously submitted orders.  In the event, these orders are removed from the Globex order book and are no longer eligible for matching against contra orders.

67.     The CME Globex system disseminates electronically all currently active orders to market participants who have obtained the necessary data feeds.  Manual traders—like the TDs—typically utilize order entry software ("trading front ends") to display this information.  The most widely used system in 2020, ██████████████████████ was the Trading Technologies ("TT") system, including the TT MD Trader.  Figure 1 presents a TT screen that is a snapshot of the June 2017 "eMini" S&P Futures market.

**Figure 1**

---

[11] "In a liquid market, a small shift in demand or supply does not result in a large price change." Hasbrouck, *supra* note 8 at 4.

[12] "From a narrower perspective, liquidity supply and demand differentiates agents who are available to trade or offer the option to trade, and those who spontaneously decide to trade. Thus, liquidity suppliers are passive, and demanders are active. In any particular trade, the active side is the party who seals the deal by accepting the terms offered by the passive side. In other words, the passive side "makes" the market and the active side "takes" the market. Hasbrouck, *supra* note 8 at 5.

Highly Confidential



68.     The salient feature of the TT screen is the "price ladder" (the numbers in the gray column) at the center of the screen.[13]  This represents possible prices in the market and remains stationary ("static") unless the user "recenters" it.  The TT system obtains data from the CME and displays it on the screen.  The number of contracts bid at any price is displayed in the cell in the blue column adjacent to that price.  The number of contracts offered at any price is displayed in the cell in the red column adjacent to that price.  The number of contracts bid or offered at a price are referred to as the "market depth" or simply "depth" at that price.  The displays of depth on the TT screen are referred to as "depth indicators."

69.     In the figure, 255 contracts are bid at a price of 2338.25 and 834 are bid at a price of 2338.00.  571 are offered at 2338.50 and 774 are offered at 2338.75.

70.     As bids and offers are submitted and canceled, or trades are executed, the numbers in those cells change.  The best bid is readily determined by looking at the cell adjacent to the highest cell in the blue column containing numbers.  The best offer is readily determined by looking at the cell adjacent to the lowest cell in the red (offer) column containing numbers.  In Figure 1 the best bid is 2338.25 and the best offer is 2338.50.  Thus, the bid-ask spread is .25.

71.     The TT system—and similar systems offered by other vendors—therefore allows market participants ▮▮▮▮▮▮▮▮▮ to identify the inside market (best bid and offer) and the amount of buying and selling interest at each price.  The number of contracts bid or offered is referred to as the "market depth" at that price.[14]  For example, the market ask depth at a price of 2339.00 is 1024 contracts.  Market participants using the TT system can also observe movements

---

[13] This is a patented feature.  See *inter alia* United States Patent 6, 776,304 and United States Patent 6,773,132.

[14] "In a deep market if we look a little above the current market price, there is a large incremental quantity available for sale. Below the current price, there is a large incremental quantity that is sought by one or more buyers." Hasbrouck, *supra* note 8 at 4.

Highly Confidential

in the inside market by tracking movements in the location of the inside market depth markers over time.

72.     The TT system facilitates the entry of limit orders.  A user merely needs to place a mouse cursor in a cell in the buy or sell column and click his mouse: after the click, the system prepares and electronically submits to Globex an order at the price corresponding to the cell the trader clicks.[15]

73.     The TT system also permits the rapid submission of a marketable limit order.  For example, a trader who places his cursor in the red column at a price equal to or lower than the best bid displayed and clicks his mouse submits a marketable sell limit order.  That is, it takes only a single action for a trader to submit a marketable order, and the TT system displays the information necessary for a trader to know whether his action will result in the submission of a marketable order.  In the figure, pointing and clicking in the red sell column at a price of 2338.25 results in the submission of a sell order at a price matching the best bid.  This sell order is matched against orders at the best bid, resulting in an immediate execution.

74.     For each trade, the CME records the aggressive and the passive party.  In essence, the CME identifies the party that submits a marketable order as the aggressor.[16]

75.     Aggressive buy and sell orders over any time interval need not be equal.  There is a "sell order imbalance" if there are more aggressive sell orders than aggressive buy orders.  There is a "buy order imbalance" if there are more aggressive buy orders than sell orders.  "Net order flow" over a given period of time (which can be a fraction of a second, a minute, or any

---

[15] MD Trader and similar front ends enable a variety of different ways of entering orders.  The "point and click" method is among the most widely used.  This "single action" order entry is also a patented feature.

[16] There are some complexities that mean that some orders have no aggressor identified.  In particular, for some spread trades ("implied spreads") no aggressor is assigned.

other interval) is the difference between the aggressive buy and sell orders submitted during that interval.[17]   Negative net order flow occurs when there are more aggressive sell orders than aggressive buy orders: positive net order flow occurs when there are more aggressive buy orders than aggressive sell orders.  As will be seen *infra*, privately informed trading is one determinant of net order flow,[18] and thus net order flow is informative.  Since information moves prices, order flow imbalances can move prices.[19]

### III.    Trade-Based Manipulation and Market Microstructure

#### A.    Theoretical Overview

76.    In this case, Plaintiff alleges that Defendants intentionally caused the price of May 2020 Crude Oil Futures to be artificially low by making sales of May 2020 Crude Oil Futures and May 2020 Crude Oil Futures Spreads on April 20, 2020 that would have been uneconomic but for Defendants' ability to profit on purchases of TAS contracts. That is, Plaintiff alleges that Defendants engaged in what economists call a "trade-based manipulation" in the Crude Oil Futures market on 20 April 2020.   As used herein and throughout, I use "manipulation" in the economic sense of the term as used by economists, not in the legal sense.

---

[17] Order flow is "the net of buyer-initiated and seller-initiated orders" and "a measure of net buying pressure." Martin D. Evans and Richard K. Lyons, Order flow and Exchange Rate Dynamics, 110 *J. Political Econ*., (2002) 170.

[18] There is a group of microstructure models "concerned with how private information is impounded in the trading process. If some agents possess private information, the revision in beliefs about asset values from time *t-1* to time *t* need not just reflect new information arrivals. Rather, it will be correlated with signed order flow…since informed traders will buy when prices are below true value and sell if the opposite is the case." Ananth Madhavan, Market Microstructure: A Survey, 3 *J. of Fin. Markets* (2000) 205.

[19]    "Order imbalances are significantly associated with daily changes in liquidity and with contemporaneous market returns, after controlling for volume. This reveals that excess buying or selling, as opposed to undifferentiated trading activity, is an additional determinant of market price movements." Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, Order Imbalance, Liquidity, and Market Returns, 65 *J. Fin. Econ*., (2002) 111.

77.　　In order for Defendants to have expected to make a profit on these futures, spread, and TAS transactions, and actually to make a profit on these transactions, (a) their sales of May 2020 Crude Oil Futures and Spreads must have caused the prices of May 2020 Crude Oil Futures to decline, and (b) the price declines in May 2020 Crude Oil Futures and Spreads caused by their sales of futures and spreads must have been larger than the increases in May 2020 Crude Oil Futures caused by their purchases of equivalent volumes of May 2020 Crude Oil Futures and Spread TAS contracts.　　The existence of asymmetric price impacts is necessary to make manipulation profitable: if TAS purchases drove up prices by as much as equivalent volume of outright and spread sales drove down prices, manipulation would be unprofitable.　　But if TAS purchases had a smaller upward impact on prices than outright and spread sales did, trade-based manipulation would have been profitable.[20]

78.　　The field of financial economics called "market microstructure" studies theoretically and empirically the price impact of trades and orders (quotes).[21]　　Therefore, market microstructure provides essential theoretical and empirical concepts and tools to analyze and test Plaintiff's allegations.

---

[20] "The existence of market manipulation trading strategies (with the exclusion of market corners and short squeezes, which always exist) is related to the time asymmetry in the sensitivity of price changes to the speculator's trades. Asymmetries create manipulation opportunities, which otherwise would not exist." Robert A. Jarrow, Market Manipulation, Bubbles, Corners, and Short Squeezes, 27 *J. of Fin. and Quant. Anal.,* (1992) 311.　Similarly, "[i]n an example of trade-based manipulation akin to our Example 2, Allen & Gorton [1992] argue that an asymmetric price response to order flows can generate market manipulation trading strategies, even if the manipulator does not possess any proprietary information." Joseph A. Cherian and Robert A. Jarrow, Chapter 20: Market Manipulation, *Handbooks in Operations Research and Management Science* (1995) 624.

[21] "The first generation of the market microstructure literature, analyz[es] the price impact of trades and the spread, assuming competitive suppliers of liquidity." Bruno Biais, Larry Glosten, and Chester Spatt, Market Microstructure: A Survey of Microfoundations, Empirical Results, and Policy Implications, 8 *J. of Fin. Markets* (2005) 219.

Highly Confidential

79.     Market microstructure analyzes the price determination process for financial instruments, and how *inter alia* the composition of market participants, their characteristics, trading protocols, and regulations interact to determine prices, price movements, and trading costs.[22]  One particular focus of market microstructure research is how transactions and quotes impact prices, and how these price impacts depend on fundamental economic considerations and the nature of the instruments being traded.[23]

80.     Market microstructure theory has identified two primary reasons why transactions and quotes impact prices: inventory costs and informational considerations ("adverse selection").[24]

81.     With respect to inventory costs, note that end users' buying and selling interests almost never match at any instant of time.  For example, at one moment, there may be more end users who want to buy March 2024 Crude Oil Futures than who want to sell March 2024 Crude Oil Futures.  At another moment, the reverse will be true.  Market makers (liquidity suppliers) absorb these order imbalances. See ¶59 above. They sell when there are more buyers than sellers, in anticipation of buying sometime later when there are more sellers than buyers.

---

[22] Market microstructure is "the study of trading mechanisms for financial securities." Hasbrouck, *supra* note 8 at 1.  It is "the investigation of economic forces affecting trades, quotes, and prices." Biais, Glosten, and Spatt, *id*.  Microstructure analyzes "the costs of providing transaction services and the impact of such costs on the short run behavior of securities prices." Hans Stoll, Noise, 55 *J. of Fin*. (2000) 1479.

[23] "Even with competitive market makers, transaction prices and trading outcomes reflect fine details of the structure of the market, such as the sequencing of moves or the price formation rule." Biais, Glosten, and Spatt, *supra* note 21.

[24] Trade processing costs are a third source of price impact, but the literature focuses primarily on information/adverse selection and inventory.  Where appropriate, I will discuss the possible relevance of trade processing costs. As noted by Professors Biais, Glosten, and Spatt, "the revenues of the agents supplying liquidity, corresponding to the spread, simply reflect the costs they incur: order-handling costs (Roll, 1984), adverse-selection costs (Kyle, 1985; Glosten and Milgrom, 1985; Glosten 1994) and inventory costs (Stoll, 1978)."  Biais, Glosten, and Chester Spatt, *supra* note 21.

Highly Confidential

82.    To perform this function, market makers must hold inventory.  When there are more end user sellers than buyers, market makers purchase and accumulate inventory.  When the reverse is true, market maker inventories decline, and market makers may actually be short a given contract.

83.    Holding inventory (either long or short) imposes costs.  Inventory must be financed.  Moreover, a market maker with inventory is subject to price risk.  The market maker must hold capital to absorb this risk, and this capital is costly.[25]

84.    Information/adverse selection costs arise whenever some market participants may have private information (in contrast to public information, like the release of a government report) about the value of a particular futures contract.  Those in possession of private information can use it to trade profitably.  But since this type of trading is a zero-sum game (if the buyer gains the seller must lose an equal amount), the informed traders' profits come at the expense of those who do not possess this information.  Knowing that, less-informed traders realize that a particular trader X may want to buy from them (sell to them) because X has information that the current price of the instrument is too low (high).  Thus, purchases can signal bullish information, and sales can signal bearish information.[26]

---

[25] Professors Biais, Glosten, and Spatt explain that various microstructure models show that dealers holding inventory require compensation for the associated risk and costs of holding said inventory, which are reflected in the bid-ask spread. These results hold when we assume dealers are either risk neutral or risk averse. Specifically, they state: "the [bid-ask] spread reflects the risk-bearing cost incurred by market makers building up positions to accommodate the public order flow." Biais, Glosten, and Spatt, *supra* note 21.

[26] On the importance of private information in FX, *see* Lyons, *supra* note 17, Evans *supra* note 17.  Also see, Richard G. Payne, Informed Trade in Spot Foreign Exchange Markets: An Empirical Investigation, 61 *J. International Econ*. (2003) 307; Frank McGroarty, Owain ap Gwilym, and Stephen Thomas, The Role of Private Information in Return Volatility, Bid-Ask Spreads and Price Levels in the Foreign Exchange Market, 19 *International Financial Markets, Institutions, and Money* (2009) 387; and Michael J. Moore and Richard Payne, On the Sources of Private Information in FX Markets, 35 *J. of Banking and Fin*. (2011) 1250.  "Bullish"

85.      When hedgers or other market participants (*e.g.*, speculators) may have private information, market makers face the risk of trading with those with superior information: when they do, market makers tend to lose on these transactions.  That is, when trading with the better-informed, they buy (sell) at prices above (below) the value implied by the private information. The losses from trading with the better-informed are a cost of making markets.  These are referred to as adverse selection costs.[27]

86.      The prices that competitive market makers charge depend on these costs.  In the Crude Oil Futures market (and many others) the "price" of market making/liquidity supply services is the "bid/ask" (or "bid/offer") spread.[28]  The bid is the price at which a market maker stands willing to buy, while the ask (or offer) is the price at which the market maker is willing to sell.  The market maker "quotes" a bid and offer.

87.      By definition, the bid is below the ask.  Thus, at any moment in time, a market maker that buys at the bid and sells at the offer captures the spread (buys low and sells high), and this margin is a source of revenue.[29]  In a competitive market, this spread must cover all the costs

---

information is that which implies prices should increase: "bearish" information is that which implies that prices should decrease.

[27] Easley, Lope d Prado, and O'Hara explain that a liquidity provider will factor in the probability that a trader has private information when setting its bid and ask prices. The authors explain "[a] liquidity provider uses his knowledge of these parameters to determine the price at which he is willing to go long, the bid, and the price at which he is willing to go short, the ask. These prices differ, and so there is a bid-ask spread, because the liquidity provider does not know whether the counterparty to his trade is informed or not. The spread is the difference in the expected value of the asset conditional on someone buying from the liquidity provider and the expected value of the asset conditional on someone selling to the liquidity provider. These conditional expectations differ because of the adverse selection problem induced by the possible presence of better-informed traders." David Easley, Mario Lopez d Prado, and Maureen O'Hara, Flow Toxicity and Liquidity in a High Frequency World, 25 *Rev. Fin. Stud*. (2012) 1461-1462.

[28] As noted by Professors Biais, Glosten, and Spatt, in efficient markets "the revenues of the agents supplying liquidity, corresponding to the spread, simply reflect the costs they incur." Biais, Glosten, and Spatt, *supra* note 21.

[29] Biais, Glosten, and Spatt, *supra* note 21.

described above.  Thus, the greater the costs (*e.g.*, the greater the adverse selection costs) the greater the spread must be.[30]

88.    The microstructure considerations that impact bid/ask spreads also affect how trades and quotes affect prices.  Specifically, the fact that market makers must earn trading profits to cover the costs of supplying liquidity implies that trades impact prices.  Prices fall when end users (or speculators) sell to market makers and rise when they buy from intermediaries.[31]  By buying low (*e.g.*, at the bid) and selling high (*e.g.*, at the offer) a market maker earns a trading profit to pay the costs of providing market making services.[32]

89.    A crucial implication of this analysis of market making is that trades have both temporary and permanent impacts on prices.[33]

90.    The price impacts of trades necessary to cover market makers' operational and inventory costs are *temporary/transitory*.[34]  That is, prices fall (rise) when a market maker buys (sells), then bounce back when the market maker reverses the transaction.  It is precisely this temporary price effect of trades—this "bounce back"—that generates the trading profit for the market maker that covers trade processing and inventory costs.  Thus, one effect of purchases or

---

[30]Professors Biais, Glosten, and Spatt explain that these costs comprise "order-handling costs (Roll, 1984), adverse-selection costs (Kyle, 1985; Glosten and Milgrom, 1985; Glosten 1994) and inventory costs (Stoll, 1978)."  Biais, Glosten, and Spatt, *supra* note 21.

[31] Professor Madhavan explains that "evidence comes from studies showing market makers earn less per round trip trade (purchase followed by sale or vice versa) than the quoted spread. This means that market maker purchases tend to be followed by declines in the ask prices while sales are followed by increases in bid prices…" Madhavan, *supra* note 18.

[32] The "revenues of the agents supplying liquidity, corresponding to the spread, simply reflect the costs they incur: order-handling costs (Roll, 1984), adverse-selection costs (Kyle, 1985; Glosten and Milgrom, 1985; Glosten 1994) and inventory costs (Stoll, 1978)."  Biais, Glosten, and Spatt, *supra* note 21.

[33] "This literature has shown that trades have both a transitory and permanent impact on prices." Biais, Glosten, and Spatt, *supra* note 21.

[34] Professors Biais, Glosten, and Spatt explain that in an efficient market, transitory impacts on prices "can be traced back to order-handling and inventory costs" and permanent price effects "reflects information." Biais, Glosten, and Spatt, *supra* note 21.

Highly Confidential

sales of a financial instrument is a temporary movement in the price of the instrument that is reversed over time.

91.     The bid/ask spread plays a role in this.  End users sell to the market maker at the bid and buy at the ask.  As market makers buy and sell over time, the price "bounces" back and forth between the bid and the ask.  That is, the price moves down temporarily when the market maker buys, and then bounces back up when the market maker sells.[35]  The end user pays the spread as a cost of trading.

92.     The fact that some trading results from private information implies that trades convey information:[36] recall that a buy (sell) order tends to convey bullish (bearish) information.  This, in turn, implies that trades can have *permanent* impacts on prices.[37]

93.     In an efficient financial market, prices change to reflect the arrival of new information.  Since purchases and sales convey information, transactions cause prices to reflect this information: prices tend to rise after purchases and fall after sales.

94.     Further, in an efficient financial market information has a permanent impact on prices.  If this were not true, there would be "arbitrage" opportunities that would allow profiting

---

[35] "Trade direction (buy or sell) and volume provide signals to market makers who then update their price expectations. Easley and O'Hara show that the adjustment path need not converge to the "true" price immediately since it is determined by the history of trades which reflects the actions of liquidity motivated traders as well. The speed at which prices adjust is determined by a variety of factors, including market size, depth, volume, and variance." Madhavan, *supra* note 18.

[36] "This evidence is consistent with the hypothesis that most of the volatility of stock return is caused by informed traders whose private information is impounded in prices when exchanges are open." Madhavan, *id*.

[37] "Intuitively, the information effect has a permanent effect on prices (trade causes a revision in consensus beliefs) while the inventory effect is transitory." Madhavan, *supra* note 18. Similarly, Professors Biais, Glosten, and Spatt explain that in an efficient market permanent price effects reflect private information. Biais, Glosten, and Spatt, *supra* note 21.

without risk.  For example, if the price impact of the arrival of a new piece of information tended to reverse (even partially) over time, traders could profit without risk.

95.     Since trades may be driven by private information, and since information has permanent effects on prices, trades have permanent price impacts.[38]  Buys tend to cause a permanent increase in prices and sales tend to cause a permanent decrease.  Contrary information may arrive subsequently and cause a movement of price in the opposite direction, but the effect of the initial piece of information remains in the price long after the trade.  For instance, a bullish piece of information about March 2024 Crude Oil Futures tends to cause the price to rise today.  A bearish piece of information that arrives tomorrow causes the price to fall tomorrow, but it falls from a higher level (that reflects the previous day's bullish information).  Thus, trades have permanent impacts on prices.

96.     Accordingly, the market microstructure literature predicts that (a) trades in Crude Oil Futures and Spread affect the price of the future and spread in the direction of the trade, with prices rising (falling) in response to a purchase (sale), and (b) some of the price impact is temporary and reverses over time, but some of the price impact persists and remains in the price long after the trade.

97.     Market microstructure also explains why the price impacts of trades (and quotes) may differ across related instruments, *e.g.*, between trades in the underlying future or TAS trades.  In particular, some instruments may be less attractive to informed traders than others.  Trades in those less attractive instruments are therefore less likely to be informed trades and

---

[38] Professor Madhavan explains the literature empirically shows "significant information effects" on "the information content of stock trades."  Madhavan, *supra* note 18.

consequently adverse selection risks in those instruments are smaller and price impacts of trades are commensurately smaller.[39]

98.    I have analyzed this issue for TAS contracts specifically.  Based on standard microstructure models, I have demonstrated that if private information is short-lived, or if there is intense competition between market makers, TAS contracts will be unattractive for informed traders.[40]   The reasoning is straightforward.

99.    Consider the case where private information is short-lived.  For example, a trader may anticipate that others are likely to learn the information he currently possesses in an hour.  Assume that this information is bullish, *i.e.*, it suggests that prices are currently too low and will rise when the information is revealed.  It is pointless to trade on this information in the TAS market by purchasing TAS more than one hour prior to `settlement because the final settlement price will likely reflect the information (because it will become widely known prior to settlement).  Therefore, to trade profitably, the informed individual will buy the underlying future which he anticipates will rise within the hour due to the wider dissemination of the information he currently possesses.

100.    This means that there are fewer informed trades in the TAS market than the outright market.  This further means that adverse selection costs in the TAS market are lower.  Lower adverse selection costs means that trades have a smaller price impact in the TAS market

---

[39] For example, I have shown that "the impact of TAS trades on the price of the underlying should be smaller than the price impact of regular trades that take place on an exchange auction because TAS traders are uninformed, whereas some traders on exchanges are informed." Craig Pirrong, Derived Pricing: Fragmentation, Efficiency, and Manipulation, University of Houston Working Paper, 2019.

[40] I have shown that "TAS leads to a semi-separating equilibrium in which informed traders do not use this order type when information is rapidly reflected in prices, either because it is disclosed rapidly to the public, or because there is sufficient competition between informed traders." Craig Pirrong, *id*.

than the outright market.[41] See ¶106 below ████████████████████████████████

███████████████████████████████████ .

### B.  Manipulative Trading

101.    The fact that trades and order flow impact prices make possible manipulative trading strategies, *i.e.*, trading strategies that are intended to, and have the effect of, causing prices to diverge from their competitive values that accurately reflect information available at a particular point in time. Since a trade impacts prices in the direction of the trade, a party who desires to cause the price of a financial instrument to increase (decrease) can do so by buying (selling) that instrument.

102.    Since others in the marketplace do not know the motive for that transaction, they will attempt to assess the motive based on experience (*e.g.*, what is the likelihood that the trade is due to the existence of private information), and this assessment will determine the permanent impact of the trade.  The immediate impact will depend on the costs that market makers incur to process, finance, and bear the risk of the transaction.

103.    Therefore, due to fundamental market microstructure considerations it is always possible to drive up the price of a financial instrument by buying it or drive it down by selling it. There remains the question of whether manipulative trades intended specifically to move the price are profitable: just because something is possible does not mean that it is profitable. Buying drives up the price, but how can one profit if selling drives the price back down?

