**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

MISH INTERNATIONAL MONETARY INC., on behalf of itself and all others similarly situated,

*Plaintiff*,

v.

VEGA CAPITAL LONDON, LTD., *et al*.,

*Defendants.*

**ORAL ARGUMENT REQUESTED**
**FILED UNDER SEAL**

Case No. 1:20-cv-04577

Hon. Manish S. Shah

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO EXCLUDE THE AMENDED CLASS CERTIFICATION**
**EXPERT REPORT OF PROFESSOR CRAIG PIRRONG**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 5

    A.    Pirrong's Long, ████████ Relationship with Plaintiff's Counsel........................ 5

    B.    Pirrong Previously Attributed the April 20 Price Movements to Supply and Demand Factors, Without Reference to TAS ............................................................ 6

    C.    Pirrong's Reports Are Riddled with Errors ........................................................... 7

    D.    Pirrong's Opinions in Support of Class Certification ........................................... 8

    E.    Professor Hendershott's Response to Pirrong's Opinions ..................................... 9

        1.    Hendershott's Assessment of Pirrong's Storage Opinion ......................... 10

        2.    Hendershott's Assessment of Pirrong's TVP-VAR Model ....................... 11

        3.    Hendershott's Assessment of Pirrong's ████████ Opinion ............... 12

        4.    Hendershott's Assessment of Pirrong's Opinion that Trader Defendants' Trading Was "Uneconomic" .................................................. 12

ARGUMENT ..................................................................................................................... 13

I.    Standard for Admissibility of Expert Testimony ................................................. 13

II.    Pirrong's Storage Opinion is Unreliable .............................................................. 14

III.    Pirrong's Opinion That Trader Defendants' "Aggressive" Trading Was "Uneconomic" and "Manipulative" is Unreliable ............................................... 20

    A.    Trader Defendants' Trading Pattern is Consistent with Speculative Trading and Inconsistent with TAS Manipulation............................................................. 20

    B.    Pirrong's Opinion that Trader Defendants' "Aggressive" Trades Were Manipulative is Unsupported by Relevant Facts and Data ................................... 21

    C.    Trader Defendants Traded Differently from Each Other ..................................... 22

IV.    Pirrong's TVP-VAR Regression Model is Unreliable ........................................ 24

    A.    Pirrong's TVP-VAR Model is Not a Generally Accepted Methodology ............. 25

    B.    Pirrong's Methodology Cannot Estimate "But-for" Prices................................... 27

C.  Pirrong's Methodology Does Not Control for Alternative Explanations.............. 28

D.  Pirrong's Over-Parameterized Model is Not Robust ............................................... 30

E.  Pirrong's Damages Methodology, Based on His TVP-VAR Model, Cannot
    Measure Only Those Damages Attributable to Trader Defendants ...................... 31

V.  Pirrong's ██████████ Opinion is Unscientific, Untested Speculation.......................... 32

CONCLUSION ................................................................................................................................ 36

# TABLE OF AUTHORITIES

**Cases**

*Am. Booksellers Ass'n v. Barnes & Noble, Inc.*,
  135 F. Supp. 2d 1031(N.D. Cal. 2001) .................................................................. 25

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ................................................................................... 37

*Barber v. United Airlines, Inc.*,
  17 F. App. 433 (7th Cir. 2001) .................................................................. 13, 20, 24

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998).................................................................................... 31

*Boyer v. Citi of Simi Valley*,
  2024 WL 993316 (C.D. Cal. Feb. 13, 2024)........................................................... 14

*Brown v. Burlington Northern Santa Fe Ry. Co.*,
  765 F.3d 765 (7th Cir. 2014) ................................................................................... 30

*Chapman v. Maytag Corp.*,
  297 F.3d 682 (7th Cir. 2002)....................................................................... 26, 29, 37

*Choi v. Tower Rsch. Cap. LLC*,
  2022 WL 4484485 (S.D.N.Y. Sept. 27, 2022) .................................................. 25, 32

*City of Rockford v. Mallinckrodt ARD, Inc.*,
  2024 WL 1363544 (N.D. Ill. Mar. 29, 2024)............................................... 16, 30, 32

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .................................................................................................... 34

*Conrad v. Jimmy John's Franchise, LLC*,
  2021 WL 718320 (S.D. Ill. Feb. 24, 2021) ............................................................. 32

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).......................................................................................... passim

*Deimer v. Cincinnati Sub-Zero Prod., Inc.*,
  58 F.3d 341 (7th Cir. 1995) ............................................................................... 35, 37

*Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*,
  2017 WL 3592775 (N.D. Ill. Aug. 21, 2017)........................................................... 37

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)....................................................................................... 13, 16, 29

*Grasshopper House, LLC v. Clean & Sober Media LLC*,
  2019 WL 12074086, at *11 (C.D. Cal. July 1, 2019) ....................................... 25

*In re Boeing 737 MAX Pilots Litig.*,
  638 F. Supp. 3d 838 (N.D. Ill. 2022) ....................................... 35

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018) ....................................... 20, 25

*In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*,
  341 F. Supp. 3d 213 (S.D.N.Y. 2018) ....................................... 37

*In re Natural Gas Commodities Litig.*,
  231 F.R.D. 171 (S.D.N.Y. 2008) ....................................... 28

*In re Northfield Lab'ys, Inc. Sec. Litig.*,
  267 F.R.D. 536 (N.D. Ill. 2010) ....................................... 26, 27

*In re Paraquat Prod. Liab. Litig.*,
  2024 WL 1659687 (S.D. Ill. Apr. 17, 2024) ....................................... 14, 30

*In re Term Commodities Cotton Futures Litig.*,
  2020 WL 5849142 (S.D.N.Y. 2020) ....................................... 20, 28

*In re Wireless Tel. Servs. Antitrust Litig.*,
  385 F. Supp. 2d 403 (S.D. Cal. 2005) ....................................... 25

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ....................................... 5, 13

*Lapsley v. Xtek, Inc.*,
  689 F.3d 802 (7th Cir. 2012) ....................................... 14, 26, 32

*LeClercq v. The Lockformer Co.*,
  2005 WL 1162979 (N.D. Ill. Apr. 28, 2005) ....................................... 19, 20, 24

*Olympia Equip. Leasing Co. v. West. Union Tele. Co.*,
  797 F.2d 370 (7th Cir. 1986) ....................................... 30

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*,
  111 F.3d 528 (7th Cir. 1997) ....................................... 31

*Ploss v. Kraft Foods Grp., Inc.*,
  637 F. Supp. 3d 561 (N.D. Ill. 2022) ....................................... 28

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) ....................................... 32, 33

*Rosen v. Ciba-Geigy Corp.*,
    78 F.3d 316 (7th Cir. 1996) ...................................................... 36

*SEC v. Terraform Labs Pte. Ltd.*,
    2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) ........................... 28

*Smith v. Ill. Dep't of Transp.*,
    936 F.3d 554 (7th Cir. 2019) ...................................................... 18

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .................................................................. 34

*Van v. Ford Motor Co.*,
    332 F.R.D. 249 (N.D. Ill. 2019) ................................................ 29

*West v. Home Depot U.S.A., Inc.*,
    2024 WL 1834112 (N.D. Ill. Apr. 26, 2024) ...................... 1, 14, 30, 31

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) ...................................................... 35

## Other Authorities

Fed. R. Evid. 702 ......................................................................... passim

Fed. R. Evid. 702 Advisory Committee Notes to 2023 Amendments ......................................... 14

## INTRODUCTION[1]

Craig Pirrong is Plaintiff's counsel's house expert, ████████████████████████

████████████████████████████████████████████████████████ His opinions in support

of Class certification contradict the analyses of regulators and other government agencies, two

exchanges, dozens of market analysts, and other academics who have studied the price of the May

2020 NYMEX West Texas Intermediate ("WTI") crude oil futures contract (the "May Contract")

on April 20, 2020. Neutral experts overwhelmingly attribute the price movements observed that

day to the interaction of a once-in-a-century drop in global demand caused by the Covid-19

pandemic, the requirement that long May Contract holders at the expiry on April 21 take physical

delivery of oil in May, and the rapidly diminishing storage capacity in Cushing, Oklahoma that

would allow them to do so. For example:

- CFTC Chairman Heath Tarbert stated that the negative May Contract price "appear[s] to be a fundamental supply and demand issue" and could "be explained by what's actually going on in the real markets, which obviously is a tremendous amount of dislocation with respect to storage, supply, capacity, and dramatically decreased demand." Ex. 21 (CFTC Press Release, Apr. 21, 2020).

- CME Chairman and Chief Executive Terrence Duffy stated, "this was no secret that this was coming at us. We have to do things to allow the market to go to a price that is reflecting the fundamentals of the product. The futures market worked to perfection." Ex. 22 (*CME boss says his exchange is not for retail investors and it's 'no secret' futures can go negative*, CNBC, Apr. 22, 2020).

