# EXHIBIT 1

## Redacted

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MISH INTERNATIONAL MONETARY INC., on behalf of itself and all others similarly situated, | |
| *Plaintiff,* | |
| v. | Case No. 1:20-cv-04577 |
| VEGA CAPITAL LONDON, LTD., Adrian Spires, Paul Commins, George Commins, Christopher Roase, Elliott Pickering, Aristos Demetriou, Connor Younger, James Biagioni, Henry Lunn, Paul Sutton, Matthew Rhys Thompson, and JOHN DOES 1-100, | Honorable Manish S. Shah |
| *Defendants.* | |

**EXPERT REPORT OF PROFESSOR TERRENCE HENDERSHOTT**

**June 20, 2024**

# Table of Contents

I.    Qualifications ..................................................................................................1

II.   Assignment .....................................................................................................2

III.   Summary of Opinions ....................................................................................3

IV.  Summary of Allegations and Dr. Pirrong's Analysis ....................................13

     A.   Plaintiff's Allegations and Class Definition ....................................... 13

     B.   Summary of Dr. Pirrong's Analyses and Opinions ............................. 14

V.   Background ..................................................................................................18

     A.   WTI Futures Contracts ...................................................................... 18

          1.   Trading of WTI Futures Contracts..................................................19

          2.   Trading at Settlement (TAS) Order Type .................................20

          3.   Delivery of Physical Crude via WTI Futures Contracts ...........................22

     B.   Dramatic Changes in Supply and Demand Resulted in a Critical Shortage of Storage Space in April 2020 and Exerted Downward Pressure on WTI Prices ... 23

          1.   The COVID-19 Pandemic and Geopolitical Tensions Created a Large Imbalance between Crude Oil Supply and Demand ................................24

          2.   The Resulting Price Structure Encouraged Storage over Selling, Resulting in Storage Space Shortages........................................................25

          3.   Storage Capacity Concerns and Declining Prices Prompted Warnings of Potential Negative Prices .....................................................30

     C.   WTI Futures Contract Market Dynamics on April 20, 2020, Diverged from Historical Penultimate Days ................................................................ 31

          1.   A Larger Number of Expiring Futures Contracts Needed to Be Sold Compared to Past Penultimate Trading Days .................................33

          2.   There Were Few Buyers Providing Liquidity in the Market and Liquidity Was Quickly Exhausted.................................................36

          3.   Other Oil Futures Contracts That Were Not Impacted by the Storage Constraints in Cushing Did Not Go Negative.............................................43

     D.   Negative Commodity Prices Have Occurred Due to Fundamental Factors, Such as Oversupply Coupled with Logistical Constraints .................................................. 44

          1.   Past Instances of Negative Prices Also Exhibited a Supply Glut Coupled with Logistical Constraints .....................................................45

          2.   Contemporaneous Negative and Near-Zero Prices Appeared in Crude Oil Physical Markets in April 2020, Indicating Fundamental Factors Were at Play .........................................................................................46

VI.    Dr. Pirrong's Claim That Storage Constraints Cannot Explain Negative Prices on April 20, 2020, Is Flawed and At Odds with the Predominant Third-Party Views and Research ...................................................................................................................................47

VII.   Dr. Pirrong's TVP-VAR Model Is Conceptually Flawed, Methodologically Unsound, and Incapable of Establishing That Trader Defendants' Trading on April 20, 2020, Caused Artificial Prices ..................................................................................................................53

    A.    Dr. Pirrong's Estimation of Price Impact Is Insufficient to Establish Price Artificiality..................................................................................................... 55

    B.    Dr. Pirrong's Use of a TVP-VAR Model to Estimate Price Artificiality Is Inconsistent with and Differs from the Literature on Which He Relies .............. 63

         1.    Description of Dr. Pirrong's TVP-VAR Model........................................63

         2.    Dr. Pirrong's Claim That His TVP-VAR Model Can Be Used to Determine the Amount of Artificiality Caused by Trader Defendants' Trades Is Unsupported by the Literature on Which He Relies .................66

    C.    Dr. Pirrong's Price Impact Model Does Not Control for Confounding Factors... 68

    D.    Dr. Pirrong's TVP-VAR Model Is Highly Sensitive to Small Changes, and Artificiality Estimates Can Flip from Depression to Inflation............................. 70

         1.    Changing the Seed of the Random Number Generator Changes Dr. Pirrong's Conclusions...................................................................................71

         2.    Changing the Ordering of the Variables in the Regression Changes Dr. Pirrong's Results, and He Provides No Basis for His Ordering ...............74

    E.    Applying Hasbrouck's VAR Methodology Produces Statistically Insignificant Price Impact Results ......................................................................................... 79

VIII.  Dr. Pirrong Offers No Methodology to Establish Causation between the Trader Defendants' Trades and the Purported ████████ Yet He Attributes ████████ ████████████████████ ...........................................................................82

    A.    After ██████, Dr. Pirrong's TVP-VAR Model Cannot Reasonably Estimate Price Impact, and Dr. Pirrong Abandons the Model............................................ 83

         1.    Order Flow Materially Stops Predicting Price Changes in Dr. Pirrong's TVP-VAR Model after ████████ and Therefore Other Unexplained Factors Explain Price Changes ...................................................................84

         2.    Dr. Pirrong Abandons His TVP-VAR Price Artificiality Model after ████ ██ .........................................................................................................87

    B.    Dr. Pirrong's VPIN Metric Is Not a Price Artificiality Model, Nor Does Dr. Pirrong Claim It Is a Price Artificiality Model .................................................... 88

         1.    Description of Dr. Pirrong's VPIN Metric Analysis ................................89

         2.    Dr. Pirrong's Conclusion That Contributors to His VPIN Caused the Purported ████████ Is Not Supported by Academic Literature or a Scientific Method..................................................................................94

3.      Dr. Pirrong's VPIN Metric Fails to Find That Trader Defendants' Allegedly Manipulative Conduct Caused ███████ ..............................................98

IX.   Many of the Diverse Putative Class Members Could Not Have Been Harmed, and Dr. Pirrong's Methodology Is Incapable of Identifying the Number of Putative Class Members ................................................................................................................101

A.   Dr. Pirrong's Methodology Does Not, and In Fact Cannot, Assess the Number of Persons or Entities That Were Harmed and Belong to the Putative Class without Individualized Inquiry....................................................................................... 104

1.      Dr. Pirrong's Methodology Cannot Address Multiple Accounts Owned by the Same Entity without Individualized and Fact-Intensive Inquiry .......105

2.      Dr. Pirrong's Methodology Ignores CME WTI Transactions That Are Impacted by His Alleged Price Artificiality Estimates...........................108

3.      Dr. Pirrong's Methodology Ignores ICE WTI Contract Transactions That Would Be Impacted by the Alleged Price Artificiality In the CME WTI Contract.............................................................................................111

4.      Individualized Inquiry Is Required to Assess Over-the-Counter Trading Positions, Including Physical Contracts.................................................112

B.   Many Putative Class Members Could Not Have Been Harmed ........................ 115

1.      Putative Class Members Trading Similarly to Trader Defendants Could Not Have Been Harmed..........................................................................116

2.      Putative Class Members Buying and Selling the Same Amount of TAS Contracts Could Not Have Been Harmed.................................................117

3.      Putative Class Members Trading Futures to Hedge Could Not Have Been Harmed............................................................................................117

C.   Mish Is Not Representative of Putative Class Members .................................... 121

X.    Each Trader Defendant's Trading Pattern is Consistent with Speculating and Providing Liquidity, Not Manipulation ....................................................................................128

A.   Trader Defendants' Buying TAS and Selling Non-TAS Contracts during the Proposed Class Period Is Consistent with Speculating on a Price Decrease ...... 129

B.   Each Trader Defendant's Speculative Pattern Is Consistent with the Large TAS Order Book Imbalances .................................................................................. 132

C.   Contrary to Dr. Pirrong's Assertions of Economically Irrational Trading, Trader Defendants' Trading Patterns Were Profitable Absent the Alleged Manipulation ...................................................................................................................... 134

D.   The Timing of Trader Defendants' Sales Is Inconsistent with Settlement Price Manipulation ................................................................................................. 137

E.     Aggressive Limit Orders Are Not Themselves a Sign of Manipulation, but Rather Are Consistent with Trader Defendants' Difficulty Executing in an Illiquid and Fast-Moving Market ........................................................................................... 139

XI.    Dr. Pirrong Fails to Offer Analysis Demonstrating Plaintiff's Claims Regarding a Trader Defendant–Coordinated Conspiracy to Manipulate and Depress the Prices of NYMEX Crude Oil Futures Contracts ...................................................................................142

A.     Contrary to Dr. Pirrong's Assertions, Trader Defendants' Trading Patterns Varied Substantially ..................................................................................................... 144

B.     Contrary to Dr. Pirrong's Assertion, Trader Defendants' Trading Behavior Was Not Unique ......................................................................................................... 152

C.     The Correlation Analysis Presented in the Second Amended Complaint Is Incomplete and Methodologically Flawed and Does Not Support a Coordinated Conspiracy ........................................................................................................ 156

        1.     The Correlation Analysis Only Includes a Subset of Traders.................157

        2.     The Correlation Analysis of Trader Defendants' Position Levels Is Methodologically Flawed and Uninformative as to Any Purported Trading Conspiracy ..............................................................................................158

        3.     Correlations between Trader Defendants' and Non-Defendant Traders' Trading Are Not Substantially Different than Between Trader Defendants ..............................................................................................................161

D.     No Analysis Is Presented by Dr. Pirrong That Supports a Coordinated Conspiracy by Trader Defendants............................................................................................ 164

## I.       Qualifications

1.       I am a Professor and the Willis H. Booth Chair in Banking and Finance at the Haas School of Business at the University of California, Berkeley.  **Appendix A** contains my CV, a list of all my publications over the last ten years, and a list of my deposition and trial testimony over the last four years.

2.       My expertise and research focus on market microstructure, which includes how information is incorporated into financial asset prices and the interaction between trading, market structure, and prices of various financial instruments including futures contracts.  Specifically, I have conducted research regarding how the prices of futures contracts and other derivatives, stocks, corporate bonds, and other over-the-counter ("OTC") and exchange-traded products incorporate information.  In addition, I have studied high-frequency trading, electronic communications networks and exchange design, regulation of financial markets, and the role of information technology in financial markets.  My research has also addressed market efficiency and related topics, including market liquidity and how market prices discover and incorporate new information, and how trading affects prices.

3.       I have published numerous articles on the structure, design, and regulation of financial markets and how market participants—such as market makers, high-frequency traders, and institutional investors—affect price discovery and the liquidity of different financial markets in leading economics and finance journals, including the *Journal of Finance*, *Journal of Financial Economics*, *Review of Financial Studies*, and *Review of Economic Studies*.

4.       My 2005 paper, "Island Goes Dark: Transparency, Fragmentation, and Regulation," published in the *Review of Financial Studies*, studies price discovery in the futures markets.[1] More recently, my paper "Asset Pricing: A Tale of Night and Day," which studies returns in the U.S. Treasury futures market among other items, has been published in the *Journal of Financial Economics*.[2]

---

[1] Terrence Hendershott and Charles Jones, "Island Goes Dark: Transparency, Fragmentation, and Regulation," *Review of Financial Studies* 18, no. 3 (2005): 743–793.
[2] Terrence Hendershott, Dmitry Livdan, and Dominik Rosch, "Asset Pricing: A Tale of Night and Day," *Journal of Financial Economics* 138, no. 3 (2020): 635–662.

5.      I teach undergraduate- and graduate-level courses on business analytics and high-frequency finance at the Haas School of Business.  I am the faculty director of the Berkeley Master of Financial Engineering program, which involves coursework in futures markets and includes examples of alleged market manipulation (among other topics).  I have served on the editorial boards of leading finance journals, including the *Journal of Finance*, *Journal of Financial Economics*, and *Journal of Financial Markets*.  In my role as editor, I have reviewed multiple papers concerning futures and commodity markets to assess their merits for publication.

6.      In addition to my academic work, I have served as a consultant in the office of the chief economist at the U.S. Commodity Futures Trading Commission ("CFTC").  I have also served as a member of the CFTC's subcommittee of the Technology Advisory Committee ("TAC").  Furthermore, I have served as a visiting economist at the New York Stock Exchange from 2005 to 2006, as a member of the Nasdaq Economic Advisory Board from 2004 to 2007, as chair of the Nasdaq Economic Advisory Board in 2007, and as a member of the Financial Industry Regulatory Authority ("FINRA")'s market surveillance advisory group.

7.      Finally, I have served as an expert for the CFTC, the U.S. Securities and Exchange Commission ("SEC"), and the U.S. Department of Justice ("DOJ") on multiple matters involving alleged market manipulation of futures contracts and other financial instruments.  I have also consulted as an expert in commodities, FX, equities, fixed income, futures and options, and a range of exchange-traded and OTC instrument markets on issues related to market efficiency and price impact, assessing a wide variety of alleged manipulative conduct, such as trading-based price manipulation, benchmark manipulation, short squeeze, momentum ignition, spoofing, and commodities manipulation involving physical delivery.

## II.    Assignment

8.      I have been asked by Dechert LLP, counsel for James Biagioni, George Commins, Paul Commins, Aristos Demetriou, Henry Lunn, Elliott Pickering, Christopher Roase, Paul Sutton, Matthew Thompson, and Connor Younger (collectively, "Trader Defendants") to review and assess the opinions and analyses offered in the Second Amended Complaint and the expert report

of Dr. Craig Pirrong ("Pirrong Report"), submitted on behalf of Plaintiff in support of class certification.[3]

9.     In undertaking this assignment, I have considered documents and data related to the issues in this matter. In **Appendix B**, I have listed the documents and data I relied on for this report. My opinions are also based upon my own educational and professional experience, including those listed under my qualifications and in my curriculum vitae. My work on this matter is ongoing and I reserve the right to supplement my opinions in the event that additional materials, including academic literature, data, documents, and depositions or other testimony that may subsequently come to light, are provided to me or submitted in connection with this matter. I am not addressing all of the merits-related points that Dr. Pirrong raises, but I reserve the right to do so if this matter proceeds past the class certification stage. Additionally, I reserve the right to comment on any opinions offered by Plaintiff's experts at later times.

10.     The analyses and opinions expressed in this report are my own. I am being compensated at my standard billing rate of $1,525 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

## III.    Summary of Opinions

11.     Based on my expertise and experience, my review of data and documents produced in this matter, and my assessment of the relevant literature, I find that Dr. Pirrong's opinions suffer from conceptual and methodological flaws, which render his assessment and conclusions inappropriate and unreliable.[4]

12.     As a threshold matter, Dr. Pirrong's claim that market conditions could not explain the price decline observed on April 20, 2020, in the May 2020 Chicago Mercantile Exchange

---

[3] Mish International Monetary Inc. on behalf of itself and all others similarly situated v. Vega Capital London, Ltd., et al., Second Amended Complaint, Corrected Copy, February 3, 2023 ("Second Amended Complaint"); Amended Class Certification Expert Report of Professor Craig Pirrong, May 9, 2024 ("Pirrong Report").

[4] The bases for this conclusion are outlined in greater detail in the balance of this report. This section summarizes those bases but is not intended to be exhaustive.

Group's ("CME") West Texas Intermediate ("WTI") Light Sweet Crude Oil futures contract (the "May Contract") is flawed and contradicted by data and the predominant view.[5] The predominant view of market participants, regulators, academics, and other informed observers points to the distinct market conditions on April 20, 2020, as the driving factor for the price decline, not the alleged manipulation by futures traders such as Trader Defendants. Distinct market conditions included the following (*see Section V*):

    a. April 20, 2020, was the penultimate day of trading in the May Contract, which means that any contracts remaining open had to be liquidated by the following day or else be closed by making or taking physical delivery of crude in Cushing, Oklahoma ("Cushing"). Since physical delivery was required, the conditions at Cushing—the contract-specified delivery location—were of critical importance.

    b. Storage at Cushing was quickly filling and was predicted to exceed full capacity, causing nontrivial constraints on physical delivery via futures contracts. The lack of available storage is consistent with long futures contract holders, who would be required to take physical delivery, selling futures contracts prior to expiry.

    c. "Open interest" on April 20, 2020 was much higher than on prior penultimate days and had an unusual composition. According to the CFTC, long position holders consisted of an unusually low amount of commercial trader open interest and an unusually high amount of financial trader open interest. Since financial traders do not typically handle physical crude, this implies there was an unusually high number of long positions that needed to sell the May Contract to exit their position before contract expiry. The combination of a high open interest and large share of long open interest held by non-commercial traders means there was an additional 61,049 contracts that had to be liquidated before expiry compared to the previous 12 penultimate days, representing a 179% increase over the average.

13. Despite these market conditions, Dr. Pirrong's report narrowly focuses on purported market manipulation as the explanation for price declines on this day while failing to consider or even cite the research expressing the predominant view, including a report from the CFTC

---

[5] The CME Group owns the New York Mercantile Exchange (NYMEX). *See* "NYMEX," CME Group, https://www.cmegroup.com/company/nymex.html. I refer to CME and NYMEX interchangeably in this report.

supporting this view.[6]  Dr. Pirrong advances what he describes as "several logical problems" with the predominant view that price declines were caused by "fully utilized" storage and therefore entities that "receive delivery of oil" via futures contracts would have "no place to store it, thus they were willing to sell their positions at any price."[7]  Yet none of Dr. Pirrong's stated "logical problems" with the predominant view withstand scrutiny (*see Section VI*):

a. First, Dr. Pirrong incorrectly asserts that short futures position holders could easily transfer ownership to long position holders in storage without moving the crude oil, and therefore fears of storage constraints are unfounded.  Dr. Pirrong provides no evidence that this happened, and his logic is contradicted by the NYMEX delivery rules that require short position holders to agree to in-storage deliveries.  The storage space was valuable as evidenced by oil prices in the future being substantially higher than current prices, meaning that short position holders were unlikely to give their valuable storage space away.

b. Second, Dr. Pirrong incorrectly claims there was ample storage at Cushing, citing 68% capacity usage, and therefore fears of storage constraints are unfounded.  His 68% capacity figure is incorrect because it refers to total storage capacity rather than *working* storage capacity, which was 84%, or "effectively full."  Dr. Pirrong's capacity analysis also fails to account for the continued buildup in storage utilization and the storage space that was not yet full but already committed (and therefore unavailable for deliveries).  With these factors, storage at Cushing was anticipated, as of April 20, 2020, to exceed capacity before the time delivery on the May Contract was required (*i.e.*, by May 31, 2020).  In prior remarks, Dr. Pirrong had stated that low 80% working storage capacity was "effectively full."

---

[6] "Interim Staff Report: Trading in NYMEX WTI Crude Oil Futures Contract Leading Up To, On, and around April 20, 2020," CFTC, November 23, 2020, https://www.cftc.gov/node/235761, p.1.  The CFTC included a footnote starting that "[t]his Report does not analyze the propriety of trading by any particular trader or group of traders. Additionally, to the extent any trading activity may have been abusive, manipulative, disruptive, or otherwise unlawful, an evaluation of that activity is beyond the scope of this Report."  However, the report "sets forth data on the geopolitical and fundamental economic drivers, as well as certain technical factors, preceding and coinciding with the negative settlement price of the WTI Contract on April 20."  These analyses support the predominant view that the price declines were caused by "near capacity" storage and long position holders needing to exit their position prior to expiry, as they could not take delivery.  I also note that the CFTC produced no subsequent public report on this matter.
[7] Pirrong Report, ¶¶ 338–339.

    c. Third, Dr. Pirrong incorrectly claims that the price decrease prior to and rebound after the 1:30 PM CT settlement is proof that the negative prices were caused by manipulation, and therefore storage constraints were not the cause of the price decline.[8] But Dr. Pirrong overlooks price changes that contradict his logic, specifically a post-settlement price drop of similar magnitude between ▮▮▮ and ▮▮▮▮▮ which could not have been caused by the Trader Defendants' alleged manipulative conduct.

    d. Lastly, Dr. Pirrong incorrectly claims the narrowing of calendar spreads after April 20, 2020, indicates alleviated storage constraint concerns. The spreads Dr. Pirrong's chose to compare for this claim are misleading. He strangely compares different spreads (May-June and June-July) across different dates. A consistent comparison shows the spread widened (not narrowed) immediately after April 20, 2020, suggesting tightening storage constraints.

14. Based on his assumption that all Trader Defendants' trading was manipulative, Dr. Pirrong proposes two distinct approaches to estimate price artificiality during the proposed class period. Prior to ▮▮▮▮ he employs a Time Varying Parameter Vector Autoregression ("TVP-VAR") model. After ▮▮▮▮ he abandons the TVP-VAR, and assumes that ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Both approaches are flawed.

15. There are multiple flaws with Dr. Pirrong's TVP-VAR model that render its results unreliable, and the model is incapable of serving as a basis to establish class-wide harm attributable to the alleged conduct (*see Section VII*). Here, I offer an overview of why:

    a. First, Dr. Pirrong's TVP-VAR model calculates price impact, but this is insufficient to estimate price artificiality, which economists define as the deviation between actual and hypothetical "but-for" prices absent the alleged manipulation. To determine a but-for price, assumptions about the but-for world are necessary, which Dr. Pirrong fails to provide or support. His methodology unreasonably implicitly assumes that sellers of Trading at Settlement ("TAS") contracts that were reliant on Trader Defendants, would have had no price impact

---

[8] All times are in listed in central time ("CT") unless otherwise noted.

in the but-for world without the alleged manipulative trades. This assumption is flawed, especially given the lack of TAS buyers on April 20, 2020. Trader Defendants' TAS purchases ███████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████

███ Further, Dr. Pirrong overlooks evidence that ███████████████

███████████████████████████████████████

███ Without Trader Defendants' buying from TAS sellers in the TAS order books, more TAS sellers would likely have switched to the non-TAS order books and sold aggressively there, impacting prices in the but-for world. To the extent that these unsuccessful TAS sellers waited until later in the afternoon to sell in the non-TAS order book, the price impact may have been larger as selling more gradually over time tends to have a smaller price impact.[9] Trader Defendants' buying from TAS sellers in the TAS order books may have therefore contributed to a smoother and more orderly liquidation for some long position holders. Dr. Pirrong's methodology fails to consider the price impact of the altered trading patterns of non-Defendant traders in his but-for world, undermining his assertions about the but-for price of the May Contract and any purported price distortion caused by Trader Defendants on April 20, 2020.

b. Second, Dr. Pirrong's use of the TVP-VAR model is inconsistent with its application in the academic literature. While Dr. Pirrong's analyses are loosely based on a class of vector autoregression ("VAR") models first developed in the market microstructure literature in the early 1990s, Dr. Pirrong eschews these VAR models and instead adapts a TVP-VAR model from a macroeconomic monetary policy article. A TVP-VAR model has never—to my knowledge—been

---

[9] Terrence Hendershott and Ryan Riordan, "Algorithmic trading and the market for liquidity.," *Journal of Financial and Quantitative Analysis* 48, no. 4 (2013): 1001-1024, p. 1002 ("Institutional investors utilize ATs to trade large quantities gradually over time, thereby minimizing market impact and trading costs.").

peer reviewed to study price impact in a market microstructure setting, nor is it generally accepted in the market microstructure literature.

c. Third, Dr. Pirrong's TVP-VAR model does not control for confounding factors or alternative explanations for the May Contract price movement because Dr. Pirrong's TVP-VAR model attributes price changes to aggressive trading, overlooking the underlying factors that drive trading behavior. This includes fundamental factors, such as storage constraints, and TAS sellers that are not included in Dr. Pirrong's model despite being the driving factor for the price decline on April 20, 2020 according to the predominant view of informed observers. Instead, Dr. Pirrong dismisses alternative explanations for the price movements, including information about storage utilization and observations about short commercial traders not liquidating futures positions.

d. Fourth, the results from Dr. Pirrong's TVP-VAR model are not robust, changing substantially with minor adjustments, which can even *reverse the direction of the alleged price impact*, rendering the model unreliable.

e. Lastly, using a more standard VAR model, aligned with the market microstructure literature, yields

 This finding that the price impact ████████████████ ████ further calls into question the reliability of Dr. Pirrong's conclusions regarding Trader Defendants' alleged manipulative impact.

16.    After ██████ Dr. Pirrong abandons the TVP-VAR model, and does not provide a model to establish that Trader Defendants impacted prices during the last ██████████ of the proposed class period from ████████████████████████████████ During this ████████ period, he simply attributes ████████████████████████████████ Thus, Dr. Pirrong has no price impact measure and no price artificiality model for the last ██████████ of the proposed class period, during which approximately ████ of his claimed damages occur. ***See Section VIII***.

17.    Instead of using a price impact model during the last ██████████ of the proposed class period, Dr. Pirrong uses a "diagnostic" metric he refers to as a volume-synchronized probability of informed trading ("VPIN"), which does not measure price impact or price artificiality. Price

is not an input or an output to Dr. Pirrong's VPIN metric, which is "based on the ratio of the absolute value of order flow imbalance to trading volume." He claims that Trader Defendants ████████████████████████████████████████████████████████████ ███████████████████████████████████████████ As a threshold matter, Dr. Pirrong has not established any scientific basis for claiming a ████████ occurred, and Dr. Pirrong does not cite to any third-party studies about this day that refer to the price movement as a ████████ I am also unaware of any regulatory reports calling this price drop a ████████ and there is evidence inconsistent with this period being a ████████ Setting this issue aside, stating that the VPIN increased sharply without providing a comparison analysis to a non-manipulated benchmark period lacks a reliable scientific basis. Further, Dr. Pirrong's ████ ████████████████████████████████████████████████████████████████ ███████████ is not supportable, especially when on average ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████ Lastly, similar to the pre-████████ analysis, even if Dr. Pirrong had attempted to estimate the price impact of Trader Defendants during this ████████ period, this would be insufficient to estimate artificiality without accounting for the impact of Trader Defendant trading on non-Defendant patterns. In a but-for world where Trader Defendants ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████ Dr. Pirrong's methodology for the last ████████ of the proposed class period does not and cannot account for changes in non-Defendant trading or other confounding factors. *See Section VIII*.

18.     Setting aside the unreliable nature of Dr. Pirrong's multiple approaches toward estimating price artificiality, his report also ignores that a substantial portion of the putative class either (i) would require individual fact-intensive inquiry to determine the existence (and extent of) any harm, or (ii) could not have suffered any harm as a result of his alleged price inflation. ***See Section IX***.

            a.   When assessing the number of purported class members, Dr. Pirrong counts affected accounts in the CME Audit Trail data, leading to potential inaccuracies when multiple accounts belong to a single entity. Analyzing May Contract

transactions in the CME Audit Trail data by account results in a flawed determination of class membership and injury, with some entities potentially benefiting overall despite individual account losses. This issue cannot be addressed without individualized evidence about each putative class member that is not necessarily held by the CME.

b. Dr. Pirrong's class member identification methodology ignores CME WTI contract transactions in the May Contract outside CME's electronic platform and therefore not captured in the Audit Trail data, such as physical deliveries, block trades, exchange-for-physical trades, and options exercise, which results in a flawed determination of class membership and harm assessment. These transactions that are part of the proposed class, but not part of the CME Audit Trail data, would involve detailed investigations into each trader to determine whether they are part of the putative class and whether they were harmed.

c. Dr. Pirrong's methodology ignores WTI futures contracts traded on the Intercontinental Exchange ("ICE") that would be impacted by an alleged price artificiality in the CME WTI contract. The absence of account (and ownership) mapping between CME and ICE account numbers means that Dr. Pirrong cannot assess if an individual is harmed without a fact-intensive individualized inquiry. Since the ICE WTI contract terms specifically reference the CME WTI prices for cash-settlement, the necessity to assess harm in both contracts is important. Even if accounts could be mapped between ICE and CME, Dr. Pirrong's artificiality for the CME WTI cannot be applied to the ICE WTI contract.

d. While Dr. Pirrong admits that OTC transactions, including physical transactions and commodity swaps, can be impacted by the alleged manipulation, there is no centralized database for OTC transactions linked to CME WTI futures prices. Therefore, individualized inquiry would be needed to assess harm.

e. Even when applying Dr. Pirrong's flawed approach to counting class members, almost ███ of the purported ███ accounts meeting the class definition are unharmed. Furthermore, three categories of putative class members inherently could not be harmed: (i) those who traded similarly to the Trader Defendants, (ii)

those who traded May Contracts intraday in the TAS order books only, and (iii) those who sold the May Contract to hedge OTC transactions with offsetting benefits.

19.     Moreover, the named plaintiff, Mish International Monetary Inc. ("Mish" or "Plaintiff"), is not representative of most putative class members.  Mish only traded non-TAS May Contracts, while TAS May Contract sales account for ███ of the alleged aggregate damages under Dr. Pirrong's methodology.  Only ███ of the ███ putative class members (or approximately ███ exhibited trading activity that was analogous to Mish's, in that they *only* traded non-TAS contracts intraday, *only* buying at positive prices and selling the same quantity after prices turned negative.  Importantly, evidence suggests that Mish's losses were due to █████████████████ █████████████ rather than the alleged manipulative conduct, indicating that Mish would have incurred losses regardless of the allegedly manipulative conduct.  Any claim that Mish would not have lost as much money in the but-for world is speculative. ***See Section IX.***

20.     Dr. Pirrong's assessment of Trader Defendants' activity starts from the flawed premise that the activity was uneconomic but for the alleged manipulation and no plausible non-manipulative rationale exists.  Contrary to Dr. Pirrong's assertion, each of the Trader Defendants' trading pattern is consistent with speculative trading that profits from a decrease in prices on April 20, 2020.  This type of trading pattern can be profitable *without* the need for manipulation.  In fact, *each Trader Defendant's trading pattern would have been profitable even without considering the price impact that Dr. Pirrong attributes to their alleged manipulation*, which directly contradicts Dr. Pirrong's argument that Trader Defendants' trading was not economically reasonable without the alleged manipulation. ***See Section X.***

21.     Lastly, Dr. Pirrong fails to offer reliable analysis that supports Plaintiff's claim of a coordinated conspiracy by Trader Defendants to manipulate May Contract prices. ***See Section XI.***

a.     Plaintiff claims that the Trader Defendants traded "in unison."  Dr. Pirrong does not offer analysis to support this claim and a comparative analysis of each of the Trader Defendants' trading reveals that ████████████████████ ███████████████████████ This lack of uniformity does not support Plaintiff's argument of a coordinated conspiracy.

b.  Dr. Pirrong incorrectly claims that ███████████████ in a trading pattern similar to the Trader Defendants involving ███████████████████ ████████████████████████████████████ ████████████████ However, this trading pattern ██████████████ ███████████████████████████████████████████████ █████████████████████████ The fact that non-Defendant traders, who are not accused of manipulation (to my knowledge), ███ ████████████████████████ undermines allegations of a coordinated conspiracy.

c.  Dr. Pirrong claims that ███████████████████████ ███████████████████ and that a larger share of aggressive trades made it more likely that they were engaged in manipulation. Dr. Pirrong does not provide a threshold for how large a share of aggressive trading a market participant must have to be considered manipulative. His opinion regarding Trader Defendants' percentage of aggressive trades therefore lacks any basis.

d.  Plaintiff misleadingly uses a "correlation" analysis to support the alleged coordinated conspiracy between Trader Defendants. The correlation analysis—which was conducted by Dr. Pirrong—is incomplete and methodologically flawed. It only includes a subset of Trader Defendants, which skews the results to find a misleadingly higher correlation than if he included all Trader Defendants. Further, the analysis does not actually measure the correlation of Trader Defendants' trading behavior. Instead, it analyzes the correlation of their position levels. When all Trader Defendants are included and the correlation analysis is corrected to assess trading activity rather than position levels, the average correlation ████████████████ Dr. Pirrong's correlation analysis is further invalidated by the fact that the correlation levels between numerous non-Defendant traders are ████████████████ rendering Plaintiff's reliance on the correlation measure to infer a conspiracy unreliable.

e. Lastly, Dr. Pirrong falsely claims that his



22.    Each of these flaws, as well as those described below, provide an independent reason why Dr. Pirrong's approach and methodology cannot provide a reliable basis to infer impact or injury, or reliably estimate damages on an aggregate or individual basis.

## IV.    Summary of Allegations and Dr. Pirrong's Analysis

### A.    Plaintiff's Allegations and Class Definition

23.    Mish, the single named plaintiff in this matter, sold ▮ May Contracts on the afternoon of April 20, 2020.[10]  Mish claims that it incurred losses when selling at an artificially low price as a result of "Defendants' manipulative impact on the trading executed and the order book maintained for May Contracts in this District."[11]

24.    Mish claims that all Trader Defendants "engaged in the exact same manipulative strategy: purchasing May Contracts via TAS and selling May Contracts for the purpose of depressing its price."[12]  In a TAS contract, the purchaser buys contracts at a price to be determined during the end-of-day settlement period, which ran from 1:28 to 1:30 PM on April 20, 2020 (the "settlement period").[13]  Mish alleges that "in order to depress the price of the May 2020 NYMEX WTI crude

[10] Second Amended Complaint, ¶ 29.
[11] Second Amended Complaint, ¶ 29.
[12] Second Amended Complaint, ¶ 137.
[13] See "NYMEX Crude Oil," CME Group,
https://cmegroupclientsite.atlassian.net/wiki/spaces/EPICSANDBOX/pages/46499076/NYMEX+Crude+Oil.

oil futures contract (and thereby reap large profits by purchasing via TAS May Contracts at an extremely low price), the Vega Trading Defendants combined and conspired to act in unison and sell large volumes of May Contracts in the final hours before the settlement price of the May Contract."[14]  Mish claims that as a result, "Plaintiff and Class members sold at prices that were not what they would have paid in the absence" of manipulation and were therefore harmed.[15]

25.     The putative class is defined as:

> All persons and entities that sold a May 2020 light sweet crude oil (WTI) futures contract ("May contract") traded on the New York Mercantile Exchange between 9:00 a.m. CST and 1:30 p.m. CST (inclusive) on April 20, 2020 (including by trade at settlement ("TAS")), to liquidate a long position in the May contract. Excluded from the Class are Defendants, their officers, directors, management, employees, subsidiaries, or affiliates and federal governmental entities.[16]

## B.      Summary of Dr. Pirrong's Analyses and Opinions

26.     In this section, I briefly summarize Dr. Pirrong's analysis and opinions.  Dr. Pirrong claims that Trader Defendants' trading involving buying TAS and selling outright futures "inherently has manipulative potential" and was manipulative.[17]  Dr. Pirrong claims that TAS purchases only have a "small upward impact on price," and "[t]he downward price impact of the sales in the underlying futures contract is larger than the upward price impact of an equivalent volume of TAS purchases."[18]  Dr. Pirrong claims that Trader Defendants profited from buying in the TAS order book and selling in the non-TAS order book, purportedly manipulating down the price and profiting due to the artificially depressed TAS settlement price.[19]  According to Dr. Pirrong "Trading Defendants traded precisely how a theoretical manipulator would trade,"[20] and he concludes that "the absence of a non-manipulative rationale for their trading combined with

---

[14] Second Amended Complaint, ¶¶ 143, 254.

[15] Second Amended Complaint, ¶ 343.

[16] *Mish International Monetary Inc. on behalf of itself and all others similarly situated v. Vega Capital London, Ltd., et al.*, Plaintiff's Motion for Class Certification, February 19, 2024 ("Plaintiff's Motion for Class Certification"), ¶ 1.

[17] *See* Deposition of Craig Pirrong, May 14, 2024 ("Pirrong Deposition"), 179:15–21 █████████████

███████████████████████████████████████████████████████

[18] Pirrong Report, ¶ 106.

[19] Pirrong Report, ¶ 106.

[20] Pirrong Report, ¶ 296.

the close correspondence between their conduct and that of a trade-based manipulator demonstrates that their conduct was uneconomic and manipulative."[21]

27.      Dr. Pirrong claims that "Defendants' conduct was uneconomic," meaning that their strategy was inconsistent with "economically beneficial speculative, hedging, or market making behavior."[22]  In his analysis concluding that Trader Defendants' behavior was inconsistent with speculation, Dr. Pirrong makes two claims.  First, he claims that ████████████████████ ███████████████████████████     ████████████████████████[24]  I address and rebut this claim in Section XI.  Second, Dr. Pirrong claims that Trader Defendants did not take advantage of an arbitrage opportunity on the ICE, which he argues is inconsistent with speculation.[25]  I address these claims in Section X.

28.      To support his claims that Trader Defendants caused the price of May Contracts to be artificially low, Dr. Pirrong states that price declines were not caused by fundamental factors, including constraints on oil storage in Cushing.  I address each of these claims in Section VI.  Dr. Pirrong makes the following arguments:

   a. He proposes that sellers "could deliver oil in store" via futures contracts and therefore more storage was not needed for long futures position holders taking delivery.[26]

   b. He claims that "Cushing stocks were well below storage capacity at Cushing" using April 24, 2020, data.[27]

   c. He also claims that the price of oil futures indicated that storage of crude oil was not constrained by pointing to a rebound in prices, suggesting that "no 'corrective' information arrived during the period in which prices rose."[28]

   d. He purports to perform a comparison between the price of May-June spreads on April 17, 2020, to the price of June-July spreads on April 24, 2020, to claim that

---

[21] Pirrong Report, ¶ 322.
[22] Pirrong Report, ¶ 284.
[23] *See, e.g.*, Pirrong Report, ¶ 287 ████████████████████████████
[24] Pirrong Report, ¶¶ 254–255.
[25] Pirrong Report, ¶ 319 ("Another uneconomic aspect of the Trading Defendants' trading behavior that has direct implications for ████████████ is their failure to trade the ICE NYMEX lookalike contract when it was more favorably priced than the May 2020 CME Crude Oil Futures contract.").
[26] Pirrong Report, ¶ 341.
[27] Pirrong Report, ¶ 356, Appendix E at 356.
[28] Pirrong Report, ¶ 382.

the spread narrowed during the week of April 20, 2020.[29]  He claims this narrowing of spreads supports the "market assessment of the severity of any putative shortage of storage capacity at Cushing became *less* dire, not more."[30]

29.      Dr. Pirrong proposes two distinct approaches to estimate price artificiality during the proposed class period, one approach from 9:00 AM to ███████ and a second approach from ███ ███ to 1:30 PM.

30.      His first approach from 9:00 AM to ███████ uses the TVP-VAR model, which he employs to estimate the impact of Trader Defendants' trades on prices.[31]  He assumes the price impact of Trader Defendants' trades is manipulative, and he equates the estimated quantity of the Trader Defendants' trade impact to the alleged artificiality amount.  During this period, the full price decline is not attributed to Trader Defendants' trading.  I address this approach in Section VII.

31.      His second approach from ███████ to 1:30 PM assumes that ███████████████████ ████████████████████████████████  He claims ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████[32]  Dr. Pirrong claims his VPIN diagnostic measures "order flow toxicity," which has been shown to predict historical flash crashes.[33]  I discuss this approach in Section VIII.

32.      Figure 1 below shows Dr. Pirrong's hypothetical "but-for" price—what the price of the May Contract would have been absent Trader Defendants' purported manipulative actions— using the cumulative price artificiality estimates from Dr. Pirrong's two approaches.

---

[29] Pirrong Report, ¶¶ 353–354 ("On Friday April 17, 2020, one business day before Monday April 20, 2020, the front month-second month spread was ████… On Friday April 24, 2020—four days after the day at issue here—the spread was substantially narrower: ████  Thus, during the week-long period including April 20, 2020 the front month-second month spread narrowed.").  The final trading day of the May 2020 contract was April 21, 2020.  On April 24, 2020, the front month was June and the second month was July.  *See* "Crude Oil Futures – Contract Specs," CME Group, https://www.cmegroup.com/markets/energy/crude-oil/light-sweet-crude.contractSpecs.html.
[30] Pirrong Report, ¶ 354.
[31] Pirrong Report, ¶ 334 ("The TVP-VAR model and the CME audit trail data that identifies Trading Defendants' transactions allows me to isolate the price impact of their uneconomic, manipulative aggressive sales.").
[32] Pirrong Report, ¶ 257.
[33] Pirrong Report, ¶¶ 236, 239.

Highly Confidential

## Figure 1



Source:  Pirrong Report and Backup Materials
Note:  Midpoint refers to the midpoint of the highest bid and lowest offer prices.  The but-for price for the "TVP-VAR Model Through ▮▮▮▮▮▮" series is based on the Pirrong Report's Figure 14 through ▮▮▮▮▮▮.  The but-for price for the ▮▮▮▮▮▮▮▮▮▮▮▮ series between ▮▮▮▮▮ and 1:30 PM is equal to the Pirrong Report's Figure 14 artificiality at ▮▮▮▮▮▮ plus the cumulative change in the May Contract midpoint since ▮▮▮▮▮ plus the midpoint.  When the midpoint is unavailable, which can happen for example during a market halt or a lack of buy side or sell side liquidity, the last available midpoint is used.  The midpoint is based on Dr. Pirrong's backup file *VegaBBOCLKAll.xlsx.*

33.      Dr. Pirrong claims that "damages incurred by each class member because of the Trading Defendants' conduct" can be calculated "in a formulaic way" and proposes an "overall methodology" that he claims is "quite straightforward."[34]  According to Dr. Pirrong, a "class member suffered harm if s/he sold at a price that was artificially low due to the Trading Defendants' uneconomic aggressive sales."[35]  He proposes that the "damage suffered by a Class member on a particular sale is determined by multiplying the quantity of May Contracts by the

[34] Pirrong Report, ¶¶ 389–390.
[35] Pirrong Report, ¶ 390.

artificiality at the time of said sale."[36]  He proposes to determine artificiality for the period from 9:00 AM to ▮▮▮▮ using the "TVP-VAR-derived artificiality estimates," which according to him, can be applied to any given transaction in this time period.[37]  He then proposes to calculate damages "attributable to the ▮▮▮▮▮▮▮▮▮▮▮▮ by "taking the difference between prices at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the price at the time of the transaction ▮▮▮▮▮▮▮▮▮▮▮▮▮▮[38]  I address Dr. Pirrong's methodology to calculate damages in Sections VII, VIII, and IX.

34.     Finally, Dr. Pirrong uses the CME Audit Trail data to identify members of the proposed class, concluding that "▮▮▮ accounts meet the Class Definition."[39]  I address Dr. Pirrong's methodology to identify putative class members in Section IX.

## V.     Background

35.     In this section, I provide factual background on the CME Group's WTI Light Sweet Crude Oil futures contract ("CME WTI futures") design and specifically the functionality of the TAS order type.  In addition, I describe the fundamentals impacting the U.S. crude oil markets in the weeks leading up to April 20, 2020.  This factual background provides important context for assessing the allegations and market dynamics in this case.

36.     Dr. Pirrong contends that the futures contract design and fundamental factors outlined in this section, including storage constraints, could not explain the negative prices on April 20, 2020.[40]  I discuss and rebut Dr. Pirrong's arguments in Section VI.

### A.     WTI Futures Contracts

37.     The allegations in this case concern trading in the CME WTI futures contract, including trading using the TAS order type.  These core items are described in detail below.

---

[36] Pirrong Report, ¶ 390.
[37] Pirrong Report, ¶ 391.
[38] Pirrong Report, ¶ 394.
[39] Pirrong Report, ¶ 396.
[40] Pirrong Report, ¶¶ 338–340.

### 1.      Trading of WTI Futures Contracts

38.      Physical crude oil is bought and sold in what is colloquially referred to as the "cash" market for oil.  The price of crude oil is influenced by many factors.  These include global consumption and production levels of oil, freight and logistics costs, storage costs, and the cost and pricing of other energy products.

39.      The CME WTI futures contract, traded on the NYMEX, is a standardized agreement to buy or sell 1,000 barrels of light sweet crude oil at a future date.[41]  In contrast to financial contracts executed through bilateral, OTC transactions, the price and quantity of futures contracts transacted are the only variables determined by the buyer and seller through the futures exchange's open, anonymous, and competitive trading system.  The agreement is fulfilled after the contract's expiration (or "maturity") by the delivery of physical crude oil satisfying specified quality and delivery criteria during the contract month.  The delivery process, which I discuss in detail below, ensures convergence between the price of the CME WTI futures contract and the underlying physical crude oil.

40.      In futures trading, the buyer on the delivery date holds a "long position" while the seller holds a "short position."  Each contract constitutes one long (buyer) and one short (seller) position, and the total quantity of contracts existing at one time is referred to as the "open interest" in that contract.  Futures trades made on the NYMEX are executed through brokers who accept orders on behalf of customers.  These brokers are called Futures Commission Merchants ("FCMs").  CME clearing members provide access to the exchange's "clearinghouses"—CME Clearing—and must be registered as FCMs.  CME Clearing acts as the buyer to all sellers and the seller to all buyers.[42]  If the same futures contract is bought and subsequently sold by the same party, the position is said to be "flat," that is, it has been offset and the obligation is closed.[43]  Futures contracts can therefore be liquidated by either entering into offsetting transactions prior to the contract expiration or by participating in the delivery process after expiration, a process I discuss in detail below.

---

[41] "Crude Oil Futures – Contract Specs," CME Group, https://www.cmegroup.com/markets/energy/crude-oil/light-sweet-crude.contractSpecs.html.
[42] "Clearing Market Structure," CME Group, https://www.cmegroup.com/education/courses/clearing/clearing-market-structure.html.
[43] "Economic Purpose of Futures Markets and How They Work," CFTC, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/economicpurpose.html.

41.     CME WTI futures contracts expire (or mature) on a monthly basis.  The CME lists 12 monthly contracts "for the current year and the next 10 calendar years and 2 additional contract months."[44]  Traders pay close attention to the price relationship between different contract maturity months.  The contract that is set to expire first is referred to as the front-month (or nearby) contract while other contract maturities are said to be deferred.  Traders can place "outright" orders on a specific futures contract maturity, or calendar "spread" orders whereby they purchase a futures contract maturity against the sale of another.  The term "spread" is also used to refer to the difference between the prices of each "leg" of the spread.  A spread trader earns a profit or incurs a loss depending on the variation in the spread over time.

42.     A CME WTI futures contract's trading terminates on the third business day before the 25th of the month prior to the contract month.  If the 25th of the month is a non-business day, trading terminates on the third business day before the last business day preceding the 25th of the month.  Thus, the May Contract's last trading day was April 21, 2020.[45]

### 2.     Trading at Settlement (TAS) Order Type

43.     In addition to placing outright or spread orders, traders have the option to place TAS orders.  TAS orders allow traders to execute trades at the yet-to-be determined daily settlement price, or at a premium or discount to the settlement price.  The settlement price for the CME WTI futures contract is determined by CME staff based on trading activity during the "settlement window" between 1:28 PM and 1:30 PM.  If at least one non-TAS trade for a contract month occurs on CME's GLOBEX electronic platform between 1:28 PM and 1:30 PM, that contract month settles at the volume-weighted average price ("VWAP"), rounded to the nearest tradable price.[46]  There are 21 possible prices at which TAS outright orders can trade, specifically up to 10

---

[44] "Crude Oil Futures – Contract Specs," CME Group, https://www.cmegroup.com/markets/energy/crude-oil/light-sweet-crude.contractSpecs.html.

[45] "Crude Oil Futures – Contract Specs," CME Group, https://www.cmegroup.com/markets/energy/crude-oil/light-sweet-crude.contractSpecs.html.

[46] CME GLOBEX is an electronic trading platform developed and operated by the CME for the global trading of futures and options.  It supports the execution of a wide range of asset classes, including commodities, currencies, and financial instruments, facilitating nearly 24-hour trading and global access.  Additionally, trades on the CME can also take place outside the GLOBEX platform, such as through privately negotiated transactions. *See* "CME Globex," CME Group, https://www.cmegroup.com/globex.html. *See also*, "NYMEX Crude Oil," CME Group, https://www.cmegroup.com/confluence/display/EPICSANDBOX/NYMEX+Crude+Oil.

cents above, 10 cents below, or at the referenced settlement price.[47]  The exact price differential (or premium/discount) to the settlement price is specified when the order is placed.

44.     TAS orders are a standard trading mechanism available across dozens of CME futures contracts, and are similar to various forms of reference price trading found in financial markets.[48]  Some types of "Market on close" orders in equity markets and fixes in the foreign exchange market are additional examples where trading is based on predetermined reference points.  These mechanisms, like TAS orders, are designed to facilitate trading at known, transparent reference prices.

45.     There are situations in which traders will want to lock in a price at or close to the settlement price, without incurring the execution risk associated with trying to trade in the settlement period.  For example, buyers and sellers of physical oil may have referenced the WTI settlement price in their physical oil contracts.  Traders may therefore want to hedge this physical price risk by executing a futures trade at or close to the settlement prices.  Other traders may be managing an investment fund with a benchmark (against which the fund performance is measured) that tracks the WTI futures settlement price.

46.     Traders who have economic motivations to trade at the settlement price are incentivized to use TAS orders versus simply trading outright contracts close to the settlement time.  Entering a TAS order ensures that the trade will be completed at the settlement price.  These traders may also be willing to pay a "risk premium" by executing at a premium or discount that is a slightly worse price than the settlement price.  This risk premium incentivizes and compensates liquidity

---

[47] "Crude Oil Futures – Contract Specs," CME Group, https://www.cmegroup.com/markets/energy/crude-oil/light-sweet-crude.contractSpecs.html.  In 2020, each leg of a TAS spread order could be traded at up to 10 cents above or below the referenced settlement price, meaning that TAS spread transactions could have a net price up to 20 cents above or below the referenced price.  *See* "Market Regulation Advisory Notice, Rule 524: TAS, TAM, BTIC, and TACO Transactions," CME Group, August 13, 2018, https://web.archive.org/web/20210318063322/https://www.cmegroup.com/rulebook/files/cme-group-Rule-524.pdf.
[48] There are over 30 CME futures contracts with TAS orders available, across agricultural, energy, metals, and treasury markets.  *See* "Trading at Settlement (TAS) Outright and Calendar Spread Availability," CME Group, https://www.cmegroup.com/trading/files/tas-tam-eligibility.xlsx; "Trading at Settlement (TAS)," CME Group, https://www.cmegroup.com/trading/trading-at-settlement.html.

providers taking on the opposite side of the trade.  The concept of a risk premium is well documented in the academic and market literature.[49]

47.    TAS orders contribute to smoothing out trading over the course of the day by allowing for the natural pairing of buy and sell interest at the futures settlement price throughout the day and thus avoiding volatile trading in the settlement window.

### 3.    Delivery of Physical Crude via WTI Futures Contracts

48.    The CME WTI futures contract is fulfilled at the contract maturity through delivery of physical crude oil satisfying specified quality and delivery criteria.  This ensures that the prices of the nearby futures remain in line or "converge" with the price in the underlying physical commodity.  A trader with a short position when the contract expires is obligated to deliver 1,000 barrels of WTI light sweet crude oil to the buyer, who is obligated to take possession of them. Those barrels of oil must be delivered at Cushing, which is a central hub of pipelines and oil tanks.[50]  Failure to make or take delivery of the oil when obligated to do so results in hefty penalties and fines.[51]

49.    Prior to expiration of the CME WTI futures contract, a trader must have secured either applicable pipeline capacity and/or storage to make or take delivery.  The obligation to make or take delivery is not transferable.[52]  The delivery must be made between the first and last calendar day of the delivery month.  The May Contract's first and last delivery days were therefore May 1, 2020, and May 31, 2020.[53]

---

[49] Jakša Cvitanić and Fernando Zapatero, *Introduction to the Economics and Mathematics of Financial Markets*, 2004 ("Cvitanić and Zapatero (2004)"), p. 48 ("One way to avoid this difficulty with the theory is to assume that the investors add a risk premium to longer maturity rates, that is, to postulate that forward rates represent expected future spot rates plus a risk premium amount. The risk premium is added to compensate for the additional risk to which the long-term investor is exposed, for example, the inflation risk."), p. 125 ("This quantity is called market price of risk, risk premium, or relative risk. It compares the return rates of the risky asset and the risk-free asset, normalized by the volatility of the risky asset."). *See also* Jeffrey F. Jaffe, Randolph W. Westerfield, and Stephen Ross, *Corporate Finance*, 6th ed. (2003), p. 232; Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (2011), p. 192.
[50] NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures, 200104, as of April 28, 2020, https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf.
[51] NYMEX Rulebook, Chapter 7: Delivery Facilities and Procedures, CME Group, as of April 16, 2020, https://web.archive.org/web/20200416161650/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/7.pdf, §§ 714 and 715.
[52] NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures, 200105.F, as of April 28, 2020, https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf.
[53] NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures, 200106, as of April 28, 2020, https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf.

50.     Prior to the last day of trading, a trader's FCM (which, as stated above, is a broker that accepts orders on behalf of customers to trade and clear futures on exchanges such as NYMEX), is "responsible for assessing the account owner's ability to make or take delivery for each account on its books with open positions in the expiring contract.  Absent satisfactory information from the account owner, the clearing member is responsible for ensuring that the open positions are liquidated in an orderly manner prior to the expiration of trading."[54]  Because many traders do not have the logistical capabilities to make or take delivery of crude oil, most positions must be closed prior to the expiration of trading (i.e., on or prior to April 21, 2020, in the case of the May Contract).  Many traders opt to "roll" their position by exiting their position in the expiring contract and simultaneously opening a trade in the deferred contract, thereby maintaining a similar position in the deferred contract.[55]

51.     In April 2020, delivery and transfer of ownership needed to take place at any pipeline or storage facility in Cushing with pipeline access to storage tanks owned by Enterprise or Enbridge.[56]  On the first business day after the final day of trading—April 22, 2020, in the case of the May Contract—the seller designates a qualified pipeline or storage facility where it will deliver the physical oil.[57]  The following day, the "Notice Day," the buyer and seller are matched and the buyer instructs the seller on its preferred method of delivery.[58]

### B.     Dramatic Changes in Supply and Demand Resulted in a Critical Shortage of Storage Space in April 2020 and Exerted Downward Pressure on WTI Prices

52.     In this section, I provide factual background on the U.S. crude oil markets in the weeks leading up to April 20, 2020, when May Contract prices went negative.  This factual background provides important context for assessing the allegations and market dynamics in this case.

---

[54] FCMs are often registered clearing members with the exchange ("clearing FCMs").  Non-clearing FCMs must have their customers' trades cleared by a clearing FCM.  *See* NYMEX Rulebook, Chapter 7: Delivery Facilities and Procedures, CME Group, as of April 16, 2020, https://web.archive.org/web/20200416161650/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/7.pdf, § 716.
[55] "Understanding Futures Expiration & Contract Roll," CME Group, https://www.cmegroup.com/education/courses/introduction-to-futures/understanding-futures-expiration-contract-roll.html.
[56] *See* NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures, 200104, as of April 28, 2020, https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf.
[57] NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures, 200105.B, as of April 28, 2020, https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf.
[58] NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures, 200105.A, 100105.E, as of April 28, 2020, https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf.

53.     In the weeks leading up to April 20, 2020, the unprecedented COVID-19 pandemic, among other factors, triggered a historic collapse in crude oil consumption that was not balanced out by a commensurate production decrease.  This imbalance created a "super contango" or "wide carry" price structure in crude oil futures and physical markets that incentivized market participants to store crude oil in the U.S., and particularly in Cushing, the sole delivery location for CME WTI futures contracts.  Consequently, storage space in Cushing became constructively full.

### 1.     The COVID-19 Pandemic and Geopolitical Tensions Created a Large Imbalance between Crude Oil Supply and Demand

54.     In the month preceding April 20, 2020, COVID-19 lockdowns in the U.S. caused a historic collapse of demand for crude oil amid a major shutdown of economic activity in large parts of the economy.  With airplanes grounded, fewer people commuting, and businesses shuttered, the demand for jet fuel, gasoline, and other petroleum products plummeted.

55.     This abrupt drop in demand, coupled with uncertainty about the pandemic's duration, resulted in a more rapid reduction in demand than supply.[59]  Producers were reluctant to bear the costs and risks of shutting down and restarting wells, anticipating that the decline in demand and prices could be temporary.[60]  Even when willing to cut production, producers struggled to adjust quickly to the sudden changes in consumption levels.[61]

---

[59] There was significant uncertainty regarding the pandemic's duration during this period.  For example, a New York Times Article on April 8, 2020, stated, "Without a vaccine, any progress is fragile, temporary.  The social distancing measures cannot continue forever.  And if they are relaxed without meticulous testing and the isolation of new patients, researchers say, the numbers of infections and fatalities are likely to soar again.  Dr. Lewnard and Dr. Jha said months could pass before Americans would be able to return to their pre-pandemic lifestyles of unrestricted movement.  Even then, they said, such a return would best take place in stages, with the government remaining vigilant for signs of outbreak."  *See* "Optimism Is Less Distant as Global Coronavirus Battle Rages On," The New York Times, April 8, 2020, https://www.nytimes.com/2020/04/08/us/coronavirus-global-progress.html.

[60] "North America's Oil Industry Is Shutting Off the Spigot," The Wall Street Journal, April 13, 2020, https://www.wsj.com/articles/north-americas-oil-industry-is-shutting-off-the-spigot-11586770200?mod=article_inline; Everett Wheeler, Allison Good, and Gorey Paul, "No Place to Go: Oil Storage Filling up Amid Collapsing Demand, Excess Production," S&P Global Market Intelligence, April 6, 2020, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/no-place-to-go-oil-storage-filling-up-amid-collapsing-demand-excess-production-57865154.

[61] It can take months for the flow from wells to taper off.  *See* "North America's Oil Industry Is Shutting Off the Spigot," The Wall Street Journal, April 13, 2020, https://www.wsj.com/articles/north-americas-oil-industry-is-shutting-off-the-spigot-11586770200?mod=article_inline.

56.     From March 13, 2020, when President Trump declared a national emergency, to April 17, 2020, consumption fell by approximately 34%, while U.S. production of crude oil—previously at record levels—fell by only 7% and net imports remained largely unchanged.[62]

57.     This oversupply imbalance was exacerbated by geopolitical tensions between major oil producers.  On March 6, 2020, Russia rejected a call from the Organization of the Petroleum Exporting Countries (OPEC) members to cut production.  This contributed to a 25% decrease in crude oil prices the following trading day.[63]  In retaliation, Saudi Arabia announced an increase in its production and Russia followed suit, which only served to further increase global oil supply and worsen the price fall.[64]  OPEC members eventually agreed on April 12, 2020, to production cuts, but only starting May 1, 2020.[65]

## 2.     The Resulting Price Structure Encouraged Storage over Selling, Resulting in Storage Space Shortages

58.     Consistent with basic economic principles, the crude oil oversupply led to a substantial drop in prices, including CME WTI futures.  The May Contract price decreased by 70% between January 2, 2020, and April 17, 2020, the last closing price before April 20, 2020.[66]  Given the uncertainty around the pandemic's duration and when demand would pick up, the decline was steeper for contracts closer to delivery compared to more deferred contracts, resulting in a large gap between the current and future prices of oil—a condition known as "super contango."[67]  Figure 2 below shows that the gap between the May 2020 and June 2020 expiring futures price increased precipitously after March 16, 2020.  The May-June calendar spread widened from -

---

[62] Crude oil consumption reduced from 21.456 to 14.103 million barrels per day (34%) between March 13 and April 17, 2020.  U.S. Production of crude oil decreased from 13.1 to 12.2 million barrels per day (7%) during the same time.  *See* "U.S. Weekly Product Supplied," U.S. Energy Information Administration, https://www.eia.gov/dnav/pet/pet_cons_wpsup_k_w.htm; "Weekly U.S. Field Production of Crude Oil," U.S. Energy Information Administration, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=WCRFPUS2&f=W.  EIA weekly data report that both U.S. imports and exports fell over the same period such that net imports remained flat overall.  U.S. exports decreased by roughly 1.5 million barrels a day (34%), while imports decreased by roughly 1.6 million barrels a day (24%). *See* "Weekly U.S. Exports of Crude Oil," U.S. Energy Information Administration, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=WCREXUS2&f=W; "Weekly U.S. Imports of Crude Oil," Energy Information Administration, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=WCRIMUS2&f=W.
[63] *See* Workpaper 1.
[64] "Oil Prices Dive as Saudi Arabia Takes Aim at Russian Production," The New York Times, March 8, 2020, https://www.nytimes.com/2020/03/08/business/saudi-arabia-oil-prices.html.
[65] Organization of the Petroleum Exporting Countries Press Release, "The 10th (Extraordinary) OPEC and non-OPEC Ministerial Meeting concludes," April 12, 2020, https://www.opec.org/opec_web/en/press_room/5891.htm.
[66] *See* Workpaper 2.
[67] For example, the August 2020 WTI futures price only decreased by 47% over the same period.  This resulted in the price of the August 2020 contract to be $12.93 above the price of the May 2020 contract. *See* Workpaper 2.

$0.55 to -$6.76 between March 16, 2020, and April 17, 2020.[68] This was the largest gap between the closest expiring futures price and the futures contract expiring a month later in over ten years.[69] This super contango condition encouraged market participants to store rather than sell oil, aiming to profit from the price difference.

## Figure 2
### *A "Super Contango" Materialized in Late March 2020 in NYMEX WTI Crude Oil Futures*



Source: *Refinitiv*
Note: A positive value indicates that the market is not in contango and a negative value indicates that the market is in contango.

59.     Traders with access to storage could engage in a "cash-and-carry" arbitrage, meaning buying and holding physical crude oil in storage while having locked in the deferred price for sale via a futures contract.[70] Functionally, traders engaged in "cash-and-carry" arbitrage would

---

[68] *See* Figure 2 backup.
[69] The largest contango over the prior ten years was -$4.59 on May 13, 2010. *Refinitiv*. *See* Workpaper 3.
[70] Robert Kolb and James Overdahl, Understanding Futures Markets, 6 ed. (2006) ("Kolb and Overdahl (2006)"), pp. 108–109 ("This is a cash-and-carry arbitrage because the trader buys the cash good and carries it to the expiration of the futures contract."; "Cost-of-Carry Rule 1[:] The futures price must be less than or equal to the spot price of the commodity plus the carrying charges necessary to carry the spot commodity forward to delivery.…  As we have seen, if prices do not conform to Cost-of-Carry Rule 1, a trader can borrow funds, buy the spot commodity with the borrowed funds, sell the futures contract, and carry the commodity forward to deliver against the futures contract.").

buy physical crude oil and sell deferred futures contracts. Then they would store the oil until the deferred futures expired and use the stored physical oil to deliver via futures (by fulfilling a short futures position obligation). These traders profit as long as the physical purchase price is less than the futures sale price after adjusting for the cost to store the crude oil (including financing and insurance costs). In Q1 2020, as the calendar spread moved into a large contango (see Figure 2 above), this cash-and-carry strategy became more attractive.

60.     Because a trader executing a cash-and-carry strategy uses stored physical crude oil to deliver via futures, storage space during a super contango typically fills up faster at or near the futures' point of delivery. As described above in Section V.A.3, the CME WTI futures' sole point of delivery is Cushing.

61.     A wealth of data shows that the tanks, pipelines, and other infrastructure for storing oil rapidly filled up across the U.S., and a storage shortage became particularly acute in Cushing. Indeed, according to U.S. Energy Information Administration ("EIA") data, the weekly inventory buildups between mid-March 2020 and mid-April 2020 were the highest ever recorded. Crude oil stockpiles increased by 63 million barrels—or 14%—in the four weeks leading up to April 17, 2020, putting inventories at 519 million barrels, just shy of the 536 million barrels record set in March 2017.[71] In Cushing, stockpiles increased by 20 million barrels—or 52%—putting inventories at 60 million barrels.[72]

62.     As Figure 3 below illustrates, this resulted in U.S. Crude Oil Weekly Alternate Storage Capacity Utilization jumping from 50% to 76% in Cushing.[73] Assuming the buildup continued at the latest rate of roughly 5 million barrels per week in Cushing, 100% capacity would have been reached by mid-May 2020.[74] Operational constraints, however, suggest that storage could become effectively full well before capacity reached 100% as some of the physically unfilled

---

[71] *See* Workpaper 4; "Weekly Supply Estimates: Stocks – Crude Oil, Commercial (Excl. Lease Stock )," U.S. Energy Information Administration, http://www.eia.gov/dnav/pet/pet_sum_sndw_a_epc0_sax_mbbl_w.htm.
[72] *See* Workpaper 4.
[73] *See* Workpaper 4.
[74] *See* Figure 3 backup.

storage may have already been leased or otherwise committed to receive new deliveries.[75] Furthermore, some capacity had to be left available for tank-to-tank transfers, blending, and other routine operations.[76]  A Congressional Research Service report published on April 22, 2020, stated that access and availability to the remaining storage at Cushing "is shrinking and that all its capacity has been leased, so it is essentially full according to traders."[77]

---

[75] ███████████████████████████████████████████████████████████████████ *See* "Pirrong Deposition, 141:4–6.  *See also* "The 20 Minutes That Broke the U.S. Oil Market," Bloomberg, April 25, 2020, https://www.bloomberg.com/news/articles/2020-04-25/the-20-minutes-that-broke-the-u-s-oil-market; "No Vacancy: Main U.S. Oil Storage in Cushing Is All Booked," Reuters, April 21, 2020, https://www.reuters.com/article/us-global-oil-usa-storage/no-vacancy-main-u-s-oil-storage-in-cushing-is-all-booked-idUSKCN22332W; "WTI crude oil futures prices fell below zero because of low liquidity and limited available storage," U.S. Energy Information Administration, April 22, 2020 ("Although Cushing has physically unfilled storage available, some of this physically unfilled storage is likely to have already been leased or already committed, limiting the uncommitted storage available for contract holders without pre-existing arrangements.  In this case, those contract holders would likely have to pay higher rates to storage operators that have uncommitted space available").
[76] "Column: U.S. Crude Oil Storage Is Filling Rapidly," Reuters, April 20, 2020, https://uk.reuters.com/article/uk-oil-prices-kemp/column-u-s-crude-oil-storage-is-filling-rapidly-idUKKBN222111.
[77] "Crude Oil Futures Prices Turn Negative," Congressional Research Services, April 22, 2020, https://crsreports.congress.gov/product/pdf/IN/IN11354.

**Figure 3**
*Cushing Weekly Storage Capacity Utilization*



Source: "Weekly Supply Estimates: Stocks – Crude Oil, Commercial (Excl. Lease Stock )," U.S. Energy Information Administration, http://www.eia.gov/dnav/pet/pet_sum_sndw_a_epc0_sax_mbbl_w.htm; "Working and Net Available Shell Storage Capacity," U.S. Energy Information Administration, https://www.eia.gov/petroleum/storagecapacity/
Note: Alternate Utilization Rate measures crude oil stores in tanks as well as crude oil in pipelines and in transit by rail in proportion to the sum of the tanks' working storage capacity and stocks in transit. Weekly utilization rates were calculated from weekly crude oil stocks compared to the most recent available semiannual storage and stocks in transit figures released by the EIA. Forecasted Cushing Alternate Utilization Rate is calculated by assuming the buildup in Cushing continued at the latest rate of roughly 5 million barrels per week as of April 17, 2020.

63.     Other contemporaneous data bolster the fact that storage was running out. For example, on April 7, 2020, Permian WTI storage futures prices jumped from $0.12 per barrel per month to $3.71 per barrel per month—a 30-fold increase in a single day.[78] Storage prices did not start subsiding until April 22, 2020. A clear sign that traditional storage was becoming unusually scarce and expensive can also be found in market participants resorting to storing oil on vessels at sea—normally a highly uneconomic proposition. The global amount of oil being stored on vessels at sea more than doubled between March 27, 2020, and April 17, 2020, adding almost 70

---

[78] ] *See* Workpaper 5. A Permian WTI storage future allows traders to buy and sell the right to store WTI crude oil in the Magellan East Houston terminal system. *See* "ICE Futures Europe: Permian WTI Storage Future," Intercontinental Exchange, https://www.ice.com/products/71090497/Permian-WTI-Storage-Future.

million barrels in the span of three weeks, approximately the amount of storage capacity at Cushing.[79]

64.     In sum, purchasers of physical oil in Cushing, including long CME WTI futures position holders that had not previously secured storage space, likely had no place to store that oil by the time they received it on or after May 1, 2020, the May Contract's first delivery day.

### 3.     Storage Capacity Concerns and Declining Prices Prompted Warnings of Potential Negative Prices

65.     The looming unavailability of storage capacity in Cushing for delivery of the May Contract was foreshadowed by many market participants, informed observers, and specialized news outlets in the days and weeks preceding April 20, 2020, prompting warnings of potential negative prices.

66.     For example, as early as March 18, 2020, Paul Sankey, managing director at Mizuho Securities, warned that "Oil prices can go negative."[80]



[81]  Negative pricing is a signal that the market does not need more crude oil and incentivizes producers to shut down wells.  S&P Global Market Intelligence reported on April 6, 2020, that there was "a lot of buzz out there about prices going negative" due to oversupply and dwindling storage capacity.[82]  The article quoted an oil production marketing consultant who stated that "[s]torage is filling up fast.  Cushing is running out of room.  The Gulf Coast is full.  The Permian is full.  We may have some Permian producers, during the month of May, who will not be able to sell their oil at any price.  Which

---

[79] *Bloomberg*. *See* Workpaper 6 and Figure 3 backup.
[80] Jonathan Garber, "Oil Prices Could Fall below Zero: Analyst," Fox Business, March 18, 2020, https://www.foxbusiness.com/markets/oil-price-could-fall-below-zero-analyst.
[81] ████████████████████████████████████████████████████████████
(emphasis in original).
[82] Everett Wheeler, Allison Good, and Gorey Paul, "No Place to Go: Oil Storage Filling up Amid Collapsing Demand, Excess Production," S&P Global Market Intelligence, April 6, 2020, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/no-place-to-go-oil-storage-filling-up-amid-collapsing-demand-excess-production-57865154.

has never happened in history."[83] Similarly, the International Energy Agency warned on April 15, 2020, that physical stocks were so massive they could "overwhelm" storage capacity.[84]

67.     As early as April 3, 2020, the CME announced it was implementing operational changes to ensure CME WTI futures and options along with some other energy products could trade at negative prices.[85] On April 8, 2020, the CME told clearing firms and clients that it was "ready to handle the situation of negative … prices in major energy contracts" and had a plan in place "if major energy prices continue to fall toward zero in the coming months."[86] On April 15, 2020, CME informed its clearing members that "[r]ecent market events have raised the possibility that certain NYMEX energy futures contracts could trade at negative or zero trade prices or be settled at negative or zero values, and that options on these futures contracts could be listed with negative or zero strike prices."[87] On April 16, 2020, the CME also increased its margin requirement for the May Contract due to heightened volatility.[88] Finally, on April 20, 2020, ████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████[89]

## C.     WTI Futures Contract Market Dynamics on April 20, 2020, Diverged from Historical Penultimate Days

68.     On April 20, 2020, the May Contract price went negative, falling ██████ during the trading day, and settled at negative $37.63 per barrel.[90] The midpoint price opened at ████ at 5:00 PM on the evening of April 19, 2020, and declined gradually overnight, reaching ████ by

[83] Everett Wheeler, Allison Good, and Gorey Paul, "No Place to Go: Oil Storage Filling up Amid Collapsing Demand, Excess Production," S&P Global Market Intelligence, April 6, 2020, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/no-place-to-go-oil-storage-filling-up-amid-collapsing-demand-excess-production-57865154.
[84] "Oil Glut May Overwhelm Global Storage Tanks within Weeks," Bloomberg, April 15, 2020, https://www.bloomberg.com/news/articles/2020-04-15/oil-glut-may-overwhelm-storage-despite-opec-cut-iea-says.
[85] "Changes to Price and Strike Price Eligibility Flags for Certain Energy Products," CME Group, April 3, 2020, https://www.cmegroup.com/notices/electronic-trading/2020/04/20200403.html.
[86] "Advisory Notice: CME Clearing Plan to Address the Potential of a Negative Underlying in Certain Energy Options Contracts," CME Group, April 8, 2020, https://www.cmegroup.com/content/dam/cmegroup/notices/clearing/2020/04/Chadv20-152.pdf.
[87] "Advisory Notice: Testing Opportunities in CME's 'New Release' Environment for Negative Prices and Strikes for Certain NYMEX Energy Contracts," CME Group, April 15, 2020, https://www.cmegroup.com/notices/clearing/2020/04/Chadv20-160.html.
[88] "Advisory Notice: Performance Bond Requirements: Energy - Effective April 17, 2020," CME Group, April 16, 2020, https://cmegroup.com/notices/clearing/2020/04/Chadv20-163.html.
[89] ███████████████████████████████████████████████████████████ (produced by SOCAR Trading).
[90] See Figure 4 backup.

8:00 AM on April 20, 2020.[91]  The midpoint price declined more rapidly from roughly 11:00 AM onward and collapsed shortly after turning negative at ███████, falling by over ███ between ███████ and 1:30 PM.[92]  The midpoint price rebounded to ██████ by █████████ but then dropped again to ██████ between ███████ and ██████████ before closing at ███████ at the end of the trading day (see Figure 4 below). ████████████████████████████████████████ ████████████████████████████████████████████[93]  After trading negative on both the rest of the afternoon of April 20, 2020, and the morning of April 21, 2020, the May Contract ended up with a final settlement price of $10.01.[94]

## Figure 4



Source:  Pirrong Report
Note:  The price series is based on Dr. Pirrong's midpoint series in his backup file *'CL_BBO_420.xlsx.'*

69.     This section explains how the storage constraints in Cushing detailed in the previous section set up the conditions for this negative price event, and describes the unusual market

---

[91] *See* Figure 4 backup.
[92] *See* Figure 4 backup.
[93] For example, ████████████████████████████████████████████████████████. *See* Workpaper 7.
[94] *See* Figure 4 backup.

dynamics on April 20, 2020, that contributed to the collapse of the May Contract price in a short period of time.

### 1.   A Larger Number of Expiring Futures Contracts Needed to Be Sold Compared to Past Penultimate Trading Days

70.    As explained above in Section V.A, the CME WTI futures contract requires the contract owner to take physical delivery of the crude oil in Cushing soon after the futures contract expiry or face large fines, penalties, and fees.[95]  For the May Contract expiry, market participants that could not take delivery of the crude oil underlying the futures contract were obligated to close out of their positions by April 21, 2020.[96]  The total number of May Contracts that remained open (the "open interest") at the start of April 20, 2020, was far higher than on past penultimate trading days, meaning more positions needed to be liquidated than usual to avoid imminent delivery.[97]  Figure 5 below shows that open interest for the May Contract was 31% higher than the largest open interest and 69% higher than the average open interest for the previous 12 contract expiry penultimate days.

71.    The CFTC has reported that a smaller share of the long side of this open interest than usual was held by traders that are typically involved in physical oil markets.  Figure 5 below shows that traders classified by the CFTC as "producers and merchants" (also called "commercial" traders) only held 12.5% of the long open interest compared to them holding on average 47.1% of the long open interest in the previous 12 penultimate days, while "non-reportable" or "other reportable" traders were driving most of the higher-than-usual open interest.[98]  Other reportable traders are entities that are not classified by the CFTC as being Producers, Merchants, Processors, Users, Swap Dealers, or Managed Money entities and are therefore unlikely to make or take delivery.[99]  Non-reportable traders are traders that fall below

---

[95] NYMEX Rulebook, Chapter 7: Delivery Facilities and Procedures, CME Group, as of April 16, 2020, https://web.archive.org/web/20200416161650/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/7.pdf.
[96] *See* ¶ 50 above.
[97] *See* "Interim Staff Report: Trading in NYMEX WTI Crude Oil Futures Contract Leading Up To, On, and around April 20, 2020," CFTC, November 23, 2020, https://www.cftc.gov/node/235761, p. 23.
[98] *See* "Interim Staff Report: Trading in NYMEX WTI Crude Oil Futures Contract Leading Up To, On, and around April 20, 2020," CFTC, November 23, 2020, https://www.cftc.gov/node/235761, p. 22. *See also* Figure 5 backup.
[99] "Disaggregated Explanatory Note," CFTC, https://www.cftc.gov/MarketReports/CommitmentsofTraders/DisaggregatedExplanatoryNotes/index.htm.

the reporting threshold.[100]  This category includes small speculators, including individual investors, who are unlikely to be able to make or take delivery.[101]

72.     The combination of a higher open interest and share of long open interest held by non-commercial traders means there were an additional 61,049 contracts (179% more) that had to be liquidated before expiry compared to the average of the previous 12 penultimate days.[102]

---

## Figure 5
### *May Contract Long Open Interest Held by Non-Commercial Traders on April 20, 2020 Was Far Higher Than On Past Penultimate Trading Days*



Source:  *Refinitiv*; "Interim Staff Report: Trading in NYMEX WTI Crude Oil Futures Contract Leading Up To, On, and around April 20, 2020," CFTC, November 23, 2020, https://www.cftc.gov/node/235761.
Note:  Trading in NYMEX WTI Crude Oil futures contracts terminates three business days prior to the 25th calendar day of the month prior to the contract month.  If the 25th calendar day is not a business day, trading terminates four business days prior to the 25th calendar day of the month prior to the contract month.

---

[100] "Commitment of Traders," CME Group, https://www.cmegroup.com/tools-information/quikstrike/commitment-of-traders.html.
[101] Letter from U.S. Commodity Futures Trading Commission to U.S. Senate Committee on Agriculture and House Committee on Agriculture, February 8, 2022,
https://www.agriculture.senate.gov/imo/media/doc/2022%2002%2008%20Ag%20committees%20digital%20asset%20response%20letter.pdf ("For analytical purposes, the CFTC categorizes reportable trading above that threshold "institutional trading," while nonreportable trading is generally indicative of retail participation").
[102] *See* Workpaper 8.

73.     Post–April 20, 2020, analyses have noted that prior to April 20, 2020, large exchange-traded funds ("ETFs") such as the US Oil Fund piled into long positions as retail traders sought a way to buy cheap oil.  That had the corresponding effect of increasing the quantity of shorts that could be taken by hedgers with abundant physical oil.  Even though US Oil Fund and other ETFs rolled their long position from the May to the June contract between April 9, 2020, and April 13, 2020, other non-commercial longs took their place, including retail traders and hedge funds, with the result being that open interest remained extraordinarily high into April 20, 2020.[103]  Traders that are not involved in physical oil markets are typically unable to take physical delivery of crude oil as they do not have the infrastructure to store or transport oil.  In other words, there were more traders holding long positions on the penultimate day of the expiring contract than usual, and more of these traders were not in a position to take delivery and needed to sell the May Contract to exit their position before contract expiry.[104]  Consequently, a larger number of expiring futures contracts needed to be sold than usual, and more urgently than usual.  In contrast, the share of the short open interest was largely composed of commercial traders.  Because commercial traders likely "had physical oil they could deliver if need be and so could stay to expiration, [they] could then force the remaining longs to pay an extreme penalty" to exit their long positions by withholding from buying futures prior to 1:30 PM on April 20, 2020, effectively "squeez[ing]" the longs.[105]

74.     Consistent with these analyses, as explained in the next section, there were few buyers on April 20, 2020, and they were quickly exhausted.

---



[103] Philip Verleger, "Negative Prices: Never Again," Energy Intelligence, April 23, 2020, https://www.energyintel.com/0000017b-a7da-de4c-a17b-e7da75620000; CITI-05594–5

[104] CITI-05594–5

[105] Philip Verleger, "Negative Prices: Never Again," Energy Intelligence, April 23, 2020, https://www.energyintel.com/0000017b-a7da-de4c-a17b-e7da75620000; "What Really Caused the Epic WTI Meltdown?" Energy Intelligence, April 21, 2020, https://www.energyintel.com/0000017b-a7da-de4c-a17b-e7da70fa0000; CITI-05594–5

### 2. There Were Few Buyers Providing Liquidity in the Market and Liquidity Was Quickly Exhausted

75.     Trading of the CME WTI futures contract operates on an order book.  There are separate order books for TAS and non-TAS orders and for different contract expiry months.  Market participants can submit different types of orders on CME that will impact the order book.  For example, in this market, CME offers limit orders and market orders.[106]  A limit order allows market participants to specify the quantity that they would like to trade along with the highest price at which they are willing to buy or the lowest price at which they are willing to sell.[107]  Bids (i.e., buy orders) or asks (i.e., sell orders) can be placed at various price levels on the order book.[108]  An order is said to be "marketable" (or "aggressive") if it can be executed immediately against an opposing order already in the market.  For example, an ask (i.e., sell order) that is placed at a price level lower than the prevailing best bid (i.e., buy) is marketable.  Otherwise, an order is "non-marketable" (or "passive").  Non-marketable orders "rest" on the order book.  It is not guaranteed that this "resting" order will trade.  For example, for a non-marketable bid to trade, an ask order has to be entered by another market participant at the same or a lower price level as the price level of the bid.  In contrast, a market order allows market participants to trade immediately at the market's current best available price.  A market order is always marketable as long as there is liquidity on the other side of the orderbook.  The notable difference between the market and limit order types is that a limit order executes if the order's price conditions are met, whereas market orders execute regardless of the prevailing market prices.[109]

76.     The set of resting or unfilled orders that are active in the market at any given time make up the order book.  The order book comprises two sides—one side is the set of bids to buy and the other side are offers to sell.  Each side is further stratified by price levels.[110]  On the bid side of the order book, the most competitive (highest) price at which a participant is willing to buy sets the first price level (also referred to as the best bid).  The next best price is the second level,

---

[106] "Futures Order Types," CME Group, https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/futures-order-types.html; "Iceberg Orders," CME Group, https://www.cmegroup.com/tools-information/webhelp/ebs-workstation-quick-guide/Content/IcebergOrders.html.
[107] "Futures Order Types," CME Group, https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/futures-order-types.html.
[108] Thierry Foucault, Marco Pagano, and Ailsa Röell, *Market Liquidity: Theory, Evidence, and Policy* (2013), p. 18.
[109] "Futures Order Types," CME Group, https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/futures-order-types.html.
[110] Larry Harris, Trading and Exchanges: Market Microstructure for Practitioners (2003) ("Harris (2003)"), p. 118.

and so forth.  The offer side follows the same structure, but with the lowest price creating the first level (the best offer) since this is the most competitive price.  The total visible quantity that participant(s) are willing to trade at any given price level will be shown at each level in the order book.[111]  This is referred to as the order book depth and gives insight into the available liquidity in the market at a given time.[112]  Thus, a market participant can look at the order book and understand the unfilled aggregate quantity and prices at which other market participants are willing to trade.[113]  A market that has a large volume of resting orders posted on the order book is usually described as a "liquid" or "deep" market.  Liquidity (or depth) is an important feature of financial markets as it denotes the ability to trade large quantities as quickly as possible, at the lowest costs possible, and when a market participant wants to trade.[114]

77.     As the April 21, 2020, expiration date of the May Contract approached, with crude oil storage options virtually non-existent and demand suppressed, the urgency to sell off long positions (i.e., offer) increased dramatically.  This urgency was compounded for those facing potential physical delivery of the oil without the means to store it.  As traders without pre-booked storage tried to unwind their positions to avoid delivery, they created liquidity on the ask (i.e., sell) side of the CME WTI futures order book and consumed bid (i.e., buy) side liquidity.

78.     By the start of the April 20, 2020, trading session at 5:00 PM on April 19, 2020,



Figure 6 below compares

[111] Note that order books typically only show the visible quantity, and exclude any invisible quantity (e.g., from iceberg orders).
[112] Harris (2003), p. 398.
[113] Harris (2003), pp. 117, 118.
[114] Harris (2003), pp. 394, 398.
[115]

## Figure 6



Source: CME
Note: Midpoint refers to the midpoint of the highest bid and lowest offer prices. Buy (sell) quantity is calculated as the total bid (offer) volume at or above (below) 2 ticks (10 ticks, 100 ticks) of the midpoint price. For example, if the midpoint price were $1, the buy quantity within 2 ticks of the midpoint would be calculated as the total volume between $0.98 and $1. Likewise, the sell quantity within 2 ticks of the midpoint would be calculated as the total volume between $1.02 and $1. Quantities are snapshots of depth taken at one-minute intervals. Droplines indicate the start of a new penultimate day. I consider the start of each penultimate day to be ▉▉▉▉ CME markets open at 5:00 PM of each trading day and close at 4:00 PM.

79.  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉ Figure 7 below compares ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

██████████████████████████████████████████████████████

████████████

---

**Figure 7**



Source: CME
Note: Midpoint refers to the midpoint of the highest bid and lowest offer prices. Buy (sell) quantity is calculated as the total bid (offer) volume at or above (below) 2 ticks (10 ticks, 100 ticks) of the midpoint price. For example, if the midpoint price were $1, the buy quantity within 2 ticks of the midpoint would be calculated as the total volume between $0.98 and $1. Likewise, the sell quantity within 2 ticks of the midpoint would be calculated as the total volume between $1.02 and $1. Quantities are snapshots of depth taken at one-minute intervals. Droplines indicate the start of a new penultimate day. I consider the start of each penultimate day to be ████████ CME markets open at 5:00 PM of each trading day and close at 4:00 PM.

80.    Figures 8 and 9 below █████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████ Figure 8 displays ██████████████████████████████

81.     Figure 9 conveys ███████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████ As I describe in more detail in Section VIII.A
below, ███████████████████████████████████████████
█████████████████████████████████████

**Figure 8**



Source: CME

Note: Midpoint refers to the midpoint of the highest bid and lowest offer prices. Buy (sell) quantity is calculated as the total bid (offer) volume at or above (below) 2 ticks (10 ticks, 100 ticks) of the midpoint price. For example, if the midpoint price were $1, the buy quantity within 2 ticks of the midpoint would be calculated as the total volume between $0.98 and $1. Likewise, the sell quantity within 2 ticks of the midpoint would be calculated as the total volume between $1.02 and $1. Quantities are snapshots of depth taken at one-minute intervals.

Highly Confidential

**Figure 9**



Source: CME
Note: Midpoint refers to the midpoint of the highest bid and lowest offer prices. Buy (sell) order quantity is calculated as the total bid (offer) volume at each price level. Quantities are snapshots of depth taken at one-minute intervals. Midpoints are snapshots taken at one-minute intervals. Within each one-minute time interval, the latest available timestamp is considered. Prices correspond to the TAS premium or discount in cents per barrel relative to the TAS settlement price.

82.     In lay terms, under normal market circumstances, the unwinding of a long position by traders without the means to store oil would have been bought by users of oil; however, with storage being close to capacity, no one wanted to buy the oil. Sellers of May Contracts were therefore forced to sell these contracts at negative prices—essentially paying someone to take the oil off their hands. This is consistent with the view of numerous market participants, academics,

and other informed observers who attributed the order book imbalance and negative prices on April 20, 2020, to the lack of storage space at Cushing.

83.    For example, 

[117]  Other self-regulatory bodies, U.S. government agencies, the CFTC Chairman, market participants, and academics reached similar conclusions.[118]

### 3.    Other Oil Futures Contracts That Were Not Impacted by the Storage Constraints in Cushing Did Not Go Negative

84.    While the May Contract went negative on April 20, 2020, due to the confluence of demand shock from the COVID-19 pandemic and the lack of storage capacity in Cushing, the more deferred CME WTI futures contracts and other oil futures contracts such as Brent futures did not.  On April 20, 2020, while the May Contract plunged, the June 2020 CME WTI futures contract remained positive despite an 18% decline.[119]  Similarly, June 2020 Brent futures also remained positive with a smaller price decline, settling at $25.57.[120]

85.    The significant divergence in prices between different oil futures contracts in April 2020 can be attributed to factors specific to the storage constraints at Cushing and the nature of the contracts themselves.  Other oil futures prices did not fall as much because they were not exposed to the short-term storage constraints in Cushing.

---

116 ████████████████████████████████████████

117 ████████████████████████████████████████
████████████████████████████████  Defendants did not own any storage space at Cushing.

118 *See* Appendix C.

119 *See* Workpaper 2.

120 *See* Workpaper 2.

86.     Importantly, Brent futures contracts are settled financially rather than physically.  Thus, holders of May 2020 Brent futures contracts unable to take physical delivery of crude oil were not required to sell off positions.  Moreover, Brent futures contracts are based on production from multiple oil fields in Europe's North Sea and are therefore not exposed to the logistical challenges associated with the landlocked Cushing hub.  Lastly, Brent oil is produced at or closer to sea, making it easier to quickly store and move on vessels at sea.

87.     Similarly, deferred CME WTI futures contracts were not immediately exposed to the storage constraints in Cushing.  Holders of June 2020 CME WTI futures contracts were not obligated to receive delivery before June 1, 2020, reducing the urgency for traders that were unable to take delivery to sell off their positions.  As discussed above, the uncertainty surrounding the pandemic's duration, whether production would fall and if so by how much, and when demand would pick up also translated into uncertainty as to when storage constraints in Cushing would ease.

88.     In sum, other oil futures contracts such as Brent futures and deferred contracts were shielded from the specific storage issues at Cushing, allowing them to better absorb the demand shocks caused by the pandemic.

### D.      Negative Commodity Prices Have Occurred Due to Fundamental Factors, Such as Oversupply Coupled with Logistical Constraints

89.     An oversupply of a commodity, when coupled with logistical constraints that prevent its efficient disposal or necessitate holding it at costs exceeding its anticipated future sale value, can compel traders to sell at negative prices.  Although rare, such negative price phenomena have occurred in several energy commodities markets.  Tellingly, in April 2020, negative prices occurred not only in futures markets but also in at least some physical crude oil markets in the Permian basin close to Cushing, indicating fundamental factors were at play.  These markets, much like the WTI crude oil market on April 20, 2020, exhibited an extreme supply glut coupled with logistical incapacities.

1.      **Past Instances of Negative Prices Also Exhibited a Supply Glut Coupled with Logistical Constraints**

90.     While April 2020 was the first time in history that CME WTI futures prices became negative, several other commodity prices, including natural gas, propane, and electricity have previously traded negatively.[121]  In each of these events, fundamental factors linked to oversupply coupled with storage and logistics issues were at play.

91.     For example, in April and May 2019, next-day natural gas prices at the Waha hub in the Permian basin in West Texas fell below zero.  A Reuters article reported that this was caused by storage and logistics constraints:

> The problem is construction of new oil and gas pipelines in the Permian has not kept up with output, which has more than doubled over the past three years as the United States has risen to become the world's largest oil producer.  So producers are forced to burn or flare the gas, pay others with space on existing pipelines to take it or stop drilling.[122]

Because "Texas rules [only] allow firms to flare gas for up to six months," producers are willing to pay others to take the gas once they can no longer burn it.[123]

92.     Similarly, electricity is not easily storable and "many of the facilities [generating electricity] aren't designed to switch on and off quickly."[124]  The electricity market therefore sometimes prices negatively when "the amount of electricity being generated is outstripping demand during certain hours of the day."[125]

---

[121] "Crude Oil Futures Prices Turn Negative," Congressional Research Services, April 22, 2020, https://crsreports.congress.gov/product/pdf/IN/IN11354 ("[O]ther commodity prices, including natural gas and propane, have previously traded negatively").  *See also* ███████████████████████████████ CME-Negative-Crude_0000048█████████████████████████████████████████████████████████████.

[122] "U.S. Natural Gas Prices Turn Negative in Texas Permian Shale Again," Reuters, May 22, 2019, https://www.reuters.com/article/idUSKCN1SS1GB/.

[123] "U.S. Natural Gas Prices Turn Negative in Texas Permian Shale Again," Reuters, May 22, 2019, https://www.reuters.com/article/idUSKCN1SS1GB/.

[124] "Power Worth Less than Zero Spreads as Green Energy Floods the Grid," Bloomberg, August 6, 2018, https://www.bnnbloomberg.ca/power-worth-less-than-zero-spreads-as-green-energy-floods-the-grid-1.1119243; Michael Sewalt and Cyriel De Jong, "Negative Prices in Electricity Markets," Commodities Now, June 2023, https://www.kyos.jp/wp-content/uploads/sites/2/2016/10/Commodities-Now-Negative-prices-in-Electricity-Markets.pdf.

[125] "Power Worth Less than Zero Spreads as Green Energy Floods the Grid," Bloomberg, August 6, 2018, https://www.bnnbloomberg.ca/power-worth-less-than-zero-spreads-as-green-energy-floods-the-grid-1.1119243; Michael Sewalt and Cyriel De Jong, "Negative Prices in Electricity Markets," Commodities Now, June 2023, https://www.kyos.jp/wp-content/uploads/sites/2/2016/10/Commodities-Now-Negative-prices-in-Electricity-Markets.pdf.

>        2.    **Contemporaneous Negative and Near-Zero Prices Appeared in Crude Oil Physical Markets in April 2020, Indicating Fundamental Factors Were at Play**

93.    As storage capacity in the U.S. started to fill up, some physical crude oils started to price at negative values as early as mid-March 2020.  Mercuria Energy Group Ltd., a trading house, bid negative 19 cents per barrel for Wyoming Asphalt Sour, a dense oil used mostly to produce paving bitumen, "effectively asking producers to pay for the luxury of getting rid of their output."[126]  Energy market analysts and traders at the time warned that "other crude streams are likely to see negative prices soon" in "areas where storage is filling up quickly."[127]

94.    In the Permian basin, closer to Cushing, reports emerged in the early morning of April 20, 2020, that "[b]uyers in Texas are offering as little as $2 a barrel for some oil streams, raising the possibility that producers may soon have to pay to have crude taken off their hands."[128]  A hedge fund manager specializing in energy derivatives posted at 3:22 AM that "there is no limit to the downside to prices when inventories and pipelines are full," that "[n]egative prices are possible," and that some landlocked physical oil prices were already negative.[129]

95.    Physical prices did end up negative in the Permian basin during the week of April 20, 2020, when "producers of crude streams such as South Texas Sour and Eastern Kansas Common had to pay more than $50 a barrel to offload their output."[130]

---

[126] "One Corner of U.S. Oil Market Has Already Seen Negative Prices," Bloomberg, March 27, 2020, https://www.bloomberg.com/news/articles/2020-03-27/one-corner-of-u-s-oil-market-has-already-seen-negative-prices.
[127] "One Corner of U.S. Oil Market Has Already Seen Negative Prices," Bloomberg, March 27, 2020, https://www.bloomberg.com/news/articles/2020-03-27/one-corner-of-u-s-oil-market-has-already-seen-negative-prices.
[128] "Oil Plunges below $12 as Storage Rapidly Fills," Bloomberg, April 20, 2020, https://www.mrt.com/business/oil/article/Oil-plunges-below-12-as-storage-rapidly-fills-15212436.php.
[129] Pierre Andurand [@AndurandPierre], Twitter Post, X, April 20, 2020, 3:22 AM, https://twitter.com/AndurandPierre/status/1252150610167771136; Pierre Andurand [@AndurandPierre], Twitter Post, X, April 20, 2020, 3:27 AM, https://twitter.com/AndurandPierre/status/1252151840474529793.
[130] "The Next Chapter of the Oil Crisis: The Industry Shuts Down," Bloomberg, April 27, 2020, https://www.bloomberg.com/news/articles/2020-04-26/the-next-chapter-of-the-oil-crisis-the-industry-shuts-down.

## VI.    Dr. Pirrong's Claim That Storage Constraints Cannot Explain Negative Prices on April 20, 2020, Is Flawed and At Odds with the Predominant Third-Party Views and Research

96.     Dr. Pirrong claims that fundamental factors, including storage constraints, cannot explain the negative prices on April 20, 2020.[131]  However, this claim is flawed and inconsistent with the views and research of many third-parties described in Section V above.  Dr. Pirrong advances what he describes as "several logical problems" with fundamental factors explaining negative prices.[132]  Each of these "problems" fails to withstand critical scrutiny.

97.     First, Dr. Pirrong claims short futures position holders could pass ownership to long futures positions holders taking delivery without the crude leaving the existing storage facility (i.e., "deliver oil in store").[133]  However, this argument ignores an important aspect of the NYMEX delivery rules, specifically that long position holders can opt to take delivery "in store" *but* that short position holders must also *agree* to make delivery in storage.[134]  Short position holders were unlikely to agree, and long position holders could not know whether they would prior to the end of trading on April 21, 2020.

98.     To understand why short position holders were unlikely to agree, consider that, on April 20, 2020, the prevailing super contango price structure discouraged short position holders from giving their valuable in-tank storage space to others, including long position holders.  As explained in Section V above, the super contango made storage space valuable because future crude oil prices were substantially higher than current prices.  Storing crude oil and selling it in the future was therefore a more attractive strategy.  By giving up storage space, the short position holder would forego a valuable profit opportunity.  Indeed, Dr. Pirrong acknowledges this disincentive to give up storage space elsewhere in his report, stating "there was no reason for those holding inventories of oil at Cushing to deliver it at negative prices rather than to continue to hold it for sale later at positive prices."[135]  Instead of the short position holder giving up its

---

[131] Pirrong Report, ¶¶ 338–340.  *See also* Pirrong Report, ¶ 349 (emphasis added) ("[T]he rebound in prices after 1:30 p.m. on April 20, 2020 is most plausibly explained by a recognition by potential takers and makers of delivery that *the negative price did not reflect supply and demand fundamentals*.").

[132] Pirrong Report, ¶ 339.

[133] Pirrong Report, ¶ 340.

[134] NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures, 200104, as of April 28, 2020, https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf (emphasis added) ("*[I]f the seller agrees to such transfer and if the facility used by the seller allows for such transfer*, without physical movement of product, by in-tank transfer of title to the buyer").

[135] Pirrong Report, ¶ 347.

storage space, the short position holder could deliver oil that was not already in storage at Cushing.[136]

99.     Second, Dr. Pirrong claims that "Cushing stocks were well below storage capacity at Cushing" and "occupied 68 percent of capacity."[137]  However, Dr. Pirrong uses total storage capacity rather than working storage capacity.  Cushing stocks, according to Dr. Pirrong's own figures, were 84% of "working storage capacity."[138]  His claim that there was plenty of storage capacity available is contradicted by his own statements on April 20, 2020, that Cushing was probably over 80% and therefore effectively full.[139]  Moreover, Dr. Pirrong uses April 24, 2020, storage data.  As explained in Section V.B. above, the May Contract's first and last delivery days were May 1, 2020, and May 31, 2020, so assuming the buildup continued at the latest rate of roughly 5 million barrels per week, prior to production cuts made after April 20, 2020, May deliveries would have occurred after storage capacity utilization in Cushing had reached 100%.[140] Because this analysis does not account for already committed storage space, it therefore also appears unlikely that long futures position holders would have been able to secure storage for an early May delivery.[141]  In fact, contemporaneous analysis from market participants reveals they came to the realization around April 20, 2020, that storage in Cushing would reach full capacity as early as May.  For example, Figure 10 shows that ███████████████████████████
██████████████████████████████████        ████████████████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

---

[136] The short position holder can always elect to deliver oil to a point of connection between their incoming pipeline and the outgoing pipeline or storage facility designated by the buyer, without giving up storage space.  *See* NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures, 200104, as of April 28, 2020,
https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf.
[137] Pirrong Report, ¶ 356.
[138] (63,378,000 barrels of Cushing stocks) / (75,835,000 barrels of tank working storage capacity) = 84%.  *See* Pirrong Report, ¶ 356.███████████████████████████████████████████████████████████████████████████
███████████████████████████████  *See* Pirrong Deposition, 140:24–25 ██████████████████████████████████████████.
[139] Craig Pirrong, "WTI-WTF? Part II (of How Many???)," Streetwise Professor, April 21, 2020,
https://streetwiseprofessor.com/wti-wtf-part-ii-of-how-many/ ("The most recent data from the EIA indicates about 55 mm bbl of oil storage at Cushing. That's about 80 percent of nameplate capacity (also per EIA.). Due to operational constraints (e.g., need working space to move barrels in and out; can't mix different grades in the same tank) that's probably effectively full").
[140] "Weekly Supply Estimates: Stocks – Crude Oil, Commercial (Excl. Lease Stock)," U.S. Energy Information Administration, buildup week of April 17, 2020, http://www.eia.gov/dnav/pet/pet_sum_sndw_a_epc0_sax_mbbl_w.htm.  Supply conditions changed following April 20, 2020, as the negative prices on that day sent a strong signal to producers, which prompted some of them to shut down production.  As a result, the number of active wells dropped 23% from 529 to 408 between April 17, 2020, and May 1, 2020.  *See* Workpaper 9; "North America Rotary Rig Count (Jan 2000-current)," Baker Hugues, https://bakerhughesrigcount.gcs-web.com/na-rig-count.
[141] The delivery period for the May 2020 CME WTI contract starts on May 1, 2020, and shorts can deliver oil throughout the month of May; therefore, the uncertainty surrounding the longs' ability to secure storage in May mattered.

 Dr. Pirrong's view that storage at Cushing was adequate is also notably at odds with the predominant view, which aligns with the findings of the CFTC report.[142]  This predominant view points to the distinct market conditions on April 20, 2020, as driving factors for the sell-off. These conditions included delivery constraints due to the anticipation that storage at Cushing would soon be at capacity, an unusually high open interest in the expiring May Contract, and a unique mix of market participants comprising an unusually low percentage of commercial traders and an unusually high percentage of financial traders.[143]

## Figure 10



Source:  Chevron__Vega_0000023, Chevron__Vega_0000251, Chevron__Vega_0000220

100.    Third, Dr. Pirrong's report fails to cite or address the key findings of the CFTC report.

_____

[142] *See* "Interim Staff Report: Trading in NYMEX WTI Crude Oil Futures Contract Leading Up To, On, and around April 20, 2020," CFTC, November 23, 2020, https://www.cftc.gov/node/235761, pp. 12–13 ("The buildup of oil in storage facilities significantly impacted available storage capacity. … [D]ata from the EIA shows that storage facilities at Cushing had increased from about 50% of capacity in mid-March to approximately 76% of capacity by April 17. Anecdotal press reports during the week leading up to the April 20 trade date suggested that crude oil storage was in particularly short supply. Some reports indicated that most, if not all, of the empty storage space had already been committed. … As the May Contract approached expiration on April 21, spreads between the May and June Contracts widened, consistent with an increase in storage capacity concerns"), p. 14 ("The dissolution of the OPEC Plus agreement in March, coupled with the delay in resuming the production cuts until May, further exacerbated crude oil oversupply concerns, ultimately raising fears about the market's ability to store excess production. These concerns were particularly pressing at the Cushing storage facilities that serve as the delivery point for the physically-settled WTI Contract.")
[143] Pirrong Deposition, 118:7–12



[144]  Dr. Pirrong's report fails to adequately consider these alternative explanations for the observed price movements.  Shortly after the proposed class period ended, Dr. Pirrong speculated that strategic trading—potentially rising to the level of manipulation—could have contributed to the price drop, but all of the examples he provided involved manipulation by traders in the physical market.[145]  His report in this matter does not consider the possibility of strategic trading (including potential manipulation) by physical traders.

101.    Fourth, Dr. Pirrong claims that the price rebound after 1:30 PM is proof that the negative prices were not caused by fundamental factors, such as storage issues, but rather were caused by Trader Defendants' alleged manipulation.[146]  However, Dr. Pirrong fails to acknowledge that, after rebounding to ▮▮▮▮ by ▮▮▮▮▮, prices dropped again to ▮▮▮ between ▮▮▮ and ▮▮▮▮, more than an hour after the settlement, before closing for the day at a price of ▮▮▮ (see Figure 4 above).[147]  This second major price decline could not have been caused by Trader Defendants' alleged manipulative trading, since none of them were selling after the 1:30 P.M. CT settlement.

---

[144] Pirrong Deposition, 99:18–100:4



60:4–62:11

[145] Craig Pirrong, "WTI-WTF?," Streetwise Professor, April 20, 2020, https://streetwiseprofessor.com/wti-wtf/ ("The proximate cause of these wild gyrations, and unprecedented negative prices is, of course, the collapse of demand and the looming exhaustion of storage space, including at the delivery point of Cushing, OK. But although this is a necessary condition for today's events, it is not a full explanation.… The likely cause is the difficulty of liquidating about 100,000 open contracts (100 million barrels!) in such extreme technical conditions. It is plausible, and indeed likely, that strategic behavior–perhaps rising to the level of manipulation–is the major cause of how prices moved today against the background of conditions that were widely known on Friday.… In these conditions, a trader, or a group of traders with modest-sized short positions can exercise market power by delivering even a small amount of oil over and above the quantity that *should* flow to Cushing. This drives down the price and allows the trader or traders to cover his (their) position(s) at artificially low prices."); Craig Pirrong, "WTI-WTF? Part II (of How Many???)," Streetwise Professor, April 21, 2020, https://streetwiseprofessor.com/wti-wtf-part-ii-of-how-many/ ("But there is another market power play possible here. A firm controlling storage could crash prices (and spreads) by withholding that capacity from the market.").

[146] Pirrong Report, ¶ 349.
[147] *See* Figure 4 backup.

102.     Finally, Dr. Pirrong claims that the narrowing of calendar spreads between Friday, April 17, 2020, and Friday, April 24, 2020, is proof that the storage capacity shortage at Cushing was becoming less dire the week of April 20, 2020.[148]  However, Dr. Pirrong's claim is grossly misleading in that he compares two *different* calendar spreads across those dates, namely the May-June calendar spread on April 17, 2020, and the June-July calendar spread on April 24, 2020.[149] ███████████████████████████████████████████████████

████████  Dr. Pirrong's spread analysis compares apples to oranges.[150]  Had Dr. Pirrong used the June-July calendar spread consistently on both dates, he would have found that the spread was very similar (-$4.39 versus -$4.28) between those two dates.  Moreover, the choice of these two dates is arbitrary.[151]  As Figure 11 shows, on April 17, 20, and 21, 2020, the June-July calendar spread *widened* from -$4.39 to -$5.85 to -$7.12, respectively.  Following Dr. Pirrong's logic, the "market assessment of the severity of any putative shortage of storage" therefore increased on and in the days immediately after April 20, 2020.

---

[148] Pirrong Report, ¶¶ 353–354.

[149] Pirrong backup production CL2020KM.xlsx.

[150] Pirrong Deposition, 142:2–4.

[151] While the EIA inventory reports are based on Friday data, they are only released the following Wednesday.  *See* "Weekly Petroleum Status Report Schedule," U.S. Energy Information Administration, https://www.eia.gov/petroleum/supply/weekly/schedule.php.  The EIA storage data for Friday, April 17, 2020, and April 24, 2020, were only released on Wednesday, April 22, 2020, and Wednesday, April 29, 2020, respectively.

## Figure 11

*Price Spreads in CME WTI June-July Futures Widened Immediately After April 20, 2020*



Source: *Refinitiv*
Note: A positive value indicates that the market is in backwardation and a negative value indicates that the market is in contango.

103.    Dr. Pirrong also claims that "there was no public information on April 20, 2020—and particularly during the period ▮▮▮▮▮▮-1:30p.m.—that would explain a massively greater deviation from the empirical relationship on that day."[152]  However, he did not in fact conduct a "systematic" news article search for this matter nor does he know when critical storage and crude oil consumption data he cites to were released.[153]

104.    In sum, none of Dr. Pirrong's "logical problems" with fundamental factors explaining negative prices are valid.  Furthermore, Dr. Pirrong's opinion is at odds with the predominant



[152] Pirrong Report, ¶ 378.
[153] Pirrong Deposition, 519:16–23

view and research of market participants, academics, and other informed observers I described in Section V.C.2 above.[154]

## VII. Dr. Pirrong's TVP-VAR Model Is Conceptually Flawed, Methodologically Unsound, and Incapable of Establishing That Trader Defendants' Trading on April 20, 2020, Caused Artificial Prices

105.    Dr. Pirrong's TVP-VAR model is his method for estimating the purported price impact of Trader Defendants' trading and the associated alleged artificial depression in the period before ███████ Upon review of the data and evidence, I find that Dr. Pirrong's TVP-VAR model, described below, suffers from multiple conceptual and methodological flaws and, as a result, does not provide a reliable basis upon which to form his opinions.

106.    First, Section VII.A below explains that Dr. Pirrong's TVP-VAR model at most calculates price impact, which is not sufficient to estimate price artificiality. Economists define the price artificiality of market manipulation as the deviation between the actual price and the hypothetical "but-for" price absent the manipulation (i.e., the difference between the actual and but-for worlds).[155] Estimating a price impact is insufficient to determine a but-for price. In order to determine a but-for price, an economist needs to make reasonable assumptions about what would happen in the but-for world. Dr. Pirrong fails to lay out and support these necessary assumptions. Moreover, Dr. Pirrong's methodology implicitly assumes the TAS sellers that relied on Trader Defendants buying TAS would have had no price impact in the but-for world absent Trader Defendants' alleged manipulative trades.[156]

107.    This assumption is economically nonsensical in this matter given ███████████ ███████████ Because Trader Defendants' ███████████████████████████ ███████ (see Section X below describing Trader Defendants' trading patterns), Trader Defendants' ███████████████████████████████████████ ███████████████████████████████████████

---

[154] *See* ¶ 83 above. *See also* Appendix C.
[155] Pirrong Deposition, 173:23–174:3 ████████████████████████
[156] Pirrong Deposition, 180:7–16 ████████████████
████████████████████████████████████
████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

108.     Dr. Pirrong's methodology assumes that either (i) TAS sellers' trading would have been unchanged and they would have sold to other TAS buyers, which unlike Defendants would have had no price impact in the non-TAS market, or (ii) TAS sellers would have instead sold in the non-TAS market with no price impact.  Dr. Pirrong ignores evidence that ███████████████

████████████████████████████████████████████████████

█████████     Absent Trader Defendants' trading, an even greater number of TAS sellers would have been unable to execute their TAS sale orders and would have likely had to sell in the non-TAS order books, likely aggressively.  Such aggressive selling in the but-for world would have had a price impact that would replace the Trader Defendants' actual world trading price impact.

109.     In other words, Dr. Pirrong's methodology cannot measure the impact that market participants who sold TAS contracts to Trader Defendants would have had absent Trader Defendants' trading (i.e., in the "but-for" world).  This fundamental flaw alone precludes Dr. Pirrong from making credible assertions regarding the but-for price of the May Contract and any price distortion allegedly caused by the Trader Defendants' trading on April 20, 2020.

110.     Second, Section VII.B below explains how Dr. Pirrong's use of the TVP-VAR model to estimate price impact allegedly caused by Trader Defendants' trades is inconsistent with the academic literature's application of the model.  Dr. Pirrong's analyses are loosely based on a VAR model first developed in the market microstructure literature in the early 1990s.  However, Dr. Pirrong eschews this market microstructure VAR model and instead adapts a TVP-VAR model from a macroeconomics article.  A TVP-VAR model has never—to my knowledge—been peer reviewed to study price impact in a market microstructure setting, nor is it generally accepted in the market microstructure literature.

111.     Third, Section VII.C below explains that the inability of Dr. Pirrong's model in estimating a but-for price is closely related to its failure to control for confounding factors or alternative explanations for the May Contract price movements such as storage constraints or genuine market supply and demand changes.  As such, Dr. Pirrong's opinion that Trader

Defendants artificially depressed the May Contract and that, but for their manipulative trading, the contract would not have traded as low as it did is unfounded.

112.    Fourth, as I explain in Section VII.D below, Dr. Pirrong's TVP-VAR model does not generate robust results—namely, his results change substantially when the model is implemented with minor changes while keeping Dr. Pirrong's stated assumptions in place.[157] These small alterations should not result in substantially changed outcomes in a robust model.

113.    Finally, Section VII.E below explains that applying a more standard price impact VAR model, in-line with the one used in the market microstructure paper cited by Dr. Pirrong, produces ███████████████ indicating that the estimated price impact of the Trader Defendants' trading activity is effectively ███████████████ The fact that a standard VAR model produces ███████████████ further calls into question the reliability of Dr. Pirrong's conclusions regarding Trader Defendants' alleged manipulative impact.

114.    Together, these limitations render Dr. Pirrong's model unsound as a basis for his opinions.  In other words, the limitations of his framework alone preclude Dr. Pirrong from reliably reaching his conclusions.

### A.  Dr. Pirrong's Estimation of Price Impact Is Insufficient to Establish Price Artificiality

115.    Dr. Pirrong purports to estimate whether Trader Defendants' conduct depressed prices of May Contracts on April 20, 2020, by estimating the price impact caused by Trader Defendants' aggressive trading.  However, as Dr. Pirrong acknowledged during his deposition, his estimation of price impact is not sufficient to estimate artificiality since "you don't read the artificiality out of the model directly."[158]

116.    Economists define the price artificiality of market manipulation as the deviation between the actual price and the hypothetical "but-for" price absent the manipulation (i.e., the difference

---

[157] When Dr. Pirrong estimates his model and constructs IRFs, he imposes a set of "identifying restrictions" by assuming that "trades can cause contemporaneous price movements, but price movements do not contemporaneously cause trades."  *See* Pirrong Report, ¶¶ 222–223.  These assumptions impose a set of restrictions to estimate his model, but there is not a unique way of estimating the model.  *See* Section VIII.D.2.
[158] Pirrong Deposition, 174:9–25

between the actual and but-for worlds).[159]  Estimating a price impact is insufficient to determine a but-for price.  In order to determine a but-for price, an economist needs to make reasonable assumptions about what would happen in the but-for world.  Dr. Pirrong fails to lay out and support these necessary assumptions.

117.    Implicitly, Dr. Pirrong's methodology relies on the economically nonsensical assumption that the trading patterns of others, including TAS sellers that relied on Trader Defendants buying TAS, would remain unchanged absent Trader Defendants' alleged manipulative trades.  During his deposition, Dr. Pirrong ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████[160]  Dr. Pirrong therefore also assumes that in the but-for world where Trader Defendants would not be buying TAS, actual-world TAS sellers would have been able to sell similar quantities in the TAS order books (but not to Trader Defendants).[161]

118.    This assumption is illogical given ███████████████████████████ Dr. Pirrong ignores evidence that TAS sellers in the real world were █████████████████████████ ████████████████████████████████  In the absence of Trader Defendants' trading, a greater number of TAS sellers would have been unable to execute their TAS sale orders and would have had to sell in the non-TAS order books.  Because only ████ of non-aggressive (or passive) orders executed during the proposed class period, these non-TAS sales would likely have required aggressive orders to execute.[162]  Such aggressive selling would have had a price impact that would replace some or all of the Trader Defendants' actual world



trading price impact.  Because Dr. Pirrong's purported price impact methodology cannot account for this but-for price impact, Dr. Pirrong's analysis is unreliable and incapable of establishing whether putative class members were harmed.

119.    As I explained in Section V.C.2 above, ████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████████
████████████ (see Figure 12 below).

**Figure 12**



Source: CME
Note: Midpoint refers to the midpoint of the highest bid and lowest offer prices. Buy (sell) quantity is calculated as the total bid (offer) volume at or above (below) 1 tick (2 ticks, 5 ticks) of the midpoint price. For example, if the midpoint price were $1, the buy quantity within 2 ticks of the midpoint would be calculated as the total volume between $0.98 and $1. Likewise the sell quantity within 2 ticks of the midpoint would be calculated as the total volume between $1.02 and $1. The midpoint in outright trading fell below zero at ▮▮▮▮▮▮

120.     Dr. Pirrong's analysis ignores the inevitable selling pressure in the non-TAS outright and spread order books that would still exist absent Trader Defendants' trading.  This pressure, stemming from sellers with long positions who could not take delivery, would replace Trader Defendants' non-TAS outright and spread selling in a but-for world where Trader Defendants did not purchase TAS contracts.  In essence, because Trader Defendants' ███████████████████ ██████████████████████████████ (see Section X below describing Trader Defendants' trading patterns), ███████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████

121.     While not stated explicitly, Dr. Pirrong's methodology assumes that the TAS sellers that traded with Trader Defendants and wanted or needed to exit long positions would not sell in the non-TAS order books.[163]  Dr. Pirrong offers no support for this assumption.  For this to be true, these traders would either need to remain long or find other traders willing to buy TAS to effectively replace Trader Defendants.  The former solution was not feasible as many holders of long positions on April 20, 2020, were not in a position to take delivery and were obligated to exit their long May Contract position prior to the expiration of trading on April 21, 2020.[164]

122.     The alternative solution of seeking replacement traders to purchase TAS contracts was unlikely to succeed given ████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████ During his deposition testimony, ██████████████ ███████████████████████████████████████████████ █████████████████████████[165]  Any such replacement TAS buyers may have hedged their TAS purchases by selling in the outright or spread order books, not unlike

---

[163] Pirrong Deposition, 284:24–285:11 ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████

[164] See Section V.A.3 ¶28.  See also "Interim Staff Report: Trading in NYMEX WTI Crude Oil Futures Contract Leading Up To, On, and around April 20, 2020," CFTC, November 23, 2020, https://www.cftc.gov/node/235761.  At the opening of the April 20, 2020, trading session, only 46% of the long open interest was held by commercial traders. See Table 2 and Table 3: 49,430 / 108,593 = 46%.

[165] Pirrong Deposition, 285:18–24 ██████████████████████████████████████████████ ███████████████████████████████████████████████

Trader Defendants' trading. Dr. Pirrong's implicit assumption that replacement traders would not impact the price by selling in the outright or spread order books is therefore nonsensical and unsupported.

123.    Moreover, in the actual world, ███████████████████████████████ ████████████████████████████████████████████████████████ ██████████ For instance, consider ████████████████, whose activity is displayed in Figure 13 below.

## Figure 13



Source:  CME
Note:
[1] Order book TAS buy quantity represents the total bid quantity, in contracts, in the May TAS order book across all order book levels (that is, buy-side liquidity).  Quantities are snapshots of depth taken at one-minute intervals.
[2] Cumulative cancelled TAS sell orders is the cumulative sum of ██████████



124.    ██████████████████████████████████████ ██████████  ████████████████████████████████ █████████████████████████████████

[166] *See* Workpaper 11.



125.    This account's behavior was not unique. ████████████████████████████████

████████████████████████████████ Dr. Pirrong's implicit assumptions that replacement TAS buyers would have

materialized absent Trader Defendants' TAS buying is inconsistent with the economic realities

of the May Contract on April 20, 2020.

126.    In the absence of Trader Defendants' trading, the volume of net May TAS buyers during

the proposed class period would have been reduced by ██████ contracts.[174]  Without replacement

TAS buyers, a *greater* number of TAS sellers would have been unable to execute their TAS sale

---

[167] *See* Workpapers 11 and 12.
[168] *See* Figure 13 backup.
[169] *See* Figure 13 backup; Workpaper 11.
[170] *See* Workpaper 11.
[171] *See* Figure 13 backup; Workpaper 11.
[172] *See* Workpaper 13.
[173] *See* Workpaper 13. ████████████████████████████████████████
[174] *See* Workpaper 14.  Defendants purchased ██████ and sold ███ TAS contracts between 9:00 AM and 1:30 PM.  Defendants provided further buy side liquidity prior to 9:00 AM, purchasing an additional ████ TAS contracts.

orders and would have had to sell in the non-TAS order books, sometimes aggressively. While the available data do not allow for a definitive determination of whether TAS sellers who sold to Trader Defendants held a long position without individualized inquiry, Dr. Pirrong's flawed methodology estimates that ███ May TAS contracts were sold to Trader Defendants by traders that were long at those times.[175] These traders were likely unable to take delivery and would have needed to liquidate their positions by selling in the outright or spread order books, similar to the actions taken by Trader Defendants in the real world. To contextualize the volume of the ███ TAS contracts purchased by Trader Defendants, this volume was roughly ███ ███ greater than the maximum buy side TAS liquidity of ███ available during the proposed class period.[176] To the extent that these unsuccessful TAS sellers waited until later in the afternoon to sell in the non-TAS order book, the price impact may have been larger because selling more gradually over time tends to have a smaller price impact.[177] Trader Defendants' buying from TAS sellers in the TAS order book may have therefore contributed to a smoother and more orderly liquidation for some long position holders.

127.     In sum, Trader Defendants provided substantial liquidity to the TAS sellers. In the but-for world, to avoid taking delivery, market participants who placed TAS sale orders would have had to sell a similar number of contracts in the outright or spread order books to what Trader Defendants sold in the real world. In the unlikely scenario where new buyers would have materialized in the TAS order book, similar to Trader Defendants, these TAS buyers would likely have sold in the non-TAS outright and spread order books. These non-TAS sales would have had a price impact under Dr. Pirrong's approach that would replace the Trader Defendants' actual world trading price impact under Dr. Pirrong's approach. This supports the idea that, in a but-for world where the Trader Defendants did not purchase TAS contracts, prices may have reached similar levels as they did in the actual world, and Dr. Pirrong's price artificiality estimates are thus unreliable and incapable of determining whether putative class members were harmed.

---

[175] *See* Section VII.B.1; Workpaper 12.

[176] *See* Workpaper 15.

[177] Terrence Hendershott and Ryan Riordan, "Algorithmic Trading and the Market for Liquidity," *Journal of Financial and Quantitative Analysis* 48, no. 4 (2013): 1001-1024, p. 1002 ("Institutional investors utilize ATs to trade large quantities gradually over time, thereby minimizing market impact and trading costs.").

**B. Dr. Pirrong's Use of a TVP-VAR Model to Estimate Price Artificiality Is Inconsistent with and Differs from the Literature on Which He Relies**

128.    While Dr. Pirrong's analyses are loosely based on a class of "vector autoregression ('VAR') models first developed by Hasbrouck in the early 1990s," as I explain below, his adaptation of the Hasbrouck framework in the context of his analysis has not been used in peer-reviewed academic articles estimating price impact.[178] This, in part, makes Dr. Pirrong's use of the TVP-VAR model unreliable for estimating the price impact purportedly caused by Trader Defendants.

**1.    Description of Dr. Pirrong's TVP-VAR Model**

129.    Dr. Pirrong's TVP-VAR model is based on a methodology first used in Hasbrouck (1991) to "[m]easur[e] the information content of stock trades," and models the relationship between price changes and transactions for a particular stock.[179] The model used in Hasbrouck (1991) estimates the dynamic relationship between buyer-initiated (i.e., the buyer placed an aggressive order) or seller-initiated (i.e., the seller placed an aggressive order) trades and price changes, that is, how past price changes and trades can predict future trades, and how an unpredicted trade is associated with further price movements.

130.    To attempt to capture intraday variations in price impact, Dr. Pirrong eschews Hasbrouck's model and adapts a TVP-VAR model from an article on macroeconomics and monetary policy.[180] Dr. Pirrong claims that by using such a TVP-VAR model rather than Hasbrouck's VAR model, his implementation of the Hasbrouck (1991) framework controls for

---

[178] Pirrong Report, ¶ 164 ("In particular, vector autoregression ('VAR') models first developed by Hasbrouck in the 1990s and widely employed to quantify how trades move prices and take into account the possibility that price movements can also cause trades."). *See also* Pirrong Report, Appendix C, pp. 1, 6 (After stating that "[a] Hasbrouck vector autoregression (VAR) model of order flow and price movements is the standard market microstructure method for quantifying the impact of trades on prices[,]" Dr. Pirrong lists as a reference used in Appendix C: "Hasbrouck, J. Measuring the Information Content of Stock Trades. 46 Journal of Finance (1991): 179-207.").

[179] Joel Hasbrouck, "Measuring the Information Content of Stock Trades," *The Journal of Finance* 46, no. 1 (1991): 179–207 ("Hasbrouck (1991)"), p. 181 ("The primary statistical technique employed here is a vector autoregression applied to quote and trade data.").

[180] Pirrong Report, ¶¶ 174, 181. *See also* Giorgio E. Primiceri, "Time Varying Structural Vector Autoregressions and Monetary Policy," *The Review of Economic Studies* 72, no. 3 (2005): 821–852 ("Primiceri (2005)").

possible intraday changes in the coefficients and in the volatility and correlation of the shocks that affect the variables of the model.[181]

131.     In his implementation of the Hasbrouck (1991) framework, Dr. Pirrong purports to estimate the cumulative price impact caused by Trader Defendants' trading during the 9:00 AM– 1:30 PM period on April 20, 2020.[182]  According to Dr. Pirrong's results, ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ [183]  Dr. Pirrong then claims that these results allow him to compute damages associated with the Trader Defendants' actions for each putative class member.[184]

132.     As I explain in more detail in Section VII.D below, Dr. Pirrong's TVP-VAR relies on a "Bayesian" estimation algorithm that draws from a set of random distributions to estimate the parameters of his model.  Dr. Pirrong sets the number of iterations at 10,000.  The draws from the random distributions are computed using a random number generator.  A random number generator is a computer algorithm that generates sequences of numbers that appear to be random, simulating draws from a predefined statistical distribution function, such as a normal distribution or a uniform distribution.[185]  To replicate results that involve draws from random number generators, researchers usually fix the starting point, or "seed," used by these generators.  Fixing the seed ensures that the sequence of random numbers remains identical every time the code is rerun.  Dr. Pirrong's methodology uses ████████████████████████████████████ ████████ [186]

133.     Dr. Pirrong designed his TVP-VAR model to quantify the relationship (i.e., coefficients) between (i) the current and lagged values of the change in the price of May Contract, June 2020 futures, and the May-June 2020 spread over a time interval of 15 seconds; and (ii) the current and lagged values of the net aggressor volume in the May Contract, June 2020 futures, and the

---

[181] See, e.g., Pirrong Report, ¶ 174 ("The standard implementation of the VAR approach assumes that all the coefficients in the model, and the variance-covariance matrix of the error terms, are constant during the estimation period. However, price impact can vary throughout the day."), ¶ 181 ("In this [TVP-VAR ] approach, the model coefficients … vary randomly over time…. Further, they can differ for every interval. Moreover, in this approach the variances and covariances of the error terms … can also vary randomly over time.").
[182] Pirrong Report, Section VI.D.
[183] Pirrong Report, ¶ 231.
[184] Pirrong Report, ¶¶ 391–396.
[185] Cvitanić and Zapatero (2004), p. 363.
[186] Pirrong Deposition, 208:23–209:5.

May-June 2020 spread defined during the same 15-second interval.[187]  Dr. Pirrong uses the midpoint (i.e., the average between the best bid and best offer) for his price datapoints.[188]  The resulting TVP-VAR model's estimated coefficients purport to represent the predicted price impact per traded contract of aggressive orders.

134.    Using the estimated coefficients of his model, Dr. Pirrong computes the price impact of aggressive trades by constructing impulse response functions ("IRFs"), which measure how a shock to a given variable of the model (e.g., an aggressive trade) "impacts" the other variables of the model (e.g., the price change in the May Contract).  For his model to measure "impact," or causation—as opposed to mere correlation—Dr. Pirrong assumes "trades can cause contemporaneous price movements, but price movements do not contemporaneously cause trades."[189]  Dr. Pirrong then computes the "cumulative impact of order imbalances on prices" using the estimated coefficients of his model and the net aggressor volume for each 15-second interval.[190]  Applying this methodology to the Trader Defendants' aggressive trades, Dr. Pirrong concludes "[t]he running total (cumulative sum) of these price movements measures the total (cumulative) impact of Trader Defendants' aggressive trades and prices for each interval."[191]  Finally, Dr. Pirrong claims that "the TVP-VAR-derived artificiality estimates … can be used to determine the amount of artificiality in a transaction at the price [*sic*] time the transaction took place."[192]

135.    As I explain next, Dr. Pirrong's interpretation of his price impact model to estimate artificial prices allegedly caused by Trader Defendants' trades is inconsistent with the academic literature's application of both the VAR and TVP-VAR models.

---

[187] Pirrong Report, ¶ 168.
[188] Pirrong Report, ¶ 169.
[189] Pirrong Report, ¶ 223.
[190] Pirrong Report, ¶ 222.
[191] Pirrong Report, ¶ 229, Figure 14.
[192] Pirrong Report, ¶ 391.

Highly Confidential                                                                                     Page 65

2.     **Dr. Pirrong's Claim That His TVP-VAR Model Can Be Used to Determine the Amount of Artificiality Caused by Trader Defendants' Trades Is Unsupported by the Literature on Which He Relies**

136.    Dr. Pirrong's claim that his TVP-VAR model can be used to determine the price impact or the amount of artificiality caused by Trader Defendants' trades is inconsistent with the application of the model from the academic literature.

137.    First, to my knowledge, a TVP-VAR model has never been peer reviewed to study price impact in a market microstructure setting, nor is it generally accepted in the market microstructure literature.[193]  The TVP-VAR model he adapts was used to measure time variation over decades in a macroeconomic and monetary policy model, not variations over a few hours in a market microstructure model.  Dr. Pirrong testified that ███████████████████████ ███████████████████████████████████████████████.[194]  Inconsistent with academic literature, Dr. Pirrong uses the TVP-VAR model in a market microstructure setting.

138.    Second, in contrast to Dr. Pirrong's conclusions, the Hasbrouck (1991) model simply estimates a lead-lag relationship between aggressive orders and price changes and does not purport to demonstrate that this price impact was artificial.  As the title of his study indicates, the model described by Hasbrouck (1991) was designed to "[m]easur[e] the information content of stock trades," which refers to the extent to which trades can incorporate information into the prices and predict the direction of imminent market moves.[195]  As the article suggests, "[w]ithin this framework, a trade's information effect [on security prices] may be meaningfully measured as the ultimate price impact of the trade innovation."[196]  Put differently, the trade itself is not the original source of information or the primary cause of the price move.  Instead, the trade can act as a conduit, conveying information known by market participants.

---

[193] To my knowledge, VAR models with time-varying parameters have only been used in the field of macroeconomics to estimate macroeconomic policy changes over time and implied shifts in private sector behavior.  *See, e.g.*, Primiceri (2005), p. 822.



[194] During his deposition testimony, ████████████████████████████████████  *See* Pirrong Deposition, 196:6–19 ███████████████████████████████████████████████████████████████████  *See* Pirrong Deposition, 195:11–24.

[195] *See* Hasbrouck (1991).
[196] *See* Hasbrouck (1991).

139.    Third, Dr. Pirrong's model assumes the price impact associated with Trader Defendants' trading is the same as the price impact associated with non-Defendants trading.  Indeed, by grouping all aggressive trades of a specific contract during a 15-second window together without differentiating Trader Defendants' trading from other trading, Dr. Pirrong's TVP-VAR model effectively assumes that the price impact of an aggressive trade is the same for all market participants.  This means that the estimated price impact attributed to Trading Defendants is partly driven by the trading of non-Defendant traders.  If at some point in time Trader Defendants' trading had a lower price impact relative to the trading from other market participants, Dr. Pirrong would not capture this occurrence and would overestimate the alleged price artificiality.

140.    Fourth, the Hasbrouck (1991) methodology does not contemplate the question of whether the price would have moved more or less if trading had not occurred, which by extension means the Hasbrouck model does not estimate a "but-for" price.  By attempting to estimate price artificiality, Dr. Pirrong draws an inference about the but-for price of May Contracts and May-June spreads based on the output of his TVP-VAR model.  However, Dr. Pirrong relies on a model that was not designed to establish an asset's but-for price.  This reliance reflects his fundamental misuse of the relevant academic literature and the methodology he purports to employ.[197]  The Hasbrouck (1991) methodology, ███████████████████████████ ███████████████ is designed to describe the actual world, not to estimate a but-for world.[198]

141.    Put differently, suppose a piece of exogenous, value-relevant information arrives in the market.  According to Hasbrouck, both the changes in prices set by passive and aggressive trades work together to make this information part of the stock's price.  This process helps the stock price "arrive at the current efficient price," meaning it accurately reflects all available information.[199]  The impact of trading on how quickly and how much the price changes is measured by the IRF, but Hasbrouck's approach does not address whether less trading would have led to a smaller change in price.  Instead, in Hasbrouck's framework, the amount of trading

---

[197] *See, e.g.*, Pirrong Report, ¶ 228 (emphasis in original) ("Since I will show *infra* that [Trader Defendants'] aggressive trades were uneconomic, the resulting price impacts are measures of price artificiality—*i.e.*, the price movement that occurred as the results of Defendants' uneconomic conduct up through ███████████").
[198] Pirrong Deposition, 192:5–12 ███████████████████████████████████████████ ███████████████████████████████████████

[199] Hasbrouck (1991), p. 183.

affects the channel (i.e., aggressive or passive trades) through which the efficient price is discovered but does not necessarily change the "efficient price."

142.    To understand why Dr. Pirrong's model cannot estimate a but-for price or distinguish legitimate market reactions from alleged manipulative activities, consider the following hypothetical example.  A company trading at $10 a share announces it will be acquired at $30 a share (with no chance the acquisition will not be completed).  Trader Z quickly places aggressive orders to purchase shares at prices below $30.  The expected swift price increase that follows the announcement could be solely attributed to Trader Z's aggressive purchases.  In this situation, Dr. Pirrong's model would find a relationship between Trader Z's aggressive purchases and the subsequent price increase.  Dr. Pirrong's model would incorrectly conclude that Trader Z *caused* the price increase, and that the price increase would not have happened absent Trader Z's purchase.  In reality, the stock price increase would have occurred absent Trader Z's aggressive trades because the true value of the stock is above the current value of $10.

143.    Therefore, while not stated explicitly, Dr. Pirrong's TVP-VAR model interpretation inherently assumes that the trading patterns of others, including TAS sellers that relied on Trader Defendants buying TAS, would remain unchanged absent Trader Defendants' alleged manipulative trades.  However, as I explain in Section VII.A, this is an economically nonsensical assumption when considering the CME WTI futures market dynamics on April 20, 2020, and the fact that without Trader Defendants' trading, TAS sellers would have faced an acute lack of liquidity.

### C.   Dr. Pirrong's Price Impact Model Does Not Control for Confounding Factors

144.    The inability of Dr. Pirrong's TVP-VAR model to estimate a but-for price is related to the model's failure to control for confounding factors or alternative explanations for the May Contract price movements.  This occurs because Dr. Pirrong's TVP-VAR model attributes price changes to aggressive trading, overlooking the underlying factors that drive trading behavior.[200] This means his model is biased towards attributing price changes to trading, when in fact the changes (and the trades) may be attributable to some other cause that he ignores.  This is

---

[200] Pirrong Deposition, 242:14–17. ██████████████████████████████████

commonly called omitted-variable bias, which means the impact of variables absent from the model are incorrectly attributed to variables included in the model.

145.    For example, his TVP-VAR model does not include factors such as storage and logistical constraints, genuine market supply and demand changes, TAS sellers needing to exit their long positions, or short commercial traders "forc[ing] the remaining longs to pay an extreme penalty" to exit their long positions by withholding futures purchases, effectively "squeez[ing]" the longs.[201]  Withholding of trading would not be accounted for in Dr. Pirrong's model as the TVP-VAR only accounts for aggressive trading, not the lack of trading.  Without controlling for such confounding factors or alternative explanations, Dr. Pirrong's methodology is biased to overestimate the price impact associated with Trader Defendants' trades.

146.    The impact of confounding factors is demonstrated by Dr. Pirrong's model ceasing to explain price changes.  The $R^2$ of Dr. Pirrong's TVP-VAR model measures the fraction of the variance of price changes explained by his trading variables, and during the last ███████ of the proposed class period his $R^2$ substantially declines.[202]  The $R^2$ for the May midpoint price change and the May-June midpoint spread change fell to levels close to zero well before the last ███████ of the proposed class period.[203]  Therefore, a decrease in $R^2$ is consistent with confounding factors or alternative explanations not being included in his model, yet being the drivers of price changes.

147.    In addition to not accounting for confounding factors, Dr. Pirrong constructs his model in a way that assume trades cause prices, but prices cannot cause trades.[204]  Functionally, in a TVP-VAR the variables placed at the top of the vector can cause contemporaneous changes to the variables below, but the variables at the top cannot contemporaneously be affected by the

---

[201] Philip Verleger, "Negative Prices: Never Again," Energy Intelligence, April 23, 2020, https://www.energyintel.com/0000017b-a7da-de4c-a17b-e7da75620000 ("The USO effect was still there because it pulled in more shorts, that is it allowed more producers to hedge, leaving the market more exposed to the risk of a squeeze by the shorts—which is what happened."); "What Really Caused the Epic WTI Meltdown?" Energy Intelligence, April 21, 2020, https://www.energyintel.com/0000017b-a7da-de4c-a17b-e7da70fa0000; ███████████████████ CITI-05594–5

[202] Pirrong Report, ¶ 205.

[203] In fact, the $R^2$ for the May midpoint price change fell to ████ at ██████████ while the $R^2$ for the May-June midpoint spread change fell to around ████ at ██████████.  See Workpaper 16.  This means that the fraction of the variability in prices explained by the order flow variations was almost nil during that time.  According to Dr. Pirrong's own logic, the low $R^2$ values produced by the TVP-VAR model before the last ██████ is symptomatic of a change in market dynamics and cast a doubt on the use of the TVP-VAR model during that period. Pirrong Report, ¶¶ 205–207.

[204] Pirrong Report, ¶¶ 222–223 ("[T]rades can cause contemporaneous price movements, but price movements do not contemporaneously cause trades.").

variables below.  Therefore in his code Dr. Pirrong placed the trade variables on top of the price variables.[205]

148.    The importance of the unilateral causation restriction put in place by Dr. Pirrong does not allow for price movements to cause the need to aggressively trade.  Dr. Pirrong's model assumes that aggressive trading always causes price movements.  This assumption is not realistic, especially in the unusual price movements on April 20, 2020.  Further, Dr. Pirrong uses 15-second time windows, which is longer than it takes for orders to be processed and trades executed.  Within a 15-second time window, traders may have aggressively traded as a reaction to rapid price movements earlier in the same 15-second time window.  Put differently, aggressive trading, including Trader Defendants', may be caused by price movements that are themselves caused by underlying confounding factors.  Dr. Pirrong's model does not allow this direction of causality.  In his deposition,



[206]

149.    In sum, Dr. Pirrong's methodology does not offer a reliable framework for distinguishing price impacts arising from confounding factors or alternative explanations that have been advanced by numerous observers (see Section V.C above).  His methodology therefore fails to establish that any putative class member was harmed by his purported price artificially.

### D. Dr. Pirrong's TVP-VAR Model Is Highly Sensitive to Small Changes, and Artificiality Estimates Can Flip from Depression to Inflation

150.    In addition to the flaws and limitations discussed in Sections VII.A through VII.C, Dr. Pirrong's price artificiality conclusions rely on a model that does not produce robust results.  Even setting aside that Dr. Pirrong's price impact model is insufficient to estimate price artificiality, basic diagnostic analyses reveal that Dr. Pirrong's TVP-VAR model is inherently unreliable and yields substantially different results when implemented with minor changes.

---

[205] Pirrong Deposition, 215:20– 24

[206] *See* Pirrong Deposition, 212:16–23



213:22–214:4

Estimating his results with his own code and data, maintaining all of his stated assumptions, but changing the starting seed used for the random number generator in his estimation or the arbitrary ordering of the variables in his TVP-VAR model drastically alters the results of his model.

151.    Overall, the results showing that Dr. Pirrong's model is not robust to minor changes are not surprising given the large number of parameters in his model.  In Dr. Pirrong's deposition, ███ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████[207]  This is worrisome because, as explained in Section VII.B.1, the Bayesian estimation algorithm used by Dr. Pirrong to estimate his model draws from a set of random distributions over 10,000 iterations to estimate the parameters of his model.  Given the large number of parameters, implementing Dr. Pirrong's model even with minor changes can affect the draws from the random distributions and therefore the estimated parameters, leading to substantially different results.

### 1.    Changing the Seed of the Random Number Generator Changes Dr. Pirrong's Conclusions

152.    As explained in Section VII.B.1 above, Dr. Pirrong's methodology relies on a Bayesian estimation algorithm that uses draws from a random number generator with a prefixed seed to estimate the parameters of his model.  Changing the seed of a random number generator changes the sequence of values drawn from a predefined distribution function, but it keeps the statistical properties of the predefined distribution function constant.  In his deposition testimony, ███ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████[208]

153.    For example, the two sequences {0.9,-1.2, 0.6} and {-0.5, -1.3, 0.9} were generated by the computer software MATLAB using the seeds 1020 and 2001 and a standard normal



distribution function.[209]  As shown, different seeds generate different sequences of numbers.  The different seeds, however, do not change the fact that both sequences represent draws from the same standard normal distribution function.  As the number of draws increases, the mean of each sequence should converge to 0 while the variance of each sequence should converge to 1, reflecting the fact that both sequences were generated by the same standard normal distribution function.

154.    The Bayesian estimation used by Dr. Pirrong relies on 10,000 draws from different distribution functions.  At a basic level, Bayesian estimation treats parameters as random variables with an unknown distribution.  The objective of such models is to estimate the distribution of the parameters based on prior beliefs of the distribution (the "prior distribution") and conditional on the data sample observed.  To achieve this, Bayesian estimation takes draws of the parameters from the "posterior distribution"—that is, the distribution of the parameters conditional on the data observed and conditional on the prior distribution.[210]  These draws depend, among other things, on the specific seed of the random number generator chosen by the researcher.

155.    As explained above, setting different values for the seed of a random number generator changes the sequence of the random numbers drawn by the algorithm, but it does not change the underlying statistical properties of the function the numbers are drawn from.  In certain cases, Bayesian estimators can be sensitive to the particular sequence of numbers drawn by the random numbers generator.[211]

156.    Dr. Pirrong's model suffers from this very problem.  To illustrate, I replicate his results by changing nothing except for the seed used in his estimation algorithm.  To keep the comparison simple, I focus on Dr. Pirrong's estimated cumulative price artificiality at 1:30 PM and replicate Dr. Pirrong's results using three different seeds: 606368, 4, and 774239.  Figure 14 below shows the results.  In the case of the May outright contract, varying the seed generates cumulative artificiality results ranging between ████/bbl and ██████/bbl compared to the ██████/bbl estimated when using Dr. Pirrong's same seed.  Similar results can be observed in the

[209] The numbers are rounded to one decimal place and the random number generator algorithm used is known as "Marsenne Twister."
[210] Andrew Gelman, et al., *Bayesian Data Analysis*, 3rd ed. (2021), p. 3.
[211] *See* Christiane Baumeister and James Hamilton, "Inference in Structural Vector Autoregressions when the Identifying Assumptions are not Fully Believed: Re-evaluating the Role of Monetary Policy in Economic Fluctuations," *Journal of Monetary Economics* 100, (2018): 48–65, p. 21.

case of the May-June spread. The TVP-VAR model's cumulative price impact using these three seeds and the 1020 seed used by Dr. Pirrong are depicted in Figure 15 below. It shows that the alleged price impact for the outright contract diverges throughout the proposed class period for each of these different seeds.

157.    I note that two of the three seeds shown in Figures 14 and 15 produce ████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████
███████████████[12]

## Figure 14



Source: Pirrong Report and Backup Materials
Note: Artificiality measures are based on Dr. Pirrong's TVP-VAR model's cumulative price impact estimates as of 1:30 PM. Seed sensitivities are run using Dr. Pirrong's produced code with 24-core computing power. Results are slightly sensitive to computing power. When running seed 1020 with 22 cores, May outright and May-June spread Artificiality are ██████ and ██████, respectively. Following Dr. Pirrong's methodology, I ran 12,500 iterations and discarded the first 2,500.

[12] During his deposition testimony, ████████████████████████████████ *See* Pirrong Deposition, 208:16–209:2.

**Figure 15**



Source:  Pirrong Report and Backup Materials
Note:  Artificiality measures are based on Dr. Pirrong's TVP-VAR model's cumulative price impact estimates for the May outright contract.  Seed sensitivities are run using Dr. Pirrong's produced code with 24-core computing power. Results are slightly sensitive to computing power.  Dr. Pirrong's results use 12,500 iterations and discard the results of the first 2,500, and seed sensitivities were run using 12,500 iterations and discarding the first 2,500.

### 2. Changing the Ordering of the Variables in the Regression Changes Dr. Pirrong's Results, and He Provides No Basis for His Ordering

158.    An additional known issue with the type of Bayesian model estimated by Dr. Pirrong is that the arbitrary order of the model's variables affects the results, yet Dr. Pirrong provides no support to choose the particular order he uses in his estimation.  In fact, the same academic article that develops the model Dr. Pirrong uses in his report states that "it is important to highlight a potential drawback of the modelling assumptions [in the model equations] in combination with the priors…. The drawback is the fact that, in principle, the order of the

variables matters in [the VAR equation]."[213]  This is a well-known issue in this literature and has been acknowledge by various researchers.[214]

159.    In a TVP-VAR like the one Dr. Pirrong estimates, the variables of the model are ordered in a vector, which is an ordered list of elements usually sorted in a row or a column.  The order of the variables is related to the causality assumptions imposed by the researcher, which are necessary to understand how a shock to one variable (e.g., an aggressive purchase of the May Contract) can affect the response of the other variables (e.g., the midpoint price of the May Contract).

160.    As explained in Section VII.B.1, when Dr. Pirrong estimates his model and constructs IRFs, he imposes a set of "identifying restrictions" that require him to place the trade variables on top of the price variables, as he effectively does in his code and confirmed in his deposition.[215]

161.    In fact, Dr. Pirrong orders the variables in the vector, from top to bottom, as follows: May outright trade imbalance, May-June spread trade imbalance, June outright trade imbalance, May outright midpoint price change, May-June midpoint spread change, June outright midpoint price change.  This order is consistent with Dr. Pirrong's identifying restrictions since the three trade variables are placed on top of the three price variables, but this ordering combination is not the only one that satisfies his identifying restrictions.[216]  For example, Dr. Pirrong could have ordered the variables as follows, while still satisfying his identifying restrictions:  June outright trade imbalance, May-June spread trade imbalance, May outright trade imbalance, June outright midpoint price change, May-June midpoint spread change, May outright midpoint price change. To determine a unique ordering of the variables, Dr. Pirrong would have to make and

---

[213] Primiceri (2005), p. 827.

[214] Mark Bognanni, "A Class of Time-Varying Parameter Structural VARs for Inference under Exact or Set Identification," Federal Reserve Bank of Cleveland Working Paper 18-11 (2018) ("Bognanni (2018)"), p. 2 ("[I]nference in the model of Primiceri (2005) depends on the ordering of variables in the VAR. Hence, an n-variable dynamic system admits n! distinct estimates of the time-varying parameters in the first stage, which form the key input into the set identification procedure.").  *See also* Timothy Cogley and Thomas J. Sargent, "Drifts and Volatilities: Monetary Policies and Outcomes in the Post WWII US," *Review of Economic Dynamics* 8, no. 2 (2005): 262–302 ("Cogley and Sargent (2005)"); Emily B. Fox and Mike West, "Autoregressive Models for Variance Matrices: Stationary Inverse Wishart Processes," *arXiv*, arXiv:1107.5239 (2011) ("Fox and West (2011)").

[215] *See* Pirrong Report, ¶¶ 222–223.  *See also* Pirrong Deposition, 215:20–24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[216] Pirrong Deposition, 216:13–217:10. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

substantiate specific assumptions on how trade variables affect each other—and the same would be necessary for price variables.

162.     This implies that, absent these specific assumptions, Dr. Pirrong's model can be estimated in multiple ways by permuting the order of the variables as long as the identifying restrictions are satisfied.[217]  However, the academic literature I discussed at the beginning of this section shows that Bayesian estimation is not always robust to the arbitrary order of the variables of the model.  At a minimum, researchers using these types of models should always check the robustness of their results to alternative orderings of the variables, something Dr. Pirrong fails to do in this case.[218]

163.     To test how the ordering of the variables in the TVP-VAR model affect Dr. Pirrong's results, I estimated his model for each of the 36 different possible permutations of the trade and price variables that satisfy his identifying restrictions.  In this exercise, I used Dr. Pirrong's original seed and I focused on the estimated cumulative price impact at 1:30 PM.  Figure 16 below shows the range of estimated cumulative price impact at 1:30 PM across the 36 different possible permutations.  ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████ ███████████████████████████████████  The TVP-VAR model's cumulative price impact using this permutation over the proposed class period is depicted in Figure 17 below.  ██ ██████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████  This finding alone demonstrates that Dr. Pirrong's model is fundamentally flawed and incapable of reliably and accurately estimating price impact, let alone artificiality.

---

[217] Since there are three trade variables and three price variables in Dr. Pirrong's model, these variables can be sorted in 3! × 3! = 36 different permutations.
[218] *See, e.g.*, Primiceri (2005) p. 827 (After recognizing the issue of the ordering of the variables affecting the results of the TVP-VAR estimation, the author notes that in his particular empirical application the results are robust to alternative ordering of the variables: "It is worth pointing out that, in the context of the empirical application of this paper, the results obtained with different orders of the variables are very similar.").

## Figure 16



Source:  Pirrong Report and Backup Materials
Note:
[1]  Except for the ordering of the variables, Dr. Pirrong's seed and methodology are replicated exactly to estimate the model and artificiality.
[2]  The ordering of variables to produce the minimum alleged price impact in the May outright and May-June spread are ($Q_M$, $Q_{KM}$, $Q_K$, $DP_M$, $DP_{KM}$, $DP_K$) and ($Q_M$, $Q_{KM}$, $Q_K$, $DP_{KM}$, $DP_M$, $DP_K$), respectively, where $Q_M$ is the net imbalance of June outright trades, $Q_{KM}$ is the net imbalance of May-June spread trades, $Q_K$ is the net imbalance of May outright trades, $DP_{KM}$ is the change in midpoint price of May-June spread, $DP_M$ is the change in midpoint price of June outright, and $DP_K$ is the change in midpoint price of May outright.
[3]  The ordering of variables to produce the maximum alleged price impact in both the May outright and the May-June spread is ($Q_K$, $Q_M$, $Q_{KM}$, $DP_{KM}$, $DP_M$, $DP_K$).

## **Figure 17**



Source: Pirrong Report and Backup Materials
Note:
[1] Except for the ordering of the variables, Dr. Pirrong's seed and methodology are replicated exactly to estimate the model and artificiality.
[2] The ordering of variables to produce the plotted "reordered" price impact is ($Q_K$, $Q_M$, $Q_{KM}$, $DP_{KM}$, $DP_M$, $DP_K$) where $Q_K$ is the net imbalance of May outright trades, $Q_M$ is the net imbalance of June outright trades, $Q_{KM}$ is the net imbalance of May-June spread trades, $DP_{KM}$ is the change in midpoint price of May-June spread, $DP_M$ is the change in midpoint price of June outright, and $DP_K$ is the change in midpoint price of May outright.

164.    Finally, as mentioned in Section VII.B above, Dr. Pirrong's TVP-VAR model conflates the price impact associated with Trader Defendants trading and the price impact associated with other market participants trading.  Differentiating the price impact of Trader Defendants would require splitting the trade variables into two groups:  Trader Defendants' aggressive trades and other aggressive trades.  However, this would increase the number of possible permutations (i.e., variable ordering) to sort the variables of the TVP-VAR model from 36 to 4,320, and the number

of parameters to be estimated from approximately 150,000 to 350,000.[219]  Dr. Pirrong's model would therefore likely present even more serious robustness issues.[220]

165.    In sum, the type of model used by Dr. Pirrong deviates from the price impact literature, and basic diagnostic analyses reveal that Dr. Pirrong's model is inherently unreliable.  TVP-VAR models have, to my knowledge, not been used in peer reviewed articles to study price impact in a market microstructure setting, are not generally accepted in the market microstructure literature, and are subject to criticism even in the field of macroeconomics from which they are drawn.[221]  Moreover, Dr. Pirrong does not assess the statistical error rates associated with his analysis and, leaving all of his stated assumptions in place, even minor changes to how it is implemented can yield completely different results.[222]

### E. Applying Hasbrouck's VAR Methodology Produces Statistically Insignificant Price Impact Results

166.    The reliability of Dr. Pirrong's idiosyncratic TVP-VAR price impact model is further called into question by the fact that applying Hasbrouck's (1991) standard VAR methodology of price impact produces ███████████████████████

167.    Unlike Dr. Pirrong's novel TVP-VAR implementation, the Hasbrouck VAR implementation to measure price impact assumes that all parameters are constant and estimates parameters by either ordinary least squares ("OLS") or maximum likelihood.  I estimate Dr. Pirrong's model under these conditions.  Specifically, I apply the VAR equations defined in the Pirrong Report and I compute cumulative IRFs under Dr. Pirrong's own identifying restrictions using the Hasbrouck OLS method.[223]

168.    Figure 18 below shows that the results of this exercise produce ███████████████ ███  to an aggressive purchase of a May Contract.  The figure presents cumulative IRFs of an aggressive purchase of one May Contract for the May outright midpoint price and the May-June

---

[219] See Workpaper 17.
[220] With six trade variables and three price variables in Dr. Pirrong's model, these variables can be sorted in $6! \times 3! = 4,320$ different permutations. See Workpaper 17.
[221] See, e.g., Bognanni (2018); Cogley and Sargent (2005); Fox and West (2011).
[222] When economists make estimations, they usually report the degree of uncertainty associated with them.  One way of reporting this uncertainty in Bayesian statistics is with a "credible interval," that is, a range of values the estimated parameter or estimated function can take with a prespecified probability, conditional on the observed data sample.  By analyzing the credible intervals, one can determine whether or not the price impact estimation is statistically different from zero.  Dr. Pirrong fails to provide credible intervals associated with his cumulative IRFs (Figure 9 and Figure 10) and with his measures of artificiality (Figure 13 and Figure 14).
[223] See Pirrong Report, ¶¶ 179, 222.

midpoint spread. The cumulative IRFs take into account the responses 20 periods (five minutes) after the aggressive purchase is made, and are therefore directly comparable to the IRFs presented in Figure 9 of the Pirrong Report.[224]

**Figure 18**



Source: Pirrong Report and Backup Materials
Note: Values plotted are the cumulative price impact of an aggresive purchase of a single May outright contract five minutes after the purchase. This figure shows 95% confidence intervals calculated by using 10,000 iterations of a statistical method known as bootstrap, whereby in each iteration impulse response functions are estimated based on a random draw of the fitted errors of the model constructed with the parameters estimated in the prior iteration.

169.    Figure 18 shows that ████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████

---

[224] Pirrong Report, ¶ 197 ("Figure 9 presents the IRF for the May order imbalance variable. The depicted IRF is for 20 periods after the imbalance occurs (i.e., 5 minutes in the model with 15 second time intervals.)").



[225]

170.    Figure 18 not only contains point estimates of the cumulative IRFs but it also shows 95%

confidence intervals. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ ██ ██████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

[227] ████████████████████████████████████████████████████████████

This means that the estimated price impact of each of the Trader Defendants' trading activity on

the May Contract is effectively █████████████████████████

171.    In sum, unlike Dr. Pirrong's untested TVP-VAR model, a Hasbrouck VAR model

produces IRFs that are indistinguishable from zero.  This calls into question the reliability of Dr.

Pirrong's idiosyncratic TVP-VAR model, especially since he has not tested if his TVP-VAR

results are statistically different from zero.

[225] *See* Pirrong Report, ¶ 199 ("The mean impact of an aggressive trade in the May contract on the May midpoint and May-June spread midpoints is approximately █ cent/contract [*sic*] in the direction of the trade (i.e., with aggressive sales causing price declines)."). *See* Workpaper 18.

[226] *See* Workpaper 18.

[227] When economists make estimations they usually report the degree of uncertainty associated with them.  Far and away, the most commonly accepted significance threshold is 5%, which is also often referred to as the 95% "confidence level."  *See, e.g.*, David A. Freedman and David H. Kaye, "Reference Guide on Statistics," in Reference Manual on Scientific Evidence, ed. National Research Council et al., 3rd ed. (2011), pp. 211–302, at p. 251 (internal citations omitted) ("In practice, statistical analysts typically use levels of 5% and 1%.  The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure."), p. 284 ("[C]onfidence interval.…  For estimates such as averages or rates computed from large samples, a 95% confidence interval is the range from about two standard errors below to two standard errors above the estimate."), p. 285 ("[C]onfidence level. See confidence interval.").

## VIII. Dr. Pirrong Offers No Methodology to Establish Causation between the Trader Defendants' Trades and the Purported ▮▮▮▮▮, Yet He Attributes ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

172.     Dr. Pirrong does not provide a methodology to establish that Trader Defendants' trading impacted prices after ▮▮▮▮ during the purported ▮▮▮▮▮.[228] Yet, Dr. Pirrong attributes ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

173.     In Section VIII.A, I explain how Dr. Pirrong abandons his TVP-VAR model after ▮▮▮▮▮.   Dr. Pirrong explains that order flow materially stops explaining price changes in his model, meaning some other factors not identified or explained by Dr. Pirrong contributed to price changes during the purported ▮▮▮▮▮.  Therefore, Dr. Pirrong has no price artificiality model during the last ▮▮▮▮▮ of the proposed class period.[229]  Approximately ▮▮ of Dr. Pirrong's damages are associated with the artificiality measure during the last ▮▮▮▮▮ of the proposed class period,[230] making this period critical to putative class members.[231]

174.     In Section VIII.B, I explain how Dr. Pirrong pivots to an entirely different approach, his VPIN metric.  Specifically, during the purported ▮▮▮▮▮ he calculates two VPIN metrics that he claims measure order flow toxicity:  one for May outrights and one for May-June spreads.

---

[228] Unless noted otherwise, here and throughout this report I use the expression "last ▮▮▮▮▮ of the proposed class period," the "period after ▮▮▮▮▮," "during the purported ▮▮▮▮▮," or the "post-▮▮▮" to refer to the period from the start of the purported ▮▮▮▮▮ and 1:30 PM, as Dr. Pirrong does in his report.  However, according to Dr. Pirrong, the purported ▮▮▮▮▮ starts at ▮▮▮▮; see, e.g., Pirrong Report, ¶ 394 (emphasis added) ("the price artificiality attributable to any transaction occurring during the ▮▮▮▮▮ can be calculated formulaically by taking the difference between prices at ▮▮▮▮▮ and the price at the time of the transaction ▮▮▮▮▮").  Throughout the Pirrong Report, Dr. Pirrong is inconsistent regarding the starting time of the purported ▮▮▮▮▮ and he repeatedly uses the expression "post-▮▮▮" and ▮▮▮▮▮ as reference to the purported ▮▮▮▮▮ period; see, e.g., Pirrong Report, ¶ 381 ("Therefore, the post ▮▮▮▮▮ price movements are instead best understood as 'endogenous volatility' characteristic of a ▮▮▮"); see also Pirrong Report, ¶ 199 (emphasis in original) ("This erratic behavior during the last ▮▮▮▮▮ of trading is consistent with the ▮▮▮▮▮ analysis presented supra.").

[229] Previously I described why Dr. Pirrong's TVP-VAR model is not suitable to estimate a but-for price and by extension price artificiality.  When I refer to Dr. Pirrong's TVP-VAR model as a price artificiality model, I am referring to how Dr. Pirrong uses it, and I am not agreeing the use is correct.

[230] See Figure 28 backup.

[231] Dr. Pirrong states that "the price artificiality attributable to any transaction occurring during the ▮▮▮▮▮ can be calculated formulaically by taking the difference between prices at ▮▮▮▮▮) and the price at the time of the transaction ▮▮▮▮▮."  See Pirrong Report, ¶ 394.  This implies that he switches his artificiality estimation approach from the TVP-VAR model to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See Pirrong Deposition 229:8–230:13.  Even by Dr. Pirrong's logic, ▮▮▮▮▮. Throughout this report, for all alleged artificiality and damages calculations, I therefore apply his TVP-VAR through ▮▮▮▮▮, which produces an artificiality estimate for the 15 second interval through ▮▮▮▮▮  I also note that Dr. Pirrong is not clear about how to calculate artificiality post-▮▮▮▮▮  Dr. Pirrong's statement in ¶ 394 of his report may be interpreted as only taking into account the price difference between ▮▮▮▮▮ and the time of the transaction, and ignoring the artificiality estimated by his TVP-VAR prior to ▮▮▮▮▮  Given the lack of clarity, I assume Dr. Pirrong adds his TVP-VAR estimated cumulative artificiality to the full price decline after ▮▮▮

His VPIN metrics do not calculate price artificiality, nor does he claim they calculate price artificiality. In fact, unlike the TVP-VAR model, Dr. Pirrong's VPIN metrics do not even estimate price impact. Price is not an input or an output to Dr. Pirrong's VPIN metrics. His VPIN metrics are simply "based on a ratio of the absolute value of order flow imbalance to trading volume."[232] He claims contributors to his VPIN metric for the May-June spreads (but not the May outrights) caused the purported ███████, and that Trader Defendants collectively made up a sufficient portion of his VPIN metric, and therefore ██████████████████████ ████████████████████████████████.[233] Dr. Pirrong's assumption that contributors to his VPIN metric caused the purported ███████ is unsupported by academic literature and not subject to a scientific method. Further, his assumption to attribute ███████ ████████████████████ is not supported, deeply flawed, and does not control for potential confounding factors. Finally, the same conceptual flaws I outlined in Section VII.A above apply in the last ███████ of the proposed class period, whereby estimating the price impact of Trader Defendants' trading is not sufficient to estimate artificiality. In a but-for world where the Trader Defendants did not purchase TAS contracts, prices may have reached similar levels as they did in the actual world, including during Dr. Pirrong's purported ███████

### A. After ███████ Dr. Pirrong's TVP-VAR Model Cannot Reasonably Estimate Price Impact, and Dr. Pirrong Abandons the Model

175. The ability of order flow to explain price changes in Dr. Pirrong's TVP-VAR model materially declines after ███████, and he therefore abandons the TVP-VAR model.[234] If the TVP-VAR model does not materially explain price changes, then it cannot reasonably estimate

---

[232] Pirrong Report, ¶ 235.
[233] Dr. Pirrong claims that the VPIN measures order flow toxicity and that "the academic literature on flash crashes identifies order flow toxicity as a cause of such crashes." He then claims that ████████████████████████████████████████ ████████████████ *See* Pirrong Report, ¶¶ 26, 235, 239, 257.
[234] Dr. Pirrong is not explicit about abandoning his TVP-VAR model; however, the change in the method to estimate price artificiality is evident from his methodology to compute damages. *See* Pirrong Report, ¶ 391 ("For the period 9 a.m.-1:30 p.m [*sic*], the TVP-VAR-derived artificiality estimates … can be used to determine the amount of artificiality in a transaction at the price time the transaction took place"), ¶ 394 ("[T]he price artificiality attributable to any transaction occurring during the ██ ████████████████ can be calculated formulaically by taking the difference between prices at ████████████ and the price at the time of the transaction ████████████████████ Although these two statements are contradictory, the code produced by Dr. Pirrong to estimate artificiality is consistent with using the TVP-VAR price artificiality only until ██ so I assume the time period Dr. Pirrong refers to in ¶ 391 is a mistake not corrected in his Corrected Report. During his deposition testimony, ████████████████████████████████ *See* Pirrong Deposition 229:6–20 ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

price impact.  Dr. Pirrong's reasoning for his abandonment of the TVP-VAR model is as follows:  "[T]he TVP-VAR model exhibits different market dynamics before and after about ▮▮▮▮ and "order flow explains little of the ▮▮▮▮ period price movements, and the magnitudes of the non-order flow price movements during this period were substantially greater than prior to ▮▮▮" Dr. Pirrong calls this period a ▮▮▮▮▮[235]

176.     Since order flow cannot explain price changes in Dr. Pirrong's model in the last ▮▮▮ ▮▮▮ of the proposed class period, this means some other factors not identified or explained by Dr. Pirrong contributed to price changes during the purported ▮▮▮▮  Dr. Pirrong abandons his TVP-VAR after ▮▮▮, effectively leaving Dr. Pirrong without a price artificiality model during his purported ▮▮▮ period.

**1.     Order Flow Materially Stops Predicting Price Changes in Dr. Pirrong's TVP-VAR Model after ▮▮▮ and Therefore Other Unexplained Factors Explain Price Changes**

177.     Dr. Pirrong's TVP-VAR model relies on order flow predicting price changes, and if order flow materially stops predicting price changes, then some other factors are explaining price changes that are not captured by his model.  Dr. Pirrong does not explain what these other factors are, and abandons his TVP-VAR model during the purported ▮▮▮▮  Below I explain in more detail how his TVP-VAR model materially ceases to explain price changes.

178.     For any of the three price change variables, the difference between the observed price change and the price change predicted by Dr. Pirrong's TVP-VAR model corresponds to the error term that measures the magnitude of a price change *not* explained by the variables in his model.[236]  The standard deviations of these error terms increase dramatically after approximately ▮▮▮▮ as volatility increased dramatically, as shown in Dr. Pirrong's Figure 11, which I have reproduced below in Figure 19 and limited to May and May-June spread futures contracts.[237]  The fact that the error term standard deviation increased after ▮▮▮▮ indicates

[235] Pirrong Report, ¶ 205.  *See also* Pirrong Deposition, 235:1–13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[236] I am referring to the error terms of the price equations within Dr. Pirrong's TVP-VAR model.
[237] Pirrong Report, ¶ 203 ("Figure 11 presents the standard deviations of the price equation error terms which quantify the magnitude of price variations not explained by contemporaneous order flow and lagged price changes and order flow.  These standard deviations … rise steeply around ▮▮▮▮).

that, after that time, variables within Dr. Pirrong's TVP-VAR model, such as order flow, could no longer materially explain price changes.  Factors not captured or explained by the model became more important.[238]  For example, during his deposition testimony, ██████████████ ████████████████████████████████████████████████████████████████  Therefore, ████████████████████████████████████████████████████████████  it would be possible for public information on fundamental factors, such as storage availability, to explain the error terms during the purported ███████ period.[239]  This type of public information is simply ignored under Dr. Pirrong's TVP-VAR model because, as explained in Section VII.C, the TVP-VAR model does not control for confounding factors that may have contributed to price declines on April 20, 2020.

---

[238] Pirrong Deposition, 236:5–11 ████████████████████████████████
████████████████████
[239] Pirrong Deposition, 236:12–25 ██████████████████████████████
██████████████████████████

**Figure 19**



Source: Corrected Pirrong Report and Backup Materials
Note: Data are derived from Dr. Pirrong's backup file 'TVP_VAR_Output_15Sec_BBO_9_1330_Graphs.xlsx.'

179.    To gauge the importance of the factors not captured by Dr. Pirrong's model during the purported ▮▮▮▮ period, I compare the mean standard deviation of the error term—calculated by Dr. Pirrong's TVP-VAR model every 15 seconds—before and after the start of the purported ▮▮▮▮ For the May-June midpoint spread change, the mean of the standard deviation of the error term increased by nearly ▮▮▮, increasing from ▮▮▮/bbl to ▮▮▮bbl. For the May outright midpoint change, the mean of the standard deviation of the error term increased over ▮▮▮, from ▮▮▮bbl to ▮▮▮/bbl.[240]  During the purported ▮▮▮▮ period, the standard deviations of the error terms in the May-June midpoint spread change and the May outright midpoint change equations reached maximums of ▮▮▮bbl and ▮▮▮/bbl, respectively, further illustrating the large impact of variables not captured by Dr. Pirrong's



[240] *See* Workpaper 16.  In these calculations and below, the period prior to the purported ▮▮▮▮ corresponds to the period from 9:00 AM to ▮▮▮▮, while the purported ▮▮▮▮ period corresponds to the period from ▮▮▮▮ to 1:30 PM.  I chose ▮▮▮▮ as the cutoff because ▮▮▮▮ ▮▮▮▮ (*see* Pirrong Deposition 229:8–230:13).

model. To put this into context, the value of the standard deviation of the unexplained error term ███████bbl) is nearly as large as the price artificiality calculated by Dr. Pirrong at the start of the purported ███████ period (█████/bbl).[241]

180.    An additional indicator of the inadequate performance of Dr. Pirrong's model during the purported ███████ period is the drop of the $R^2$ associated with each price equation. As explained in Section VII.C.1, the $R^2$ measures the fraction of the variance of the dependent variable of a model (Dr. Pirrong's variable for the variance of the May midpoint price change) explained by the variance of the control variables of the model (Dr. Pirrong's order flow variables).

181.    As Dr. Pirrong points out in his report, "the fraction of the variability in prices explained by order flow variations declined substantially in the last ███████ of trading."[242] This is illustrated by Figure 12 in the Pirrong Report, which shows that the $R^2$ for the May midpoint price changes and the May-June midpoint spread changes reached values close to zero after ███████ When comparing the period from prior to the purported ███████ with the purported ███████ period, the mean $R^2$ declined from ████ to ████ for the May outright midpoint price change and from ████ to ████ for the May-June midpoint spread change.[243]

182.    In sum, the evidence discussed above highlights the inadequate performance of Dr. Pirrong's TVP-VAR model during the last ███████ of the proposed class period, when Dr. Pirrong abandoned this model, and renders the TVP-VAR model unreliable for calculating damages during this period.

## 2.    Dr. Pirrong Abandons His TVP-VAR Price Artificiality Model after ███████

183.    The previous discussion explains how Dr. Pirrong's TVP-VAR model materially stops explaining price changes and is not used to calculate price artificiality after ███████ Dr. Pirrong devotes a whole section of his report to explain that there was a change in market

---

[241] *See* Workpaper 16.
[242] Pirrong Report, ¶ 205.
[243] I note that, according to Figure 12 in the Pirrong Report, the $R^2$ for the May midpoint price change and the May-June midpoint spread change also fell to levels close to 0 well before ████ In fact, the $R^2$ for the May midpoint price change fell to ████ at ██████████, while the $R^2$ for the May-June midpoint spread change fell to around ████ at ████ This indicates that the inadequate performance of Dr. Pirrong's model is not restricted to the purported ███████ period. *See TVP_VAR_Output_15Sec_BBO_9_1330_Graphs.xlsx* in Backup Materials for Pirrong Report. *See* Workpaper 16.

dynamics (see Section VI.B in the Pirrong Report) after █████ and then turns to an analysis of order flow toxicity for this period (see Section VII in the Pirrong Report).

184.    Despite pivoting to an order flow toxicity analysis to compute price artificiality during the post-█████ period, Dr. Pirrong claimed in his deposition that ████████████████████████ ████████████████████████████[244]  However, the results discussed in the previous section undermine this assertion since ██████████████████ his TVP-VAR ceases to operate as intended after █████ and thus cannot form any support, much less adequate support, for estimating price impact and price artificiality after that time.[245]

185.    Application of Dr. Pirrong's TVP-VAR model in the last ████████ of the proposed class period is undermined by the market dynamics during the period.  The sharp increase in volatility in the last ████████ of the proposed class period leads to standard deviations of the error terms in the price equations of Dr. Pirrong's TVP-VAR model that are large relative to Dr. Pirrong's estimated price artificiality.  For the May-June spreads, the maximum standard deviation of the error is █████bbl and the mean during the purported ████████ is ████bbl, which is ████ and ████ respectively, of Dr. Pirrong's artificiality as of █████████.[246]

186.    In sum, in the last ████████ of the proposed class period, Dr. Pirrong's TVP-VAR model is inadequate to estimate price impact and price artificiality.

**B.    Dr. Pirrong's VPIN Metric Is Not a Price Artificiality Model, Nor Does Dr. Pirrong Claim It Is a Price Artificiality Model**

187.    As discussed in the previous section, Dr. Pirrong abandons his TVP-VAR price artificiality model during the proposed class period after █████ and changes his focus to a metric he calls VPIN, which purports to measure "order flow toxicity."  In effect, Dr. Pirrong does not have a single method to estimate price artificiality for the full proposed class period, and he has no method to measure price artificiality after █████  During his deposition, Dr. Pirrong ████████████████████████████████████████ ████████████████████████████████████████

---

[244] Pirrong Deposition, 231:12–19 ██████████████████████████
████████████████

[245] Pirrong Deposition, 236:5–11 ████████████████████████████
████████████████████

[246] *See* Workpaper 16.



███████████████████████████████████████[247] ███████████████████████████████

███████████████████████████████████████[248]  Instead, Dr. Pirrong claims that

order flow toxicity, which his VPIN metric purportedly measures, caused the purported ███

███  Trader Defendants collectively made up a sufficient portion of his VPIN metric, and

therefore ████████████████████████████████████████████████████

█████████  Dr. Pirrong's assumption that contributors to his VPIN caused the purported ███

███  is unsupported by academic literature and not subject to a scientific method.  Further, his

assumption to attribute ████████████████████████  is not supported by

his analysis or the academic literature and does not control for potential confounding factors.  At

best, I find this full decline assumption puzzling since the assumption simply ignores actual

trading.

### 1.    Description of Dr. Pirrong's VPIN Metric Analysis

188.    Before getting into the specific problems with Dr. Pirrong's use of the VPIN metric, it is

first useful to explain this metric at a high level.  His VPIN "is based on a ratio of the absolute

value of order flow imbalance to trading volume," which he also refers to as a measure of "order

flow toxicity."[249]  Price is not an input or an output to Dr. Pirrong's VPIN metric.[250]  Since his

VPIN is based on absolute values, it is directionally agnostic and does not predict price changes

up or down.  Connecting the VPIN metric to this matter, Dr. Pirrong cites to an academic paper

that states "the VPIN metric[] could be used by market makers to anticipate a rise in volatility

and estimate the risk of a liquidity-induced crash."[251]  Dr. Pirrong argues that the increase in the

VPIN metric in the May-June spread market in this matter anticipated the rise in volatility and

the purported ███████████  Notably, a high VPIN metric is connected to anticipating *volatility*,

---

[247] Pirrong Deposition, 254:11–17



[248] Pirrong Deposition, 267:21–268:6

[249] Pirrong Report, ¶ 235.
[250] David Easley, Marcos M. López de Prado, and Maureen O'Hara, "Flow Toxicity and Liquidity in a High-Frequency World," *The Review of Financial Studies* 25, no. 5 (2012): 1457–1493 ("Easley et al. (2012)"), p. 1457.  The VPIN represents a "procedure to estimate flow toxicity based on volume imbalance and trade intensity."
[251] David Easley, Marcos López de Prado, and Maureen O'Hara, "The Microstructure of the 'Flash Crash': Flow Toxicity, Liquidity Crashes and the Probability of Informed Trading," *The Journal of Portfolio Management* 37, no. 2 (2011): 118–128 ("Easley et al. (2011)"), p. 127.

not the direction of price movements.  Dr. Pirrong does not claim his VPIN model results in a price impact or price artificiality measure for the purported ██████[252]

189.    At a high level, Dr. Pirrong uses a two-part argument.  First, he claims that the total VPIN for all traders in the market caused the purported ██████  Second, he claims that Trader Defendants ████████████████████████████████████████████ ████████████  I describe each in turn.

190.    For his total market VPIN, Dr. Pirrong calculates his metric for the full proposed class period for the May outright and May-June spread.  In Figures 20 and 21 below, I have reproduced Dr. Pirrong's VPIN calculations for the proposed class period, with the addition of a drop line for the purported ██████ period.[253]  These calculations are what Dr. Pirrong uses to draw the conclusion that his total VPIN metric (blue line) was high and therefore is attributed to the purported ██████

___

[252] Pirrong Deposition, 267:21–268:6
████████████████████████████████████████████
████████

[253] Pirrong Report, Figures 15, 16.

## Figure 20



Source:  Corrected Pirrong Report and Backup Materials
Note:  Figure 15 in the Pirrong Report erroneously depicts VPIN assuming equal time intervals for each observation. In contrast, Dr. Pirrong's VPIN analysis defines intervals by a fixed volume traded, thus the time between observations varies with market conditions.  To correct this charting error, I plot observations according to the timestamp when each fixed volume amount is filled, resulting in differing intervals.  Consequently, this figure does not match the Pirrong Report Figure 15 exactly.  Data are derived from Dr. Pirrong's backup file 'Vega VPIN Analysis.xlsx.'

Highly Confidential

## Figure 21



Source:  Corrected Pirrong Report and Backup Materials
Note:  Figure 16 in the Pirrong Report erroneously depicts VPIN assuming equal time intervals for each observation.
In contrast, Dr. Pirrong's VPIN analysis defines intervals by a fixed volume traded, thus the time between
observations varies with market conditions.  To correct this charting error, I plot observations according to the
timestamp when each fixed volume amount is filled, resulting in differing intervals.  Consequently, this figure does
not match the Pirrong Report Figure 16 exactly.  Data are derived from Dr. Pirrong's backup file 'Vega VPIN
Analysis.xlsx.'



191.    Dr. Pirrong's analysis ███████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████.[254]

192.    For the May outright in Figure 20 above, Dr. Pirrong's results show that ████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████.[255]  Since Dr. Pirrong does not provide a comparison of what is a

normal level for VPIN, there is no conclusion as to whether the VPIN is "high."

[254] Pirrong Deposition, 260:16–21 ████████████████████████████████████
████████████████████████████████████████████████████████████████
[255] Pirrong Deposition, 274:3–12 ███████████████████████
████████████████████████████████████ *See* Workpaper 19.

193.    For the May-June futures contract in Figure 21, Dr. Pirrong states ██████████ ████████████████████████████████████████████████ ██ [256] ████████████████████████████████████████████ ████████████████████████████████████████████ Again, since Dr. Pirrong does not provide a comparison of what is a normal level for VPIN, there is no conclusion as to whether the VPIN is "high." Moreover, in his deposition testimony ██████████ ████████████████████████████████████████ ███████████████ [257]

194.    For the Trader Defendants–only VPIN (red line), Dr. Pirrong calculates his VPIN measures for the full proposed class period for the May outright and May-June spread, ██████ ██████████████████████████████████████ ████████████████████████████████████ ████ [258] ████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████ █ ██ ████████████████████████████████████ ████████████

195.    In sum, ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████ Next I will describe the problems with Dr. Pirrong's use and conclusions drawn from his VPIN metric.

[256] Pirrong Report, ¶ 239. *See also* Pirrong Deposition, 260:3–11 ████████████
████████████████████████████████████████████
██████████████████
[257] Pirrong Deposition, 269:25–270:3 ██████████████████████
████████████████████████████████████
██████████████
[258] Pirrong Report, ¶¶ 240–241.
[259] Pirrong Report, ¶¶ 242, 257.
[260] Pirrong Deposition, 282:5–10 ████████████████████████
████████████████████████████

2.     **Dr. Pirrong's Conclusion That Contributors to His VPIN Caused the Purported ▇▇▇▇▇▇ Is Not Supported by Academic Literature or a Scientific Method**

196.    Dr. Pirrong concludes that the purported ▇▇▇▇▇ was caused by contributors to his total market VPIN metric in the May-June spread.  Below I will describe some of the flaws with this conclusion.  First, Dr. Pirrong's assumption that his VPIN metric predicts ▇▇▇▇▇▇ is controversial in the literature.  Second, Dr. Pirrong fails to follow a scientific method in reaching his conclusions.  Third, Dr. Pirrong fails to demonstrate that his VPIN is persistently high prior to his purported ▇▇▇▇▇ which is an expected condition according to the Easley et al. (2012) paper he relies on.[261]

197.    In the description of Dr. Pirrong's VPIN metric, I described his total VPIN for all traders together (blue line in Figures 20 and 21) and separately for Trader Defendants only (red line in Figures 20 and 21).  In this section, I am referring to Dr. Pirrong's total VPIN reflected by the blue line.

198.    First, the academic literature does not support that Dr. Pirrong's VPIN measure predicts ▇▇▇▇▇▇  Dr. Pirrong relies on an academic article by David Easley, Mario Lopez de Prado, and Maureen O'Hara, titled "Flow Toxicity and Liquidity in a High-Frequency World" (Easley et al. (2012)), to attempt to establish a link between the VPIN metric ▇▇▇▇▇▇[262]  Dr. Pirrong's VPIN metric differs from the Easley et al. (2012) academic paper measure in that Dr. Pirrong does not need to imperfectly estimate what trades are aggressive using an algorithm, since the data he uses ▇▇▇▇▇▇  In a 2015 study, Andersen and Bondarenko found that when a VPIN measure does not use the imperfect algorithm, but rather accurate trade categories, "the VPIN metric based on the actual order imbalance is *negatively* correlated with future volatility."[263]  In other words, increases in a VPIN metric constructed with the actual trade classification, like the one Dr. Pirrong uses, would be indicative of lower volatility, not higher volatility as Dr. Pirrong claims.  This is therefore directly opposite to what Dr. Pirrong claims.

---

[261] Easley et al. (2012).

[262] Easley et al. (2012), p. 1459 ("[O]rder flow as captured by the VPIN metric was becoming increasingly toxic in the hours before the May 6, 2010, 'flash crash,' and that this toxicity contributed to the withdrawal of many liquidity providers from the market.").  In his deposition testimony, ▇▇▇▇▇▇ *See* Pirrong Deposition, 264:8–14 ▇▇▇▇▇▇

[263] Torben G. Andersen and Oleg Bondarenko, "Assessing Measures of Order Flow Toxicity and Early Warning Signals for Market Turbulence," *Review of Finance* 19, no. 1 (2015): 1–54 ("Andersen and Bondarenko (2015)"), p. 5 (emphasis added).

199.    There are additional academic papers specifically addressing the numerous shortcomings of the Easley et al. (2012) VPIN measure of predicting flash crashes.  Among these shortcomings, the academic literature has pointed to the issue that, by construction, VPIN measures like the one proposed by Easley et al. (2012) are correlated with trading volume and volatility, which can be persistent over time.  The reason is that these VPIN metrics are constructed with trade classification algorithms that produce errors correlated with volatility and trading volume.  Since volatility is persistent over time, high volatility predicts high future volatility, and therefore a high VPIN metric will be associated with high volatility episodes by construction.  Thus, the fact that a VPIN was high before a particular high-volatility episode does not mean contributors to the VPIN caused the high-volatility episode, but rather it shows that the VPIN is constructed with variables that are correlated with volatility and trading volume.[264] Since Dr. Pirrong does not use the Easley et al. (2012) trade classification algorithm, I will not address all the critiques in further detail.  However, it is important to note that because of these methodology differences, the academic literature does not support the purported relationship between Dr. Pirrong's VPIN metric ▮▮▮▮▮▮▮▮▮▮.[265]

200.    Second, Dr. Pirrong fails to follow a scientific method in reaching his analysis and provides no falsifiable hypotheses and statistical hypothesis testing.  Dr. Pirrong concludes that because the blue VPIN line increased sharply, it caused the purported ▮▮▮▮▮.  But, Dr. Pirrong offers no benchmark or threshold to create a hypothesis to test whether his VPIN metric on April 20, 2020, is high enough or persists long enough to have triggered the alleged ▮▮▮ ▮▮ after ▮▮▮▮▮▮ because, according to his deposition testimony, ▮▮▮▮▮▮▮▮▮▮▮

---

[264] *See, e.g.*, Torben G. Andersen and Oleg Bondarenko, "VPIN and the Flash Crash," *Journal of Financial Markets* 17 (2014): 1–46, at p. 1 ("[The VPIN] is a poor predictor of short run volatility, [] it did not reach an all-time high prior, but rather after, the flash crash, and [] its predictive content is due primarily to a mechanical relation with the underlying trading intensity."); Torben G. Andersen and Oleg Bondarenko, "Reflecting on the VPIN Dispute," *Journal of Financial Markets* 17 (2014): 53–64, at p. 53 ("[I]t is crucial for the interpretation of VPIN as a harbinger of market turbulence or as a predictor of short-term volatility to control for current volume and volatility. Doing so, we find no evidence of incremental predictive power of VPIN for future volatility."); Andersen and Bondarenko (2015), p. 1 ("VPIN is unsuitable for capturing order flow toxicity or signaling ensuing market turbulence.").

[265] During his deposition testimony, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See Pirrong Deposition, 270:9–15.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████[266] Stating that the VPIN increased sharply but not providing an analysis of a non-manipulated comparison benchmark period lacks a reliable scientific basis.

201.    Key characteristics of the process of seeking knowledge through the scientific method are the use of falsifiable hypotheses and statistical hypothesis testing.[267]  A hypothesis is said to be falsifiable when it can be proven false.[268]  Statistical hypothesis testing allows one to define quantifiable and objective criteria (conditional on the model's assumptions) to reject a hypothesis or not.[269]  Furthermore, statistical hypothesis testing allows one to measure the power of a test, which is the "chance that a statistical test will declare an effect when there is an effect to be declared."[270]

202.    Despite their flaws and their inadequacy to compute price artificiality, VAR models allow for falsifiable hypotheses and statistical hypothesis testing.  For example, as shown in Section VII.E above, in standard VAR models one could test whether or not the price impact associated with each trade variable is statistically different from zero.  In contrast, in Dr. Pirrong's VPIN metric does not allow for falsifiable hypotheses and statistical hypothesis testing.

203.    Dr. Pirrong also does not follow the benchmark method put forth by the papers he cites. Specifically, Easley et al. (2011) and Easley et al. (2012) compared their specific VPIN calculation leading up to the E-mini S&P 500 flash crash on May 6, 2010, to a benchmark period to assess whether the VPIN metric was abnormally high.[271]  For benchmarking levels, Easley et al. (2012) states, "[f]or predicting toxicity-induced volatility, what matters is whether the level of VPIN at any time is unusual *relative* to its distribution for the asset in question.  The actual level of the VPIN … is not our primary concern."[272]  Dr. Pirrong does not perform benchmark analysis on his VPIN metric levels, and thus he fails to follow the method he purports to implement.

---

[266] Pirrong Deposition, 269:1–11 █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

[267] Karl Popper, *The Logic of Scientific Discovery* (2005), p. 18.
[268] Karl Popper, *The Logic of Scientific Discovery* (2005), p. 18.
[269] Frederick Gravetter and Larry Wallnau, *Statistics for the Behavioral Sciences*, 10 ed. (2015), pp. 228–232.
[270] National Research Council et al., *Reference Manual on Scientific Evidence*, 3rd ed. (2011), p. 254.
[271] Easley et al. (2011), p. 122 ("Our first observation is that the VPIN metric for E-mini S&P 500 futures was abnormally high at least one week before the flash crash.… Our second observation is that this situation worsened (from the point of view of liquidity providers) several hours before the crash. …[B]y 11:55 a.m. on May 6 the realized value of the VPIN metric was in the 10% tail of the distribution (it exceeded a 90% CDF(VPIN) critical value). By 1:08 p.m., the realized value of the VPIN metric was in the 5% tail of the distribution (over a 95% CDF(VPIN)). By 2:30 p.m., the VPIN metric reached its highest level in the history of the E-mini S&P 500. At 2:32 p.m., the crash began, according to the CFTC-SEC Report time line.").
[272] Easley et al. (2012), p. 1472 (emphasis added).

204.    Dr. Pirrong limits his analysis to depicting the values his VPIN metrics take on April 20, 2020, only.[273]  This is a critical flaw in his analysis because VPIN results change based on the choices of parameters used (e.g., bucket size).[274]  Dr. Pirrong provides no apples-to-apples comparison of whether or not the VPIN metric on April 20, 2020, is high, low, or normal.  This is a crucial step he skips in his analysis.  Further, without a comparison to a typical VPIN measure, there is no ability to conduct hypothesis testing and statistical analysis on what constitutes a significantly high VPIN metric or long duration.

205.    Dr. Pirrong's lack of statistical rigor is reflected in the vagueness of his conclusions that the Trader Defendants ██████████████████████████████[275] or ████████████ ██████████████████████████████████████████████[276]  During his deposition, Dr. Pirrong ████████████████████████████████████████████████ ████████████████████████████████████████████[277]



206.    Third, even according to the Easley et al. (2012) paper Dr. Pirrong relies on, showing sharp increases or high levels of the VPIN metric is not sufficient to predict a high-volatility event or flash crash.  It takes *continuously high* levels of VPIN to reliably predict a high-volatility event:  "[E]ven for high levels of VPIN, absolute returns over the next volume bucket are most often not large.  …[I]t takes persistently high levels of VPIN to reliably generate large absolute returns."[278]  Dr. Pirrong's analysis does not show continuously high levels of VPIN, and therefore is not analogous with the results found by Easley et al. (2012).

207.    In sum, academic literature does not support that Dr. Pirrong's VPIN metric predicts ███████████ and his VPIN metric is not compared to any benchmark, making it essentially useless for hypothesis testing.

---

[273] *See* Pirrong Report, Figures 15, 16.
[274] Pirrong Deposition 270:9–15 ███████████████████████████████████████████████

[275] Pirrong Report, ¶ 256 (emphasis added).  *See also* Pirrong Deposition, 279:6–12 (emphasis added) ████████████████████████████████████████████████████

[276] Pirrong Report, ¶ 257 (emphasis added).
[277] *See also* Pirrong Deposition, 281:22–282:3 (emphasis added) ████████████████████████ ████████████████████████████████████████████

[278] Easley et al. (2012), pp. 1485–1486.

**3.** **Dr. Pirrong's VPIN Metric Fails to Find That Trader Defendants'**
**Allegedly Manipulative Conduct Caused** ███████████████

208.    In the prior section, I explained the fatal flaws in Dr. Pirrong's total VPIN metric (blue line in Figures 19 and 20). In this section, I discuss the flaws in Dr. Pirrong's Trader Defendant–only VPIN metric (red line in Figures 19 and 20).

209.    Even assuming, for the sake of argument, that contributors to Dr. Pirrong's total VPIN metric caused the purported ██████ Dr. Pirrong still has no model to properly determine the price artificiality attributable to Trader Defendants during the alleged ████████ Dr. Pirrong's VPIN metric does not explain how the cause of the purported ████████ can be attributed to a particular individual trader or group of traders.[279]  Dr. Pirrong's VPIN metric is simply an estimated measure of order flow toxicity with no model to estimate the price impact associated with any particular trade.[280]

210.    Dr. Pirrong argues that the nature of flash crashes is non-linear, meaning "that small changes in market conditions trigger extremely large price movements."[281]  However, his VPIN metric fails to explain his apparent "straw that broke the camel's back" theory, whereby ██████ ███████████████████████████████████████████████████████████████ ██████████████████████████ For example, consider the following hypothetical example whereby a threshold of 100 contracts sold aggressively would cause a flash crash, other traders sold 81 contracts, and Trader Defendants sold 20. Dr. Pirrong's VPIN measure would lead him to claim that the 20 contracts sold by Trader Defendants' "broke the camel's back"—but it is hard to believe that 20 contracts caused the hypothetical flash crash. Without a model able to clarify these issues, any effort to attribute ████████████████ ███████████████████████████████████

211.    In the absence of a model to provide a measure of price artificiality during the purported ████████ Dr. Pirrong assumes ███████████████████████████

---

[279] Pirrong Deposition, 264:15–20 ████████████████████████████████████
████████████████████

[280] Pirrong Deposition, 267:21–268:6 ████████████████████████████████████
████████████████████

[281] Pirrong Report, ¶ 257.

██████████████████████ Even assuming the VPIN metric causes flash crashes, Dr. Pirrong's ███████████████████████████████████████

212.    Based on Dr. Pirrong's VPIN metric calculations, ███████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████ ██████████████████████████████████████████████
████████████████████████████████████████████

213.    Since Dr. Pirrong's VPIN metric is directly impacted by "aggressive" trades (since aggressive trades remove resting orders from the order book), I also examine the percentage of aggressive trades attributed to Trader Defendants.  In the at-issue period, aggressive sell trades primarily increase the order book imbalance, and therefore increase Dr. Pirrong's VPIN measure.  To the extent the Trader Defendants were acting as a conduit for TAS sellers (see Section VII.A), then none of the VPIN is directly attributable to Trader Defendants.

214.    Between 9:00 AM and 1:30 PM, by volume, Trader Defendants only accounted for ███ of aggressive sales of non-TAS contracts, meaning that ████ of aggressive sales were generated by other traders.[283]  This suggests that non-Defendant traders contributed the majority of aggressive sales volume and to the "high" VPIN measured during the proposed class period—especially in the May outright futures contracts—contradicting the idea of ██████████████
██████████████████████████████████████████████████████

215.    Moreover, even though Dr. Pirrong calls the period between ████████ and 1:30 PM a ███████████████████████████████████████████ I note that Dr. Pirrong has not established any scientific basis for claiming a ████████ occurred, and Dr. Pirrong does not cite to any third-party study about this day that refers to the price movement as a █████████ I am also unaware of any regulatory reports calling this price drop a ████████ and there is evidence that this period may not be consistent with a ███████.  Dr. Pirrong states that flash crashes are associated with large price drops, followed by pronounced price rebounds.[284]  In contrast, the price pattern of the May Contract depicted in Figure 4 above shows that while prices fell

---

[282] The average VPIN share attributed to non-Defendant traders is calculated as one minus the average of Trader Defendants' VPIN share over the proposed class period.  *See* Workpaper 19.
[283] *See* Workpaper 20.
[284] Pirrong Report, ¶¶ 107, 118.

between ████ and 1:30 PM and rebounded by ████, they then dropped again between ████ and ████ such that the price level was close to the same at 1:30 PM as at ████ Such a pattern is not typically associated with a flash crash, in a flash crash prices plummet once and then bounce back without a subsequent drop of comparable magnitude. For example one of the most notable market events described by the CFTC as a flash crash occurred on May 6, 2010, when the U.S. stock market experienced a rapid and severe drop in prices before rebounding within minutes (see Figure 22 below).

---

**Figure 22**

***The Flash Crash in U. S. Equity Indices on May 6, 2010 Exhibited a Rapid and Severe Drop in Prices before Rebounding within Minutes***



Source: Andrei Kirilenko, et al., "The Flash Crash: The Impact of High Frequency Trading on an Electronic Market," *CFTC* (2014).

---

216.    Even assuming for the sake of argument that ████████████████████████ ████████████████████ his price impact estimations during the purported ████████ are not sufficient to estimate artificiality.  His conclusions suffer from the same flawed but-for world assumption as the one he relies on for his TVP-VAR model (see Section VII.A above).  Dr. Pirrong's analysis during the purported ████████ implicitly assumes that the trading patterns of other traders would remain unchanged absent Trader Defendants' alleged manipulative trades.  This includes TAS sellers that relied on Trader Defendants buying TAS to exit their long positions.  Dr. Pirrong's analysis does not account for this situation, effectively discarding the possibility that the alleged triggering of the purported ████████ from aggressive selling would have occurred even without the actions of Trader Defendants.  In fact, Dr. Pirrong explicitly claims that, without Trader Defendants' trades, the purported ████████ would have been less likely to happen.[285]  In sum, Dr. Pirrong's VPIN metric does not support that ████████████ ████████████████████████████████████████████████████████

## IX.    Many of the Diverse Putative Class Members Could Not Have Been Harmed, and Dr. Pirrong's Methodology Is Incapable of Identifying the Number of Putative Class Members

217.    Dr. Pirrong does not explain how or why, in light of the extreme macroeconomic environment of COVID-19 and unprecedented price volatility of April 20, 2020, his TVP-VAR model or his post-████ approach "can be applied on a class-wide basis to quantify the damages Trading Defendants caused for the members of the class" or whether each putative class member suffered any harm.[286]

218.    As explained in Section IX.A below, Dr. Pirrong's methodology is incapable of assessing the number of putative class members and whether they were harmed without fact-intensive individualized inquiry.  Dr. Pirrong claims that ████ unique accounts meet the "class definition" and that a damages "calculation can be performed in an identical way for each Class Member based on their trading records."[287]  However, his calculations and claim of common method of proof are incorrect for at least three reasons.

---

[285] Pirrong Report, ¶ 257.
[286] Pirrong Report, ¶ 190.
[287] Pirrong Report, ¶ 396.

a. First, Dr. Pirrong's methodology assesses the number and alleged harm to *accounts* instead of *persons* or *entities*. The proposed class definition comprises "[a]ll persons and entities that sold a May 2020 [] WTI[] futures contract [during the putative class period] to liquidate a long position in the May contract."[288] Multiple accounts can roll up to a single entity, and an account with a long position during the putative class period may belong to an entity that was not, in fact, net long when aggregating positions across all of its accounts. Furthermore, an entity whose damages on sales in some accounts are equal or lower than the benefits on purchases in other accounts would not be harmed overall. Dr. Pirrong's methodology cannot address the effects of the alleged manipulation across accounts. Therefore, Dr. Pirrong cannot determine whether an entity was harmed and is part of the putative class without individualized inquiry.

b. Second, Dr. Pirrong's methodology uses the CME Audit Trail data, which do not reflect CME WTI trades that took place outside CME's GLOBEX electronic platform.[289] This includes contracts fulfilled at the contract maturity through delivery of physical crude and "ex-pit" transactions such as block trades or exchange-for-physical ("EFP") transactions. Produced third-party data from a very limited set of trading entities ██████████████████████ ███████████████████████████████████████ An entity whose damages on sales recorded in the CME Audit Trail data were lower than the benefits on purchases not captured in the CME Audit Trail data would not be harmed overall. Furthermore, Dr. Pirrong relies on transactions between the start of the proposed class period and the expiry of the May Contract to determine whether an entity sold to "liquidate a long position in the May contract" during the proposed class period. Inasmuch as it ignores non-GLOBEX transactions, options exercise, and May Contract deliveries, Dr. Pirrong's "determin[ation] that ████ accounts meet the Class Definition" is flawed because he cannot know

---

[288] Plaintiff's Motion for Class Certification, ¶ 1.
[289] CME GLOBEX is an electronic trading platform developed and operated by the CME for the global trading of futures and options. It supports the execution of a wide range of asset classes, including commodities, currencies, and financial instruments, facilitating nearly 24-hour trading and global access. Additionally, trades on the CME can also take place outside the GLOBEX platform, such as through privately negotiated transactions. *See* "CME Globex," CME Group, https://www.cmegroup.com/globex.html; "CME GLOBEX REFERENCE GUIDE," CME Group, https://bit.ly/3Khp8iw, p. 2.

whether the owner of the account was actually "long" when it sold the May Contract.[290] Again, Dr. Pirrong cannot determine whether an entity was harmed and is part of the putative class without individualized inquiry.

c.  Third, Dr. Pirrong's methodology ignores ICE WTI contract transactions that would be impacted by an alleged price artificiality in the CME WTI contract. The absence of account (and ownership) mapping between CME and ICE account numbers means that Dr. Pirrong cannot assess if an individual is harmed without a fact-intensive individualized inquiry. Since the ICE WTI contract terms specifically reference the CME WTI prices for cash-settlement, the necessity to assess harm in both contracts is important. Even if accounts could be mapped between ICE and CME, Dr. Pirrong's artificiality for the CME WTI cannot be applied to the ICE WTI contract.

d.  Fourth, there is no centralized database containing information on entities' OTC transactions, including physical transactions, whose price is directly linked to the CME WTI futures price. Traders whose damages on sales of futures were equal to or higher than their benefits on OTC purchases of the same contract could not be harmed. It is not possible to assess each putative class member's OTC benefits, including cash market benefits, without a fact-intensive individualized inquiry into the history of each OTC contract for each putative class member.

219.  Moreover, Section IX.B below explains that while Dr. Pirrong makes no assessment of how many putative class members actually suffered harm under his proposed analysis, even applying his flawed methodology results in almost ▮ of unharmed accounts among his purported ▮ unique accounts meeting the proposed class definition.[291] Even more fundamentally, I identify three categories of putative class members who *could not* be harmed by Dr. Pirrong's alleged price artificiality, meaning trading entities belonging to the putative class and for whom harm is impossible as a conceptual matter:

a.  Putative class members who traded like Trader Defendants, that is, purchasing TAS May Contracts and selling non-TAS May Contracts during the alleged class period.

---

[290] Pirrong Report, ¶ 396.
[291] *See* Figure 28 backup.

b.  Putative class members who only traded TAS May Contracts intraday, meaning they purchased and sold the same number of TAS May Contracts on April 20, 2020.

c.  Putative class members who used CME WTI futures contracts to hedge OTC transactions, including physical transactions, and whose benefits on OTC purchases were equal to or exceeded their damages on sales of futures.

220.    Finally, as explained in Section IX.C below, my analysis of the trading and alleged damages for the ████ accounts Dr. Pirrong claims are part of the alleged class reveals that named plaintiff Mish is not representative of the overwhelming majority of putative class members.  For example, while TAS May Contract sales represent ████ of alleged aggregate damages when applying Dr. Pirrong's methodology, Mish only traded non-TAS May Contracts.[292]  Furthermore, available contemporaneous records and deposition testimony indicate that ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

**A.  Dr. Pirrong's Methodology Does Not, and In Fact Cannot, Assess the Number of Persons or Entities That Were Harmed and Belong to the Putative Class without Individualized Inquiry**

221.    Dr. Pirrong's methodology cannot determine, without individualized inquiry, whether a trading entity was harmed by the alleged price artificiality estimates or whether it belongs to the putative class.  Dr. Pirrong claims that ████ unique accounts meet the proposed class definition and that a damages "calculation can be performed in an identical way for each Class Member based on their trading records."[293]  However, even if Dr. Pirrong's artificiality estimates were reliable—and they are not as I explain in Sections VII and VIII above—his calculations and claim of a common method of proof are incorrect for at least three reasons.

---

[292] *See* Figure 28.
[293] Pirrong Report, ¶ 396.

1.     **Dr. Pirrong's Methodology Cannot Address Multiple Accounts Owned by the Same Entity without Individualized and Fact-Intensive Inquiry**

222.    Dr. Pirrong's analysis relies on CME Audit Trail data that ████████████ ████████████████████████████████████████ Yet Plaintiff acknowledges that the *same trading entity may have multiple trading accounts*, such that all accounts for the same entity would have to be aggregated in order to assess both (i) whether any individual trader is a member of the proposed class, and (ii) whether such a trader would have been harmed by allegedly artificial prices.[294]  Combining account numbers by entity requires a fact-intensive process that varies across entities.  Treating individual accounts separately is problematic for several reasons.

223.    First, the same economic entity (e.g., trading firm) may buy and sell CME WTI futures contracts across different accounts that may follow different strategies and leave the owner unharmed overall.  While Dr. Pirrong's view is that price artificiality can provide economic benefit to purchasers of affected contracts, because his methodology does not aggregate accounts by owners, it does not allow for the potentially beneficial effects of transactions across accounts and therefore cannot determine whether an entity was harmed.  ████████████████████ ████████████████████████████████████████████████████[295]  In order to definitively determine if the same trading entity holds multiple accounts within a particular FCM or across multiple FCMs, one would need to conduct an individualized and fact-intensive inquiry with each FCM.

224.    Second, the same economic entity (e.g., trading firm) may hold simultaneous long and short positions in the same contract across different accounts.  An account with a long position during the alleged class period may belong to an entity that was not, in fact, long when considering all of its accounts.  Dr. Pirrong therefore (i) likely greatly overstates the number of

---

[294] *Mish International Monetary Inc., on behalf of itself and all others similarly situated v. Vega Capital London, LTD., et al.*, Plaintiff's Memorandum of Law in Support of Its Motion for Class Certification Corrected Copy, February 23, 2024, p. 11 ("[A]n individual Class member could have traded May contracts on April 20 through more than one account such that the number of unique accounts may not equal the number of individual Class members").  Indeed, third-party productions ████████ ███████████████████████████████████████████████████ *See* Workpaper 21. A single account may also reflect trading on behalf of multiple customers, further requiring the need for individualized inquiry. *See, e.g.*, Pirrong Deposition, 296:2–6 █████████████████████████████████

[295] *See* footnote 305 below.

putative class members, and (ii) cannot identify whether a trading individual or entity meets Plaintiff's class definition.

225.    To illustrate the flaw in Dr. Pirrong's approach, consider the following hypothetical: trading firm A owns two trading accounts.  Suppose that trading account 1A is long 10 contracts while trading account 2A is short 10 Contracts  9:00 AM.  Further, suppose trading firm A exits its positions in both accounts by selling 10 May Contracts in account 1A and buying 10 May Contracts in account 2A at 1:08 PM when the price reached $0.  In the aggregate, trading firm A does not fit the proposed class definition as it always had an overall flat position and was never net long the May Contract during the proposed class period.  Furthermore, the trading firm is also unharmed in the aggregate as the damages in its account 1A are equal to the benefits in its account 2A.  However, Dr. Pirrong's methodology would consider account 1A as within the putative class and would attribute damages to trading firm A while ignoring the benefits from account 2A.  This is because Dr. Pirrong's methodology does not, and in fact cannot, address this issue of aggregating benefits and damages across different accounts.

226.    The multiple account issue outlined in the above hypothetical example is not merely theoretical; it actually manifests in the data.  By conducting individualized mapping of the CME Audit Trail data to produced third-party trading data, ████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████

227.    For example, ███████████████████████████████████ █ ████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ █ ██████████████████ ████████████████████████████████████████████████████ ██████████████████████

228.    Similarly, trade data produced by ████████████████████████████ ████████████████████████████████████████████████████



[300] This may be because, as discussed in the next section, some transactions do not show up in the CME Audit Trail data. These missing transactions can have an impact on whether a trading entity is harmed or not and whether it meets the proposed class definition and point to the need for even further individualized inquiry.

229.    These examples found using individualized analysis demonstrate the inability of Dr. Pirrong's method to assess putative class members with more than one account, and, further, his method cannot tell which putative class members have more than one account.

Confirming the identity of putative class members would require additional data

[299] *See* Workpaper 24.
[300] *See* Workpaper 24.
[301] PSXVEG0000001.xlsx
[302] Pirrong Deposition, 324:4–14

[303] Pirrong Deposition, 295:19–296:6

[304] Pirrong Deposition, 324:15–25

This is because obtaining and compiling these data would require individualized and fact-intensive inquiry with purported class members, FCMs, clearing members, and foreign brokers. As a recent CFTC rule proposal explains, exchanges such as the CME usually "identify traders by account numbers" but "do not routinely collect detailed trader-identifying data." Even the CFTC obtains such trader-identifying data directly from FCMs, clearing members, and foreign brokers as part of the data collected under the CFTC's Large Trader Reporting Program.[305]

███████████████████████████████████████████████████████████████[306]

### 2. Dr. Pirrong's Methodology Ignores CME WTI Transactions That Are Impacted by His Alleged Price Artificiality Estimates

230.    Dr. Pirrong's methodology only focuses on a subset of transactions in the putative class. Specifically, Dr. Pirrong relies on CME Audit Trail data that do not reflect futures trades outside CME's GLOBEX electronic platform, but which are part of the proposed class definition.[307] These include "ex-pit" transactions such as block trades or EFP transactions, certain transactions executed through brokers, contracts fulfilled at the contract maturity through delivery of physical

---

[305] A recent CFTC rule proposal explains that Designated Contract Markets (or "DCMs") such as the CME "identify traders by account numbers, but certain DCMs do not routinely collect detailed trader-identifying data" and that the CFTC "generally obtains such trader-identifying data from FCMs, clearing members, and foreign brokers through § 17.01." In addition, "Section 17.01 requires, separately, that reporting firms submit information, via Form 102, identifying the traders behind special accounts by name, address, and occupation, once an account accrues a reportable position. 17 CFR 17.01. Reporting firms, as appropriate, submit Form 102 to the Commission for each account when that account becomes reportable as a special account. By aggregating information from § 17.00(a) large trader reports and Form 102, the Commission can determine the size of each reportable trader's overall positions across special accounts held with multiple FCMs, clearing members, or foreign brokers." *See* "17 CFR Part 17: Large Trader Reporting Requirements," CFTC, May 1, 2024, https://www.cftc.gov/media/10606.

[306] Pirrong Deposition, 325:1–15



[307] Pirrong Deposition, 312:17–23

315:4–18

crude, and options exercise.[308]  Such transactions can have an impact on whether a trading entity is harmed or not and whether it meets the proposed class definition.

231.    An entity that incurred damages on sales recorded in the CME Audit Trail data but incurred greater benefits on purchases not captured in the CME Audit Trail data would not be harmed overall.  For example, block trades are privately negotiated trades that are executed away from CME's order book but at prices that are "fair and reasonable," meaning the price must be consistent with the prices of other transactions in the same contract at the relevant time.[309]  Block trades, by transacting at or close to the prevalent market price, would therefore be subject to Dr. Pirrong's alleged artificiality.  Because it ignores block trades and other ex-pit transactions that were executed during the alleged class period and would be impacted by Dr. Pirrong's alleged price artificiality estimates, Dr. Pirrong's methodology cannot accurately determine whether an entity was actually harmed.

232.    Furthermore, to determine whether an account sold to "liquidate a long position in the May contract" during the alleged class period, Dr. Pirrong needs futures positions that are not directly reflected in the CME Audit Trail data he uses.[310]  If Dr. Pirrong does not have the full set of transactions, then his position calculation is wrong and his assessment of which accounts are in the putative class is wrong.  I find Dr. Pirrong does not have the full set of transactions because he ignores non-GLOBEX transactions such as ex-pit trades, options exercise, and May Contract deliveries.  Therefore, Dr. Pirrong's "determin[ation] that ██ accounts meet the Class Definition" is not correct.[311]

233.    To begin with, Dr. Pirrong calculates positions by assuming a position of zero at the expiration of the May Contract on April 21, 2020, and building back the account position until

---

[308] "Ex-pit" transactions refer to trades executed outside the traditional open outcry trading pits or the GLOBEX electronic platform, including block trades and EFP transactions.  Block trades are privately negotiated, large-volume trades between parties that are reported to the exchange and meet minimum size requirements.  EFP transactions involve swapping a futures position for a physical position or vice versa.  Additionally, as explained in Section V.A.3, CME WTI futures contracts may be fulfilled at maturity by the delivery of the physical commodity.  Options on futures contracts can be exercised, resulting in the establishment of a position in the underlying futures contract according to the terms of the option.  *See* "Daily Bulletin Glossary," CME Group, 2012, https://www.cmegroup.com/tools-information/files/CME-Group-Daily-Bulletin-Glossary.pdf; "Understanding Block Trades," CME Group, November 1, 2017, https://www.cmegroup.com/education/articles-and-reports/understanding-block-trades.html; "Exchange for Related Positions (EFRPs)" CME Group, https://www.cmegroup.com/clearing/operations-and-deliveries/accepted-trade-types/efp-efr-eoo-trades.html.
[309] "Market Regulation Advisory Notice, Rule 526: Block Trades," CME Group, https://www.cmegroup.com/rulebook/files/cme-group-Rule-526.pdf.
[310] Plaintiff's Motion for Class Certification, ¶1.
[311] Pirrong Report, ¶ 396.

the start of the proposed class period on April 20, 2020, using transactions.[312]  But CME public reports indicate that 2,427 May Contracts were delivered, meaning that—contrary to Dr. Pirrong's assumption—not all entities had a position of zero at the expiration of the May Contract.[313]

234.    These types of investigations require individualized inquiry, and Dr. Pirrong's methodology cannot be modified to include these transactions absent individualized inquiries. For example, while the CME reports which FCMs made or took delivery, the data do not indicate which underlying trading entity made or took delivery and for how many contracts, unless the FCM did so for its own "house" account.  The CME positions data, which provide end-of-day positions and would include open positions at the close of trading on April 21, 2020, only cover reportable positions for large traders that hold a position equal to or higher than 350 contracts in CME WTI contracts.[314]  These data would therefore also be insufficient to establish the position at contract expiry of accounts with smaller positions.  Only individualized inquiry enables the identification of non-reportable traders that made or took delivery, and such information resides solely with the trading entities' FCM.

235.    Concrete examples found in non-party productions in this case



---

[312] Dr. Pirrong's methodology for reconstructing an account's position during the proposed class period assumes that the account position was zero at the expiration of the May 2020 futures contract and works backwards.  In other words, Dr. Pirrong reconstructs the position by going backwards from zero at expiration to the start of the proposed class period by summing all May 2020 futures contract transactions within a specific account.  *See* Pirrong Deposition, 296:7–297:5

[313] "DVL662-T Report," CME Group, December 30, 2020.                                                       . *See* Pirrong Deposition, 298:2–4

[314] Reportable and non-reportable positions refer to data collected under the CFTC's Large Trader Reporting Program.  In April 2020, any trader with a position of 350 CME WTI contracts or larger in any single futures or option expiration month had to report all their positions to the CFTC.  Such traders are referred to as "reportable" or "large" traders, and traders below the 350-contract threshold are "non-reportable."  *See* "Large Trader Reporting Program," CFTC, https://www.cftc.gov/IndustryOversight/MarketSurveillance/LargeTraderReportingProgram/ltrp.html.



236.    Produced third-party trading data from a very limited set of trading entities ████████

███████ Dr. Pirrong's methodology of calculating positions and alleged harm is unable to account for these transactions without individualized inquiry.

### 3.    Dr. Pirrong's Methodology Ignores ICE WTI Contract Transactions That Would Be Impacted by the Alleged Price Artificiality In the CME WTI Contract

237.    Dr. Pirrong's methodology exclusively examines CME WTI contract transactions, ignoring trades in ICE's cash-settled Crude Oil Futures contract ("ICE WTI contract"). The ICE WTI contract is explicitly linked to the CME WTI contract, because the ICE WTI contract is cash-settled based on the CME WTI contract price.[320] Although trades involving the ICE WTI contract are not included in Plaintiff's class definition, Dr. Pirrong asserts that ICE WTI contract settlement prices at expiration would be "artificially depressed by the same amount" as the CME



_____

[315] ████████████████████████████████████████ VEGA_MISH_000043277; *VEGA_MISH_000042708.1.xlsx.*

[316] ████████████████████████████████████

[317] Non-partyBP024467 ████████████████████████

[318] Non-partyBP029546 ████████████████████████ *See also* "Learn About Exercise and Assignment," CME Group, https://www.cmegroup.com/education/courses/introduction-to-options/learn-about-exercise-and-assignment.html

[319] Non-partyBP029555

[320] "The West Texas Intermediate Light Sweet Crude Oil futures contract is cash settled against the prevailing market price for US light sweet crude. It is a price in USD per barrel equal to the penultimate settlement price for WTI crude futures as made public by NYMEX for the month of production per 2005 ISDA Commodity Definitions." "WTI Crude Futures," ICE, https://www.ice.com/products/213/WTI-Crude-Futures.

WTI contract, and that prior to expiration, the ICE WTI contact could be impacted by his artificiality because the two prices "[converge] to the same price,"[321]

238. The same economic entity (e.g., trading firm) may have bought (sold) CME WTI contracts and sold (bought) ICE WTI contracts such that the entity is unharmed overall. Because Dr. Pirrong's methodology ignores ICE transactions executed during the alleged class period, he cannot accurately determine whether an entity was actually harmed. An attempt to include ICE transactions would require a fact intensive individualized inquiry. The account numbers (and ownership) in ICE data do not correspond to CME Audit Trail data account numbers, and therefore Dr. Pirrong cannot link the ICE accounts to his ▮▮▮ CME Audit Trail data accounts that purport to meet Plaintiff's class definition. An individualized review and time-intensive analysis of each putative class member's account statements, FCM inquiries, and in-house trading data would enable Dr. Pirrong to assess whether an entity is harmed.

239. Even if the putative class members could be linked across the CME and ICE data, Dr. Pirrong's CME May Contract artificiality estimates and methodology cannot be applied to ICE transactions because, he asserts there was a "breakdown of the normal relationship between CME and ICE prices" on April 20, 2020.[322]

240. In sum, the absence of account (and ownership) mapping between CME and ICE account numbers means that Dr. Pirrong cannot assess if an individual is harmed without a fact-intensive inquiry. Since the ICE WTI contract terms specifically reference the CME WTI prices for cash-settlement, the necessity to assess harm in *both* contracts is important. Even if accounts could be mapped between ICE and CME, Dr. Pirrong's artificiality for the CME WTI cannot be applied to the ICE WTI contract.

### 4. Individualized Inquiry Is Required to Assess Over-the-Counter Trading Positions, Including Physical Contracts

241. Similarly, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it is not possible to assess each putative class member's OTC benefits, including cash market benefits, without a fact-

---

[321] Pirrong Report, ¶¶ 53, 262.
[322] Pirrong Report, Section VIII.

intensive individualized inquiry into the history of each OTC contract for each putative class member.[323]

242.    A primary use of futures is to hedge against the risk of price movements in OTC markets. Therefore, many participants in the WTI crude oil market have OTC positions, including physical positions, that are hedged using futures contracts. ██████████████████████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ his methodology is incapable of assessing if putative class members transacting in physical (i.e., cash) crude oil benefited or were harmed by Trader Defendants' alleged manipulation.[324]  This is a significant flaw ████████ ███████████████████████████████████████████████████████████████████████████ ████████████████████████████████████[325]  As I explain in more detail in Section IX.B.3 below, if they are hedging exactly, any damages that these putative class members incur in the futures market due to the alleged manipulation equals benefits in the OTC market.  For example, buyers and sellers of physical oil may reference the CME WTI futures price in their physical oil contracts.[326]  The final price of such physical oil is determined by the WTI price plus a premium or discount.  The price of other OTC financial instruments such as commodity swaps may also rely on the CME WTI futures price.[327]

243.    Produced third-party futures trading data ████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

---

[323] Pirrong Deposition, 317:15–22
[324] Pirrong Deposition, 317:23–318:5 ██████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ 317:6–22 ██ ████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████
[325] Pirrong Deposition, 316:12–17 █████████████████████████████████████████
[326] ███████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *See* Pirrong Deposition 483:22–484:4.
[327] █████████████████████████████████ *See* Pirrong Deposition, 314:2–6 ████ ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████[328]

244.     The production of third-party OTC transactions data would be required to determine, through fact-intensive individualized inquiry, whether any trading entity benefited or was harmed according to Dr. Pirrong's price artificiality estimate on such transactions.  Because no centralized record of all OTC transactions exists, it is not possible to assess each putative class member's benefits or damages on each physical or other OTC transaction without this fact-intensive individualized inquiry into each cash market and OTC contract for each putative class member.

245.     A further complication is that each contract and each party to the contract may have different internal processes for recording and managing cash transactions.  Establishing an alleged impact will depend on the individualized contractual and pricing documents for each transaction.  Dr. Pirrong has not explained how the many different processes can be generalized into a class-wide approach because each putative class member's physical transactions will need to be assessed separately.  Absent a thorough detailed analysis of these OTC contracts from each putative class member, an economist cannot make a reliable assessment of whether a commercial market participant suffered *any* harm from a deflated futures price, much less measure the amount of damages (or benefits).

246.     In at least one other pending case, Dr. Pirrong acknowledged the need to net benefits related to cash positions linked to futures positions hedges.  In *In Re: Term Commodities Cotton Futures Litigation*, Dr. Pirrong "made an adjustment to reflect hedging" as "[t]heory predicts that manipulation can cause the prices of some non-deliverable cotton to increase" and "[h]olders of this cotton would have realized a gain as a result of the manipulation."[329] ██████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████[330]  Unlike the U.S. cotton market,

---

[328] PSXVEG0000001.xlsx. ████████████████████████████████████████████████
████████████████████████ *See* Workpaper 25.
[329] *In Re: Term Commodities Cotton Futures Litigation*, Pirrong Report (Redacted), March 18, 2022, footnote 260.
[330] Pirrong Deposition, 308:24–309:2 █████████████████████████████████████████
████████████████ 299:16–18 ████████████████████████████████████████

there are no centralized data on physical transactions in crude oil markets.[331]  Given the CME data limitations and the lack of centralized data on physical crude oil and other OTC transactions such as commodity swaps, a fact-intensive individualized inquiry would be required to account for any benefits putative class members might have experienced from the alleged price deflation.

[332]  However, Dr. Pirrong does not explain how such an exercise would avoid fact-intensive individualized inquiry, ████████████████ ████████████████████████[333]

### B.    Many Putative Class Members Could Not Have Been Harmed

247.    As stated previously, Dr. Pirrong does not identify the number of putative class members, but instead he identifies accounts that are purportedly in the proposed class.  Dr. Pirrong identifies █████ accounts belonging to the putative class but makes no assessment of the number of putative class members these accounts belong to or whether these accounts were harmed according to his alleged price artificiality estimates.

248.    Assuming for the sake of the argument that Dr. Pirrong's methodology of counting accounts is correct and his price artificiality estimates are correct, I find that ██ of the ██ accounts identified by Dr. Pirrong as meeting the proposed class definition—or almost ███ are unharmed.[334]  These accounts both purchased and sold the affected May Contracts in a way where the "economic loss" suffered from sales at "deflated" prices was equal to or smaller than

---

[331]  The U.S. Cotton market has a CFTC "Cotton-On-Call" report and a centralized Electronic Warehouse Receipt database that contains information on the quantity of physical cotton that has been bought or sold. "Cotton On-Call," CFTC, https://www.cftc.gov/MarketReports/CottonOnCall/index.htm; "eCotton's Electronic Warehouse receipt Providership System," Intelligent Decisions, Inc., http://www.ecotton.com/documents/EWR/EwrProviderOverview.pdf

[332]  Pirrong Deposition, 320:7–321:5



321:6–19

[333]  Pirrong Deposition, 325:1–9

[334]  Pirrong Report, ¶¶ 390–396;  Figure 28 backup.

the "economic gain" from purchases.  Such accounts were not harmed and may in fact have benefitted from the allegedly artificial prices.

249.    Even more fundamentally, I identify three categories of putative class members who *could not* be harmed by Plaintiff's alleged price artificiality, irrespective of Dr. Pirrong's methodology, meaning trading entities belonging to the putative class for whom harm is impossible as a conceptual matter.  I discuss these in the next sections.

### 1.    Putative Class Members Trading Similarly to Trader Defendants Could Not Have Been Harmed

250.    The first category of putative class members for whom harm is impossible as a conceptual matter is entities that traded like Trader Defendants.  Dr. Pirrong argues that the Trader Defendants benefitted from artificially depressing prices.  But at the risk of stating the obvious, any putative class member who traded like Trader Defendants—purchasing TAS contracts and selling non-TAS contracts in similar quantities during the proposed class period— also benefited and could not have been harmed.

251.    As I demonstrate in Section XI.B below, contrary to Dr. Pirrong's claim, Trader Defendants' trading behavior was not unique.  Other non-Defendant traders ███████████ ████████████████████████████████████████████████████

252.    Given the CME Audit Trail data limitations discussed in Sections IX.A.1 and IX.A.2 above, it is not possible to accurately assess the number of putative class members that traded like Trader Defendants without individualized inquiry.  However, the CME Audit Trail data provide a reference point to estimate the number of accounts whose purchases of TAS contracts and sales of non-TAS contracts were analogous to Trader Defendants.  Specifically, I identify ██ ██████████████████████████████████████████████████████████████████ [335]

---

[335] *See* Workpaper 26.

### 2. Putative Class Members Buying and Selling the Same Amount of TAS Contracts Could Not Have Been Harmed

253.     The second category of putative class members for whom harm is impossible as a conceptual matter are individuals or trading entities that bought and sold the same number of TAS contracts on April 20, 2020, and did not engage in any other trades.  As explained in Section V.A.2 above, TAS contracts execute at a premium or discount to the yet-to-be-determined daily settlement price.  Because no artificiality is alleged on the magnitude of the premium or discount, the alleged price deflation on all TAS contract prices is the same.  One TAS contract purchase at the allegedly depressed settlement price would benefit by the same amount as one TAS contract sale's damages.  Putative class members who only purchased and sold the same number of TAS contracts on April 20, 2020, could therefore not have been harmed.

254.     Using the CME Audit Trail data, I estimate the number of accounts Dr. Pirrong identifies as putative class members that could not have been harmed because they bought and sold the same amount of TAS contracts on April 20, 2020.  While this is not a substitute for the type of individualized inquiry discussed above, it provides a reference point.  ██████████████████████ ████████████████████████████████████████████████████████████████████████[336]

### 3. Putative Class Members Trading Futures to Hedge Could Not Have Been Harmed

255.     The third category of putative class members for whom harm is impossible as a conceptual matter are individuals or trading entities that used May Contracts to hedge.  Specifically, entities allegedly damaged on futures contracts but with equal or greater benefits on non-futures OTC positions could not be harmed.  I discussed this concept in Section IX.A.3 above in the context of the lack of centralized data on non-futures OTC transactions and the need for individualized inquiry, but the concept is discussed again in this section in the context of putative class members that could not be harmed.

256.     As discussed in Section IX.A.3 above, a primary use of futures is to hedge against the risk of price movements, and many participants in the WTI crude oil market have OTC positions,

---

[336] *See* Workpaper 27.

including physical positions, that are hedged using futures contracts. For example, buyers and sellers of physical oil may reference the WTI settlement price in their physical oil contracts. Such traders may hedge the price risk associated with these OTC contracts by executing futures trades that involve taking an offsetting combination of a non-TAS and TAS futures position to hedge against the price risk of the yet-to-be-determined settlement price. If they are hedging exactly, any damages that these putative class members incur in the futures market due to the alleged manipulation equal benefits in the OTC market.

257.    To illustrate this hedging strategy, consider the following hypothetical example (depicted in Figure 23 below): an energy company buys 1,000 barrels of physical oil for spot delivery on April 19, 2020, at a 5 cent premium to the yet-to-be-determined April 20, 2020, May Contract settlement price.[337]  A futures price decline between the time of the physical purchase and the time of settlement would cause the company to buy the physical oil at a cheaper price (it would realize a gain) while an increase in futures price would cause it to buy the physical oil at a higher price (it would incur a loss). In order to hedge this physical purchase price risk, it immediately buys one May non-TAS futures contract (corresponding to 1,000 barrels). On April 20, 2020, it also sells one TAS contract in order to ensure it exits the non-TAS futures hedge at the settlement price referenced in the physical contract. The long non-TAS futures contract position—exited with the TAS—would incur a loss from a decrease in the futures price between the time of the physical transaction and the time of settlement, while it would incur a gain if the futures price increased. In effect, the gain (loss) the energy company would accrue on its physical contract sale from a futures price decrease (increase) would equal the loss (gain) on its short non-TAS futures position.

---

[337] Spot delivery in physical crude oil markets refers to the transaction process where crude oil is bought or sold for immediate delivery, rather than for delivery at a future date. In this context, "spot" implies that the transaction is settled promptly, usually within a few days of the trade agreement. The exact timing can vary based on logistical factors and the specific terms agreed upon by the trading parties. *See* John Hull, *Options, Futures, and Other Derivatives*, 9th ed. (2015), p. 6.

## Figure 23
### A Hypothetical Hedger Is Unharmed by Price Movements



258.    Similarly, Figure 24 below illustrates using the same energy company example while overlaying Dr. Pirrong's alleged artificiality amount, Dr. Pirrong's damages calculation methodology only considers the impact of the alleged artificiality on the TAS sale, not the benefit of the physical oil sale.  In this example, the energy company would be unharmed overall.[338]

---

[338] The non-TAS future purchase on April 19, 2020, would be unaffected by Dr. Pirrong's artificiality estimates given the purchase price was set outside the proposed class period.

**Figure 24**



Source: Pirrong Report and Backup Materials
Note: Artificiality is calculated attributing ████████████████████████████ Only the first observation in each minute is used to plot artificiality.

259.    For these hedgers, in order to determine if they suffered economic harm, any alleged damages they suffered on futures positions due to the alleged deflation should equal benefits they received on cash positions. Dr. Pirrong completely ignores these basic economic facts in his proposed methodology, which likely leads him to include putative class members who could not have suffered economic harm in his analysis.

260.    Critically, and as discussed above, it is not possible to assess each putative class member's benefits on OTC transactions, including in the physical cash market, without fact-intensive individualized inquiry into the history of each contract for each putative class member. For example, the cash market is characterized by individualized negotiations and nuanced structure, rendering such an analysis extremely challenging. Each firm's process for establishing an alleged impact will depend largely on the individualized contractual and pricing documents

from the firm.  This cannot easily be generalized into a class-wide or even a firm-wide approach. Each individualized contract and individualized hedging transaction would need to be assessed separately.

261.    This issue likely applies to a large fraction of putative class members.  According to the CFTC, "[a]ll of a trader's reported futures positions in a commodity are classified as commercial if the trader uses futures contracts in that particular commodity for hedging."[339]  At the opening of the April 20, 2020, trading session, 46% of the long open interest was held by commercial traders.[340]  Furthermore, non-commercial traders could also hedge OTC financial instruments such as commodity swaps that rely on the CME WTI futures price.

### C.  Mish Is Not Representative of Putative Class Members

262.    The circumstances and trading activity of named plaintiff Mish diverge substantially from those of the overwhelming majority of the accounts identified by Dr. Pirrong as putative class members.  An analysis of the CME Audit Trail data for ▮▮▮▮▮▮ putative class members' accounts, as well as an evaluation of the alleged damages of these accounts based on Dr. Pirrong's price artificiality estimates, reveals that Mish's experience is not representative of the alleged damages caused to accounts identified by Dr. Pirrong as putative class members. Moreover, Mish's trading sequence and stated trading rationale reflects trading decisions that do not align with the majority of putative class members.  This in turn suggests that Mish still would have incurred losses even absent Trader Defendants' allegedly manipulative trading.

263.    While Dr. Pirrong's price artificiality estimates are flawed (as detailed in Sections VII and VIII above), and any accurate assessment of class membership, injury, and calculation of damages would require individualized inquiry (as explained in Section IX.A above), his methodology can still be instructive for the purposes of testing whether Mish is a suitable class representative.  Applying Dr. Pirrong's methodology to the CME Audit Trail data, as shown in

---

[339] "Commitment of Traders, Explanatory Notes," CFTC,
https://www.cftc.gov/MarketReports/CommitmentsofTraders/ExplanatoryNotes/index.htm ("All of a trader's reported futures positions in a commodity are classified as commercial if the trader uses futures contracts in that particular commodity for hedging as defined in CFTC Regulation 1.3, 17 CFR 1.3(z).").
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Pirrong Deposition, 111:21–112:4.
[340] 49,430 / 108,593 = 46%. *See* "Interim Staff Report: Trading in NYMEX WTI Crude Oil Futures Contract Leading Up To, On, and around April 20, 2020," CFTC, November 23, 2020, https://www.cftc.gov/node/235761, Tables 2, 3.

Figure 25 below, demonstrates that TAS transactions account for roughly ███ of Dr. Pirrong's alleged aggregate damages.

## Figure 25



Source:  CME; Pirrong Report and Backup Materials
Note:  Alleged damages (benefits) are calculated as the quantity sold (bought) multiplied by the alleged artificiality of the instrument at the time of the transaction based on Figure 14 of the Pirrong Report until ██████████ After ████████ artificiality is calculated as the difference between the "but-for" price as of ████████ and the transaction price.  The "but for" price is the midpoint based on Dr. Pirrong's best bid and offer (BBO) data production less artificiality.  Alleged damages and benefits are aggregated within an account.  Alleged TAS damages are calculated based on the artificiality as of 1:30 PM.  Artificiality of May-July 2020 WTI futures spread and May-July 2020 WTI futures TAS spread are calculated based on the artificiality of the non-TAS May Contract and TAS May Contract respectively.

264.    Furthermore, according to available contemporaneous records and deposition testimony, ████████████████████████████████████████████████████████[341] Despite the abundance of public sources warning of potential negative WTI futures prices, including *five* notices from the CME, ██████████████████████████████████ ██████████████████[342]

265.    As depicted in Figure 26 below, at ████████ Mish placed a buy order for ██ non-TAS May Contracts.  The market filled this order within ████████ at a price of ██████ less than ████████ before the price went negative.[343]  Mish's stated trading rationale for its purchase of ██ May Contracts was that ████████████████████████████████ ████████████████████████████████████████████

[341] ████████████████████████████████████████████ Plaintiff_Mish_0000948–55 at 48; ██ Plaintiff_Mish_0001040–44 at 40 ████████████████████████████████ Deposition of Robert Mish, December 20, 2023 ("Mish Deposition"), 175:14–15 ████████████████████████████

[342] ████████████████████████████████████████████████████████████████████████████████████████

[343] Plaintiff_Mish_0000638.xlsx.

████████████████████████████████████████ [344] Consistent with this belief, approximately ████████ after its purchase, at ██████████ Mish placed an offer to sell these ██ May Contracts at a price of ██████ [345] However, the price continued to decline and at ██████ the price fell below zero, causing ██████████████████████████████████ ███████████████████████████ [346] Approximately eight minutes later, at ██████████ Mish liquidated its ██ May Contracts at ████████████████ [347]

---

[344] ████████████████████████████████████████████████████████

[345] Plaintiff_Mish_0000638.xlsx. ███████████████████████████████████

[346] Deposition of Justin Boshnack, December 18, 2023 ("Boshnack Deposition"), 186:8–12; Mish Deposition, 374:14–15.
[347] Plaintiff_Mish_0000638.xlsx; CME Audit Trail data.

## Figure 26



Source: CME; Pirrong Report and Backup Materials
Note: The price of the May Contract first traded below zero at ▮▮▮ on the CME. The daily settlement period is 1:28 PM to 1:30 PM. The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period. Trading halts at 4:00 PM each business day and resumes at 5:00 PM. Mish sold ▮ contracts at ▮▮▮ exiting its position. The but-for price for the "TVP-VAR Model Through ▮▮▮ series is based on Pirrong Report's Figure 14 through ▮▮▮ The but-for price for the ▮▮▮ series between ▮▮▮ and 1:30 PM is equal to Pirrong's Figure 14 artificiality at ▮▮▮ plus the cumulative change in the May Contract midpoint since ▮▮▮ plus the midpoint. When the midpoint is unavailable, which can happen for example during a market halt or a lack of buy side or sell side liquidity, the last available midpoint is used. The midpoint is based on Dr. Pirrong's backup file *VegaBBOCLKAll.xlsx.*

266.    Assuming Mish's trading rationale remained unchanged, it would have incurred losses even absent Trader Defendants' alleged manipulative actions. Any claim that Mish would not have lost as much money in the but-for world is speculative. Dr. Pirrong testified that ▮▮▮ ▮▮▮

█████████ [348] Figure 27 below shows Dr. Pirrong's hypothetical "but-for" price—what the price of the May Contract would have been absent Trader Defendants' purported manipulative actions—using Dr. Pirrong's cumulative price artificiality estimates. Even without Trader Defendants' alleged price impact, the price of the May Contract would have dropped below $0 at approximately ████████ and would have remained negative through the end of the proposed class period. If Mish traded according to the strategy it outlined at deposition, █████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ This would still have resulted in losses as prices went negative. Mish's losses are therefore attributable to ████████████████████████████████████ rather than to Trader Defendants' alleged conduct. These same types of issues need to be addressed for each putative class member, because prices would have still gone negative in Dr. Pirrong's but-for world.

---

[348] Pirrong Deposition, 242:1–17 ████████████████████████████████████████ ██████ 303:12–21 ██████████████████████████████████████████ ████████████████████████████████████████████

**Figure 27**



Source:  Pirrong Report and Backup Materials
Note:  The but-for price for the "TVP-VAR Model Through ▮▮▮▮▮▮" series is based on Pirrong Report's Figure 14 through ▮▮▮▮▮▮▮  The but-for price for the series between ▮▮▮▮▮ and 1:30 PM is equal to Pirrong Report's Figure 14 artificiality at ▮▮▮▮▮▮ plus the cumulative change in May 2020 CME WTI futures midpoint since ▮▮▮▮▮ plus the midpoint.

267.    The CME Audit Trail data suggest that Mish's trading decisions do not align with the majority of accounts Dr. Pirrong claims are part of the alleged class.  Figure 28 shows that only ▮ of the ▮▮▮ putative class members (or approximately ▮▮, including Mish, exhibited trading activity that was analogous to Mish's, in that they *only* traded non-TAS contracts intraday, buying at both positive prices and selling equal quantities shortly after prices turned negative. On the other hand, of the ▮▮▮ purportedly harmed putative class members' accounts, ▮▮▮ accounts—representing ▮▮ of Dr. Pirrong's alleged aggregate damages—traded TAS contracts. Similarly, ▮▮ accounts—or over ▮▮▮ of accounts Dr. Pirrong claims are part of the alleged class—*only* traded prior to 10:00 AM, ▮▮▮▮▮▮ before prices went negative.[349]

---

[349] There are ▮▮ purported class members who are unharmed according to Dr. Pirrong's methodology of applying his price artificiality estimates to the CME Audit Trail Data.

**Figure 28**



Source:  CME; Pirrong Report and Backup Materials
Note:  Putative class member accounts are pulled from Pirrong's backup files
*ClassMembersNegativeZeroStartAccts.xlsx* and *TotalQtySalesAccts.xlsx*.  The category "Trading behavior analogous
to Mish" includes traders who bought while the WTI May-20 price was positive, sold while WTI May-20 prices
were negative, did not transact during the purported ████████ and bought and sold in equal amounts during the
proposed class period.  The category "No TAS, Other" includes traders who did not trade TAS during the proposed
class period and who did not meet the criteria for any other category.

268.    In sum, the overwhelming majority—almost ████ of damages claims are predicated on
the impacts of trading TAS contracts, while Mish only traded non-TAS contracts.  Contrary to
public information at the time, Mish's trading decisions, ███████████████████████████
██████████████████ do not align with the vast majority of putative class members and
suggest that Mish would have incurred losses even absent Trader Defendants' alleged
manipulative actions.

## X.   Each Trader Defendant's Trading Pattern is Consistent with Speculating and Providing Liquidity, Not Manipulation

269.    Plaintiff asserts that Trader Defendants manipulated the market for May Contracts by "[exerting] significant cumulative net selling pressure on [this] futures contract over a specific time period."[350]   In particular, Plaintiff alleges that "[Trader] Defendants agreed to and did use their sales as manipulative 'ammo' to depress May Contract prices."[351]   Dr. Pirrong purports to find supportive evidence of this alleged manipulative scheme and contends that "Trading Defendants' conduct was uneconomic," "coincided exactly with trade-based manipulative conduct," and that "there is no plausible non-manipulative rationale for their trading behavior."[352] He claims that "[Trader Defendants'] trading conduct was not consistent with economically beneficial speculative, hedging, or market making behavior."[353]   However, as shown in this section, these claims are systematically rebutted using calculations, market conditions, and market operation facts.[354]

270.    In Section X.A, I explain that Plaintiff and Dr. Pirrong ignore that each of the Trader Defendants' trading patterns is consistent with speculative trading that profits from a decrease in prices on April 20, 2020.  The trading pattern is profitable if selling non-TAS contracts prior to settlement occurs at higher prices than purchases at settlement via the TAS contracts.  This type of trading pattern can be profitable *without* the need to involve any type of manipulation.

271.    In Section X.B, I explain that ████████████████████████████████ ████████████████████████████████████████████████████████████████



████████████████ are consistent with decreasing prices over the course of the day.  Each Trader Defendant's speculative trading pattern is consistent ███████████████████████████

---

[350] Second Amended Complaint, ¶ 2.a.
[351] Second Amended Complaint, ¶ 2.b.
[352] Pirrong Report, ¶¶ 284, 322.
[353] Pirrong Report, ¶ 284.
[354] Furthermore, ███████████████████████████████████████████████████ ██████████████████████████████████████████   *See* Pirrong Deposition, 224:23–225:9 ████████████████████████████████████████████████████████████████████ ██████████████████   Not only is Dr. Pirrong's methodology incapable of distinguishing Trader Defendants' manipulative from non-manipulative trading but adapting his model to distinguish the price impact associated with manipulative trades would require differentiating manipulative from non-manipulative trades in the vector of his TVP-VAR model.  This would further increase the number of parameters to be estimated and Dr. Pirrong's model would therefore likely present even more serious robustness issues (*See* discussion in Section VII.D).

272.     In Section X.C, I show that each Trader Defendant's trading pattern was profitable absent the alleged manipulative scheme, which directly contradicts Dr. Pirrong's argument that Trader Defendants' trading was not economically reasonable without the alleged manipulation.

273.     In Section X.D, I discuss Dr. Pirrong's prior academic work on TAS manipulation.  Dr. Pirrong's prior writings about TAS-related manipulative trading patterns state that the manipulating party should execute the majority of non-TAS contracts during the settlement window.  ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████[355]

274.     In Section X.E, I explain that it is not manipulative per se to use aggressive orders, yet in this matter Dr. Pirrong describes "aggressive" selling at any time during the day by Trader Defendants as manipulative.  Dr. Pirrong fails to explain that *all* executed trades in the futures market consist of an "aggressive" and a "passive" order.  Further, using aggressive orders during the extreme market conditions on April 20, 2020 is consistent with attempting to ensure execution in a rapidly changing market, which is particularly true when Trader Defendants are immediately hedging using TAS purchases.[356]

### A.  Trader Defendants' Buying TAS and Selling Non-TAS Contracts during the Proposed Class Period Is Consistent with Speculating on a Price Decrease



275.     As explained in more detail in Section XI below, Trader Defendants ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████[357]  This type of trading pattern aims to profit from a decrease in prices over the course of the day.[358]  Put differently, a trader that pursues this type of trading pattern profits if they sell at a higher price in the non-TAS market than the settlement

---

[355] *See* Workpaper 28.

[356]  As mentioned in Section VII.A above, only ████ of non-aggressive (or passive) orders executed during the proposed class period.

[357] Trader Defendants ██████████████████  I refer to Trader Defendants ████████████████████ as "selling non-TAS contracts."

[358] I note that there is one Trader Defendant ██████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████ is pointed out by Dr. Pirrong in ¶ 351 of his report, in which he refers to Trader Defendants █████████████

price they will purchase at using TAS contracts.  The trader is therefore speculating that prices will decrease between the time they sell the asset and the time they purchase it at settlement. This type of trading pattern can be profitable *without* the need to involve any type of manipulation (including "trade-based manipulation" alleged by Dr. Pirrong).[359]  This type of trading pattern is not without risk.[360]  Prices can quickly increase, and traders can incur losses rather than gains.

276.    Figure 29 shows an example of the trading of one Trader Defendant (Aristos Demetriou) on April 20, 2020.



(see Exhibits 1 to 6 in **Appendix D**).

---

[359] In his deposition, ████████████████████████. *See* Pirrong Deposition, 378:7–17 ████████████████████████████ 355:14–24 ████████████████████████ 373:11–374:1.

[360] Pirrong Deposition, 392:7–17 ████████████████████████████

[361] This is an example chart.  The charts for the other Trader Defendants can be found in Exhibits 1 to 6 in Appendix D; they confirm that ████████████████████ *See* VEGA_MISH_000042650–73 at 61.

Highly Confidential

**Figure 29**



Source: CME
Note: The price of the May Contract first traded below zero at ▮▮▮▮▮ on the CME. The daily settlement period is 1:28 PM to 1:30 PM. The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period. Trading halts at 4:00 PM each business day and resumes at 5:00 PM.

277. In sum, Trader Defendants' speculative trading patterns differ but each of the patterns profits if prices decrease. This profit occurs in scenarios without any alleged market manipulation. If prices had increased over the course of the day, each Trader Defendant would have experienced losses. The binary outcome of profiting when prices decrease and losing when prices increase is consistent with speculation.[362]

---

[362] I note that prices on this day were volatile throughout the trading day. That means that Trader Defendants might have lost on some trades and gained on others.

**B. Each Trader Defendant's Speculative Pattern Is Consistent with the Large TAS Order Book Imbalances**

278.    In addition to all the factors contributing to decreasing crude oil prices described in Section V, ███████████████████████████████████████████████████ ████████████████████ were consistent with decreasing prices.

279.    As Dr. Pirrong acknowledges, ████████████████████████████ ██████████████████████████████████████████████████████████████████████ ███████████████████[363]  Market participants, like Trader Defendants, gain information from order book imbalances and liquidity when deciding how to trade, and a sell side imbalance is consistent with more market participants expecting prices to fall.  These imbalances were therefore consistent with each Trader Defendant's trading pattern.

280.    Below are exhibits depicting █████████████████████████████ ████████████████████████  This provides a visual to see what the traders were seeing.  As explained above in Section V.C.2, a market participant can look at the order book and understand the unfilled aggregate quantity and prices at which other market participants are willing to trade.[364]  If, for whatever reason, one side of the order book (e.g., the buy side) is showing less order book depth than the other side (e.g., the sell side), there is said to be an "order book imbalance."  Market participants gain information from order book imbalances and order book liquidity when deciding on how to trade.[365]  For example, when an order book shows a sell side imbalance—meaning more orders have been submitted to the sell side than the buy side—traders typically infer that prices in the relevant instrument are about to decrease as there are more sellers than buyers in the market.  The opposite holds true if a market shows an imbalance on the buy side.[366]

281.    Dr. Pirrong correctly observes that the day at issue experienced ██████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████



---

[363] Pirrong Report, ¶ 125.

[364] Harris (2003), pp. 117, 118.

[365] Jonathan Brogaard, Terrence Hendershott, and Ryan Riordan, "Price Discovery without Trading: Evidence from Limit Orders," *The Journal of Finance* 74, no. 4 (2019): 1621–1658.

[366] For examples of how order imbalances predict future price movements, see Rama Cont, Arseniy Kukanov, and Sasha Stoikov, "The Price Impact of Order Book Events," *Journal of Financial Econometrics* 12, no. 1 (2014): 47–88.  *See also* Charles Cao, Oliver Hansch, and Xiaoxin Wang, "The Information Content of an Open Limit-Order Book," *Journal of Futures Markets: Futures, Options, and Other Derivative Products* 29, no. 1 (2009): 16–41.



282.    Figure 30 shows the daily order book imbalance on each day leading up to April 20, 2020, with orange shades reflecting sell interest and blue shades reflecting buy interest.

283.    Moreover, as discussed in Section IX.C, even Dr. Pirrong's TVP-VAR model suggests that prices would have declined over the course of the day and dropped below zero without any purported manipulation by the Trader Defendants.  Assuming for the sake of argument that Dr. Pirrong's TVP-VAR model accurately reflects price dynamics during the proposed class period (which I disagree with), this supports that each Trader Defendant's trading pattern was consistent with decreasing prices during the relevant period.

---

[367] Pirrong Report, ¶ 125.
[368] I note that order book imbalance is another factor that is not included in Dr. Pirrong's TVP-VAR model.
[369] *See* Workpaper 29.
[370] *See* Workpaper 30.

**Figure 30**



Source: CME

Note: Midpoint refers to the midpoint of the highest bid and lowest offer prices. Buy (sell) quantity is calculated as the total bid (offer) volume at or above (below) 1 tick (2 ticks, 5 ticks) of the midpoint price. For example, if the midpoint price were $1, the buy quantity within 1 tick of the midpoint would be calculated as the total volume between $0.99 and $1. Likewise, the sell quantity within 1 tick of the midpoint would be calculated as the total volume between $1.01 and $1. CME TAS markets are closed between 1:30 PM and 5:00 PM every weekday. Data are not plotted between Friday at 4:00 PM and Sunday at 4:00 PM while CME markets are closed for the weekend. Markets open at 5:00 PM Sunday through Thursday. Quantities are snapshots of depth taken at one-minute intervals.

## C. Contrary to Dr. Pirrong's Assertions of Economically Irrational Trading, Trader Defendants' Trading Patterns Were Profitable Absent the Alleged Manipulation

284.    When calculating Trader Defendants' profits and using Dr. Pirrong's but-for price that removes alleged artificiality (instead of the actual transaction prices for Trader Defendants' trades), each of the Trader Defendants still earned a profit. This directly contradicts Dr.

Pirrong's allegations that Trader Defendants' actions would not have been economic absent the alleged manipulation.

285.     Dr. Pirrong supports Plaintiff's claims that "[Trader] Defendants intentionally caused the price of May 2020 Crude Oil Futures to be artificially low by making sales of May 2020 Crude Oil Futures and May 2020 Crude Oil Futures Spreads on April 20, 2020 that would have been uneconomic but for Trader Defendants' ability to profit on purchases of TAS contracts."[371]  In addition, Dr. Pirrong purports that "selling the ICE contract was more economically attractive than selling the CME contract: in essence, the Trading Defendants were selling low, rather than selling high, which competitive, non-manipulative traders would not do."[372]  He also asserts that "if the Trading Defendants truly wanted to offset the exposures they had assumed by buying CME Crude Oil Futures TAS contracts, it would have been more profitable to do so by selling ICE contracts instead of CME contracts."[373]

286.     However, Dr. Pirrong fails to acknowledge that Trader Defendants' trading pattern was profitable absent the alleged manipulation.  Applying Dr. Pirrong's but-for price—which I assume to be accurate for the sake of argument—I find that each of the Trader Defendant's profits were still positive (see Figure 31).  In fact, using Dr. Pirrong's but-for price, I find that Trader Defendants' aggregated profits would have been between ████████ and ████████ (see Figure 31).  For robustness I use two different scenarios regarding Dr. Pirrong's but-for price during his purported ████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████  In both scenarios, each Trader Defendant's trading remains profitable.  Dr. Pirrong is therefore not correct when he claims that Trader Defendants' trading was "uneconomic" and therefore must be manipulative.

---

[371] Pirrong Report, ¶¶ 76–77.  *See also*, Pirrong Report, ¶¶ 6–7, 228.
[372] Pirrong Report, ¶ 319.
[373] Pirrong Report, ¶ 319.

**Figure 31**



Source:  Pirrong Report and Backup Materials
Note:  But-for profits are calculated as the quantity traded times the but-for price under each scenario.  The but-for price for the "Using Dr. Pirrong's Figure 14 Artificiality Through 1:30 PM" series is based on the Pirrong Report's Figure 14 through 1:30 PM.  The but-for price for the ▮▮▮▮▮▮▮▮▮▮ series before ▮▮▮▮▮▮ is based on Pirrong Report's Figure 14.  Between ▮▮▮▮▮▮ and 1:30 PM, the but-for price is equal to the May Contract midpoint, minus Dr. Pirrong's Figure 14 artificiality at ▮▮▮▮▮▮ plus the cumulative change in the in May Contract midpoint since ▮▮▮▮▮▮  When the midpoint is unavailable, which can happen for example during a market halt or a lack of buy side or sell side liquidity, the last available midpoint is used.  The midpoint is based on Pirrong's backup files VegaBBOCLKAll.xlsx, VegaBBOCLMAll.xlsx, VegaBBOCLNAll.xlsx.

287.     Separately, Dr. Pirrong's claim that "it would have been profitable for the Trading

Defendants to buy CME contracts and sell ICE contracts"[374] is incorrect for at least two reasons.

First, functionally trading on ICE does not offset a CME TAS position.  ICE and CME are

different exchanges, and trading on one exchange does not offset positions on the other.  This is

true for Trader Defendants as well as all other market participants.  Second, even if somehow

---

[374] Pirrong Report, ¶ 319.

ICE trading offset CME positions, on April 20, 2020, ICE had "virtually stopped trading" and had insufficient liquidity.

288.    Trading in the ICE contract *may not have been feasible* given a lack of liquidity. 

289.    In sum, Trader Defendants' trading patterns were profitable absent the alleged manipulation, which directly contradicts Plaintiff's and Dr. Pirrong's assertion that Trader Defendants' trading was manipulative because it was uneconomic.  Further, Dr. Pirrong's claim that Trader Defendants should have traded on ICE to offset positions on CME is wrong and functionally cannot occur because these are two separate exchanges.

### D.  The Timing of Trader Defendants' Sales Is Inconsistent with Settlement Price Manipulation

290.    Based on Dr. Pirrong's own academic work about settlement price manipulation and related prior legal matters, the timing of Trader Defendants' sales is not consistent with settlement manipulation.

291.    In his report, Dr. Pirrong cites to a working paper he wrote on "Derived Pricing: Fragmentation, Efficiency, and Manipulation" in 2019.[377]  He claims to show "how the existence of TAS markets create[s] manipulative opportunities" and "presents an example of manipulation of TAS contracts by the trading firm Optiver in 2008" whereby Optiver sells the majority of its



[375]
[376] Pirrong Deposition, 277:15–278:5

[377] Pirrong Report, footnote 39.

non-TAS contracts during the settlement period to enact manipulation.[378]  Dr. Pirrong

summarizes the Optiver matter as follows:[379]

> Optiver would usually accumulate the bulk of its TAS position during the
> morning of the settlement day.  If it obtained a sufficiently large TAS position,
> starting about 2:25 (three minutes prior to the beginning of the settlement
> window) Optiver began to trade heavily in the underlying … in the opposite
> direction as its TAS position through market orders.  Optiver's volume during the
> 2:25-2:30 period was roughly equal to the size of the TAS position it had
> accumulated.  Optiver traded so that approximately 25 percent of its volume was
> executed from 2:25-2:27:59, and the remainder during the settlement period.  *It
> intended that its volume during the 2:28-2:29:59 settlement window would
> represent such a large fraction of total volume during this period that its average
> execution price during this period would approximately equal the VWAP, and
> thus the settlement price.*

292.     In other words, both Dr. Pirrong's theoretical model and the Optiver matter suggest that if

an entity was trying to depress the TAS settlement price, the most impactful way would be to

concentrate sales during the settlement window.  As I describe in detail in Section XI.A and as

Dr. Pirrong confirmed in his deposition,[380] ███████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████[381]  Further, in contrast to the TAS trade-based

manipulation described in Dr. Pirrong's 2019 article, Trader Defendants ███████████

█████████████████████████████████████████████████████████████

████████[382]

---

[378] Craig Pirrong, "Derived Pricing: Fragmentation, Efficiency, and Manipulation," Working Paper (2019), pp. 2, 16–17.

[379] Craig Pirrong, "Derived Pricing: Fragmentation, Efficiency, and Manipulation," Working Paper (2019), pp. 16–17 (emphasis added).

[380] Pirrong Deposition, 85:6–12 ████████████████████████████████████████████


[381] *See* Workpaper 28.

[382] Craig Pirrong, "Derived Pricing: Fragmentation, Efficiency, and Manipulation," Working Paper (2019), pp. 13 – 14.  *See also* Pirrong Deposition, 85:6–12 ████████████████████████████████████

is pointed out by Dr. Pirrong in ¶ 351 of his report, in which he refers to Trader Defendants ████████████████████  *See* Workpaper 31.

293. Instead, Trader Defendants ██████████████████████████████████

██████████████[383] Specifically, Trader Defendants ████████████████



294. Dr. Pirrong has no explanation for why Trader Defendants, who were supposedly trying to drive the settlement price lower, would ████████████████████████████████████

████████████████

295. Further, in the Optiver case, Dr. Pirrong attributed a lack of price reversal to "permanent price impact" due to the manipulative conduct.[388] Contrary to the Optiver matter in which prices did not reverse after the settlement window, Dr. Pirrong claims that prices reversed after the settlement window on April 20, 2020.[389]

296. In sum, Plaintiff's and Dr. Pirrong's claims regarding Trader Defendants' allegedly manipulative trading behavior are *inconsistent* with how Dr. Pirrong himself has outlined, in theory and through examples, the ways in which traders can profit from trading TAS manipulatively.

### E. Aggressive Limit Orders Are Not Themselves a Sign of Manipulation, but Rather Are Consistent with Trader Defendants' Difficulty Executing in an Illiquid and Fast-Moving Market

297. Setting aside Dr. Pirrong's prior paper describing how selling during the settlement period is a method for manipulation, in this matter Dr. Pirrong describes "aggressive" selling at any time during the day by Trader Defendants as manipulative. In his report, Dr. Pirrong describes Trader Defendants' trading ████████████████████████████████████

████████████████████████████████████████

---

[383] *See* Workpaper 28.
[384] *See* Workpaper 32.
[385] *See* Workpaper 32.
[386] *See* Workpaper 32.
[387] *See* Workpaper 32.
[388] Craig Pirrong, "Derived Pricing: Fragmentation, Efficiency, and Manipulation," Working Paper (2019) pp. 19, 21–22.
[389] Pirrong Deposition, 87:10–18 ████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████[390] Dr. Pirrong contends that
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

████████[391] Dr. Pirrong also contends that Trader Defendants' ████████████████

███████ sales on April 20 had an increasingly depressive effect on May Contract prices and

increasingly exacerbated the order imbalance in the May Contract."[392] He claims that Trader

Defendants ████████████████████████████████████████

██████████████████████████████████[393] From his observations of Trader

Defendants' trading patterns, he concludes that their "actions … mirrored exactly the conduct of

an entity implementing what economists define as a trade-based manipulation strategy utilizing

TAS contracts."[394]

298.    As a basic matter, Dr. Pirrong does not provide a threshold for how large a share a market

participant has to have in terms of (aggressive) trading volume to be considered indicative of

manipulative trading. ████████████████████████████████████

██████████████████████████ ████████████████████████████

████████████████████████████████████████████████

██████████████████████████[396] Yet, as discussed above, Dr. Pirrong does not offer any

methodology to establish which trading was or was not manipulative. █████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████[397] His opinion regarding Trader Defendants' percentage of aggressive

trades therefore lacks any basis.

299.    In addition to this fundamental flaw in his approach, Dr. Pirrong does not explain that *all*

trades in the futures market—that is, every single trade—consists of an "aggressive" and

"passive" order.  Just because the word "aggressive" is used to describe an order, it does not

---

[390] Pirrong Report, ¶ 314.
[391] Pirrong Report, ¶ 288.
[392] Pirrong Report, ¶ 13.c.
[393] Pirrong Report, ¶ 16.
[394] Pirrong Report, ¶ 321.
[395] Pirrong Deposition, 330:24–331:10.
[396] Pirrong Deposition, 330:24–331:10.
[397] Pirrong Deposition, 331:11–332:13.

mean it is nefarious.  Without an "aggressive" order, no trades would ever occur since together aggressive and passive orders make a trade.

300.    Orders that can immediately execute are called "aggressive."  This means all market orders are aggressive, and limit orders that can immediately trade are aggressive.  Orders that do not immediately trade are called "passive," which are limit orders that make up the resting liquidity of the order book.[398]

301.    Without the use of "aggressive" orders, certain Trader Defendants may not have been able to offset their TAS purchases and may not have returned to an overall neutral position by the end of the trading day.  Put simply, aggressive trading can be necessitated by market conditions, rather than being a tell-tale sign of manipulative intent, as Dr. Pirrong tries to claim.[399]  As explained in more detail in Section XI below, ████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

302.    Dr. Pirrong also ignores that Trader Defendants' speculative trading patterns were dependent on the *successful* execution of (i) orders to purchase TAS contracts, and (ii) orders to sell non-TAS contracts.  The speculative trading patterns would have been jeopardized if any of these types of orders did not execute.  For example, if a Trader Defendant had bought a TAS contract but had not managed to sell an outright contract prior to settlement, they would have faced post-settlement price risk—that is, the risk of prices moving adversely to Trader Defendants' position while they are trying to exit out of their position.  There are two additional benefits of Trader Defendants ending the day without a position.  The first benefit is to not incur the risk of carrying a position overnight, which might incur a loss if there are potential price fluctuations that occur after the market closes and before it opens the next day.  The second benefit stems from the at-issue day being one day before the expiration of the contract maturity. If Trader Defendants had ended the day with an open position, they would have needed to exit the position on the next day since Trader Defendants were not set up to make or take delivery of crude oil.  Any market participants holding positions at the close of trading on April 21, 2020,

---

[398] Harris (2003), p. 75.
[399] ███████████████████████████ *See* Pirrong Deposition, 389:21–390:5 █████████ ████████████████████████████████

were making or taking delivery.  The last day of trading in a contract tends to have limited liquidity, making the risk of adverse price movements a possibility for Trader Defendants.

303.    Setting aside that aggressive trades are not inherently manipulative, I find that Dr. Pirrong incorrectly claims that Trader Defendants ████████████████████████



304.    Setting aside the incorrect representations made by Dr. Pirrong, it is important to recognize the market environment in which the disputed activity took place.  April 20, 2020, is an example of an extremely volatile market environment with rapidly declining prices in the middle of a global pandemic.  In a volatile market environment that is characterized by (rapidly) declining prices, these declining prices often lead to more aggressive selling as traders are pressured to sell quickly to avoid further losses or guarantee execution.  This urgency to sell can be particularly acute when the market is subject to numerous trading halts.  The fact that Trader Defendants used aggressive orders does not automatically mean they did so with the objective of maximizing price impact for manipulative purposes.  Instead, using aggressive orders is consistent with an attempt to execute in a rapidly changing market.  Dr. Pirrong fails to acknowledge this, and instead attributes all of Trader Defendants' trades to his construed theory of manipulation.

## XI.    Dr. Pirrong Fails to Offer Analysis Demonstrating Plaintiff's Claims Regarding a Trader Defendant–Coordinated Conspiracy to Manipulate and Depress the Prices of NYMEX Crude Oil Futures Contracts

305.    Both Plaintiff and Dr. Pirrong allege that Trader Defendants engaged in a coordinated conspiracy to manipulate and depress prices, and they attempt to support their claims by

---

[400] Pirrong Report, ¶¶ 19, 21.
[401] *See* Workpaper 33.
[402] *See* Workpaper 32.

presenting a "correlation"[403] and ████████████████████[404] analysis. Plaintiff alleges that from "at least as early as April 2020, the Vega [Trader] Defendants[] combined, conspired, and agreed to depress on April 20, 2020 prices of the May 2020 [WTI] contract."[405] Dr. Pirrong contends that Trader Defendants' alleged manipulative conduct followed the pattern of "[f]irst, the purchase of TAS contracts. Second, the sale of the instruments underlying the TAS contracts. To maximize price impact, sell the underlying instruments aggressively, that is, by taking liquidity."[406] Dr. Pirrong further claims that ████████████████████████[407]

306.    Below I discuss substantial problems with Plaintiff's and Dr. Pirrong's claims of a coordinated trading conspiracy based on my review of their analyses and the produced data. To summarize:

- Contrary to Plaintiff's and Dr. Pirrong's claim, Trader Defendants ████████████ ████████████████████████████████████████████████ ████████████████████████████████████

- Contrary to Plaintiff's and Dr. Pirrong's claim, Trader Defendants' ████████████ ████████████████████████████████████████████ ████████████████████████████

- Plaintiff's "correlation" analysis is incomplete and methodologically flawed.

    o    First, the analysis presented in the Second Amended Complaint only includes a subset of the Trader Defendants and is therefore incomplete.[408]

    o    Second, Plaintiff's analysis is methodologically flawed because Plaintiff claims to assess if "Trader Defendants engaged in coordinated trading"[409] but instead of assessing "coordinated trading," Plaintiff analyzes correlation in coordinated position levels. Revising Plaintiff's correlation analysis to be conducted on trading instead of position levels for the six Trader Defendants specified in the

---

[403] Second Amended Complaint, ¶ 141; Pirrong Report, ¶¶ 294–295.
[404] Pirrong Report, ¶¶ 294–295.
[405] Second Amended Complaint, ¶ 1.
[406] Pirrong Report, ¶¶ 284–285.
[407] Pirrong Report, ¶ 287.
[408] *See* Plaintiff_Mish_0000028. I note that the file includes ████████████████████████ ████████
[409] Second Amended Complaint, heading C.2, "The Vega Trading Defendants Engaged in Coordinated Trading In WTI Crude Oil Futures Contracts A Month Prior to Engaging in Substantially Similar But More Extreme Conduct on April 20, 2020." *See also* Second Amended Complaint, ¶ 286.

Second Amended Complaint, the average correlation falls from ▇ to ▇ [410]
Correcting the analysis to include all Trader Defendants (not just a subset like
Plaintiff does) reduces the average correlation from ▇ to ▇ [411]

o   Third, interpretation of the correlation analysis is rendered meaningless ▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇

• ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇   Moreover, Dr. Pirrong does not offer any hypothesis about Trader Defendants'
trading patterns that he purports to test statistically.  By lacking testable hypotheses, Dr.
Pirrong's analysis becomes unscientific and his opinions arbitrary.

307.    Each of these findings are described in more detail below.

### A.  Contrary to Dr. Pirrong's Assertions, Trader Defendants' Trading Patterns Varied Substantially

308.    Based on my review of Trader Defendants' trading data, ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ as I discuss in Section XI.B. ▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇



---

[410] I note that it is not entirely clear how Plaintiff arrived at its Trader Defendant minute-by-minute positions.  I have therefore run my own analyses, which may differ slightly from Plaintiff's analysis.  *See* Workpaper 34.
[411] *See* Workpaper 34.
[412] Pirrong Report, ¶¶ 294–295.



309.    Figure 32 below plots each of the Trader Defendants' net May Contract positions on April 20, 2020. ███████████████████████████████████████████████████████████

██████

[413] *See* Workpaper 35.  *See also* Figures 33 to 36; Exhibits 1 to 6 in Appendix D.
[414] ████████████████████████████████████████████████████████████ *See* Pirrong Deposition, 465:8–468:25.
[415] The only exception to this is ████████████████████████████████████ which is consistent with the use of TAS contracts to exit their open positions.

# Figure 32



Source:  CME; VEGA_MISH_000042708.1 (Vega Produced Trade Data)
Note:  The price of the May Contract first traded below zero at ███████ on the CME.  The daily settlement period is 1:28 PM to 1:30 PM.  The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period.  Trading halts at 4:00 PM each business day and resumes at 5:00 PM.  Connor Younger's purchase of ██ contracts after 1:30 PM does not appear in the CME Audit Trail data and is pulled from the VEGA produced trade data.

310.    Figures 33 through 36 show a subset of Trader Defendants' trading on CME in the products at issue on April 20, 2020.  Below I describe these Trader Defendants' trading on the day and, by way of example, illustrate how ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ █████████████████████████████████

311.    Figure 33 shows the cumulative position in barrels and number of contracts of Aristos Demetriou on April 20, 2020,



312.    Figure 34 shows the cumulative position in the same contracts for Connor Younger on April 20, 2020.

313.    Figure 35 shows the cumulative position in the same contracts for Elliott Pickering on April 20, 2020.

---

[416] *See* Workpaper 36.
[417] *See* Workpaper 35.
[418] *See* Workpaper 35.
[419] *See* Workpaper 36.
[420] *See* Workpaper 36.
[421] *See* Workpaper 36.
[422] *See* Workpaper 35.
[423] *See* Workpaper 36.
[424] *See* Workpaper 35.
[425] *See* Workpaper 36.



314.    Figure 36 shows the cumulative position in the same contracts for Matthew Thompson on April 20, 2020. █████████████████████████████████████████████████████████████████

315.    None of Trader Defendants' trading was ██████████████████████████████ ████████████████████████████ which undermines Plaintiff's and Dr. Pirrong's claim that they engaged in a conspiracy to depress prices.

---

[426] *See* Workpaper 36.
[427] *See* Workpaper 36.
[428] *See* Workpaper 36.
[429] *See* Workpaper 36.
[430] *See* Workpaper 35.
[431] *See* Workpaper 35.
[432] *See* Workpaper 36.
[433] *See* Workpaper 36.
[434] *See* Workpaper 36.
[435] *See* Workpaper 35.
[436] *See* Workpaper 35.

## Figure 33



Source:  CME
Note:  The price of the May Contract first traded below zero at  on the CME.  The daily settlement period is 1:28 PM to 1:30 PM.  The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period.  Trading halts at 4:00 PM each business day and resumes at 5:00 PM.

**Figure 34**



Source:  CME; VEGA_MISH_000042708.1 (Vega Produced Trade Data)
Note:  The price of the May Contract first traded below zero at ▮▮▮▮▮ on the CME.  The daily settlement period is 1:28 PM to 1:30 PM.  The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period.  Trading halts at 4:00 PM each business day and resumes at 5:00 PM.  Connor Younger's purchase of ▮ contracts after 1:30 PM does not appear in the CME Audit Trail data and is pulled from the VEGA produced trade data.

# Figure 35



Source:  CME
Note:  The price of the May Contract first traded below zero at ▮▮▮▮▮ on the CME.  The daily settlement period is 1:28 PM to 1:30 PM.  The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period.  Trading halts at 4:00 PM each business day and resumes at 5:00 PM.

**Figure 36**



Source:  CME
Note:  The price of the May Contract first traded below zero at ███████ on the CME.  The daily settlement period is 1:28 PM to 1:30 PM.  The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period.  Trading halts at 4:00 PM each business day and resumes at 5:00 PM.

### B. Contrary to Dr. Pirrong's Assertion, Trader Defendants' Trading Behavior Was Not Unique

316.    Dr. Pirrong further claims that ███████████████████████████[437] to buy TAS contracts and sell non-TAS contracts.  He contends that ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████  Based on my review of the produced data, Dr. Pirrong's claims are incorrect.  The data show other traders with what Dr. Pirrong calls his "elements" of "trade-based manipulation," which is "[f]irst, the

---

[437] Pirrong Report, ¶ 287.
[438] Pirrong Report, ¶ 291.

purchase of TAS contracts.  Second, the sale of the instruments underlying the TAS contracts," and third, "sell[ing] the underlying instruments aggressively."[439]

317.    Dr. Pirrong does not offer any methodology for determining if a trade is manipulative; he simply assumes it for Trader Defendants' trading.[440] ███████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

███████████████    The fact that non-Defendant traders, who are not accused of manipulation (to my knowledge), ████████████████████████████████████    undermines Dr. Pirrong's attempt to portray Trader Defendants' trading as different or manipulative.

318.    Figures 37 through 39 show ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

319.    Figure 37 shows that ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████

---

[439] Pirrong Report, ¶ 285.
[440] Dr. Pirrong relies on his claim that Trader Defendants' behavior was uneconomic without proposing a test to determine whether individual trades were manipulative. *See* Pirrong Report, ¶ 322 ("The absence of a non-manipulative rationale for their trading combined with the close correspondence between their conduct and that of a trade-based manipulator demonstrates that their conduct was uneconomic and manipulative"). Dr. Pirrong then proceeds to assume that all trades conducted by Trader Defendants were manipulative (Pirrong Report, ¶ 334 ("The TVP-VAR model and the CME audit trail data that identifies Trading Defendants' transactions allows me to isolate the price impact of their uneconomic, manipulative aggressive sales")).
[441] *See* Workpaper 37.  I restrict to accounts that had offsetting TAS and non-TAS positions as of 1:30 PM.  When including accounts with TAS purchases and non-TAS sales quantities within 10% of each other at 1:30 PM, there are 42 such accounts.
[442] *See* Workpaper 35.

## Figure 37



Source:  CME
Note:  The price of the May Contract first traded below zero at ███████ on the CME.  The daily settlement period is 1:28 to 1:30 PM.  The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period.  Trading halts at 4:00 PM each business day and resumes at 5:00 PM.

320.    Figure 38 shows that ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████[443]

---

[443] *See* Workpaper 35.

## Figure 38



Source:  CME
Note:  The price of the May Contract first traded below zero at ████████ on the CME.  The daily settlement period is 1:28 to 1:30 PM.  The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period.  Trading halts at 4:00 PM each business day and resumes at 5:00 PM.

321.    Figure 39 shows that ███████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████[444]

---

[444] *See* Workpaper 35.

**Figure 39**



Source: CME
Note: The price of the May Contract first traded below zero at ▮▮▮▮▮▮ on the CME. The daily settlement period is 1:28 to 1:30 PM. The settlement price is based on the VWAP of the outright CME GLOBEX trades executed during this period. Trading halts at 4:00 PM each business day and resumes at 5:00 PM.

### C. The Correlation Analysis Presented in the Second Amended Complaint Is Incomplete and Methodologically Flawed and Does Not Support a Coordinated Conspiracy

322. As detailed below, the correlation analysis presented in the Second Amended Complaint is based on only a subset of Trader Defendants, the analysis does not actually measure the correlation of Trader Defendants' trading behavior, and the analysis has no meaningful interpretation since non-Defendant traders also have similar correlations. When considering all the methodological flaws, the correlation analysis is not reliable or useful for evaluating the allegations and does not support a coordinated conspiracy.

### 1.    The Correlation Analysis Only Includes a Subset of Traders

323.    Setting aside methodological flaws, Plaintiff's conspiracy correlation analysis is based on a subset of traders, and contains material errors that reverse Plaintiff's high correlation conclusions.

324.    Plaintiff uses a "correlation" analysis to ostensibly support an allegation that a conspiracy between Trader Defendants existed to decrease prices because "the five Vega Trading Defendants who build up the largest May Contract short positions, did so in a manner that is extremely highly correlated on a minute-by-minute basis with one another as well as with Defendant Paul Commins' buildup of his May Contract short position."[445]  Specifically the Trader Defendants included in this analysis are Paul Commins, Mr. Younger, Mr. Demetriou, Mr. Pickering, Mr. Roase, and Mr. Lunn.[446]

325.    Plaintiff alleges that correlations for this subset of Trader Defendants ranged from ██████████████████  According to Plaintiff, this is "extremely unlikely to happen by independent decision making or freak occurrence,"[448] and "highly consistent with a very carefully executed agreement to build cumulative net selling pressure on the market in a manner which will succeed in depressing prices."[449]

326.    Plaintiff's correlation analysis is based on calculating correlations only among six Trader Defendants.  If all traders are included, Plaintiff's average correlation decreases from ██ to ██ [450]  But as shown below, even this analysis remains flawed.

---

[445] Second Amended Complaint, ¶ 5.
[446] Second Amended Complaint, ¶¶ 140–142.  I include Paul Commins in this subset because Plaintiff also alleges that "each of the [five Vega Trading] Defendants additions to its positions was highly correlated with those of Defendant Paul Commins." *See* Second Amended Complaint, ¶ 142.
[447] Second Amended Complaint, ¶ 141.  Note this range does not include Paul Commins.
[448] Second Amended Complaint, ¶ 5.
[449] Second Amended Complaint, ¶ 5.
[450] *See* Workpaper 38.  I note that Dr. Pirrong ████████████████████████████████████████████████████████████████ *See* Pirrong Deposition, 488:10–490:7 ████████████████████████████████████████ The average correlation excluding ██████████████████ and ████████ is ████

2.      **The Correlation Analysis of Trader Defendants' Position Levels Is Methodologically Flawed and Uninformative as to Any Purported Trading Conspiracy**

327.    Plaintiff claims to be assessing if "Trading Defendants engaged in coordinated trading"[451] and purports that Trader Defendants "combined and conspired to sell large volumes of May Contracts in the final hours before the settlement price of the May Contract was to be determined."[452]  Yet, the purported correlation analysis does not measure correlation in *trading* as Plaintiff has set out to analyze.  Instead, it measures correlation in position levels.[453]  Correlating position levels provides information on the direction in which a position was accumulated.  To understand if trading activity is similar across market participants, one must analyze the actual trading patterns of these market participants—which is better captured by correlating *changes* in positions (i.e., trade executions). ██████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████[454] Yet, despite the fact that Dr. Pirrong was involved in Plaintiff's correlation analysis,[455] his report analysis does not cover the correlation of Trader Defendants' trading.

328.    This methodological flaw results in vastly inflated correlation figures.  If Plaintiff had actually correlated trading instead of position levels, the analysis would show much lower levels of correlation among Trader Defendants' trading.  The average correlation across the six Trader Defendants' specified in the Second Amended Complaint falls from ████ to ████[456]  If trading correlations for all Trader Defendants are considered, the correlation drops even further to ████[457]

329.    Figures 40 and 41 show that correlations across Trader Defendants' trading instead of position levels are much lower than ████ for both non-TAS and TAS May Contracts. ████

[451] Second Amended Complaint, heading C.2, "The Vega Trading Defendants Engaged in Coordinated Trading In WTI Crude Oil Futures Contracts A Month Prior to Engaging in Substantially Similar But More Extreme Conduct on April 20, 2020."
[452] Second Amended Complaint, ¶ 143.
[453] Pirrong Deposition, 491:11–███████████████████████████████████████████████
[454] Pirrong Deposition, 458:12–23, 498:8–15.
[455] Pirrong Deposition, 488:10–20 ██████████████████████████████
[456] *See* Workpaper 34.
[457] *See* Workpaper 34.

 The average correlation across Trader Defendants is ███ for May non-TAS and ███ for May TAS (see Figure 42 below).

**Figure 40**



Source:  CME
Note:  Correlations are calculated minute-to-minute from 12:00:07 AM to 1:54:07 PM on April 20, 2020.  May legs of May-June and May-July spread contracts are included.

**Figure 41**



Source:  CME
Note:  Correlations are calculated minute-to-minute from 12:00:07 AM to 1:54:07 PM on April 20, 2020.  May legs of May-June and May-July spread contracts are included.

330.    The analysis above demonstrating that correlation across Trader Defendants is substantially lower using trading instead of position levels is also true for different periods of time.  Figures 40 and 41 use the time period in the Second Amended Complaint spanning from 12:00:07 AM to 1:54:07 PM on April 20, 2020.  It is not clear why this time period was chosen.  If I conduct the same calculations for (i) the proposed class period (9:00 AM–1:30 PM), and (ii) the last hour of trading during the proposed class period (12:30 PM–1:30 PM), the conclusions are unchanged.  The findings for the three different time periods are summarized in Figure 42, which reports the average Trader Defendant correlations for position levels and trading for both non-TAS and TAS May Contracts.[458]

## Figure 42



Source:  CME
Note:
[1]  Correlations are calculated minute-to-minute on April 20, 2020, for each account before calculating group averages.  May legs of May-June and May-July spread contracts are included.
[2]  The full period covers the time period used in the Second Amended Complaint analysis:  12:00:07 AM to 1:54:07 PM.
[3]  The proposed class period covers 9:00 AM to 1:30 PM.
[4]  The last hour of proposed class period covers 12:30 PM to 1:30 PM.

331.    Overall, these findings, regardless of the time period shown, demonstrate that Trader Defendants show smaller correlations on trading compared to position levels.

---

[458] *See* Figure 45 backup for detailed trader tables for each of the different time periods.

**3.** **Correlations between Trader Defendants' and Non-Defendant Traders' Trading Are Not Substantially Different than Between Trader Defendants**

332.    As I discuss in Section XI.B, other non-Defendant traders ███████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████ This renders reliance on the correlation analysis meaningless for purposes of assessing the alleged conspiracy among Trader Defendants.  The results contradict Plaintiff's statement that correlations among Trader Defendants are "extremely unlikely to happen by independent decision making" since I identified █████████████████████████████ ███████████████████████ and do not involve allegations of a "carefully executed agreement" to coordinate trading to depress prices.[459]

333.    Figures 43 and 44 show correlations between non-Defendant traders, between Trader Defendants and between non-Defendant traders and Trader Defendants for position levels and trades, respectively.  ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████

334.    In Figure 43 on position levels, for example, the correlation between non-Defendant trader ███████████████████████████████████ The correlation between non-Defendant trader ███████████████████████████████████ These correlations are ████████████████████ correlation that Plaintiff asserts exists between Trader Defendants Henry Lunn and Paul Commins.[460]

---

[459] Second Amended Complaint, ¶ 5.
[460] Second Amended Complaint, ¶ 142.

**Figure 43**



Source: CME
Note: Correlations are calculated minute-to-minute from 12:00:07 AM to 1:54:07 PM on April 20, 2020. May legs of May-June and May-July spread contracts are included.

335.    In Figure 44 on trades, for example, the correlation between non-Defendant trader

 The correlation between non-

Defendant trader  These correlations

are  correlation between Trader Defendants Henry Lunn and

George Commins.

**Figure 44**



Source:  CME
Note:  Correlations are calculated minute-to-minute from 12:00:07 AM to 1:54:07 PM on April 20, 2020.  May legs of May-June and May-July spread contracts are included.

336.    The many correlations in Figures 43 and 44 can be summarized by the average correlation of three different groupings: non-Defendant traders, Trader Defendants and non-Defendant traders, and Trader Defendants (see Figure 45 below).  Across these groupings, ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮

**Figure 45**

Source:  CME
Note:  Correlations are calculated minute-to-minute from 12:00:07 AM to 1:54:07 PM on April 20, 2020, for each account before calculating group averages.  May legs of May-June and May-July spread contracts are included.

337.     Figure 45 along with Figures 43 and 44 show that Plaintiff's correlation analysis is meaningless for purposes of assessing the purported conspiracy.[461]  The examples I provide show correlations between traders not alleged to have engaged in a conspiracy that ███████ to correlations between Trader Defendants alleged to have engaged in a conspiracy.  Overall, reliance on the correlation measure put forth by Plaintiff to infer a conspiracy is improper and unreliable.

### D.  No Analysis Is Presented by Dr. Pirrong That Supports a Coordinated Conspiracy by Trader Defendants

338.     Dr. Pirrong does not appear to present analysis to support a coordinated conspiracy among Trader Defendants.   Dr. Pirrong's



In fact, Dr. Pirrong was not able to point to any academic literature that supports this type of analysis or this type of analysis being used for trading patterns.[464]

339.     Dr. Pirrong contends that Trader Defendants'

[461] The conclusions of the analysis are confirmed when using different time periods.  The additional time periods I analyzed are the proposed class period of 9:00 AM through 1:30 PM and the last hour of trading during the proposed class period (12:30 PM–1:30 PM).  *See* Figure 45 backup.
[462] Pirrong Report, ¶¶ 294–295.
[463] Pirrong Deposition, 384:10–21,
[464] Pirrong Deposition, 382:15–24

383:25–384:9

[465] Pirrong Report, ¶ 294.

████████████████████████████████████████████████

████████████████████████████████████████ ██ █

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ █ ██████████████████████

███████████████████████████████████████████████████

340.    When analyzing Dr. Pirrong's Figure 22, I find that ███████████████████

████████████████████████████████████████████████████

███████ [468]

341.    In fact, █████████████████████████████████████████

██████████████████████████████████████████████████ Figure

46 shows ███████████████████████ in Dr. Pirrong's Figure 22, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ [469]  Dr. Pirrong conveniently ignores this fact, which is not consistent with the conclusions he makes from his chart.

---

[466] Pirrong Report, ¶ 295.
[467] Pirrong Report, ¶ 295.
[468] Pirrong Report, ¶ 295
[469] Pirrong Report, ¶ 295.

**Figure 46**



Source: CME
Note: White stars indicate the net May TAS transactions and net aggressive May non-TAS transactions of Trader Defendants between 5:00 PM on April 19, 2020, and 4:00 PM on April 20, 2020. ████████████████████████████████████████████████████████████████████ May TAS transactions and May non-TAS transactions include May outrights, May-June spreads, and May-July spreads.

342.     Dr. Pirrong uses the word "correlation" in reference to Trader Defendants' trading patterns only once in the body of his report.[470]   Dr. Pirrong stated that he analyzed ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

████ [471]  These correlations are *not* correlations across Trader Defendants or across non-Defendant traders.  Rather, this is simply a correlation between █████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

343.     Finally, Dr. Pirrong's analysis fails to meet the most basic scientific requirement:  Dr. Pirrong does not offer any hypothesis about Trader Defendants' trading patterns that he purports to test statistically.  By lacking testable hypotheses, Dr. Pirrong's analysis becomes unscientific.

344.     In sum, ████████████████ and correlation analysis put forth by Dr. Pirrong do not measure coordination among Trader Defendants, and the conclusions he draws are incorrect.

Executed this 20th of June, 2024

*Terrence J. Hendershott*
_____
      Terrence Hendershott, Ph.D.

---

[470] ███████████████████████████████████████ *See* Pirrong Deposition, 465:18–468:8. ███████████████████████████████████████████████████████████████████████████████████████████████ *See* Pirrong Deposition, 607:13–608:11.  This contradicts an article by Bloomberg—which I understand prompted Plaintiff's filing of the complaint—which claimed that Defendants traded in "unison."  *See* "London Traders Hit $500 Million Jackpot When Oil Went Negative," Bloomberg, August 3, 2020, https://www.bloomberg.com/news/articles/2020-08-04/oil-s-plunge-below-zero-was-500-million-jackpot-for-a-few-london-traders?sref=aHrd9Iuo&embedded-checkout=true.
[471] Pirrong Report, ¶ 295.

**Appendix A**

## Terrence Hendershott
June 2024

Professor
Willis H. Booth Chair in Banking and Finance
Faculty Director, Master of Financial Engineering
Haas School of Business
University of California
Berkeley, CA 94720-1900

phone: (510) 643-0619
fax: (510) 643-1412
hender AT haas.berkeley.edu

### Education

Ph.D., Operations, Information, and Technology, Graduate School of Business, Stanford University, 1999.

B.S., Mathematics and Statistics, Miami University, 1989.

### Publications

- When failure is an option: Fragile liquidity in over-the-counter markets (with Dmitry Livdan, Dan Li, and Norman Schürhoff), *Journal of Financial Economics* 157 (July 2024).
- Transparency in Fragmented Markets: Experimental Evidence (with Marvin Wee and Yuanji Wen), *Journal of Financial Markets* 59 (June 2022), 1-20.
- Asset Price Dynamics with Limited Attention (with Albert Menkveld, Remy Praz, and Mark Seasholes), *Review of Financial Studies* 35 (February 2022), 962-1008.
- Does Financial Market Structure Impact the Cost of Raising Capital? (with James Brugler and Carole Comerton-Forde), *Journal of Financial and Quantitative Analysis* 56 (August 2021), 1771-1808.
- FinTech as a Game Changer: Overview of Research Frontiers (with Michael Zhang, Leon Zhao, and Eric Zheng), *Information Systems Research* 32 (March 2021), 1-17.
- Asset Pricing: A Tale of Night and Day (with Dmitry Livdan and Dominik Rösch), *Journal of Financial Economics* 138 (December 2020), 635-662.
- Relationship Trading in OTC Markets (with Dan Li, Dmitry Livdan, and Norman Schürhoff), *Journal of Finance* 75 (April 2020), 683-734.
- Short Selling and Price Discovery in Corporate Bonds (with Roman Kozhan and Vikas Raman), *Journal of Financial and Quantitative Analysis* 54 (January 2020), 77-115.
- Price Discovery without Trading: Evidence from Limit Orders (with Jonathan Brogaard and Ryan Riordan), *Journal of Finance* 75 (August 2019), 1621-1658.
- High Frequency Trading and the 2008 Short Sale Ban (with Jonathan Brogaard and Ryan Riordan), *Journal of Financial Economics* 124 (April 2017), 22-42.
- Are Institutions Informed about News? (with Dmitry Livdan and Norman Schürhoff) *Journal of Financial Economics* 117 (August 2015), 249-287.
- Click or Call? Auction versus Search in the Over-the-Counter Market (with Ananth Madhavan), *Journal of Finance* 70 (February 2015), 419-447.
- Price Pressures (with Albert Menkveld), *Journal of Financial Economics*, 114 (December 2014), 405-423.
- High-Frequency Trading and Price Discovery (with Jonathan Brogaard and Ryan Riordan), *Review of Financial Studies* 27 (August 2014), 2267-2306. Won Michael J. Brennan Best Paper Award for best paper published in *Review of Financial Studies* in 2015.
- Liquidity provision and stock return predictability (with Mark Seasholes), *Journal of Banking & Finance* 45 (August 2014), 140-151.
- How Slow is the NBBO? A Comparison with Direct Exchange Feeds (with Shengwei Ding and John Hanna), *Financial Review* 49 (May 2014), 313-332.
- High-Frequency Trading and the Execution Costs of Institutional Investors (with Jonathan Brogaard, Stefan Hunt, and Carla Ysusi), *Financial Review* 49 (May 2014), 345-369. Won *Financial Review* Outstanding Publication Award for 2014.
- Levelling the Trading Field (with David Easley and Tarun Ramadorai), *Journal of Financial Markets* 17 (January 2014), 65-93.
- The Intended and Collateral Effects of Short-Sale Bans as a Regulatory Tool (with Ethan Namvar and Blake Phillips), *Journal of Investment Management* 11 (2013), 5-13.

# Appendix A

- Algorithmic Trading and the Market for Liquidity (with Ryan Riordan), *Journal of Financial and Quantitative Analysis* 48 (August 2013), 1001-1024. Won 2013 Philip Brown Prize.
- Informed Trading and Portfolio Returns (with Alex Boulatov and Dmitry Livdan), *Review of Economic Studies* 80 (January 2013), 35-72.
- Automation, Speed, and Stock Market Quality: The NYSE's Hybrid (with Pam Moulton), *Journal of Financial Markets* 14 (November 2011), 568-604.
- Does Algorithmic Trading Increase Liquidity? (with Charles Jones and Albert Menkveld), *Journal of Finance* 66 (February 2011), 1-33. Won New York Stock Exchange Euronext Award for best paper on equity trading, Western Finance Association (2008). Finalist for the Smith-Breeden Prize for best paper published in the *Journal of Finance*.
- Time Variation in Liquidity: The Role of Market Maker Inventories and Revenues (with Carole Comerton-Forde, Charles Jones, Pam Moulton, and Mark Seasholes), *Journal of Finance* 65 (February 2010), 295-331.Won Nasdaq Award for best paper on market microstructure, Financial Management Association (2007).
- The NFL Should Auction Possession in Overtime Games (with Yeon-Koo Che), *Economists' Voice* 9 (October 2009), http://www.bepress.com/ev/vol6/iss9/art5/.
- A Comparison of Trading and Non-Trading Mechanisms for Price Discovery (with Michael Barclay), *Journal of Empirical Finance* 15 (December 2008), 839-849.
- How to Divide the Possession of a Football? (with Yeon-Koo Che), *Economics Letters* 99 (June 2008), 561-565.
- Order Consolidation, Price Efficiency, and Extreme Liquidity Shocks (with Michael Barclay and Charles Jones), *Journal of Financial and Quantitative Analysis* 43 (March 2008), 93-121.
- Market Maker Inventories and Stock Prices (with Mark Seasholes), *American Economic Review (P&P)* 97 (May 2007), 210-214.
- Automation versus Intermediation: Evidence from Treasuries Going Off the Run (with Michael Barclay and Kenneth Kotz), *Journal of Finance* 61 (October 2006), 2395-2414.
- A Model of Direct and Intermediated Sales (with Jie Zhang), *Journal of Economics & Management Strategy* 15 (Summer 2006), 279-316.
- Island Goes Dark: Transparency, Fragmentation, and Regulation (with Charles Jones), *Review of Financial Studies* 18 (Fall 2005), 743-793.
- Trade-through Prohibitions and Market Quality (with Charles Jones), *Journal of Financial Markets* 8 (February 2005), 1-23.
- Liquidity Externalities and Adverse Selection: Evidence from Trading After Hours (with Michael Barclay), *Journal of Finance* 59 (April 2004), 681-710.
- Competition Among Trading Venues: Information and Trading on Electronic Communications Networks (with Michael Barclay and Tim McCormick), *Journal of Finance* 58 (December 2003), 2637-2666. Won New York Stock Exchange Award for best paper on equity trading, Western Finance Association (2001). Nominated for the Smith-Breeden Prize for best paper published in the *Journal of Finance*.
- Price Discovery and Trading After Hours (with Michael Barclay), *Review of Financial Studies* 16 (Winter 2003), 1041-1073.
- Electronic Trading Systems in Financial Markets, *IEEE-IT Professional* 5 (Jul/Aug 2003), 10-14.
- The Future of Virtual Malls (with Patric Hendershott and Robert Hendershott), *Real Estate Finance* 18 (Spring 2001), 25-32.
- Crossing Networks and Dealer Markets: Competition and Performance (with Haim Mendelson), *Journal of Finance* 55 (October 2000), 2071-2115. Nominated for the Smith-Breeden Prize for best paper published in the *Journal of Finance*.
- Bundling and Optimal Auctions of Multiple Products (with Christopher Avery), *Review of Economic Studies* 67 (July 2000), 483-497.
- Will the Internet Reduce the Demand for Mall Space? (with Patric Hendershott and Robert Hendershott), *Real Estate Finance* 17 (Spring 2000), 41-46.

## Working Papers
- All-to-All Liquidity in Corporate Bonds (with Dmitry Livdan and Norman Schürhoff)

**Appendix A**

- Quote Competition in Corporate Bonds (with Dmitry Livdan, Dan Li, Norman Schürhoff, and Kumar Venkataraman)
- Option Auctions (with Saad Khan and Ryan Riordan)
- Stock Exchanges as Platforms for Data and Trading (with Marc Rysman and Rainer Schwabe)
- Order Exposure in High Frequency Markets (with Bidisha Chakrabarty, Samarpan Nawn, and Roberto Pascual)
- Public and Private Information in Quotes and Trades (with James Brugler)
- Market Predictability and Non-Informational Trading (with Mark Seasholes)

**Books, Reviews, and Chapters**

- Handbook of Economics and Information Systems (Editor), Elsevier, ISBN 0444517715.
- Implementation Shortfall with Transitory Price Effects (with Charles Jones and Albert Menkveld), chapter in High Frequency Trading: A Survival Guide, Eds. David Easley, Marcos Lopez de Prado, and Maureen O'Hara, Risk Books.
- Book Review of Econometrics of Financial High-Frequency Data, by Nikolaus Hautsch, *Quantitative Finance* (2013).

**Other Publications**

- Call for Papers—Special Issue of Information Systems Research Fintech – Innovating the Financial Industry Through Emerging Information Technologies (with Michael Zhang, Leon Zhao, and Eric Zheng), *Information Systems Research* (December 2017), 885-886.
- Automated Trading, *Encyclopedia of Quantitative Finance*.
- Preface to the Focus Theme Section: 'Financial Market Engineering' (with Dirk Neumann, Robert Schwartz, Bruce Weber, and Christof Weinhardt), *Electronic Markets* 16 (May 2006), 98-100.
- An Economic View of Information Systems (with Krishnan Anand), Introduction to Special Issue on Information Systems and Economics, *Decision Support Systems* 41(May 2006), 683-687.
- Wall St's appeal for new rules is not altruistic, *Financial Times*, comment/op-ed, 7/21/2004, p. 13.
- Should the Outcome of a Coin Flip Mean So Much in NFL Overtime? Bid for the Ball (with Jonathan Berk), *Wall Street Journal Online*, 12/22/2003.

**Honors, Awards, Miscellaneous**

- Advisory Committee, Consolidated Audit Trail (2022-)
- Faculty Director, Master of Financial Engineering, UC Berkeley (2020-)
- University of California Retirement System Advisory Board (2020-24; Chair 2023-24)
- Willis H. Booth Chair in Banking and Finance, Haas School of Business, UC Berkeley (2017-)
- Norwegian Finance Initiative Grant to study the effect of technological and regulatory changes on market structure and transparency across equity and fixed-income markets in the US and Europe (2018-2022)
- Digging into Data Round 4; Digging Into High Frequency Data: Present And Future Risks And Opportunities (2016-2020)
- Market Surveillance Advisory Group, Financial Industry Regulatory Authority (2016-2018, 2021-2022)
- Cheryl and Christian Valentine Chair, Haas School of Business, UC Berkeley (2012-2017)
- Consultant, Office of the Chief Economist, Commodity Futures Trading Commission (2016-2017)
- Distinguished Visiting Scholar, Securities and Exchange Commission (2015).
- Michael J. Brennan Best Paper Award for best paper published in *Review of Financial Studies* in 2014.
- *Financial Review* Outstanding Publication Award for 2014.
- 2013 Philip Brown Prize.
- High Frequency Trading Subcommittee of the Technology Advisory Committee, Commodity Futures Trading Commission (2012-2013)
- Barbara and Gerson Bakar Faculty Fellow, Haas School of Business, UC Berkeley (2011-2012)
- Consultant, Office of the Chief Economist, Commodity Futures Trading Commission (2009-2011)
- Visiting Scholar, University of Sydney (2010)
- Net Institute Grant (2009)
- Kauffman Foundation Entrepreneurship & Innovation Research Grant (2008-2009)

# Appendix A

- New York Stock Exchange Euronext Award for best paper on equity trading, Western Finance Association (2008)
- Visiting Fellow, The Paul Woolley Centre for the Study of Capital Market Dysfunctionality, London School of Economics (2008)
- Nasdaq Award for best paper on market microstructure, Financial Management Association (2007)
- Visiting Professor, Université Paris-Dauphine (2007, 2008, 2009, 2010, 2012, 2013)
- Nasdaq Economic Advisory Board, (2004-7; Chair 2007)
- Visiting Economist, New York Stock Exchange (2005-2006)
- National Science Foundation Grant #0133848, CAREER: Electronic Trading Systems (2002-2006)
- Schwabacher Fellow (outstanding teaching and research), University of California, Berkeley (2005-2006)
- Junior Faculty Research Grant, Committee on Research, University of California, Berkeley (2001, 2003)
- New York Stock Exchange Award for best paper on equity trading, Western Finance Association (2001)
- Simon School Teaching Honor Roll, University of Rochester (2000, 2001)
- Xerox Assistant Professor, University of Rochester (1999-2001)
- Frye Fellowship, Stanford University (1992)
- Chiles Fellowship, Stanford University (1991)

**Teaching Experience**
- High-Frequency Finance (MFE 230X), UC Berkeley.
- Introduction to Business Analytics (UGBA 104), UC, Berkeley.
- Information Technology Strategy (MBA 247B, ENGIN 298A, INFOSYS 290, UGBA 196), UC, Berkeley.
- Operations Management (MBA and EWMBA 204), UC, Berkeley.
- Financial Information Systems (CIS 446/Finance 446), University of Rochester.
- Investment Management and Trading Strategies (Finance 434), Simon School, University of Rochester.

**Professional Service**

Editorial:
- Associate Editor, *Journal of Finance*, 2022-
- Associate Editor, *Journal of Financial Economics*, 2021-
- Associate Editor, *Review of Asset Pricing Studies*, 2021-
- Associate Editor, *Journal of Financial Markets*, 2012-
- Associate Editor, *Management Science*, 2010-2018
- Associate Editor, *Journal of Banking & Finance*, 2015-2016
- Co-Editor, *Journal of Economics and Management Strategy*, 2006-2013
- Associate Editor, *Information Systems Research*, 2004-2005
- Associate Editor, *Decision Support Systems*, 2003-2016
- Advisory Editor, *Handbooks in Information Systems*, Elsevier
- Guest Editor, Special Issue of Information Systems Research Fintech – Innovating the Financial Industry Through Emerging Information Technologies (with Michael Zhang, Leon Zhao, and Eric Zheng), *Information Systems Research*
- Guest Editor, Special Issue on Behavioral Finance and Recent Developments in Capital Markets, *Pacific-Basin Finance Journal*
- Guest Editor, Focus Theme Section: 'Financial Market Engineering', *Electronic Markets*
- Guest Editor, Special Issue on Information Systems and Economics, *Decision Support Systems*

Conferences:
- Western Finance Association, program committee, 2011-
- SAFE Market Microstructure Conference, program committee, 2017-
- International FinTech, InsurTech & Blockchain Forum, program committee, 2018-2021
- Napa Conference on Financial Markets, program committee, 2009-2017
- European Finance Association, program committee, 2001-2004, 2012-2016
- French Finance Association Paris December Conference, 2013-2019

# Appendix A

- Finance Down Under Conference, 2013-2016
- Society for Financial Econometrics and Tinbergen University (Amsterdam) Conference on Measuring and Understanding Asset Price Changes: The Price of Liquidity, and the Liquidity of Price, program committee, 2011
- NYSE-Euronext/Dauphine University, 3rd Workshop on Financial Market Quality, organizer, 2010
- NYSE Euronext & Tinbergen Institute Workshop on Liquidity and Volatility, program committee, 2009
- National Institute of Securities Markets Conference on Structure, Microstructure and Regulation of Securities Markets, Mumbai, India, program committee, 2008
- NYSE-Euronext/Dauphine University, 2nd Workshop on Financial Market Quality, organizer, 2008
- INFORMS Conference on Information Systems and Technology, program committee, 2000-6
- Microstructure of International Financial Markets, Hyderabad, India, program committee, 2006
- FinanceCom (International Workshop on Finance Industry Enterprise, Applications & Services), program committee, 2005-2012

**Appendix A**

# Prior Testimony

### Last 4 Years

Deposition and Trial Testimony (2019, 2020), *Emily and Malcom Fairbairn v. Fidelity Investments Charitable Gift Fund*, Case No. 3:18-cv-04881 (U.S. District Court Northern District of California).

Deposition and Hearing Testimony (2020, 2021), *In re Global Brokerage, Inc f/k/a FXCM Inc. Securities Litigation*, Case No. 1:17-cv-00916-RA-BCM (U.S. District Court Southern District of New York).

Deposition Testimony (2021), *Budicak, Inc., et al. v. Lansing Trade Group, LLC, et al.*, Case No. 2:19-cv-02449 (U.S. District Court District of Kansas).

Deposition Testimony (2021), *City of Providence v. BATS Global Markets Inc., et al.*, Case No. 2:19-cv-02449 (U.S. District Court Southern District of New York).

Deposition Testimony (2021), *Iowa Public Employees' Retirement System, et al. v. Bank of America Corporation, et al.*, Case No. 1:17-cv-06221-KPF (U.S. District Court Southern District of New York).

Deposition Testimony (2022), *In re QuantumScape Securities Litigation*, Case No. 3:21-cv-00058-WHO (U.S. District Court Northern District of California).

Deposition Testimony (2022), *Set Capital LLC v. Credit Suisse AG,* Case No. 1:18-cv-02268-AT-SN (U.S. District Court Southern District of New York).

Deposition Testimony (2022), *In re CBL & Associates Properties, Inc. Securities Litigation* Case No. 1:19-cv-00181-JRG-CHS (U.S. District Court Eastern District of Tennessee).

Deposition, Hearing, and Trial Testimony (2023, 2024), *SEC vs Terraform Labs PTE LTD and Do Hyeong Kwon*, Case No. 1:23-cv-1346 (U.S. District Court Southern District of New York).

Deposition Testimony (2024), *Tang Capital Partners, LP v. BRC Inc.*, Case No. 1:22-cv-03476 (U.S. District Court Southern District of New York).

Deposition and Trial Testimony (2024), *In re Rocket Companies, Inc. Stockholder Derivative Litigation*, Civil Action No. 2021-1021-KSJM (Court of Chancery of the State of Delaware).

Deposition Testimony (2024), *Shupe v. Rocket Companies, Inc.*, Case No. 21-cv-11528 (U.S. District Court Eastern District of Michigan Northern Division).

**Appendix B**

# Documents Relied Upon

**Academic Articles**

- Andrei Kirilenko, et al., "The Flash Crash: The Impact of High Frequency Trading on an Electronic Market," *CFTC* (2014)

- Charles Cao, Oliver Hansch, and Xiaoxin Wang, "The Information Content of an Open Limit-Order Book," *Journal of Futures Markets: Futures, Options, and Other Derivative Products* 29, no. 1 (2009): pp. 16–41

- Christiane Baumeister and James Hamilton, "Inference in Structural Vector Autoregressions When the Identifying Assumptions Are Not Fully Believed: Re-Evaluating the Role of Monetary Policy in Economic Fluctuations," *Journal of Monetary Economics* 100, no. C (2018): pp. 48–65

- Craig Pirrong, "Derived Pricing: Fragmentation, Efficiency, and Manipulation," *University of Houston*, Working Paper (2019), https://www.bauer.uh.edu/spirrong/TAS_Manipulation.pdf

- David Easley, Marcos López de Prado, and Maureen O'Hara, "The Microstructure of the 'Flash Crash': Flow Toxicity, Liquidity Crashes and the Probability of Informed Trading," *The Journal of Portfolio Management* 37, no. 2 (2011): pp. 118–128

- David Easley, Marcos M. López de Prado, and Maureen O'Hara, "Flow Toxicity and Liquidity in a High-Frequency World," *The Review of Financial Studies* 25, no. 5 (2012): pp. 1457–1493

- Emily B. Fox and Mike West, "Autoregressive Models for Variance Matrices: Stationary Inverse Wishart Processes," *arXiv*, arXiv:1107.5239 (2011)

- Giorgio E. Primiceri, "Time Varying Structural Vector Autoregressions and Monetary Policy," *The Review of Economic Studies* 72, no. 3 (2005): pp. 821–852

- Joel Hasbrouck, "Measuring the Information Content of Stock Trades," *The Journal of Finance* 46, no. 1 (1991): pp. 179–207

- Jonathan Brogaard, Terrence Hendershott, and Ryan Riordan, "Price Discovery without Trading: Evidence from Limit Orders," *The Journal of Finance* 74, no. 4 (2019): pp. 1621–1658

- Mark Bognanni, "A Class of Time-Varying Parameter Structural Vars for Inference under Exact or Set Identification," *Federal Reserve Bank of Cleveland*, Working Paper 18-11 (2018), https://www.clevelandfed.org/publications/working-paper/2018/wp-1811-a-class-of-time-varying-parameter-structural-vars

- Rama Cont, Arseniy Kukanov, and Sasha Stoikov, "The Price Impact of Order Book Events," *Journal of Financial Econometrics* 12, no. 1 (2014): pp. 47–88

- Terrence Hendershott and Charles M. Jones, "Island Goes Dark: Transparency, Fragmentation, and Regulation," *The Review of Financial Studies* 18, no. 3 (2005): pp. 743–793

**Appendix B**

- Terrence Hendershott and Ryan Riordan, "Algorithmic Trading and the Market for Liquidity," *Journal of Financial and Quantitative Analysis* 48, no. 4 (2013): pp. 1001–1024

- Terrence Hendershott, Dmitry Livdan, and Dominik Rosch, "Asset Pricing: A Tale of Night and Day," *Journal of Financial Economics* 138, no. 3 (2020): pp. 635–662

- Timothy Cogley and Thomas J. Sargent, "Drifts and Volatilities: Monetary Policies and Outcomes in the Post WWII US," *Review of Economic Dynamics* 8, no. 2 (2005): pp. 262–302

- Torben G. Andersen and Oleg Bondarenko, "Assessing Measures of Order Flow Toxicity and Early Warning Signals for Market Turbulence," *Review of Finance* 19, no. 1 (2015): pp. 1–54

- Torben G. Andersen and Oleg Bondarenko, "Reflecting on the VPIN Dispute," *Journal of Financial Markets* 17, no. 1 (2014): pp. 53–64

- Torben G. Andersen and Oleg Bondarenko, "VPIN and the Flash Crash," *Journal of Financial Markets* 17, no. C (2014): pp. 1–46

**Books and Book Chapters**

- Andrew Gelman, et al., *Bayesian Data Analysis*, 3rd ed. (2021)

- David A. Freedman and David H. Kaye, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, ed. National Research Council et al., 3rd ed. (2011), pp. 211–302

- Frederick Gravetter and Larry Wallnau, *Statistics for the Behavioral Sciences,* 10 ed. (2015)

- Jakša Cvitanić and Fernando Zapatero, *Introduction to the Economics and Mathematics of Financial Markets* (2004)

- Jeffrey F. Jaffe, Randolph W. Westerfield, and Stephen Ross, *Corporate Finance*, 6th ed. (2003)

- John Hull, *Options, Futures, and Other Derivatives*, 9th ed. (2015)

- Karl Popper, *The Logic of Scientific Discovery* (2005)

- Larry Harris, *Trading and Exchanges: Market Microstructure for Practitioners* (2003)

- National Research Council et al., *Reference Manual on Scientific Evidence*, 3rd ed. (2011)

- Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 10th ed. (2011)

- Robert Kolb and James Overdahl, *Understanding Futures Markets*, 6th ed. (2006)

- Thierry Foucault, Marco Pagano, and Ailsa Röell, *Market Liquidity: Theory, Evidence, and Policy* (2013)

**Appendix B**

**Expert Reports**

- Amended Class Certification Report of Professor Craig Pirrong, May 9, 2024, with Backup Materials

- *In Re: Term Commodities Cotton Futures Litigation*, Amended Expert Report of Dr. Craig Pirrong (Redacted), March 18, 2022

**Depositions**

- Deposition of Justin Boshnack, December 18, 2023

- Deposition of Robert Mish, December 20, 2023, with Exhibits

- Deposition of Craig Pirrong, May 14, 2024, with Exhibits

**Legal Documents**

- *Mish International Monetary Inc. on behalf of itself and all other similarly situated v. Vega Capital London, Ltd., et al.*, Plaintiff's Memorandum of Law in Support of Its Motion for Class Certification, Corrected Copy, February 23, 2024

- *Mish International Monetary Inc. on behalf of itself and all other similarly situated v. Vega Capital London, Ltd., et al.*, Plaintiff's Motion for Class Certification, February 19, 2024

- *Mish International Monetary Inc. on behalf of itself and all other similarly situated v. Vega Capital London, Ltd., et al.*, Second Amended Complaint, Corrected Copy, February 3, 2023

**Rules and Regulatory Documents**

- "17 CFR Part 17: Large Trader Reporting Requirements," Commodity Futures Trading Commission, May 1, 2024, https://www.cftc.gov/media/10606

- "CME GLOBEX Reference Guide," CME Group, https://bit.ly/3Khp8iw

- "Large Trader Reporting Program," Commodity Futures Trading Commission, https://www.cftc.gov/IndustryOversight/MarketSurveillance/LargeTraderReportingProgram/ltrp.html

- Letter from U.S. Commodity Futures Trading Commission to U.S Senate Committee on Agriculture and House Committee on Agriculture, February 8, 2022, https://www.agriculture.senate.gov/imo/media/doc/2022%2002%2008%20Ag%20committees%20digital%20asset%20response%20letter.pdf

- "NYMEX Rulebook, Chapter 7: Delivery Facilities and Procedures," CME Group, as of April 16, 2020, https://web.archive.org/web/20200416161650/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/7.pdf

**Appendix B**

- "NYMEX Rulebook, Chapter 200, Light Sweet Crude Oil Futures," as of April 28, 2020, https://web.archive.org/web/20200428053717/https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/2/200.pdf

**Publicly Available Reports**

- Commodity Futures Trading Commission, "Interim Staff Report: Trading in NYMEX WTI Crude Oil Futures Contract Leading Up To, On, and around April 20, 2020," November 23, 2020, https://www.cftc.gov/node/235761

- Everett Wheeler, Allison Good, and Gorey Paul, "No Place to Go: Oil Storage Filling up Amid Collapsing Demand, Excess Production," S&P Global Market Intelligence, April 6, 2020, https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/no-place-to-go-oil-storage-filling-up-amid-collapsing-demand-excess-production-57865154

- Jeffrey Currie et al., "Oil Views: An Industry Game-Changer," Goldman Sachs Commodities Research, March 30, 2020, https://valori.it/wp-content/uploads/2020/04/Oil-Views_-An-industry-game-changer-1.pdf

- Michael Sewalt and Cyriel De Jong, "Negative Prices in Electricity Markets," Commodities Now, June 2023, https://www.kyos.jp/wp-content/uploads/sites/2/2016/10/Commodities-Now-Negative-prices-in-Electricity-Markets.pdf

- Philip Verleger, "Negative Prices: Never Again," Energy Intelligence, April 23, 2020, https://www.energyintel.com/0000017b-a7da-de4c-a17b-e7da75620000

- U.S. Energy Information Administration, "WTI Crude Oil Futures Prices Fell below Zero Because of Low Liquidity and Limited Available Storage," April 22, 2020, https://www.eia.gov/petroleum/weekly/archive/2020/200422/includes/analysis_print.php

**Notices and Press Releases**

- "Advisory Notice: CME Clearing Plan to Address the Potential of a Negative Underlying in Certain Energy Options Contracts," CME Group, April 8, 2020, https://www.cmegroup.com/notices/clearing/2020/04/Chadv20-152.html

- "Advisory Notice: Performance Bond Requirements: Energy - Effective April 17, 2020," CME Group, April 16, 2020, https://cmegroup.com/notices/clearing/2020/04/Chadv20-163.html

- "Advisory Notice: Testing Opportunities in CME's 'New Release' Environment for Negative Prices and Strikes for Certain NYMEX Energy Contracts," CME Group, April 15, 2020, https://www.cmegroup.com/notices/clearing/2020/04/Chadv20-160.html

- "Changes to Price and Strike Price Eligibility Flags for Certain Energy Products," CME Group, April 3, 2020, https://www.cmegroup.com/notices/electronic-trading/2020/04/20200403.html

**Appendix B**

- "Market Regulation Advisory Notice, Rule 524: TAS, TAM, BTIC, and TACO Transactions," CME Group, August 13, 2018, https://web.archive.org/web/20210318063322/https://www.cmegroup.com/rulebook/files/cme-group-Rule-524.pdf

- "Market Regulation Advisory Notice, Rule 526: Block Trades," CME Group, https://www.cmegroup.com/rulebook/files/cme-group-Rule-526.pdf

- Organization of the Petroleum Exporting Countries Press Release, "The 10th (Extraordinary) OPEC and non-OPEC Ministerial Meeting concludes," April 12, 2020, https://www.opec.org/opec_web/en/press_room/5891.htm

**Public Press Articles and Other Web Content**

- "Clearing Market Structure," CME Group, https://www.cmegroup.com/education/courses/clearing/clearing-market-structure.html

- "CME Globex," CME Group, https://www.cmegroup.com/globex.html

- "Column: U.S. Crude Oil Storage Is Filling Rapidly," Reuters, April 20, 2020, https://www.reuters.com/article/idUSKBN222110

- "Commitment of Traders," CME Group, https://www.cmegroup.com/tools-information/quikstrike/commitment-of-traders.html

- "Commitment of Traders, Explanatory Notes," Commodity Futures Trading Commission, https://www.cftc.gov/MarketReports/CommitmentsofTraders/ExplanatoryNotes/index.htm

- "Crude Oil Futures – Contract Specs," CME Group, https://www.cmegroup.com/markets/energy/crude-oil/light-sweet-crude.contractSpecs.html

- "Crude Oil Futures Prices Turn Negative," Congressional Research Services, April 22, 2020, https://crsreports.congress.gov/product/pdf/IN/IN11354

- "Daily Bulletin Glossary," CME Group, 2012, https://www.cmegroup.com/tools-information/files/CME-Group-Daily-Bulletin-Glossary.pdf

- "Disaggregated Explanatory Note," Commodity Futures Trading Commission, https://www.cftc.gov/MarketReports/CommitmentsofTraders/DisaggregatedExplanatoryNotes/index.htm

- "Economic Purpose of Futures Markets and How They Work," Commodity Futures Trading Commission, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/economicpurpose.html

- "eCotton's Electronic Warehouse Receipt Providership System," EWR, Inc., http://www.ecotton.com/documents/EWR/EwrProviderOverview.pdf

**Appendix B**

- "Exchange for Related Positions (EFRPs)" CME Group, https://www.cmegroup.com/clearing/operations-and-deliveries/accepted-trade-types/efp-efr-eoo-trades.html

- "Futures Order Types," CME Group, https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/futures-order-types.html

- "ICE Futures Europe: Permian WTI Storage Future," Intercontinental Exchange, https://www.ice.com/products/71090497/Permian-WTI-Storage-Future

- "Iceberg Orders," CME Group, https://www.cmegroup.com/tools-information/webhelp/ebs-workstation-quick-guide/Content/IcebergOrders.html

- "Learn About Exercise and Assignment," CME Group, https://www.cmegroup.com/education/courses/introduction-to-options/learn-about-exercise-and-assignment.html

- "London Traders Hit $500 Million Jackpot When Oil Went Negative," Bloomberg, August 3, 2020, https://www.bloomberg.com/news/articles/2020-08-04/oil-s-plunge-below-zero-was-500-million-jackpot-for-a-few-london-traders?sref=aHrd9Iuo&embedded-checkout=true

- "No Vacancy: Main U.S. Oil Storage in Cushing Is All Booked," Reuters, April 21, 2020, https://www.reuters.com/article/us-global-oil-usa-storage/no-vacancy-main-u-s-oil-storage-in-cushing-is-all-booked-idUSKCN22332W

- "North America Rotary Rig Count (Jan 2000-current)," Baker Hugues, https://bakerhughesrigcount.gcs-web.com/na-rig-count

- "North America's Oil Industry Is Shutting Off the Spigot," The Wall Street Journal, April 13, 2020, https://www.wsj.com/articles/north-americas-oil-industry-is-shutting-off-the-spigot-11586770200?mod=article_inline

- "NYMEX Crude Oil," CME Group, April 26, 2024, https://www.cmegroup.com/confluence/display/EPICSANDBOX/NYMEX+Crude+Oil

- "NYMEX," CME Group, https://www.cmegroup.com/company/nymex.html

- "Oil Glut May Overwhelm Global Storage Tanks within Weeks," Bloomberg, April 15, 2020, https://www.bloomberg.com/news/articles/2020-04-15/oil-glut-may-overwhelm-storage-despite-opec-cut-iea-says

- "Oil Plunges below $12 as Storage Rapidly Fills," Midland Reporter-Telegram, April 20, 2020, https://www.mrt.com/business/oil/article/Oil-plunges-below-12-as-storage-rapidly-fills-15212436.php

- "Oil Prices Could Fall below Zero: Analyst," Fox Business, March 18, 2020, https://www.foxbusiness.com/markets/oil-price-could-fall-below-zero-analyst

- "Oil Prices Dive as Saudi Arabia Takes Aim at Russian Production," The New York Times, March 8, 2020, https://www.nytimes.com/2020/03/08/business/saudi-arabia-oil-prices.html

**Appendix B**

- "One Corner of U.S. Oil Market Has Already Seen Negative Prices," Bloomberg, March 27, 2020, https://www.bloomberg.com/news/articles/2020-03-27/one-corner-of-u-s-oil-market-has-already-seen-negative-prices

- "Optimism Is Less Distant as Global Coronavirus Battle Rages On," The New York Times, April 8, 2020, https://www.nytimes.com/2020/04/08/us/coronavirus-global-progress.html

- Pierre Andurand [@AndurandPierre], Twitter Post, X, April 20, 2020, 3:22 AM, https://twitter.com/AndurandPierre/status/1252150610167771136

- Pierre Andurand [@AndurandPierre], Twitter Post, X, April 20, 2020, 3:27 AM, https://twitter.com/AndurandPierre/status/1252151840474529793

- "Power Worth Less than Zero Spreads as Green Energy Floods the Grid," Bloomberg, August 6, 2018, https://www.bnnbloomberg.ca/power-worth-less-than-zero-spreads-as-green-energy-floods-the-grid-1.1119243

- "The 20 Minutes That Broke the U.S. Oil Market," Bloomberg, April 25, 2020, https://www.bloomberg.com/news/articles/2020-04-25/the-20-minutes-that-broke-the-u-s-oil-market

- "The Next Chapter of the Oil Crisis: The Industry Shuts Down," Bloomberg, April 27, 2020, https://www.bloomberg.com/news/articles/2020-04-26/the-next-chapter-of-the-oil-crisis-the-industry-shuts-down

- "Trading at Settlement (TAS)," CME Group, https://www.cmegroup.com/trading/trading-at-settlement.html

- "U.S. Natural Gas Prices Turn Negative in Texas Permian Shale Again," Reuters, May 22, 2019, https://www.reuters.com/article/idUSKCN1SS1GB/

- "Understanding Block Trades," CME Group, November 1, 2017, https://www.cmegroup.com/education/articles-and-reports/understanding-block-trades.html

- "Understanding Futures Expiration & Contract Roll," CME Group, https://www.cmegroup.com/education/courses/introduction-to-futures/understanding-futures-expiration-contract-roll.html

- "What Really Caused the Epic WTI Meltdown?" Energy Intelligence, April 21, 2020, https://www.energyintel.com/0000017b-a7da-de4c-a17b-e7da70fa0000

- "WTI Crude Futures," ICE, https://www.ice.com/products/213/WTI-Crude-Futures

- "WTI-WTF?  Part II (of How Many???)," Streetwise Professor, April 21, 2020, https://streetwiseprofessor.com/wti-wtf-part-ii-of-how-many/

- "WTI-WTF?" Streetwise Professor, April 20, 2020, https://streetwiseprofessor.com/wti-wtf/

**Data**

- *Bloomberg*

## Appendix B

- CME Audit Trail Data
- CME DVL662-T "DVL662-T Report," CME Group, December 30, 2020
- CME Order Entry Data
- "Cotton On-Call," Commodity Futures Trading Commission, June 13, 2024, https://www.cftc.gov/MarketReports/CottonOnCall/index.htm
- "Working and Net Available Shell Storage Capacity," U.S. Energy Information Administration, https://www.eia.gov/petroleum/storagecapacity/
- ██████████████████████████████████████████████████ xlsx
- *Refinitiv*
- "Trading at Settlement (TAS) Outright and Calendar Spread Availability," CME Group, https://www.cmegroup.com/trading/files/tas-tam-eligibility.xlsx
- "U.S. Weekly Product Supplied," U.S. Energy Information Administration, https://www.eia.gov/dnav/pet/pet_cons_wpsup_k_w.htm
- "Weekly Petroleum Status Report Schedule," U.S. Energy Information Administration, https://www.eia.gov/petroleum/supply/weekly/schedule.php
- "Weekly Supply Estimates: Stocks – Crude Oil, Commercial (Excl. Lease Stock)," U.S. Energy Information Administration, http://www.eia.gov/dnav/pet/pet_sum_sndw_a_epc0_sax_mbbl_w.htm
- "Weekly U.S. Exports of Crude Oil," U.S. Energy Information Administration, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=WCREXUS2&f=W
- "Weekly U.S. Field Production of Crude Oil," U.S. Energy Information Administration, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=WCRFPUS2&f=W
- "Weekly U.S. Imports of Crude Oil," Energy Information Administration, https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=PET&s=WCRIMUS2&f=W

**Bates Stamped Documents**

- Chevron__Vega_0000023–35
- Chevron__Vega_0000220–34
- Chevron__Vega_0000251–66
- CITI-05594–5
- CME-Negative-Crude_0000048
- █████████████████████
- █████████████████████
- ████████████████████████████ (produced by SOCAR Trading)

## Appendix B

- IFEU-000007–20
- Non-partyBP024467
- Non-partyBP029546
- Non-partyBP029555
- Plaintiff_Mish_0000028
- Plaintiff_Mish_0000638
- Plaintiff_Mish_0000948–55
- Plaintiff_Mish_0001040–44
- Plaintiff_Mish_0001571–72
- PSXVEG0000001
- VEGA_MISH_000042650–73
- VEGA_MISH_000042708.1
- VEGA_MISH_000043277

**Note: In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.**

**Appendix C**

**Other Self-Regulatory Bodies, U.S. Government Agencies, the CFTC Chairman, Market Participants, and Academics Attributed the Order Book Imbalance and Negative Prices on April 20, 2020, to the Lack of Storage Space at Cushing**

**Self-Regulatory Bodies**

- The Futures Industry Association (FIA) attributed WTI futures prices becoming negative on April 20, 2020, to some traders that failed to anticipate this shortage of storage capacity at Cushing by noting that "one day before expiration, they realized that they had to get out of their positions before expiration—or take delivery of barrels of physical oil with limited or no options for storage. This led to a wave of selling, and this is what caused the futures price to fall to a negative $37.63 per barrel on April 20 as the market looked for a clearing price."
    - o "FAQs on Negative Pricing in Exchange-Traded Futures and Options," FIA, May 6, 2020, https://www.fia.org/fia/articles/faqs-negative-pricing-exchange-traded-futures-and-options.

**U.S. Government Agencies**

- The U.S. Energy Information Administration (EIA) attributed negative WTI futures prices on April 20, 2020, to "several factors, including the inability of traders who had purchased futures to find other market participants to sell futures contracts to. In addition, in this case, the scarcity and high cost of available crude oil storage meant several market participants were heavily incentivized to close their positions before having to physically settle their contracts, with some contract holders resorting to selling their futures contracts at negative prices, in effect paying a counterparty to allow them to exit their positions."
    - o "Low liquidity and limited available storage pushed WTI crude oil futures prices below zero," U.S. Energy Information Administration (EIA), April 27, 2020, https://www.eia.gov/todayinenergy/detail.php?id=43495.

**CFTC Chairman**

- When discussing the reasons for negative WTI futures prices on April 20, 2020, CFTC Chairman Tarbert pointed to a "fundamental supply and demand issue …[I]t's not a financial markets issue at this point. Obviously we're looking into it to make sure we understand all the factors, but basically it can be explained by what's actually going on in the real markets, which obviously is a tremendous amount of dislocation with respect to storage, supply, capacity, and dramatically decreased demand. So, the markets are just simply reflecting at this point what's going on in the real economy, which obviously is a lot of volatility … [I]n fact, it was somewhat expected because as many of the viewers know, futures contract ultimately relies on convergence. At the end of the day, at the end of trading, the futures price needs to be the same as the cash. So, for weeks now, we've seen spot physical cash prices of crude approach zero and go negative. So, market participants as well as the CFTC have actually been preparing for some time to make sure that our trading systems could handle negative prices."
    - o Commodity Futures Trading Commission Press Release, "ICYMI: Chairman Tarbert Discusses Crude Oil Futures on CNBC's Squawk Alley," April 21, 2020, https://www.cftc.gov/PressRoom/PressReleases/8155-20.

# Appendix C

## Market Participants

- Public press summarized reactions from market participants regarding the reason for why WTI futures prices went negative. Market participants generally agreed that storage constraints in Cushing led to negative WTI futures prices on April 20, 2020. Below are examples of such reactions.

- "[The] realization among traders and funds managers" that "[t]he terminals [in Cushing] have already contracted their storage 100 per cent … sparked a panic on Monday that caused the expiring May oil contract to crash to minus-$37.63 a barrel."
  - "No Vacancy: Main U.S. Oil Storage in Cushing Is All Booked," Reuters, April 21, 2020, https://www.reuters.com/article/us-global-oil-usa-storage/no-vacancy-main-u-s-oil-storage-in-cushing-is-all-booked-idUSKCN22332W.

- "That threat of having to take physical delivery is why the May contract plunged on Monday, said Jeff Carter, a venture capitalist and former Chicago Mercantile Exchange board member" and "U.S. crude reflected global oversupply, high levels in U.S. storage, and convergence of futures and cash prices ahead of the May West Texas Intermediate (WTI) oil contract's expiration on Tuesday, CME Group said."
  - "CME Group, as Oil Contract Plunges Negative, Says Markets Working Fine," Reuters, April 20, 2020, https://www.reuters.com/article/idUSL1N2C82MD/.

- "CME Chairman and Chief Executive Terrence Duffy said in an interview that WTI futures worked as designed, and their foray into negative territory was a signal of real market forces at work. 'It's not a price that makes you feel good,' he said. 'But the reality is, there is oversupply, there is under-demand that's virus driven, and there is nowhere to put the stuff.'"
  - "Negative Oil Prices Pose Headache for Futures Giant CME," The Wall Street Journal, April 22, 2020, https://www.wsj.com/articles/negative-oil-prices-pose-headache-for-futures-giant-cme-11587547802.

- "The negative pricing in the front-month May WTI futures contract was driven by three fundamental factors impacting the global oil market: 1) Significant oversupply of crude oil in the US, 2) Significantly reduced demand for oil due to COVID-19 impacts, 3) Concerns about increasingly full US storage for WTI."; "So our WTI contract did exactly what it was designed to do, which is reflect the underlying supply and demand dynamics."
  - CME internal email, "Ag Advisory Committee Meeting Summary – UPDATE," April 23, 2020, CME-Negative-Crude_0000046.

## Academics

- In an article by Adam S. Nagy and Nobel Memorial Prize Winner Professor Robert C. Merton, the authors attribute the negative WTI futures prices to storage constraints. The authors note that "[u]nder normal market conditions, at some discount the natural users of oil would buy these contracts from the speculators providing liquidity on the buy side of the [order book]. Since the hedgers have the infrastructure to handle and store the commodity, if the spot, near and further dated futures prices are not in equilibrium, they can buy the oil (at spot or leading future prices) and sell it at a later date via a further dated futures contract. Therefore, under normal market conditions this arbitrage opportunity would allow speculators to liquidate their positions at some discount. However, as storage facilities are already operating near capacity the cash and carry trade

**Appendix C**

is more costly to implement and liquidity is impaired. Given this impaired liquidity, speculators are forced to sell oil at negative prices, essentially paying someone for taking the oil off their hand[s]."

- o Adam S. Nagy and Robert C. Merton, "Negative WTI Crude Futures Prices Event Study," Massachusetts Institute of Technology, April 26, 2020, https://mitsloan.mit.edu/shared/ods/documents?PublicationDocumentID=7455.



