**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

MISH INTERNATIONAL MONETARY
INC., on behalf of itself and all others similarly
situated,

               *v.*

VEGA CAPITAL LONDON, LTD., *et al.*

Case No. 1:20-cv-04577

Judge Manish S. Shah

**PLAINTIFF'S CONSOLIDATED REPLY MEMORANDUM OF LAW IN**
**FURTHER SUPPORT OF ITS MOTION FOR CLASS CERTIFICATION**

Corrected Copy

**TABE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

A.    Plaintiff Has Demonstrated That Its Evidence Is "Capable" Of
Establishing Antitrust Injury By Proof Common To All Class Member ................................. 1

    1.    Discovery And The Uncontested Evidence Now Show That Defendants
Made ████████████████████
Than Plaintiff Alleged And *Mish I* Found To Be Sufficient At The
Pleadings ........................................................................................................ 2

        a.    Dominance ......................................................................................2
        b.    Predominant Cause ......................................................................2
        c.    Pirrong's Opinion That, From The Time Of ████████████
████████ ...................................................................................2

    2.    Discovery Has Also Revealed That Defendants Engaged In
████████████ Sales Of May Contracts .......................................... 4

    3.    Pirrong's Now Unchallenged Statistical Probability Analysis Shows That,
Absent Manipulation, There Is Effectively A Zero Percent Chance That
The Prices Observed On April 20th And 21st Would Have Occurred ................. 6

    4.    Dr. Pirrong's Extensive Analyses Of Supply And Demand Further
Indicate That An Artificial Force Depressed Prices On April 20 ....................7

    5.    Predominant View .......................................................................................... 11

ARGUMENT ........................................................................................................................... 12

I.    Antitrust Injury Is A Common Question .......................................................................... 12

II.    Uncontested Rule 23 Prerequisites: Defendants Do Not Contest That
Ascertainability, Commonality, or Adequacy of Counsel are Satisfied ............................ 15

III.    Rule 23(a)(1) Numerosity: Defendants Do Not Appear to Contest The Class Is
Sufficiently Numerous that Joinder of All Members Is Impracticable ..............................16

IV.    Rule 23(a)(3) Typicality: Defendants Fail To Contest That Plaintiff's Claims and The
Claims of All Class Members Arise From Defendants' Same Common Course of
Misconduct and Instead Attempt to Shift The Focus to Immaterial Differences
In Class Member Trading of the May Contract on April 20 ..............................................17

    A.    Plaintiff and All Class Members Traded The Same Standardized May Contract
In The Same Centralized NYMEX Futures Exchange Marketplace ........................ 19

i

B.     Courts Have Consistently Held Trading Differences Between a Class Representative and The Class Do Not Defeat Typicality .............................20

C.     Plaintiff Has Undertaken to Prove, and Has the Incentive to Prove, Defendants' Entire Scheme To Depress May Contract Prices on April 20......................................21

V.     Rule 23(a)(4) Adequacy: Defendants' "Unique Defense" Arguments Fail................................22

     A.     Defendants' Boot-Strapped Typicality Argument Fail To Demonstrate Plaintiff is Not an Adequate Representative .........................................................23

     B.     Defendants' Manufactured "Unique Defense" As To Proximate Cause Is Not A Significant Defense and Does Not Otherwise Impact Plaintiff's Adequacy.....................................................................................................................25

VI.     Rule 23(b)(3) Predominance: Defendants Fail To Contest A Significant Portion of Plaintiff's Predominance Showings and Rely on Severe Misstatements and Misapplications of Controlling Law to Manufacture Individual Issues...................................28

     A.     Dr. Pirrong's Price Impact Model and Causation Opinions Satisfy FRE 702, But The Court is Not Required to Make That Merits Determination Now ............. 29

     B.     Dr. Pirrong's Price Impact Model and Causation Opinions Are Common Evidence of Defendants' Artificial Impact on May Contract Prices, Including "Antitrust Impact" and "CEA Injury".........................................................31

          1.     Dr. Pirrong's Model Is Common Proof of "CEA Injury" and "Antitrust Impact" For All Class Members........................................32

          2.     No Individual Analysis of Account Ownership or Trading Data Are Required To Demonstrate Impact or Injury......................................... 33

          3.     Dr. Pirrong's Analyses and Opinions are Common Evidence of Injury and Impact Across The Class .................................................. 36

     C.     There Are No "Uninjured" Class Members and Defendants Ignore the Controlling Seventh Circuit Standard Concerning "Uninjured" Class Members.....................................................................................................................37

          1.     Every Single Class Member Sold At Least One May Contract at An Artificially Low Price And Was Thereby Injured….......................................... 37

          2.     Defendants' "Net Damages" Arguments Do Not Defeat Predominance and Impermissibly "Put The Cart Before The Horse"....................................39

     D.     Plaintiff's Proposed Damages Formula Has Been Accepted By This Court ............. 40

E.  Defendants' "Hedging" and "Offset" Arguments Have Been Unanimously Rejected in Prior Class ............................................................... 43

F.  To Any Extent Defendants Raise a "*Comcast*" Argument, It Fails ............................ 44

G.  Defendants Misguided "Fundamental Factors" Arguments Are Merits Issues That Raise Questions of Law and Fact Common to All Class Members ........................................................................................................ 44

VII.  Rule 23(b)(3) Superiority: Defendants' Strained Superiority Arguments Fail To Refute a Class Action Is "Superior" To Other Methods of Adjudication…. ........................... 46

A   The Absence of Additional Lawsuits Supports Superiority and Does Not Defeat It ......................................................................................................... 46

B.  Defendants' Own Expert Work Demonstrates A Significant Number of Potential Class Members Have "Negative Value" Claims ............................... 47

C.  The Narrow Class Definition Does Not Render The Action "Unmanageable" ................................................................................................. 49

D.  Defendants' Remaining "Superiority" Arguments Fail ................................. 51

VIII.  The Vega Defendants "Likelihood" of Success on The Merits Arguments Are Completely Unsupported and Argue Against The Court's Prior Rulings ............................... 53

A.  The "Likelihood" of Success on the Merits Is Not A Recognized Rule 23(b)(3) Superiority Consideration and Is Otherwise Irrelevant To Superiority ....................................................................................................... 53

B.  The Multiple Sustained Claims Against The Vega Defendants Are Strong ............................................................................................................. 55

C.  The Vega Defendants' Remaining Superiority Arguments Fail ................... 57

IX.  ████████████████████ The Court May Properly ████████ From the Repeated Assertions of ████████████ ........................................ 57

CONCLUSION .............................................................................................................................. 58

## Table of Authorities

**Cases**                                                                   **Page(s)**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ...........................................................................………51

*American Pipe & Construction Co. v. Utah,*
414 U.S. 538 (1974) ................................................................................... 47

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,*
568 U.S. 455 (2013) ...............................................................................…54

*Barnes v. Airline Pilots Ass'n, Int'l,*
310 F.R.D. 551 (N.D. Ill. 2015)................................................................ 16

*Beaton v. SpeedyPC Software,*
907 F.3d 1018 (7th Cir. 2018)………..........................................................23, 31

*Bell v. PNC Bank, Nat. Ass'n,*
800 F.3d 360 (7th Cir. 2015)...........................................................…28, 31, 37

*Birchmeier v. Caribbean Cruise Line, Inc.,*
302 F.R.D. 240 (N.D. Ill. 2014)...............................................................…50

*CE Design Ltd. v. King Architectural Metals, Inc.,*
637 F.3d 721 (7th Cir. 2011)...................................................................…25

*Centurions v. Ferruzzi Trading Int'l, SA.,*
1994 WL 114860 (N.D. Ill. Jan. 7, 1993) .............................................….24, 34

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) ......................................................................……1, 44

*Gaspar v. Linvatec Corp.,*
167 F.R.D. 51 (N.D. Ill. 1996)................................................................…25

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*,
29 F.4th 839 (7th Cir. 2022)…………….......................................................................…...34

*Grossman v. Waste Mgmt., Inc.*,
100 F.R.D. 781 (N.D.Ill. 1984)...........................................................................................25

*Hardy v. City Optical Inc.*,
39 F.3d 765 (7th Cir. 1994) ...............................................................................................26

**In re Amaranth Nat. Gas Commodities Litig.,**
**269 F.R.D. 366 (S.D.N.Y. 2010)**...........................................................................4, 24, 37, 51

*In re Asacol Antitrust Litig.*,
907 F.3d 47 (1st Cir. 2018).........................................................................................…...39

*In re Intuniv Antitrust Litig.*,
2019 WL 3947262 (D. Mass. Aug. 21, 2019)...................................................................39

*In re Nat. Gas Commodities Litig.*,
231 F.R.D. 171 (S.D.N.Y. 2005) ...........................................................................……24, 43

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
292 F. Supp. 3d 14 (D.D.C. 2017), *aff'd* 934 F.3d 619 (D.C. Cir. 2019) .............................…...13, 33, 38

*In re Sulfuric Acid Antitrust Litig.*,
2007 WL 898600 (N.D. Ill. Mar. 21, 2007)...............................................................……34

*In re Sumitomo Copper Litig*,
182 F.R.D. 85 (S.D.N.Y. 1998) ......................................................................6, 20, 24, 43

*In re Sumitomo Copper Litigation*,
74 F.Supp.2d 393 S..D.N.Y. Nov. 15, 1999) ..................................................................48

*In re Term Commodities Cotton Futures Litig.*,
   2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020)................................................................13, 30, 32

*In re Term Commodities Cotton Futures Litig.*,
   2022 WL 485005 (S.D.N.Y. Feb. 17, 2022)................................................................ 17, 27, 42

**In The Matter of Rhone-Poulenc Rorer, Inc.,**
**51 F.3d 1293 (7th Cir. 1995)**................................................................................51, 54

*Johnson v. Yahoo!, Inc.*,
   2016 WL 25711 (N.D. Ill. Jan. 4, 2016) ................................................................…51

*Kleen Prod. LLC v. Int'l Paper Co.*,
   831 F.3d 919 (7th Cir. 2016) ................................................................…52

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
   244 F.R.D. 469 (N.D. Ill. 2007)
   *aff'd* 571 F.3d 672 (7th Cir. 2009)................................................................…*Passim*

*Messner, et al v. Northshore University Health system*
   669 F.3d 818 (7th Cir. 2012) ................................................................*Passim*

*Microsoft Corp. v. Baker*,
   582 U.S. 23 (2017) ................................................................ 54

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
   596 F. Supp. 3d 1076 (N.D. Ill. 2022) ................................................................…*Passim*

*Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*,
   648 F. Supp. 3d 980 (N.D. Ill. 2022) ................................................................55, 56

*Morrow v. City of Tenaha*,
   277 F.R.D. 172 (E.D. Tex. 2011) ................................................................56

*Mullins v. Direct Digital, LLC*,
   795 F.3d 654 (7th Cir. 2015) ................................................................49, 50

*National Super Spuds, Inc. v. New York Mercantile Exchange,*
77 F.R. D. 361 (S.D.N.Y. 1977) ..................................................................................43

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
259 F.3d 154 (3d Cir. 2001) ......................................................................................54

*Payton v. County of Kane,*
308 F.3d 673 (7th Cir. 2002) .....................................................................................53

*Ploss v. Kraft Foods Grp., Inc.,*
431 F. Supp. 3d 1003 (N.D. Ill. January 3, 2020)........................ ……………………………*Passim*

*Ploss v. Kraft Foods Grp., Inc.,*
637 F. Supp. 3d 561 (N.D. Ill. 2022) ..................................................................30, 41

*Prokhorov v. llk Transport, Inc.*
2023 WL 2711599 (N.D. Ill. March 30, 2023) ......................................................25, 37

*Reed v. Advoc. Health Care,*
268 F.R.D. 573 (N.D. Ill. 2009).........................................................................…...34

*Schleicher v. Wendt,*
618 F.3d 679 (7th Cir. 2010) .....................................................................................53

*Stampley v. Altom Transp., Inc.,*
2015 WL 5675095 (N.D. Ill. Sept. 24, 2015)...............................................23, 35, 49

*Strobl v. New York Mercantile Exch.,*
582 F. Supp. 770 (S.D.N.Y. 1984) .............................................................................34

*Suchanek v. Sturm Foods, Inc.,*
764 F.3d 750 (7th Cir. 2014) .....................................................................................47

*Toney v. Quality Res., Inc.,*
323 F.R.D. 567 (N.D. Ill. 2018).................................................................................47

*Vista Healthplan v. Cephalon*,
   2015 WL 3623005 (E.D. Pa. June 10, 2015)......................................................... .......39

*Wagner v. NutraSweet Co.*,
   95 F.3d 527 (7th Cir. 1996) ......................................................................... …..18

*Wal-Mart Stores, Inc., v. Dukes*,
   564 U.S. 338 (2011) ............................................................................... 12, 18, 41

**Statutes**

7 U.S.C. §1.....................................................................................................18

15 U.S.C. §1...................................................................................................18

**Rules**

Fed. R. Civ. P. 23(a) .......................................................................*Passim*

Fed. R. Civ. P. 23(a)(3) ...................................................................*Passim*

Fed. R. Civ. P. 23(a)(4) ...........................................................…..*Passim*

Fed. R. Evid. 702...................................................................... …..*Passim*

 **Other Authorities**

Newberg and Rubenstein on Class Actions (6th ed. 2022.)…………………………… 17, 25, 46, 51, 52

**Errata**

| Page No. | Change |
|---|---|
| | Corrected Table of Contents and Table of Authorities |
| *Passim* | Citation corrections |
| 1 | Change "Introduction" to "INTRODUCTION" |
| 1 | Change "demonstrate" to "demonstrated" |
| 2 | Change "power then" to "power, than" |
| 2 | Deleted "Mish I" |
| 2 | Add "CDT. For example:" after "CDT." |
| 6 | Change "and result in" to "which led to the" |
| 8 | Change "outlfows" to "outflows" |
| 12 n.8 | Change "began" to "begun" |
| 14 | Change "Plaintiffs'" to "Plaintiff's" |
| 15 | Change "Plaintiffs'" to "Plaintiff's" |
| 17 n. 10 | Change "firms are impacted" to "firms impacted" |
| 19 | Change "contract." to "contract" on which a TAS is delivered." |
| 21 | Add "that" after "ignore" |
| 24 n. 16 | Change "contract." to "contract" on which a TAS is delivered." |
| 34 | Change "Plaintiffs'" to "Plaintiff's" |
| 42 | Add "a" after "proof on" |
| 44 | Change "Plaintiffs'" to "Plaintiff's" |
| 48 | Add "the" after "However," |
| 51 n. 43 | Change "But" to "What" |
| 56 n. 56 | Add "that" before "May contract" |

**INTRODUCTION.** Plaintiff Mish International Monetary Inc. ("Plaintiff") respectfully submits this consolidated reply memorandum of law and accompanying evidentiary materials[1] in response to the joint class certification opposition submitted by all Defendants[2] (ECF No. 352, "Opp.") and the supplemental opposition submitted by defendants Vega and Spires (ECF No. 359, "S.Opp."), and to further demonstrate the contested Rule 23 prerequisites are satisfied by a preponderance of the evidence.[3]

### A. Plaintiff Has Demonstrated That Its Evidence Is "Capable" Of Establishing Antitrust Injury By Proof Common To All Class Members.

"Under the proper standard, a plaintiff's 'burden at the class certification stage [was] not to prove the element of antitrust impact,' but only to 'demonstrate that the element of antitrust impact *is capable of proof at trial* through evidence that is common to the class rather than individual to its members.'" *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 818 (7th Cir. 2012) ("*Messner*") (emphasis in original), *quoting Behrend v. Comcast Corp.,* 655 F.3d 182, 197 (3d Cir. 2011) (other citations omitted); ECF No. 352 ("Opp."), p. 38 (same). The antitrust impact in this case is that Defendants (a) allegedly conspired with one another in order to achieve sufficient collective selling pressure, (b) to cause lower prices of the May 2020 NYMEX West Texas Intermediate ("WTI") Light Sweet Crude Oil futures contracts ("May Contract").

Defendants have failed to contest Plaintiff's showing that conspiracy is a common question. *Compare* ECF No. 311 ("Pl.Br.") at 12 *with* Opp. *passim* and S.Opp. *passim*. Defendants have raised numerous merits defenses[4] which tend to show that the common question of whether Defendants were in a conspiracy, will involve significant disputes, substantial time, and will consume a

---

[1] Submitted herewith is the declaration of Matthew Kuipers, Esq. ("KD") and exhibits thereto, including the rebuttal expert report of Professor Craig Pirrong ("Pirrong Reb.").