104.    Trading with the intent to move price—which economists refer to as "trade-based manipulation"—is always costly.  The temporary price impact of the trade is a cost to the price-

---

[41] Specifically, I show that "the impact of TAS traders on the price of the underlying should be smaller than the price impact of regular trades that take place in an exchange auction because TAS traders are uninformed, whereas some traders on exchange are informed." Pirrong, *supra* note 39.

moving trader.[42]  For instance, if buying the March 2024 Crude Oil Futures drives up the price temporarily by 10 cents/bbl, the buyer pays the higher price but sells later at a price that is (on average) more than 10 cents/bbl lower because the price reverses sometime after the purchase: the sales price is more than 10 cents/bbl lower because the subsequent sale drives price down.

105.    Absent some source of profit that would offset this cost, trades intended to move the price would be unprofitable to undertake.  This is where TAS comes into play.

106.    Specifically, a trader can buy TAS contracts on a particular futures contract (*e.g.*, the March 2024 Crude Oil Futures contract), and due to the low adverse selection costs in this market, these trades will have a small upward impact on price.  Then, prior to settlement, the trader can sell the underlying futures contract (the March 2024 Crude Oil Futures, in the example), thereby driving down its price.  The downward price impact of the sales in the underlying futures contract is larger than the upward price impact of an equivalent volume of TAS purchases because of the asymmetry in adverse selection costs in the two markets.  Due to this asymmetry, this manipulative strategy is expected to be profitable.[43]

## C.    Flash Crashes

---

[42] As I have explained in previous work, "if market makers are risk averse, or incur trade processing costs, if the permanent impact of purchases and sales is identical, trade-based manipulative strategies will lose money because the manipulator must compensate the market maker for trade processing or inventory/risk costs." Pirrong *supra* note 39.  Professor Jarrow shows this is true when we assume the existence of a large trader who can move prices. Jarrow, *supra* note 20.

[43] Although the expected profits from this strategy are positive, in any particular manipulation attempt the trader may lose money.  Consider, for example, the case in which a manipulator sells futures and drives down the price, but then a piece of bullish information comes out prior to settlement that drives up the price.  If the new information has a bigger impact on price than does the manipulator's trades, the manipulator loses money.  Of course, things can work in the opposite direction.  The arrival of a piece of bearish information drives down the price even further, thereby enhancing the manipulator's profits.  Since in advance the manipulator does not know whether bullish or bearish information will arrive, these effects cancel out in expectation, but contribute `to the variability of the manipulator's profit.  That is, trade-based manipulation is risky even if it makes money on average.

Highly Confidential

107.    The foregoing analysis focuses on what can be called "normal" market conditions or "normal" market regimes.   In these conditions or regimes, prices move relatively continuously, and order imbalances have relatively continuous effects on prices. However, as noted in the chronology discussed *infra*, sometimes markets can exhibit far different, and far more extreme behavior in which prices move discontinuously, market liquidity declines substantially (and often precipitously), order imbalances can result in extremely large price movements, and prices reverse rapidly after experiencing a sudden decline or increase.  These are now typically referred to as "flash crashes,"[44] (or "flash events"—a broader term that recognizes that sometimes the initial abrupt price movement is upwards), with the "flash" referring to the speed and suddenness in which they occur, and the "crashes" referring to the fact that most such episodes (including the most notorious one on 6 May 2010[45]) involve rapid declines in prices (although sometimes sudden price increases followed by declines are observed, as in the United States Treasury securities market on October 15, 2014, the Sterling market on October 7, 2016, or the London Metal Exchange Nickel Futures market on March 8, 2022).

108.    Flash events have become relatively common in "a broader range of fast electronic markets . . . including markets whose size and liquidity used to provide such protection against such events."[46]

---

[44] "Flash crashes are characterized by high price volatility and a significant negative return in instruments' prices, and are defined by a sharp price reversal." Khaladdin Rzayev and Gbenga Ibikunle, Order Aggressiveness and flash crashes, 26 *International J. Fin. Econ.* (2021) 2647.

[45] "The most notable flash crash in recent history occurred on May 6, 2010…On this day, market indices such as the S&P 500, the Russell 2000, and the NASDAQ 100 fell significantly before rebounding within an extremely short period." Rzayev and Ibikunle, *id*.

[46] Bank of International Settlements The sterling 'flash event' of 7 October 2016 (2017).

109.    Market microstructure is markedly different during flash crash episodes and economists have developed specialized microstructure theories and models to explain them.  In particular, severe order imbalances can trigger flash crashes.

110.    In these models, the "toxicity" of order flow plays a central role.[47]  Toxicity refers to the imbalances in order flow, and especially severe and protracted imbalances.  Large and/or persistent order flow imbalances are symptomatic of substantial information asymmetries and adverse selection problems.  Severe information asymmetries/adverse selection problems are inimical to normal market operation.

111.    Indeed, it has long been known that severe information asymmetries can cause the failure of a market altogether.  That is, the "winner's curse" in these conditions is that no one wants to play the game.[48]  Thus, toxicity—extreme order imbalances symptomatic of severe adverse selection problems—can kill a market.

112.    Even if toxicity (extreme order imbalances) does not result in a complete cessation of trading, it can result in extreme price movements, price reversals, and declines in liquidity (measured by increases in bid-ask spreads and declines in market depth).  The most rigorous extant theoretical model shows that persistent and extreme order imbalances in a

---

[47] David Easley, Mario Lopez d Prado, and Maureen O'Hara, The Microstructure of the Flash Crash, 37 *J. of Portfolio Management* (2010) 118. Easley, Lopez d Prado, and O'Hara, supra *note* 27.  For the case of the famous stock market Flash Crash of 6 May 2010, Andrei Kirilenko, Albert S. Kyle, Mehrdad Samadi and Tugkan Tuzun, The Flash Crash: High-Frequency Trading in an Electronic Market, 72 *J. of Fin.* (2017) 967 also attribute the crash to an episode of "large and temporary selling pressure," where by "selling pressure" they mean a sell order imbalance. Jennifer Huang and Jiang Wang, Liquidity and Market Crashes, *22 Rev. of Fin. Studies* (2009) 2607, and Market liquidity, asset prices, and welfare, 95 *J. Financial Econ.* (2010) 107 present theoretical models in which large order imbalances can lead to crashes.
[48] Larry Glosten, Insider Trading, Liquidity, and the Role of the Market Specialist, 62 *J. of Bus.* (1989) 211.

particular direction (*e.g.*, sell imbalances) can lead to discontinuous price movements ("crashes" or "non-linearities" in prices) and subsequent price reversals.[49]

113.     The intuition is straightforward.  Standard microstructure models (like those discussed *supra*) assume that market participants know the likelihood a particular order is submitted by someone with private information.  Price movements in response to an order are conditional on this probability.  This is a convenient modeling assumption, but market participants may be uncertain about the likelihood that orders are informed.  Moreover, they may learn about this likelihood from the order flow.

114.     Specifically, in the presence of uncertainty about the probability that orders are informed, large and *persistent* order flows in one direction indicate that (a) the likelihood of informed trading was higher than market participants had previously believed, and (b) the informed have information in the direction of the order imbalance (*e.g.*, sell imbalances indicate bearish private information).

115.     Large and persistent ("toxic") order flows can lead to discontinuous price movements because they lead market participants to reevaluate the information content of previous trades.  For example, an extended sequence of aggressive sell orders leads market participants to conclude that sell orders early in the sequence were more likely informed than they had believed at the time they were entered.  Thus, the arrival of a new aggressive sell order

---

[49] "The accelerating price impacts during unbalanced order flow and more informative reversals due to the repricing history effect imply that the price adjustments to order flow can be particularly sharp consistent with empirical evidence, such as the 'mini flash crashes' that have become pervasive feature of equity market dynamics (*e.g.*, Brogaard *et al*. 2018). For example, a long series of sell orders will lead to accelerating price impacts on the way down, leading to a sharp decline in the price. A few buy orders at such time will recover the price quickly. The result is a sharp downward price movement and a quick recovery, amplified by learning about adverse selection." Nihad Aliyev, Xue-Zhong He and Talis J. Putnins, Learning About Adverse Selection in Markets, working paper (2023) at 5.

leads to a large price movement because it contains information about the information content of previous aggressive orders. In particular, it implies that the price movements in response to the earlier orders were too small (because they underestimated the probability that the orders were informed). Thus, in such a situation, the new order leads to repricing of the previous orders, and hence a large price movement.

116. This can be analogized to the straw that broke the camel's back. The addition of one straw does not break the camel's back alone, but in conjunction with the previous accumulation of straws leads to the collapse.

117. This "camel's back" effect is an example of a non-linearity: a small shock to the system causes a large response. Such non-linearities are characteristic of "complex systems."[50]

118. This theory can also explain reversals. If the direction of order flow reverses, or even if the rate of order imbalances declines (*e.g.*, sell imbalances become smaller) market participants may again revise their evaluations of the information content of previous orders. Aggressive buys following a string of aggressive sales, for example, lead market participants to

---

[50] "Complex system" is a term of art, and the term means more than the system is complicated or has a large number of elements: "A complex system is a system composed of many interacting parts, often called agents, which displays collective behavior that does not follow trivially from the behaviors of the individual parts." M. E. J. Newman, Complex Systems: A Survey (2011). Financial markets obviously consist of many interacting parts (including *inter alia* the numerous entities trading on them), and the outcomes of these interactions are not trivially understood by examining any individual participant. One feature of complex systems is "non-linearity," most widely known as the "butterfly effect." Edward N. Lorenz, Predictability: Does the Flap of a Butterfly's Wings in Brazil Set Off a Tornado in Texas?, Proceedings of the 199th Meeting of AAAS Section on Environmental Sciences, New Approaches to Global Wather, GARP, AAAS, (1972) *See also* Martin Scheffer, Stephen R. Carpenter, Timty M. Lenton, John Bascompte, William Brock, Vasilis Dakos, Johan van de Kopple, Ingrid A. van de Leemput, Simon A. Levin, Egbert H. van Nes, Mercedes Pascual, and Jon Vandemeer, Anticipating Critical Transitions, 338 *Science* (2012) 344. There is research that indicates that financial markets are complex systems. Indeed, this literature explains crashes generally (flash crashes and more long-lived ones like the Crash of 1987) as endogenously generated phenomenon attributable to the complex nature of financial markets. Didier Sorrente, *Why Stock Markets Crash: Critical Events in Complex Financial Systems* (2017).

reduce their estimation of the negative content of the previous order imbalances. The arrival of some aggressive buys after a large sell imbalance can therefore result in a repricing of the previous sell orders, and therefore in a discontinuous price increase and a price reversal.

119.    This theory has several implications. First, toxic order flow, and especially large and persistent order imbalances on one side of the market, can cause flash crashes. Moreover, prices can exhibit strong reversals during such flash events. Furthermore, toxic order flow is associated with acute erosions in measures of market liquidity (bid/ask spreads and depth), and these erosions are most acute on the side of the market experiencing the order imbalance: *e.g.*, large and persistent sell imbalances cause erosion on the bid side of the market.

120.    Empirical research on flash events also identifies large order imbalances as an important contributory factor: based on this evidence, order imbalances are likely a necessary, though not sufficient, condition for a flash event.[51]

## IV.    April 20, 2020 WTI Trading: A Chronology

### A.    Prior to 1:00 P.M. CT

121.    ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████

---

[51] Tom McInish, James Upson, and Robert Wood, The Flash Crash: Trading Aggressiveness, Liquidity Supply, and the Impact of Intermarket Sweep Orders, 49 *Financial Rev*. (2014) 481. BIS. Khaladdin Rzayev and Gbenga Ibikunle, Order Aggressiveness and flash crashes, 26 *International J. Fin. Econ*. (2021) 2647.

Highly Confidential



122. 

123.

124.

Highly Confidential



125.

**B.      1:00 P.M.-1:30 P.M. CT**

Highly Confidential

126. 

Highly Confidential



Highly Confidential



127.

128.

129.

130.

131.

---

[52] I discuss trading halts *infra*.



132.

133.

134.

135.

136.

137.

C.    **Post-1:30 p.m.**

138.

Highly Confidential



139. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

**D.     Market Chronology Summary**

140. ████████████████████████████

141. ██████████████████████████████████████████

██████████████████████████████████████████████

Highly Confidential



Highly Confidential

███████████████████████████████████████████████████████

██████████████████████████████████████████████

147.    ████████████████████████████████████████████

**E.    Trading Halts**

148.    Trading in the May contract, and/or spreads involving the May contract (*e.g.*, the May-June spread) was halted based on CME GLOBEX logic, rules, and parameters on numerous occasions on April 20, 2020.  Appendix D lists all the halts for the May contract, the May-June spread, and the May-July spread.  Other instruments (*e.g.*, the May-August spread, or the May WTI-May Brent spread) were also halted at times on this day.

149.    On April 20, 2020, the CME had certain measures in place to "ensure that our markets continue to work in an efficient and orderly manner during volatile market conditions."[53] For CME energy markets, these measures included, dynamic circuit breakers ("DCB") and velocity logic ("VL").

150.    CME energy products, which include the Light Sweet Crude Oil contract, are subject to dynamic circuit breakers. If the market moves plus or minus a certain percentage based on a rolling 60-minute lookback window then a 2-minute trading halt is initiated.

151.    CME energy products are also subject to velocity logic monitoring. If a violation of the velocity logic occurs, then trading is temporarily suspended.[54]

152.    According to the CFTC, on April 20, 2020, over 30 dynamic circuit breakers were triggered involving the May contract.[55]

---

[53] CME Group, Understanding Price Limits and Circuit Breakers (2020).
[54] "Velocity logic monitors potential significant price movements in extremely small time increments on CME Globex. It works in conjunction with price banding to preserve the integrity of our markets." CME Group, Understanding Price Limits and Circuit Breakers (2020)

Highly Confidential

153. ████████████████████████████████

████████████████████████████████████

████████████████████████████████  ████████████

████

**F.** **Trading Defendants' Trading Chronology**

154. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

155. ████████████████████████████████

████████████████████████████████████

████████████████████████████████



**Figure 6**

████████████████████████████████████
████████████████████████████████████
████████████████████████

Highly Confidential



156.

157.

Highly Confidential



158.

Highly Confidential

159. ████████████████████████████████████

████████████████████████████████████████

████████████████████████

████



160. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

161.    The Trading Defendants' aggressive selling was often associated with large price movements.  On April 20, 2020 

GHFLTD 000004.

*See* Appendix E, 161.

## V.    There Are Standard Econometric Models That Can Quantify the Price Impact of Defendants' Trades and Therefore Determine the Amount of Artificiality Attributable to Defendants' Conduct

162.    The foregoing chronology demonstrates that

Moreover, the chronology demonstrates that

163.    These parallels between price movements and order imbalances are not coincidental.  The theoretical analysis presented *supra* demonstrates that (a) trades—such as trades in May 2020 Crude Oil Futures and Spreads—impact prices, and (b) that such price impacts create opportunities for what economists refer to as "trade-based manipulation" which is similar to what Plaintiff alleges against Defendants.  There are standard empirical models for quantifying such price impacts.  These models can be utilized to determine how much Defendants' sales of Crude Oil Futures and Spreads on April 20, 2020 caused the prices of these instruments to decline.  That is, they can be used to quantify how much artificiality Defendants caused through their alleged manipulative trading.

164.    In particular, vector autoregression ("VAR") models first developed by Hasbrouck in the 1990s are widely employed to quantify how trades move prices and take into account the possibility that price movements can also cause trades.

165.    The VAR method is widely employed in the peer-reviewed microstructure literature to estimate the price impact of trades.

166.    A VAR estimates the dynamic relationship between a set of variables. In the market microstructure context, the set of variables of interest are (a) prices, and (b) signed trades. Trades are "signed" because buys tend to cause prices to increase, and sales tend to cause prices to fall. Therefore, in a microstructure context, it is important to be able to identify which trades are initiated by buyers, and which are initiated by sellers.

167.    In the present case, as noted *supra* the CME Globex system can determine whether a particular transaction is initiated by a buyer or seller. The initiating party is referred to as the "aggressor," and the Globex data that I employ ██████████████████ This represents an advantage over other applications of this methodology, which require inferring whether a particular trade is buyer- or seller-initiated based on an algorithm which is subject to error.

168.    Rather than describe VARs in generality, to illustrate their use herein I will consider a model of the Crude Oil Futures and Spread markets on April 20, 2020. In the base model that I implement *infra*, I will consider six variables in the VAR system: (a) the change in the price of May 2020 Crude Oil Futures over a time interval of $x$ seconds, (b) the change in the price of the May-June 2020 Crude Oil Spread over a time interval of $x$ seconds, (c) the change in the price of June 2020 Crude Oil Futures over a time interval of $x$ seconds, (d) the net aggressor volume in the May 2020 Crude Oil Futures during a time interval of $x$ seconds, (e) the net

Highly Confidential

aggressor volume in the May-June 2020 Crude Oil Spread during a time interval of $x$ seconds, and (f) the net aggressor volume in the June 2020 Crude Oil Futures during a time interval of $x$ seconds. Net volumes are the aggressor buys minus aggressor sells during the time interval. I denote the May 2020 Crude Oil Futures price change in interval $i$ as $\Delta P_i^K$ the May-June 2020 Spread change in interval $i$ as $\Delta S_i$; the June 2020 Crude Oil Futures price change in interval $i$ as $\Delta P_i^M$; the net May 2020 Crude Oil Futures volume in interval $i$ as $\Delta V_i^K$; net May 2020 Crude Oil Spread volume in interval $i$ as $\Delta V_i^S$, and the net June 2020 Crude Oil Futures volume in interval $i$ as $\Delta V_i^M$.

169.   In this analysis, I use the market midpoint, *i.e.*, the average of the bid and ask prices, as the measure of price.[56]

170.   The VAR involves the estimation of six equations—one for each variable in the system:

$$\Delta P_i^K = \beta_K + \sum_{j=1}^{L} \beta_j^{KK} \Delta P_{i-j}^K + \sum_{j=1}^{L} \beta_j^{KS} \Delta S_{i-j} + \sum_{j=1}^{L} \beta_j^{KM} \Delta P_{i-j}^M + \sum_{j=1}^{L} \beta_j^{KVK} \Delta V_{i-j}^K$$

$$+ \sum_{j=1}^{L} \beta_j^{KVS} \Delta V_{i-j}^S + \sum_{j=1}^{L} \beta_j^{KVM} \Delta V_{i-j}^M + e_i^K$$

$$\Delta S_i = \beta_S + \sum_{j=1}^{L} \beta_j^{SK} \Delta P_{i-j}^K + \sum_{j=1}^{L} \beta_j^{SS} \Delta S_{i-j} + \sum_{j=1}^{L} \beta_j^{SM} \Delta P_{i-j}^M + \sum_{j=1}^{L} \beta_j^{SVK} \Delta V_{i-j}^K$$

$$+ \sum_{j=1}^{L} \beta_j^{SVS} \Delta V_{i-j}^S + \sum_{j=1}^{L} \beta_j^{SVM} \Delta V_{i-j}^M + e_i^S$$

---

[56] I have also implemented the model using transaction prices to measure price movements.

Highly Confidential

$$\Delta P_i^M = \beta_K + \sum_{j=1}^{L} \beta_j^{MK} \Delta P_{i-j}^K + \sum_{j=1}^{L} \beta_j^{MS} \Delta S_{i-j} + \sum_{j=1}^{L} \beta_j^{MM} \Delta P_{i-j}^M + \sum_{j=1}^{L} \beta_j^{MVK} \Delta V_{i-j}^K$$

$$+ \sum_{j=1}^{L} \beta_j^{MVS} \Delta V_{i-j}^S + \sum_{j=1}^{L} \beta_j^{MVM} \Delta V_{i-j}^M + e_i^M$$

$$\Delta V_i^K = \beta_{VK} + \sum_{j=1}^{L} \beta_j^{VKK} \Delta P_{i-j}^K + \sum_{j=1}^{L} \beta_j^{VKS} \Delta S_{i-j} + \sum_{j=1}^{L} \beta_j^{VKM} \Delta P_{i-j}^M + \sum_{j=1}^{L} \beta_j^{VKVK} \Delta V_{i-j}^K$$

$$+ \sum_{j=1}^{L} \beta_j^{VKVS} \Delta V_{i-j}^S + \sum_{j=1}^{L} \beta_j^{VKVM} \Delta V_{i-j}^M + e_i^{VK}$$

$$\Delta V_i^S = \beta_{VS} + \sum_{j=1}^{L} \beta_j^{VSK} \Delta P_{i-j}^K + \sum_{j=1}^{L} \beta_j^{VSS} \Delta S_{i-j} + \sum_{j=1}^{L} \beta_j^{VSM} \Delta P_{i-j}^M + \sum_{j=1}^{L} \beta_j^{VSVK} \Delta V_{i-j}^K$$

$$+ \sum_{j=1}^{L} \beta_j^{VSVS} \Delta V_{i-j}^S + \sum_{j=1}^{L} \beta_j^{VSVM} \Delta V_{i-j}^M + e_i^{VS}$$

$$\Delta V_i^M = \beta_{VM} + \sum_{j=1}^{L} \beta_j^{VMK} \Delta P_{i-j}^K + \sum_{j=1}^{L} \beta_j^{VMS} \Delta S_{i-j} + \sum_{j=1}^{L} \beta_j^{VMM} \Delta P_{i-j}^M + \sum_{j=1}^{L} \beta_j^{VMVK} \Delta V_{i-j}^K$$

$$+ \sum_{j=1}^{L} \beta_j^{VMVS} \Delta V_{i-j}^S + \sum_{j=1}^{L} \beta_j^{VMVM} \Delta V_{i-j}^M + e_i^{VM}$$

171.    In these expressions, the $\beta$'s are coefficients and the $e$'s are random errors.  These random errors quantify price movements that are not caused by lagged price changes or lagged trades.  They can be due, for example, to public information that arrives in time interval $i$ that affects prices.  Moreover, the error terms reflect changes in each of the variables in the system

that are unexpectedly conditional on the values of the lagged variables in the system. For example, $e_i^{YK}$ is affected by trades in the underlying futures contract in interval $i$. If net aggressive volume in interval $i$ is higher than one would predict conditional on past values of the variables in the system, this error term will be positive.

172.  In words, the six equations state that the movement of each of the variables in the system at a given time is caused by the lagged values of all variables in the system, and random shocks to each of the variables.

173.  Given data on the variables in the VAR system, the coefficients can be estimated using standard econometric techniques.[57] This estimation requires several choices. In the present application, one choice is the length of the time interval $x$. Given the volume of trading in Crude Oil Futures, time intervals measured in seconds are reasonable. Another choice is the time period used for estimation.

174.  The standard implementation of the VAR approach assumes that all the coefficients in the model, and the variance-covariance matrix of the error terms, are constant during the estimation period. However, price impact can vary throughout the day. It is well-known that various measures of market activity and volatility vary systematically throughout the day. Moreover, *a priori* there is no reason to believe that the degree of information asymmetry, or market participants' evaluation thereof, is constant within a day. Intra-day variations in asymmetry or estimates of asymmetry can lead to intra-day variations in price impact. Moreover, the economic circumstances of liquidity suppliers can change within a day, especially in response to large price movements. For example, large price movements that impose losses

---

[57] James D. Hamilton, *Time Series Analysis* (1994) at ch. 11.

on liquidity suppliers can lead them to reduce their supply of liquidity, which in turn results in changes in the price impact of aggressive orders.