- The U.S. Energy Information Administration (EIA) stated that the price movements "were predominantly driven by the timing of the May 2020 contract expiration against the backdrop of precipitous decline in consumption." Ex. 29 (EIA, *Low liquidity and limited available storage pushed WTI crude oil futures prices below zero*, Apr. 27, 2020).

- Market analysts reached the same conclusion. *See, e.g.*, Ex. 16 ████████████████ ██████ Ex. 18 ████████████████████████████████████████

---

[1] Exhibits in support of Defendants' Memorandum in Opposition to Plaintiff's Motion for Class Certification and Motion to Exclude the Amended Class Certification Expert Report of Professor Craig Pirrong are collected in Defendants' separately filed Appendix of Exhibits.



Ex. 19

- The CFTC staff later published a report citing fundamental supply and demand factors, unusually high open interest in the May Contract, and long positions held by non-commercial traders (who were unable to take delivery of oil) as key contributors to the price movements on April 20. Ex 32 (CFTC, *Trading in NYMEX WTI Crude Oil Futures Contract Leading up to, on, and around April 20, 2020*).[2]

- Two economists from the CFTC published a paper analyzing the events of April 20 and attributed the negative WTI price to "a confluence of factors, including a shock to global demand caused by the COVID-19 pandemic, an oversupply of oil, and limited storage capacity at the delivery point of Cushing, OK." Ex. 33 (C. Burns & S. Kane, *Arbitrage breakdown in WTI crude oil futures: An analysis of the events on April 20, 2020*, May 12, 2022).

- Consistent with these explanations, Professor Philip Verleger, who was critical of the CME's failure to prevent the plunge into negative prices, suggested that retail traders piling into the market with long positions allowed commercial traders to take much larger short positions and "[t]he patience of the shorts punished any "longs" in the market who did not have storage lined up and were thus not in position to take delivery. . . . These participants [the "shorts"], many of whom had physical oil they could deliver if need be and so could stay to expiration, could then force the remaining longs to pay an extreme penalty." Ex. 25 (Verleger, *Negative Prices: Never Again*, Apr. 23, 2020).

Without citing to any prior analyses or the copious evidence of what market participants were actually seeing and thinking on April 20, Pirrong offers a contradictory and deeply idiosyncratic opinion: that a handful of independent day-traders, working from home and trading manually (without the aid of high-frequency computer algorithms), with no physical positions, depressed prices artificially in one of the world's largest and most competitive markets. How did

---

[2] Although the CFTC report includes a disclaimer that it did not determine the "root cause(s)" of price movement in the May Contract, the Report "set forth data on the geopolitical and fundamental economic drivers, as well as certain technical factors, preceding and coinciding with the negative settlement price of the WTI Contract on April 20." Ex. 32 at 1.

they do it, according to Pirrong? By "aggressively" purchasing May Contracts in the Trading-at-Settlement ("TAS") order book based on the to-be-determined settlement price and selling equivalent contracts in the non-TAS order book at prevailing prices, thereby making a straightforward bet on declining prices, after the CME itself had issued multiple warnings about the potential for negative pricing.

Pirrong also claims that he can isolate the "impact" of the Trader Defendants' "aggressive" sales on the price of the May Contract from all the other forces pushing prices downwards on April 20 using a "TVP-VAR" model that was developed for an entirely different purpose and ██ ████████████████████████████████████ has never been peer reviewed to study price impact. When Pirrong's model fails after ████████[3] he changes tactic and attributes ████████████████████ ████████████████████████████████ on the theory that they precipitated a ████████ that no other regulator, academic, or market participant has found to have occurred.

As demonstrated herein, at least five categories of Pirrong's outlier opinions fall well short of the requirements of Rule 702 of the Federal Rules of Evidence, such that they are inadmissible and therefore cannot serve as the basis for Class certification.

**First**, Pirrong opines that fundamental supply and demand factors, including storage constraints at Cushing, cannot explain the price movements in the May Contract on April 20. This conclusion—which flies in the face of the overwhelming consensus—rests on unrealistic assumptions, cherry-picked storage data, and misleading calculations. Even the most cursory scrutiny of Pirrong's contentions causes his analysis to fall apart. *See* Section IV.A.

**Second**, Pirrong opines that the Trader Defendants' "aggressive" trading was "uneconomic," followed a pattern that is typical of manipulation, and was unique. But Pirrong

---

[3] Unless otherwise noted, all times are in Central Standard Time.

ignores the obvious profitability of buying TAS contracts and selling non-TAS contracts "aggressively" on a day when prices were widely expected to fall. He also ignores *the actual trading patterns* of Trader Defendants, ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *See* Section IV.B.

  **Third**, Pirrong's methodology for estimating price artificiality relies on a novel and untested "TVP-VAR" model and fails to incorporate reasonable assumptions both of how Trader Defendants and other market participants would have traded the May Contract in the absence of the allegedly manipulative trading—an essential step for estimating "but-for" prices on a volatile day like April 20. Further, Pirrong's novel and untested TVP-VAR model results in contradictory outcomes when replicated. And Pirrong's model ultimately breaks down completely during the time period with the largest price movement, cementing its unreliability as a methodology for estimating price artificiality. Using Pirrong's variables in a standard "VAR" model ████████

████████████████████████████████████████████████████████████████

██████ Any impact, moreover, was not artificial, as Trader Defendants were merely "conduits" for the sales of the TAS sellers, who had to liquidate their long positions before the May Contract's expiry. *See* Section IV.C.

  **Fourth**, Pirrong's ████████████ opinion typifies precisely the kind of *ipse dixit* expert speculation courts routinely exclude. As Pirrong admitted at his deposition, ████████████████

████████████████████████████████████████████████████████████████

████████████████████████ Ex. 2 (Pirrong Dep. 254:11–17). Instead, he relies on unverifiable "straw that broke the camel's back" conjecture, rooted in "chaos theory," to conclude that ████

████████████████████████████████████████████████████████ His

"VPIN" metric ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████ *See* Section IV.D.

Pirrong's opinions abjectly fail to satisfy the standards for reliability and relevance set forth in Rule 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). This Court should, therefore, fulfill its "basic gatekeeping obligation" to exclude them. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

## FACTUAL BACKGROUND

**A.    Pirrong's Long, ████████ Relationship with Plaintiff's Counsel**

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Ex. 2 (Pirrong Dep. 16:15–18:1). Pirrong described his relationship with Plaintiff's counsel ████████ Ex. 2 (Pirrong Dep. 15:1–11, 18:2–6). ██████████████████████████████████ *Id.* Although Pirrong's expert witness work takes up █████████████████ it accounts for ███████████ of his income, with well over ████████████████████████████████████ *Id.* 19:22-22:3, 508:8-509:10. Pirrong also leverages his expert work to bolster his academic reputation. For example, Pirrong published a paper in 2023 based on the events of April 20, suggesting that manipulation involving TAS trading could have played a role in negative pricing. Ex. 41 (Pirrong, *Strategic trading and manipulation in trade at settlement contracts*, 2023, J. Futures Markets). Astonishingly, even though he was already hard at work as Plaintiff's expert on this case, Pirrong attested to the journal that he had "no conflict of interest." *Id.* 633; Ex. 2 (Pirrong Dep. 95:14–97:24).

5

**B.  Pirrong Previously Attributed the April 20 Price Movements to Supply and Demand Factors, Without Reference to TAS**

███████████████████████████████████████████████████████████████

█████████████████████████████████ Ex. 2 (Pirrong Dep. 40:8–16, 45:9–46:22). He also wrote a paper in 2019 about how TAS trading could be used to manipulate futures markets. *Id.* 45:24-46:3. Yet on April 20, with this experience firmly under his belt, Pirrong voiced his agreement with the consensus opinion that the price movements observed in the May Contract were due to fundamental market factors, without even mentioning TAS trading. Specifically, in a post on his "Streetwise Professor" blog, Pirrong cited fundamental supply and demand factors, along with the technical constraints and frictions associated with the physical delivery mechanism of the May Contract, as the "proximate cause" of price movements in the May Contract. Ex. 38 (*WTI-WTF?*, Apr. 20, 2020); Ex. 2 (Pirrong Dep. 57:17–63:8). The next day, Pirrong explained— based on contemporaneous reports—that storage at Cushing for WTI was above 80%, which he deemed "effectively full." Ex. 39 (*WTI-WTF? Part II (of How Many???)*, Apr. 21, 2020); Ex. 2 (Pirrong Dep. 75:19–77:8). In his blog posts, Pirrong also proposed two theories of potential strategic behavior in the *physical* oil market that could have exacerbated the price decline in the May Contract: (1) a short market power manipulation involving a physical oil trader and (2) a firm controlling storage and withholding storage capacity to crash prices. Ex. 38 (*WTI-WTF?*, Apr. 20, 2020)); Ex. 39 (*WTI-WTF? Part II (of How Many???)*, Apr. 21, 2020); Ex. 40 (*WTI-WTF? Part 3: Did CLK20 Get TAS-ed?*, Apr. 30, 2020); Ex. 2 (Pirrong Dep. 68:19–70:8) (short market power

manipulation); *id.*71:13-75:18 (storage capacity theory). But he failed to say anything about TAS trading.[4]

Despite his initial musings on how physical players may have contributed to price movements on April 20 in the futures market, Pirrong's expert report in this case fails completely to address these obvious alternative explanations for the -$37.63/barrel settlement price on April 20, instead focusing entirely on the Trader Defendants' trading in the futures market.