[2] Defendants are Paul Commins, George Commins, Christopher Roase, Elliott Pickering, Aristos Demetriou, Connor Younger, James Biagioni, Henry Lunn, Paul Sutton, and Matthew Thompson ("Trader Defendants"), Vega Capital London, Ltd. ("Vega") and Adrian Spires ("Spires").

[3] Plaintiff is submitting concurrently herewith a separate memorandum of law opposing Defendants' motion to exclude the expert testimony of Plaintiff's expert Professor Craig Pirrong (ECF No. 355).

[4] S.Opp. at pp. 11-18; Opp. at pp. 6-12.

substantial portion of this litigation.

1. **Discovery And The Uncontested Evidence Now Show That Defendants Made A ████████████████████████████████ Than Plaintiff Alleged And *Mish I* Found To Be Sufficient At The Pleadings**

One reason that the issue of whether Defendants' conspiracy caused May Contract prices to

be lower, is "capable" of proof at trial through evidence common to the Class (*see Messner,* 669 F.3d

at 818), is that discovery has shown that Defendants made ████████████████████████████

████████████████████ than were alleged in the Complaint and found to be sufficient by *Mish Int'l*

*Monetary Inc. v. Vega Cap. London, Ltd.,* 596 F. Supp. 3d 1076 (N.D. Ill. 2022) ("*Mish I*").

| Time Period | Defendants' Share Of Net Aggressor Sales Per *Mish I* | Uncontested Market Share Of Defendants' Aggressor Sales | Percentage Increase From Amended Complaint To The Now Uncontested Evidence |
|---|---|---|---|
| ██████ | ████████████ | ██████████ | ████ |
| ██████ | ██████████ | ████████ | ██ |
| ██████ | ████████████ | ██████████ | ██ |
| ██████ | | ████████ | |
| ██████ | ██████████ | ████ | |
| ██████ | ██████████ | ████████ | ██ |
| ██████ | ██████████ | ████ | ██ |

a. **Dominance**

Also not available at the time of the complaint, Dr. Pirrong has now offered his opinion that



[5] Based on the Vega Traders████████████████████████████████ (see *infra*). ████████████████████████████████████████ For example: ████████████████████████

10.     …. I reach the additional opinion that the Defendants held ████████████████████████████████████████████

***

██████████████████████████████████████████ *Compare* Pirrong ¶21 *with* ECF KD, Ex. 7,

Hendershott Expert Report (hereafter "Hendershott") *passim* (failing to dispute Pirrong's dominance

opinions), *and* Opp. *passim* (same) *and* S.Opp. *passim*. As reflected in the table above, Defendants also

made █████ of the total aggressor sales of May Contracts during the period between ████████ ██████

**b. Predominant Cause.**

Dr. Pirrong testified that the significance of his opinion that ███████████████████████████

██████████████████

A. ...that **they [Defendants] were a**████████████████████████████████████
███████████ ████████████████████████████████

KD Ex. 6 (Pirrong Dep. Tr.) p. 613:20-23 (emphasis added); *compare id. with* Def. submissions *passim*

and KD, Ex. 7, Hendershott *passim* (failing to mention). Having failed to contest "dominance",

Defendants likewise do not mention Pirrong's opinion that Defendants were the "predominant

cause of the price movements" during the all-time record decline in WTI prices between ███████████

████████ on April 20. Opp. *passim* and Hendershott *passim*.

**c. Pirrong's Opinion That, From The Time Of** ███████████████████████████
███████████████████████████████

Dr. Pirrong previously opined:

The consistent effect of Defendants' foregoing ███████████████████████████ enabled

---

18. Next, beginning at ████████ the TDs substantially increased the rate at which they made aggressor sales of May Contracts. *See* ¶¶126-37, 155-58, 237-38, 255. By ████████ the May Contract prices traded at negative levels. This was the first time that any WTI futures contract had traded at a negative price. Between ██████████████, the May Contract price fell from $0 to -$37.63. **This rapid decline was an all-time record decline.**
***

21. ... when May Contract prices were trading at negative levels and **plummeted by an all-time record amount** between ████████████ I find that the TDs increased their shares of aggressive sales of May Contracts to more than █████ of the amount of the total May Contract aggressor sales during that ████████████████. *See* ¶¶126-34, 154-61, 281. **That is, the TDs** ██████████████████████████ while the all-time record price decline occurred. *See* ¶¶191-207, 258-59.4 Accordingly, the TDs had, in my opinion, **a dominant share** of the price moving sales of May Contracts during the all-time record price decline.

Pirrong ¶¶10, 18, 21, (emphases added); *compare* Opp. *passim* (failing to contest these points) and S.Opp. *passim* (same).

Defendants to continue to add to Defendants' cumulative depressive impact on May Contract prices. See ¶¶121-39, 140-47, 191-232, 280-81 below. Defendants' foregoing ███████████████████ directly caused a substantial decrease in the May Contract prices ████████████████████████████████████████████████████████ See ¶¶121-25, 154-61. [Emphasis added] Pirrong ¶17. That is, Pirrong's detailed analyses show that ████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ Id. Given that market power in trade manipulation involves the making of an aggressive trade, Pirrong's foregoing findings are also consistent with (his now uncontested) definition of market power. *Compare* Pirrong ¶¶271-272 *with* Hendershott *passim*, Opp. *passim*, S.Opp. *passim*.

Second, Defendants' lowest market share of aggressive sales on April 20 was for the time period between ███████████. *See* table on p. 2. But even this ████ ████ ████ ████ ████ was significantly higher than the market shares found sufficient in prior manipulation cases.[6]

Third, Vega's ████ market share of aggressive sales between ████████████, and Vega's ████ share between ██████████ on April 20, are each **higher** than the highest market share ████ which Plaintiff originally alleged for any period. *See* Table on p. 2. Defendants' continuously growing market share of the aggressor sales through the end of the day, strongly indicates that the Vega Traders █████████████████████████████████████ ████████████████████.

**2. Discovery Has Also Revealed That Defendants Engaged In ████████████**

Second, discovery has now revealed that Defendants also engaged in a qualitatively different



___

[6] *Brian Hunter*, 130 FERC ¶ 63004, 2010 WL 232835 (FERC Jan. 22, 2010) (finding, based on the same facts as *CFTC v. Amaranth Advisors, LLC*, 523 F.Supp.2d 523 (S.D.N.Y. 2007), *reconsideration denied*, 554 F.Supp.2d 523 (S.D.N.Y. 2008) and *In re Amaranth Nat. Gas Commod. Litig.*, 587 F.Supp.2d 513 (S.D.N.Y. 2008) (manipulation under the Commodity Exchange Act).

type of act which was unknown at the time of the filing of the amended complaint and the decision in *Mish I*: Defendants made ████████████████ An ██████████████████████ ████████████████████████████████████████████ *Compare* Pirrong ¶¶13(b), 249, 252, 254, 309, 311, 313-314 *with* Hendershott *passim* (failing to dispute this).



314

*See* Appendix E,314.
[Emphasis added] Pirrong ¶314; *see also* Pirrong ¶ 249 ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████

   The discovery record further now shows that Defendants ██████████████████ ████████████████████████████████████████████████

████ *E.g.,*

Pirrong Reb. ¶¶ 61, 309, 475. Similarly, the Vega Traders made ████ ██████████████ ██ ████████████████ ████████████ But such Defendants made ████ ████████████████ ██ ██████████████ ██ ████ ██████████████████████ In fact, extensive evidence now shows that the Vega Traders engaged in the ████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ Pirrong Reb. ¶¶50-51; KD, Ex. 3 (Expert Rebuttal Report About

the Price Impact of Vega's Trading, Professor Talis J. Putnins) ("Putnins Report")¶¶109-11.

### 3. Pirrong's Now Unchallenged Statistical Probability Analysis Shows That, Absent Manipulation, There Is Effectively A Zero Percent Chance That The Prices Observed On April 20th And 21st Would Have Occurred

Pirrong also conducted a statistical probability test of whether, absent manipulation, the all-time record decrease in WTI prices would have occurred on April 20 followed by the all-time record increase in prices on April 21. *E.g.*:

> Nor did Dr. Hendershott question in any way my quantitative analyses showing that it is extraordinarily unlikely (**with probability approaching zero**) that in a **competitive market free from manipulation**, and **where there was no intervening news on supply demand**, prices would have registered the observed decrease on April 20 and the observed increase on April 21.

[Emphasis added] Pirrong Reb. ¶18 ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ Hendershott Tr.

pp. 160-163, 165.

The simple explanation is that offered by Dr. Pirrong ███████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Pirrong ¶¶20-21.

Mish further alleges that the prices dropped most dramatically when Defendants exerted the most pressure on the market and that there was a substantial rebound in prices on April 21. Doc 40 at ¶¶ 183-195, 207; Doc. 95 at 27-28. These allegations make it plausible that Trading Defendants played at least some role in causing Mish's injuries.

*Mish I* at 1091; *accord In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 87 (S.D.N.Y 1998) ("*Sumitomo*")

(substantial decline in prices after the alleged manipulation ended was an indication that the accused had caused the artificially inflated prices.).

Hendershott does not challenge the accuracy of Pirrong's quantitative analyses that, absent manipulation, there is a near zero percent chance that the May Contract would register an all-time record decrease on April 20 and an all-time record increase on April 21. Hendershott *passim.*

███████████████████████████████████████████████ Hendershott Tr. pp. 160-163, 165. Dr. Pirrong's unchallenged statistical probability test thus strongly corroborates his findings that ██████████████████████████████████████████████████████████████████ ███████████████████████████.

### 4. Dr. Pirrong's Extensive Analyses Of Supply And Demand Further Indicate That An Artificial Force Depressed Prices On April 20.

Pirrong analyzed extensive evidence relating to the supply and demand for crude oil, including substantial information relating to storage at Cushing Oklahoma. Pirrong ¶¶338-388; Pirrong Reb. ¶¶23-27, 46-50, 62-168. Pirrong concluded that the supply and demand for crude oil, including the storage situation at Cushing Oklahoma, could not begin to explain the all-time record price decreases on April 20. Pirrong Reb. ¶¶24, 105-156, 215, 218, 229. Much less could they explain the all-time record decrease on April 20 and the all-time record increase on April 21. Pirrong ¶¶360-365; Pirrong Reb. ¶¶24, 105-107.

The market for the WTI futures contract is an efficient market. **Pirrong** ¶¶86-96. But no new information was released on April 20 regarding Cushing storage or otherwise indicating prices should fall (let alone by an all-time record amount). Pirrong ¶378; Pirrong Reb. ¶¶47, 146, 187, 191; KD Ex. 73 (Reuters on April 24, 2020: "Prices for May WTI experienced by far their largest one-day decline in history **despite the absence of any obvious new information about production, consumption or inventories**"). Nor were there any new announcements about supply and demand after April 20 indicating that prices should increase, let alone by an all-time record amount on April 21. **Pirrong** ¶¶382-383, Pirrong Reb. ¶¶16, 18. *See e.g.,* KD Ex. 7, Hendershott Dep. Tr. 157:17-25; 159:2-13; 160:6-12; 162:16-25.

On the contrary, information that Cushing might be full in May had long been in the market. Pirrong ¶365, Pirrong Reb. ¶¶88-104, Fn. 139. ███████████████████████████████ ████████████████████████████████████████████████████████ ███████████

█████████████████████████████████ At least thirteen (13) other statements from market participants agreed.[7]

---



Recognizing the need for some new material information as an alternative to Pirrong's opinion that Defendants caused the price depression on April 20, Dr. Hendershott ███████████ ███████████████████████████████████████████████████████ Hendershott ¶99, KD Ex. 7, Hendershott Dep. 140:9-25; 144:3-5; 145:18-20. ██████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ KD Ex.5 Hendershott Report ¶99, KD, Ex. 7 Hendershott Dep. 140:9-25; 144:3-5; 145:18-20. Based solely on ██████████ Dr. Hendershott states that "contemporaneous analysis from market participants reveals they came to the realization around April 20, 2020, that storage in Cushing would reach full capacity as early as May." KD Ex. 5, Hendershott ¶99. As shown above, the information that Cushing might become full had already long been in the market. Pirrong Reb. ¶¶88-104, Fn. 139.

Much worse, the documents cited by Hendershott refute rather than support his assertions. Pirrong Reb. ¶¶87-91, 95, Fn. 215. Dr. Hendershott emphasized in deposition, "[W]e can look at exactly what ████████ was doing, which is a specific example." KD Ex. 7, Hendershott Dep. 119:24—120:1. Resting his entire argument for influential new information on █████████████ ███████████████████████████████████████████████████████████████, Dr. Hendershott wholly neglected to notice (or admit) critical information in ████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████ ██████████████████████ ████████████████████████████████ ███████████████████████ █████████████████████████████████ Consistent with all the other market participants, there is

─────────────────────────

██████████████████████████████████████████████████████████████ ███████████████████ █ ███████████████████████████████████████ ███████████████████████████████████████████████████

nothing in the ███ documents that support Dr. Hendershott's attempt to manufacture a news announcement or non-public supposed mental realization among market participants. Pirrong Reb.¶¶ 87-97 (further criticizing the mismatch between what the ███ documents show and what Dr. Hendershott is attempting to use them for).

In contrast to Dr. Hendershott, Dr. Pirrong analyzed the actual supplies at Cushing in storage. He found that at the beginning of March 2020 Cushing was utilizing ██ percent of its working capacity and by April 20 Cushing's storage tanks were at ██ percent working capacity. Pirrong ¶ 370-372. Pirrong also scrutinized the Energy Information Administration ("EIA") data and determined that by April 24, 2020 Cushing was at 68 percent total storage capacity, which was lower than Cushing had been during 8 months from March 2011 – September 2017. Pirrong 356-357, 370-372; Pirrong Reb. ¶¶ 78-85. Hendershott did not rebut this finding. Hendershott *passim*.

Pirrong reviewed Genscape, GeoSpatial Insight documents ("GSI"), and subpoenaed documents from tank owners. Pirrong ¶¶356, 357, 370-372; Pirrong Reb. ¶¶24, 78-85. Pirrong performed quantitative analyses on the amounts of "working storage" at Cushing. Pirrong ¶371; Pirrong Reb. ¶¶78-85, 205-214. Based on all his analyses, Pirrong determined that the actual storage situation at Cushing could not begin to explain the price movements in the May Contract. Pirrong ¶378; Pirrong Reb. ¶¶116, 215-218.

Importantly, in economics, the applicable quantitative test for determining whether a shortage of storage justifies changes in prices and spreads is based on the theory of storage, and is sometimes referred to as the supply of storage analysis. *See* Pirrong ¶¶359-363; Pirrong Reb. ¶¶23, 105-178, 349-354, Fn. 175. Pirrong performed detailed theory of storage tests. *Id.* They showed that May Contract prices were artificially low on April 20 and not justified by supply and demand. *Id.* Hendershott did not perform a theory or supply of storage analysis. Hendershott *passim*.

Next, Defendants pointed to a statement by the CME that fourteen separate commodity

futures contracts had the potential to trade at negative prices. Pirrong Reb. ¶22. Pirrong performed quantitative tests and determined that (a) of all 14 contracts, only WTI crude oil traded at negative levels, and (b) substantially all of the extraordinary price decline in the May Contract on April 20th was far outside the range of trading in the other similar energy futures contracts. *Id.*

Through the foregoing and other detailed analyses, Pirrong repeatedly opined that the typical quantitative tests in economics and his observation of all of the facts of storage at Cushing and news flow, indicated that nothing in the actual or reported storage conditions could have justified the all-time record price decrease on April 20 and the all-time record price increase on April 21. Pirrong Reb. ¶¶16, 24, 108, 196.

The overwhelming majority of the all-time record price decrease on April 20 ---**$37.63** per barrel --- occurred between ▮▮▮▮▮▮▮▮▮▮▮ CDT. Pirrong ¶23. Pirrong's uncontested market microstructure analyses show that ▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ *See* pp. 2-5 above.