175.    The unusual economic conditions on April 20, 2020—notably, the economic uncertainty involving Covid-19 generally and its impact on the oil market specifically—also plausibly gave rise to uncertainty that in turn resulted in intra-day changes in price impacts. Indeed, as noted the trading process itself can lead to changes in price impacts.  Furthermore, persistent order imbalances (like those experienced on April 20, 2020) can lead market participants to revise their estimation of the likelihood that orders are informed, which in turn alters price impacts.[58]  Since the TDs were major contributors to these order imbalances, and hence could have altered price impacts, an analysis of their effect on prices should allow for the possibility of time variation in price impacts.

176.    The market microstructure theory implies that price impact is likely to change because of the conditions that prevailed on April 20, 2020.  Specifically, price impacts change due to persistent order imbalances: prices are more sensitive to aggressive sales after a period of persistent sell order imbalances than they would be without such an extended period of order imbalances.[59]  As noted *supra*, there were long intervals of sell order imbalances in Crude Oil Futures and spreads on April 20, 2020.

177.    There is an extensive literature demonstrating that liquidity varies randomly over time.[60]  Price impact is one measure of liquidity.

---

[58] See ¶¶112-119 *supra*.

[59] Aliyev *et al supra* note 49.

[60] Aliyev *et al supra* note 49.  Qin Lei and Guojun Wu, Time-varying informed and uninformed trading activities, 8 *J. Fin. Markets* (2005) 153. Sanders S. Chang, Lenisa V. Chang, F. Albert Wang, A dynamic intraday measure o fthe probability of informed trading and firm-specific return variation, 29 J. of Empirical Finance (2014) 80. Paul Pfleiderer and Anat Admati, A theory of intra-day patterns: Volume and price volatility, 1 *Rev. of Financial Stud.* (1988) 3.

Highly Confidential

178.    A review of the application of VARs by renowned econometricians James Scott and Mark Watson states: "State of the art VAR forecasting systems contain more than three variables and allow for time-varying parameters to capture important drifts in coefficients.[61]

179.    Moreover, it is widely documented that price volatilities and correlations vary randomly over time, for financial prices generally and crude oil prices specifically.[62]

180.    Thus, *a priori* it is reasonable and appropriate—and indeed necessary—to estimate a VAR that allows for intra-day variation in price impacts, price volatilities, and price correlations.    That is, it is reasonable and appropriate to utilize a model that allows the β coefficients in the above equations to vary over time, and that allows the variances of the error terms (the *e*'s) and the covariances between them to vary over time.

181.    One of the most sophisticated and rigorous (and peer reviewed) methods of estimating a VAR with time-varying coefficients is the Time Varying Parameter VAR model ("TVP-VAR").[63]    In this approach, the model coefficients (the *β*'s) vary randomly over time:

---

Doron Avramov, Si Cheng, and Allaudeen Hameed, Time-Varying Liquidity and Momentum Profits, 51 *J. Financial and Quant. Anal.* (2016) 1897. Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, 2000, Commonality in liquidity, 56 *J. of Fin. Econ.* (2000) 3. Randi Naes, Johannes A. Skjeltorp, and Bernt Arne Odegaard, Stock Market Liquidity and the Business Cycle, *66 J. of Fin.* (2011) 139. Brendan Daley and Brett Green, An Information-Based Theory of Time-Varying Liquidity, 71 *J. of Fin.* (2016) 109.

[61] James H. Scott and Mark W. Watson, Vector Autoregressions, 15 *J. Econ. Perspectives* (2001) 101 at 111.

[62] Stephen Craig Pirrong, Metallgesellschaft: A Prudent Hedger Ruined, or a Wildcatter on NYMEX? 17 *J. Futures Markets* (1997) 543. Nima Ebrahimi and Craig Pirrong, Oil Jump Risk, 40 J. Futures Markets (2020) 1282.  Victor Ng and Stephen Craig Pirrong, Price Dynamics in Refined Petroleum Spot and Futures Markets, 2 *J. Empirical Fin.* (1996) 359.

[63] Giorgio E. Primiceri, Time Varying Structural Vector Autoregressions and Monetary Policy, 72 *Rev. Econ. Stud.* (2005) 821. Gary Koop and Dmitris Korobilis, Bayesian Multivariate Time Series Methods for Empirical Macroeconomics, 3 Foundations and Trends in Econometrics (2010) 268.  Jouchi Nakajima, Time-Varying Parameter VAR Model with Stochastic Volatility: An Overview of the Methodology and Empirical Applications, 29 *Monetary and Economic Studies* (2011) 107.  The Primiceri article has been widely used and cited: as of the time of the drafting of this report, it had been cited 3228 times.

specifically, they follow a random walk, meaning that they fluctuate randomly, but exhibit no trend. Further, they can differ for every interval. Moreover, in this approach the variances and covariances of the error terms (the *e*'s) can also vary randomly over time. This is also plausible given the conditions of April 20, 2020. In particular, it is well known that many financial time series exhibit "volatility clustering," meaning that large (small) price moves tend to follow large (small) price moves. The large price movements during the day of April 20, 2020, say around noon, could therefore have plausibly been associated with (and a harbinger of) larger volatility later in the day.

182. TVP-VAR has well-recognized advantages over alternative means of estimating time-varying parameters in a VAR framework. These alternatives include "rolling window" estimation, in which standard VARs are estimated over incompletely overlapping subsets of the data, with the estimation subset "rolling" forward in time through the data to estimate parameters for different time subperiods, and non-overlapping window estimation, in which the data set is divided into non-overlapping time periods, with separate VARs estimated on each subperiod. Both methods generate different parameter estimates for different subsets of the data.

183. The advantages of TVP-VAR *vis a vis* these alternatives include the fact that it does not depend on choice of an arbitrary window size, it estimates the parameters of interest more precisely, it is less sensitive to outliers in the data, and includes all data in the estimation.[64] Moreover, TVP-VAR is superior at rapidly and properly adjusting to parameter changes,

---

[64] Nikolaos Antonaakis, Ioannis Chatziantoniou, and David Gabauer, Refined Measures of Dynamic Connectedness Based on Time-Varying Parameter Vector Autoregressions, 13 *J. of Risk and Fin. Management* (2020) 84. Yang Hu, Chunlin Lang, Shaen Corbet, Yang Hou, and Les Oxley, Exploring the dynamic behavior of commodity market tail risk connectedness during the negative WTI pricing event, 125 *Energy Econ*. (2023) 124. Chunlin lang, Yang Hu, Shaen Corget, Yang Hou, Tail risk connectedness in G7 stock Markets: Understanding the impact of COVID-19 and related variants, *J. of Behavioral and Experimental Fi*nance, forthcoming (2024).

whereas the alternatives are subject to overreaction (due to sensitivity to outliers) or excessive persistence.[65] That is, parameter estimates in the rolling window and non-overlapping window alternatives tend to "jump" too much, or adjust too slowly, or both.

184. VARs in a microstructure context, including high frequency applications, are often implemented using "natural clock" time intervals and aggregate order flows within these natural clock time intervals.[66] TVP-VAR can be estimated using relatively short time intervals, such as 15 seconds.

185. TVP-VAR is a type of "state space" model. State space models are ubiquitous in economic and econometric applications, and time series analyses generally.[67] State space models have been used to analyze price impacts.[68]

186. As noted *supra*, I implement a version of the TVP-VAR that allows for stochastic variances of and covariances between the variables in the system. It has long been recognized that stochastic volatility and correlations are ubiquitous in financial time series.[69]

---

[65] Dimitris Korobilis and Kamil Yilmaz, Measuring Dynamic Connectedness With Large Bayesian VAR Models, working paper (2018).

[66] Joel Hasbrouck, Price Discovery in High Resolution, 19 *J. of Fin. Econometrics* (2019) 395. Carole Comerton-Forde and Talis Putnins, Dark trading and price discovery, 118 *J. Fin. Econ.* (2015) 70. Francesco Capponi and Rama Cont, Trade duration, volatility, and market impact, working paper (2019). Luca Philippe Mertens, Alberto Ciacci, Fabrizio Lilla and Giulia Livieri, Liquidity fluctuations and the latent dynamics of price impact, 22 *Quantitative Finance* (2022) 149. Alvaro Cartea and Sebastian Jaimungal, Incorporating order-flow into optimal execution, 10 *Mathematical and Financial Economics* (2016) 339. Rama Cont, Arseniy Kukanov, and Sasha Stoikov, The price impact of order book events, 12 *J. of Fin. Econometrics* (2014) 47.

[67] J. Durbin and S. J. Koopman, *Time Series Analysis by State Space Methods* (2012).

[68] Mertens *et al, id.*

[69] Eric Ghysels, Andrew C. Harvey, and Eric Renault, Stochastic Volatility, in G. S. Maddala and C. R. Rao, eds., *Statistical Methods in Finance* (1996). Neil Shephard and Torben G. Andersen, Stochastic Volatility: Origins and Overview, in Thomas Mikosch, Jens-Peter Kreiss, Richard A. Davis, and Torben Gustav Andersen, eds., *Handbook of Financial Time Series* (2009). Siddhartha Chib, Yasuhiro Omori, and Manabu Asai, Multivariate Stochastic Volatility, in Thomas Mikosch, Jens-Peter Kreiss, Richard A. Davis, and Torben Gustav Andersen, eds.,

187.     Following the academic literature, the model is estimated using Bayesian methods.[70]  Bayesian methods are appropriate, and arguably necessary, in this context because some model components, including the $\beta$ coefficients, the variance and covariances of the coefficients and the error terms, are unobservable.  Furthermore, alternative methods (such as maximum likelihood) are subject to a "pile-up" problem that prevents accurate estimation.[71]  The high dimensionality and non-linearity of the problem also poses difficulties for alternative estimators (including maximum likelihood) because the likelihood will have multiple local maxima.  Furthermore, there are practical difficulties in maximizing the likelihood function over such a large number of parameters.[72]  Bayesian methods are also better able to identify parameter shifts accurately.[73]

188.     Bayesian methods have been used extensively in finance, including in microstructure applications, to estimate time-varying parameters.[74]

---

*Handbook of Financial Time Series* (2009). Riccardo Colacito, Robert F. Engle, and Eric Ghysels, A component model for dynamic correlations, 164 *J. of Econometrics* (2011) 45.

[70] Primiceri, *supra* note 63.  Koop and Korobilis, *supra* note 63. *See* also Lutz Kilian and Helmut Lutkepohl, *Structural Vector Autoregressive Analysis* (2018).

[71] James H. Stock and Mark W. Watson, Median Unbiased Estimation of Coefficient Variance in a Time-Varying Parameter Model, 93 J. Amer. Stat. Assoc. (1998) 349.

[72] *See* Primiceri *supra* note 63 and Koop and Korobilis *supra* note 63 for discussions of these issues.

[73] Massimo Guidolin, Erwin Hansen, and Maneula Pedio, Cross-asset contagion in the financial crisis: A Bayesian time-varying parameter approach, 45 *J. Fin. Markets* (2019) 83. Daniele Bianchi, Massimo Guidolin, and Francesco Ravazzalo, Macroeconoimc Factors Strike Back: A Bayesian Change-Point Model of Time-Varying Risk Exposures and Premia in the U.S. Cross-Section, 35 *J. Business Econ. and Stat*. (2017) 110. Jun Tu, Is Regime Switching in Stock Returns Important in Portfolio Decisions, 56 *Management Science* (2010) 1547.

[74] Doron Avramov, Stock return predictability and model uncertainty. *J. of Fin. Econ*. 64 (2002) 423.  Martijin J. K. Cremers, Stock return predictability: a Bayesian model selection perspective. 15 *Rev. of Fin. Stud*. (2002) 1223. Jessica A. Wachter and Missaka Warusawitharana, What is the chance that the equity premium varies over time? Evidence from regressions on the dividend-price ratio, 186 *J. Econometrics* (2015) 74.  Michael Johannes, Arthur Korteweg, and Nicholas Polson, Sequential Learning, Predictability, and Optimal Portfolio Returns, 69 *J. of Fin*. (2014) 611. Thomas Dangl and Michael Halling, Predictive regressions with time-varying coefficients,

189.    Exhibit A presents an overview of the details of the estimation of the model.[75]
*See* Appendix E, 189.

190.    As shown in detail *infra*, I have implemented the TVP-VAR on the relevant data from April 20, 2020.  Further, I use this model to estimate the impact of the Trading Defendants' trading on the prices of the May 2020 Crude Oil futures contract and spreads involving the May 2020 Crude Oil futures contract (*e.g.*, the May-June 2020 Crude Oil futures spread).  This is a model derived from common evidence (including *inter alia* market data and data on the Trading Defendants' trading) that can be applied on a class-wide basis to quantify the damages Trading Defendants caused for the members of the class.

## VI.    The TVP-VAR Model Results

### A.    Price Impacts Derived From the TVP-VAR

191.    I have estimated a TVP-VAR model for the period ██████████ period on April 20, 2020: this period encompasses virtually all the TDs trading on April 20, 2020.  The results of the model I present in this, the main body of the report, are based on a version of the model with the following characteristics.

192.    First, the model is estimated on data divided into 15 second time intervals.[76]

---

106 *J. Fin. Econ*. (2012) 157.  Meirui Zhong, Rui Zhang, and Xiaohang Ren, The time-varying effects of liquidity and market efficiency of the European Union Carbon market: Evidence from the TVP-SVAR-SV approach, 123 *Energy Econ*. (2023) 1.

[75] In the present context, moreover, Bayesian methods are readily adapted to handle a feature of Crude Oil futures trading on 20 April 2020.  Specifically, CME "circuit breakers" periodically halted trading in the May contract, spread contracts, and sometimes both simultaneously.  These halts were sometimes two minutes long, and at other times 5 seconds in duration.  Trading halts pose challenges to estimating VARs because they interfere with the model's time structure.  A natural extension of the Bayesian method for handling unobserved (latent) variables can address trading halts: in essence, the prices and quantities of the halted instruments are treated as unobserved, latent variables that are handled analogously to the handling of the unobserved/latent parameters.

193.    Second, the model includes six variables:

- The change in the May midpoint over the 15 second interval

- The change in the May-June spread midpoint over the 15 second interval

- The change in the June price over the 15 second interval

- The May order imbalance in the 15 second interval

- The May-June spread order imbalance in the 15 second interval

- The June order imbalance in the 15 second interval.

194.    The model includes 3 lags of all variables.

195.    Although different choices are possible, this analysis is sufficient to show that there is a model that can estimate price impacts based on common evidence, which can be applied to quantify damages incurred by each class member because of Trading Defendants' conduct.

196.    The standard way of representing the impact of trades in the VAR framework is through an "impulse response function" ("IRF"). IRFs estimate how a random shock to a given variable impacts all variables in the system. Since the VAR is a dynamic system, the IRFs

---

[76] The choice of a 15-second time interval is based on the data and the nature of the TVP-VAR methodology. Intuitively, the methodology estimates a slope coefficient: price impact is the change in price per unit of order imbalance. Moreover, the methodology estimates a different slope coefficient for every time interval. If the order imbalance for, say, the May-June spread is zero during a time interval, or especially is zero for several consecutive time intervals, the denominator in this slope calculation for that interval is close to zero. If price changes during that interval the slope estimate "spikes" or "blows up", *i.e.*, becomes very large in absolute value, because the denominator in the calculation is very small. With a small time interval, such intervals of zero order imbalance in one of the three order-flow variables, and consequently large movements (spikes) in estimated price impacts, are more frequent. For Crude Oil Futures data on 20 April 2020, a 15 second time interval is sufficiently wide to avoid this problem: as will be seen in figures *infra*, the evolution of price impacts during 20 April 2020 using the 15 second interval is smooth and not characterized by the extreme movements ("spikes") that occur when shorter time intervals are used. Nonetheless, it permits the estimated price impact to change multiple times every minute.

Highly Confidential

quantify the impact of a change in a variable at a given time on the values of all other variables in the system at future dates. For example, volume in interval $i$ affects prices in that interval, and in future intervals $i+k$, where $k$=1, 2, 3, . . .

197.    Figure 9 presents the IRF for the May order imbalance variable. The depicted IRF is for 20 periods after the imbalance occurs (*i.e.*, 5 minutes in the model with 15 second time intervals). This is a measure of the persistent impact (treated as a "permanent" impact in the market microstructure literature) of a trade on the market midpoint because it allows for sufficient time for the temporary price impacts resulting from *inter alia* inventory adjustments to dissipate. *See* Appendix E, 197.



198.    The blue line in the graph is the impact of an aggressive buy of one May contract on the price of the May futures.  The red line in the graph is the impact of an aggressive buy of one May contract on the May-June spread midpoint.  The green line in the graph is the impact of an aggressive buy of one May contract on the June price.

199.    The mean impact of an aggressive trade in the May contract on the May midpoint and May-June spread midpoints is approximately █ cent/contract in the direction of the trade (*i.e.*, with aggressive sales causing price declines).  Moreover, they vary quite substantially over the day, sometimes reaching approximately █ cents/contract.  This variation provides justification for the use of the TVP-VAR model.  After peaking around ████████, the IRFs decline before rising sharply around ███████, peaking at ████████, falling sharply, then rising shortly before █████████.  This erratic behavior during the last ████████ of trading is consistent with the ██████ analysis presented *supra*.  *See* Appendix E, 199.

200.    The model results imply that trades in the May contract caused movements in the June Crude Oil futures price, although substantially less than the effect on the May or May-June spread prices.  This is consistent with economics: for a storable commodity in particular, trades in one contract can convey information about supply and demand conditions for the same commodity at later dates.

201.    Figure 10 presents the IRF for the May-June spread imbalance variable.  Again, the price impacts vary substantially.  *See* Appendix E, 201.

████████



202.    Again, there is considerable variation of the IRFs throughout the day, with the IRFs peaking at between ███ and █████ before declining until about ███ and then rising sharply and remaining elevated until ██████ *See* Appendix E, 202.

203.    The TVP-VAR estimates also show that market price dynamics changed dramatically at around ██████ Figure 11 presents the standard deviations of the price equation error terms which quantify the magnitude of price variations not explained by contemporaneous order flow and lagged price changes and order flow.   These standard deviations increase progressively and relatively gradually throughout the day, and then rise steeply around ██████ The increase in the May-June Crude Oil spread equation variability is especially pronounced. *See* Appendix E, 203.

Highly Confidential



204.    This large increase in price equation error variability is symptomatic of a ███

███.   Moreover, this huge change indicates the importance of utilizing a methodology that

allows for random variation in volatility.[77]

205.    Furthermore, the fraction of the variability in prices explained by order flow

variations declined substantially in the last ██████████ f trading.  Figure 12 presents the time-

varying $R^2$'s for the May Crude Oil price and the May-June Crude Oil spread implied by the

TVP-VAR model.[78]  Note that the $R^2$'s fall starting around ████████ recover partially around

---

[77] Correlations also varied substantially throughout the day.

[78] $R^2$ measures the fraction of the variance of the variable of interest (in this case price changes) explained by the control variables (in this case order flows).  This is calculated as one minus the variance in a price conditional on order flow divided by the unconditional variance in price.  The

Highly Confidential

██████ and then fall to ██████ at ██████ At ██████ the $R^2$ for the May Crude Oil future is ████ (*i.e.*, ███ percent). At ██████ the $R^2$ for the May-June Crude Oil spread is ████ (*i.e.*, ███ percent). That is, at this time, order flows explain less than ███ percent of price changes. In contrast, at other times of the day order flows explain over ███ percent of price movements. *See* Appendix E, 205.





206. This dominance of price variability by pure noise is symptomatic of a ██████ style structural break in the last ██████ of trading prior to settlement.

---

conditional variances are calculated from the variance-covariance matrices estimated for the TVP-VAR model at each time interval by applying the standard formula for conditional variances for the multivariate normal distribution. The unconditional variances are taken directly from the variance-covariance matrices. The variations in the $R^2$'s reflect variations in variances and correlations.

Highly Confidential

207.    Note that price variations *not* explained by order flow are attributable to the arrival of public, non-trade-related information.  Since the order flow $R^2$'s are routinely less than one, the model implies that some of the price variations on 20 April 2020 were caused by non-trade-related information flows.  These can include public announcements, such as the CME's alert at 12:06 p.m. CDT about the possibility of negative prices.

**B.    Evidence of Large Differences in Market Dynamics and Operation Pre- and Post-** 

208.    As noted in the chronology *supra*, there are substantial differences in market dynamics before and after about ████    Moreover, the TVP-VAR model exhibits different market dynamics before and after about ████    Although prices had declined throughout the day on April 20, 2020, the rate of price decreases accelerated in the last ████ prior to ████, and the rate of price decline and the volatility of price movements were extreme after ████    Moreover, there was ████████████████████ ████ around that time.  Thus, on *a priori* grounds there are reasons to believe that market dynamics were fundamentally different prior to ████ and afterwards.

209.    An alternative statistical analysis provides further (and striking) evidence that the pre- and post-████ periods are structurally different, and indeed substantially so.  I have estimated a set of regressions of price movements and order flow imbalances over five second intervals for the period ████████ and another set for the period ████████ The regression results for the two subsamples are extremely different.  These results support the conclusions derived from the market chronology and the TVP-VAR results.  *See* Appendix E, 209.

210.    Specifically, I estimate regressions of the change in the May price (measured by the midpoint) over five-second-long intervals[79] against: (a) the May futures order imbalance in that second, (b) the May-June spread order imbalance in that second, (c) the May-July spread order imbalance, (d) the June order imbalance (e) the May TAS order imbalance, and (f) the May-June spread TAS imbalance:

$$\Delta P_T^K = \beta_{K0} + \beta_{KK}Q_T^K + \beta_{KMK}Q_T^{KM} + \beta_{MM}Q_T^M + \beta_{KTAS}Q_T^{KTAS} + \beta_{KMTAS}Q_T^{KMTAS} + \beta_{KdK}\Delta Q_T^K$$
$$+ \beta_{KdKM}\Delta Q_T^{KM} + \beta_{KdM}\Delta Q_T^M + e_T^K$$

where $\Delta P_T^K$ is the change in the May midpoint in interval $T$, $Q_T^K$ is the May order flow imbalance in interval $T$, $Q_T^{KM}$ is the May-June spread order flow imbalance in interval $T$, $Q_T^{KTAS}$ is the May TAS order flow imbalance in interval $T$, $Q_T^{KMTAS}$ is the May-June spread TAS order flow imbalance in interval $T$, $\Delta Q_T^K$ is the first difference in the May order flow imbalance, $\Delta Q_T^{KM}$ is the first differences in the May-June spread order flow imbalance, $\Delta Q_T^M$ is the first difference in the June order flow imbalance, $Q_T^{KMTAS}$ is the May-June spread TAS order flow imbalance in interval $T$, and $e_T^K$ is an error term.[80]  *See* Appendix E, 210.

211.    Similarly, I have estimated the following regression:

$$\Delta P_T^{KM} = \beta_{K0} + \beta_{KK}Q_T^K + \beta_{KMK}Q_T^{KM} + \beta_{KNK}Q_T^{KN} + \beta_{MM}Q_T^M + \beta_{KTAS}Q_T^{KTAS} + \beta_{KMTAS}Q_T^{KMTAS}$$
$$+ \beta_{KMdK}\Delta Q_T^K + \beta_{KMdKM}\Delta Q_T^{KM} + \beta_{KdMM}\Delta Q_T^M + e_T^K$$

where $\Delta P_T^{KM}$ is the change in the May-June spread midpoint in interval $T$.  *See* Appendix E, 211.