### C. Pirrong's Reports Are Riddled with Errors

Trying to justify his contrarian opinion has not been easy for Pirrong. On February 19, 2024, Plaintiff filed both its motion for Class certification and Pirrong's expert report in support of its motion. ECF Nos. 303, 305-1. Four days later, on February 23, 2024, Pirrong submitted a "corrected copy" of his report, along with some of the back-up materials for his report. Over the next ten weeks, defense counsel identified numerous issues with Pirrong's corrected report, prompting the service of nine separate supplemental back-up productions and three additional versions of his report and appendices on April 30, May 7, and May 8, 2024. Ex. 2 (Pirrong Dep. 27:1–30:24). Finally, on May 9, 2024, more than two months after his initial report, Pirrong submitted a *sixth* version—the "amended" report now before the Court. ECF No. 324, ("Pirrong Rep.").

Pirrong admits that ████████████████████████████████████████ Ex. 2 (Pirrong Dep. 38:25–39:3, 223:15–19). His errors included incorrect dates, incorrect prices, and incorrect computations, resulting in at least 60 "corrections" throughout his report. Pirrong Rep. App. E. And, even after submitting five corrected reports, the amended report still has

---

[4] Over a week later, Pirrong read a column by Matt Levine speculating that TAS traders may have played a role in the price movements, at which point Pirrong jumped in to cite his prior research on TAS. Ex. 40 (*WTI-WTF? Part 3: Did CLK20 Get TAS-ed?*, Apr. 30, 2020).

significant errors. Ex. 2 (Pirrong Dep. 220:23–223:19). ██████████████████████

████████████████████████ *Id.* 22:19-23:10.

### D. Pirrong's Opinions in Support of Class Certification

Plaintiff asked Pirrong whether it "may present economic and finance methodologies which show whether Defendants' conduct depressed prices of [the May Contract] and provide reasonable estimates of such price depression." Pirrong Rep. ¶ 6. He opines that three different methodologies can do the job.

First, Pirrong analyzes Trader Defendants' trading, including comparisons of their trading with a subset of other market participants. *Id.* ¶ 8. He concludes that Trader Defendants' conduct was "uneconomic" and "manipulative"—inconsistent with "economically beneficial speculative, hedging, or market making behavior." *Id.* ¶ 284.

Second, Pirrong offers his bespoke time-varying parameter vector autoregression ("TVP-VAR") model to estimate the approximate amounts of the direct impact of Defendants' trades on the May Contract's price. Never before used to estimate price impact in financial markets or accepted by any court, Pirrong claims that his model captures the total price impact of order flow imbalances on the May Contract during Plaintiff's proposed Class Period of 9am to 1:30pm. *Id.* ¶¶ 222-227. Noting that all aggressive trading has an impact on price, and assuming that all the Trader Defendants' trading was uneconomic, Pirrong then claims that his model allows him to isolate the effect of the Trader Defendants' trading up "until ████████" *Id.* ¶ 228-29.

During the last ████████ of the Class Period, however, Pirrong abandons TVP-VAR, which he admits cannot explain the price movement, and instead opines that there was a ████ ████ starting at ████████ in both the May-June spread price and the May Contract price. *Id.* ¶¶ 10, 24-27, 233-59. He opines that Defendants were "a direct and substantial economic cause of such ████████ and the resulting further depression of May Contract prices." *Id.* ¶ 10. Ultimately,

leaning on "chaos theory" to establish causality, Pirrong concludes that ███████████
████████████████████████████████████████████████████████████████████████████
████████████████████████ *Id.* ¶¶ 115-120, 257.

In further support of his analysis of price impact, Pirrong opines that fundamental factors, including constraints on oil storage at Cushing, cannot explain the price movements observed on April 20. *Id.* ¶¶ 338-388. Pirrong's price impact model completely ignores storage factors, so he is constrained to make a series of spurious arguments to try to rule out storage constraints as an explanation: (i) suggesting that the May Contract shorts (sellers) "could deliver oil in store" and so additional storage was not needed for long futures position holders (buyers) taking delivery; (ii) claiming that "Cushing stocks were well below storage capacity at Cushing"; (iii) arguing that May Contract's post-1:30pm price rebound indicates that storage was not constrained; and (iv) contending that analysis of front month-second month spreads between April 17 and April 24 shows the "market assessment of the severity of any putative shortage of storage capacity at Cushing became *less* dire, not more." *Id.* ¶¶ 340, 353-56, 382.

E.     **Professor Hendershott's Response to Pirrong's Opinions**

Counsel for the Trader Defendants retained Professor Terry Hendershott to review and assess Pirrong's opinions. Hendershott is the Willis H. Booth Chair in Banking and Finance at the Haas School of Business at the University of California Berkeley and a leading expert on market microstructure who has served as an expert for the SEC, CFTC and DOJ in multiple matters involving alleged market manipulation of futures contracts and other financial instruments. Ex. 1 (Hendershott Rep. ¶¶ 1-7). Hendershott finds that Pirrong's opinions suffer from a variety of conceptual and methodological flaws that render his opinions unscientific and unreliable. *Id.* ¶ 11.

### 1. Hendershott's Assessment of Pirrong's Storage Opinion

Hendershott observes that Pirrong's claim that market conditions could not explain the May Contract price decline on April 20 is fundamentally flawed and squarely contradicted by the relevant facts, data, and predominant views of market participants, industry analysts, regulators, academics, and other observers. *Id.* ¶¶ 12, 48-83. Hendershott also explains why Pirrong's supposed "logical problems" with the consensus opinion do not in fact undermine the conclusion that market forces caused the price decline.

First, Pirrong's suggestion that long futures position holders could take delivery from shorts already holding oil in storage at Cushing ignores NYMEX delivery rules, which only permit such transfers if the shorts "agree." *Id.* ¶¶ 97-98. Of course, the shorts were unlikely to agree in the super contango market on April 20, when storage was so valuable. No rational holder of oil in store would do so, when they could instead hold the oil and sell it at the much higher future prices. *Id.*

Second, Hendershott addresses Pirrong's claims about Cushing storage capacity. Pirrong writes that Cushing was "well below storage capacity" at only "68 percent of capacity." *Id.* ¶ 99. But this calculation is based on perhaps-interesting-to-know-but-wholly-irrelevant "total storage capacity" figures rather than Cushing's "net working storage capacity"—*i.e.*, how much storage could actually be used. By that measure, Cushing was already 84% full as of April 24, a level Pirrong himself previously deemed "effectively full." *Id.* ¶ 99. Compounding the problem, Pirrong completely ignores contemporaneous analyses projecting that Cushing would reach full capacity as early as the first half of May 2020 and evidence that any remaining storage space was already fully committed. *Id.*

Third, Hendershott notes Pirrong's failure to consider market factors other than actual storage capacity that could have caused May Contract prices to fall, including those cited in the CFTC's report and even Pirrong's own prior observation that strategic trading in the physical

market could have moved futures prices. *Id.* ¶ 100. Pirrong's claim that prices rebounded after 1:30pm likewise ignores the even greater price decline to ███barrel around ███ when none of the Trader Defendants were trading. *Id.* ¶ 101.

Finally, Hendershott explains that Pirrong's claim that narrowing of calendar spreads proves storage issues were becoming "less dire" is rooted in a misleading comparison of *different calendar spreads*. An apples-to-apples spread comparison shows that spreads not only did not narrow, but actually widened between April 20 and 22, meaning that the market perceived storage constraints as getting worse. *Id.* ¶ 102.

### 2.    Hendershott's Assessment of Pirrong's TVP-VAR Model

Hendershott identifies multiple flaws with Pirrong's TVP-VAR model that render it unreliable as a means to prove Classwide injury attributable to Trader Defendants' alleged conduct. To begin with, Hendershott explains that Pirrong's model cannot be used to estimate "price artificiality" because his implicit assumptions about trading in the "but-for" world on April 20 (*i.e.*, absent the alleged manipulation by the Trader Defendants), are unsupported, unreasonable, and contradicted by trading patterns in the actual world. Ex. 1 (Hendershott Rep. ¶¶ 115-127). Most significantly, Pirrong fails to account for how TAS sellers who needed to liquidate their long positions would have done so absent Trader Defendants' TAS purchases and offsetting non-TAS sales. *Id.* ¶¶ 126-127.