### 5. Predominant View

Instead of conducting standard economic analyses, Hendershott ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[8] Hendershott ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ KD, Ex.7 Hendershott Dep. 102:18—103:5. Hendershott ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Decl. Ex.7 Hendershott Dep. 129:13-14. For example, Dr. Hendershott did not include in his predominant view the following. ▮▮▮▮▮▮▮

---

[8] Compare KD, Ex.7 Hendershott Dep. 10:12-15 *with* KD, Ex. 75 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ That is, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



KD Exs. 78 and 79

KD Ex. 67

KD Ex. 62

KD Ex. 73. Finally,

KD Ex. 80.

Plaintiff has demonstrated that the issue of whether Defendants depressed May contract prices during the Class period is "capable of proof at trial" by evidence common to all Class members. *Messner,* 669 F.3d at 818.

**ARGUMENT**

**I.    Antitrust Injury Is A Common Question**

As Plaintiff reads Hendershott's Report and the Defendants Brief, they fail to contest Plaintiff's initial showing that Defendants caused lower May Contract prices on April 20. Opp. *passim*, S.Opp. *passim*, Hendershott *passim*.

Instead, Defendants avoid the issue of causation of lower prices by trying to transform the antitrust injury test into net impact, *i.e.,* a damages test. Opp. pp. 30-38. However, it "is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)". *Messner,* 669 F.3d at 815 *citing Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 at 362 (deeming it "clear that individualized monetary claims belong in Rule 23(b)(3)"). Likewise, "actual injury" under the CEA is established when a plaintiff transacted in a commodity

futures contract at an artificial price that was to its detriment. *In re Term Commodities*, 2020 WL 5849142, at *38; *see also Kohen*, 244 F.R.D. at 474-76 (plaintiff alleged injury because it "purchased one or more June Contracts during the class period and was injured as a result of defendants' manipulative conduct"). Again, Plaintiff and all Class members, by definition, sold at least one May contract during the Class Period. Motion at 1 (Class definition). Dr. Pirrong's price impact opinions demonstrate May contract prices were artificially depressed by Defendants throughout the Class Period. Pirrong, ¶¶389-397. Thus, Plaintiff and every Class member sold at least one May contract at a price artificially depressed by Defendants and such sale was to their detriment because they received less for those sales than they would have absent Defendants' manipulation.

In *Kohen*, the Court rejected an argument—just like Defendants' argument here—that proof of CEA injury was an individual issue: "if plaintiffs can prove price manipulation, then fact of injury will have been established for all members of the class that purchased the June Contract at higher prices than otherwise would have existed absent manipulation." *Kohen*, 244 F.R.D. at 480. Contrary to Defendants, a full damages analysis is not required to establish "CEA injury."

To establish antitrust injury (what Defendants refer to as "antitrust impact"), Plaintiff must demonstrate Defendants' antitrust violation (*i.e.*, their combination and conspiracy to manipulate and depresses prices of the May contract) was a "substantial factor" in causing the alleged injuries. *Mish I*, 596 F.Supp.3d at 1091. Defendants' own *Rail Freight* case held "a single overcharge is sufficient to show injury" under the antitrust laws and rejected an argument that analysis of all transactions is required for antitrust impact. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137 (D.D.C. 2017), *aff'd* 934 F.3d 619 (D.C. Cir. 2019).

Plaintiff and each Class member incurred the exact same injury as a result of Defendants' anticompetitive conduct—selling one or more May contracts at artificially low prices caused by

Defendants and thereby **receiving less money** for those sales than they would have absent the price depression. Dr. Pirrong's price impact and causation opinions are common proof every Class member sold at least on May contract at an artificially depressed price caused by the Defendants, and thus is capable of demonstrating antitrust impact on a Class-wide basis. *Ploss*, 431 F.Supp.3d at 1018(expert model capable of demonstrating antitrust impact on a class-wide basis). Defendants' arguments should be rejected.

Moreover, Dr. Pirrong also performed a Time Varying Parameter Vector Auto Regression ("TVP-VAR") model. Dr. Pirrong opines

> Based on fundamental and uncontested market microstructure principles, I conclude that the extensive evidence on the ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
>
> ▉▉▉▉▉ Further, I rule out alternative causes of the price declines on April 20, 2020, including supply and demand fundamentals and constraints on storage space.
>
> It is my further opinion that the **outputs from my TVP-VAR model constitute reasonable estimates of the artificial impact** on May contract prices caused by each trade by each TD.

[Emphasis added] Pirrong Reb. ¶¶660-661. Accordingly, if the antitrust injury standard were inflated to require demonstration of net damages (and Plaintiff respectfully submits it should not be), then Plaintiff has satisfied through Dr. Pirrong's TVP-VAR model even Defendants' improperly high test for antitrust injury.

Defendants have moved to exclude Dr. Pirrong's TVP-VAR model under Federal Rules of Evidence 702, because it is supposedly not reliable. ECF 355. However, Plaintiff's opposition to the Rule 702 motion and the expert reports accompanying such opposition demonstrate that it is Dr. Hendershott, not Dr. Pirrong, who has made important modeling and other errors. *See* KD, Ex. 1 (Pirrong Reb.), ¶¶230-378, 400-420, 432-479, KD, Ex. 3 (Putnins Report and Ex.4 (Expert Rebuttal by Dr. Benjamin Goodrich: Evaluating Convergence of Markov Chain Monte Carlo Estimates of a

TVP-VAR Model Applied To Crude Oil Futures Prices on April 20, 2020) ("Goodrich Report").[9] The foregoing and Plaintiff's papers in opposition to the Rule 702 motion are respectfully incorporated herein.

As demonstrated above, the law does not require Plaintiff to establish at this stage that the evidence is "capable" of establishing net damages. But Plaintiff has done so through Dr. Pirrong's TVP-VAR model. Also resolving Defendants' FRE 702 motion against Pirrong's TVP-VAR model is not "critical" to the resolution of the class motion because Defendants' proposed net damages standard far exceeds the demonstration of antitrust injury, *i.e.,* of having sold at an artificially low price. See Motion, pp. 22-23 (price artificiality is established where the accused has specific intent to manipulate and is an illegitimate force in the market and/or when prices are not justified by supply and demand).

## II. <u>Uncontested Rule 23 Prerequisites</u>: Defendants Do Not Contest That Ascertainability, Commonality, or Adequacy of Counsel are Satisfied

Plaintiff previously demonstrated the narrowly defined Class is "ascertainable," that Rule 23(a)(2) commonality is satisfied because there are numerous legal and factual questions common to the Class that are capable of class-wide resolution, and that Rule 23(a)(4) adequacy of counsel is satisfied because the proposed Class counsel have, and will continue to, fairly and adequately protect the interests of the Class. ECF No. 311 ("Motion") at 10-13, 15-18. Defendants do not contest that the foregoing prerequisites are satisfied. *Compare* Opp., *passim* and S.Opp., *passim with Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1011, n. 4 (N.D. Ill. 2020) (defendants "failed to oppose and effectively concedes" numerous Rule 23 prerequisites were satisfied).

---

[9] Two leading experts in their respective fields have provided rebuttal opinions (a) concluding that Dr. Hendershott failed to perform a standard Hasbrouck VAR model, and failed to execute the Markov Chain Monte Carlo ("MCMC") analysis correctly. KD, Ex. 3 (Putnins Report) and Ex. 4 (Goodrich Report). Professor Putnins opines that the TVP-VAR model is a reasonable and appropriate approach for numerous reasons. KD, Ex. 3, ¶19.

### III. Rule 23(a)(1) Numerosity: Defendants Do Not Appear to Contest The Class Is Sufficiently Numerous that Joinder of All Members Is Impracticable

Plaintiff previously demonstrated that there are likely hundreds of geographically dispersed Class members such that "joinder of all members is impracticable." Motion at 10-11. Defendants' do not mention or dispute the geographical disbursement of Class members, or that joinder is "impracticable." *See* Opp., *passim*. Although Defendants only mention numerosity once (Opp., 43, n. 30), and do not appear to contest it has been satisfied, Defendants make two assertions that concern numerosity. First, Defendants suggest in a footnote Plaintiff "may not" satisfy numerosity because only ▇ accounts in the Chicago Mercantile Exchange ("CME") audit trail data traded May contracts "the way Mish [Plaintiff] did." *Id.* But the criteria Defendants' expert employed to reach this conclusion are (a) arbitrary and contrary to the record (*see* V.A. below), and (b) meaningless to numerosity because the test is whether "the class is so numerous that joinder of **all members** is impracticable" Rule 23(a)(1) (emphasis supplied).

Second, Defendants raise certain issues with Plaintiff's expert's analysis showing ▇ accounts in the CME audit trail data satisfy the Class definition. Opp. at 33-34. However, none of these issues is likely to have a significant impact on Plaintiff's estimate of the number of Class members.[10] Moreover, "a plaintiff need not plead or prove the exact number of class members to establish numerosity under Rule 23(a)(1)…and the court may make common sense assumptions to determine numerosity." *Barnes v. Airline Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015)

---

[10] First, most market participants are not equipped to make or take delivery of physical crude oil at the storage and pipelines facilities in Cushing, Oklahoma. Based on CME data ▇▇▇ Pirrong Reb., ¶¶525. Second, ▇▇▇ ECF No. 356, Ex. 32 at 15. Third, if an individual ▇▇▇ account in the CME data ▇▇▇ (Opp. at 33), then ▇▇▇ Defendants identify only ▇▇▇ impacted by the issues they raise. Opp. at 23 and n. 25.

(collecting cases); Newberg and Rubenstein on Class Actions § 3:13 (6th ed.) ("Newberg") ("…it is well settled that a plaintiff need not allege the exact number or specific identity of proposed class members."). The CME data reflecting ▮▮▮▮ accounts that satisfy the Class definition is more than sufficient to demonstrate by a preponderance of the evidence that the Class is sufficiently numerous that joinder of all members is impracticable based on Class size alone. Newberg, § 3:12 ("a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.").

In addition to the CME data, the November 2020 Interim Report by the Commodity Futures Trading Commission ("CFTC") submitted by Defendants reflects that at the start of trading on April 20 there were 173 distinct trader IDs holding "reportable positions" in the May contract (*i.e.*, 350 May contracts or more). ECF No. 356, Ex. 32 at 17-18.[11] These 173 "large traders" do not include any traders holding positions less than 350 May contracts at the start of trading, or any traders holding no position at the start of trading. *In re Term Commodities Cotton Futures Litig.*, 12-cv-5126, 2022 WL 485005, at *4 (S.D.N.Y. Feb. 17, 2022) (numerosity satisfied where 96 large traders held cotton futures contracts during class period). This alone satisfies numerosity.

## IV. Rule 23(a)(3) Typicality: Defendants Fail To Contest That Plaintiff's Claims and The Claims of All Class Members Arise From Defendants' Same Common Course of Misconduct and Instead Attempt to Shift The Focus to Immaterial "Differences" In Class Member Trading of the May Contract on April 20

Rule 23(a)(3) requires "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and if his or her claims are based on the same legal theory." *Ploss*, 431 F.Supp.3d at 1011.

---

[11] The Interim Report does not identify how many of the 173 large traders held short positions at the start of trading on April 20. However, it does reflect that the 173 large traders were short 105,264 May contracts at the start of trading on April 20 and substantially liquidated (bought back) almost 88% of those short positions by the close of trading on April 20. ECF No. 356, Ex. 32 at 17-18.

"The commonality and typicality requirements of Rule 23(a) tend to merge" and commonality is not contested here. *Wal-Mart Stores, Inc., v. Dukes,* 564 U.S. 338 at 349 n. 5 (2011).

Plaintiff demonstrated its claims, and the claims of each Class member, all arise from Defendants' same exact common course of misconduct on April 20, such that Plaintiff and all Class members seek relief from the same Defendants, pursuant to the same statutes, and based on the same set of facts and legal theories. Motion at 13-14. This alone satisfies typicality in cases alleging manipulation of commodity futures contracts in violation of the Commodity Exchange Act, 7 U.S.C. §1 *et seq.* ("CEA") and Sherman Antitrust Act, 15 U.S.C. §1 *et seq.* ("Sherman Act"). *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 244 F.R.D. 469, 477 (N.D. Ill. 2007) (typicality satisfied where plaintiff's claims "arise from the same events or course of conduct that gives rise to the claims of other class members and are based on the same legal theory"), *aff'd*, 571 F.3d 672 (7th Cir. 2009); *Ploss*, 431 F.Supp.3d at 1011 (same). Defendants do not (and cannot) dispute the foregoing. Opp., *passim*.

Yet, Defendants argue typicality is not met because of supposed "differences" between Plaintiff's trading patterns and the trading patterns of other Class members. Opp. at 23-26. The Seventh Circuit has rejected this argument. *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) ("Typicality under Rule 23(a)(3) should be determined with reference to the company's actions…"). Similarly, this Court recently rejected this very argument in denying Defendants' requests to obtain discovery of trading records (ECF Nos. 333, 339), which Defendants argued were relevant to Rule 23(a)(3) typicality, *e.g.*, *Vitol, Inc. v. Vega Capital London Limited, et al.*, 24-cv-01492, ECF No. 7 at 10 (N.D. Ill.):

> I am not persuaded that the requested evidence will move the needle much on the typicality question. Looking at plaintiff's proposed class definition, **it seems unlikely to me that the vagaries of a putative class member's trading strategies or patterns will affect the decision on whether plaintiff has a typical claim about defendants' conduct as compared to anyone else who sold a May 2020 contract between 9:00 a.m. and 1:30 p.m. to liquidate a long position**.

May 30, 2024 Transcript (ECF No. 339) at 6:7-13 (emphasis supplied); ECF No. 338.

**A.** **Plaintiff and All Class Members Traded The Same Standardized May Contract In The Same Centralized NYMEX Futures Exchange Marketplace**

Defendants' typicality arguments depend upon two very bold fact assertions: (1) Plaintiff and Class members supposedly did not all trade the same standardized May contract on April 20, and (2) Plaintiff and Class members supposedly did not all trade in the same centralized NYMEX futures marketplace. Opp. at 23-24. Both assertions are demonstrably false.

First, Defendants claim Plaintiff traded a "non-TAS contract" whereas other Class members traded a "TAS contract." Opp. at 23-25, 26. But there is no such thing as a "TAS contract" on which a TAS is delivered. TAS (Trade at Settlement) is defined by the CME as "an order type that specifies the day's settlement price as the order price."[12] Defendants and their expert both acknowledge TAS is an *order* type, *not* a contract type. Opp. at 2 ("TAS refers to 'Trading at Settlement,' a distinct **order type** offered by the CME…) (emphasis supplied); ECF No. 356, Ex. 1 ("Hendershott") at ¶43 ("TAS **orders** allow traders to execute trades at the yet-to-be determined daily settlement.") (emphasis supplied). Thus, the "TAS contract" Defendants suggest Plaintiff did not trade on April 20 and supposedly will not "focus on" (Opp. at 26), is in fact the same standardized May contract Plaintiff and every other Class member traded on April 20.[13] The only difference is the type of order used to buy or sell the May contract. Accordingly, all Class members (including Plaintiff) traded the same May contract on April 20.

---

[12] https://www.cmegroup.com/education/glossary.html

[13] Defendants assert Plaintiff's expert Dr. Pirrong supposedly did not "focus" on "TAS sellers" because he did not address what these sellers would have done if the Trader Defendants had not purchased the May contracts they sold via TAS. Opp. at 26. However, Dr. Pirrong did focus on "TAS sellers," including by estimating Defendants' impact on the May contract settlement price paid by each TAS seller. ECF No. 324 (Amended Pirrong Report, "Pirrong"), ¶¶77, 97-100, 106, 154, 159-60, 208-221, 282, 284-300, 315-321, 393-94, 399-400. The "but-for" world issue raised by Defendants concerning "TAS sellers" was not addressed by Dr. Pirrong in his initial report because it was immaterial to his analysis. Pirrong Reb., ¶¶276-311. On rebuttal, Dr. Pirrong has shown there was ample depth and liquidity in the market for "TAS sellers" even if the Trader Defendants had not traded and such sellers could have sold the same quantities and without "driving prices even lower." *Id.*, ¶¶285-306, 397, 495, 549-50.