---

[79] I have also estimated regression models with 1 second and 15 second intervals, and in "transaction time" in which every trade is an observation.  The results are very similar and produce the same conclusions.

[80] Similar regressions have been used in *inter alia* Thierry Foucault, Marco Pagano, and Alisa Roell, *Market Liquidity: Theory, Evidence, and Policy* (2013); Anath Madhavan, Matthew Richardson, and Mark Roomans, Why Do Securities Prices Change: A Transaction-Level Analysis of NYSE Stocks, 10 *Rev. Fin. Stud.* (1997) 1035; and Alvaro Cartea and Sebastian Jaimungal, Incorporating Order-Flow into Optimal Execution, 10 Mathematical and Financial Economics (2016) 339.  Foucault *et al* call it "the cornerstone of what empiricists call a 'price impact regression.'"

212. Table 1 presents the results for the May regression for the ███████ period. *See* Appendix E, 212.



213. Table 2 presents the results for the May-June Spread regression for the ███ ███████ period. *See* Appendix E, 213.



214.    First, the May and May-June spread order flow variable coefficients are positive and have extremely small *p*-values.  This is consistent with microstructure theory in "normal" market conditions.  Order imbalances are informative, and the information moves the price in the expected direction: buys cause prices to increase and sells cause prices to decrease.  The small *p*-values indicate that these co-movements are highly unlikely to be the result of chance.  That is, it would be extremely unlikely to observe the co-movements if there was in fact no relationship between order flows and price movements.  This is strong statistical evidence that aggressive order flow moves prices.  This supports the conclusions derived from the TVP-VAR model.

215.    The point estimates of the coefficients indicate that aggressive trades have price impacts of between ██ and ████ per contract, depending on the instrument.  These magnitudes are similar to the average values from the TVP-VAR.

216.    Second, the coefficients on the TAS variables are far smaller in absolute value, and indeed of the "wrong" sign: TAS buys are associated with price decreases.  However, the *p*-values on these coefficients are quite large, indicating that there is only very weak evidence against the null hypothesis that these coefficients are in fact zero, that is, against the null hypothesis that there is no relationship between TAS transactions and the movements of May and May-June spread prices.  This provides strong support for the microstructure theory discussed above which predicts that TAS trades are unlikely to be informed, and hence have no (or only very small) price impact.

217.    Table 3 presents the regression results for the ████████ period for the May Price.  The coefficients are substantially different from those in Table 1.  For example, the coefficient on the May futures order imbalance in the May price change equation is more than ██ times larger than in the pre-████ regression, and the sign on the May-June spread order

Highly Confidential

imbalance is ███████ in the May price change regression. The *p*-values on order imbalance coefficients are all ███████, and the standard error of the regression—which measures the variability of the price change not explained by the order flow variables—is ██ times larger in this period than in the period prior to ███████ *See* Appendix E, 217.

**Table 3**



218.    Table 4 presents the ███████████ regression results for the May-June spread. *See* Appendix E, 218.

**Table 4**



Highly Confidential



219. Again, the coefficients are massively different than for the corresponding ███ ███ regression, and the adjusted $R^2$ is actually ███ All of the *p*-values are ███. Furthermore, the standard error the regression (a measure of the variability of the May-June spread not explained by the order flow variables) is more than ███ times larger for this regression than for the ███████ regression.

220. A formal statistical test demonstrates that the pre- and ███████ periods are fundamentally different, and that the differing regression results are not due to disparate sample sizes (and in particular the relatively small size of the post-███████ sample). Specifically, I have implemented a "Chow test" that tests whether there was a structural break at ███████ The results of this test are clear. The null hypothesis of no structural break is decisively rejected for both the May and May-June spread regressions. The *p*-value for the May regression is ███. That is, a ███████████. For the May-June spread regression, the *p*-value is ███.

That is, a ███████████. That is, the likelihood that statistical sampling error caused

the disparate results pre- and post-█████ is vanishingly small.[81]  *See* Appendix E, 220.

221.    Thus, the relationships between prices and order flow variables differ materially

between before ████████ and afterwards.  Moreover, order flow explains little of the post-

████ period price movements, and the magnitudes of the non-order flow price movements

during  this  period  were  substantially  greater  than  prior  to  ████  These  differences  are

understandable given the facts laid out in the chronology *supra* and support the findings of the

TVP-VAR model.

### C.    The Cumulative Impact of Order Imbalances on the May and May-June Spread Prices

222.    The  estimated  parameters  from  the  TVP-VAR  can  be  applied  to  the  April  20,

2020 data to quantify the cumulative impact of order imbalances on prices.   Doing so requires

"identifying  restrictions."   In  essence,  these  restrictions  "identify"  the  causal  relationships

between variables in the system.[82]

223.    Market  microstructure  theory  motivates  the  restrictions  in  the  present  case.

Specifically,  microstructure  theory  implies  that  trades  can  cause  contemporaneous  price

movements, but price movements do not contemporaneously cause trades.[83]   In VAR settings

with one order flow variable this justifies an identifying ordering of the variables that places the

order flow variable in the first row.   Here, the Trading Defendants traded the May Crude Oil

futures, the May-June Crude Oil spread, and the May-July Crude Oil spread.   Each of these

variables could have impacted prices, so this approach must be augmented.

---

[81] To put things in perspective, there have been about $5 \times 10^{12}$ days since the beginning of the universe.

[82] See Hamilton, *supra* note 57 and Kilian and Lutkepohl *supra* note 70.

[83] *See e.g.*, Michael J. Fleming, Bruce Mizrach, and Giang Nguyen, *The Microstructure of a Treasury ECN: The BrokerTec Platform*, 40 J. of Fin. Markets (2018) 2.

224.    The details of the augmented identification method are in Appendix C.  The basic idea can be explained relatively simply.  The TVP-VAR produces time varying estimates of the variance-covariance matrix of the "shocks" in the model.  The variance-covariance matrix can be used to determine the coefficients of a projection (in essence, a regression) of the price change variables in the model on the order flow variables.  These coefficients capture the combined effect of all the order flow variables on all the prices, assumes that order flows cause price movements and not *vice versa*, and accounts for the relationships (including causal relationships) between the order flow variables.  The product of the coefficients at time $T$ on the observed order flow variables at $T$ quantifies the price changes caused by the time-$T$ order flows.

225.    The β coefficients imply that time-$T$ order flows and price movements caused by these order flows affect future price movements and order flows.  Given time-$T$ order flows and the time-$T$ price movements these order flows cause, the time-$T$ β coefficients can be used to calculate the future price and order flow changes caused by the time-$T$ order flows.  These time-$T$ and future price changes can be cumulated to calculate the total price impact of time-$T$ order flow imbalances.  The sum of these price impacts across all $T$ (from ▮ to ▮▮▮ measures the price impact of order imbalances at each time during this period.

226.    Figure 13 depicts the total price impact of order flow imbalances at each time ▮ ▮▮▮  The figure has three lines.  The blue line is the impact of order imbalances in the May future, the May-June spread, and the June futures on the price of the May contract.  The red line is the impact of order imbalances in the May future, the May-June spread, and the June futures on the price of the May-June spread.  The green line is the impact of order imbalances in the May future, the May-June spread, and the June futures on the price of the June contract.  *See* Appendix E, 226.

Highly Confidential



227.    The figure demonstrates that the cumulative order imbalances from ▮▮▮ to ▮▮

▮▮ on May 20 caused all these prices to decline throughout this period.  By ▮▮▮▮▮ the

cumulative order imbalances had caused the May price to fall by ▮▮▮▮/bbl, the May-June

spread to fall by ▮▮▮▮▮/bbl, and the June price to fall by ▮▮▮▮/bbl. This includes the impact of

the Trading Defendants transactions, which I will now discuss in detail.  *See* Appendix E, 227.

**D.      The Impact of Trading Defendants' Trades on the May and May-June
Spread Prices**

228.    The foregoing analysis estimates the impact of all order imbalances on the prices

of the May futures and May-June spread.  The same methodology can be employed to estimate

the impact on prices of the Trading Defendants' aggressive trades alone.  Since as I will show

Highly Confidential

*infra* that their aggressive trades were uneconomic, the resulting price impacts are measures of price artificiality—*i.e.*, the price movements that occurred as the result of Defendants' uneconomic conduct up through ██████████

229. The methodology is identical to that performed *supra*. The Trading Defendants' aggressive trades are input into the model. Combined with the coefficients in the model and the identifying assumptions, these aggressive trades measure the price movements caused by these trades from the time of the trade until ████████ The running total (cumulating sum) of these price movements measures the total (cumulative) impact of Defendants' aggressive trades and prices for each time interval.

230. Figure 14 presents the price artificiality thus estimated. *See* Appendix E, 230.



Highly Confidential

231.  ████████████████████████████████████████████



This does not include the effect of any price movements associated with ████████ *See* Appendix E, 231.

232.  To put these declines in perspective, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████.

*See* Appendix E, 232.

## VII. Trading Defendants' Conduct and the ████████████████████ in the May Crude Oil Futures Market

233.  As noted *supra*, (a) there are substantial differences in market dynamics before and after ████████████████████ and (b) the May Crude Oil futures market experienced a price decline analogous to ████████ during this period.

234.  As also noted *supra*, the market microstructure literature has identified order flow "toxicity"—that is, large and persistent order flow imbalances in one direction—as the likely cause of ████████████████████████.

235.  The most widely used measure of order flow toxicity in the academic literature is called the Volume-Synchronized Probability of Informed Trading—"VPIN"—and is based on a ratio of the absolute value of order flow imbalance to trading volume.[85]  In essence, a high value

---

[84] ████████████████████████████████████████████
████████████████████████████████████████████

[85] See Easley et al *supra* note 27.  This measure is derived from the Probability of Informed Trading ("PIN") developed in D. Easley, N. M. Kiefer, M. O'Hara, and J. Paperman, Liquidity,

Highly Confidential

of VPIN means that a high fraction of the trading volume is attributable to informed trading. Informed trading creates adverse selection. As noted *supra*, acute adverse selection risk can result in large price movements and large declines in liquidity (especially on the side of the imbalances), and in some circumstances can lead trading to break down altogether.[86]

236. VPIN has been called ███████████████████████████████

████[87]

237. I have implemented a VPIN analysis for April 20, 2020 for the May Crude Oil futures and the May-June Crude Oil spread (by far the most heavily traded spread involving the May contract). Figures 15 and 16 present the VPIN for the May Crude Oil futures and May-June Crude Oil spread, respectively. The figures depict the VPIN based on all trading activity (in blue) and on Trading Defendants' trading alone (in red). *See* Appendix E, 237.

████████

---

information, and infrequently traded stocks, 51 *J. of Fin.* (1996) 1405. It is specifically adapted to measure the probability of informed trading in electronic markets with high volumes and a high rate of transactions. The data available to Easley *et al* require them to employ an algorithm to identify aggressive transactions. I do not need to deploy their algorithm or any other because CME determines and identifies the aggressor in each transaction.

[86] In essence, VPIN is a volume-scaled measure of order imbalance. Calculation of VPIN requires the choice of various parameters, notably the size of volume "buckets." The results for 20 April 2020 are not materially dependent on the choice of these parameters. Moreover, unscaled order imbalances exhibit similar patterns. Thus, the conclusions that (a) there were large sell order imbalances on 20 April 2020, (b) these imbalances varied over time, (c) the May-June spread imbalance grew starting around ████████ and peaked around ████████ (d) TD were large contributors to these imbalances, and (e) the TD contribution to order imbalances increased throughout the day on 20 April 2020 are independent of the methods for calculating order imbalances.

[87] ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

Highly Confidential



Highly Confidential



238. The figures indicate that ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████ *See*

Appendix E, 238.

239. ████████████████████████████████████

██████████████ And again, the academic literature on ████████████

██████████████████████

240. Moreover, ██████████████████████████████████

████████ Figures 17 and 18 depict ██████████████████████

██████████████████████████████████████████████████████

Highly Confidential

*See* Appendix E, 240.



Highly Confidential



241. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ *See* Appendix E, 241.

242. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

243. ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Highly Confidential



*See* Appendix E, 243.

244.

*See* Appendix E, 244.

245.    Figure 19 illustrates this

*See* Appendix E, 245.

Highly Confidential



246.    Figure 19 indicates that ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

247.    Figure 20 presents more economic evidence of ████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Highly Confidential

██████████████████████████████████████████

████████████████████████████████████ *See* Appendix E, 247.

████████



248.    ███████████████████████████████████ Moreover, ███████

████████████, even small transactions can have large price effects.

249.    ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████ *See* Appendix E, 249.

Highly Confidential

250.     With respect to the May Crude Oil futures contract, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████        ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████     *See* Appendix E, 250.

251.     Furthermore, with respect to the May Crude Oil futures contract, ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████     *See* Appendix E, 251.

252.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████     *See* Appendix E, 252.

253.     With respect to the May-June Crude Oil spread, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



*See* Appendix E, 253.

254.    Furthermore, with respect to the May-June Crude Oil spread,

*See*

Appendix E, 254.

255.

*See* Appendix E, 255.

256.

*See*

Appendix E, 256.

257.

Highly Confidential



258.

*See* Appendix E, 258.

259. Thus,

## VIII. The Breakdown of the Normal Relationship Between CME and ICE Prices Provides Further Economic Evidence of a Flash Crash

260. The Intercontinental Exchange ("ICE") traded a cash settled WTI contract that was inextricably linked to the CME (NYMEX) Crude Oil Futures contract. The ICE contract is often referred to as a "NYMEX lookalike."

261. The inextricable linkage under normal market conditions between the CME Crude Oil Futures and the ICE WTI Crude Futures exists because of the design of the latter contract.[88]

---

[88] *See* https://www.ice.com/products/213/WTI-Crude-Futures.

Specifically, the ICE WTI Crude Futures contract expires on the day before the last day of trading of the CME Crude Oil Futures contract for the same contract month. ICE sets the final settlement price of the WTI Crude Futures equal to the CME Crude Oil Futures price on the penultimate day of trading of the CME Crude Oil Futures contract. Thus, on 20 April 2020, ICE set the May 2020 WTI Crude Futures settlement price equal to the settlement price of the May 2020 Crude Oil Futures contract on that date.

262. The convergence to the same price at expiration links the prices *prior* to expiration: any large deviation would create an arbitrage opportunity (buy the "cheaper" contract and sell the "richer" one), under normal market conditions anyways where the risks and costs of such arbitrage transactions are small.

263. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████

264. █████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████ ██
██████████████

Highly Confidential

265. █████████████████████████████████████

████████████████████████████████████



266. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ as documented *supra*.

## IX. Trading Defendants Had Market Power in the Relevant Market and the Ability to Cause an Artificial Price

267.    As an economist, I define a relevant antitrust market (or "relevant market" hereafter) as a market defined by location, quality, and time, such that products that differ by location/quality/time are imperfect substitutes, and hence price in that market can rise without inducing extensive substitution to these alternatives.   An economist uses the definition of a relevant market as a starting point of an analysis of market power. I have been informed that as a matter of law, Plaintiff's position is that Plaintiff does not need to show the market power of the Trading Defendants. Further, my foregoing analyses show that the Vega Traders had market power, but it is not a predicate for my opinions that the TDs had market power.

268.    In this case, the relevant market is readily defined.  It is the market for May 2020 Crude Oil futures contracts and spreads referencing the May 2020 Crude Oil futures contract at or before 1:30 p.m. on April 20, 2020.  It is the relevant market because (a) it is the market in which Trading Defendants transacted, and (b) the prices in this market determined the profits earned by the Trading Defendants and the damages incurred by class members.

269.    Given the definition of relevant antitrust markets, the next step of the economist's analysis is to determine whether a firm could exercise market power in those markets.  That is, could a firm raise the price in a relevant market by withholding output in that market, or taking other anticompetitive actions (*e.g.*, raising rivals' costs)?

270.    In the present case, the conduct at issue is the sales of futures contracts in the relevant market.  At the outset, it is essential to recognize that this conduct is different than the price-distorting conduct in the traditional antitrust case.   In the traditional antitrust case, the relevant price-impacting conduct is a restriction of output (*i.e.*, withholding). That is not the case here: as in trade-based manipulation cases generally, here the Trading Defendants did not impact

prices by restricting output, but by trading too much. This means that the means of establishing market power differ between a traditional antitrust case and the present litigation.

271. In a nutshell, "market power" means the ability to affect price through conduct. A firm with market power is a price maker and not a price taker. Economically, to have market power, an entity must face a downward sloping demand curve.

272. As noted *supra*, market microstructure theory, and the extensive empirical evidence supporting it, implies that in most cases, *all* aggressive orders in markets like the relevant market here move prices. That is, the fact that aggressive orders affect prices, with aggressive buys causing prices to rise and aggressive sales causing prices to fall, means that every market participant has some market power. The price impact scales with the size of the transaction: bigger transactions have bigger price impacts. Crucially, the dollar magnitude of price impact of a given transaction does not depend on what *share* of total transactions that given purchase or sale represents.

273. A simple example illustrates this point. Consider a standard model of market microstructure: the Kyle model.[89] In this model, price changes are a linear function of net order flow (the difference between market order buys and market order sells). Assume the "price impact coefficient" is .1, meaning that a one-unit order imbalance causes the price to move by 10 cents. A given trader's purchase of 10 units would cause price to be higher by $1.00 relative to what it would have been but for that purchase regardless of the number of purchases and sales made by others. Thus, in this example *every trader* faces a demand curve with a slope of .1.

274. This result is an artifact of the anonymity of the trading process in centralized financial exchanges including the relevant market here. Due to anonymity market participants

---

[89] Albert S. Kyle, Continuous Auctions and Insider Trading, 53 Econometrica (1985) 1315.

Highly Confidential

cannot determine whether a particular order is submitted by a trader who is likely to be informed or not. Therefore, even uninformed orders move prices.

275. Indeed, as noted *supra*, this fact is exactly what makes trade-based manipulation possible. A trade-based manipulator can move prices in one instrument to benefit a related position because market participants do not know that the manipulator's orders are uninformed and in fact manipulative and thus the manipulator's orders move prices even though they are not informed.

276. Plaintiff's Counsel has informed me that market power can be proven by either direct or indirect evidence. The indirect analysis conventionally involves calculating a firm's market share in the relevant antitrust market, with the presumption that a firm with a small share cannot raise price but a firm with a large share can. The direct analysis uses empirical techniques to determine whether a firm can raise price by the conduct at issue.

277. Indirect market share-based tests are completely inapposite here. They assume that the price moving conduct at issue is a restriction of output as in a textbook monopoly model or Cournot model. Depending on the nature of strategic interactions between sellers in markets, firms with large market share may be able to increase prices by restricting output, but firms with small market shares may not.

278. But output restriction is *not* how market power is exercised in a trade-based manipulation. Instead, a trade-based manipulator exercises market power by selling or buying too much, not by selling too little.

279. Direct evidence is appropriate, and arguably necessary, to demonstrate market power in a trade-based manipulation such as that alleged here.

280.    The TVP-VAR model results provide that direct evidence for the relevant market in this case.



281.    Although the direct evidence provided by the TVP-VAR is sufficient to demonstrate the Trading Defendants' market power, it may be worth noting that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ As noted *supra*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *See* Appendix E, 281.

282.    As shown *supra*, a profitable TAS-based trade-based downward manipulation requires that sales of the instrument underlying the TAS must have a larger impact on prices than purchases of the TAS.  I have estimated a version of the TVP-VAR model that includes TAS order imbalances as a variable in the VAR system.  The results of this version of the model demonstrate that the impact of TAS order imbalance on May Crude Oil futures prices was approximately an order of magnitude smaller than the impact of order imbalances in May Crude Oil futures and spreads thereon.  Therefore, the necessary conditions for a profitable trade-based

---

[90] The regressions in Section VI.B provide further direct evidence of market power.

Highly Confidential

manipulation of May Crude Oil futures and spreads thereon existed on April 20, 2020.[91]   The regression analysis *supra* provides additional econometric evidence that TAS order flow did not materially impact the prices of May Crude Oil Futures or spreads referencing May Crude Oil Futures.

283.    Thus, the economic evidence produced herein demonstrates that the Trading Defendants had market power and hence had the ability to cause prices to be "artificial," *i.e.*, to depart from the prices that would prevail in a competitive, unmanipulated market.

## X.    Trading Defendants' Trading Was Uneconomic and Corresponded Exactly to The Economic Definition of Manipulative Conduct

284.    Trading Defendants' conduct was uneconomic.  That is, their trading conduct was not consistent with economically beneficial speculative, hedging, or market making behavior. Indeed, their conduct coincided exactly with trade-based manipulative conduct described *supra*.

285.    Recall that a trade-based manipulation to depress prices involving the use of TAS contracts involves the following elements.  First, the purchase of TAS contracts.  Second, the sale of the instruments underlying the TAS contracts.  To maximize price impact, sell the underlying instruments aggressively, that is, by taking liquidity.

286.    This is exactly what the Trading Defendants did.

---

[91] There is other economic evidence that strongly suggests that orders in the Crude Oil TAS market were less informed than orders in Crude Oil futures or spreads.  Specifically, ███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ *See* Appendix E, 282, Fn. 91.

Highly Confidential



287.  Moreover,

*See* Appendix E, 287.

288.

*See* Appendix E, 288.

289.

*See* Appendix E, 289.

---

[92] Moreover,

Highly Confidential

290. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ *See* Appendix E, 290.

291.   Thus, ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

292. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████.

*See* Appendix E, 292.

293. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ *See* Appendix E, 293.

294.   Figure 22 depicts ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

Highly Confidential

████████████████████████████████████████████████████

*See* Appendix E, 294.

**Figure 22**

---

[93] The probability density is estimated using a kernel smoother.

Highly Confidential



Highly Confidential

295. 

*See*

Appendix E, 295.

296. Thus, Trading Defendants traded precisely how a theoretical manipulator would trade,

297. Moreover,

Figure 23 depicts

*See* Appendix E, 297.

Highly Confidential



298.

Highly Confidential



*See* Appendix E, 298.

299.

*See* Appendix E, 299.

300.

301

*See* Appendix E, 301.

302. Moreover,

. *See* Appendix E, 302.

303. As a result,

Highly Confidential

*See* Appendix E, 303.

304.

Appendix E, 304.

305.

*See*

Appendix E, 305.

306.

Highly Confidential

307. With respect to the May Crude Oil futures contract, ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████ *See* Appendix E,

307.

308. Furthermore, with respect to the May Crude Oil futures contract, ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ *See*

Appendix E, 308.

309. ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████ *See*

Appendix E, 309.

310. With respect to the May-June Crude Oil spread, ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Highly Confidential



*See* Appendix E, 310.

311.    Furthermore, with respect to the May-June Crude Oil spread

*See* Appendix E, 311.

312.    Thus,

313.

*See* Appendix E, 313.

314.

Highly Confidential

███████████████████████████████████████████████████████ *See*

Appendix E,314.