Additionally, Hendershott shows that Pirrong's use of TVP-VAR differs considerably from the accepted use of a VAR model, has never been peer reviewed to study price impact in a market microstructure setting, and is not generally accepted in the market microstructure field. *Id.* ¶¶ 128-143. Hendershott also finds that Pirrong's model fails to control for confounding factors and alternative explanations for May Contract price movement, such that it would falsely attribute price movements to trading that in fact had other causes. *Id.* ¶¶ 144-149. Finally, Hendershott finds

11

that minor adjustments that should not change the output of Pirrong's model in fact yield substantial changes, including scenarios which yield ███████ *Id.* ¶¶ 150-165. Application of the "standard," generally accepted VAR methodology using Pirrong's variables shows ████ ████████████████████████████████ *Id.* ¶¶ 166-171.

### 3. Hendershott's Assessment of Pirrong's ████████ Opinion

As for Pirrong's ████████ opinion, Dr. Hendershott finds that it is so thoroughly rooted in unscientific and unreliable methodology that Pirrong has no price artificiality model at all for the last ████████ of the Class Period. Pirrong abandons his TVP-VAR model after ████████ as the model is not able to reliably explain price changes. *Id.* ¶¶ 175-185. But Hendershott shows that Pirrong's use of a "VPIN" metric also ████████████████████████████████ ████████████████████████████████████████████████████ even if one were to accept VPIN as valid, it does not purport to explain or determine that ████████████ ████████████████████████ *Id.* ¶¶ 208-216.

### 4. Hendershott's Assessment of Pirrong's Opinion that Trader Defendants' Trading Was "Uneconomic"

Finally, Hendershott disputes Pirrong's opinion that Trader Defendants' trading was "uneconomic" and "inconsistent with speculative trading." Pirrong ignores data demonstrating the opposite—that each of Trader Defendants' trading pattern is consistent with speculative trading and profitable even absent any manipulation. Ex. 1 (Hendershott Rep. ¶¶ 269-305). Hendershott further notes that Trader Defendants ████████████████████████████████████ ████████████████████████████████████████████████████ ████████ *Id.* ¶¶ 309-316. He also shows that Pirrong ignored non-Defendant traders ████████████ ████████████████████████████████████████████████████ ████████████████████ *Id.* ¶¶ 317-322.

## ARGUMENT

### I.    Standard for Admissibility of Expert Testimony

Rule 702 governs the admissibility of expert testimony and permits a qualified expert to opine on an issue relevant to the case where the proponent demonstrates that (a) the expert's scientific, technical, or specialized knowledge will help the factfinder determine a fact in issue, (b) the expert's testimony is based on sufficient facts or data, (c) the expert used reliable principles and methods, and (d) the expert reliably applied those methods to the facts of the case. Fed. R. Evid. 702. The rule imposes a gatekeeping responsibility on district courts to ensure that any proposed expert testimony "is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. As "gatekeepers," courts must exclude opinion testimony that is not based on reliable methods or does not fit the facts of the case. *Kumho*, 526 U.S. at 147.

To be relevant, an expert opinion must be based on "sufficient facts or data" and must "fit" the facts of the case. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591. "[S]elective use of facts fails to satisfy the scientific method and *Daubert,* and it thus fails to assist the trier of fact." *Barber v. United Airlines, Inc.*, 17 F. App. 433, 437 (7th Cir. 2001). Further, an opinion based only on the *ipse dixit* of the expert is unhelpful and irrelevant, and properly excluded under Rule 702. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

An expert is "reliable" if both the expert's methodology and its application to the case at hand display the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. A non-exhaustive list of factors courts should consider when assessing reliability include "whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert*, 509 U.S. at 593–94).

In explaining its recent amendments to Rule 702, the Advisory Committee stated that it is an "incorrect application" to find that "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology are questions of weight and not admissibility." Fed. R. Evid. 702 Advisory Committee Notes to 2023 Amendments; *see also West v. Home Depot U.S.A., Inc.*, 2024 WL 1834112, at *2 (N.D. Ill. Apr. 26, 2024). While the amendments did not change the rule's meaning, "the [Advisory Committee] Note makes clear that previous holdings 'that the critical question of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility' are an 'incorrect application' of Rules 702 and 104." *Boyer v. Citi of Simi Valley*, 2024 WL 993316, at *1 (C.D. Cal. Feb. 13, 2024) ("The Court is required to analyze the expert's data and methodology at the admissibility stage more critically than in the past"). "Ultimately, a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *In re Paraquat Prod. Liab. Litig.*, 2024 WL 1659687, at *4 (S.D. Ill. Apr. 17, 2024).

## II. Pirrong's Storage Opinion is Unreliable

Pirrong purports to rebut the consensus explanation for the price movements observed on April 20 by noting several supposed "logical problems" with it. But Pirrong ignores storage completely in his analyzed models, and his storage opinions fail to consider all relevant facts and data, including those cited in the CFTC's report detailing the unique features of the WTI market on April 20. Pirrong also impermissibly cherry-picks and manipulates evidence to support his idiosyncratic opinion. This is not reliable and admissible expert testimony.

In the aftermath of April 20, numerous market analysts, academics, U.S. government agencies, and commodities exchanges, including the CFTC, the CME, █ and the U.S. Energy Information Administration (EIA), all identified fundamental supply and demand conditions,

14

including the storage constraints at Cushing as the causes of the price movements observed on April 20. Ex. 1 (Hendershott Report ¶ 83) (citing public statements from the CFTC Chairman and the CME Chairman and CEO, analyses produced in litigation, and public EIA reports); *see also supra* pp. 1-2. Pirrong completely ignores this overwhelming consensus[5] and, in trying to construct a route around it, grounds his contrary view on inaccurate and highly misleading Cushing storage capacity calculations. His disregard for widely understood explanation and fundamental errors in creating his own render his opinion unreliable and irrelevant.

First, Pirrong suggests that diminishing storage capacity cannot explain price movements because short futures position holders could pass ownership to long futures positions holders taking delivery without the crude leaving the existing storage facility (*i.e.*, "deliver oil in store"). Pirrong Rep. ¶ 340. This flies in the face of economic reality in a super contango market. As Professor Hendershott notes, NYMEX rules require short position holders to agree to make delivery in storage. Ex. 1 (Hendershott Rep. ¶¶ 97-98). But there is no reason why a short would give up a valuable profit opportunity on April 20. *Id*. Even Pirrong acknowledges that there was "no reason" for short futures position holders to "deliver [oil] at negative prices rather than to continue to hold it for sale later at positive prices." Pirrong Rep. ¶ 347. ██████████████████

████████████████████████████████████████████████████████████

████████████ Ex. 2 (Pirrong Dep. 152:18–23). Pirrong's unsupported opinion about delivering

---

[5] To counsel's knowledge, a grand total of three other people cited TAS trading as *potentially* implicated in the price movement of the May Contract on April 20, in the months immediately following the event, but none reached the conclusion that Pirrong does. *See* Matt Levine, *Money Stuff: It's a Good Time to Cut Dividends*, Bloomberg, Apr. 29, 2020, at https://www.bloomberg.com/news/newsletters/2020-08-04/money-stuff-some-people-made-money-on-negative-oil-prices; Better Markets, *Letter re: Position Limits for Derivatives (RIN 3038-AD99)* (May 15, 2020), https://bettermarkets.org/sites/default/files/Better_Markets_Comment_Letter_on_Position_Limits_for_Derivatives_Upload.pdf; *see also Dissenting Statement of Commissioner Dan M. Berkovitz Regarding Final Rule on Position Limits for Derivatives*, Oct. 15, 2020, at https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatementb101520b#.

oil in store rests on his word alone, without supporting evidence or authority. Such textbook *ipse dixit* is inadmissible. *Joiner*, 522 U.S. at 146 (1997); *see also City of Rockford v. Mallinckrodt ARD, Inc.*, 2024 WL 1363544, at *7 (N.D. Ill. Mar. 29, 2024) (excluding *ipse dixit* opinion).