Second, Defendants claim Plaintiff traded its May contracts prior to ██████ in a "market" that was "fundamentally different" than Class members who traded May contracts between ██████████ *i.e.*, the ██████████ of the Class Period. Opp. at 23-24. Defendants' assertion is based on a misleading citation to Dr. Pirrong's report. Opp. at 23 *citing* Pirrong, ¶208. Dr. Pirrong opined that "*market dynamics* were fundamentally different prior to ██████ and afterwards." Pirrong, ¶208 (emphasis supplied). In any event, the ██████████ starting at ██████ did not transform the NYMEX futures market into a different "market" than Plaintiff traded in ██████████ All trading in the May contract by all Class members throughout the Class Period necessarily occurred on the NYMEX futures exchange.

## B. Courts Have Consistently Held Trading Differences Between a Class Representative and The Class Do Not Defeat Typicality

Consistent with this Court's recent ruling quoted above, courts have repeatedly rejected arguments (just like those asserted by Defendants here) that the timing of trades and other differences in a class representative's trading compared to the trading of class members operate to defeat typicality. *E.g.*, *Kohen*, 244 F.R.D. at 477 (finding typicality satisfied and holding "[t]he fact that plaintiffs did not trade through the entire class period does not preclude class certification" and "all class members would desire to compile historical evidence, as opposed to merely relying on evidence based on a single date, to support an allegation of price manipulation in order to lend reliability to their claims"), *In re Sumitomo Copper Litig*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998) (rejecting argument that proposed representative was atypical because they traded on isolated dates during the class period because the fact that members "may have purchased and sold copper futures at different times, for different purposes, does not detract from the fact that every class member purchased or sold the same fungible copper futures contract in the same centralized [] market").

Tellingly, Defendants cite **no case** holding that timing or other differences in trading among class members defeats typicality. Opp., 23-26, *passim*. Instead, Defendants rely exclusively on

inapposite cases involving significantly different claims than those at issue in this commodity futures manipulation case, *e.g.*, sex discrimination, race discrimination, and sexual harassment claims. Opp. at 23-26. Unlike the cases on which Defendants rely, Defendants' common course of misconduct impacted all Class members here in the exact same way—each received less money for their sales of May contracts on April 20 due to Defendants' artificial depression of May contract prices.

### C. Plaintiff Has Undertaken to Prove, and Has the Incentive to Prove, Defendants' Entire Scheme To Depress May Contract Prices on April 20

According to Defendants, Plaintiff's liquidation of its position in the May contract prior to ▮▮▮▮ on April 20 supposedly means Plaintiff has no "need" or "incentive" to prove any of Defendants' conduct or impact on prices between ▮▮▮▮▮▮▮ Opp. at 24-25. This includes whether Defendants caused a ▮▮▮▮▮ starting at ▮▮▮▮ or whether they artificially depressed the May contract settlement price determined at 1:30 p.m. *Id.* These arguments fail.

Critically, Defendants' ignore that Plaintiff's claim for unjust enrichment requires proof of Defendants' profits, which were at least ▮▮▮▮▮ Pirrong, ¶¶398-401. Defendants' profits in the May contract were determined and realized as of 1:30 p.m. on April 20 and turned on the settlement price of the May contract at 1:30 p.m. Thus, contrary to Defendants, Plaintiff and all Class members have every incentive to prove Defendants' manipulative conduct and impact on May contract prices between ▮▮▮▮▮▮▮▮ This includes proving Defendants proximately caused the ▮▮▮▮▮▮▮ and that Defendants otherwise artificially depressed the settlement price of the May contract determined at 1:30 p.m.

Defendants apparently hope Plaintiff and Class members will not undertake to develop comprehensive economic and other proof of Defendants' scheme before or after each Class member traded on April 20. Defendants also apparently hope Plaintiff and Class members will ignore highly relevant events that occurred before April 20 (*e.g.*, Defendants' similar manipulative conduct in penultimate days of prior futures contracts), and highly relevant events that occurred

after April 20 (*e.g.,*  ECF No. 202 ("Complaint"), ¶¶8, 179-194, 253, 262-275, 297, 314.

However, this comprehensive proof is some of the most compelling evidence of Defendants' conspiracy, manipulative conduct, and intent on April 20. Also, a comprehensive economic evaluation of Defendants' trading and impact on May contract prices on April 20 is necessary to have reliable expert testimony under FRE 702—Plaintiff cannot merely evaluate certain slivers of Defendants' conduct limited to the times it traded. Indeed, courts have repeatedly **rejected** arguments that a plaintiff who transacted for only part of the class period supposedly has no need to prove the full extent of the defendants' manipulative scheme. *Kohen*, 244 F.R.D. at 477 ("all class members would desire to compile historical evidence, as opposed to merely relying on evidence based on a single date, to support an allegation of price manipulation in order to lend reliability to their claims"); *see* "B" above (collecting cases). It is illogical as a matter of litigation that Plaintiff will simply disavow any proof of Defendants' conspiracy to manipulate May contract prices ▬▬▬▬ short of the conspiracy successfully reaching one of its primary objectives, *i.e.,* to artificially depress the settlement price of the May contract at ▬▬▬ Since this case began in 2020, Plaintiff has undertaken to prove the *totality* of Defendants' scheme to artificially depress May contract prices on April 20.[14] That same proof will prove the claims of all Class members.

## V.     Rule 23(a)(4) Adequacy: Defendants' "Unique Defense" Arguments Fail

---

[14] The Complaint is replete with allegations concerning Defendants' communications, manipulative conduct, and impact on May contract prices before and after Plaintiff traded on April 20, including Defendants' efforts to artificially depress the May contract settlement price at ▬▬▬ *E.g.,* Complaint at ¶¶137-194. The Court relied on many of these allegations when it denied Defendants' motions to dismiss. *E.g., Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.,* 596 F. Supp. 3d 1076, 1086-1090, 1096 (N.D. Ill. 2022) ("*Mish I*"). This includes Defendants' "highly suspicious" communications before, during, and after the April 20 trading day. *Id.*

To satisfy adequacy "[a] named plaintiff must be a member of the putative class and have the same interest and injury as other members." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027-28 (7th Cir. 2018); *Kohen*, 244 F.R.D. at 478 (same). "The Seventh Circuit has made clear that the bar for a named plaintiff's adequacy is not set high." *Stampley v. Altom Transp., Inc.*, 14-cv-3747, 2015 WL 5675095, at *5 (N.D. Ill. Sept. 24, 2015).

Plaintiff is a member of the Class and suffered the same exact injury as all Class members due to Defendants' alleged violations of the law, *i.e.*, Plaintiff and each Class member sold one or more May contracts at an artificially low price caused by Defendants, and thereby received less money for such sales than they would have received absent the artificially depressed price. Motion at 15-17. Thus, Plaintiff and all Class members (each of whom sold a May contract on April 20) have the exact same interest in establishing Defendants conspired to manipulate and artificially depress the price of the May contract on April 20. *Id.*[15] Defendants assert Plaintiff is supposedly not adequate for two reasons: (1) Plaintiff did not trade the May contract " the same way" other Class members traded the May (*i.e.*, the same argument Defendants make in respect of typicality, *see* IV above), and (2) Plaintiff is supposedly subject to a "unique defense" concerning the proximate cause element of Plaintiff's Sherman Act and CEA claims. Opp. at 26-30. Both arguments fail.

### A.    Defendants' Boot-Strapped Typicality Argument Fails To Demonstrate Plaintiff is Not an Adequate Representative

Defendants argue "[f]or the same reasons that Mish is not typical, it is also not an adequate Class representative." Opp. at 27. The basis for Defendants' first adequacy argument is thus the same as Defendants' typicality arguments—Plaintiff supposedly did not trade the May contract "the same way" Plaintiff did. Opp. at 23-27.[16] However, as previously demonstrated, Plaintiff's claims

---

[15] Defendants do not challenge Plaintiff's showings that it has no fundamental conflicts with the Class and no credibility issues. *Compare* Motion at 15-17 *with* Opp., *passim*.

[16] Defendants rely on their expert for their repeated assertion that "only ▮ accounts" in the CME audit trail data "traded the way" Plaintiff did. Opp. at 4, 5, 19, 25, 27, 37-38 *citing* Hendershot, ¶267. Defendants'

are typical of the Class, including because Plaintiff traded the same May contract on April 20 as every other Class member, and did so on the same NYMEX marketplace.

Defendants rely upon an unpublished Magistrate Judge ruling from 1993 to support their "trading differences" argument in the adequacy context. Opp. at 27 *citing Centurions v. Ferruzzi Trading Int'l, S.A.*, 1994 WL 114860, at \*11 (N.D. Ill. Jan. 7, 1993). *Centurions* found that the proposed class representative supposedly had an "interest" only in proving price artificiality on the specific days it traded the relevant futures contracts during the class period, and no other days. *Id.* However, *Centurions'* findings have since been **expressly rejected** by numerous district courts, including this Court, and have been **implicitly rejected** by the Seventh Circuit. *Kohen*, 244 F.R.D. at 478-479 (rejecting argument plaintiff was not adequate because it traded on different dates than other class members), *aff'd* 571 F.3d at 679-680 (affirming district court's adequacy findings).[17] Moreover, the circumstances present in *Centurions* are not present here: the Class Period is one day (not five and a half months), the Class includes one futures contract (not three), and the Class includes only persons that sold a contract to liquidate a long position. *Centurions*, 1994 WL 114860, at \*13.[18]

---

expert arrives at his █████ account conclusion by limiting Class members to only those that████████ ███ on an ███████ basis, and bought the May contract at positive prices then sold the ████████ of May contracts at negative prices ████████████ *Id.* However, there is no economic or other reasoned basis to divide up Class members using these criteria. Pirrong Reb., ¶¶52-60. Again, there is no such thing as a "TAS contract" on which a TAS is delivered. Plaintiff's claims do not depend on May contract prices trading negative, nor they do depend upon Class members buying the same amount of May contracts when prices were positive. It is also not of any significance that certain Class members traded the May contract "intraday" whereas others had open positions at the start of the Class Period.

[17] *See also Amaranth*, 269 F.R.D. at 380 (expressly rejecting defendants' reliance on *Centurions* in connection with Rule 23(a)(4) adequacy and finding adequacy satisfied where class members traded on different days); *In re Nat. Gas Commodities Litig.*, 231 F.R.D. 171, 183 (S.D.N.Y. 2005) (rejecting argument plaintiff was not adequate because it traded on different dates than other class members); *Sumitomo*, 182 F.R.D. at 92 n.8 (specifically finding *Centurions* to be "unpersuasive" and holding "[a]s to the existence of alleged conflicts because Class members have differing interests in establishing the dates and amounts of manipulation, they do not give rise to a material conflict…").

[18] Defendants fail to acknowledge *Centurions* was certified as a redefined class later that same year. *See sub nom. In re Soybeans Futures Litigation*, 89-cv-7009 & 90-cv-1138, Dkt. No. 208 (N.D. Ill. December 27, 1993)

**B.    Defendants' Manufactured "Unique Defense" As To Proximate Cause Is Not A Significant Defense and Does Not Otherwise Impact Plaintiff's Adequacy**

Defendants assert Plaintiff is not an adequate representative of the Class because it is supposedly subject to a "unique defense" with respect to the proximate cause element of Plaintiff's CEA and Sherman Act claims.  Opp. at 27-30.  However, "[a] unique defense that is insignificant or improbable will not render the proposed class representative's claims atypical."  Newberg, Section 3.45, *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 728 (7th Cir. 2011) (a defendant may not manufacture insubstantial defenses to defeat class certification).[19]  Also, "…it is only when a unique defense will consume the merits of a case that a class should not be certified."  *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 58 (N.D. Ill. 1996).  As Defendants acknowledge, they bear the burden of demonstrating Plaintiff is subject to a unique defense that "is of a nature likely to significantly distract or preoccupy Mish."  Opp. at 29; *Grossman v. Waste Mgmt., Inc.*, 100 F.R.D. 781, 789 n. 9 (N.D. Ill. 1984) (party opposing certification bears burden to demonstrate plaintiff is subject to a unique defense that is a "major focus" of the litigation).  Defendants claim they "have developed strong evidence that the losses for which Mish seeks relief were not proximately caused by the alleged violations of the CEA or Sherman Act" because Plaintiff did not know ████████████

████████.  Opp. at 27-28.  Defendants further assert this "unique defense" will supposedly "divert a significant amount of its [Plaintiff's] time and resources away from protecting the interests of the whole Class."  *Id.* at 28.

---

(recommending motion for expansion of subclass definition be granted; adopted by order on January 26, 1994, Dkt. No. 209); KD, Exs. 70, 76.

[19] Defendants assert their unique defense arguments should be analyzed under Rule 23(a)(4) adequacy instead of Rule 23(a)(3) typicality.  Opp. at 27, n. 20.  However, this Court recently analyzed (and rejected) arguments that a plaintiff's claims failed on "unique grounds" in the context of Rule 23(a)(3) typicality.  *Prokhorov*, 2023 WL 2711599 at *7.  In any event, Defendants do not assert the standards for evaluating a unique defense are different when analyzed under Rule 23(a)(3) or (a)(4).  Opp. at 26-30, *passim*.  Defendants' arguments fail under both Rule 23 prerequisites.

First, Defendants do not have a legitimate proximate cause defense unique to Plaintiff, let alone a "substantial" defense. Contrary to Defendants' assertions, Plaintiff is not seeking any "relief" for "losses" not proximately caused by Defendants, including any losses due to Plaintiff's awareness about whether May contract prices could trade below zero. Defendants' entire "defense" is based upon a severe mischaracterization of Plaintiff's claims and the relief sought. *Ploss*, 431 F.Supp.3d at 1012-13 (rejecting defendants' arguments that typicality and adequacy were not satisfied due to a supposed unique defense because such defense was "unimportant" to plaintiff's theory of liability); *Hardy v. City Optical Inc.*, 39 F.3d 765, 770 (7th Cir. 1994) (rejecting defendants' "unique defense" argument because "defense" did not actually bear upon the underlying claim).

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████ ▪ Plaintiff's actual claims in this action sustained by the Court are based upon, and seek to recover damages arising from, Defendants' conspiracy to manipulate and *artificially depress* the prices of the May contract. Complaint, ¶¶1, 16-17, 29, 128, 137-144, 195-202. Plaintiff's claims are **not** based upon Defendants causing the price of the May contract to trade below zero. *Id.*, *passim*. As Defendants acknowledge, ████████████████████████████████████████

████████████████████████████████████████████████████

---

[20] Although Defendants say Plaintiff is "inexperienced" (Opp. at 12-13), Plaintiff has traded commodity futures contracts for decades, including crude oil futures. Mish Dep. 77:12-79:11.

██████████████. Opp. at 1, 16, 41. This further confirms Plaintiff is not seeking to recover any losses in the May contract not caused by Defendants' misconduct, including any losses due to prices trading below zero.

Second, the proximate cause defense raised by Defendants has not (and will not) "consume" the merits of the case or otherwise become a "major focus" of the litigation. The four-year record in this case reflects Plaintiff has diligently worked to fully protect the interests of the Class. Motion at 15-17. The "defense" asserted by Defendants has not been a focus in this case, nor has it resulted in Plaintiff diverting any resources away from protecting the interests of the Class and Defendants *do not* assert that it has. Opp. at 26-30. Defendants' contention their defense is "likely to significantly distract or preoccupy Mish" *in the future* is based entirely on their own speculation.[21] *In re Term Commodities*, 2022 WL 485005 at *7 (rejecting argument plaintiff's conduct with respect to certain document issues rendered him inadequate because it had not become "a central issue in the action").

Third, Defendants' proximate cause "defense" is also contrary to the legal standards for proximate causation. Defendants state May contracts prices would have traded below zero on April 20 absent the manipulation, Plaintiff's May contract trades would have suffered a loss absent the manipulation, and Plaintiff "might" have suffered more losses absent the manipulation because it could have taken longer to sell its position. Opp. at 29.[22] However, none of these assertions are

---

[21] Defendants have consistently asserted a proximate causation defense applicable to all Class members, which is that fundamental supply and demand factors (and not Defendants) supposedly caused the historic movements in May contract prices on April 20. *E.g.*, ECF No. 71 at 1-2. Indeed, it is Defendants' lead (merits) argument in their opposition brief. Opp. at 1, 6-10. Even if Defendants had a legitimate unique proximate cause defense as to Plaintiff (they do not), it would not become a major focus given Defendants' overarching proximate causation defense against all Class members. Plaintiff and all Class members have the same interest in establishing Defendants' conduct proximately caused artificially depressed May contract prices.