315.    The foregoing analysis implies that Trading Defendants did not make markets in—that is, supply liquidity to—to the TAS markets for May Crude Oil futures or Crude Oil futures spreads involving the May contract, or the markets for May Crude Oil futures or Crude Oil spreads involving the May contract. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

316.    The trading patterns of the Trading Defendants are also inconsistent with the hedging of pre-existing exposures to crude oil prices, or crude oil spreads.  Such exposures would include, for example, inventories of crude oil or positions in over-the-counter instruments referencing Crude Oil futures prices.  A firm hedging such exposures would have been a net purchaser or seller in the futures market, and their net purchases or sales would have been large relative to their gross purchases or sales.  However, Trading Defendants' purchases of Crude Oil TAS contracts referencing the May contract almost exactly balanced their sales of Crude Oil contracts referencing the May contract.  Thus, they were not plausibly hedging any other exposure.

317.    Moreover, Trading Defendants were not involved in physical crude oil producing, refining, or trading.  Nor were they participants in the market for over-the-counter crude oil derivatives.  Thus, they had no physical or OTC crude oil market exposures to hedge using Crude Oil futures contracts.

318.    Relatedly, some market participants use TAS contracts to hedge exposures to settlement prices. For example, a financial institution offering a retail investment product that is

Highly Confidential

priced or marked-to-market using settlement prices might use a TAS contract to hedge the price exposure inherent in the investment product. Trading Defendants had no such contractual exposures, and in any event, their trading was not consistent with hedging such exposures. A hedger of an exposure to settlement prices would trade the TAS contracts alone, and not engage in ███████████ offsetting transactions in the underlying futures contracts.

319.     Another uneconomic aspect of the Trading Defendants' trading behavior that has direct implications for ████████████████████████████████████████████ ███████████████ is their failure to trade the ICE NYMEX lookalike contract when it was more favorably priced than the May 2020 CME Crude Oil Futures contract. As noted *supra*, the ICE May 2020 WTI Crude Futures price exceeded the CME May 2020 Crude Oil Futures price by a large and increasing amount after 1:00 p.m. Therefore, selling the ICE contract was more economically attractive than selling the CME contract: in essence, the Trading Defendants were selling low, rather than selling high, which competitive, non-manipulative traders would not do. That is, traders not engaged in manipulation would have rationally chosen to sell the ICE contract rather than the CME contract. Indeed, it would have been profitable for the Trading Defendants to buy CME contracts and sell ICE contracts. Moreover, if the Trading Defendants truly wanted to offset the exposures they had assumed by buying CME Crude Oil Futures TAS contracts, it would have been more profitable to do so by selling ICE contracts instead of CME contracts.

320.     Instead, traders intending to drive down the May 2020 Crude Oil Futures price to increase the value of their long TAS positions would continue to sell on the CME despite its lower price, because (a) sales on ICE would not impact the final settlement price on CME, and

Highly Confidential

(b) sales on CME would impact that price, and indeed reliably cause it to be lower.[94]  For this reason as well, the Trading Defendants' conduct was not consistent with economic conduct.

321.    In sum, Trading Defendants actions in Crude Oil futures on April 20, 2020 mirrored exactly the conduct of an entity implementing what economists define as a trade-based manipulation strategy utilizing TAS contracts.   Their aggressive sales of May Crude Oil futures and spreads involving the May contract drove down the prices of these instruments (as demonstrated by the TVP-VAR model and my other economic analyses above).  Trading Defendants benefited from these price movements.  Moreover, they profited from the ▮▮▮▮ that occurred in the last roughly ▮▮▮▮ of trading before settlement—a ▮▮▮▮ which was ▮▮▮▮

322.    Furthermore, there is no plausible non-manipulative rationale for their trading behavior.  The absence of a non-manipulative rationale for their trading combined with the close correspondence between their conduct and that of a trade-based manipulator demonstrates that their conduct was uneconomic and manipulative (*i.e.*, conduct intended to *cause* prices to move to generate a profit).

---

94 

323.    For more than 20 years, I have taught undergraduate and graduate finance courses which included as one subject compliance by financial and other firms. I have been the featured speaker at a Rome, Italy conference on comparing, among other things, United States compliance requirements with the Mat and the replacement for Mat, known as the Market Abuse Regime. I am academically familiar with steps that finance and trading firms may or should take to avoid manipulation or responsibility for manipulation of prices.

324.    I have been informed that Vega Capital had an agreement with ███████████ the 2016 Terms of Business, in which Vega Capital did: ████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ Vega_Mish_000008607.

I have reviewed that provision.

325.    I have been informed that Vega Capital had an agreement with ███████████ dated 2017. VEGA_MISH_000046822. Therein, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████  The definition of ███████████████████████

████████████████████████████████████████

████████████████████████████████████

VEGA_MISH_000046822 at 8650 and 8644-45. I have read this portion of the agreement.

326.    I have reviewed a form of contract which I understand was entered among ███████

████████████████  Vega Capital, and other Trading Defendants. Vega_Mish_000008666. I

see the reference to a ███████████████████████████████████████

█████████████████████

327.    However, I have been informed that no such ████████████████

████████████████ has been produced; and that it has been represented by counsel for Vega

Capital and Mr. Spires that ████████████████████████████████████

██████████████████████████ Because the events here happened well after Mr. Spires

acquired ownership of Vega Capital, I am inferring that, during 2019-2020, Vega Capital had no

such ████████████████████████████████████████████████

328.    I have reviewed Companies House filings dated 4/1/2021 by ██████ Among other

things, ██████ states that Adrian Spires was appointed as a director of the company; that the former

owners, ████████████████████████████ and Paul David Commins transferred

their 4 ownership shares to Adrian Spires; and that Adrian Spires "holds, directly or indirectly,

██████ or more of the shares in the company."

329.    I have reviewed the ██████████████████████ (Vega_Mish_000008666)

which refers to ████████████ and the Vega Capital letter ████████████ (Vega_Mish_000042674)

which states that ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Vega_Mish_000042674 at

42676.  It further states ██████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ Id.

Highly Confidential

330.    I have also reviewed VEGA_MISH_000043267. Specifically, I reviewed the question asked 

331.    I have never worked professionally in compliance, and do not consider myself to be a compliance expert. But I have taught and spoken on compliance matters, especially as it relates to market manipulation, for 20 years. I don't recall ever seeing a situation in which the trading firm had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

332.    I understand that neither Defendant Spires nor any person from Vega Capital has been deposed. My work on these issues is ongoing.

333.    I am in the process of investigating the Trading Defendants' trades through Vega Capital on days prior to April 20, 2020 for the purpose of determining whether Defendant Spires and Vega Capital had knowledge that the Trading Defendants ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ that they allegedly used on March 19, 2020 in the April WTI contract, and April 20, 2020. My work is ongoing.

## XI.    The Analysis Specifically Quantifies the Price Impact of the Trading Defendants' Uneconomic Conduct and Does Not Attribute to Them Price Movements Caused by Other Factors, Other Traders, or Market Developments

### A.    The Price Artificiality Estimates Only Price Changes That Occurred as the Direct Result of Trading Defendants' Uneconomic Trading

334.    The TVP-VAR model and the CME audit trail data that identifies Trading Defendants' transactions allows me to isolate the price impact of their uneconomic, manipulative

aggressive sales from the impacts of (a) the aggressive trades of other market participants, and (b) other information or factors that caused prices to change on April 20, 2020. Therefore, the artificiality estimates related to order imbalances and the price impacts thereof reflect the effect of the actions of Trading Defendants alone.

335. With respect to (a),



depicted in Figure 3

Figure 6.

336. With respect to (b), the model's three price change equations and the variance-covariance matrix of the error terms in the six equations in the system mean that the model quantifies price changes on April 20, 2020 that did not occur as the result of order flow, including order flow attributable to the Trading Defendants. The model, and the artificiality calculations based on it, do not attribute such price changes to the conduct of the Trading Defendants.

337. Thus, artificiality estimates control for price movements caused by non-Trading Defendant causes. These causes include the trades of other traders and all other non-order imbalance factors that caused price movements.

## B. Fundamental Economic Factors Cannot Explain the Price Movements on 20 April 2020

338. One hypothesis that has been advanced to explain the price collapse on April 20, 2020 is that it was due to the anticipated depressive effect of Covid-19 (and policy responses thereto) on the demand for oil, and that as a result of this demand decline storage capacity at the NYMEX Crude Oil futures delivery point of Cushing, Oklahoma would be fully utilized.

According to this hypothesis, concerns by holders of long positions that they would receive delivery of oil with no place to store it, thus they were willing to sell their positions at any price. Relatedly, according to this story, owners of oil were willing to sell at negative prices because they anticipated they would not be able to store it and hence engaged in what might be characterized as a fire sale.

339.    There are several logical problems with this explanation.  Moreover, it is not consistent with available data.

340.    One logical problem is that under the rules of the CME Crude Oil contract, shorts could deliver oil in store.  Capacity at Cushing was obviously adequate to hold oil already in store, and those taking delivery would not need to secure storage space or find a buyer for the oil. Moreover, the holders of oil already in store had no need to sell at negative prices—they could simply retain the oil in the storage they were already utilizing.

341.    Indeed, delivery of oil already in store was almost certainly adequate to satisfy any likely quantity of deliveries.  At the beginning of the April 20, 2020 trading day (which began at 5 p.m. on April 19, 2020), there were 108,593,000 barrels of open interest in May 2020 Crude Oil Futures.  Since the contract was in the process of liquidating, it was almost certain that this open interest was going to decline on April 20, 2020, and thus the upper bound on the quantity of deliveries was 108,593,000 barrels.  *See* Appendix E, 341.

342.    On the previous Friday, April 17, 2020, there were 59,741,000 barrels in store in Cushing—almost exactly one-half the open interest at the beginning of trading on April 20, 2020.  Not all these barrels were deliverable because they did not meet the quality requirements of the May 2020 Crude Oil Futures contract (*e.g.*, some barrels were sour crude rather than light

sweet crude eligible for delivery), but oil already in store was adequate to offset a substantial fraction of open interest via delivery.

343.    As noted *supra*, the starting open interest on April 20, 2020 is an upper bound on deliveries, and hence on the amount of storage space required to accommodate deliveries.  On April 20, 2020, 95,549,000 barrels of open interest in the May 2020 Crude Oil Futures contract liquidated by offset, leaving 13,044,000 barrels in open interest.  Thus, by the end of trading on April 20, 2020 the maximum number of deliveries that could have occurred on the May 2020 Crude Oil Futures contract was about 13 million barrels, far less than the amount of oil already in store in Cushing.  Thus, existing storage capacity and oil already in store was more than adequate to accommodate potential deliveries.  *See* Appendix E, 343.

344.    Indeed, most of the 95,549,000 barrels of liquidations had already occurred by the time the price of the May 2020 Crude Oil Futures contract went negative.  Of the 247,947 May 2020 Crude Oil Futures contracts traded on April 20, 2020, only slightly more than 11,000 (or about 4.5 percent) traded from the time the May 2020 Crude Oil Futures price first traded at zero to settlement at 1:30 p.m.[95]  Assuming that the same fraction of volume resulted in liquidations for the entire day and for the period in which prices were negative, by that time approximately 17,000,000 barrels of open interest in the May 2020 Crude Oil Futures contract remained. Again, this quantity could have been satisfied by oil already in storage in Cushing.  There was no prospect that deliveries would be so large that longs would not be able to find the space to store the delivered oil.  *See* Appendix E, 344.

345.    Another logical problem is that very few Crude Oil futures contracts go to delivery.  The foregoing calculations are extremely conservative in the sense that they represent

---

[95] This is the volume of trading in the May 2020 outright, the May-June spread, and the May-July spread.

the *maximum* number of contracts that could have resulted in delivery. Since further liquidations were expected to occur on the last day of trading, April 21, 2020, substantially fewer deliveries than open interest were expected, and hence oil already in store would have sufficed to make these deliveries. Thus, those holding long positions in the May Crude Oil futures contract were almost certainly going to liquidate regardless of market conditions. Their liquidations on April 20, 2020 were therefore expected. Unexpected events move prices: expected ones do not. Therefore, there was no unexpected surge of liquidations of long positions on April 20, 2020 that would have been a plausible cause of price movements.

346.    In the event, there were deliveries on only 2,427 contracts on the May 2020 Crude Oil futures contract. This represents 2,427,000 barrels of oil. This was far less than the amount of oil in store at Cushing at that time: these deliveries represented only around 4 percent of oil in store on the day that longs and shorts submitted their delivery intentions (April 22, 2020). Thus, oil in store in Cushing was more than adequate to meet demand for and supply of deliveries against the May 2020 Crude Oil futures contract. *See* Appendix E, 346.

347.    Moreover, there was no reason for those holding inventories of oil at Cushing to deliver it at negative prices rather than to continue to hold it for sale later at positive prices—which they could have secured by selling June or later-expiring Crude Oil Futures, all of which were trading at positive prices. *See* Appendix E, 347.

348.    I note that there were no deliveries at negative prices. Under CME/NYMEX rules, longs and shorts can submit delivery intentions only on the day after the last day of trading (April 21, 2020 for the May 2020 Crude Oil futures contract). Thus, the futures settlement price on the last day of trading represents the price at which deliveries occur, and the equilibrium price of delivered crude oil. This price was positive (█████/bbl).

119

349.    Even if longs had wanted to take delivery at a negative price on April 20, 2020, they could not be sure that the price would remain negative at the time they could actually stand for delivery (at the end of trading on the May 2020 Crude Oil futures contract).  Indeed, the rebound in prices after 1:30 p.m. on April 20, 2020 is most plausibly explained by a recognition by potential takers and makers of delivery that the negative price did not reflect supply and demand fundamentals.  Trading by potential makers and takers of delivery from 1:30 p.m. on April 20, 2020 through expiration could have contributed to this price increase,[96] but to the extent that it was widely recognized that the settlement price on April 20, 2020 did not represent the value of oil in store trading would not have been necessary to cause the price reversal.[97]

350.    Indeed, to the extent that aggressive sellers were longs attempting to liquidate their positions, the TVP-VAR captures their effect on prices and does not attribute the impact of their trading to TDs.

351.    It should also be noted that the ███████████ price collapse cannot be explained as the result of large liquidations, panicked or otherwise, by those holding long positions at that time who were allegedly doubtful of their ability to take delivery due to lack of storage space (or any other reason).  As noted *supra*, order flow movements (including order flows driven by liquidating longs) have virtually no power to explain price movements after ███  Moreover, there were no substantial non-TD order imbalances during this period, and hence no order imbalances that could be attributed to the liquidation of long positions, including by those who allegedly feared their inability to find storage space for deliveries.  From ██████

---

[96] For example, potential takers of delivery could have bought futures to establish a potential delivery obligation, or shorts who could make delivery could have bought futures to extinguish their delivery obligations.

[97] That is, to the extent that the divergence between the price at 1:30 p.m. on 20 April 2020 and the value of crude oil in store at Cushing was widely understood, this would have been public information and public information can be incorporated into prices without trading.

 the net order flow in the May Crude Oil Futures was only ██████ which is trivial compared to the net order flow of ██████ from 9 a.m. to 1:30 p.m.  Indeed, during the last ████ of trading prior to settlement at 1:30 p.m. the net order flow in May Crude Oil Futures was ██████.  With respect to the May-June Crude Oil Futures spread, net order flow was ████ contracts from ████████████████  However, ████████████████████████ ██████████████  Moreover, in a six second period beginning around ██████ net order flow in the May-June Crude Oil Futures spread was ████ (accounting for most of the ██████ net order flow), of which ████████████████████████████████████████ ██████████  *See* Appendix E, 351.

352.    Insofar as empirical evidence regarding alleged shortages of storage capacity at Cushing is concerned, (a) the May-June spread was already very wide prior to April 20, 2020, both in comparison to previous values and after controlling for the relationship between spreads and inventories, and (b) the front month-second month (June-July) spread was far narrower four days after April 20, 2020, and narrower than the front month-second month spread had been the business day prior to April 20, 2020.[98]  *See* Appendix E, 352.

353.    The United States Energy Information Agency ("EIA") releases reports on inventories of crude oil in the United States and at the CME Crude Oil futures delivery point of Cushing, Oklahoma each Friday.  On Friday April 17, 2020, one business day before Monday April 20, 2020, the front month-second month spread was ████.  This was the widest value of that spread during the entire 2008-2020 period except for one day—December 19, 2008, during the depths of the Great Financial Crisis.  *See* Appendix E, 353.

---

[98] In the nomenclature of spreads, the spread widens when it decreases and narrows or tightens when it increases.  For example, a movement of the spread from -$1 to -$2 represents a widening of the spread, and a -$2 spread is wider than a -$1 spread.  The movement of the spread from -$1 to $1 represents a narrowing of the spread.

354.    On Friday April 24, 2020—four days after the day at issue here—the spread was substantially narrower: ██████ Thus, during the week-long period including April 20, 2020 the front month-second month spread *narrowed*.  On balance, therefore, during the week including the price and spread collapse, market assessment of the severity of any putative shortage of storage capacity at Cushing became *less* dire, not more.  *See* Appendix E, 354.

355.    To explain the massive detour from an already wide spread of ██████ to ██████ back to ██████ would require dire information about storage conditions to arrive on Monday only to be offset by news received between Tuesday and Friday that not only contravened Monday's dire news but implied that conditions were even more favorable on that Friday than the one prior.  I have seen nothing in the record that even remotely supports this conjecture.  *See* Appendix E, 355.

356.    Moreover, even at their peak on Friday May 1, 2020 Cushing stocks were well below storage capacity at Cushing.  On May 1, 2020 Cushing stocks equaled 63,378,000 barrels.  On that date total storage capacity at Cushing totaled 92,691,000 barrels, and tank working storage capacity was 75,835,000 barrels.  Thus, on May 1, 2020 Cushing stocks occupied 68 percent of capacity.  *See* Appendix E, 356.

357.    Cushing capacity utilization was higher on numerous other dates with spreads far narrower than those observed in April-May 2020, let alone on April 20, 2020.  For example, Cushing capacity utilization exceeded 67 percent in March 2011, September 2012, March 2013, September 2015, March 2016, September 2016, March 2017, and September 2017.[99]  At the time of the highest capacity utilization in March 2017 the front month-second month spread averaged

---

[99] The EIA reports Cushing capacity and capacity utilization twice per year, in March and September.  Based on estimates of capacity interpolated from the semi-annual data, the weekly data reported by EIA imply that capacity utilization exceeded 67 percent for 97 weeks during 2008-2020.

 *i.e.*, ███████████ per barrel, or about ███████████ of the widest spread value observed on April 20, 2020.

358.    For most of the period April 10, 2015- November 10, 2017 Cushing stocks were above 60 million barrels, and often larger than their Covid-19 era peak on May 1, 2020.  Yet the spread during this period was never wider tha ███ and was usually narrower than that.  *See* Appendix E, 358.

359.    I have estimated a model that quantifies the relationship between inventories at Cushing and the front month-second month spread.  This is referred to as a "supply of storage" curve and is a relationship that is predicted by the canonical Theory of Storage.[100]

360.    Specifically, the Theory of Storage predicts that spreads should be wider the larger are inventories.  I have estimated a supply of storage curve of the relationship between spreads and inventories using EIA data on Cushing inventories and the CME Crude Oil futures front month-second month spread.  The data is weekly, and I utilize data from January 4, 2008 to December 18, 2020.  *See* Appendix E, 360.

361.    Given the non-linear nature of the relationship predicted by theory, I utilize semi-parametric methods that are appropriate for estimating such general non-linear relationships.

362.    The model validates the predicted relationship between spreads and inventories, as demonstrated in Figure 24.  However, the relationship is relatively weak: spreads do not widen substantially when inventories increase.  For example, according to the fitted model, when inventories are around 25 million barrels, the predicted spread is around 50 cents.  When

---

[100] Holbrook Working, Price Relations Between July and September Wheat Futures at Chicago Since 1885, 9 WHEAT STUDS. (1933). Craig Pirrong, COMMODITY PRICE DYNAMICS: A STRUCTURAL APPROACH (2011); Brian Wright and Jeffrey Williams, STORAGE AND COMMODITY MARKETS (1991).

Highly Confidential

inventories are 65 million barrels, the predicted spread is around -80 cents. *See* Appendix E, 362.

**Figure 24**



363.    The model implies that on April 17, 2020 the front month-second month spread was already far wider than would be predicted based on Cushing inventories on that date and the fitted relationship. Specifically, the model implies that the spread was ███ wider than expected conditional on inventory levels on that date. On April 24, the model implies that the spread was ███ wider than expected conditional on inventories. On May 1—when Cushing inventories reached their peak—the model implies the spread was ███ wider than expected conditional on inventories. All these deviations are unlikely to have occurred by chance in a competitive

Highly Confidential

market.  The *p*-value for April 17, is $1.9 \times 10^{-19}$; for April 24, it is $1.7 \times 10^{-5}$; and for May 1, it is .025.[101]  *See* Appendix E, 363.

364.    There are many weeks in the data used for estimation in which inventories were larger than their Covid-19 era peak value yet spreads during these periods were far narrower than observed between April 17, 2020- May 1, 2020.  *See* Appendix E, 364.

365.    Therefore, spreads were already very wide given inventory levels prior to April 20, 2020.  This means that market participants were already incorporating expectations of extremely tight storage conditions into prices immediately before April 20, 2020, and if anything, they had overreacted to storage conditions: in previous periods Cushing storage was utilized more extensively yet spreads were far tighter.

366.    The pronounced widening of the spread occurred starting March 19, 2020.  Except for a modest reversal on March 31 -April 6, 2020, the spread widened progressively from March 19 until April 14.  *See* Appendix E, 366.

367.    This widening of the spread corresponds to the imposition of lockdowns due to Covid-19.  This is illustrated by mobility data that demonstrates that Americans dramatically reduced their visits to retail and recreational outlets due to the lockdowns, as shown in Figure 25. *See* Appendix E, 367.

**Figure 25**

---

[101] A model based on capacity utilization produces similar results.

Highly Confidential



368. Note that the sharp decline in mobility ceased around March 24, 2020, and mobility remained roughly constant until around April 19, 2020, when it began an upward trend that continued through early July. Thus, the worst of the initial Covid-19 shock had ended by April 20, 2020 and actually had started to reverse by that date.

369. There is evidence that suggests that this economic rebound was anticipated well prior to April 20, 2020. From March 2 - March 23, 2020, S&P 500 (eMini) futures prices fell from 3059 to 2252—a decline of almost 26 percent—reflecting the expected effect of Covid-19 and lockdowns on economic activity. Starting on March 24, 2020, the U.S. stock market began to rally: by April 17, 2020 (the Friday before the day of interest here), the eMini futures price had risen to 2870—a 27 percent increase off its post-lockdowns low. Thus, demand conditions were objectively improving as of April 20, 2020, and the reversal of the stock market prior to the

126

low ebb of American mobility indicates that this improvement was widely anticipated. *See* Appendix E, 369.

370.    I have also evaluated data on Cushing storage provided by ███████ Unlike EIA data, this data is available on a daily basis, and reports amounts in store in each individual tank at Cushing. This data indicates that there was still a substantial amount of storage space at Cushing on April 20, 2020. *See* Appendix E, 370.

371.    The ███ data reports not just "shell" capacity, but "working" capacity. Working capacity adjusts for operational limitations on storage tanks. The ███ methodology for estimating working capacity is based on a tank-by-tank analysis of historical data. ███ also reports the amount of oil held in each tank at Cushing. On April 20, 2020, storage tanks at Cushing were operating at only ██ percent of working capacity. This figure comports closely with the EIA data analyzed *supra*. *See* Appendix E, 371.