Second, Pirrong claims that storage issues could not have caused the May Contract price decline because "Cushing stocks were well below storage capacity at Cushing…[and] occupied 68 percent of capacity." Pirrong Rep. ¶ 356. The claim is deeply misleading, irrelevant, and contradicts Pirrong's own prior statements. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ Ex. 2 (Pirrong Dep. 143:17–145:14). More troublingly, he calculates his 68% figure based on Cushing's "total" capacity, rather than the relevant "working" capacity. Ex. 1 (Hendershott Rep. ¶ 99). Had Pirrong used the working capacity figure, he would have found that Cushing storage was at 84% of capacity on April 24 (a week before any deliveries of oil under a May Contract), a level that Pirrong previously wrote was "probably effectively full." *Id.*[6] Taking the wrong measure of the wrong period, while excluding relevant data and ignoring his prior conclusions, renders Pirrong's storage capacity opinions not only unreliable and unhelpful to the trier of fact, but actively misleading. They should be excluded. *See, e.g.*, *Smith*, 936 F.3d at 558.

Pirrong also ignores evidence of what actual market participants experienced and believed about Cushing's May storage capacity on April 20. As this Court stated, market participants' "perception of the market and their understanding of storage capacity at Cushing are relevant…and that's different than evidence of actual capacity." ECF No. 339, Hr'g Tr. (May 30, 2024), 7:6-9. Had Pirrong bothered to research this question, he would have learned that analysts were predicting

---

[6] ███████████████████████████████████████████████████████████ Ex. 2 (Pirrong Dep. 143:7–147:6).

that Cushing would be at tank tops in early May. Ex. 1 (Hendershott Rep. ¶¶ 62, 100). As Hendershott explains, Cushing storage capacity utilization had already jumped from 50 percent to 76 percent between mid-March and mid-April 2020, and was projected to reach 100 percent by mid-May 2020 at the rate it was filling. *Id.* ¶¶ 61-62.

Hendershott's analysis is consistent with contemporaneous analyses from non-party productions in this case. For instance, immediately after the April 20 trading day ended, ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████

Projections aside, actual traders were reporting that, notwithstanding published figures, terminals at Cushing "[had] already contracted their storage 100%" such that anyone who had a long position in the May Contract but had not already found storage would not be able to take delivery. Ex. 20 (*Remaining Oil Storage in Cushing, OK is Already Booked – Traders*, Pipeline &

Gas Journal, Apr. 21, 2020 at 1); Ex. 20A (*No vacancy: Main U.S. oil storage in Cushing is spoken for*, Reuters, Apr. 21, 2020). Other contemporaneous reports also confirm that storage was effectively full. *See* Ex. 29 (EIA, *Low liquidity and limited available storage pushed WTI crude oil futures prices below zero*, Apr. 27, 2020); Ex. 27 (*Negative prices reveal the crisis for US oil*, Wood Mackenzie, Apr. 24, 2020). Pirrong missed all this. He testified that he ███████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████ Ex. 2 (Pirrong Dep. 447:19–24; 519:16–23). Pirrong's omission of these critical facts makes his opinions unreliable. *See Smith v. Ill. Dep't of Transp.*, 936 F.3d 554, 558 (7th Cir. 2019) (district court properly excluded expert who "omitted a substantial set of facts from her analysis"); *LeClercq v. The Lockformer Co.*, 2005 WL 1162979, at *4 (N.D. Ill. Apr. 28, 2005) (expert unreliable for "fail[ing] to discuss the import of, or even mention, [ ] material facts" relevant to his conclusions). Moreover, none of his supposed "logical problems" with the consensus opinion withstand scrutiny.

Third, Pirrong cites the supposed price rebound after 1:30pm as evidence that storage issues could not have caused the May Contract price movement. Pirrong Rep. ¶ 349. But while prices initially rebounded to ██████ after settlement, they dropped again after ██████ to █████████████████████ before closing for the day at ██████ Ex. 1 (Hendershott Rep. ¶ 101). ███████████████████████████████████████████ ████████████████████████████████████████ Ex. 2 (Pirrong Dep. at 158:18–159:5). He has done nothing to investigate why sellers traded at prices lower than the settlement price after 1:30pm, and he even concedes in his report that the price rebound could have been caused by strategic commercial traders who waited until after the settlement to cover their positions. Pirrong Rep. ¶ 349 n. 96 ("[P]otential takers of delivery could have bought futures to

establish a potential delivery obligation, or shorts who could make delivery could have bought futures to extinguish their delivery obligation."); *cf.* Ex. 25 (Verleger, *Negative Prices: Never Again*, Apr. 23, 2020) (explaining how commercial "shorts" with the ability to make delivery could have waited out the non-commercial "longs" who had to liquidate their positions). Yet Pirrong did nothing to investigate this alternative explanation for the price movement.[7]

Fourth, Pirrong claims that the narrowing of calendar spreads between April 17 and April 24 demonstrates that the market believed Cushing storage issues were becoming "less dire." Pirrong Rep. ¶¶ 352-54. But Pirrong's misleading and erroneous conclusion rests on his use of two different calendar spreads (May-June and June-July) across those dates, rather than a comparison of the same spreads. Because the May Contract had already expired by April 24, the best available apples-to-apples comparison would have been to compare the June-July calendar spread across the two dates. Had Pirrong done so, he would have seen that the spread remained virtually unchanged week over week. Ex. 1 (Hendershott Rep. ¶ 102 & Figure 11). Moreover, the June-July spread actually *widened* between April 20 and April 22, which—according to Pirrong's own logic— suggests a recognition that storage issues were getting worse, not better. *Id.* Picking and choosing data points and time periods that support a predetermined outcome, rather than examining all relevant data and evidence, is exactly the type of expert opinion that courts must exclude as unreliable and unscientific. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 484 (S.D.N.Y. 2018) (selection of dates for artificiality analysis "strongly suggests cherry-picking"); *Barber*, 17 F. App. at 437 (district court properly excluded expert opinion that cherry-

---

[7] Pirrong's failure to consider manipulation of futures prices by physical traders is all the more surprising given that he is currently serving as Lovell Stewart's expert in two cases alleging just that. *See Ploss v. Kraft Foods Grp., Inc.*, 637 F. Supp. 3d 561, 569 (N.D. Ill. 2022); *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020).

picked data, ignoring without explanation information that contradicted his opinion); *LeClercq*, 2005 WL 1162979, at \*4.

### III. Pirrong's Opinion That Trader Defendants' "Aggressive" Trading Was "Uneconomic" and "Manipulative" is Unreliable

Pirrong opines that the Trader Defendants' conduct was "uneconomic," "coincided exactly with trade-based manipulative conduct," and "not consistent with economically beneficial speculative, hedging, or market making behavior." Pirrong Rep. ¶ 284. However, Pirrong ignores evidence that Trader Defendants' trading patterns would have been expected to be profitable absent manipulation, and █████████████████████████████████████████████████████ █████████████████████████████████████████

#### A. Trader Defendants' Trading Pattern is Consistent with Speculative Trading and Inconsistent with TAS Manipulation

Pirrong admits that █████████████████████████████████████████████ ██████████████ Ex. 2 (Pirrong Dep. 378:7–17). Yet he ignores relevant data demonstrating those circumstances existed on April 20, when prices were not only widely predicted to fall over the course of the day, but to reach negative numbers, and traders could observe the high open interest and a large TAS order book imbalance. As Hendershott demonstrates, Trader Defendants' trading patterns are wholly consistent with basic speculation: the strategy "profit[s] when prices decrease and los[es] when prices increase." Ex. 1 (Hendershott Rep. ¶¶ 275-283). In fact, even removing the alleged manipulative price impact Pirrong found, each of the Trader Defendants' trading patterns remained profitable—a finding that upends Pirrong's opinion that the trading was "uneconomic." *Id.* ¶¶ 284-89.

Pirrong also claims that Trader Defendants' failure to sell WTI contracts on ICE was uneconomic, ██████████████████████████████████ Pirrong Rep. ¶ 319-320 & n. 94. But he ignores or misses the elementary point that since trading on ICE does *not* offset a TAS

position on NYMEX, it would *not* make sense for Trader Defendants (or any other market participants) to have opposite open positions on the two exchanges that would not offset and extinguish the physical delivery requirement. Ex. 1 (Hendershott Rep. ¶¶ 287-289). Further, even within the bounds of his logic-defying construct, Pirrong ignores the lack of liquidity in the ICE contract. ███████████████████████████████████████████████████████████

███████████████████████████████████████████ Ex. 30 (ICE Report). ███████████████

███████████████████████████████████████████████████████ Ex. 2

(Pirrong Dep. 277:15–278:5).

### B. Pirrong's Opinion that Trader Defendants' "Aggressive" Trades Were Manipulative is Unsupported by Relevant Facts and Data

Pirrong claims that Trader Defendants' "aggressive" trading pattern "mirrored exactly the conduct of an entity implementing what economists define as a trade-based manipulation strategy utilizing TAS contracts." Pirrong Rep. ¶ 321. But Trader Defendants' trading patterns are

████████████████████████████████████████████████████████████████

██████████████████████████████ Pirrong previously explained that Optiver manipulated TAS by accumulating its TAS position during the morning of the settlement day and liquidating it through market orders during the last five minutes before settlement, with **75 percent** of its sales volume occurring during the two-minute settlement window. Ex. 42 (Pirrong, *Derived Pricing: Fragmentation, Efficiency, and Manipulation* (2019) at 2, 16-17). ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 1 (Hendershott Rep.