[22] Defendants rely on their expert for their assertion Plaintiff "might" have lost more money absent the manipulation. Opp. at 29 *citing* Hendershott at ¶108. But this opinion is not based on any statistical analysis or other economic proof. *Id.* Plaintiff's expert Dr. Pirrong has demonstrated, based upon an analysis of the relevant data, that Dr. Hendershott's opinion that "TAS sellers" would have been forced to sell in the "non-TAS market" and thereby push May contract prices down further, is wrong and contradicted by the evidence. Pirrong Reb., ¶¶276-311.

relevant to the issue of whether Defendants' conduct "played at least some role in causing Mish's injuries." *Mish I*, 596 F. Supp. 3d at 1091 ("[a]n antitrust violation need not be the sole cause of the alleged injuries," but only a "material element of, and substantial factor in producing, the injury"). Thus, contrary to Defendants, Plaintiff need not claim or establish that the May contract would not have traded below zero absent Defendants' manipulation. Instead, Plaintiff and all Class members need to demonstrate (through common proof) Defendants' conduct was a "substantial factor" in artificially depressing the price of the May contracts they sold during on April 20 during the Class Period. *See* V below (discussing common evidence of proximate cause and injury). Accordingly, Plaintiff and Class members are not seeking relief for losses not proximately caused by Defendants.

Fourth, Defendants have not cited ***any*** CEA or Sherman Act case where class certification was denied due to a supposed unique defense, let alone a proximate cause defense. Opp. at 26-30. Instead, Defendants rely exclusively on inapposite cases that involve very different claims and facts than those at issue here, namely fraud claims that involved alleged violations of state consumer protection and fraud statutes, and federal securities laws. Opp. at 29-30, n. 21 (citing cases). The cases Defendants rely upon all involved situations where there was evidence the class representative had no claim because it had not been deceived by the defendants' alleged deceptive conduct, or it had not relied on defendants' alleged misrepresentations. *Id.*

## VI. <u>Rule 23(b)(3) Predominance</u>: Defendants Fail To Contest A Significant Portion of Plaintiff's Predominance Showings and Rely on Severe Misstatements and Misapplications of Controlling Law to Manufacture Individual Issues

To satisfy predominance, a plaintiff need only demonstrate its claims are "*capable of proof at **trial*** through evidence that is common to the class"—a plaintiff is not required to "actually prove" the elements of its claims, or that it will prevail on the merits. *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 375-76 (7th Cir. 2015); *Messner*, 669 F.3d at 818 (same). District courts have repeatedly found "common questions do predominate over individual questions in cases alleging

price manipulation under the Commodity Exchange Act and § 2 the Sherman Act." *Ploss*, 431

F.Supp.3d at 1014-15 (collecting cases); Motion at 9, n. 5 (collecting certified CEA cases).[23]

Plaintiff has demonstrated, claim-by-claim, element-by-element, common evidence is

available and may be used resolve the CEA, Sherman Act, and unjust enrichment claims of all Class

members. *Compare* Motion at 18-32 *with Messner,* 669 F.3d at 819 (a plaintiff can meet the

predominance requirement by showing that common evidence will be used to prove the class

members' claims.). In response, Defendants did not contest a significant portion of Plaintiff's

showings that common questions are capable of resolution through common proof. Motion at 18-

34. This includes whether Defendants engaged in a conspiracy in restraint of trade to manipulate

May contract prices, whether Defendants intended to manipulate May contract prices, whether

Defendants had the ability to manipulate May contract prices, and whether May contract prices on

April 20 were "artificial." *Compare* Motion at 18-24 *with* Opp. at 30-38, *passim.* Defendants instead

focus their predominance arguments on the admissibility and merits of Dr. Pirrong's price impact

modeling (*see* "A" below), a supposed need for individual inquiries to establish "antitrust impact"

and "CEA injury" (*see* "B" below), a supposedly high number of "uninjured" Class members (*see* "C"

below), and Class member damage calculations (*see* "D"-"F" below). Opp. at 30-39. Defendants'

predominance arguments are premised upon severe misstatements and misapplications of

controlling law.

## A. Dr. Pirrong's Price Impact Model and Causation Opinions Satisfy FRE 702, But The Court is Not Required to Make Merits Determinations Now

---

[23] Defendants attempt to distinguish all the previously certified CEA cases based on supposedly unique fact circumstances of this case. Opp. at 21. This misses the point. When an alleged manipulator engages in conduct designed to artificially inflate or depress prices of a standardized futures contract traded in a centralized futures market, the alleged manipulator's conduct is common to all persons (class members) trading that same standardized contract and such conduct impacts members the same way—*i.e.*, paying too much or selling for too little. Thus, the key overarching questions and issues (*e.g.*, manipulative intent, ability to influence, and causation of artificial prices) are all common questions capable of class-wide resolution. The same is true in this case.

Defendants' lead predominance argument is that Dr. Pirrong's price impact model cannot serve as (class-wide) proof Defendants caused artificial May contract prices because Dr. Pirrong's opinions should be excluded pursuant to FRE 702. Opp. at 30-32. Dr. Pirrong is a leading expert in commodity futures price manipulation. He has served as an expert for plaintiffs alleging manipulation, defendants accused of manipulation and has been retained by the CFTC and CME due to his expertise in commodity markets. Dr. Pirrong's opinions in manipulation cases have been found reliable and admissible by this Court and other courts over the objections of defendants. *E.g.,* *Ploss v. Kraft Foods Grp., Inc.,* 637 F. Supp. 3d 561, 566-67 (N.D. Ill. 2022) (denying *Daubert* motion seeking to exclude Dr. Pirrong's price impact model and causation opinions in CEA class action); *In re Term Commodities Cotton Futures Litig.,* 12-cv-5126, 2020 WL 5849142, at *18-22 (S.D.N.Y. Sept. 30, 2020) (same).[24] As set forth in Plaintiff's opposition to Defendants' FRE 702 motion submitted herewith, Dr. Pirrong's opinions are reliable and otherwise fully satisfy FRE 702.[25]

Defendants claim the Court must "conclusively" rule on their separate FRE 702 motion prior to ruling on Plaintiff's Rule 23 motion. *Id.* at 3, n. 6. However, the Court is not required to

---

[24] Defendants' merits criticisms of Dr. Pirrong in their "statement of facts" are addressed in Dr. Pirrong's rebuttal report. *E.g.,* Pirrong Reb., ¶¶301, 424-31 (trading during settlement period), ¶¶53, 193, 220-25, 314, 394, 408 (May contract price action after 1:30 p.m. settlement on April 20), ¶¶421-33 (price rebound on April 21 and "permanent" price impact), ¶¶79-94, 101014, 174-78, 187, 354 (storage utilization calculation), ¶¶33, 157-66 ("committed" storage at Cushing). Relatedly, Dr. Pirrong's modelling specifically controlled for non-Defendant factors, including fundamental supply and demand factors identified by Defendants. *Compare* Opp. at 31 *with* Pirrong, ¶¶, 337, 352. Dr. Pirrong also separately analyzed supply and demand factors and determined that such factors cannot explain the historic price changes in the May contract on April 20 (or the historic bounce back in May contract prices the next day), including because there were no material changes in such factors on April 20-21. *Id.* at ¶¶334-88.

[25] Defendants' FRE 702 motion is premised largely on the work of Defendants' expert Dr. Hendershott whose work includes numerous disabling methodological and other serious errors. ████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ KD, Ex. 7 at 12:21-13:2.

rule on Defendants' FRE 702 challenges unless Dr. Pirrong's opinions are "critical" to the determination of whether predominance is satisfied. *Messner*, 669 F.3d at 812.[26] Again, Plaintiff is required to demonstrate its claims are "*capable of proof at trial* through evidence that is common to the class." *Bell*, 800 F.3d at 375-76. The Court's recent treatment of this exact issue in a CEA manipulation case is instructive. In *Ploss*, the defendants opposed class certification and moved to exclude Dr. Pirrong's modeling and causation opinions. *Ploss*, 431 F.Supp.3d at 1021-22. The defendants in *Ploss* argued (like the Defendants here) that the Court was supposedly required to rule on their *Daubert* challenges because plaintiff relied on Dr. Pirrong's price impact and causation opinions for their predominance showing. *Id.* The Court considered and squarely **rejected** this argument: "Neither Pirrong's causation opinions in his initial report nor the "new" material in his rebuttal report are critical to establishing any of the Rule 23 requirements for class certification. …At this stage, all that Ploss was required to do was show that the class's claims will rely on common evidence. And that Ploss has done, specifically by relying on Pirrong's event study." *Ploss*, 431 F.Supp.3d at 1021-22; *Ploss*, 15-cv-2937, ECF No. 345 (N.D. Ill. Feb. 21, 2020) (Rule 23(f) review denied).[27]

### B. Dr. Pirrong's Price Impact Model and Causation Opinions Are Common Evidence of Defendants' Artificial Impact on May Contract Prices, Including "Antitrust Impact" and "CEA Injury"

Defendants' second primary argument against predominance is that Dr. Pirrong's price impact model and other opinions supposedly fail to provide common evidence of "antitrust impact

---

[26] Defendants misquote the applicable standard for evaluating expert testimony at the class certification stage. Opp. at 3, n. 6 citing *Beaton*. The full quote in *Beaton* states a district court "must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion," **if the "expert's report or testimony is critical to class certification**." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1027 (7th Cir. 2018) (emphasis supplied).

[27] Defendants attempt to distinguish *Ploss* in one sentence by suggesting its determination of defendants' *Daubert* challenges were not "critical" to the predominance determination turned on the **type** of expert modelling at issue, an event study. Opp. at 32. This is false. The determination was based on "what is required at the class-certification stage." *See* above quote.

31

and CEA injury." Opp. at 32-27. However, Defendants have conspicuously avoided defining or otherwise explaining the requirements for antitrust impact and CEA injury. Opp., *passim*. This is because Defendants have no legal support for what they say is required to demonstrate injury and impact—namely a showing of "net damages." *Id.* That is, Defendants claim injury and impact require analysis of *all* May contract trades during the Class Period (and potentially even other non-Class instruments as well) and proof that, on net, a Class member sold more negative price artificiality in May contracts than artificiality it bought. This is not the law, and Defendants seek to impose this standard to manufacture individual inquiries where none exists. *See* "1"-"2" below.

### 1. Dr. Pirrong's Model Is Common Proof of "CEA Injury" and "Antitrust Impact" For All Class Members

"Actual injury" under the CEA is established when a plaintiff transacted in a commodity futures contract at an artificial price that was to its detriment. *In re Term Commodities*, 2020 WL 5849142, at *38; *see also Kohen*, 244 F.R.D. at 474-76 (plaintiff alleged injury because it "purchased one or more June Contracts during the class period and was injured as a result of defendants' manipulative conduct"). Again, Plaintiff and all Class members, by definition, sold at least one May contract during the Class Period. Motion at 1 (Class definition). Dr. Pirrong's price impact opinions demonstrate May contract prices were artificially depressed by Defendants throughout the Class Period. Pirrong, ¶¶389-397. Thus, Plaintiff and every Class member sold at least one May contract at a price artificially depressed by Defendants and such sale was to their detriment because they received less for those sales than they would have absent Defendants' manipulation.

In *Kohen*, the Court rejected an argument—just like Defendants' argument here—that proof of CEA injury was an individual issue: "if plaintiffs can prove price manipulation, then fact of injury will have been established for all members of the class that purchased the June Contract at higher prices than otherwise would have existed absent manipulation." *Kohen*, 244 F.R.D. at 480. Contrary to Defendants, a full damages analysis is not required to establish "CEA injury."

To establish antitrust injury (what Defendants refer to as "antitrust impact"), Plaintiff must demonstrate Defendants' antitrust violation (*i.e.*, their combination and conspiracy to manipulate and depresses prices of the May contract) was a "substantial factor" in causing the alleged injuries. *Mish I*, 596 F.Supp.3d at 1091. Defendants' own *Rail Freight* case held "a single overcharge is sufficient to show injury" under the antitrust laws and rejected an argument that analysis of all transactions is required for antitrust impact. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 137 (D.D.C. 2017), *aff'd* 934 F.3d 619 (D.C. Cir. 2019).

Plaintiff and each Class member incurred the exact same injury as a result of Defendants' anticompetitive conduct—selling one or more May contracts at artificially low prices caused by Defendants and thereby **receiving less money** for those sales than they would have absent the price depression. Again, Dr. Pirrong's price impact and causation opinions are common proof every Class member sold at least on May contract at an artificially depressed price caused by the Defendants, and thus is capable of demonstrating antitrust impact on a Class-wide basis. *Ploss*, 431 F.Supp.3d at 1018 (expert model capable of demonstrating antitrust impact on a class-wide basis).

## 2. No Individual Analysis of Account Ownership or Trading Data Are Required To Demonstrate Impact or Injury

Defendants rely upon their incorrect "net damages" standard for injury and impact to argue at length that (a) the CME trading records and other information currently available are insufficient to determine Class membership and do not include all trading Defendants deem relevant to the calculation of net damages, and (b) even if sufficient information were available, "individualized" analyses of that information would be required to determine injury and impact (net damages) for each Class member. Opp. at 33-36. A complete answer to all these arguments is that CEA injury and antitrust impact do not require a calculator, a damages analysis, or any individual inquiries into account ownership or trading records. *See* "B" above (discussing standards). The Seventh Circuit has squarely rejected the exact argument Defendants raise here:

> PIMCO argues that before certifying a class the district judge was required to determine which class members had suffered damages. But putting the cart before the horse in that way would vitiate the economies of class action procedure; in effect the trial would precede the certification.

*Kohen*, 571 F.3d at 676. Indeed, the determination of damages depends upon the proof and outcome at trial and ultimately the jury's findings concerning the levels of price artificiality. *E.g., Strobl v. New York Mercantile Exch.*, 582 F. Supp. 770, 779 (S.D.N.Y. 1984) (jury was not required to accept plaintiff's expert's testimony concerning price artificiality but was entitled to do so and holding jury's finding of more price artificiality than expert estimated was not unreasonable). Additional Seventh Circuit precedent further confirms that the damages analyses Defendants say are required are "irrelevant" to class certification. *Messner*, 669 F.3d at 823 ("that some class members' claims will fail on the merits if and when damages are decided, [is] a fact generally irrelevant to the district court's decision on class certification"). The only legal authority cited by Defendants to support their net damages standard is *Centurions* (Opp. at 36), which is a heavily criticized 1993 decision issued well before the controlling Seventh Circuit decisions in *Kohen* and *Messner* quoted above.[28] *See* above (detailing why Defendants' reliance on *Centurions* is misplaced). Although the foregoing is a complete answer to Defendants' individual inquiry arguments concerning injury and impact, Plaintiff responds to Defendants' trading records arguments.

First, Defendants argue Dr. Pirrong's price impact model "does not consider all relevant trading" because he relied on CME audit trail data, ████████████████████████████

---

[28] Defendants' misleading quotes from *Gorss*, *Sulfuric Acid*, and *Reed* do not support Defendants' arguments that impact or injury will require individual inquiries. Opp. at 35. The "mini trials" Defendants reference in *Gorss* related to the issue of whether class members consented to faxes that formed the basis for the alleged violations of the Telephone Consumer Protection Act, a defense asserted by the defendants. *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 846 (7th Cir. 2022). *Sulfuric Acid* granted certification and found predominance satisfied when considering the "relevant question," *i.e.*, "whether any given price that was charged [] was higher than it would have been in the absence of the alleged conspiracy…" *In re Sulfuric Acid Antitrust Litig.*, 03-cv-4576, 2007 WL 898600, at *7-10 (N.D. Ill. Mar. 21, 2007). *Reed* involved a situation where the expert's antitrust impact analysis suffered from at least three "fatal flaws," none of which are present here. *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 590-93 (N.D. Ill. 2009).