372.    The ███ indicate that oil in store at Cushing had been increasing in the weeks leading up to April 20, 2020. At the beginning of March 2020, only ██ percent of capacity was utilized. This figure grew steadily through March and April. Crucially, however, the rate of increase had begun to decline by April 20, 2020. Thus, whereas only a pronounced acceleration in the trend of storage capacity utilization would have resulted in the complete utilization of Cushing capacity after April 20, 2020, the trend was actually decelerating.

373.    The storage analysis *supra* focuses on Cushing, but Cushing is connected via pipeline to other locations where oil was and could be stored. These include locations in the "Midcontinent" ("PADD 2") and the U.S. Gulf Coast ("PADD 3"). Just as oil storage levels at Cushing were below previous historical highs, storage levels in PADD 2 and PADD 3 in mid-to-

Highly Confidential

late April 2020 were also below or near historical highs. This demonstrates that there was storage capacity available outside Cushing. *See* Appendix E, 373.

374. There is a futures market and a spot market for storage space at the LOOP storage facility in Louisiana. The price of May 2020 LOOP storage futures did increase in April 2020, but reached a maximum of only ███/bbl/month. Such a storage cost cannot explain a one-month futures spread two orders of magnitude larger. The June LOOP storage futures price also reached a maximum of ███/bbl/month but began to decline in early-May 2020.

375. Cushing is also connected *via* pipeline (the Seaway and Cushing Marketlink pipelines) to locations on the Gulf Coast from where crude oil was exported in 2020. Exports represented another use for crude oil shipped to Cushing in addition to domestic storage or refining. The Brent crude oil futures price represents a measure of the price of crude oil in the export market for U.S. crude. The spread between Brent and West Texas Intermediate crude at Cushing is a measure of the cost of transforming crude at Cushing to oil for sale in the export market that provides an estimate of the value of oil in Cushing.

376. During the period of declining mobility (due to lockdowns), the Brent-WTI spread averaged ███, indicating a transformation cost of approximately this amount. On April 20 -June 2020 Brent crude futures price settled at ███ and the July 2020 Brent crude futures price settled at ███. Netting out a cost of ███ per barrel from these prices indicates a value of WTI of between ███ and ███. Brent prices were somewhat lower on 21 April ███ for the June and ███ for the July). Even at these lower prices, the "netback" export value of WTI was still well above zero, and certainly far above ███. Thus, even despite the worldwide Covid-19-driven demand decline for crude oil there was a market for WTI at Cushing at values well above zero. *See* Appendix E, 376.

377.    In particular, given this market opportunity, there was no economic reason for owners of crude oil in store in Cushing or being transported *via* Cushing to sell at a negative price: they could have sold it for export at a positive price.  This is further economic evidence that fundamental supply and demand conditions cannot explain the dramatic drop the price of, and the negative price of, the May 2020 Crude Oil Futures contract on April 20, 2020.

378.    In sum, the hypothesis that storage conditions in Cushing caused the price and spread collapse on April 20, 2020 is logically flawed and empirically unsupported.  Indeed, the empirical relationship between inventories and spreads from 2008 to 2020 implies that spreads were already wider than justified by inventory conditions on April 17, 2020.  Further, there was no public information on April 20, 2020—and particularly during the period ███████-1:30 p.m.—that would explain a massively greater deviation from the empirical relationship on that day.  Similarly, there is no empirical evidence to support the hypothesis that fundamental conditions in the oil market generally caused the price and spread collapse on that date.

379.    To the extent that additional private information regarding fundamental conditions, including storage conditions at Cushing, arrived during the April 20, 2020 trading day, that information likely motivated those possessing that information to trade.  In that event, order flow and order imbalances would have reflected that information that was related to supply and demand conditions, including storage conditions at Cushing.   The TVP-VAR model accounts for that.

380.    Indeed, if anything, the model implies that non-order flow-related information that arrived prior to ████████ was bullish: the actual price decline from 9 a.m. to ████████ was smaller than the price decline attributable to order flow (including TD's uneconomic order flow). *See* Appendix E, 380.

381.    Therefore, the ▮▮▮▮▮▮▮ price movements are instead best understood as "endogenous volatility" characteristic of a ▮▮▮▮▮▮ Such crashes occur because of the trading process itself, rather than as the direct result of the arrival of public information related to supply-demand fundamentals.

382.    These ▮▮▮▮▮▮ price movements include both the large price decline that commenced around that time and the subsequent recovery in prices described *supra*.  Just as there was no public information about storage conditions at Cushing arriving at ▮▮▮▮▮., no "corrective" information arrived during the period in which prices rose after approximately 2:34 p.m.

383.    The extraordinary nature of the price change and the reversal provide compelling economic evidence that the price movements that occurred starting around ▮▮▮▮▮▮ were the result of endogenous volatility, rather than any shock to supply-demand fundamentals or the release of information related thereto.

384.    From January 2, 1985 through March 31, 2020, the largest absolute daily change in the front month Crude Oil futures was ▮▮▮.  In contrast, the change in the May Crude Oil futures contract on April 20, 2020 ▮▮▮—more than ▮ times the largest daily price change ever observed in the history of Crude Oil futures trading, and most of which occurred in a five-minute period.  From January 2, 1985 through March 31, 2020, the largest absolute daily change in the front month-second month Crude Oil spread was ▮▮▮  In contrast, the change in the May-June Crude Oil futures spread on April 20, 2020 ▮▮▮—almost ▮ times the largest spread move ever observed in the history of Crude Oil futures trading, and most of which occurred in a five-minute period.[102]  *See* Appendix E, 384.

---

[102] The differences are even more pronounced in percentage terms.

385.    The price and spread reversals from April 20, 2020 to April 21, 2020 are even more extreme when measured against the historical record.  I measure the spread reversal by the product of the price change (or spread change) on a given day and the price change (or spread change) on the next day.  These products will be negative if there is a price reversal.

386.    The minimum price reversal product from January 2, 1985 through March 31, 2020 was ███.  In contrast, the price reversal on April 20, 2020 was ████████ times larger than the largest price reversal on record.  The minimum spread reversal product from January 2, 1985 through March 31, 2020 was █████  In contrast, the price reversal on April 20, 2020 was ████████ times larger than the largest price reversal on record.  *See* Appendix E, 386.

387.    Thus, the most extreme fundamental information that arrived in the entire previous history of Crude Oil Futures trading—including the Iraqi invasion of Kuwait on August 2, 1990, the commencement of the allied bombing campaign in Kuwait and Iraq on January 16, 1991, 9/11, and the Great Financial Crisis—resulted in price changes and reversals far smaller than observed on April 20, 2020.  It is therefore extremely unlikely that information regarding supply or demand shocks arrived on April 20, 2020, and in particular between ████████ and ████████ that caused the massive price and spread decline observed then.  Instead, the most reasonable conclusion is that the price decline on that day and in those minutes was the result of a ████████ resulting endogenously from the trading process itself.

388.    As the analysis *supra* demonstrates, moreover, the Trading Defendants were the biggest single influence on the trading process on April 20, 2020, and during the last half-hour and last five minutes of trading on that day.  That is, they were the biggest single influence on

the trading process up to and including the period in which a price crash resulting endogenously from the trading process occurred.

## XII.    Damages Caused by Trading Defendants' Uneconomic Conduct

389.    The estimates of the impact of Trading Defendants' aggressive selling on the prices of Crude Oil futures and spreads—that is, the estimates of the artificiality in these prices— can be used in a formulaic way to calculate the damages incurred by each class member because of the Trading Defendants' conduct.

390.    The overall methodology is quite straightforward.  A class member suffered harm if s/he sold at a price that was artificially low due to the Trading Defendants' uneconomic aggressive sales.  The CME has produced ██████████████████████████████████ ████████████████████████████████████.  The damage suffered by a Class member on a particular sale is determined by multiplying the quantity of May Contracts by the artificiality at the time of said sale.  A Class Member's total losses from sales at artificially low prices is the sum of the losses on all individual sales.  If a Class Member that sold also purchased during the relevant period when Trading Defendants had artificially depressed prices, s/he gained on those purchases as a result of Trading Defendants' uneconomic conduct.  Net damages for a Class Member are determined by subtracting the Class Member's said gains (if any) on purchases from artificially low prices from the Class Member's losses on sales at artificially low prices.

391.    For the period 9 a.m.-1:30 p.m, the TVP-VAR-derived artificiality estimates depicted in Figure 14 can be used to determine the amount of artificiality in a transaction at the price time the transaction took place.  It is my understanding that the Class is limited to transactions that occurred between 9 a.m. and 1:30 p.m. on April 20, 2020.

392.    Since (a) Class Members are limited to those who sold May Crude Oil Futures contracts between 9 a.m. and 1:30 p.m. on April 20, 2020, and (b) May Crude Oil Futures prices were artificially low during this period, all Class Members suffered an injury, in the sense that they sold at an artificially low price.

393.    Damages on TAS transactions can be calculated by multiplying the artificiality estimated for 1:30 p.m. by the quantity of a TAS sale.

394.    Damages attributable to the ███████████████ can be calculated similarly.  Specifically, the price artificiality attributable to any transaction occurring during the ███████ can be calculated formulaically by taking the difference between prices at ██████ ████████████████ and the price at the time of the transaction████████████ ██████████ This includes TAS transactions that remained open at 1:30 p.m. because these transactions were settled at the final settlement price (determined at 1:30 p.m.).

395.    I have employed this methodology to calculate the net damages incurred by Plaintiff Robert Mish.  Mr. Mish bought ██ May 2020 Crude Oil Futures at█████████ and closed his position by selling ██ contracts at █████████ He purchased these contracts at artificiality equal to █████ and sold them at artificiality of █████████ This caused him to incur damages of ██████.[103]  *See* Appendix E, 395.

396.    This calculation can be performed in an identical way for each Class Member based on their trading records. Based on my analysis of CME audit trail information, I have determined that ██████ accounts meet the Class Definition.

397.    It is my understanding that whether damages thus calculated must be offset by gains on other transactions (*e.g.*, purchases of physical crude oil at artificially low prices) is a

---

[103] ████████████████████████████████

Highly Confidential

legal issue, and that the Plaintiff argues that no such offsets are required. However, in the event the Court determines that such offsets are appropriate, they can be calculated formulaically based on information provided by Class Members at the Proof-of-Claim stage of the litigation.

## XIII. Trading Defendants' Profits From Their Uneconomic Conduct

398. I have estimated the profits the Trading Defendants made as a result of their uneconomic conduct on April 20, 2020.

399. Based on CME audit trail information, I estimate that the Trading Defendants made ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See* Appendix E, 399.

400. Based on ICE transaction data, I estimate that Trading Defendants made ████████████████████████████████████████████████████████████████████████████.[104] *See* Appendix E, 400.

401. Thus, the Trading Defendants made at least ████████████ as a result of their uneconomic trading on April 20, 2020. *See* Appendix E, 401.


I reserve the right to amend, modify, or supplement this report.

May 09, 2024                                */s/ Craig Pirrong*
                                           Dr. Craig Pirrong

---

[104] I say "at least" because ICE trading records ████████████████████████████████████████████████████████████████████████████████████████████████████████

**Appendix A**

# CRAIG PIRRONG

Professor of Finance
Director, Global Energy Management Institute
Bauer College of Business
University of Houston
Houston, TX 77204
713-743-4466
cpirrong@uh.edu

## EDUCATION

Ph.D., UNIVERSITY OF CHICAGO, December, 1987.
　　　Thesis:  An Application of Core Theory to the Study of the Organization of Ocean
　　　　　　Shipping Markets.

M.B.A., UNIVERSITY OF CHICAGO, March, 1983.
　　　Concentrations in finance, economics and econometrics.

B.A., THE UNIVERSITY OF CHICAGO, June, 1981.
　　　Major in economics.

THE UNITED STATES NAVAL ACADEMY, July, 1977-August, 1979.

## EMPLOYMENT

BAUER COLLEGE OF BUSINESS, UNIVERSITY OF HOUSTON, Houston, TX.  Professor
　　　of Finance and Director, Gutierrez Energy Management Institute, 2003-present.

COMMODITY FUTURES TRADING COMMISSION, Washington, DC.  Consultant, Office of
　　　the Inspector General, 2023-2024.

OKLAHOMA STATE UNIVERSITY, Stillwater, OK.  Watson Family Professor of Commodity
　　　and Financial Risk Management and Director, Center for Risk Management, 2001-2003.

WASHINGTON UNIVERSITY, OLIN SCHOOL OF BUSINESS, St. Louis, MO.
　　　Assistant Professor of Finance, 1996-2001.

UNIVERSITY OF CHICAGO, GRADUATE SCHOOL OF BUSINESS, Chicago,
　　　IL. Visiting Assistant Professor of Finance (October, 1994-August, 1996).

UNIVERSITY OF MICHIGAN, SCHOOL OF BUSINESS ADMINISTRATION,
　　　Ann Arbor, Michigan.  Assistant Professor of Business Economics and Public
　　　Policy (January, 1989-June, 1996).

LEXECON, INC., Chicago, Illinois.  Economist (November 1987-December, 1988).

GNP COMMODITIES, Chicago, Illinois.  Senior Investment Strategist (1986-1987).

**PUBLICATIONS**

**Articles**

"Strategic Trading and Manipulation in Trade at Settlement Contracts," *Journal of Futures Markets*, 2023.

"Supply, Demand, and Risk Premiums in Electricity Markets," with Kris Jacobs and Yu Li.  *Journal of Banking and Finance*, 2022.

"Sheep in Wolves Clothing: Using False Signals of Demand to Execute a Market Power Manipulation." *Journal of Futures Markets*, 2022.

"Apocalypse Averted: The COVID-Caused Liquidity Trap, Dodd-Frank, and the Fed."  *Journal of Applied Corporate Finance*, 2020.

"Oil Jump Risk," with Nima Ebrahimi,.  *Journal of Futures Markets*, 2020.

"Will Blockchain Be a Big Deal? Reasons for Caution." *Journal of Applied Corporate Finance*, 2019

"The Economics of Commodity Market Manipulation: A Survey." *Journal of Commodity Markets*, 2017.

"Liquefying a Market: Contracting Dynamics in LNG." *Journal of Applied Corporate Finance*, 2017.

"Bund for Glory, or, It's a Long Way to Tip a Market." *Journal of Applied Corporate Finance*, 2016.

"Risk Management by Commodity Trading Firms: The Case of Trafigura." *Journal of Applied Corporate Finance*, 2015.

"Pick Your Poison-Fragmentation or Market Power? An Analysis of RegNMS, High Frequency Trading, and Securities Market Structure." *Journal of Applied Corporate Finance*, 2014.

"Bill of Goods: Central Counterparties and Systemic Risk." *Journal of Financial Market Infrastructure*, 2014.

"Clearing and Collateral Mandates: A New Liquidity Trap?" *Journal of Applied Corporate Finance*, 2012.

"The Cost of Collateral Management in a New CCP Environment."  *DerivSource, 2012.*

 "Competition and Vertical Integration in Financial Exchanges." *Competition Policy International*,

2011.

"The Economics of Central Clearing: Theory and Practice." ISDA Discussion Papers Series, 2011.

"Squeeze Play: The Dynamics of the Delivery End Game." *Journal of Alternative Investments*, 2011 (working paper predecessor titled "The Economics of the Manipulation End Game with Private Information About Positions").

"Energy Market Manipulation: Definition, Diagnosis, and Deterrence." *Energy Law Journal*, 2010.

"The Inefficiency of Clearing Mandates." *Cato Policy Studies*, 2010.

"Derivatives Clearing Mandates: Cure or Curse?**" *Journal of Applied Corporate Finance,* Vol. 22, Issue 3, pp. 48-55, Summer 2010.

"No Evidence?  No Theory?  No Problem!: The Inefficiency of Speculative Position Limits." *Regulation*, 2010.

"Comment on Stout, Regulate OTC Derivatives by Deregulating Them." *Regulation*, Fall 2009.

"The Clearinghouse Cure." (Lead article.) *Regulation*, 2009.

"Clearing Up Misconceptions on Clearing." *Regulation*, 2008.

"The Price of Power: The Valuation of Power and Weather Derivatives." *Journal of Banking and Finance*, 2008.

"Just Say No To Gazprom." *World Energy*, July 2007.

"The Thirty Years War." *Regulation*, 2005.

 "Detecting Manipulation in Futures Markets: The Ferruzzi Soybean Episode." *American Law and Economics Review*, 2004.

"Price Discovery and Data Hubs." *The Utility Project*, 2004.

"Got a Match?  The Right Way to Report Energy Prices." *World Energy*, 2003.

"The Case for an Independent Gas Price Repository." *World Energy*, 2003.

"Securities Market Macrostructure: Property Rights and the Efficiency of Securities Trading." *Journal of Law, Economics, and Organization*, 2002.

"Securities Market Regulation: A Twenty-five Year Retrospective." *Regulation,* 2002.

"The Clinton Regulatory Legacy: Securities Regulation." *Regulation*, 2001.

"Manipulation of Cash-Settled Futures Contracts." *Journal of Business*, 2001.

"A Positive Theory of Financial Exchange Organization." *Journal of Law and Economics*, 2000.

"The Organization of Financial Exchange Markets: Theory and Evidence." *Journal of Financial Markets*, 1999 (lead article).

"Electronic Exchanges Are Inevitable and Beneficial." *Regulation*, 1999.

"Self-Regulation of Private Organized Markets." *New Palgrave Dictionary of Economics and the Law*, 1998.

"The Inefficiency of U.S. Commodity Manipulation Law: Diagnosis and a Proposed Cure." *Research in Law and Economics*, 1997.

"Metallgesellschaft: A Prudent Hedger Ruined or a Wildcatter on NYMEX?" *Journal of Futures Markets*, 1997.

"Liquidity and Depth on Open Outcry and Automated Exchanges: A Comparison of the LIFFE and DTB Bund Contracts." *Journal of Futures Markets*, 1996.

"Price Dynamics in Physical Commodity Spot and Futures Markets: Spreads, Spillovers, Volatility and Convergence in Refined Petroleum Products," with Victor Ng. *Journal of Empirical Finance*, 1996.

"The Self-Regulation of Commodity Exchanges: The Case of Market Manipulation." *The Journal of Law and Economics*, April, 1995.

"The Welfare Costs of Arkansas Best: the Pareto Inefficiency of Asymmetric Taxation of Hedging Gains and Losses." *The Journal of Futures Markets*, April, 1995.

"Mixed Manipulation Strategies in Commodity Futures Markets." *The Journal of Futures Markets*, February, 1995.

"The Efficient Scope of Private Transactions Cost Reducing Institutions: The Case of Commodity Exchanges." *The Journal of Legal Studies*, January, 1995.

"Commodity Futures Market Regulation: The Inefficiency of the Anti-Manipulation Provisions of the Commodity Exchange Act." *Regulation*, Fall, 1994.

"Commodity Market Manipulation Law: A (Very) Critical Analysis of the Existing Doctrine and A Proposed Alternative." *Washington and Lee University Annual Review of Securities and Commodities Law*, September, 1994.

"Fundamentals and Volatility: Storage, Spreads, and the Dynamics of Metals Prices," with Victor Ng.

*The Journal of Business,* April, 1994.

"Regulation: Futures Trading and Institutional Investors." *The American Enterprise,* January-February, 1994.

"Multiple Delivery Points, Pricing Dynamics, and Hedging Effectiveness in Futures Markets for Spatial Commodities." *The Journal of Futures Markets,* August, 1994.

"Contracting Practices in Bulk Shipping Markets: A Transactions Cost Explanation." *Journal of Law and Economics*, October, 1993.

"Manipulation of the Commodity Futures Market Delivery Process." *Journal of Business*, July 1993 (lead article).

"Reforming the Contract Designation Process." *Journal of Financial Engineering*, March 1993.

"Removing Undue Regulatory Impediments to the Use of Futures and Options by Institutional Investors." *Journal of Financial Engineering*, March 1993. (Reprinted in Futures International Law Letter, October, 1992.)

"Application of Core Theory to the Analysis of the Ocean Shipping Industry." *Journal of Law and Economics*, April 1992.

"The Economic Geography of Grain Markets and Futures Delivery Specification: Manipulation, Price Discovery, and Hedging Effectiveness." *Review of Futures Markets,* 1992.

"Resolving the Thrift Crisis" with V. Bernard, R. Kormendi and E.Snyder. *Journal of Applied Corporate Finance*, Autumn 1989.

**Newspaper Articles\***

"Outside Opinion: High-frequency trading will pay off in time" *Chicago Tribune*. (June 2, 2013).

"Restricting Speculators will not reduce oil prices." *Wall Street Journal*, July 11, 2008.

"Cox in the Crucible." *Orange County Register*, 2005.

**Contributions to Books**

Craig Pirrong. Regulate in Haste, Repent at Leisure: Private and Public Orderings in OTC Derivatives Markets. In E. Brousseau and J. M. Glachant (eds.), *Oxford Handbook on International Economic Governance*. Oxford, 2017 .

"Exchanges: The Ultimate Manufactured Markets." In E. Brousseau and J. M. Glachant (eds.), *The Manufacturing of Markets*, Cambridge, 2014.

"Structural Models of Commodity Price Dynamics." In H. Geman (ed.), *Encyclopedia of Quantitative Finance*; *Risk Management in Commodity Markets*, Wiley, 2008.

"Lattice Approaches to Pricing Derivatives." In R. Kolb and J. Overdahl (eds.), *Companion to Financial Derivatives*.

"Energy Derivatives." In R. Kolb and J. Overdahl (eds.), *Companion to Financial Derivatives,* (republicshed in 2013).

"Pricing Power Derivatives: Theory and Matlab Implementation." In J. London, *Modeling Derivatives Applications in Matlab, C++, and Excel*. Financial Times Press, 2006.

"Market Microstructure Issues." In A. Kleit (ed.), *Electric Choices: Deregulation and the Future of Electric Power*. Rowan and Littlefield, 2006.

"The New Economy: Implications for the Organization and Structure of Securities Markets." In D. Jones (ed.), *The New Economy Handbook*. The Academic Press, 2003.

"Pricing Forwards and Options Using the Mesh-Based Partial Differential Equation Approach." R. Jameson (ed.), *Energy Modelling and the Management of Uncertainty*. Risk Publications, 1999. (Republished in 2005).

"Pricing Energy Derivatives," with Kaushik Amin and Victor Ng. Chapter 4 in R. Jameson (ed.), *Managing Energy Price Risk*. Risk Magazine Publications, 1994. (Republished in 1999 and 2004).

"The Market for Treasury Securities: Microstructure and Market Power." Chapter 1 in P. Knapp (ed.), *The Treasury Securities Market*: *The Scholars' Assessment*. Homewood, IL: Business One Irwin, 1994.

"The Economics of Risk Based Capital Requirements." Chapter 33 in K. Lehn and R. Kamphuis (eds.), *Modernizing U.S. Securities Regulation*. Homewood, IL: Business One Irwin, 1993.

## Books

*Commodity Price Dynamics: A Structural Approach*, Cambridge University Press, 2011.

*Corners and Squeezes: The Economics, Law, and Public Policy of Financial and Commodity Market Manipulation*. Kluwer Academic Publishers, 1996.

*Grain Futures Contracts: An Economic Appraisal*. With R. Kormendi and D. Haddock. New York: Kluwer Academic Publishers, 1993.