¶¶ 290-296). Pirrong concedes that ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ Ex. 2 (Pirrong Dep. 85:6–12, 86:3–12). But he ignores the stark differences

when opining that Trader Defendants traded precisely as a manipulator would have been expected to trade, again rendering his opinion unreliable and unhelpful to the trier of fact.

As for Pirrong's opinion that the Trader Defendants ███████████████████████████ ████████████████████████ Pirrong ignores the basic fact that every single trade in the futures market consists of an "aggressive" order matching with a "passive" order,[8] and he offers no way to distinguish whether a particular "aggressive" order is manipulative. Ex. 1 (Hendershott Rep. ¶¶ 297-304). ██████████████████████████████████████████ ████████████████████████████████████████████████████ Ex. 2 (Pirrong Dep. 330:24–332:13). He also ignores data that Trader Defendants ███████████████ ███████████████████████████████████████ Pirrong Rep. ¶¶ 19, 21. ██████████ ████████████████████████████████████████████ Ex. 1 (Hendershott Rep. ¶ 303).

### C. Trader Defendants Traded Differently from Each Other

Pirrong claims throughout his report that Trader Defendants ████████████████ ████████████████████████████████████ *See, e.g.*, Pirrong Rep. ¶ 295. ████ ████████████████████████████████████████████████████████████ █████████████████████████████████████ Ex. 2 (Pirrong Dep. 465:8–468:25). By doing so, he cut himself off from the facts that demonstrate that different Trader Defendants ████████████████████████████████████████████ Ex. 1 (Hendershott Rep. ¶¶ 308-315). Pirrong also focuses on *positions* of a subset of the Trader Defendants, rather than purchases and sales for all of them, even though Plaintiff alleges coordinated *trading*. Ex. 2



---

[8] Orders that can immediately execute are called "aggressive." This means all market orders are aggressive and limit orders at or below the best bid are aggressive. Ex. 1 (Hendershott Rep. ¶ 373).

(Pirrong Dep. 458:12–23, 498:8–15). This approach vastly inflates correlation figures. Focusing on actual trading by all Trader Defendants, rather than positions, ████████████████████ ████ Ex. 1 (Hendershott Rep. ¶¶ 322-331).

One of Pirrong's key claims is that ████████████████████████████████ ████████ Pirrong Rep. ¶¶ 284-287, 291. But he limits his comparison to a subset of Trader Defendants and non-Defendant traders, and he ignores █████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████ *Id.* ¶¶ 294-298. █████████████ █████████████████████████████████████████████████████ Ex. 2 (Pirrong Dep. 382:15–24, 383:25–384:9). Nor is the analysis at all scientific, lacking any testable hypotheses. *See* Ex. 1 (Hendershott Rep. ¶ 343). Further, ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ *Id.* ¶¶ 339-342.

The CME audit trail data shows that more than ██ accounts purchased TAS and sold non-TAS aggressively. *Id.* ¶¶ 316-321. A correlation analysis of these accounts demonstrates that ██ ████████████████████████████████████████████████ ████████████ *Id.* ¶¶ 332-37. Pirrong's exclusion of relevant facts and data that contradict his opinions about the Trader Defendants' trading again falls well short of Rule 702's standards. *See Barber*, 17 F. App. at 437; *LeClercq*, 2005 WL 1162979, at *4.

### IV. Pirrong's TVP-VAR Regression Model is Unreliable

The foundation of Pirrong's opinion that injury to all putative Class members can be proven using common evidence is his TVP-VAR model, a regression model intended to demonstrate the effect that the alleged manipulation had on May Contract prices. Although autoregressive models have been accepted as reliable in other cases, they are by no means *Daubert*-proof. Indeed, courts routinely reject flawed autoregressive models, including models like Pirrong's. *See Choi v. Tower Rsch. Cap. LLC*, 2022 WL 4484485, *8 (S.D.N.Y. Sept. 27, 2022) (rejecting model that "suffers from an inability to distinguish between prices that are the result of the legitimate supply and demand and those that are due to Tower's alleged manipulation"); *Grasshopper House, LLC v. Clean & Sober Media LLC*, 2019 WL 12074086, at *11 (C.D. Cal. July 1, 2019) (rejecting expert opinion because his "autoregressive distributed lag regression model . . . simply assum[ed] the facts of [defendant's] liability for the purpose of his analysis" even though his expert opinion purported to establish causation of damages); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. at 484 (excluding expert's for cherry picking clean periods to determine the alleged artificiality in LIBOR rates); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427–28 (S.D. Cal. 2005) (rejecting a regression analysis as "methodologically unsound" because expert failed to "introduce any independent variables"); *Am. Booksellers Ass'n v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1041–42 (N.D. Cal. 2001) (striking economic model that "contains entirely too many assumptions and simplifications that are not supported by real-world evidence"); *cf. In re Northfield Lab'ys, Inc. Sec. Litig.*, 267 F.R.D. 536, 548 (N.D. Ill. 2010) (exclusion of dates from event study rendered it unreliable). Pirrong's TVP-VAR model should meet the same fate.[9]

---

[9] Pirrong's difficulty in developing his analysis further illustrates why courts do not accept regression models at face value. He had years to assess trading data, to form opinions, and to develop a working model. Yet, after "correcting" his report six times in three months, it still has errors. Ex. 2 (Pirrong Dep. at 220:23–

### A. Pirrong's TVP-VAR Model is Not a Generally Accepted Methodology

Pirrong offers a novel regression model unsupported by the scientific literature as his basis for calculating an estimate of price artificiality for part of the Class Period. Falling afoul of several prongs of the *Daubert* factors, including whether a methodology has been subjected to publication and peer-review and whether it is generally accepted within the relevant scientific field, *Daubert*, 509 U.S. at 593–94; *Lapsley*, 689 F.3d at 810, Pirrong's opinion cannot meet the "standard of reliability." *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002).

Pirrong's regression model is based initially on a vector auto-regression (VAR) model developed by Hasbrouck. Pirrong Rep. ¶ 164. However, Pirrong does not use the "standard" Hasbrouck model. *Id.* ¶ 186. He instead adapts the model to try to account for the significant price volatility on April 20. *Id.* ¶¶ 174-181. But the paper Pirrong cites involved macroeconomic monetary policy, rather than market microstructure, and analyzed coefficients over a period of *decades*, rather than on a single, volatile trading day. Ex. 1 (Hendershott Rep. ¶ 137). A TVP-VAR model has "never been peer-reviewed to study impact in a market microstructure setting, nor is it generally accepted in the market microstructure literature." *Id.*; *see also* Ex. 2 (Pirrong Dep. 196:6–19) ████████████████████████████████████████████████████████████████ ██████████████████████████████[10]

---

223:19). The fact that he "corrected his expert report multiple times" is reason enough to "significantly undermine[] [the Court's] confidence in [his] choice of [price artificiality] model and the assumptions upon which he based [those] opinions." *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1091-92 (D. Colo. 2020) (expert's "assumptions, methods, and calculations [were] so unreliable that they cannot support a finding [of the claimed losses], by the preponderance of the evidence"), *aff'd*, 1 F.4th 769 (10th Cir. 2021).

[10] Pirrong testified that ████████████████████████████████████ ████████████████████ Ex. 2 (Pirrong Dep. 194:16–195:10). However, the TVP-VAR model is not mentioned in his Declaration in Support of Preliminary Approval of Class Action Settlement, which sets forth his model and opinions in that case. ECF No. 591-1, *Laydon*, No. 12-cv-03419, Apr. 6, 2016 (S.D.N.Y.). Rather, it states that he used a "standard event study methodology to quantify the artificiality of prices during the Class Period." *Id.* ¶¶ 32-33. Moreover, Pirrong was not deposed in that case, and there is no indication that his model was the subject of any challenge or other analysis.

Furthermore, to try to justify the use of the TVP-VAR model to estimate price impact, Pirrong must make assumptions that are simply not reasonable in a market like the one that existed during the proposed Class Period. Whereas over a longer period of time it may be safe to assume that trading other than the trading under investigation would have been similar, even absent alleged manipulation, it is simply unfathomable that in the but-for world on April 20—where the Trader Defendants did not aggressively buy over ███ TAS contracts and ████████████ ████████████████████████████████ the other traders in the market would have traded at all similarly. Ex. 1 (Hendershott Rep. ¶¶ 115-127). ███████████ ████████████████████████████████████████████████████████████

███████ Ex. 2 (Pirrong Dep. 188:20–189:6); *see Northfield*, 267 F.R.D. at 548-49 (finding expert's event study unreliable in light of market inefficiencies during the proposed class period).