Opp. at 33. This fundamentally misunderstands Dr. Pirrong's analysis. Dr. Pirrong utilized CME audit trail data to estimate Defendants' impact on May contract prices because all Defendants' trading in the May contract occurred on Globex. The fact that a small number of May contract trades on April 20 (less than 6.5%) occurred on the NYMEX but not on the CME Globex system is of no consequence. Dr. Pirrong's estimates of Defendants' depressive impact on May contact prices can be applied equally to May contract trades on and off Globex. Pirrong Reb. ¶¶39, 504-541. Second, "[a]t the certification stage, a plaintiff need not prove that there is a reliable and administratively feasible way to identify all who fall within the class definition." *Stampley*, 2015 WL 5675095, at *3. Thus, Defendants' arguments concerning the need to identify Class members are irrelevant. In any event, Plaintiff has detailed administratively feasible ways to identify Class members. *See* VII.C. below.

Third, Plaintiff is not required to compile a complete record of all Class member trading in the May contract on April 20 to satisfy any Rule 23 prerequisite. However, Plaintiff has obtained such a record in this case. Defendants acknowledge the CME produced ██████████████████ ████████████████. Opp. at 33-34. But Defendants say a small number of May contract trades (6.5% of May contract trades) did not occur on Globex and thus █████████████████ █████████████ *Id.* However, Defendants fail to disclose that the CME also produced ██████ ███████████████████████████████████████ Pirrong Reb., ¶¶39, 504-541. Moreover, there are multiple other sources of Class member trading records besides the CME, including clearing firms, non-clearing firm futures commission merchants ("FCM"), and Class members themselves. *See* VII.C. below.

Fourth, "hedging" and "offsets" are not required to determine injury or impact, nor do these issues (which have not even been ruled on by the Court) otherwise defeat class certification. *See* "E" below (collecting cases rejecting hedging arguments in CEA class certification cases). To any extent

the Court permits offsets, there are common formulas available to address the products identified by Defendants. *Id.* Fifth, Defendants' arguments that predominance is not satisfied because Class members did not "trade the same way" as Plaintiff traded, has repeatedly been rejected as a basis to defeat certification. *See* above. Notwithstanding Defendants' attempts to differentiate Plaintiff's trading based on irrelevant criteria, Plaintiff and all Class members all sold the same exact standardized May contract on the same exact centralized NYMEX futures market, and all received less money for those sales than they would have absent Defendants' misconduct.

### 3. Dr. Pirrong's Analyses and Opinions are Common Evidence of Injury and Impact Across The Class

Defendants argue Plaintiff does not have a "common model" because Dr. Pirrong's supposedly "abandons" his TVP-VAR model at ████████ and has "no price impact model at all" from ████████ Opp at 18, 32-33. This is false. Dr. Pirrong ran the TVP-VAR model from the start of the Class Period at 9:00 a.m. until the end of the Class Period at 1:30 p.m. and the TVP-VAR model can estimate artificiality throughout that entire period. Pirrong Reb., ¶¶411, 400-416; Pirrong, ¶391. However, Dr. Pirrong found evidence of a substantial evidence of a structural break, *i.e.* ████████ at around ████████ *Id.* Dr. Pirrong opined Defendants were a substantial cause of the ████████ and proposed a methodology for estimating Defendants' price impact during the ████████ Pirrong, ¶¶10, 394. Dr. Pirrong testified that because of double counting, it would not be appropriate to attribute artificiality to Defendants from both the TVP-VAR model and the ████████ analysis after ████. Pirrong Reb., ¶¶414-416. Even when augmented with the ██ ██ analysis, the TVP-VAR price impact model remains common class-wide proof of impact for every single Class member, including during the ████████ of trading. This is because Dr. Pirrong's artificiality estimates after ████ include both (a) the price impact estimates from the TVP-VAR model from ████████ plus (b) the incremental price impact estimate from the ████ during the ████████ Pirrong Reb., ¶¶414-416. The

additional common proof of the █████ analysis for trades during the ███████ of the Class Period would not somehow operate to defeat predominance, and Defendants do not cite a single case that would support such a conclusion. *Compare* Opp. at 32-33 (citing no cases) *with In re Amaranth Nat. Gas Commodities Litig.*, 269 F.R.D. 366, 383-84 (S.D.N.Y. 2010) (certifying class Rule 23(b)(3) class in CEA action involving multiple price impact models). Dr. Pirrong's TVP-VAR model and █████ analysis are common evidence to all Class members, who will endeavor to prove the entirety of Defendants' scheme to depress May contract prices on April 20 and not limit their proof to only specific times they traded.

### C. There Are No "Uninjured' Class Members and Defendants Ignore the Controlling Seventh Circuit Standard Concerning "Uninjured" Class Members

#### 1. Every Single Class Single Member Sold At Least One May Contract at An Artificially Low Price And Was Thereby Injured

The Class includes precisely **zero uninjured** Class members under the controlling Seventh Circuit "could not have been harmed" standard. Motion at 38-39. Defendants have avoided quoting or citing this standard. Opp, *passim*. This is because Defendants' "uninjured" Class member arguments are all premised (again) on an incorrect "net damage" standard. Opp. at 36-38.

As this Court has repeatedly acknowledged, "there is a difference between a class including members who **could not have been harmed at all** by the defendants' conduct, and those who **ultimately were not harmed**. The former, but not the latter, can preclude certification." *Ploss*, 431 F.Supp. 3d at 1019 (emphasis supplied); *Prokhorov*, 2023 WL 2711599 at *3 (same). This critical distinction between members who "could not have been harmed" and those that "ultimately were not harmed," has been consistently affirmed by the Seventh Circuit. *Messner*, 669 F.3d at 824 ("[A] class is defined too broadly" if it "include[s] a great number of members who for some reason *could not* have been harmed by the defendant's allegedly unlawful conduct."); *Bell*, 800 F.3d at 380 (same).

In *Ploss*, the defendants argued traders who were "hedgers" or only traded "intraday" were "uninjured" because losses they incurred buying futures at an inflated price would have been offset by gains from sales of futures other transactions. *Ploss*, 431 F.Supp. at 1019-20. The Court squarely *rejected* that argument, which is the same argument Defendants make here:

> Kraft has not presented any evidence showing that intraday or hedging trader *could not* have been harmed by Kraft's Scheme. Indeed, these traders could have been harmed— they purchased wheat futures at the allegedly inflated prices.

*Id.* Thus, a Class member "could have been harmed" if they sold a May contract at an artificially depressed price. *Id.* Every Class member here did just that.

The cases on which Defendants rely for their "uninjured" Class member arguments further serve to highlight Defendants have disregarded the controlling Seventh Circuit standard. For example, Defendants cite the 12.7% "uninjured members" in *Rail Freight*. Opp. at 37. In *Rail Freight*, the defendants (like Defendants here) tried to argue the court should consider all shipments for class members to determine whether the class included uninjured members. *Rail Freight*, 292 F.Supp.3d at 135-36. The district court rejected this argument and concluded "even a single shipment with a positive overcharge to a particular shipper is sufficient to show injury to that shipper." *Id.* at 136-137, *aff'd* 934 F.3d 619 (D.C. Cir. 2019). Class certification was defeated in *Rail Freight* because 12.7% of the class had zero conspiratorial overcharges due to operating under legacy contracts that predated the alleged conspiracy. *Id.* at 138

Defendants' other cases (all outside of the Seventh Circuit except for *Messner*) similarly involve persons (unlike any Class members here) that **could not have been harmed** by the alleged misconduct at issue in the case. Each of these cases clearly identifies the "uninjured" class members as those who never paid an anticompetitive price. *Messner*, 669 F.3d at 826 (recognizing class members could not have been harmed if they were contractually insulated from the conspiratorial

price increases but rejecting defendants' arguments that the class could not be certified because the defendant "has given us no indication how many such individuals actually exist.").[29]

Defendants and their expert tacitly acknowledge the correct standard by attempting to show there are supposedly "three categories" of Class members who "could not have been harmed." Opp. at 19, 37. However, each of the three examples fails to identify **any** Class member (hypothetical or otherwise) that did not sell at least one May contract at an artificially depressed price. Again, a Class member "could have been harmed" if they transacted a May contract at an artificial price to their detriment—all did. Thus, although Defendants use the phrase "could not have been harmed" for purposes of their "categories," they continue to focus on Class members who may be shown, after trial, to not have net damages.

Class members who are "hedgers" are not uninjured. First, the presence of hedgers in a Class does not operate to defeat certification. *See* "E" below (collecting cases). Second, the Court in *Ploss* rejected the argument that hedgers "could not have been harmed." *Ploss*, 431 F.Supp. at 1019-20. Indeed, each "hedger," like every other Class member, sold at least one May contract at an artificially low price. Third, the issue of "hedging" offsets has not been decided and Defendants have cited no case that would support the types of one-sided offsets Defendants suggest are appropriate.[30] Fourth, if offsets are accepted, they may be calculated formulaically. *See* "E" below.

### 2. Defendants' "Net Damages" Arguments Do Not Defeat Predominance and Impermissibly "Put The Cart Before The Horse"

---

[29] *In re Intuniv*, 2019 WL 3947262, at *8 (D. Mass. Aug. 21, 2019) (estimating that 8% of the class "never paid an overcharge and were therefore uninjured by Defendants' allegedly anticompetitive conduct"); *Vista Healthplan v. Cephalon*, 2015 WL 3623005, at *20 (E.D. Pa. June 10, 2015) (finding that 5% of the class "had no out-of-pocket payment, and thus were uninjured," that is they did not pay any allegedly anticompetitive price); *Asacol*, 907 F.3d at 47 (10% of the class was not injured because those class members would have paid additional monies for the name brand Asacol prescription even in the presence of the less expensive generic Asacol).

[30] Even though the Class is only seeking to recover damages arising from their transactions in May contracts during the Class Period, Defendants suggest that "offsets" in other instruments should operate only to reduce (but not increase) Class member damages. That is, if a Class member lost additional money in "offset" instruments, those damages would not increase that Class member's recovery. Defendants cite no support for this inequitable and one-sided treatment.

Unable to identify a single Class member that "could not have been harmed," Defendants switch to attempting to demonstrate the percentage of the Class who may latter be shown to not have "net damages." Defendants estimate the percentage of Class members that do not have "net damages" to be ███████ using the same CME audit trail data Defendants say cannot be used to calculate damages. Opp. at 36-37.

This argument fails. Again, this is not the correct standard for determining whether the Class definition is too broad because it includes too many members who "could not have been harmed." *See* "1" above. Second, the Class is defined in such a way that there will likely be a small number of members who may not be later shown to have net damages. This is because (1) Class membership requires the sale of a May contract to liquidate a long position (*see* Class definition); and (2) ████████████████████████████████████████████████████ ██ Pirrong, ¶¶17-24, 230. Class members who are long before they sell would typically be selling more negative artificiality than they are buying. Third, courts recognize that following a liability trial, there is typically a claims process through which Class member damages may be determined. *E.g.,* *Kohen*, 571 F.3d at 676. Any Class member determined to not have net damages after the finder of fact determines the appropriate amounts of artificial depression in the May contract on April 20, will not be entitled to any recovery. *See* "D" below. Thus, Defendants will not be liable for one penny of damages to any Class member later determined to not have net damages.[31]

## D. Plaintiff's Proposed Damages Formula Has Been Accepted By This Court

---

[31] Even if "net damages" was the correct standard (it certainly is not), the remedy would be to narrow the Class definition. *Kohen*, 571 F.3d at 672. If Class membership was limited to persons who (a) sold a May contract to liquidate a long position during the Class Period and also (b) did not purchase a May contract during ████████████ the number of accounts in the CME data that do not have net damages is less than ██ *i.e.,* below the threshold Defendants say is required. *Compare* Pirrong Reb., ¶651 *with* Opp. at 37.

Case: 1:20-cv-04577 Document #: 425 Filed: 12/19/24 Page 51 of 69 PageID #:16712

The Supreme Court and the Seventh Circuit recognize predominance is satisfied despite the need to make individualized determinations as to damages. *Messner*, 669 F.3d at 815 ("It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)") *citing Wal–Mart v. Dukes,* 564 U.S. at 362 (deeming it "clear that individualized monetary claims belong in Rule 23(b)(3)"). Individualized damages determinations were present in each prior CEA manipulation case certified under Rule 23(b)(3). *E.g., Kohen*, 244 F.R.D. at 480 ("the Court rejects defendants' argument that individual questions will predominate because, at some point, damage calculations may be required on an individual basis.").

Defendants nevertheless assert several arguments to the effect that Class member damage calculations supposedly defeat predominance. First, Defendants claim Plaintiff has "no 'formulaic' way of calculating damages across the class" because Plaintiff cannot prove injury on a class-wide basis. Opp. at 38. However, Plaintiff has demonstrated injury is capable of proof on a class-wide basis. *See* above. Moreover, Plaintiff has proposed a "formulaic" way of calculating Class member damages and detailed that formula in its moving papers. Motion at 35. The formula proposed by Plaintiff (*i.e.*, calculating artificiality paid and artificiality received for each purchase and sale of May contracts during the Class Period and netting artificiality paid and artificiality received) has been accepted in prior CEA class actions, including in this District. *E.g., Ploss,* 637 F. Supp. 3d at 580 (accepting plaintiff's expert's formula for applying futures contract artificiality estimates to class representative's futures trading). It is also the same formula Defendants' expert used to programmatically calculate damages for ▮▮▮▮ accounts in the CME data (Hendershott, ¶262, Fig. 25), which Defendants rely upon to assert Rule 23(b)(3) arguments.

Second, Defendants argue Plaintiff's proposed common formula for calculating damages is "too simplistic." Opp. at 38-39. But Defendants do not identify any specific flaw with Plaintiff's proposed damages formula. *Id.* Instead, Defendants assert that *applying* the formula requires

41

evaluation of a Class member's individual positions and trades in the May contract "on and off Globex." *Id.* However, the formula applies equally to May contract trades both on and off Globex, and evaluation of Class member positions and trades to calculate damages has been necessary in every prior CEA action certified pursuant to Rule 23(b)(3).[32]  *Compare* Motion at 9, n. 5.  To any extent Defendants are suggesting the proposed damages formula is "too simplistic" because it does not include trading in additional instruments beyond the May contract (the only Class instrument), these "hedging" or "offset" argument fail to defeat predominance.  *See* "E" below.

Third, Defendants assert calculating Class member damages will be a "highly individualized" and "laborious process." Opp. at 39.  This same argument has been repeatedly rejected as a basis to defeat predominance in CEA actions.  *Ploss*, 431 F.Supp.3d at 1017-18 (rejecting argument that "individual damages issues will predominate over common questions"); *Kohen*, 244 F.R.D. at 480 (same); *Cotton*, 2022 WL 485005 at *6 ("the complexity of the damages calculation is not a sufficient bar to certification at this stage in the litigation.").  Moreover, the calculation of damages in this case will be much less "laborious" than each of the previously certified CEA actions because the Class Period here is only 4.5 hours long and involves a single futures contract.  *Compare* Motion at 9, n. 5 (detailing certified classes with longer class periods and more futures contracts).  Fourth, Defendants assert Plaintiff's formula "would identify trading losses as 'damages' even where a trader may have been entirely unharmed." Opp. at 39.  This is false.  There are no uninjured Class members (*see* "C"

---

[32] Defendants repeatedly point to certain May contract trades that did not occur on the CME's Globex platform and thus are not ███████████████, namely block trades and EFP trades.  Opp. at 33-34.  However, Defendants fail to disclose that the CME did indeed produc ██████████

Pirrong Reb., ¶¶504-541.  That this detailed trade information appears in a separate file from the CME is of no consequence.  Moreover, information submitted by Defendants reflects that **less than 6.5%** of all trading in the May contract on April 20 was block trades and EFPs.  ECF 356, Ex. 32 at 15.  In any event, Dr. Pirrong's May contract price artificiality estimates can be applied to block trades and EFPs involving the May contract in the same exact way as such estimates can be applied to May contract trades on Globex.  Pirrong Reb., ¶¶504-541.

above), and to any extent a Class member is shown after trial to not have "net damages," the formula proposed by Plaintiff will ensure that any such Class member will not be entitled to a recovery. The proposed damages formula will not identify or attribute any damages not incurred as a direct result of Defendants' unlawful conduct.