*The Origins and Resolution of the Thrift Crisis*. With V. Bernard, R. Kormendi and E. Snyder. New York: Kluwer Academic Publishers, 1989.

**Amicus briefs***

*NRG Power Mktg. v. Maine PUC*, 2008 U.S. Briefs 674 (U.S. July 14, 2009)*

*Morgan Stanley capital Grp v. Public Util. Dist. No. 1 of Snohomish County*, Washington 2006 U.S. Briefs 1457 (U.S. Nov. 28, 2007)*

## PAPERS PRESENTED

"Learning From Liquidation: The Commodity Futures Convergence Process." Commodity and Energy Markets Association Meetings, 2019.

"Limited Only by the Ingenuity of Man." Commodity and Energy Markets Association Meetings, 2019. (Keynote lecture).
"Limited Only by the Ingenuity of Man." J.P. Morgan Commodities Center, 2019. (Keynote lecture).

"Limited Only by the Ingenuity of Man." ESSEC, 2018. (Keynote lecture).

"Supply, Demand, and Risk Premiums in Electricity Markets," with Kris Jacobs and Yu Li. University of Oklahoma Energy Conference, 2018.

"Commodity Market Financialization, Indexation, and Correlation." Commodity and Energy Markets Association Meetings, 2017.

"A Bill of Goods: Clearing and Systemic Risk." Oxford University Conference on Derivatives After the Crisis, 2013. Bank of England, Banque de France, and European Central Bank Conference on OTC Derivatives, 2013.

"The Industrial Organization of Execution, Clearing, and Settlement in Financial Markets." Haas/Sloan Conference on the Law & Economics of Organization, University of California, Berkeley, 2012.

"The Mutualization of Default Risk, Fungibility, and Moral Hazard: The Economics of Default Risk Sharing in Cleared and Bilateral Markets." ISNIE Annual Conference, Scotland, 2010. Notre Dame Financial Regulation Conference, 2010.

"Stochastic Volatility and Commodity Price Dynamics." Texas A&M University, 31 October, 2008. Institute of Financial Mathematics Conference, Champuloc, Italy, 21 January 2008.

"The Price of Power." Commodities 2007. University of London, 17 January, 2007.

"Modeling Issues in Commodity Markets." Commodities 2007. University of London, 18 January, 2007.

"Momentum In Futures Markets." 2005 European Finance Association Meetings, Moscow, Russia, 25 August, 2005. University of Illinois, September, 2006.

"Upstairs, Downstairs."  2003 European Finance Association Meetings, Glasgow, 27 August, 2003.

"Upstairs, Downstairs."  2003 Midwest Finance Association Meetings, St. Louis, March 2003.

"The Price of Power."   2002 European Finance Association Meetings, Berlin, 28 August, 2002.

"The Price of Power."  2002 Bachelier Finance Society Second World Congress, Crete, 12 June, 2002.

"Technological Change, For-Profit Exchanges, and the Self-Regulation of Financial Markets."
American Law and Economics Association Meetings, New York, 7 May, 2000.

"Manipulation in Power Markets."  University of California Energy Institute Restructuring Conference,
Berkeley, 17 March, 2000.

"A Positive Theory of Financial Exchange Organization."  International Society of the New Institutional
Economics Meetings, Paris, 18 September, 1998.

"A Positive Theory of Financial Exchange Organization."  American Law and Economics Association
Meetings, Berkeley.  8 May, 1998.

"Efficient Deterrence of Manipulation in Futures Markets."  American Law and Economics Association
Meetings, Chicago.  6 May, 1996.

"Raising Revenue in the Worst Way: The Economic Effects of Asymmetric Hedge Taxation." Virginia
Tech Symposium on "Hedge Taxation After *Arkansas Best*: Law, Economics, and Public Policy."  21
July, 1993.

"Fundamentals and Volatility: Storage, Spreads, and the Dynamics of Metals Prices."  National Bureau
of Economic Research Summer Institute Workshop on Asset Pricing.  20 July, 1993.  American Finance
Association Meetings, 3 January, 1993.

"Price Dynamics in Physical Commodity Spot and Futures Markets."  Econometric Society Meetings, 7
January, 1993.  Western Finance Association Meetings, June, 1993.  ORSA/TIMS Meetings, November,
1993.

"Still Nature's Metropolis?"  Kalo Hineman Symposium on Grain Futures Market Delivery Issues at the
Commodity Futures Trading Commission, 15 September, 1991.

"Maintaining the Integrity of the Futures Delivery Process: The Economics of Manipulation and its
Deterrence."  American Bar Association/Virginia Tech Conference on Market Manipulation, 9
November, 1990.

"Multiple Delivery Points: Manipulation, Liquidity, and Basis Risk."  American Bar
Association/Virginia Tech Conference on Market Manipulation, 10 November, 1990.

Seminar presentations at North Carolina State University, Vanderbilt University, Southern Methodist University, the Federal Reserve Bank of Atlanta, the University of Missouri, the University of Kansas, Arizona State University, Babson University, Yale University Law School, the Michigan Business and Law Schools, the University of Chicago, the Tuck School of Business at Dartmouth University, North Carolina State University, the University of Alberta, Virginia Tech University, Washington University, Columbia University Law School, and the Commodity Futures Trading Commission.

## CURRENT RESEARCH ACTIVITY

### Papers Under Review

"Rocket Science, Default Risk, and the Organization of Derivatives Markets."  First round, *Journal of Law and Economics*.

### Selected Working Papers

"Supply, Demand, and Risk Premiums in Electricity Markets," with Kris Jacobs and Yu Li.

"Sheep in Wolves Clothing: Using False Signals of Demand to Execute a Market Power Manipulation."

"Learning From Liquidation: The Commodity Futures Convergence Process."

"Derived Pricing: Fragmentation, Efficiency, and Manipulation."

"Commodity Market Financialization, Indexation, and Correlation."

"The Mutualization of Default Risk, Fungibility, and Moral Hazard: The Economics of Default Risk Sharing in Cleared and Bilateral Markets."

"The Economics of Clearing in Derivatives Markets: Netting, Asymmetric Information, and the Sharing of Default Risk Through a Central Counterparty."

"The Industrial Organization of Trading, Clearing, and Settlement in Financial Markets."

"The Valuation of Power Options in a Pirrong-Jermakyan Model."

"Momentum in Futures Markets"

"Bund for Glory, or, It's a Long Way to Tip a Market."

"Upstairs, Downstairs: Electronic vs. Open Outcry Markets."

"The Macrostructure of Electronic Financial Markets."

"The Organization of Electronic Financial Markets."

"Third Markets and the Second Best."

"The Price of Power: Valuation of Power and Weather Derivatives."

"Manipulation of Power Markets."

"The Economic Implications of *Arkansas Best*: Asymmetric Tax Treatment of Hedge Income, Hedging Effectiveness, and Price Discovery."

"The Effects of *Arkansas Best* on Hedge Ratios."

"Brave New World?  The Prospects for Computerized Futures Trading."

"A Structural Model of Cross Hedging Risk."

"Two Cheers for Follow-on Research in Pharmaceutical Markets."

"The Asset Management Incentives Implicit in FSLIC Assisted Acquisition Agreements."

"Futures Markets as Implicit Loan Markets: The Case of Grains."

**Research in Progress**

Momentum in Futures Markets.

Storable Commodity Price Dynamics and Commodity Derivatives Pricing.

Power Price Dynamics.

Pricing Contingent Claims on Power and Weather.

Clearing Mechanisms in Derivatives Markets: Efficiency and Distributive Issues.

Rights Aspects of Commodity Exchanges

**Reports**

"Not Too Big to Fail: Systemic Risk, Regulation, and the Economics of Trading Firms." Trafigura, 2015.

"The Economics of Commodity Trading Firms." Trafigura, 2014.

"Market oversight for cap and trade: efficiently regulating the carbon derivative market." Brookings Institute, 2009.

"An Evaluation of the Performance of Oil Price Benchmarks During the Financial Crisis."  WTI Report

U. of Houston, 2009.

"Woodpulp Futures: Establishing the Essential Facts."  Report to OM Stockholm, 1996.

"Agricultural Futures Exchange in Germany for Europe: Feasibility-Design-Implementation." Report to
the Warentermiborse, 1995.

"Strengthening the Winnipeg Commodity Exchange Canola Futures Franchise."  Report to the
Winnipeg Commodity Exchange, 1995.

"The Costs and Benefits of Adding Local Traders to the Deutsche Terminbörse."  Report to the
Deutsche Terminbörse, 1994.

"Derivatives Exchanges, Liquidity, and Locals: A Look to the Future." Catalyst Institute Report, 1994.

"Is There a Future for Stock Branch Indices?"  Catalyst Institute Report, 1994.

"The Contribution of Dual Trading to the Liquidity of New York Mercantile Exchange Energy
Contracts" (with NERA).  Report for the New York Mercantile Exchange submitted
to the Commodity Futures Trading Commission in support of NYMEX's application
for a waiver from the dual trading ban contained in the 1992 CFTC re-authorization
bill.

"Political Rhetoric and Stock Price Volatility: A Case Study."  Catalyst Institute Report, 1993.

"The Relation Between Oil and Gasoline Futures and Spot Prices" (with Victor Ng).  Report submitted
to the New York Mercantile Exchange, 1992.

"An Economic Analysis of the Grain and Oilseed Delivery Mechanism at the Chicago Board of Trade."
Report submitted to the Chicago Board of Trade, 1991.

"Crisis Resolution in the Thrift Industry: Beyond the December Deals" (with Victor Bernard,
Roger Kormendi, and Ted Snyder).  Reported submitted to the Federal Home Loan
Bank Board, 1989.


**Refereeing Activities**

*American Economic Review*; *Economic Inquiry*; *International Journal of Law and Economics*; *Journal of Business*; *Journal of Economic Dynamics and Control; Journal of Economics and Finance*; *Journal of Finance*; *Journal of Financial Markets*; *Journal of Futures Markets*; *Journal of Industrial Organization*; *Journal of Law and Economics; Journal of Quantitative Financial Analysis; Journal of Risk; Review of Financial Studies; Journal of Economic Behavior and Organization; Journal of Business and Economic Statistics; Managerial and Decision Economics; Journal of Economics and Business*.

11

**FELLOWSHIPS**

Oscar Mayer Fellow, University of Chicago (1983-1986)

**RESEARCH GRANTS**

Montreal Exchange grant to evaluate feasibility of introducing new commodity futures contracts. OM Stockholm and OMLX, London grant to study the feasibility of a pulp futures market and to design pulp futures and futures options contracts, 1996.

Winnepeg Commodity Exchange grant to study the contracts, rules, and bylaws of the WCE, with the objective of making recommendations to revise them in order to improve the performance of the Exchange's markets, 1994.

Catalyst Institute/DTB Deutsche Terminbörse grant to study the effects of attracting local traders to the DTB, 1994.

Catalyst Institute/DTB Deutsche Terminbörse grant to study the feasibility of new currency derivatives contracts, 1994.

Catalyst Institute/DTB Deutsche Terminbörse grant to study the feasibility of stock branch index derivatives, 1994.

Virginia Tech Center for Study of Futures and Options Markets grant to study the economic implications of the Internal Revenue Service policy on the taxation of hedging gains and losses 1993.

Warner Lambert Corporation grant for the study of competition in pharmaceutical markets 19901991.

Chicago Board of Trade grant to study grain futures market delivery issues 1990-1991.

**EXECUTIVE TEACHING**

Bayerische Vereinsbank, 1995

Anheuser-Busch, 1996.

Energy Power and Risk Management Courses and Conferences, March, June, September, and December, 1999, May 2000.

Peabody Coal Co., 2000.

HSM II Program, Olin School of Business, Washington University, Spring 2000.

**PERSONAL**

Married to Terry Lehman Pirrong. Two children: Renee Elise and Genevieve Corinne. Hobbies: history (especially U.S. Civil War), agonizing over Chicago sports teams, and exercise.

# DR. CRAIG PIRRONG
## EXPERT TESTIMONY and RETENTIONS
### 2005-2013

Puget Sound Energy, Inc. v. All Jurisdictional Sellers of Energy, et al FERC Docket No. EL01-10-085.

San Diego Gas & Electric Company v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator Corporation And the California Power Exchange. FERC Docket No. EL00-95-248.

In re Amaranth Natural Gas Commodity Litigation, S.D.N.Y. 07-C-6377.

Randy Schaefer et. al. vs. Bayer AG et. al., 2010 (Written report). Circuit Court of Lonoke County, AR CV2006-413.

In re Natural Gas Commodity Litigation, S.D. NY 03-CV-6186(VM).

In re BP Propane Indirect Purchaser Antitrust Litigation, N.D. IL Eastern Division 06-C-3541.

Lenny Joe Kyle et. al. vs. Bayer AG et. al. Circuit Court of Woodruff County, AR. CV-2008-107.

Energy Trading Partners L.P. et al v. Federal Energy Regulatory Commission. Docket Number IN06-3-003.

RCG v. Trading Technologies, International, Inc., N.D. IL Eastern Division 95-C-4088.

Asarco LLC v. American Mining Corp. Bankruptcy Court Southern District of Texas, 05-21270.

Energy Trading Partners L.P. et al v. Federal Energy Regulatory Commission. Docket Number IN06-3-003.

Trading Technologies International, Inc. v. eSpeed, Inc., N.D. IL Eastern Division 04-C-5312.

Trading Technologies International, Inc. v. GL Trade, N.D. IL Eastern Division 05-C-4120.

Trading Technologies International, Inc. v. Future Path Trading LLC., N.D. IL Eastern Division 05-C-5164.

Trading Technologies International, Inc. v. CQGT, LLC and CQG, Inc., N.D IL Eastern Division 05-CV-4811.

Power Authority of the State of New York v. Entergy Nuclear Indian Point 3, LLC and Entergy Nuclear Fitzpatrick, LLC, 7:00-cv-06346-CM

Josef A Kohen, Breakwater Trading LLC, and Richard Hershey v. Pacific Investment Management Co. et al. N.D. IL 05-C-4681.

In re Williams Securities Litigation, 2006.  N.D. OK 02-CV-72-SPF-FHM.

AEP Energy Services v. Bank of Montreal, 2005. S.D. OH Eastern Division C2-03-335.

In re: Dairy Farmers of America, Inc. Cheese Antitrust Litigation, N.D. IL 09-cv-03690.

In re: Optiver Commodities Litigation, S.D.N.Y. 08-cv-6842.

In re: Platinum and Palladium Commodities Litigation, S.D.N.Y. 10-cv-3617.

Lehman Brothers International (Europe) v. AG Financial Products, Inc. CPLR Sections 501, 503, 509 and GOL-1402 (Supreme Court of the State of New York, County of New York).

PJM Up To Congestion Transactions FERC Docket Number IN10-5-000.

Fifth Market Inc. v. CME Group Inc. et al. D. Del. 08-cv-520.

Chicago Mercantile Exchange, Inc. v. 5th Market Inc., CBM2013-00027 (PTAB 2013) .

**DR. CRAIG PIRRONG**
**EXPERT TESTIMONY**
**2019-2023**

Lehman Brothers International v. AG Financial Products Inc. index number 653284/2011 Supreme Court of the State of New York, County of New York.

Trading Technologies International, Inc. v. CQGT, LLC and CQG, Inc., N.D IL Eastern Division 05-CV-4811.

In re Term Commodities Futures Litigation. S.D.N.Y. 12-Civ.-5126.

In re Alaska Electrical Pension Fund v. Bank of America. S.D.N.Y. 14-cv-7126.

U.S. Futures Exchange, L.L.C., and U.S. Exchange Holdings, Inc., v. Board of Trade of the City of Chicago, and Chicago Mercantile Exchange Inc. N.D.IL. 1:04-cv-6756.

Stephen Sullivan, et al, v. Barclays PLC et al, S.D.N.Y. 13-cv-02811 (PKC).

Harry Ploss, et al v. Kraft Foods Group, Inc. and Mondelez Global LLC. N.D.IL 15-cv-2937.

Jeffrey Laydon v. The Bank of Tokyo-Mitsubishi UFJ LTD et al. S.D.N.Y. 12-cv-3419 (GBD)(HBP)

Trading Technologies International, Inc. v. IBG LLC et al. N.D.IL 10-C-715.

Bats Global Markets and Holdings, Inc. and Subsidiaries, Petitioner, v. Commissioner of Internal Revenue. United States Tax Court Docket No. 1068-17.

Quantile Technologies Limited, Petitioner, v. TriOptima AB, Patent Owner. Patent Trrial and Appeal Board Case CBM2020-00011 Patent No. 7,613,649.

Elmagin Capital, LLC v. Chao Chen, Karl Petty, Entergrid LLC and Entergrid Fund I LLC. E.D.PA. No. 20-2576.

Budicak, Inc., Blue Marlin Arbitrage, LLC, and Prime Trading, LLC et al v. Lansing Trade Group, LLC, Cascade Commodity Consulting, LLC et al. D. Kan. 2:19-cv-02449.

Midwest Renewable Energy, LLC, et al v. Archer Daniels Midland Company, C.D.IL 2:20-CV-02212-CSB-EIL.

Duberstein v. Messer, State of Connecticut Superior Court, Docket No. FST-FA19-6044155-S.

*In re* Total Gas and Power North America, Inc., *et al.* Federal Energy Regulatory Commission Docket No. IN12-17-000.

*In re* California Gasoline Spot Market Antitrust Litigation, Case No. 3:20-cv-03131-JSC.

The People of the State of California v. Vitol Inc., *et al*. Case No. CGC-20-584456

Richard Dennis, Michael Glass, and PORT 22, LLC v. The Andersons, Inc., and Cargill, Inc., Case No.: 1:20-cv-04090.

**Appendix B**

**Materials Relied On**

- Market Depth April 20, 2020 outright Crude Oil

- Market Depth April 20, 2020 spreads Crude Oil

- CME-Negative-Crude_0000034_HIGHLY CONFIDENTIAL – CONTAINS PROPRIETARY TRADING INFORMATION_masked_20200420_OE_dat.csv

- CME-Negative-Crude_0000033_HIGHLY CONFIDENTIAL – CONTAINS PROPRIETARY TRADING INFORMATION_masked_20200419_OE_dat.csv

- CME-Negative-Crude_0000035_HIGHLY CONFIDENTIAL – CONTAINS PROPRIETARY TRADING INFORMATION_masked_20200421_OE_dat

- EOD data for CL futures 1983-2022

- ICE Production IFEU-000036 – IFEU-000128

- GHFLTD_000004

- Vega_Mish_000008607

- Vega_Mish_000046822

- Vega_Mish_000008666

- Vega_Mish_000042674

- Vega_Mish_000043267

- Vega_Mish_000019496

- Vega_Mish_000019503

- GSI-TankWatch Every Tank JAN-FEB 2020.xlsx

- GSI-TankWatch Every Tank MAR-APR 2020.xlsx

- GSI-TankWatch Every Tank MAY-JUN 2020.xlsx

- GSI-TankWatch Tank Shell Fill JAN-FEB 2020.xlsx

- GSI-TankWatch Tank Shell Fill MAR-APR 2020.xlsx

- GSI-TankWatch Tank Shell Fill MAY-JUN 2020.xlsx

- GSI-TankWatch Tank Working Cap Fill JAN-FEB 2020.xlsx

- GSI-TankWatch Tank Working Cap Fill MAR-APR 2020.xlsx

- GSI-TankWatch Tank Working Cap Fill MAY-JUN 2020.xlsx

- GSI-Cushing Lease Data Jan-June 2020.xlsx

- crudeoilstorage - March and Sept reports 2011 - 2023.xlsx

- storagecapacity - 2020.xlsx

- storagecapacity -2019.xlsx

- storagecapacity -2021.xlsx

- Weekly_Cushing_OK_Ending_Stocks_excluding_SPR_of_Crude_Oil (2004 - 2023).csv

- ClassMembersNegativeZeroStartAccts.xlsx

- TotalQuantitySalesAccts.xlsx

- All articles are available on JStor, publisher websites (e.g., for J. Financial Econ.), Google Scholar, or Google.

**Appendix C**

# Analyzing 20 April 2020 CL Prices Using TVP-C VAR

February 19, 2024

## 1  Introduction

A Hasbrouck vector autoregression (VAR) model of order flow and price movements is the standard market microstructure method for quantifying the impact of trades on prices. The standard Hasbrouck VAR assumes that the VAR coefficients are constant over the estimation period. Further, it typically assumes that the shocks to the variables in the system are homoskedastic, i.e., have constant variances and covariances over the estimation period.

Both assumptions are dubious for an event as unusual and volatile as CME Light Sweet Crude Oil ("CL") futures trading on 20 April 2020. Thus, when analyzing CL trading on this day it is desirable and appropriate to utilize a model that allows for time-varying coefficients and heteroskedasticity (including time varying covariances between variables in the VAR).

The most rigorous and advanced method to do so is the Time Varying Parameter and Covariance VAR ("TVP-C VAR") first analyzed by Primiceri (2005).[1] I have implemented this model for CL trading on 20 April

---

[1]Time varying parameter VARs have been utilized for decades, e.g., Doan *et al 1983*. *According to Stock and Watson (2001), time varying VARs are "state of the art."*

2020. The model captures and quantifies extensive time variation in parameters and covariances. This model can therefore be used to quantify the impact of the Vega Trading Defendants (TDs) on the prices of CL futures (including spreads) on the penultimate trading day of the May 2020 contract ("CLK0").[2]

# 2    Model Overview

The basic VAR system includes order flow and price variables. Following market microstructure, I utilize "signed" trades as order flow variables. To do so, I identify buyer- and seller-initiated trades ("aggressive trades") using the aggressor tag in CME trade data files.[3] Thus, a buyer-initiated trade in one contract is denoted as +1 unit of order flow, and a seller-initiated trade is denoted as -1.

I have implemented the analysis using six variables: CLK0 order flow ($Q_K$), CLKM0 order flow ($Q_{KM}$), CLM0 order flow ($Q_M$), the CLK0 price change ($\Delta P_K$), the CLKM0 price change ($\Delta P_{KM}$), and the CLM0 price change ($\Delta P_M$).[4]

As is common in empirical microstructure analyses, I have aggregated order flow and price changes into time intervals Specifically, I have implemented

---

[2]Hereafter I refer to the June 2020 contract as CLM0, and the May-June 2020 CL spread as CLKM0.

[3]CME data do not identify an aggressor in some trades, such as implied spread transactions.

[4]Various other analyses demonstrate that TAS trades have little, if any price impact. Indeed, the price impacts are an order of magnitude (or more) smaller than the impacts of CLK0 and CLKM0 trades. This is consistent with economic theory that shows that TAS contracts' clientele is uninformed traders, and that privately informed traders have little incentive to utilize them. Thus, they are excluded from the estimation of the TVP-VAR.

the analysis using 15 second time intervals. That is, each observation utilizes the sum of each net order flow variable during a 15 second interval, and the each of the price changes over an interval of that length. As will be discussed *infra,* it is possible to quantify TD price impacts within these intervals.

I have implemented the model using the midpoint of the bid and ask for each contract as the measure of prices. I have also implemented a version using transaction prices.