████████████████████████████████████████ Ex. 2 (Pirrong Dep. 174:9–25). His methodology therefore cannot support the type of "fraud on the market" theory that typifies securities fraud cases or that the court adopted in *Ploss v. Kraft Foods Grp., Inc.*, 637 F. Supp. 3d 561, 572 (N.D. Ill. 2022). His quixotic attempt to isolate the price impact of Trader Defendants' trading during a period of unprecedented downward price pressure is itself unprecedented.[11] Plaintiff also cites to *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023), in which Judge Rakoff rejected challenges to a VAR model proffered by an expert for the SEC. Pl. Class Cert. Mem. 28, ECF No. 318. But, as discussed above, Pirrong ***did not*** use the Hasbrouck VAR model. Moreover, the SEC in *Terraform* did not need to

---

[11] Plaintiff's citation to other cases approving of autoregressive models to show price impact on a classwide basis are similarly unpersuasive, as none of them involved a TVP-VAR model or such a short Class Period at a time of unprecedented volatility. *See, e.g.*, *In re Term Commodities Cotton Futures Litig.*, 2020 WL 5849142, at *18-21 (S.D.N.Y. 2020); *In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 182 (S.D.N.Y. 2008).

demonstrate the existence of artificial prices or that such prices had a common impact on all Class members, as Plaintiff must do here.

So why not use the peer-reviewed, standard Hasbrouck VAR regression model to measure price impact? The answer becomes clear by doing just that. Hendershott applied Pirrong's VAR equations to the standard Hasbrouck VAR regression model and found that the price impact of Trader Defendants' trading activity was "effectively ███████████████ Ex. 1 (Hendershott Rep. ¶¶ 166-171). Pirrong's untested TVP-VAR should be excluded.

### B.    Pirrong's Methodology Cannot Estimate "But-for" Prices

Pirrong claims that his TVP-VAR model is sufficient to provide estimates of "price artificiality—*i.e.*, the price movements that occurred ***as the result*** of Defendants' uneconomic conduct up through ██████ Pirrong Rep. ¶ 228 (emphasis added). But the Hasbrouck VAR model estimates a "lead-lag relationship between aggressive orders and price changes," and says nothing about artificiality. Ex. 1 (Hendershott Rep. ¶ 138). Nor can Pirrong's model estimate "artificiality"—meaning the difference between observed prices and prices in the "but-for" world absent manipulation. Ex. 2 (Pirrong Dep. 173:23–174:25). This is because, as detailed below, he fails to make reasonable assumptions about what would have happened in his but-for world.

Courts must evaluate the assumptions underpinning an expert's methodology to ensure they are not based on an expert's "subjective belief or unsupported speculation," *Chapman*, 297 F.3d at 687, or *ipse dixit*, *Joiner*, 522 U.S. at 146. When an expert makes assumptions, there is also the potential for "cherry-picking" evidence, which "fail[s] to satisfy the scientific method and *Daubert*." *Van v. Ford Motor Co.*, 332 F.R.D. 249, 269 (N.D. Ill. 2019). Here, Pirrong's methodology is dependent on his patently unreasonable assumption that ███████████████ ████████████████████████████████████████████████ ██████████████ Ex. 2 (Pirrong Dep. 180:7–16). ████████████████████



[BLACK BAR] *Id.* 285:25–286:6 [BLACK BAR]

[BLACK BAR] These assumptions are not only unsupported, but conflict with the real-world data showing how TAS sellers acted.

As Hendershott explains, [BLACK BAR]

[BLACK BAR]

[BLACK BAR] Ex. 1 (Hendershott Rep. ¶ 119 & Figure 12). Contrary to Pirrong's speculation, market data shows that [BLACK BAR]

[BLACK BAR] *Id.* ¶¶ 122-126 & Figure 13. Pirrong's but-for world inexplicably ignores this reality in favor of an imagined one where the TAS sellers would somehow have been able to sell [BLACK BAR] TAS contracts without any explanation of (i) where the additional buy-side liquidity would come from, and (ii) if it did not appear, how TAS sellers selling non-TAS contracts would impact prices. *Id.*

## C. Pirrong's Methodology Does Not Control for Alternative Explanations

When an expert fails to investigate or control for obvious alternatives that may have contributed to an injury, his opinions must be excluded as unreliable. *See Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 773-774 (7th Cir. 2014) ("failure to rule out obvious potential alternative causes is [ ] fatal to [expert's] testimony"); *Olympia Equip. Leasing Co. v. West. Union Tele. Co.*, 797 F.2d 370, 382 (7th Cir. 1986) (failure to account for "economic reality"); *In re Paraquat Prod. Liab. Litig.*, 2024 WL 1659687, at *32 ("[f]ailing to take account of likely confounders . . . is a serious methodological concern" that "calls [an expert's] objectivity and credibility into question"); *City of Rockford*, 2024 WL 1363544, at *8 (failure to "control for any other factors that might have affected [ ] price" rendered damages model unreliable). Here, Pirrong failed to consider obvious alternative explanations for price declines in the May Contract and

overlooked the underlying factors that drive trading behavior. As Hendershott explains, the market's *perception* of storage utilization and capacity, ███████████████████ ███████████████████████████████████ and potential strategic trading in the physical market could all have affected futures prices on April 20, and all are obvious alternative explanations for price declines. Ex. 1 (Hendershott Rep. ¶¶ 144-145). Pirrong's analysis also does not account for why demand disappeared at negative prices, including why large traders declined to take possession of oil when they would have been paid to do it. He admitted in his deposition that ████████████████████████████████████████████ ████████████ Ex. 2 (Pirrong Dep. 534:2–18). He admitted that ████████████████ ████████████████ *Id.* 549:15-23. Yet Pirrong did not consider any of this. Just as a doctor who assumes away pre-existing injuries cannot reliably offer a causation opinion, Pirrong's model cannot be considered reliable. *See West*, 2024 WL 1834112, at *2-6 (applying the 2023 Rule 702 Amendments and excluding Plaintiff's three causation experts).

Nor does Pirrong's model correct for these obvious alternative explanations. As Hendershott explains, the TVP-VAR model may attribute price changes to trading that actually had *different* causes. Ex. 1 (Hendershott Rep. ¶¶ 145-146). His model also relies on flawed assumptions that prevent his model from analyzing whether price movements caused by confounding factors caused trades, █████████████████████ *Id.* ¶¶ 147-148; Ex. 2 (Pirrong Dep. 212:16–214:12). Such confounding factors and potential false positives render his model unreliable. *See Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (deeming the expert's reports to be "worthless" because they were based on "[s]tatistical studies that fail[ed] to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff [was] complaining");

*People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 111 F.3d 528, 537–38 (7th Cir. 1997) ("a statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court"); *City of Rockford*, 2024 WL 1363544, at *8; *Choi v. Tower Rsch. Cap. LLC*, 2022 WL 4484485, *8 (S.D.N.Y. Sept. 27, 2022) (rejecting model that "suffers from an inability to distinguish between prices that are the result of the legitimate supply and demand and those that are due to Tower's alleged manipulation"); *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 718320, at *19 (S.D. Ill. Feb. 24, 2021) (regression model failed to account for wage differences that led to "inflated estimates of impact").

### D.    Pirrong's Over-Parameterized Model is Not Robust

A model's robustness goes to whether it has been tested, evaluated for error rate, and is generally accepted under *Daubert*. *Lapsley*, 689 F.3d at 810. Where "very minor changes in arbitrarily selected model parameters can entirely alter the model's conclusions," the model is not reliable. *Reed Constr. Data Inc.* v. *McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 407 (S.D.N.Y. 2014), *aff'd*, 638 F. App. 43 (2d Cir. 2016). That is exactly the case here. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2 (Pirrong Dep. 196:20–22).[12]

As Hendershott shows, minor changes to the seed number used for Bayesian estimation or the ordering of variables can result in substantially different results. Ex. 1 (Hendershott Rep. ¶¶ 152-157, Fig. 14-15). Nor does Pirrong provide any "statistical error rates." *Id.* ¶ 165.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2 (Pirrong Dep. 207:6–13). And yet, that

---

[12] Pirrong acknowledges that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ Exs. 43-44; Ex. 2 (Pirrong Dep. 198:1–7).

is exactly what happens. When Hendershott ran three different seeds to replicate Pirrong's results, he obtained wildly different results, ranging from ███ to ██████ Ex. 1 (Hendershott Rep. ¶¶ 152-157, Fig. 14-15), ████████████████████████████████████████████████ ████████████████████████████████████████████ A model that results in such wildly different outcomes based on a small change is not reliable.