### E. Defendants' "Hedging" and "Offset" Arguments Have Been Unanimously Rejected in Prior Cases

Defendants argue Plaintiff has not properly accounted for Class member trading in financial instruments other than the May contract, *i.e.*, the only instrument in the Class definition. Opp. at 35-36. Defendants assert that the following additional instruments must be considered for the purpose of calculating damages: physical transactions linked to the May contract price, options on the May contract, and WTI futures contracts traded on the ICE futures exchange. Opp. at 35-36. However, Courts in CEA manipulation cases have unanimously granted class certification over hedging and offset objections. *E.g., Ploss,* 431 F. Supp. 3d at 1019 (rejecting argument that inclusion of hedgers prevented certification); *Kohen,* 571 F.3d at 676; *Sumitomo,* 182 F.R.D. at 93(predominance not defeated by inclusion of hedgers in class); *Nat. Gas,* 231 F.R.D. at 183 (same); *National Super Spuds, Inc. v. New York Mercantile Exchange,* 77 F. R. D. 361, 372 n. 12 (S.D.N.Y. 1977) (same).

Defendants cite no CEA manipulation case that has denied certification due to hedging or offset issues. Opp. at 35-36, *passim.* Defendants also fail to cite any substantive law that hedging or offset issues are even appropriate **on the merits** and instead simply assume the Court will later accept (over Plaintiff's objections) Defendants' arguments. *Id.* Given the short 4.5-hour Class Period, it is unlikely many Class members traded extensively in the other instruments identified by Defendants. To any extent hedging or other offsets are later found by the Court to be appropriate, such offsets are capable of being addressed through common class-wide formulas. Pirrong Reb., ¶¶533-541 (physical transactions linked to May contract price), ¶532 (options on the May contract); and ¶¶511-524 (ICE contracts).

### F.  To Any Extent Defendants Raise a "*Comcast*" Argument, It Fails

Defendants suggest Plaintiff's proposed formula for calculating Class member damages (not Plaintiff's price impact evidence) will supposedly identify damages that are "not the result of the wrong."  Opp. at 38-39.  This supposed "*Comcast*" argument fails.  In *Comcast*, the plaintiffs alleged four different theories of liability but only one was accepted by the court as a theory of antitrust impact subject to class-wide proof.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 31-34 (2013).  However, plaintiff's damages expert estimated the extent of the damages premised on the assumption that *all four* liability theories had been established, leaving plaintiff's only damages evidence untethered from their claims.  *Id.*

Unlike the plaintiff in *Comcast*, Plaintiff asserts only **one** theory of liability, and it is the same theory on which Dr. Pirrong' based his price impact analysis and causation opinions.  Pirrong, ¶¶344-388.  That theory of liability is that Defendants acted pursuant to a manipulative and anticompetitive scheme on April 20 for the purpose of artificially depressing prices of the May contract.  *Mish I*, 596 F.Supp.3d at 1086-90 (describing the "alleged scheme").  Defendants do not even assert there is more than one theory of liability.  *Ploss*, 431 F.Supp. 3d at 1018 (rejecting *Comcast* arguments where plaintiff asserted only on theory of liability).  Thus, there is no "*Comcast*" issue.

### G.  Defendants' Misguided "Fundamental Factors" Arguments Are Merits Issues That Raise Questions of Law and Fact Common to All Class Members

Defendants argue at length that fundamental supply and demand factors (and not Defendants) caused the historic price declines in the May contract on April 20.  Opp. at 6-10.  This is a merits question common to all Class members.  Tellingly, Defendants' own expert, Dr. Hendershott, expressly disclaimed ████████████████████████████████████████

████████████████████████████████████ Pirrong Reb., ¶49.[33]  Thus, Defendants

---

[33] Although the Trader Defendants ████████████████████████████████████████
████████████████████ the Trader Defendants rely on Dr. Hendershott to offer numerous opinions

have been forced to rely upon a series of public statements they collected and deem the "consensus explanation for price movements on April 20." Opp. at 8-9. There are several serious problems with Defendants' arguments concerning the fundamentals. As the exhibits Defendants rely upon reflect, these factors were known in the market days, weeks, or even more than a month prior to April 20. *Id. citing* Ex. 4-9. Indeed, Defendants conspicuously fail to identify any material *change* in these factors on April 20 that can begin to explain the historic price decline in May contract prices. Opp. at 6-7, *passim*. What *was* occurring the same time as prices collapsed on April 20 was Defendants' aggressive sales of May contracts constituting more than ███████████████████ ████████████████████████ Motion at 4. Defendants ignore this inconvenient and undisputed fact. Opp., *passim*. After Defendants' manipulative trading ceased on April 20, the price of the May contract bounced all the way back from negative $37.63 at the close of trading on April 20 to positive $10.01 at the close of trading on April 21. Motion at 22. Defendants similarly do not identify any material change or reversal in any fundamental factor that could explain why prices bounced back on April 21. Opp., *passim*.

None of the analyses Defendants point to examined Defendants' trading on April 20, their "highly suspicious" internal communications, or other highly relevant evidence collected in this action. The CFTC, an entity that could have obtained such information, expressly stated on the first page of Interim Report it did "not analyze the propriety of trading by any particular trader or group of traders…this Report does not consider whether forces outside of supply and demand impacted prices…nor does this Report identify the root cause(s) of any price movement of the WTI Contract

---

suggesting their trading was not conspiratorial or manipulative. Dr. Pirrong has refuted these opinions. Pirrong Reb., ¶¶587-606███████████████████████ ███████¶¶480-503███, ████████, ¶¶607-636██████ ████¶¶421-433██████ ████¶¶292-311██████

leading up to, on, or around April 20." Interim Report at 1, n. 4.[34] CFTC Commission Dan Berkowitz issued a statement severely criticizing the Interim Report, including because it failed "to analyze the price effect" of TAS trading and similarly failed "to analyze" the "flash crash" near the close of trading.[35] Defendants similarly rely on a public report to speculate that "strategic" trading by sophisticated short traders could have caused the record price movements on April 20. Opp. at 9. Plaintiff's expert has rebutted this theory. Pirrong Reb., ¶¶199-218, 225. After more than 18 months of discovery, dozens of subpoenas by Defendants, and a complete record of trading from the CME, Defendants have not identified any such "sophisticated short traders." Opp., *passim*.

## VII. <u>Rule 23(b)(3) Superiority</u>: Defendants' Strained Superiority Arguments Fail To Refute a Class Action Is "Superior" To Other Methods of Adjudication

Rule 23(b)(3) requires a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Courts have repeatedly found superiority satisfied in class actions alleging manipulation of commodity futures contracts in violation of the CEA and Sherman Act. Motion at 9, n. 5 (collecting cases). Where—like here—there are numerous overarching common issues of law and fact relating to Defendants' liability "…the superiority requirement likely poses no serious obstacle to class certification." *Compare Messner*, 669 F.3d at 814, n. 5 *with* Section II above (Defendants do not dispute existence of questions of law and fact common to the Class).

### A. The Absence of Additional Lawsuits Supports Superiority and Does Not Defeat It

Defendants assert that because no other Class members have filed a lawsuit against them, there is supposedly "low" Class member "interest" in this action. Opp. at 43. However, the absence of additional lawsuits **supports** superiority, it does not defeat it. Newberg, § 4:70 ("if

---

[34] Although Defendants offer statements by the CFTC and CME in the days following April 20, Defendants fail to mention ███████████████████████████████████████████████████████ Motion

████████████████████████████████████████████████████████████████████

████████████████████████████████ *Id.*

[35] https://www.cftc.gov/PressRoom/SpeechesTestimony/berkovitzstatement112320

individuals have not filed other suits, they appear to have little interest in pursuing individual litigation, and hence, a class action will likely be superior."); *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 593 (N.D. Ill. 2018) (same).[36] Defendants have not cited any case that found a lack of superiority because additional lawsuits were not filed. Opp, *passim*.[37] Defendants offer nothing more than their own speculation about the level of Class member interest in this action. Class members do not need to decide whether to file individual actions until class certification is decided because Plaintiff's complaint tolled the statutes of limitations for all Class members. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 552-53 (1974). Similarly, the decision to "opt out" of the Class is made after certification. Rule 23(c)(2)(B).[38]

### B. Defendants' Own Expert Work Demonstrates A Significant Number of Potential Class Members Have "Negative Value" Claims

Defendants argue Plaintiff's claims and the claims of Class members are "large enough to proceed individually." Opp. at 40. However, the Court previously rejected a similar argument in a CEA class action and found superiority even where one plaintiff had a "multi-million dollar claim." *Compare Kohen*, 244 F.R.D. at 480-81 *with* Opp. at 41 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Defendants nevertheless assert courts have denied certification on superiority grounds where "all or

---

[36] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Valid objections by two non-parties (ECF No. 338) to subpoenas issued by Defendants is not proof of Class member "disinterest" in this action, or a lack of superiority.

[37] The sole case Defendants cite in support of their argument concerning an "idiosyncratic and possibly unique claim" addresses Rule 23(a)(2) typicality, not superiority. Opp. at 43 *citing Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014); *see* III above (Plaintiff's claims are typical).

[38] Prior practice demonstrates Defendants' speculation about Class member interest based on the number of lawsuits filed is misguided. For example, in *Kohen*, four plaintiffs filed CEA class action lawsuits, yet more than 655 persons and entities (class members) submitted proofs of claims seven years after the initial lawsuits were filed. *Kohen*, 05-cv-4681, ECF Nos. 585, 614 (N.D. Ill.).

almost all of the claims are likely to be large enough to justify individual litigation." Opp. at 40.[39]
Defendants cannot satisfy their own standard.

To estimate total damages of ███████████ Defendants' expert first calculated the damages
for each of the ██████ relevant accounts in the CME audit trail data that satisfy the Class definition.
Hendershot Rep., ¶262-263. Defendants then divided the total estimated damages by the ████████
accounts to arrive at a (misleading) "average" claim of █████████████ Opp., 41. However,
Defendants fail to mention that the individual account calculations reveal ████ ██████ ████████
████████████████████ ██ ██████████████████████
Pirrong Reb., ¶656. Thus, Defendants cannot even satisfy their **own standards** for demonstrating a
negative value claim because their **own work** demonstrates ████████████████████████
█████████████████████████████████████████████
███████████████████████ This alone defeats all of Defendants' "large enough
to proceed individually" arguments. In addition to inflating the claim values, Defendants also
underestimate the costs of prosecution. Opp. at 41-42. Claims involving manipulation of
commodity futures contracts are notoriously "complex and difficult" to prosecute. *Sumitomo*, 74
F.Supp.2d 393, 395. This action is far more complicated than the statutory damages cases
Defendants rely upon, which involved claims such as unauthorized credit reports and unpaid
overtime. Opp. at 40-41.[40] Defendants admit this case involves █████████████ but suggest

---

[39] Notably, Defendants' "damages" estimates are based on the same CME audit trail data Defendants claim
cannot be used to calculate damages. Also, even though Defendants say Class member damages cannot be
calculated "formulaically," that is precisely what Defendants' own expert did for purposes of his analysis
estimating Class member damages. Opp. at 41 *citing* Hendershott Rep., Fig. 25 ("Note" describing formula
used to calculate damages).

[40] The three cases on which Defendants rely for their $18,000 threshold for superiority are not applicable to
this complex case: each case involved claims with statutory damages. Opp. at 40-41. In those cases, upon
establishing defendants' violation of the law, no additional proof or work was required to establish impact or
the appropriate amount of damages. The CEA and Sherman Act claims do not provide for statutory
damages and thus require significantly more work.

these high costs are due to class certification efforts. But before any class certification discovery or other class work began in this case, the parties litigated Defendants' multiple Rule 12(b)(6) motions to dismiss and other numerous issues for almost two and a half years, resulting in multiple decisions by the Court and generating approximately 200 docket entries. ECF Nos. 1-200. Moreover, much of the work Defendants cast aside as "class" work would still be necessary in an individual action.[41]

C. **The Narrow Class Definition Does Not Render The Action "Unmanageable"**

Defendants assert the Class definition supposedly renders the action "unmanageable" and inferior to individual litigation because determining Class membership would be "administratively difficult." *Compare* Opp. at 43-45 *with Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015) ("well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns"). Defendants argue (a) the CME audit trail data alone is insufficient to determine Class membership and (b) obtaining information from other admittedly available sources would be "unwieldy and cumbersome." Opp. at 44-45. However, at the certification stage, a plaintiff need not even "prove that there is a reliable and administratively feasible way to identify all who fall within the class definition." *Stampley*, 2015 WL 5675095, at *3. That is, Plaintiff is not even required to make the type of showing that underpins all of Defendants' manageability arguments. Defendants cite no case (CEA or otherwise) that has found an action unmanageable due to class membership identification. Opp., 43-45, *passim*. In fact, the two cases Defendants cite do not even

---

[41] Defendants suggest Plaintiff's lawsuit is "inefficient" because it is "based on an anonymous source quoted in a *Bloomberg* article." Opp. at 42. This is false and ignores all Defendants' internal communications quoted in the Complaint the Court found were "highly suspicious," all the additional allegations of an agreement to manipulate the Court found "eminently plausible," the undisputed trading records reflecting Defendants made in excess of ███████████████████████████████████████████████ as May contract prices collapsed, and the ████████████████ *Mish I*, 596 F.Supp.3d at 1096,

support their arguments.[42] Defendants have also failed to contest the Class is "ascertainable." *See* II above. That is the relevant standard for the Class definition at the class certification stage. *Id.*

Regardless – and although not required at this stage – there are reliable and administratively feasible ways to identify Class members.[43] As Defendants concede (Opp. at 33-45), information sufficient to determine Class membership is obtainable from NYMEX clearing firms and/or FCMs used by Class members to trade May contracts on April 20.[44] Every market participant (including every Class member) was required to have all May contract trades (on and off CME's Globex system) cleared through a registered NYMEX clearing member.[45] During discovery, the CME produced a list of approximately ███████ NYMEX clearing firms that cleared May contract trades on April 16-23, 2020. KD, Ex. 41. In addition, Plaintiff has prepared and served Rule 45 subpoenas on fifty-two clearing firms that seek information sufficient to identify Class members. KD, Ex. 74 (exemplar subpoena sent to one clearing firm). The information sought includes: (1) customer names; (2) open positions (if any) in the May contract at the end of trading on April 17, 2020 (*i.e.*, the last trading day before April 20); and (3) details of May contract trading activity (including price, volume and time of trades) after the close of trading on April 17 through the close of all trading in

---

[42] Opp at 43- 44 *citing Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 254 (N.D. Ill. 2014) (rejecting manageability argument that "it will be either impossible or else costly and onerous to obtain the identities of the subscribers for the phone numbers on the list of 930,000"); *Mullins*, 795 F.3d at 662-633 (refusing to reverse certification even where "the only method for identifying class members proposed by Mullins in the district court was self-identification by affidavit.").

[43] Defendants (and their expert) say the CME audit trail data █████████████████████████████ Opp. at 34, n. 26. What they fail to disclose is that, in addition to the audit trail data, the CME also produced ██████████████████████████████████████████████████████████████████████████ Pirrong ████████████████████ Reb., ¶¶526-531. Thus, the CME has produced detailed records for ███████████████████ ███████████████████

[44] A clearing firm is a company that works directly through an exchange clearing house to execute trades on behalf of customers. The NYMEX publishes a list of clearing firms on its website. *See* https://www.cmegroup.com/clearing/financial-and-regulatory-surveillance/clearing-firms.html.

[45] An FCM is a firm that solicits or accepts orders to buy or sell futures contracts and must be registered with the CFTC. Market participants may enter trades through non-clearing firm FCMs and "clear" trades through a separate NYMEX clearing firm. Thus, non-clearing firm FCMs are an additional source of information for Class membership.

the May contract on April 21. *Id.* The information sought by the subpoenas (alone or combined with CME data) is sufficient to identify Class members and calculate Class member damages. Pirrong Reb., ¶507. Determining Class membership using records from clearing firms, FCMs, the CME and/or Class members themselves would involve a simple, two-step process: (1) determining whether a trader sold at least one May contract between 9:00 a.m. and 1:30 p.m. on April 20 and (2) if so, determining whether such trader sold at least one May contract to liquidate a long position in the May contract during the same period. The foregoing analysis is not difficult, and district courts have certified broader and more complex CEA classes. *E.g.,* Motion at 9, n. 5 *citing Amaranth*, 269 F.R.D. at 386; *see also Kohen*, 244 F.R.D. at 475, 485.