The setup of the model follows Primiceri. Denote $y_t$ as the vector of the $n$ variables in the system (e.g., $[Q_K \; Q_{KM} \; \Delta P_K \; \Delta P_{KM}]'$) in time interval $t$. The VAR is:

$$y_t = c_t + B_{1,t}y_{t-1} + B_{2,t}y_{t-2} + \ldots + B_{p,t}y_{t-p} + u_t$$

where the $B_{i,t}$ are $n \times n$ matrices of time-varying coefficients and the $u_t$ is an $n \times 1$ vector of heteroskedastic shocks with variance covariance (VCV) matrix $\Omega_t$. Further:

$$A_t \Omega_t A_t' = \Sigma_t \Sigma_t'$$

Here $A_t$ is a lower triangular matrix:

$$A_t = \begin{pmatrix} 1 & 0 & \ldots & 0 \\ \alpha_{21,t} & 1 & \ddots & \vdots \\ \vdots & \ddots & \ddots & 0 \\ \alpha_{n1,t} & \ldots & \alpha_{nn,t} & 1 \end{pmatrix}$$

and $\Sigma_t$ is a diagonal matrix:

$$\Sigma_t = \begin{pmatrix} \sigma_{1,t} & 0 & \ldots & 0 \\ 0 & \sigma_{2,t} & \ddots & \vdots \\ \vdots & \ddots & \ddots & 0 \\ 0 & \ldots & 0 & \sigma_{n,t} \end{pmatrix}$$

Thus:

$$y_t = c_t + B_{1,t}y_{t-1} + B_{2,t}y_{t-2} + \ldots + B_{p,t}y_{t-p} + A_t^{-1}\Sigma_t\epsilon_t$$

3

where $\epsilon_t$ is an $n \times 1$ vector of uncorrelated shocks with variance one.

This system can be rewritten as:

$$y_t = X_t' \mathbf{B_t} + A_t^{-1} \Sigma_t \epsilon_t$$

where $\mathbf{B_t}$ is the $(p^2 + p) \times 1$ vector of stacked $B_{t,k}$ coefficient and

$$X_t' = I_n \otimes [1, y_{t-1}', \dots y_{t-p}']$$

The dynamics of the various parameters are:

$$\mathbf{B_t} = \mathbf{B_{t-1}} + \nu_t$$

$$\alpha_{\mathbf{t}} = \alpha_{\mathbf{t-1}} + \psi_t$$

and

$$\ln \sigma_{\mathbf{t}} = \ln \sigma_{\mathbf{t-1}} + \eta_t$$

where $\alpha_{\mathbf{t}}$ is the vector of non-zero elements of the $A_t$ matrix stacked by rows and $\sigma_{\mathbf{t}}$ is the $n \times 1$ diagonal of $\Sigma_t$.

All of the innovations to the $y_t$ and the parameters are assumed to be jointly normal with:

$$V = Var \begin{pmatrix} \epsilon_t \\ \nu_t \\ \psi_t \\ \eta_t \end{pmatrix} = \begin{pmatrix} I_n & 0 & 0 & 0 \\ 0 & Q & 0 & 0 \\ 0 & 0 & S & 0 \\ 0 & 0 & 0 & W \end{pmatrix}$$

# 3  Estimation

Following Primiceri and Koop-Korobilis (2009) the model is estimated using Bayesian methods. Primiceri details the reasons for the superiority of Bayesian methods over alternatives (such as maximum likelihood estimation), and further, Bayesian methods are now standard in estimation of structural VARs (Kilian and Lutkepohl, 2017).

4

The Bayesian method employs the Gibbs Sampler. The various parameters are "blocked." Specifically, $\mathbf{B_t}$ is drawn from a distribution conditional on $y_t$, $A_t$, $\Sigma_t$, and $V$. That is, there is a $\mathbf{B_t}$ block. Then $A_t$ is drawn from a distribution conditional on $y_t$, $\mathbf{B_t}$, $\Sigma_t$, and $V$. Then $\Sigma_t$ is drawn conditional on $y_t$, $\mathbf{B_t}$, $A_t$, and $V$. This is repeated a large number of times (e.g., 10,000). The output of the procedure is the means of the various parameters.[5]

Bayesian methods require a specification of "priors" of the distributions of all parameters in the model: the various parameters are drawn from these prior distributions on the first run through the Gibbs Sampler. I utilize the same priors as Primiceri and Koops-Korobilis.[6]

---

[5]It is possible to retain all of the draws of the process.

[6]The Bayesian method offers another important potential benefit in the analysis of CL trading on 20 April 2020. Specifically, CME "circuit breakers" periodically stopped trading on this date. In some cases, trading in CLK0 was stopped (usually for two minutes). In others, CLKM0 trading was halted (usually for two minutes, but sometimes for 5 seconds). In yet others, both CLK0 and CLKM0 trading was halted simultaneously. The Bayesian method can be adapted to handle these outages. Such an adaptation is advisable when estimating the model with short time intervals (e.g., 5 seconds) but does not have a material effect on results with a longer 15 second time interval.

# References

[1] Doan, T., R. B. Litterman, and C. A. Sims, Forecasting and Conditional Projection Using Realistic Prior Distributions. 3 *Econometric Reviews* (1984) 1.

[2] Fleming, M. J., B. Mizrach, and G. Nguyen. The Microstructure of a Treasury ECN: The BrokerTec Platform. FRBNY Staff Report No. 381 (2009).

[3] Hasbrouck, J. Measuring the Information Content of Stock Trades. 46 *Journal of Finance* (1991): 179-207.

[4] Kilian, L., and H. Lutkepohl. *Structural Vector Autoregressive Analysis.* (2017).

[5] Koop, G., and D. Koribilis. Bayesian Multivariate Time Series Methods for Empirical Macroeconomics. 3 *Foundations and Trends in Econometrics* (2010) 267-358.

[6] Primiceri, G. E. Time Varying Structural Autoregressions and Monetary Policy. 72 *Review of Economic Studies* (2005): 821-852.

[7] Stock, J. H., and M. W. Watson. Vector Autoregressions. 15 *Journal of Economic Perspectives* (2001) 101.

**Appendix D**







**Appendix E**

| Paragraph | Support | Additional Instructions | Changes |
|---|---|---|---|
| 121 | | | |
| 122 | | | |
| 123 | | | |
| 124 | | | |
| 125 | | | |
| 126 | | | |
| 127 | | | |
| 128 | | | |







| | | | |
|---|---|---|---|
| 157 | ██████████ ██ ▌ | ████████ █████████ █████ | |
| 158 | ████████ ████████ ████████ ██████ | | |
| 159 | ██████ ███████ ███████ ████ | | |
| 160 | ███ ██████ ████████ | | |
| 161 | GHFLTD 000004 | | |
| 189 | Appendix C Pirrong Corrected Report | | |
| 197 | TVP_VAR_Output_15Sec_ BBO_9_1330.xlsx, tab "IRFs", "Q_K IRFs" | | |
| 199 | TVP_VAR_Output_15Sec_ BBO_9_1330.xlsx, | Tab "IRFs", "Q_K IRFs", Average of Column B and Average C provide mean impacts. ██████ ████████ ████████ ███ | |
| 201 | TVP_VAR_Output_15Sec_ BBO_9_1330.xlsx, tab "IRFs", "Q_KM IRFs" | | |
| 202 | TVP_VAR_Output_15Sec_ BBO_9_1330.xlsx, tab "IRFs", "Q_KM IRFs" Maximum of Columns E and F gives max impact. Rises begins about row 990. | | |
| 203 | TVP_VAR_Output_15Sec_ BBO_9_1330.xlsx, tab "sigma_e", "Price Shock SD Chart" | | |

| 205 | TVP_VAR_Output_15Sec_BBO_9_1330.xlsx, | Tab "R2s", "R2 Chart" R2 [redacted] [redacted] [redacted] | Furthermore, the fraction of the variability in prices explained by order flow variations declined substantially in the last [redacted] of trading. Figure 12 presents the time varying R2's for the May Crude Oil price and the May-June Crude Oil spread implied by the TVPVAR model.78 Note that the R2's fall starting around [redacted] recover partially around [redacted] p.m., and then fall to [redacted] at [redacted] the R2 for the May Crude Oil future is [redacted]. At [redacted] the R2 for the May-June Crude Oil spread is [redacted]. That is, at this time, order flows explain less than [redacted] percent of price changes. In contrast, at other times of the day order flows explain over [redacted] percent of price movements. |
|---|---|---|---|
| 209 | Read directly from the Table. Table matches with Depth_Regression_Lag_15Sec_Output.xlsx | | |
| 210 | | As reflected by the outputs of the program provided on February 23, 2024, the actual equation for the regressions also included as variables first differences of the May outright, May-June spread, and June order imbalances in an interval. Specifically, the outputs reflect the equation actually run in the report as follows (with some coefficient subscripts modified for clarity): Equation In Report: $\Delta P_T^K = \beta_{K0} + \beta_{KK}Q_T^K + \beta_{KMK}Q_T^{KM} + \beta_{MM}Q_T^M + \beta_{KTAS}Q_T^{KTAS} + \beta_{KMTAS}Q_T^{KMTAS} + \beta_{KdK}\Delta Q_T^K + \beta_{KdKM}\Delta Q_T^{KM} + \beta_{KdM}\Delta Q_T^M + e_T^K$<br><br>Clarified Equation Run: $\Delta P_T^K = \beta_{K0} + \beta_{KK}Q_T^K + \beta_{KKM}Q_T^{KM} + \beta_{KM}Q_T^M + \beta_{KKTAS}Q_T^{KTAS} + \beta_{KKMTAS}Q_T^{KMTAS} + \beta_{KdK}\Delta Q_T^K + \beta_{KdKM}\Delta Q_T^{KM} + \beta_{KdM}\Delta Q_T^M + e_T^K$ | $\Delta P_T^K = \beta_{K0} + \beta_{KK}Q_T^K + \sout{\beta_{KMK}}\beta_{KKM}Q_T^{KM}$<br>$+ \sout{\beta_{MM}}\beta_{KM}Q_T^M$<br>$+ \sout{\beta_{KTAS}}\beta_{KKTAS}Q_T^{KTAS}$<br>$+ \sout{\beta_{KMTAS}}\beta_{KKMTAS}Q_T^{KMTAS}$<br>$+ \beta_{KdK}\Delta Q_T^K + \beta_{KdKM}\Delta Q_T^{KM}$<br>$+ \beta_{KdM}\Delta Q_T^M + e_T^K$ |

| 211 | | The outputs of the program provided on February 23, 2024 reflects the equation actually run in the report as follows (with some coefficient subscripts modified for clarity): | |
|---|---|---|---|

The outputs of the program provided on February 23, 2024 reflects the equation actually run in the report as follows (with some coefficient subscripts modified for clarity):

Equation In Report:
$$\Delta P_T^{KM} = \beta_{K0} + \beta_{KK} Q_T^K + \beta_{KMK} Q_T^{KM} + \beta_{KNK} Q_T^{KN} + \beta_{MM} Q_T^M + \beta_{KTAS} Q_T^{KTAS} + \beta_{KMTAS} Q_T^{KMTAS} + \beta_{KMdK} \Delta Q_T^K + \beta_{KdMM} \Delta Q_T^{KM} + \beta_{KdMM} \Delta Q_T^M + e_T^K$$

Clarified Equation Run:
$$\Delta P_T^{KM} = \beta_{K0} + \beta_{KMK} Q_T^K + \beta_{KMKM} Q_T^{KM} + \beta_{KMM} Q_T^M + \beta_{KMTAS} Q_T^{KTAS} + \beta_{KMKMTAS} Q_T^{KMTAS} + \beta_{KMdK} \Delta Q_T^K + \beta_{KMdKM} \Delta Q_T^{KM} + \beta_{KMdM} \Delta Q_T^M + e_T^K$$

Formatted: Left, Line spacing: Multiple 1.15 li

$$\Delta P_T^{KM}$$
$$= \beta_{K0} + \beta_{KKK}\beta_{KMK} Q_T^K + \beta_{KKK}\beta_{KMKM} Q_T^{KM}$$
$$+ \beta_{KNK} Q_T^{KN} + \beta_{MM} Q_T^M \beta_{KMM} Q_T^M$$
$$+ \beta_{KMKTAS} Q_T^{KTAS} + \beta_{KTAS} Q_T^{KTAS}$$
$$+ \beta_{KMTAS} Q_T^{KMTAS} \beta_{KMKMTAS} Q_T^{KMTAS}$$
$$+ \beta_{KMdK} \Delta Q_T^K + \beta_{KMdKM} \Delta Q_T^{KM}$$
$$+ \beta_{KdMM} \Delta Q_T^M \beta_{KMdM} \Delta Q_T^M + e_T^K$$

Formatted: Font: Cambria Math, Italic

| 212 | Depth_Regression_Lag_5Sec_Output.xlsx, tab "K20▆▆▆" | | |
| 213 | Depth_Regression_Lag_5Sec_Output.xlsx, tab "KM20 ▆▆▆▆▆▆" | | |
| 217 | Depth_Regression_Lag_5Sec_Output.xlsx, tab "K20 ▆▆▆▆▆▆" | | |
| 218 | Depth_Regression_Lag_5Sec_Output.xlsx, tab "KM20 ▆▆▆▆▆▆" | | |
| 220 | Depth_Regression_Lag_5Sec_Output.xlsx, tab "Chow Test" | | |
| 226 | TVP_VAR_Output_15Sec_BBO_9_1330.xlsx, tab "Cumulative Price Impact", "Cumulative Price Impact Chart". | | |
| 227 | TVP_VAR_Output_15Sec_BBO_9_1330.xlsx, tab "Cumulative Price Impact", "Cumulative Price Impact Chart". | | |
| 230 | VTD Artificiality 6 Variable Model.xlsx, tab "Artificiality" | | |
| 231 | VTD Artificiality 6 Variable Model.xlsx, tab "Artificiality" Row 1078. | | |

| 232 | ██████████████ | | |
| 237 | Vega VPIN Analysis.xlsx, tab "K20", "KM20", "K VPIN Chart", "KM VPIN Chart" | | |
| 238 | Vega VPIN Analysis.xlsx, tab "K20", "KM20" | | |
| 240 | Vega VPIN Analysis.xlsx, tab "K20", "KM20" | | |
| 241 | Vega VPIN Analysis.xlsx | Tab "KM20", D61, D157, D190, D234 | |
| 243 | ███████████████████████████████████████████████ | | |
| 244 | | | |
| 245 | | | |
| 247 | | | |
| 249 | | | |





264

265

280

281

Although the direct evidence provided by the TVP-VAR is sufficient to demonstrate the Trading Defendants' market power, it may be worth noting that ███████████████ ████████████████████. As noted supra, ██████████████████████ ███████████████████████ ███████████████████████ ███████████████████████

282, Fn. 91

There is other economic evidence that strongly suggests that orders in the Crude Oil TAS market were less informed than orders in Crude Oil futures or spreads. Specifically, ████







| | | | |
|---|---|---|---|
| 308 | ████████████████ | | |
| 309 | ████████████████ | | |
| 310 | ████████████████ | | |
| 311 | ████████████████ | | |
| 313 | GHFLTD 000004 NATIVE FILE ████████ ████████ | | |
| 314 | ████████████████ | | |
| 341 | This is public information. Pulled from EOD CME file for Crude Oil futures for April 17, 2020. | Cell P2. | |
| 343 | This is public information. Pulled from EOD CME file for Crude Oil futures for April 20, 2020. | Cell P2 (April 17) - Cell P2 (April 20). | |
| 344 | ████████████████ | | |
| 346 | 20200421-EOD_xynm_cl_fut_eth_f.csv, Weekly_Cushing_OK_Ending_Stocks_excluding_SPR_of_Crude_Oil (2004-2023).csv | Cell P2 for EOD. For stocks, B188. | |
| 347 | 20200421-EOD_xynm_cl_fut_eth_f.csv. | Cell N2. | |

| 351 | ██████████████████ ██████████ | ████████████ ██████████████ ████████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ██████████████ ████████████ ██████████████ ██████████ | It should also be noted that the post ██ price collapse cannot be explained as the result of large liquidations, panicked or otherwise, by those holding long positions at that time who were allegedly doubtful of their ability to take delivery due to lack of storage space (or any other reason). As noted *supra*, order flow movements (including order flows driven by liquidating longs) have virtually no power to explain price movements after ████ Moreover, there were no substantial non-TD order imbalances during this period, and hence no order imbalances that could be attributed to the liquidation of long positions, including by those who allegedly feared their inability to find storage space for deliveries. From ██████ ████████, the net order flow in the May Crude Oil Futures was only ████, which is trivial compared to the net order flow of ████ the ████████ rom 9 a.m. to 1:30 p.m. Indeed, during ████████████ of trading prior to settlement at 1:30 p.m. the net order flow in May Crude Oil Futures was ████ With respect to the May-June Crude Oil Futures spread, net order flow was ████ contracts from ████ However, ██████████████ ████████ Moreover, in a six second period beginning around ████ net order flow in the May-June Crude Oil Futures spread was -██ (accounting for most of the ████ net order flow), of which ████████ ████████ |
| --- | --- | --- | --- |
| 352 | CL_Futures_1985_2021.xlsx . Vega_cl_analysis.m CL_Stocks_Spread_Semiparametric.xlsx | Statement (a) based on CL_Stocks_Spread_Semiparametric.xlsx Spread Dummies tabs. Statement (b) is based on simple calculation of CL11-CL21 for the days in question. | |
| 353 | CL_Stocks_Spread_Semiparametric.xlsx | Tab Estimation Data. The spread is the 2nd widest from all days in that data set, which includes days on which EIA reported stocks, not all days. | |
| 354 | This is public information. Pulled from EOD CME file for Crude Oil futures for April 24, 2020. | See N3-N4. | |
| 355 | This is public information. Pulled from the EOD CME file for Crude Oil futures for April 17, 2020 and April 24, 2020. | EOD for each Date. For April 17, N2-N3, For April 20, N2-N3. For April 24, N3-N4. | |

| 356 | Weekly_Cushing_OK_Ending_Stocks_excluding_SPR_of_Crude_Oil (2004-2023).csv, storagecapacity -2020.xlsx | Date changed to April 24, 2020. Stocks B188. For storage capacity, Tab "Table 2", J35 + K35. For working storage capacity, Tab "Table 1", F35. For percentage, Stocks / Total Storage Capacity. | Moreover, even at their peak on Friday ~~May 1~~April 24, 2020 Cushing stocks were well below storage capacity at Cushing. On ~~May 1~~April 24, 2020 Cushing stocks equaled 63,378,000 barrels. On that date total storage capacity at Cushing totaled 92,691,000 barrels, and tank working storage capacity was 75,835,000 barrels. Thus, on ~~May 1~~April 24, 2020 Cushing stocks occupied 68 percent of capacity. |
|---|---|---|---|
| 358 | Weekly_Cushing_OK_Ending_Stocks_excluding_SPR_of_Crude_Oil (2004-2023).csv. CL_Futures_1985_2021.xlsx. Vega_cl_analysis.m. CL_Stocks_Spread_Semiparametric.xlsx | CL_Stocks_Spreads_Semiparametric.xlsx. Refer to Estimation Data tab, cells H367 to H497. | |
| 360 | Well-known implication of the Theory of Storage., Fn. 100 Pirrong Corrected Report. CL_Stocks_Spread_Semiparametric.xlsx, vega_CL_Cushing_semiparametric_SOS.m | | |
| 362 | CL_Stocks_Spread_Semiparametric.xlsx | Tab "Spread Stocks Fitted", B93 and B21 (Actual predicted spread is 3 cents for 25 million barrels). | The model validates the predicted relationship between spreads and inventories, as demonstrated in Figure 24. However, the relationship is relatively weak: spreads do not widen substantially when inventories increase. For example, according to the fitted model, when inventories are around 25 million barrels, the predicted spread is around ~~50~~3 cents. When inventories are 65 million barrels, the predicted spread is around -80 cents. |
| 363 | CL_Stocks_Spread_Semiparametric.xlsx. CL_Futures_1985_2021.xlsx. | Spread Dummies tab. Apply normsdist to Artificiality_t values in column C. April 17 p-value should be 1.9e-13. | The model implies that on April 17, 2020 the front month-second month spread was already far wider than would be predicted based on Cushing inventories on that date and the fitted relationship. Specifically, the model implies that the spread was ▉ wider than expected conditional on inventory levels on that date. On April 24, the model implies that the spread was ▉ wider than expected conditional on inventories. On May 1—when Cushing inventories reached their peak—the model implies the spread was ▉ wider than expected conditional on inventories. The p-value for April 17, is 1.9x10-~~19~~13; for April 24, it is 1.7x10-5; and for May 1, it is .025. |
| 364 | CL_Stocks_Spread_Semiparametric.xlsx. | Tab "Estimation Data", Compare Column G with Column H. | |
| 366 | CL2020KM.xlsx | | |

| | | | |
|---|---|---|---|
| 367 | United States Global Mobility.xlsx, tab "US Mobility Chart", "US" | | |
| 369 | This is public information. Pulled from the EOD E-mini Futures prices. ES2020M.csv. | The March 23, 2020 price should be 2220.5. This results in a change in the 3/2-3/23 price decline to 27.5 percent and the 3/23-4/17. increase to 29 percent.  See F244, F259, F277. | There is evidence that suggests that this economic rebound was anticipated well prior to April 20, 2020.  From March 2 - March 23, 2020, S&P 500 (eMini) futures prices fell from 3059 to ~~2252~~2220.5—a decline of almost ~~26~~ 27.5 percent—reflecting the expected effect of Covid-19 and lockdowns on economic activity. Starting on March 24, 2020, the U.S. stock market began to rally: by April 17, 2020 (the Friday before the day of interest here), the eMini futures price had risen to 2870—a ~~27~~ 29 percent increase off its post-lockdowns low.  Thus, demand conditions were objectively improving as of April 20, 2020, and the reversal of the stock market prior to the low ebb of American mobility indicates that this improvement was widely anticipated. |
| 370 | ■■■■ | | |
| 371 | ■ | | |
| 373 | EIA Crude Stocks Tank Farms by PADD.xlsx EIA Midwest_(PADD_2)_Crude _Oil_Stocks_at_Refineries.x lsx EIA Gulf_Coast_(PADD_3)_Cru de_Oil_Stocks_at_Refinerie s.xlsx | | |
| 376 | This is public information. CB2020MN.xlsx, CB2020M.csv, CB2020N.csv.  See also CL2020KM.xlsx | CB2020MN.xlsx cells F1519 and N1519.  Underlying data CB2020M.csv and CB2020N.csv. | |
| 380 | TVP_VAR_Output_15Sec_ BBO_9_1330_Graphs.xlsx and CL_420_Bid_Ask_mid.xlsx | | |
| 384 | CL_Futures_1985_2021.xlsx .  Vega_cl_analysis.m | Line16 output compare to April 20.  Change line 16 to max(abs(cl_2020.dSpread)) and compare to April 20.  Column B - Column C. | |
| 386 | CL_Futures_1985_2021.xlsx .  Vega_cl_analysis.m | Lines 19 and 20 output compared to April 20. | |
| 395 | ■■■■■■■■■■ | | |
| 399 | ■■■■■■■■■■ | | |
| 400 | ■■■■■■■■■■ | | |

| | m | | |
|---|---|---|---|
| 401 | ████████████ ▪ | ████████████ | |

**Appendix F**

| vega_aggressor_analytics.m - Variable | Value |
|---|---|