Pirrong's model also changes substantially when his variables are ordered differently. Hendershott found that there are 36 different possible arrangements of the trade and price variables in the TVP-VAR model that satisfy Pirrong's identifying restriction. *Id.* ¶ 162. But performing the calculations using these equally valid permutations of the variables in Pirrong's model produces significantly different price impact results, with the various permutations differing by as much as ███ *Id.* ¶¶ 163-164. █████████████████████████████████████ ██████████████ *Id.* As with the changes to the random seed, this minor change to what should be a randomly applied variable results in wildly different outcomes. Because Pirrong's model lacks robustness, it is unreliable. *Reed Constr. Data Inc.*, 49 F. Supp. 3d at 407 (S.D.N.Y. 2014).

### E. Pirrong's Damages Methodology, Based on His TVP-VAR Model, Cannot Measure Only Those Damages Attributable to Trader Defendants

Pirrong claims his damages methodology is "formulaic" and "straightforward," arriving at damages by multiplying a putative Class member's May Contract sale by the artificiality estimates calculated by the TVP-VAR model at the time of the sale. Pirrong Rep. ¶¶ 389-393. But even if Pirrong's model could reliably estimate price artificiality, his proposed damages methodology is far too simplistic. Because Pirrong's damages methodology considers only May Contracts traded on Globex, it fails to capture the complexity of the market and how Class members actually traded and "cannot possibly establish that damages are susceptible of measurement across the entire Class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *see also Tyson Foods, Inc. v.*

*Bouaphakeo*, 577 U.S. 442, 459 (2016) ("[r]epresentative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of [damages]"). Furthermore, Pirrong's TVP-VAR model breaks down during the period covering ████ of his claimed damages. Ex. 1 (Hendershott Rep. ¶ 263). He offers no methodology capable of measuring what portion of losses attributable to the so-called ██████ should be considered damages from the alleged manipulation.

**V.    Pirrong's ██████ Opinion is Unscientific, Untested Speculation**

████████ he has no model for measuring price impact in the final ████ of the Class Period. During his deposition, Pirrong said that he is ████████ ████████ Ex. 2 (Pirrong Dep. 229:6–20). ████████ ████ ████████ ████████ ████████ *Id.* 236:5–11; Pirrong Rep. ¶¶ 203-20. ████████ ████████ Pirrong Rep. ¶ 205; Ex. 2 (Pirrong Dep. 235:1–13). ████████ ████████ Ex. 2 (Pirrong Dep. 254:11–17).

In place of a model, Pirrong offers the speculative theory that "toxic" order flow imbalance caused a ████████ and that ████████ ████ Pirrong Rep. ¶¶ 181, 256. This opinion is based on the notion of a so-called "chaos theory" that small changes in complex systems can cause distant events, through a chain of causation that is difficult to predict. *Id.* ¶ 117. The archetypal example, which Pirrong himself cites, is the single

flap of a butterfly's wings in Brazil potentially leading to a tornado in Texas. Ex. 2 (Pirrong Dep. 255:25–257:14); Pirrong Rep. ¶ 117 & n. 50.

"But we don't hold butterflies liable for hurricanes [or tornados]." *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 854 (N.D. Ill. 2022). "The supposed 'uniqueness' of a market does not justify substituting a guess for careful analysis." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 418-19 (7th Cir. 2005). No one else has reported a ▇▇▇▇▇ on April 20. Even Pirrong cannot bring himself to say more than "there is strong economic evidence" of a ▇▇ ▇▇ and that Trader Defendants ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Pirrong Rep. ¶¶ 181, 256. Needless to say, such highly speculative and unsupported opinions should be excluded. *Deimer v. Cincinnati Sub-Zero Prod., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995) (court must "rule out" expert opinions based on "subjective belief or unsupported speculation").

Given the absence of any model to estimate artificiality, Pirrong turns to a different method of analysis to try to explain the price drop during the purported ▇▇▇▇▇ period. The approach he uses, however, is unscientific and unreliable, and cannot explain price movements after ▇▇▇▇ without significant impermissible speculation. Pirrong's argument proceeds as follows: (i) extreme order flow imbalance, or "toxicity," as measured by his "VPIN" metric, caused a ▇▇▇▇▇ (ii) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *ergo* (iii) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ "But the courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇ Ex. 2 (Pirrong Dep. 271:11–14). There is no consensus, much less general acceptance, in the academic literature that VPIN measures are predictive of ▇▇▇▇▇ Ex. 1 (Hendershott

Rep. ¶¶ 196-207). And again, Pirrong provides no "error rate." *Id.* ¶ 205. In fact, when a VPIN metric is based on actual order imbalance—as it is in Pirrong's analysis—academic research has concluded that the VPIN metric is ***negatively*** correlated with future volatility, the polar opposite of Pirrong's opinion. *Id.* ¶ 198.[13]

Pirrong also makes no attempt to explain why the price of the May Contract ███████████ ████████████████████████████████████████████████ He offers no benchmark or threshold to test whether the VPIN was high enough or persisted long enough to have triggered the alleged ███████████ a benchmark method used in all the academic papers Pirrong cites in support its use. *Id.* ¶¶ 200-203; Ex. 2 (Pirrong Dep. 269:1–11) ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Unlike the academic literature that he cites, Pirrong limits his analysis to the VPIN values on April 20, and therefore can draw no reliable conclusions as to whether it was high, low, or normal. Ex. 1 (Hendershott Rep. ¶¶ 204-207). Pirrong's failure to empirically verify a methodology that is generally accepted in the scientific community again renders his ████████ opinion inadmissible. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 817-18 (7th Cir. 2010); *Deimer*, 58 F.3d at 344; *Chapman*, 297 F.3d at 688 (expert failed to produce tests or experiments to justify conclusions and failed to prove that his theory was generally accepted in the scientific community); *Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, 2017 WL 3592775, at *13 (N.D. Ill. Aug.

---

[13] Other academic papers point out that VPIN metrics use algorithmic variables correlated with volatility and trading volume, indicating that VPIN may reflect correlation without causation. *Id.* ¶ 199.

21, 2017) (excluding methodology that "create[s] too great an analytical gap between the data and the opinion proffered" (cleaned up)).

Pirrong's VPIN approach should also be excluded on the independent basis that he cherry-picked which VPIN results to use—a "selectivity" that "strongly suggests outcome bias" and rendering his opinion "unreliable and inconsistent with rigorous scientific inquiry." *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 277 (S.D.N.Y. 2018). Pirrong generates two VPIN metrics, one for the May contract and one for the May-June spread. Pirrong Rep. ¶ 237. ███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████ *Id.* ¶ 256. This is totally unsupported. ██████████████

██████████████████████████████████████ Ex. 1 (Hendershott Rep. ¶ 214). ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████ *Id.* ¶ 212. Pirrong's opinion that ███████

██████████████████████ is a transparent attempt to capture the outsized portion of claimed damages ███████ represented by TAS sellers and those who sold the May Contract during the last ███████ of the Class Period. *Id.* ¶ 263. His ███████ opinion should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude the opinions expressed in the Amended Class Certification Expert Report of Professor Craig Pirrong (ECF No. 324). To the extent the Court does not exclude Pirrong's opinions based on the papers submitted, Defendants respectfully request oral argument and, if necessary, an evidentiary hearing.

Respectfully submitted,                            Dated: June 20, 2024

/s/ Michael P. Kelly
Michael P. Kelly
Lauren Goddard
AKERMAN LLP
750 Ninth Street, N.W., Suite 750
Washington, DC 20001
(202) 824-1716
michael.kelly@akerman.com

Amy G. Doehring
Shawn M. Taylor
Lauren Goddard
AKERMAN LLP
71 S. Wacker Drive, 47th Floor
Chicago, IL 60606
(312) 634-5700
shawn.taylor@akerman.com
amy.doerhing@akerman.com
lauren.goddard@akerman.com

Joel S. Forman
AKERMAN LLP
520 Madison Avenue, 20th Floor
New York, NY 10022
(212) 880-3800
joel.forman@akerman.com

*Attorneys for Defendants Vega Capital
London Limited and Adrian Spires*

/s/ Matthew L. Mazur
Roger A. Burlingame
Matthew L. Mazur
Ryan Dykhouse
DECHERT LLP
25 Cannon Street
London EC4M 5UB
United Kingdom
Telephone: +44 20 7184 7000
Roger.Burlingame@dechert.com
Matthew.Mazur@dechert.com
Ryan.Dykhouse@dechert.com

Steven E. Bizar
Julia Chapman
Tony Leyh
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-2000
Steven.Bizar@dechert.com
Julia.Chapman@dechert.com
Tony.Leyh@dechert.com

*Attorneys for Defendants Paul Commins,
George Commins, Christopher Roase, Elliot
Pickering, Aristos Demetriou, Connor
Younger, James Biagioni, Henry Lunn, Paul
Sutton, and Matthew Rhys Thompson*