### D. Defendants' Remaining "Superiority" Arguments Fail

Defendants repeatedly assert the "*in terrorem* character" of class actions is a reason not to find superiority. Opp. at 5, 40, 42.[46] This is not a superiority consideration. *Johnson v. Yahoo!, Inc.*, 14-cv-2028, 2016 WL 25711, at *2 (N.D. Ill. Jan. 4, 2016) (Shah, J.) (recognizing financial impact of certification is not a superiority concern); Newberg, § 4:81 ("Rule 23's superiority prong focuses on the forms of adjudication, not their financial consequences."). Indeed, neither case cited by Defendants involved superiority concerns.[47] Moreover, any "*in terrorem*" effects of certification here would be greatly reduced or eliminated because Defendants' allegedly manipulative trades on April 20 resulted in profits of at least ▇▇▇▇▇ Pirrong, ¶¶401-402.

---

[46] Defendants quote *Amchem* as follows: "class actions are only superior when economies of scale can be achieved 'without sacrificing procedural fairness or bringing about other undesirable results.'" Opp. at 42. But this quote has nothing to do with "*in terrorem*" concerns. It relates to "procedural fairness" to *class members* who may wish to pursue their own actions. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997).

[47] The "inflict irreparable harm" language Defendants quote is from *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995), which involved the standard for a writ of mandamus, not any Rule 23(a) or b(3) consideration. *Kohen's* mention of "*in terrorem*" did not relate to superiority but rather a potentially overbroad class definition where plaintiffs had presented a class-wide aggregate damages model defendants argued "wildly overstated" damages. *Kohen*, 571 F.3d at 678.

Next █████████████████████████████████████████████████

████████████████████████ █████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Regardless, after more than four years of litigation, Defendants have never moved to compel

Plaintiff to arbitrate. This is because Plaintiff is not required to arbitrate its claims. If, as, and when

Defendants ever move to compel any Class member to arbitrate, Plaintiff intends to oppose such a

request on numerous grounds.[50]

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████ ███████████

███████████████████████████ Mish. Dep. at 202:15-203:5, 391:18-392:2. Defendants

offer no support for their suggestion that a separate lawsuit against a different party is pertinent to

determining whether this class action against these Defendants is superior to individual actions.[51]

---

[48] Arbitration is not an "adjudication" contemplated by Rule 23(b)(3), it is an extra-judicial dispute resolution device. Newberg, § 4:86.

[49] ████████████████████████████████████████████████████████████
████████████████████████████████████ Unlike civil litigation, NYMEX arbitration provides for very limited discovery and no ability compel witnesses to testify. NYMEX Rulebook, Chapter 6. Assuming Plaintiff could prove his claims in the NYMEX forum, NYMEX does not provide for treble damages or attorneys' fees, unlike Section 1 of the Sherman Act.

[50] The only case Defendants cite in connection with their arbitration assertions is *Kleen*, which found an arbitration defense as to certain class members did **not** defeat superiority. *Kleen Prod. LLC v. Int'l Paper Co.*, 831 F.3d 919, 930 (7th Cir. 2016).

[51] Defendants assert Plaintiff's broker ██████████████████████████████████
██████████████████ Opp. at 13. The CME (located in Chicago) e-mailed the negative price notice ██████ ████████████████████████████████ KD, Ex. 77 at 126:3-1); ECF No. 356, Exs. 48-49. ███████████████████████████████████████████████████ KD, Ex. 77 at 141:11-142:3; 154:5-13); ECF No. 356, Exs. 48-49. █████████████████████████████████████████
███████████████████████████████ ECF No. 356, Ex. 35 at 224:21-225:21).

### VIII. The Vega Defendants' "Likelihood" of Success on The Merits Arguments Are Completely Unsupported and Argue Against The Court's Prior Rulings

Defendants Vega and Spires ("Vega Defendants") submitted a separate "Supplemental Opposition" that asserts arguments characterized as Rule 23(b)(3) superiority issues. Therein, the Vega Defendants contend the Court must supposedly inquire into the merits of Plaintiff's sustained claims against them, including by making findings concerning Plaintiff's "likelihood" of success on the merits, to determine whether a class action is the "superior" method for adjudicating this controversy. S.Opp. at 2-3, 9-18. In addition to being contrary to Supreme Court and Seventh Circuit precedent, the entire basis for the Vega Defendants' supplemental opposition is also contradicted by the Vega Defendants' **own prior admissions to the Court in this case**:

> The class certification decision here will turn, ███████████████████████████ ████████████████████████████████████████████ but, *assuming the merit of those allegations*, on the distinct questions of whether there is commonality among the claims of the members of the putative class, whether there is any methodology for showing injury on a class-wide basis and whether Plaintiff is a suitable representative of the class.

ECF No. 198 at 2 (emphasis in original).[52]

### A. The "Likelihood" of Success on the Merits Is Not A Recognized Rule 23(b)(3) Superiority Consideration and Is Otherwise Irrelevant To Superiority

The law is clear that the strength of the merits is not relevant to the determination of whether a class action is the superior method for adjudicating a controversy. *Payton v. County of Kane,* 308 F.3d 673, 677 (7th Cir. 2002) ("a determination on the propriety of class certification should not turn on [the] likelihood of success on the merits") *Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010) ("likely success on the merits" not an appropriate consideration under Rule 23 even in disfavored securities-fraud cases); *see also* Rule 23 Advisory Committee Notes ("…an evaluation of

---

[52] Notably, the Trader Defendants do not raise any similar merits-based superiority arguments and elected not to join the Vega Defendants' supplemental opposition. Opp., *passim*; S.Opp., *passim*.

the probable outcome on the merits is not properly part of the certification decision.").  Indeed,

none of the "matters pertinent" to superiority have anything to do with the merits.  Rule 23(b)(3).

The Vega Defendants acknowledge Supreme Court precedent precludes merits inquiries on

Rule 23 motions unless such an inquiry is relevant to determining whether a Rule 23 prerequisite has

been satisfied.  S.Opp. at 10 *citing Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466

(2013).  Thus, they have struggled to demonstrate the merits overlap with Rule 23(b)(3) superiority.

Specifically, Vega Defendants repeatedly argue the "imposition of potentially **ruinous liability** and

the great **likelihood that Plaintiff's claim lacks legal** merit are **the two most important factors**

demonstrating the superiority of permitting this action by Plaintiff to proceed as an individual

action."  S.Opp. at 1-2, 18, *passim* (emphasis supplied).  "Ruinous liability" is mentioned a dozen

times in the S.Opp. but has nothing to do with superiority.  It concerns the standards for permissive

Rule 23(f) interlocutory review.[53]  "Lack legal merit" is mentioned nine times in the S.Opp., but that

was a standard applied in the context of a decision involving a writ of mandamus that had nothing

to do with superiority.  *Rhone*, 51 F.3d at 1299.  Moreover, the "lack legal merit" examination in

*Rhone* occurred in the context of a record with **thirteen** completed jury trials.  Here, the Vega

Defendants are requesting the Court weigh the merits before discovery has even closed, and long

before any finder of fact has had an opportunity to issue determinations based on a full evidentiary

record.  The Vega Defendants do not cite **a single case** that weighed the strength of claims in

---

[53] The phrase "ruinous liability" is from the Third Circuit *Newton* case, which concerned the standards for permissive Rule 23(f) interlocutory review of a district court class certification order.  S.Opp. at 6 *citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 163 (3d Cir. 2001).  In determining permissive review is warranted, circuit courts often consider whether certification imposes undue settlement pressure on the defendants.  *E.g.*, S.Opp. at 6 *citing Microsoft Corp. v. Baker*, 582 U.S. 23, 29 (2017) (discussing Rule 23(f) review).  The 1998 Advisory Committee Note the Vega Defendants quote concerning "potentially ruinous liability" also concerns Rule 23(f), not Rule 23(b)(3), as the omitted sentence immediately following the quoted passage confirms: "[t]hese concerns can be met at low cost by establishing in the court of appeals a discretionary power to grant interlocutory review in cases that show appeal-worthy certification issues."  S.Opp. at 6, n. 1.

54

connection with a superiority analysis. S.Opp., *passim*. In sum, the Vega Defendants have no support for their invitation to the Court to conduct a prohibited "dress rehearsal for the trial on the merits." *Messner*, 699 F.3d at 811.[54]

### B. The Multiple Sustained Claims Against The Vega Defendants Are Strong

The Court has already held Plaintiff "plausibly" stated Sherman Act, CEA, and unjust enrichment claims against the Vega Defendants. *Mish Int'l Monetary Inc. v. Vega Cap. London, Ltd.*, 648 F. Supp. 3d 980, 996 (N.D. Ill. 2022) ("*Mish II*"). However, the Vega Defendants seek to relitigate the Court's decision denying their motion to dismiss. S.Opp. at 11-18.

First, the Vega Defendants previously raised their "negligence" versus "intentional" conduct arguments, S.Opp. at 16-17, they were already rejected by the Court. ECF No. 148 at 1-2, 9-10, 14-16. The Court held Plaintiff plausibly stated multiple claims against the Vega Defendants with intent elements. *Mish II*, 648 F.Supp.3d at 991-996. Second, the Vega Defendants assert the price of the May contract on April 20 was supposedly not "artificial" is belied by the record evidence in this case.[55] Plaintiff identified numerous well-accepted indicia of artificial prices such as Defendants' uneconomic conduct, Defendants' aggressive sales, and the record bounce back in May contract prices the very next trading day after Defendants' manipulative trading had been removed from the market. Motion at 22-23.[56] None of the different supply and demand factors identified by the

---

[54] The Vega Defendants cite no evidence for their baseless contention Plaintiff is supposedly seeking certification to impose "undue settlement pressure" on the Vega Defendants. S.Opp., 10, *passim*.

[55] Contrary to the Vega Defendants, there is no legal support for their suggestion that conduct or statements by non-party "large oil firms" are relevant to the issue of whether the May contract price was artificial. Supp. Opp., *passim*. Such statements and conduct are not relevant to the test for an artificial price. *Mish I*, 596 F.Supp.3d at 1095-96. To any extent statements by market participants are relevant, Plaintiff's Motion identified a statement by ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ Defendants did not respond to this statement.

[56] Dr. Pirrong did not merely "assume" the existence of artificial prices. S.Opp. at 15. His opinion that May contract prices were not reflective of supply and demand is based on well-accepted economic theories and a robust analysis of the record evidence. Pirrong, Sections IX, X, XI. Moreover, the Vega Defendants ignore all the well-accepted indicia of artificial prices Plaintiff identified in its moving papers. Motion at 22-23.

"large oil companies" the Vega Defendants rely upon can explain the record price *changes* on April 20 because none of these factors *changed* in any material way during the record price movements on April 20. Pirrong Reb., ¶¶16-30, 46-49, 194-198. What *was* happening as May contract prices collapsed was Defendants' aggressive selling of May contracts. *Mish I*, 596 F.Supp. at 1096.

Third, 

S.Opp. at 11-12. The Court does not need to determine the intent behind

to evaluate any Rule 23 prerequisite, including superiority. Moreover,

ECF No. 174-1 (submitting letter); *Mish II*, 648 F.Supp.3d at 991-992; *see* Complaint, ¶¶264, 296-298.

Fourth, the Vega Defendants assert the Court should not

S.Opp. at 17-18. The Court already held Plaintiff has plausibly alleged the Vega Defendants "conspired with the Trading Defendants." *Mish II*, 648 F.Supp.3d at 992. Courts have indeed

in Section 1 Sherman Act cases who had not

including at the class certification stage. Motion at 8 *citing Morrow v. City of Tenaha*, 277 F.R.D. 172, 186-87 (E.D. Tex. 2011) (rejecting argument by certain defendants it would be prejudicial to draw

---

Instead, the Vega Defendants suggest May contract prices could not have been artificial because "large multinational conglomerates" did not step in and buy May contracts. S.Opp. at 12. The Vega Defendants cite no legal or economic support for their "arbitrage" theory. *Id.*, *passim*. In any event, market participants did buy May contracts at negative prices and the price of the May contract rebounded to $10.01 the next day. Motion at 6.

[57] The Vega Traders incorrectly state
S.Opp. at 17                                                                    Motion at 6-8.

█████████ against all defendants because only two defendants █████████

█████████ where it was alleged all defendants acted in concert).

### C.  The Vega Defendants' Remaining Superiority Arguments Fail

The Vega Defendants raise three additional superiority arguments.  S.Opp. at 18-19.  First, they assert "the stakes are large enough" for Class members to bring individual actions.  *Id.* at 18. This is a repeat of a misleading argument in Defendants' joint opposition that is refuted by Defendants' own expert's work.  *See* VII.B. above.  Second, the Vega Defendants argue "a worldwide unjust enrichment claim raises the problem of attempting to apply many different state laws."  S.Opp. at 19.  However, Plaintiff's unjust enrichment claim is evaluated under Illinois law (ECF No. 71 at 41, n. 17) and courts have certified unjust enrichment claims in cases alleging manipulation.  *E.g., Ploss*, 431. F.Supp.3d at 1014.  Third, the Vega Defendants argue "defenses unique to Plaintiff cuts against a finding of superiority."  S.Opp. at 18.  But they do not identify any "unique defenses," and the joint opposition brief identifies only one relating to proximate causation. *See* IV above (addressing adequacy).  The Vega Defendants do not explain how a proximate causation defense would operate to make individual actions superior to this class action.  It would not.[58]

**IX.** █████████████████████████**: The Court May Properly**████████
**From the Repeated Assertions of** ████████████████



Plaintiff demonstrated the Court may ███████████████ in determining whether the

Rule 23 prerequisites have been met because of the Trader Defendants'██████████████

████████████████████ Motion at 6-8.  Plaintiff cited numerous district court

---

[58] The Vega Defendants' reliance on *Siegel v. Shell Oil Co.* for its "unique defense" superiority argument is misplaced.  Opp. at 18-19.  Unlike the claims and conduct at issue in *Siegel*, the Defendants' conduct here is standardized, and no individual inquiries are required to determine Defendants' liability under the claims at issue here.  Thus, the "plaintiff-specific issues" in *Siegel* (*i.e.*, inquiries into how each class member reacted to the defendants' conduct) are not present here.

decisions that have ██████████████ in connection with Rule 23 class motions, including with respect to typicality and predominance. *Id.* 7-8. Defendants do not confront any of these cases.[59] Opp., *passim*; S.Opp., *passim*. Defendants instead concoct two strawman arguments. Opp. at 22-23. First, Defendants assert Plaintiff "cannot sustain its [Rule 23] burden" by relying on ██████████████ *Id.* at 22-23. However, Plaintiff never made such an assertion (Motion, *passim*), nor has Plaintiff relied on the Trader Defendants' ██████████████ as a standalone basis for any Rule 23 prerequisite. Motion, *passim* (making showings as to each Rule 23 prerequisite).

Second, the Trader Defendants assert the ██████████████████████████ is supposedly not "relevant" to the contested issues of typicality, adequacy, or predominance. Opp. at 22-23. However, the cases cited by Plaintiff (which Defendants failed to address) did not require any such a showing. Motion at 8 (citing cases). Regardless, Defendants are incorrect. Typicality focuses on the Defendants' conduct (*see* III above) and the Trader Defendants ██████████████ ████████████████████████████████ ██████ *Id.* at 7. Defendants have asserted a supposed "proximate cause" against Plaintiff as the basis for their adequacy arguments and have raised "CEA injury" and "antitrust impact" arguments in opposition to Rule 23(b)(3) predominance. However, the Trader Defendants have ██████ ████████████████████████████████ ████████████████████████████ Motion at 7. The Court may properly ██████████████ from the repeated ██████████████ ██████████ as an additional basis to find the contested Rule 23 requirements are satisfied.

## CONCLUSION

The Court should grant Plaintiff's Motion to certify the Class.

Dated: September 24, 2024

---

[59] Each ██████████ case cited by Defendants is an individual action that addresses ██████████████ at the summary judgment stage, not class certification. Opp. at 22-23.

Respectfully submitted,

*/s/ Christopher M. McGrath*
Christopher Lovell
Christopher M. McGrath
Benjamin Jaccarino
Travis H. Carter
**LOVELL STEWART HALEBIAN
JACOBSON LLP**
500 5th Avenue, Suite 2440
New York, New York 10110
Telephone: (212) 608-1900
Facsimile: (212) 719-4677

Marvin A. Miller
Andy Szot
**MILLER LAW LLC**
53 W. Jackson Boulevard, Suite 1320
Chicago, Illinois 60604
Telephone: (312) 332-3400

*Counsel for Plaintiff and Proposed Class Counsel*